UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 41-45 PROPERTY OWNER, LLC,<br><br>    Plaintiff and Counter-Defendant,<br><br>-against-<br><br>CDM1, LLC,<br><br>    Defendant and Counter-Plaintiff<br><br>and<br><br>ARTURO R. MORENO, and CAROLE D. MORENO,<br><br>    Defendants. | Case No. 1:22-cv-08634<br><br>**ANSWER AND COUNTERCLAIM** |

Defendant and Counter-Plaintiff CDM1, LLC and Defendants Arturo R. Moreno and Carole D. Moreno, by their attorneys, for their Answer and Additional Defenses to Plaintiff and Counter-Defendant 41-45 Property Owner, LLC's Summons with Notice for Breach of Contract, Breach of the Implied Covenant of Good Faith and Faith Dealing, and Tortious Interference, and for CDM1's Counterclaim against Plaintiff and Counter-Defendant, state as follows:

## ANSWER

Defendants deny the allegations of Plaintiff's Summons with Notice.

## ADDITIONAL DEFENSES

### FIRST ADDITIONAL DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

**SECOND ADDITIONAL DEFENSE**

Plaintiff's claims under the Option Agreement are barred or reduced by setoff because Plaintiff failed to fully perform under the Option Agreement.

**THIRD ADDITIONAL DEFENSE**

Any failure of performance by CDM1 was the consequence of Plaintiff's actions.

**FOURTH ADDITIONAL DEFENSE**

Plaintiff's claims are barred by the doctrine of unclean hands.

## COUNTERCLAIM OF CDM1, LLC AGAINST 41-45 PROPERTY OWNER, LLC

**NATURE OF THE CASE**

1. CDM1 brings this counterclaim to recover $8.5 million for breach of the Option Agreement it entered into with 41-45 Property Owner ("Owner") for the purchase of apartment PH-58 at 520 Park Avenue, New York, New York (the "Option Payment"). A true and accurate copy of the Option Agreement is attached as Exhibit 1.

2. The deal never closed because Owner failed to comply with specifically-negotiated pre-closing obligations. Rather than perform those obligations, Owner sent CDM1 a notice of default for refusing to close and cancelled the Option Agreement.

3. Owner's failure to perform its pre-closing obligations before the scheduled closing date was a breach of contract. Owner's decision not to postpone the closing while it cured that breach, and to instead declare an event of default and cancel the contract without satisfying its pre-closing obligations, constitutes a repudiation of the contract. That breach and repudiation entitle CDM1 to a full refund of its Option Payment, any interest accrued on that payment, and New York statutory pre-judgment interest.

4. Apartment PH-58 is immediately adjacent to a large mechanical equipment room designed to hold a massive, two-story fire suppression tank and pump system (the "Tank and Pump System"). CDM1 was concerned that being next to such large equipment would disrupt quiet

enjoyment of the apartment, and was interested in purchasing the unit only if it could be assured that whatever was installed in the equipment room would not be disruptive.

5. To induce CDM1 to purchase the apartment, Owner agreed to add a clause to CDM1's Option Agreement. Under the Option Agreement, Owner agreed that, *prior to closing*, Owner would take "all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of" the Tank and Pump System would "not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance." (Option Agreement § 17.3.)

6. Despite its clear obligation under Section 17.3 of the Option Agreement, Owner never did *anything* to test, to verify, or to ensure CDM1 concerning the Tank and Pump System before it sought to schedule a closing.

7. CDM1 objected to closing without the assurance to which it was entitled under Section 17.3 of the Option Agreement. In response, Owner provided a report (the "SM&W Report") that is plainly insufficient to satisfy Section 17.3.

8. The SM&W Report is dated January 7, 2019, three days *after* the scheduled closing date of January 4, 2019 to which CDM1 objected, demonstrating that the report was a hasty attempt by Owner to paper over the breach of its pre-closing obligations in order to schedule a new closing as soon as possible.

9. Moreover, the SM&W Report does not satisfy Section 17.3, most notably because it offers the results of only one sound test performed *while the Tank and Pump System was not operating*. Thus, the test provides no assurance that quiet enjoyment will remain unimpaired during "mechanical functioning" of the system, as required by Section 17.3.

10. CDM1 retained engineers, at its own expense, to assess potential noise and sound from the Tank and Pump System. CDM1 provided its engineers with a copy of the Condominium Offering Plan for 520 Park Avenue (the "Plan"), which sets forth Owner's entire offer to sell units in 520 Park, including Unit PH-58, and discloses all material information about the sale offering. CDM1's engineers reviewed the limited information in the Plan about the Tank and Pump System and explained that systems of the sort described can include equipment that cycles on and off as part of its routine operation, presenting a real risk of disturbance. The engineers could not determine whether the Tank and Pump System would make noise, or how often or how much noise, without access to the equipment room for an inspection or at least a detailed technical description of the equipment in the room.

11. CDM1 informed Owner that the SM&W Report was insufficient, provided the explanation from CDM1's own engineers, and requested information CDM1 needed to obtain assurance at its own expense.

12. In response, Owner:

   a) refused to provide CDM1 with a technical description of the Tank and Pump System;

   b) refused to permit an inspection by CDM1's engineers;

   c) failed to provide any information concerning noise levels in PH-58 when the Tank and Pump System was operating; and

   d) failed to provide a report from anyone with technical understanding of the Tank and Pump System, to verify that it would not make noise except in an emergency or for maintenance.

13. CDM1 notified Owner that because Owner failed to meet its pre-closing obligation to "test, verify and specifically ensure Purchaser" as required under Section 17.3 of the Option Agreement, CDM1 would not attend the scheduled closing. As a result of Owner's failure to comply with its pre-closing obligation, CDM1 did not attend the scheduled closing.

14. Rather than acknowledge or cure its breach of Section 17.3, Owner sent CDM1 a default notice declaring that the Option Agreement was terminated without any further action by Owner or CDM1. Owner's decision to terminate in lieu of satisfying Section 17.3 was a repudiation of the contract, as a result of which CDM1 is entitled to a return of the Option Payment, any interest accrued on that payment, and New York statutory pre-judgment interest.

## PARTIES, JURISDICTION, AND VENUE

15. Counter-Plaintiff CDM1, LLC is a Delaware Limited Liability Company that has its principal place of business in Phoenix, Arizona at 4455 E. Camelback Road, Suite D145, Phoenix, Arizona, 85018. All of its members are domiciled in Arizona.

16. Counter-Defendant 41-45 Property Owner, LLC is a Delaware Limited Liability Company that has its principal place of business in New York at 445 Park Avenue, Suite 1902, New York, New York 10022 and whose members, on information and belief as represented by Owner's counsel, are domiciled in New York.

17. The subject property, Unit PH-58 of the 520 Park Avenue Condominium ("Unit PH-58"), is located at 520 Park Avenue, New York, New York, 10022.

18. This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a). The citizenship of the parties is diverse and the value of the Option Payment exceeds $75,000 exclusive of interest and costs.

19. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this Counterclaim occurred in this District—specifically the subject property is located in this County.

20. Pursuant to the Option Agreement, New York law applies.

## STATEMENT OF FACTS

21.     In 2017, CDM1 was shown Unit PH-58 at 520 Park Avenue. 520 Park Avenue is a skyscraper located on East 60th Street near Park Avenue on the Upper East Side of Manhattan, New York City. The building was completed in 2018, but it was still under construction when CDM1 viewed the apartment in 2017.

22.     In or around August 2017, during an early visit to 520 Park Avenue, CDM1 expressed concern that there was a large mechanical room immediately adjacent to the unit on the same floor. CDM1 specifically raised concern that equipment in the mechanical room—the Tank and Pump System—might make noise that was audible in Unit PH-58.

23.     In order to induce CDM1's purchase, Owner's agent agreed that, prior to closing, Owner would take "all reasonable measures to test, verify, and specifically ensure Purchaser" that the equipment room would not impair CDM1's quiet enjoyment of the unit. That agreement was fundamental to the parties' contract. Without that agreement, CDM1 would not have entered into the Option Agreement.

24.     In October 2017, CDM1 entered into an Option Agreement with Owner to purchase Unit PH-58.[1]

25.     The Option Agreement provides a total purchase price for Unit PH-58 of $34 million, payable in two installments: $8,500,000 (i.e. 25%) due upon signing of the Option Agreement, and $25,500,000 (i.e. 75%) payable on the delivery of the deed.

26.     The Option Agreement memorialized the parties' agreement concerning the equipment room with a provision, drafted specifically to address CDM1's concerns and inserted into the Option Agreement in bold typeface, as follows:

---

[1] The Option Agreement is dated August 18, 2017, but it was entered into by CDM1 and Owner on October 6, 2017.

> **17.3 Prior to the date of Closing of Title to the Unit, Owner will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.**

(Ex. 1, § 17.3, emphasis in original.)

27. Section 17.3 was a material provision of the Option Agreement. Its fundamentality is evidenced by the fact that it is the only bolded provision in the 38-page Option Agreement.

28. The Option Agreement also sets forth several other rights and obligations, including:

   a) Owner agreed to "execute, acknowledge and deliver to Purchaser such instruments, and take such other actions . . . as Purchaser may reasonably request in order to effectuate the provisions of this Agreement." (Ex. 1, § 28.)

   b) Owner agreed that Purchaser had the right "to insist upon the strict performance by the other party of any and all provisions of this Agreement to be performed by such party." (Ex. 1, § 32.)

   c) Owner agreed that "[i]n the event [Owner] cannot convey title to the Unit to Purchaser by reason other than the Purchaser's default, the Premium Payment shall be returned to the Purchaser." (Ex. 1, § 5.)

29. CDM1 made the initial payment of $8,500,000 pursuant to the terms of the Option Agreement, made payable to the direct order of "Star Associates LLP, as Escrow Agent." On information and belief, the funds paid by CDM1 remain in the custody of Star Associates LLP, as escrow agent.

30. Owner sought to schedule the closing approximately one year after entering into the Option Agreement. Owner provided a notice on October 24, 2018 seeking to schedule the closing date for November 27, 2018. CDM1 asked to reschedule in light of the holidays, and Owner ultimately agreed to adjourn until just after the holidays, on January 4, 2019.

31. As the scheduled closing date of January 4, 2019 approached, it became clear that

Owner had no intention of complying with its obligations under Section 17.3. Throughout the nearly fifteen months from the signing of the Option Agreement up to the scheduled closing date on January 4, 2019, Owner had not done anything to test, verify, or ensure CDM1 concerning the Tank and Pump System in satisfaction of Section 17.3.

32. Approximately two weeks before the scheduled closing date, on December 27, 2019, CDM1's counsel sent Owner's counsel a note expressing CDM1's frustration with Owner and highlighting Owner's failure to provide any assurances with respect to the Tank and Pump system as required under Section 17.3. CDM1 made clear that it remained ready, willing, and able to close if Owner complied with its obligations.

33. In a December 31 email, Owner disregarded its failure to comply with Section 17.3 and did not provide any further information or assurances in satisfaction of its obligations under Section 17.3.

34. The day before the scheduled closing date of January 4, 2019, CDM1's counsel sent Owner's counsel another written notice informing Owner that CDM1 intended to enforce its contractual rights under Section 17.3, demanding to know what steps Owner had taken to comply with its obligations thereunder, and making clear that it would not attend the closing in light of Owner's failure to satisfy its pre-closing obligations.

35. Owner agreed to reschedule the closing, which was ultimately set for February 8, 2019. In the interim, Owner sought to paper over its failure to comply with Section 17.3.

36. Owner provided CDM1 a report from Owner's sound consultant Shen, Milsom and Wilke, LLC—the SM&W Report. The SM&W Report is dated January 7, 2019, which is three days *after* the previously scheduled closing date. The SM&W Report from Owner's counsel is attached as Exhibit 2. On information and belief, Owner took no steps to comply with its pre-

closing obligations under Section 17.3 before the scheduled closing date of January 4, 2019.

37. The SM&W Report, which purports to summarize "the recently-measured sound levels within the 58th floor apartment at 520 Park," is manifestly insufficient to satisfy Owner's obligation under Section 17.3 and as such does not cure Owner's breach. The SM&W Report does not satisfy Section 17.3, most notably because it offers the results of only one sound test performed *while the Tank and Pump System was not operating*. Thus, the test provides no assurance that quiet enjoyment will remain unimpaired during "mechanical functioning" of the system, as required by Section 17.3.

38. Nor does the SM&W Report "specifically ensure Purchaser that the . . . system does not create any sound or noise that will impair Purchaser's quiet enjoyment," and that the Tank and Pump System will only create sound during emergencies. (Ex. 1, § 17.3.) The Report states: "It should also be noted that there was no noise coming from the pump room adjacent to the bedroom, since the pumps in this room are activated only during emergencies." (Ex. 2 at page 1.) But there is no indication that the author of the SM&W Report had any basis to state that "the pumps in this room are activated only during emergencies."

39. As CDM1 made clear to Owner, the SM&W Report did not provide CDM1 with any assurances that there will be no noise from the pumps except in emergencies and failed to provide any testing to verify it.

40. It is not just that Owner failed to take "all *reasonable* measures to . . . specifically ensure Purchaser" of the system's noise; Owner failed to provide CDM1 with *any* assurances. (Ex. 1, § 17.3, emphasis added.)

41. The SM&W Report is useless because it assumes the very thing that it is supposed to verify—that there will be no noise from the pumps except in emergencies—while failing to

-9-

provide any support for that assumption or any testing to verify it.

42. CDM1 hired its own expert engineering consultants, Form Space Image Architecture PC ("FSI"), to assess potential sound and noise from the Tank and Pump System. (FSI Reports, attached as Exhibits 3 and 4.)

43. The First FSI Report explains that the SM&W Report is insufficient, most obviously because "the [SM&W] report does not address noise or vibrations caused by the pumps in operation as no testing while in operation was performed." The FSI Report advised that "acoustical testing should consist of Base line readings with Pumps in operation and not in operation, and from within the pump room and the adjacent space at [Unit PH-58]." (Ex. 3.)

44. The First FSI Report also requested that "a clear description of the installed equipment should be provided" to allow CDM1 to assess "[whether] the tanks maintain pressure [with] Jockey pumps that turn on and off periodically" and "[h]ow and when [] the equipment [will] be exercised." *Id.* The FSI Report concluded that "[a]ll of these conditions must be defined and tested acoustically to determine how the Tank and Pump unit will perform and to determine if quiet enjoyment can actually be achieved as required by article 17.3." *Id.*

45. FSI also confirmed that CDM1 was right to be concerned about potential noise from the Tank and Pump System. The only information about the Tank and Pump Systems available from the building's Plan documentation is a general description of a Fire Suppression Tank and Fire Pump that indicates there will be accessory pumps in the building's Fire Protection System. Accessory pumps could run intermittently to satisfy pressure requirements in the system, and the cycling of pumps on and off could occur at almost any time depending on the design and operation of the system. The Second FSI Report advised that it was impossible to tell from the Plan and supporting documents what specific machinery comprises the Tank and Pump System, so further

information was necessary to verify one way or the other. (Ex. 4.)

46. CDM1 provided the First FSI report to counsel for Owner to explain why the SM&W Report was insufficient and to identify the additional information and testing necessary to satisfy Section 17.3. (*See* Ex. 1, § 17.3 ("[Owner] will . . . specifically ensure Purchaser that the mechanical functioning of said Tank and Pump System does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit . . . .") and § 28 (Owner must "deliver to Purchaser such instruments, and take such other actions . . . as Purchaser may reasonably request in order to effectuate the provisions of this Agreement.").)

47. Even after receiving the First FSI report, Owner still

    a) refused to provide CDM1 with a technical description of the Tank and Pump System;

    b) refused to permit an inspection by CDM1's engineers;

    c) failed to provide any information concerning noise levels in Unit PH-58 when the Tank and Pump System was operating; and

    d) failed to provide a report from anyone with technical understanding of the Tank and Pump System to verify that it would not make noise except in an emergency or for maintenance.

48. CDM1 informed Owner that it would not close before Owner fulfilled its obligations under Section 17.3.

49. On February 11, 2019, Owner sent CDM1 a default notice (the "Default Notice"), for failure to close title on Unit PH-58 as scheduled on February 8, 2019. The Default Notice states that, in the event CDM1 "fails to cure the Default by closing title" before March 15, 2019, "the Option Agreement shall be deemed *cancelled without further notice*" (emphasis added) and asserts a right to retain the initial $8.5 million payment.

50. On February 26, 2019, CDM1 communicated to Owner that CDM1 was not in default because Owner had failed to satisfy its pre-closing obligations per § 17.3 of the Option

Agreement, and thus CDM1 did not yet have any obligation to close.

51. In a March 1, 2019, Owner reiterated its position that CDM1 had defaulted for failing to close on Unit PH-58 and that the Option Agreement was cancelled.

52. On April 19, 2022, Owner sold PH-58. On information and belief, Owner was paid around $32.5 million for PH-58.

## COUNTERCLAIM 1
### (BREACH OF CONTRACT)

53. CDM1 realleges and incorporates by reference Paragraphs 1 through 52 of this Counterclaim.

54. The Option Agreement was a valid and binding contract between CDM1 and Owner.

55. Owner breached the Option Agreement, including a breach of its material pre-closing obligations set forth in Section 17.3 of the Option Agreement.

56. The plain text of Section 17.3 obligates Owner to take all reasonable measures to ensure CDM1 that it has tested and verified that the "Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use" of PH-58 *prior to the date of Closing*. (Ex. 1, § 17.3.) Yet Owner failed to test the noise that the Tank and Pump System make; Owner only conducted a sound test while the Tank and Pump System was not operating.

57. CDM1 made express requests for assurance, which it was entitled to under Sections 17.3 and 28, which Owner ignored. Section 32 provides CDM1 with the right "to insist upon the strict performance by the other party of any and all provisions of this Agreement to be performed by such party." (Ex. 1, § 32.) Nevertheless, Owner failed to perform this obligation prior to or after the scheduled closing date. In doing so, Owner breached a material provision of the Option Agreement.

58. Notwithstanding Owner's failure to comply with its own pre-closing obligations, Owner declared an Event of Default by CDM1 for failure to attend the scheduled closing on February 4, 2019. In the Default Notice, Owner further declared that the Option Agreement was terminated (absent cure) without further notice.

59. The Default Notice constitutes a repudiation of the Option Agreement by Owner.

60. Because Owner elected to repudiate the Option Agreement instead of curing its breach of Section 17.3, CDM1 is entitled to return of its Option Payment, together with interest accrued on the payment, and New York statutory prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff CDM1, LLC requests that judgment be entered in its favor against Counter-Defendant 41-45 Property Owner, LLC:

    a)    Awarding CDM1 $8,500,000 in damages, plus any interested accrued, New York statutory prejudgment interest, attorneys' fees, and costs; and

    b)    Granting CDM1 such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated: New York, New York<br>October 11, 2022 | ARENTFOX SCHIFF LLP<br><br>By: */s/ Brittany H. Sokoloff*<br>    Brittany H. Sokoloff<br>    brittany.sokoloff@afslaw.com<br>    1301 Avenue of the Americas<br>    42nd Floor<br>    New York, NY  10019<br>    Telephone:  212.745.9555<br>    Facsimile:  212.484.3990<br><br>    Frederick J. Sperling<br>    Adam Diederich<br>    Arent Fox Schiff LLP<br>    233 South Wacker Drive<br>    Suite 7100<br>    Chicago, IL 60606<br>    frederick.sperling@afslaw.com<br>    adam.diederich@afslaw.com<br>    *To Be Admitted Pro Hac Vice*<br><br>    *Attorneys for Defendants CDM1, LLC, Arturo R. Moreno, and Carole D. Moreno* |

NY:55006351.7