UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
41-45 PROPERTY OWNER, LLC,

        Plaintiff

 -against-

CDM1, LLC,

        Defendant.
------------------------------------------------------------------ X

Case No. 1:22-cv-08634

**COMPLAINT**

Plaintiff 41-45 Property Owner, LLC (the "Sponsor" or "Plaintiff"), by and through its attorneys, Herrick, Feinstein LLP, as and for its Complaint against Defendant CDM1, LLC (the "Purchaser" or "Defendant"), alleges as follows:

## NATURE OF ACTION

1. This is an action for money damages incurred by Plaintiff as a result of Defendant's deliberate and bad faith breach of its agreement to purchase a condominium unit from Plaintiff.

2. Under the terms of the Parties' agreement, Defendant was obligated to close title and provide complete payment upon Plaintiff's satisfaction of certain terms of sale.

3. Rather than fulfilling its contractual obligations, Defendant deliberately breached the implied covenant of good faith and fair dealing by unilaterally and arbitrarily imposing additional terms, criteria, and requirements on Plaintiff's performance in an effort to manufacture a breach by Plaintiff that would serve as Defendant's pretext to terminate the Parties' agreement.

4. Plaintiff suffered significant financial harm as a result of Defendant's failure to act in good faith and failure to close title to the unit. Pursuant to the Parties' agreement, Plaintiff is entitled to retain Defendant's contract deposit and to reimbursement of its attorneys' fees and

1

all costs incurred to enforce its its contractual rights. Plaintiff is also entitled to compensation for its out-of-pocket damages caused by Defendant's breach of the implied covenant of good faith and fair dealing.

## PARTIES

5. Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware, authorized to do business in New York, with a principal place of business located at 445 Park Avenue, Suite 1902, New York, New York 10022. All of Plaintiff's members are domiciled in New York.

6. Upon information and belief, Defendant CDM1, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business in Phoenix, Arizona at 4455 E. Camelback Road, Suite D145, Phoenix, Arizona 85018. Upon information and belief, all of Defendant's members are domiciled in Arizona.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a dispute between citizens of different States. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

8. The Court has personal jurisdiction over Defendant pursuant to the Notice of Removal filed by Defendant on October 11, 2022.[1] (Dkt. 1.)

---

[1] Plaintiff commenced an action against Defendant by filing a Summons with Notice with the Supreme Court of New York, County of New York on June 27, 2022 (the "State Action"). The State Action is entitled *41-45 Property Owner, LLC v. CDM1, LLC, Arturo R. Moreno, and Carole D. Moreno* and bears Index No. 656970/2011. On October 11, 2022, Defendant filed a Notice of Removal seeking removal of the State Action to the District Court for the Southern District of New York based on diversity jurisdiction. (Dkt. 1.)

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this District and the subject real property is located in this District.

10.     Pursuant to the written agreement between the Parties, New York law applies.

## FACTUAL BACKGROUND

**520 Park Avenue**

11.     Plaintiff is the Sponsor of a new construction luxury condominium project known as 520 Park Avenue Condominium located at 520 Park Avenue, New York, New York 10018 ("520 Park Avenue").

12.     520 Park Avenue consists of 35 residential units that were offered for sale to the public, along with suite units, storage units, and wine storage, through an offering plan that was accepted by the New York State Department of Law on September 16, 2014 (the "Offering Plan"). A true and correct copy of the Offering Plan is attached hereto as Exhibit A.

13.     520 Park Avenue is an ultra-luxury residential skyscraper which is currently the tallest building on Manhattan's Upper East Side. Thoughtfully designed by world renowned Architect Robert A.M. Stern, 520 Park Avenue offers floor-through apartments and 15,000 square feet of world class amenities, including a fitness center and an indoor swimming pool.



14.     520 Park Avenue's sales launched in the spring of 2017, at a time when NYC luxury real estate was setting record high prices. By early summer, two of 520 Park Avenue's duplex units were in contract for over $60,000,000 each.

**Defendant's Agreement to Purchase PH-58**

15.     On or around October 6, 2017, Sponsor and Purchaser entered into an agreement for the purchase and sale of 520 Park Avenue's unit PH-58 (the "Option Agreement"). A true and correct copy of the Option Agreement dated October 6, 2017 is attached hereto as Exhibit B.

16.     Purchaser is a limited liability company that was used to privately purchase 520 Park Avenue's unit PH-58 ("PH-58")[2] for billionaire Arturo R. Moreno ("Moreno") and his wife Carole D. Moreno.

17.     Moreno, a self-made billionaire with significant real estate, business, and contract experience, was represented by counsel during the negotiation of the Option Agreement.

18.     Purchaser agreed to pay the sum of $34 million for PH-58, with a deposit in the amount of $8,500,000 due upon the execution of the agreement (the "Premium Payment").

19.     In the Option Agreement, Purchaser acknowledged it had received and read a copy of the Offering Plan and further agreed that:

> The [Offering] Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the [Offering] Plan, the provisions of the [Offering] Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the [Offering] Plan (including, without limitation, the Declaration, By-laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the [Offering] Plan duly filed by Sponsor.

20.     Before the Parties entered into the Option Agreement, they negotiated modifications that Purchaser required Sponsor to make to PH-58. Purchaser also requested the insertion of ¶ 17.3 which states that:

> Prior to the date of the Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical function of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in any emergency or routine maintenance.

21.     Though the term "Tank and Pump system" is not defined in the Option Agreement, Sponsor understood that the clause referenced the portion of 520 Park Avenue's Fire

---

[2] PH-58 is a simplex unit located on 520 Park Avenue's 42nd Floor.

Suppression System which was located on the same floor as PH-58 (the "Automatic Fire Pump").

22.  The Offering Plan granted the condominium an easement to access the fire corridor located on the 42nd Floor adjacent to PH-58[3] "for the purpose of accessing, servicing, maintaining and utilizing the Fire Suppression Tank Room . . . [and] anticipated that such easement will be exercised three (3) times per year." Ex. A. at 17.

23.  As explained in the Offering Plan, 520 Park Avenue's Fire Suppression System consisted of the following equipment:

c.  Equipment Schedule:

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| Automatic Fire Pump | FP-1 | Sub-Cellar 1 Level | 750gpm, 163psi head, 125hp, 208v, 3p | Peerless or equivalent | 4AEF10 |
| Automatic fire pump | FP-2 | 37th floor | 750gpm, 80psi head, 50hp, 480v, 3p | Peerless or equivalent | 5AEF8 |
| Automatic fire pump | FP-3 | 48th floor | 750gpm, 132si head, 100hp, 480v, 3p | Peerless or equivalent | 4EF10 |
| Automatic fire pump (Special Service) | FP-4 | 57th floor | 750gpm, 70psi head, 40hp, 480v, 3p | Peerless or equivalent | 5AEF8 |

24.  Sponsor agreed to the inclusion of ¶ 17.3 because the Automatic Fire Pump would rarely be activated, if ever, because it was installed only for use during a fire emergency or infrequent routine maintenance. Furthermore, the language requested by Purchaser only prohibited noise which would "impair Purchaser's quiet enjoyment and use of the Unit," a seemingly inapplicable and very forgiving standard which does not preclude noise or other nuisances unless they rise to a level that substantially interferes with the possession of real

---

[3] Plaintiff notes that the relevant documents refer to units by both their designated marketing floor number and by their construction floor number. At the time the Offering Plan was drafted, PH-58 was designated as PH-48 or the "48th floor."

HF 14729496v.7

property. Accordingly, Purchaser's requested language did not expressly grant any additional rights to Purchaser or impose any additional obligations on Sponsor.

25. Sponsor also agreed to make certain modifications to PH-58 as requested by Purchaser as set forth in Schedule D – Rider to Option Agreement dated October 6, 2017 (the "Rider").

26. The Rider included Purchaser's specific and detailed modifications such as: (i) revising the unit's floorplan; (ii) eliminating the door to the kitchen and creating a new opening to align with the doorway between the living room and dining room; (iii) replacing spandrel glass with vision glass; (iv) eliminating pocket doors between the dining room and living room; (v) relocating plumbing in the master bathroom; and (vii) eliminating a powder room to frame out a walk-in closet. **Notably, Purchaser did not make any effort to request any additional soundproofing measures, modifications, or additional construction specifications for the wall adjoining the mechanical room.**

27. On or around October 6, 2017, Purchaser executed the Option Agreement and duly provided the Premium Payment to Sponsor.

28. On or around November 10, 2017, the Parties entered into an Additional Rider to the Option Agreement which further addressed PH-58's revised floor plan and unit modifications ("Additional Rider"). Similar to the Rider, the Additional Rider did not include any additional soundproofing measures, modifications, or additional construction specifications for the wall adjoining the mechanical room.

**Sponsor Completes its Obligations and Notices Closing for PH-58**

29. After completing the required construction and obtaining a temporary certificate of occupancy, Sponsor provided notice to Purchaser, as required by the Option Agreement and

Offering Plan, that the closing was scheduled to occur on November 27, 2018 (the "Original Closing Date").

30. Pursuant to the Offering Plan's Terms of Sale, the Sponsor's "delivery to Purchaser of written notice of the time and place of the Closing at least 30 days prior to the Closing Date Specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal business hours and in the company of Sponsor's representative, prior to Closing" obligated Purchaser to close title.

31. While it was not required to, Sponsor agreed to adjourn the Original Closing Date, at Purchaser's request, to January 4, 2019 (the "Adjourned Closing"), in light of the holidays. Though Purchaser had visited PH-58 several times, it did not indicate that there were any issues when it requested the adjournment.

**Purchaser's Refusal to Close**

32. Sponsor was ready, willing, and able to close at the Adjourned Closing.

33. Pursuant to ¶ 18.1 of the Option Agreement, Purchaser had the waivable right to:

[a]rrange an appointment with a representative of Sponsor to inspect the interior of the Unit within the 7 days prior to the Closing Date. Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement . . . and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such an appointment or to inspect the interior of the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Exercise Price when due and shall constitute Purchaser's full acceptance of the Unit as is. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

34. Upon information and belief, Purchaser did not arrange or attend any such pre-closing inspection of the unit. Accordingly, Purchaser waived its right to the inspection which constituted Purchaser's full acceptance of the PH-58 as is.

35. On or around January 3, 2019 (the day before the Adjourned Closing), Purchaser's counsel provided written notice that Purchaser would not attend the Adjourned Closing. Purchaser also demanded to know what steps Sponsor had taken to comply with ¶ 17.3 of the Option Agreement.

36. Even if Purchaser had inspected PH-58 and provided an inspection statement alleging that additional work was required by Sponsor, pursuant to ¶ 18.2 of the Option Agreement, "[a]ny work set forth on the Inspection Statement shall be completed by Sponsor in a reasonable period of time following the Closing and **shall not be grounds for delaying the Closing**."

37. Pursuant to ¶ 15 of the Option Agreement, Purchaser was only entitled to terminate the agreement "[i]f Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan **by reason of a defect in title, substantial damage or deconstruction of the Building**."

38. Even if Sponsor had failed to comply with ¶ 17.3 of the Option Agreement, Purchaser would not have been entitled to delay the Adjourned Closing or terminate the agreement.

39. Purchaser had no right to delay the Adjourned Closing and was obligated to close title and provide complete payment of the full purchase price. As set forth in ¶ 17.4 of the Option Agreement:

> The Closing of Title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Terms of Sale" in Part 1 of the Plan. As a result, **if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price** (without provision for escrow), notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the

incomplete construction and/or decoration of any other portions of the Building or the Unit.

40. The Offering Plan's Terms of sale further confirm that:

Purchasers are required to close title upon the occurrence of the following events:

\* \* \*

(b) . . . . a Temporary or Permanent Certificate of Occupancy for the Unit shall be deemed presumptive evidence of substantial completion of the Unit and **is the only construction-related prerequisite that must occur before Sponsor may require the closing of title**.

\* \* \*

(e) the delivery to Purchaser of a written notice of the time and place of the closing at least 30 days prior to the Closing Date specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal business hours and in the company of Sponsor's representative, prior to Closing. **So long as a Temporary Certificate of Occupancy for the Unit is in effect, Purchaser will be obligated to close title irrespective of the nature of the items that may be included on Purchaser's Inspection Statement**.

41. Purchaser's failure to close title on the Adjourned Closing date constituted an event of default pursuant to ¶ 13.1 of the Option Agreement.

42. Notwithstanding Purchaser's default, Sponsor again acted in good faith and agreed to reschedule the closing to February 8, 2019 (the "Third Scheduled Closing"), in an effort to accommodate Purchaser.

43. Although it had no obligation to do so, Sponsor also obtained a report from SM&W, an integrated communications technology and consulting firm, to assuage Purchaser's pre-close jitters. The SM&W report confirmed that there was no noise coming from the mechanical room adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though the unit was empty without any furniture, fixtures, or carpet to dampen any sound.

44. On January 15, 2019, Purchaser arbitrarily and unreasonably rejected the SM&W report claiming it failed to satisfy ¶ 17.3 of the Option Agreement. Notwithstanding Purchaser's arguments to the contrary, ¶ 17.3 does not contain any criteria or requirements.

45. Purchaser further objected to the SM&W report because the Automatic Fire Pump, which is only active during emergencies or infrequent routine maintenance, was not active during the testing. Logically, the Automatic Fire Pump was not active because there was no fire emergency or routine maintenance while the testing was conducted.

46. Purchaser demanded additional information and testing such as:

(i) baseline readings with the Automatic Fire Pump in operation and not in operation;

(ii) a description of the installed equipment;

(iii) complete plans and specifications for the Automatic Fire Pump;

(iv) engineered documents for the Automatic Fire Pump;

(v) original design documents and details;

(vi) written specifications;

(vii) approved shop drawings;

(vii) commissioning reports;

(viii) sign offs;

(ix) approvals stating that the systems are finished and fully operational;

(x) complete operating instructions for the Automatic Fire Pump;

(xi) the Automatic Fire Pump's maintenance and testing requirements;

(xii) details regarding the adjacent wall;

(xii) specific acoustical design criteria utilized and implemented in the adjacent wall's construction; and

(xiv) additional acoustical testing performed by Sponsor with the specific criteria spelled out by the Purchaser's acoustical consultant.

47. None of Purchaser's demands were founded in any right under the Option Agreement or the Offering Plan.[4]

48. On February 11, 2019, Sponsor served Purchaser with a notice of default due to Purchaser's failure to close title to the unit at the Third Scheduled Closing (the "Notice of Default"). A copy of the Notice of Default dated February 11, 2019 is attached hereto as Exhibit C.

49. The Notice of Default advised Purchaser of its right under the Option Agreement and Offering Plan to cure the default within 30 days (on or before March 15, 2019) with time being of the essence and that, upon Purchaser's failure to cure its default, Sponsor is entitled to retain Purchaser's Premium Payment as liquidated damages and to seek repayment of all legal fees and costs relating to Purchaser's default.

50. Pursuant to ¶ 13 of the Option Agreement:

**TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Exercise Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving the notice cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment . . . Upon cancellation of this Agreement, Purchaser and Sponsor will be

---

[4] Furthermore, ¶ 20 of the Option Agreement contains a no representation clause whereby Purchaser acknowledges that it is not relying on any plans, representations, statements, or warranties relating to the description or physical condition of the building.

released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

51. Pursuant to ¶ 4 of the Special Risks contained in the Offering Plan:

(b) Purchasers should note that the agreement pursuant to which they will purchase the Unit is referred to as an Option Agreement . . . A Purchaser is not receiving any "options" not included in a standard real estate contract and if Purchaser does not close on the Option Agreement, Purchaser will forfeit Purchaser's Premium payment as liquidated damages . . . Sponsor cannot compel specific performance as a remedy against Purchaser. Sponsor is bound, however, to sell to a Purchaser that elects to perform all of Purchaser's obligations under the Option Agreement.

\*     \*     \*

(d) In the event a Purchaser defaults under the Option Agreement, time being of the essence with regard to the obligations of Purchaser under the Option Agreement, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel the Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then the Option Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment . . . Upon the cancellation of the Option Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though the Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of the sale.

\*     \*     \*

(e) TIME IS OF THE ESSENCE as to Purchaser's obligations under the Option Agreement, including, without limitation, for the payment of all Premium Payments and the Exercise Price. According to Black's Law Dictionary (Revised Fifth Edition), "time is of the essence of contract" means generally that punctual performance by one party at one precise time named or within a period specified in the contract is essential to enable the party to require performance by the other party.

52. Pursuant to ¶ 30 of the Option Agreement:

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this

13

Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

53. Purchaser failed to cure its default and close the transaction on or before March 15, 2019. Instead, Purchaser argued that Sponsor's tendering of the Notice of Default constituted Sponsor's repudiation of the Option Agreement entitling Purchaser to the return of its Premium Payment.

54. Upon information and belief, Purchaser no longer desired to purchase PH-58 at this time and was acting in bad faith to manufacture duties and a breach thereof pursuant to ¶ 17.3 of the Option Agreement.

55. Upon information and belief, Purchaser – a shrewd businessman with significant experience in real estate – perceived a softening in New York City's luxury real estate market based on some press reports and used the Automatic Fire Pump as an excuse to back out of the transaction to either not purchase an apartment at that time or possibly get a better deal on a different apartment.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

56. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

57. The Option Agreement is a valid, binding, and enforceable contract between Sponsor and Purchaser.

58. Sponsor fully performed its obligations under the Option Agreement and constructed PH-58 in accordance with Purchaser's requirements set forth in Rider and Additional Rider to the Option Agreement.

HF 14729496v.7

59. Sponsor was ready, willing, and able to close when it noticed and scheduled the closing to occur on November 27, 2018.

60. In an effort to accommodate Purchaser, Sponsor adjourned the closing twice to January 4, 2019 and then February 8, 2019.

61. Purchaser materially breached its obligations to Sponsor under the Option Agreement by failing appear on or before February 8, 2019 and tender sufficient funds to Sponsor to close title.

62. On February 11, 2019, Sponsor served Purchaser with a notice of default, due to Purchaser's failure to appear at the February 8, 2019 closing, with time being of the essence.

63. Purchaser failed to cure its default within 30 days as required by ¶ 13.2 of the Option Agreement.

64. As a result of the Purchaser's breach of the Agreement, Sponsor is entitled to retain the Premium Payment in the sum of $8,500,000 in accordance with ¶ 13.2 of the Option Agreement.

65. In addition to the foregoing, pursuant to ¶ 30 of the Option Agreement, Sponsor is also entitled to reimbursement of any attorneys' fees and disbursements incurred by Sponsor while canceling this Agreement or otherwise enforcing Purchaser's obligations in a sum to be determined.

66. In addition to the foregoing, Sponsor is also entitled to 9% prejudgment interest from March 15, 2019 to the date judgment is entered pursuant to N.Y. C.P.L.R. §§ 5001 and 5004.

HF 14729496v.7

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

67. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

68. The Option Agreement is a valid, binding, and enforceable contract between Sponsor and Purchaser.

69. Purchaser requested that Sponsor make certain modifications to PH-58 as set forth in the Rider and Additional Rider. Sponsor incurred additional costs to achieve the modifications to PH-58 as requested by Purchaser in the Rider and Additional Rider.

70. Purchaser also requested the inclusion of additional language in ¶ 17.3 of the Option Agreement which provides that:

> Prior to the date of the Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical function of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in any emergency or routine maintenance.

71. Sponsor agreed to the inclusion of ¶ 17.3 because the Automatic Fire Pump would rarely be activated, if ever, because it was installed only for use during a fire emergency or infrequent routine maintenance. Furthermore, the language requested by Purchaser only prohibited noise which would "impair Purchaser's quiet enjoyment and use of the Unit," a seemingly inapplicable and very forgiving standard which does not preclude noise or other nuisances unless they rise to a level that substantially interferes with the possession of real property. Accordingly, Purchaser's requested language did not expressly grant any additional rights to Purchaser or impose any additional obligations on Sponsor.

72. Purchaser refused to attend the Adjourned Closing and instead demanded information about what steps Sponsor had taken to comply with ¶ 17.3 of the Option Agreement.

16

73. Although it had no obligation to do so, Sponsor obtained a report from SM&W, an integrated communications technology and consulting firm, to assuage Purchaser's pre-close jitters.

74. The SM&W report confirmed that there was no noise coming from the mechanical room adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though there was no furniture, fixtures, or carpet to dampen any sound.

75. Purchaser arbitrarily and unreasonably rejected the SM&W report claiming it does not meet the criteria of ¶ 17.3 of the Option Agreement and demanded substantial additional information and testing to prove Sponsor's compliance with ¶ 17.3 of the Option Agreement, despite the fact that ¶ 17.3 of the Option Agreement does not contain any criteria or require any testing.

76. None of Purchaser's demands were founded in any right under the Option Agreement.

77. The Option Agreement included implied promises on the part of Purchaser to not seek unreasonable enforcement of the undefined and vague clause that it added to the agreement.

78. Sponsor would not have entered into the Option Agreement or consented to the inclusion of ¶ 17.3 but for that implied promise. In accordance with the terms of the Option Agreement, Sponsor made Purchaser's requested modifications to PH-58.

79. The Option Agreement would be meaningless to Sponsor if Purchaser could unilaterally and arbitrarily determine that Sponsor was in breach of ¶ 17.3 and that such purported breach entitles Purchaser to the return of its Premium Payment despite express contractual terms to the contrary.

80. Purchaser breached the implied covenants of good faith and fair dealing by unilaterally and arbitrarily imposing additional terms, criteria, and requirements to establish Sponsor's compliance with ¶ 17.3 and using Sponsor's purported breach of ¶ 17.3 as a pretext to terminate the agreement.

81. Sponsor incurred additional costs of approximately $2,400,000 to eliminate Purchaser's modifications and restore PH-58 to its original completed state to render the unit marketable to future purchasers.

82. As a direct and proximate result of Purchaser's conduct, Sponsor was damaged in an amount to be determined at trial, but not less than $2,400,000 for damages resulting from the modifications of PH-58 required by Purchaser and the additional costs incurred to restore PH-58 to its original completed and marketable state.

**WHEREFORE**, judgment should be entered in favor of Plaintiff 41-45 Property Owner, LLC against Defendant CDM1, LLC as follows:

    (a)    awarding damages in the amount of at least $8,500,000, plus interest, for Plaintiff's First Cause of Action;

    (b)    awarding damages in the amount of at least $2,400,000 plus interest, for Plaintiff's Second Cause of Action;

    (c)    awarding Plaintiff prejudgment interest accrued at 9%;

    (d)    awarding Plaintiff its attorneys' fees and disbursements in a sum to be determined by the Court; and

    (e)    granting Plaintiff further relief as this Court may deem just and proper.

HF 14729496v.7

Dated:   New York, New York
         November 11, 2022

                                       HERRICK, FEINSTEIN LLP

                                       By: */s/ Scott E. Mollen*
                                             Scott E. Mollen

                                       Alan D. Kaplan, Esq.
                                       Jennifer M. Muller, Esq.
                                       2 Park Avenue
                                       New York, New York 10016
                                       Tel: (212) 592-1400
                                       Fax: (212) 592-1500

                                       *Attorneys for 41-45 Property Owner LLC*

HF 14729496v.7