# EXHIBIT A

<u>CONDOMINIUM OFFERING PLAN</u>

**520 PARK AVENUE CONDOMINIUM**

**520 PARK AVENUE**
**NEW YORK, NEW YORK 10022**

| | |
|---|---:|
| **32 Units (including 1 Resident Manager's Unit)** | **$1,206,704,000** |
| **7 Suite Units** | **$10,685,000** |
| **15 Storage Lockers** | **$1,080,000** |
| **10 Wine Storage Lockers** | **$1,865,000** |
| **Total Offering Amount** | **$1,220,334,000** |

| **SPONSOR:** | **SALES CENTER** | **SELLING AGENT:** |
|---|---|---|
| 41-45 Property Owner, LLC | 520 Park Avenue Sales Center | Zeckendorf Marketing LLC |
| 445 Park Avenue, Suite 1902 | 650 Madison Avenue | 770 Lexington Avenue, 4th Floor |
| New York, New York 10022 | New York, New York 10022 | New York, New York 10065 |

Filing Date of this Offering Plan: September 16, 2014. This Offering Plan may not be used September 15, 2015, unless this Offering Plan is extended by amendment.

This Offering Plan contains Special Risks to Purchasers. See Page 1.

BECAUSE SPONSOR IS RETAINING THE UNCONDITIONAL RIGHT TO RENT RATHER THAN SELL UNITS, THIS OFFERING PLAN MAY NOT RESULT IN THE CREATION OF A CONDOMINIUM IN WHICH A MAJORITY OF THE UNITS ARE OWNED BY OWNER-OCCUPANTS OR INVESTORS UNRELATED TO SPONSOR. PURCHASERS FOR THEIR OWN OCCUPANCY MAY NEVER GAIN CONTROL OF THE CONDOMINIUM BOARD UNDER THE TERMS OF THIS OFFERING PLAN. (SEE THE SECTION OF THIS OFFERING PLAN ENTITLED "SPECIAL RISKS")

THIS OFFERING PLAN IS SPONSOR'S ENTIRE OFFER TO SELL THESE CONDOMINIUM UNITS. NEW YORK LAW REQUIRES SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS OFFERING PLAN AND TO FILE THIS OFFERING PLAN WITH THE NEW YORK STATE DEPARTMENT OF LAW PRIOR TO SELLING OR OFFERING TO SELL ANY CONDOMINIUM UNIT. FILING WITH THE DEPARTMENT OF LAW DOES NOT MEAN THAT THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY HAS APPROVED THIS OFFERING.

# TABLE OF CONTENTS
## PART I

| Section | Page |
|---|---|
| SPECIAL RISKS | 1 |
| INTRODUCTION | 19 |
| DEFINITIONS | 26 |
| DESCRIPTION OF PROPERTY AND IMPROVEMENTS | 33 |
| LOCATION AND AREA INFORMATION | 40 |
| SCHEDULE A – PURCHASE PRICES OF UNITS AND RELATED INFORMATION | 43 |
| SCHEDULE B – BUDGET FOR FIRST YEAR OF CONDOMINIUM OPERATION | 53 |
| SCHEDULE B-1 - PROJECTED INDIVIDUAL ENERGY COSTS BUDGET | 67 |
| OPINION OF COUNSEL RE: REAL PROPERTY LAW SECTION 339-I | 71 |
| REAL PROPERTY LAW SECTION 339-I COMPLIANCE LETTER | 75 |
| CHANGES IN PRICES AND UNITS | 78 |
| USE AND OCCUPANCY AGREEMENTS | 80 |
| PROCEDURE TO PURCHASE | 81 |
| ESCROW AND TRUST FUND REQUIREMENTS | 86 |
| ASSIGNMENT OF OPTION AGREEMENTS | 92 |
| EFFECTIVE DATE | 93 |
| TERMS OF SALE | 94 |
| CLOSING COSTS AND ADJUSTMENTS | 97 |
| RIGHTS AND OBLIGATIONS OF SPONSOR | 105 |
| CONTROL BY SPONSOR | 119 |
| CONDOMINIUM BOARD | 121 |
| RIGHTS AND OBLIGATIONS OF UNIT OWNERS | 122 |
| RIGHTS AND OBLIGATIONS OF THE CONDOMINIUM BOARD/ SUMMARY OF BY-LAWS | 132 |
| INCOME TAX DEDUCTIONS TO UNIT OWNERS AND TAX STATUS OF CONDOMINIUM | 138 |
| REAL ESTATE TAXES | 140 |
| ATTORNEY'S INCOME TAX OPINION | 141 |
| REAL ESTATE TAX PROJECTION OPINION | 147 |
| WORKING CAPITAL FUND AND APPORTIONMENTS | 155 |
| RESERVE FUND | 157 |
| MANAGEMENT AGREEMENT | 158 |
| IDENTITY OF PARTIES | 160 |
| REPORTS TO UNIT OWNERS | 164 |
| DOCUMENTS ON FILE | 164 |
| GENERAL | 165 |
| SPONSOR'S STATEMENT OF BUILDING CONDITION | 166 |

**TABLE OF CONTENTS**

## PART II

| Section | Page |
|---|---|
| DESCRIPTION OF PROPERTY AND IMPROVEMENTS | 169 |
| FLOOR PLANS | 217 |
| USE AND OCCUPANCY AGREEMENT | 251 |
| OPTION AGREEMENT | 261 |
| UNIT DEED | 295 |
| ANCILLARY AMENITY LICENSE | 303 |
| ASSIGNMENT AND ASSUMPTION OF ANCILLARY AMENITY LICENSE | 309 |
| DECLARATION OF CONDOMINIUM | 313 |
| BY-LAWS OF THE CONDOMINIUM | 349 |
| UNIT POWER OF ATTORNEY | 411 |
| UNIT OWNER'S SPECIMEN TITLE POLICY | 415 |
| FORM W-8 (CERTIFICATION OF FOREIGN STATUS) | 427 |
| FORM W-9 (REQUEST FOR TAXPAYER IDENTIFICATION NUMBER) | 431 |
| ESCROW AGREEMENT | 435 |
| CERTIFICATION OF SPONSOR AND PRINCIPALS | 449 |
| CERTIFICATION OF ARCHITECT | 457 |
| CERTIFICATION OF BUDGET EXPERT | 461 |
| REAL PROPERTY LAW SECTION 339-kk | 465 |

PART I

**CONDOMINIUM OFFERING PLAN**

**520 PARK AVENUE CONDOMINIUM**
**520 PARK AVENUE**
**NEW YORK, NEW YORK 10022**

1

## SPECIAL RISKS

### Building Location

1.     The entrance to the Building is located on East 60th Street between Park Avenue and Madison Avenue at 45 East 60th Street, which is approximately 150 feet from the northwest corner of Park Avenue and 60th Street. The Building will be constructed on the property located at 41-45 East 60th Street between Park Avenue and Madison Avenue on building lot 28.  The Building will also cantilever 25 feet over the Grolier Club (47 East 60th Street) to the east into Lot 9031 which is a vertical tax lot owned by Sponsor that is located above the Grolier Club parcel.  The Building is the beneficiary of a light and air easement over the Christ Church parcel (Lot 36, 524 Park Avenue) that extends to Park Avenue (See the Section of the Plan entitled "Location and Area Information").

### Building Address

2.     (a)     The current address of the Building is 45 East 60th Street.  Sponsor has an agreement with Christ Church to issue an irrevocable license for the term of 100 years in favor of Sponsor to utilize the 520 Park Avenue address.  Sponsor has obtained initial approval from the Manhattan Borough President's Office ("MBPO"), through the issuance of a reservation letter, to use 520 Park Avenue, New York, New York as the address of the Building in lieu of 45 East 60th Street. The reservation letter indicates that MBPO has found the request to be appropriate and the address can't be used by another party.  In accordance with the reservation letter, following the completion of the Building's front entrance, Sponsor will re-apply to MBPO for the address to be permanently assigned at which point final approval should be provided.

(b)     Upon issuance of the final approval by MBPO, the license agreement with Christ Church will commence for a term of 100 years in exchange for an annual payment of $30,000, which amount shall be included in Schedule B.

(c)     See Section of the Plan entitled "Location and Area Information."

### Sponsor Control of the Condominium Board

3.     (a)     Sponsor will have voting control over the Condominium Board until the later to occur of: (i) the Closing of Title with Purchasers under the Plan to Units representing at least 95% in number of all Units offered for sale, or (ii) the issuance of a Permanent Certificate of Occupancy ("Sponsor Control Period").  As such, it is possible that Sponsor may never relinquish control of the Condominium Board. Sponsor reserves the right to relinquish voting control of the Condominium Board prior to the expiration of the Sponsor Control Period.

(b)     After the Sponsor Control Period, Sponsor shall have the right to designate 1 Member to the Condominium Board for so long as Sponsor continues to own at least 1 Unsold Unit.

(c)     During the Sponsor Control Period, Sponsor will designate a majority of the members and shall have voting control of the Condominium Board.  Therefore, Sponsor will have control of the maintenance and operation of, and the services to be provided by, the Condominium, and will determine the Common Charges to be paid by all Unit Owners. Notwithstanding the foregoing, Sponsor must maintain the Building with services consistent with those set forth in the Section of the Plan entitled "Schedule B - Budget for First Year of Condominium Operation."  Sponsor may continue to exercise veto power over the following actions of or contemplated by the Condominium Board after the Sponsor Control Period, for so long as Sponsor shall continue to own Unsold Units representing at least 25% in number of all Units, but in no event later than 5 years after the First Closing, the Condominium Board may not take any of the following

actions without Sponsor's prior written consent: (a) make any addition, alteration or improvement to the Common Elements or to any Unit, or (b) assess any Common Charges, Common Charges or Special Assessment for the creation of, addition to or replacement of all or part of a working capital, reserve, contingency or surplus fund, or (c) increase or decrease the number, or change the kind of, employees referred to in the Plan, or (d) enter into any service or maintenance contract for work not covered by contracts in existence on the date of the First Closing or otherwise provide services in excess of those referred to in the Plan, except as is required to reflect normal annual increases in operating services, or (e) borrow money on behalf of the Condominium, or (f) exercise a right of first refusal to lease or purchase a Unit; provided, however, that Sponsor's written consent is not necessary to perform any function or take any action described in clauses (a) through (f) above, if, and only if, the performance of such function or the carrying out of such an action is necessary and no other commercially reasonable alternative is available to enable the Condominium to (i) comply with Law; or (ii) remedy any notice of violation; or (iii) remedy any work order of the Condominium's insurer oar (iv) to ensure the health and safety of the occupants of the Building.

(d)     See the Sections of the Plan entitled "Control By Sponsor" and "Condominium Board" for details.

## Purchase of a Condominium Unit

4.     (a)     THE PURCHASE OF A CONDOMINIUM UNIT HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES AND MAY BE ONE OF THE MOST IMPORTANT FINANCIAL TRANSACTIONS OF YOUR LIFE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING AN AGREEMENT TO PURCHASE A CONDOMINIUM UNIT.

(b)     Purchasers should note that the agreement pursuant to which they will purchase the Unit is referred to as an Option Agreement. This characterization is consistent with Sponsor's intention to treat the Option Agreement for purposes of applicable provisions of the Internal Revenue Code as similar to an option. If this characterization is respected, Sponsor will be able to account for the sale of the Units for federal income tax purposes in the same manner as it would be able to account for such sale if the Unit had constituted a separate townhouse or other separate dwelling. A Purchaser is not receiving any "options" not included in a standard real estate contract and if Purchaser does not close on the Option Agreement, Purchaser will forfeit Purchaser's Premium Payment as liquidated damages. Purchasers should note that Sponsor's characterization of the Option Agreement is not binding on the Internal Revenue Services ("IRS") which may challenge such characterization. However, even if the IRS was to successfully challenge Sponsor's tax characterization of the Option Agreement and the Premium Payment, as described above, there will be no adverse tax or other consequences to Purchaser. Sponsor cannot compel specific performance as a remedy against Purchaser. Sponsor is bound, however, to sell to a Purchaser that elects to perform all of Purchaser's obligations under the Option Agreement.

(c)     At the time an Option Agreement is executed, Purchaser is required to make an initial Premium Payment in an amount equal to 15% of the Purchase Price and an additional Premium Payment equal to 10% of the Purchase Price upon the earlier to occur of (i) 6 months after Purchaser executes the Option Agreement or (ii) within 15 days of the Presentation Date of the amendment declaring the Plan effective. A Purchaser executing an Option Agreement on or after the date the Plan is declared effective is required to make the full Premium Payment in an amount equal to 25% of the Purchase Price.

(d)     In the event a Purchaser defaults under the Option Agreement, time being of the essence with regard to the obligations of Purchaser under the Option Agreement, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel the Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then the Option Agreement shall be

deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds, except if Sponsor abandons or withdraws the Plan, in which case the Unit Upgrade Funds will be returned to Purchaser. Upon the cancellation of the Option Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though the Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale. (See the Section of the Plan entitled "Procedure to Purchase" for details.

(e)     TIME IS OF THE ESSENCE as to Purchaser's obligations under the Option Agreement, including, without limitation, for the payment of all Premium Payments and the Exercise Price. According to Black's Law Dictionary (Revised Fifth Edition), "time is of the essence of contract" means generally that punctual performance by one party at one precise time named or within a period specified in the contract is essential to enable the party to require performance by the other party. If a check delivered by a Purchaser for the Initial Premium Payment fails for collections, the Option Agreement will be deemed void ab initio.

(f)     Under current law, if a Purchaser makes a Premium Payment in excess of $250,000 for the purchase of a Unit, the amount in excess of $250,000 will not be federally insured. If a Purchaser maintains accounts at the Escrow Bank, the funds in such accounts, together with the Premium Payment, may be aggregated by the Escrow Bank for purposes of determining the $250,000 federally insured limit. Additionally, until such time as Purchaser delivers either an executed W-9 Form or W-8 Form to Sponsor, the Premium Payment shall remain in the non-interest bearing portion of the Master Escrow Account. While the Premium Payment is in the non-interest bearing portion of the Master Escrow Account, the Premium Payment may not be federally insured even if the Premium Payment does not exceed $250,000. No representation is made with respect to any further changes in law concerning such accounts. Purchasers should consult with their accountants or financial advisors for further information. (See the Section of the Plan entitled "Escrow and Trust Fund Requirements" for details.)

(g)     If Sponsor makes an application to the Department of Law to withdraw the Premium Payments from escrow and secures the Premium Payments with a Letter of Credit or Surety Bond and such application is approved by the Department of Law, following such withdrawal, no interest will be earned on the Premium Payments.  (See the Section of the Plan entitled "Escrow and Trust Fund Requirements" for details.)

(h)     If a Purchaser fails for any reason to close title to the Unit on the originally Scheduled Closing Date other than due to Sponsor's failure or inability to close:  (a) the Closing apportionments to be made will be made as of midnight of the day preceding the Scheduled Closing Date, regardless of when the actual closing occurs ("Actual Closing Date"), and (b) Purchaser will be required to pay to Sponsor an amount equal to .03% of the Purchase Price of the Unit for each day commencing with the Scheduled Closing Date through the Actual Closing Date, as a reimbursement of Sponsor's increased carrying costs for the Unit by virtue of the delay, in addition to the other payments to be made to Sponsor under the Option Agreement and the Plan. (See the Section of the Plan entitled "Procedure to Purchase" for details.)

(i)     The signing of the Option Agreement signifies Purchaser's acceptance of the condition of the Property (as represented by Sponsor in the Plan) including, but not limited to, the Unit, the Ancillary Amenities, the Building and all Common Elements contained therein. Sponsor has no obligation to make any repairs, improvements or decorations in or to the Property, the Unit, the Ancillary Amenities, the Building or the Common Elements, except as may otherwise be set forth in the Plan. (See the Sections of the Plan entitled "Procedure to Purchase" and "Rights and Obligations of Sponsor" for details.)

(j)     Unit Upgrade Funds will initially be placed in the Master Escrow Account. However, Purchasers should note that such Unit Upgrade Funds may be released from the Master Escrow

Account by Escrow Agent to Sponsor to pay, or reimburse Sponsor, for such upgrades or extras. **As a result, in the event Sponsor cancels the Option Agreement or Purchaser is entitled to rescind the Option Agreement in accordance with the Plan, Purchaser will not receive a refund of any Unit Upgrade Funds, except if Sponsor abandons or withdraws the Plan, in which case the Unit Upgrade Funds will be returned to Purchaser. (See the Section of the Plan entitled "Escrow and Trust Fund Requirements" for details.)**

(k)     Prior to the Closing of Title to a Unit, the Option Agreement prohibits a Purchaser from advertising or otherwise offering, listing, promoting or publicizing the availability of the Unit for sale or rental. (See the Section of the Plan entitled "Procedure to Purchase" and the Option Agreement set forth in Part II of the Plan for details.)

(l)     Any purported assignment of the Option Agreement in violation of the Plan shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in the Plan and the Option Agreement and shall be voidable at the option of Sponsor.

(m)     Sponsor shall be entitled to deliver the 30 day closing notice to a Purchaser prior to meeting the closing prerequisites set forth in items (b) – (g) exclusive of item (e), of the Section of the Plan entitled "Terms of Sale". As a result, if any of such prerequisites have not been met by the Closing Date set forth in the 30 day closing notice, the Closing Date will be adjourned by Sponsor.

(n)     Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under the Option Agreement or, in the event Purchaser defaults under the Option Agreement beyond any applicable grace period, in canceling the Option Agreement or otherwise enforcing Purchaser's obligations under the Option Agreement.

(o)     Each Unit Owner who acquired a Unit from Sponsor ("Sponsor Sale") and subsequently enters into an agreement, written or oral ("Resale Agreement") to resell the Unit prior to the first anniversary of the closing of the Sponsor Sale ("Resale") shall be obligated to pay Sponsor a portion of the proceeds of the Resale ("Resale Fee"). A Unit Owner will be required to send Sponsor a copy of the Resale Agreement within 10 days of agreeing to the Resale. The Resale Fee paid to Sponsor shall be equal to 50% of the difference between: (A) the sales price of the Unit per the Resale Agreement *less* the following expenses actually paid for by Unit Owner (to the extent applicable): (1) brokerage commissions not exceeding 6% in the aggregate; (2) transfer taxes imposed by Law and (3) actual legal fees not exceeding $5,000; *and* (B) the Purchase Price paid to Sponsor in connection with the Sponsor Sale. In addition, prior to the first anniversary of the Sponsor Sale, each Unit Owner is prohibited from listing the Unit for sale with any broker or placing or authorizing any listing in any broker's listing system or other listing service or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion. (See the Section of the Plan entitled "Rights and Obligations of Unit Owners" and the By-laws for further details.)

**Conveyance of Title**

5.     (a)     In the event of the existence of any lien, encumbrance or title defect other than Permitted Encumbrances which Sponsor fails or refuses to correct, the sole remedy of Purchaser under the Plan, provided Purchaser is not then in default, will be to either (i) take title to the Unit subject to the title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (ii) terminate the Option Agreement, within 15 days after receipt of notice or an amendment disclosing such lien, encumbrance or title defect. If Purchaser fails to notify Sponsor of Purchaser's election within 15 days after Sponsor notified Purchaser of Sponsor's failure or refusal to remedy the title defect, it will be conclusively deemed that Purchaser elected to acquire title subject to the title defect. Sponsor has no obligation to institute any action or

proceeding or to expend any sum of money in excess of ½ of 1% of the Purchase Price of the affected Unit to make title insurable or to eliminate any encumbrances or title defects. (See the Section of the Plan entitled "Terms of Sale" for details.)

(b)    Sponsor shall be entitled to adjourn the Closing to remove or correct any defect in title which is not set forth in Schedule A annexed to the Option Agreement. However, if such defect existed at least 10 days prior to the Closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the Closing of Title, then Purchaser shall be deemed at fault under the terms of the Option Agreement for not having sent timely notice, and the Closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

(c)    If, subsequent to the Closing of Title, Purchaser claims that Sponsor did not convey fee simple title to the Unit in accordance with the Plan, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor. Sponsor and Purchaser agree that Sponsor's liability shall be limited to any loss or damage not covered by Purchaser's title insurance company. If Purchaser did not obtain title insurance at the Closing, for purposes of this subparagraph, the amount and coverage which Purchaser could have obtained from Purchaser's title insurance company shall be deducted from the loss or damage collectable against Sponsor. Notwithstanding the foregoing, nothing contained in this paragraph shall be construed to waive any of Purchaser's rights or abrogate any of Sponsor's obligations under the Plan or Article 23-A of the General Business Law.

## Risk of Loss

6.    The risk of loss to any Unit by fire or other casualty prior to the Closing of Title to such Unit is assumed by Sponsor (unless and until Purchaser takes possession of the Unit, at which time Purchaser shall assume the risk of loss not covered by insurance, including the risk of loss to Purchaser's personal property) but without any obligation or liability by Sponsor to repair or restore such Unit. In the event a Purchaser is permitted to take possession of the Unit prior to Closing, such Purchaser will be required to obtain casualty and liability insurance for their own benefit covering the Unit and any Limited Common Elements appurtenant thereto in such amounts as determined by Sponsor. (See the Section of the Plan entitled "Use and Occupancy Agreements" for details.)

## Sponsor's Right to Rent Unsold Units

7.    (a)    Sponsor intends in good faith to sell rather than rent Units. However, Sponsor reserves the unconditional right to rent Units rather than sell Units. Because Sponsor is not limiting the conditions under which it will rent rather than sell Units, Sponsor is not committed to sell more Units than the 15% necessary to declare the Plan effective and, therefore, owner-occupants may never gain effective control and management of the Condominium.

(b)    Sponsor intends to offer Unsold Units for sale both to Purchasers for personal occupancy and Purchasers who are purchasing for investment or resale. Purchasers for investment or resale may, in turn, rent such Units and accordingly, such Units will not be used for the personal occupancy of the owner thereof. As a result, some and possibly many Units may be occupied by renters instead of Unit Owners. Since the Condominium Board does not have the right to approve or disapprove potential purchasers of Units, the Condominium Board is unable to limit the number of purchasers who purchase Units for investment or resale rather than for personal occupancy and there may always be a substantial percentage of Unit Owners who are not occupants. It is possible that those Unit Owners who occupy their Units may have different interests than those Unit Owners who purchased such Units as an investment.

(c)    Sponsor reserves the unconditional right to make Bulk Sales of Units. The term "Bulk Sales" shall mean the transfer of 10 or more Units or 20% of the total number of Units in the

Condominium, whichever is less. Purchasers of Bulk Sales of Units shall be bound by Sponsor's representations in the Plan with regard to Sponsor's commitment to sell Units.

## Transfer Taxes/Closing Fees

8.     Purchasers shall be required to pay (i) certain closing fees to Attorneys for Sponsor at Closing and (ii) all New York City Real Property Transfer Tax ("RPT Tax"), New York State Real Estate Transfer Tax ("State Transfer Tax") and New York State Additional Real Estate Transfer Tax, commonly referred to as the "Mansion Tax," imposed on their purchase.  The New York City Department of Finance has taken the position that where the purchaser of property assumes the obligation for the payment of State Transfer Tax and the RPT Tax, the amount of the tax which would otherwise be payable if the seller were to pay such taxes, will be treated as additional consideration for the transaction subject to tax.  The State Transfer Tax is currently equal to $2 per $500 of the grossed up consideration and the RPT Tax is currently equal to 1% of the grossed up consideration where the grossed up consideration is $500,000 or less, and 1.425% where the grossed up consideration is greater than $500,000.  (See the Section of the Plan entitled "Closing Costs and Adjustments" for details.)

## Reserve Fund and Working Capital Fund

9.     (a)     Sponsor has not established a reserve fund for capital repairs, replacements or improvements. Because the Building, upon completion of construction, will be entirely new construction, Sponsor does not anticipate the imminent need for capital repairs, replacements or improvements. However, no assurance or guaranty is given that such needs will not arise in the future. Unit Owners will be obligated to pay their share of the cost of repairs, replacements and/or improvements to the Common Elements as the need for such arises. The Condominium Board, in its discretion, and subject to certain restrictions contained in the By-Laws, may decide in the future to create a reserve fund by Special Assessment or by increases in Common Charges.

(b)     The contingency line item provided for in Schedule B – First Year's Budget is intended to provide a fund for unanticipated expenses not included in the Budget and for possible increases in operating expenses above the amounts projected if the Working Capital Fund is not sufficient to cover such costs.  The contingency line item is not intended and may not be sufficient to meet the cost of any major capital repairs or replacements which may be required.  If additional funds are required to meet such costs, it may be necessary for the Condominium Board to increase Common Charges or impose Special Assessments.

(c)     Each Purchaser of a Unit will be required to make a non-refundable contribution to the Working Capital Fund of the Condominium.  Such contribution, to be made at the time of Closing, shall be in an amount equal to 2 months' Common Charges with respect to the Unit based on the Condominium's budget in effect as of the Closing Date of the Unit.  The payment of the Working Capital Contribution shall be required of all Purchasers of Units, whether purchased from Sponsor or on a resale.

(d)     See the Section of the Plan entitled "Working Capital Fund and Apportionments" for details.

## Foreign Government Purchaser

10.     Any Purchaser that is a foreign government, a resident representative of a foreign government or other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (.i.e., diplomatic or sovereign immunity) ("Foreign Government Purchaser") shall be required to expressly and voluntarily waive such immunity and consent to any suit, action or proceeding arising out of or relating to the Option Agreement or the Condominium Documents being brought in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with the Option Agreement or the Condominium Documents. Any Foreign Government Purchaser shall

designate and authorize a lawful agent to receive process for and on behalf of the Foreign Government Purchaser in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with the Option Agreement or the Condominium Documents. (See the Section of the Plan entitled "Procedure to Purchase" for details.)

## Ancillary Amenity Licenses

11.     (a)     Certain portions of the sub-cellar and cellar levels of the Building will be designated as Ancillary Amenity Areas in which the Ancillary Amenities will be located. Sponsor is offering Purchasers of Units the opportunity to purchase certain Ancillary Amenity Licenses for the exclusive use of Purchaser for so long as Purchaser owns a Unit in the Condominium pursuant to the terms of a license ("Ancillary Amenity License"), the forms of which are set forth in Part II of the Plan. Purchasers should note that the Closing of an Ancillary Amenity License does not require the issuance of a Temporary Certificate of Occupancy. Purchasers will be required to consummate the purchase of the Unit and the Ancillary Amenity License simultaneously at Closing even though a Temporary Certificate of Occupancy has not been issued (and access may not be available) to the Ancillary Amenity Area in which the Ancillary Amenity is located. In such event, the proceeds from the sale of the Ancillary Amenity License will be held in escrow ("Ancillary Amenity Escrow") by Escrow Agent until such time as a Temporary Certificate of Occupancy has been issued for the Ancillary Amenity Area in which the Ancillary Amenity is located. The Ancillary Amenity Escrow will be held in an Interest-On-Lawyer's-Account ("IOLA") pursuant to New York Judiciary Law Section 497. Purchasers will earn no interest on the Ancillary Amenity Escrow. (See the Section of the Plan entitled "Terms of Sale" for details.)

(b)     Although the Ancillary Amenity Areas are Common Elements, the Condominium Board has granted Sponsor the exclusive right, without charge, to sell Ancillary Amenity Licenses located therein. The Condominium will not be entitled to any of the proceeds from the sale of the Ancillary Amenity Licenses. The Condominium Board has the right to impose monthly license fees and Special Assessments in connection with the Ancillary Amenity Licenses.

(c)     The Storage Lockers and Storage Locker Area will not be serviced by an emergency generator to maintain proper temperatures in the event of a power outage as a consequence of whatever cause, including, without limitation, water infiltration. Any resulting damage and/or spoilage to and/or inability to access the contents located in the Storage Lockers will be at the sole cost of the licensee of such Storage Locker. Neither Sponsor nor the Condominium Board shall be responsible for any damage and/or spoilage caused by power outages, temperature fluctuations, or other causes (whether by mechanical or as a consequence of natural causes), including, without limitation, water infiltration, in the Storage Locker Area.

(d)     See the Section of the Plan entitled "Rights and Obligations of Unit Owners," subsection "Use of Units and Common Elements and Ancillary Amenities" for details.

## Resident Manager's Unit

12.     (a)     At, or subsequent to the First Closing, but in no event later than 5 years from the date of the First Closing, Sponsor shall sell Unit 5B to the Condominium to be used by the Resident Manager and designated as the "Resident Manager's Unit". The Purchase Price for the Resident Manager's Unit will be $4,354,000. At the Closing of each Unit (exclusive of a Suite Unit), Purchaser will be required to pay on behalf of the Condominium Board, Purchaser's share of the cost of the Resident Manager's Unit including, without limitation, recording fees, title insurance, legal fees, transfer taxes and other transaction fees (estimated to be approximately $148,060) determined in accordance with the Common Interest of the Unit acquired, in proportion to the Common Interest of all Units (other than the Resident Manager's Unit and the Suite Units). The amount of each Purchaser's share of this closing cost is set forth in the Section of the Plan entitled "Schedule A – Purchase Prices and Related Information." There is no guarantee or assurance that the taxing authorities will not require that each

Purchaser's allocable portion of the cost of the Resident Manager's Unit be included in the total consideration deemed to have been paid by Purchaser at Closing, in which case additional transfer taxes may be payable by Purchaser. (See the Footnotes to Schedule A and the Section of the Plan entitled "Closing Costs and Adjustments" for details.)

(b)     From the date of the First Closing until the transfer of title to the Resident Manager's Unit, (i) the Resident Manager will be permitted to reside in the Resident Manger's Unit pursuant to a use and occupancy agreement between the Condominium Board and Sponsor, and (ii) the Condominium Board shall be obligated to pay all costs and expenses associated with the Resident Manager's Unit, including, without limitation, common charges, utilities, and real estate taxes, as more specifically set forth in Schedule B.

(c)     Sponsor reserves the right, prior to the First Closing, in its sole discretion, to choose a different Unit other than Unit 5B to sell to the Condominium as the Resident Manager's Unit, provided, however, that such sale shall only be made pursuant to an amendment to the Plan and shall not result in an increase of each Purchaser's share of the cost of the Resident Manager's Unit by 25% or more.

(d)     See the Section of the Plan entitled "Schedule B - Budget for First Year of Condominium Operation" for details regarding the costs of housing the Resident Manager.

## Suite Units

13.     (a)     To protect the security of the Building, a Suite Unit (with the exception of the Suite Units owned by the Grolier Club, as described in more detail hereafter) cannot be owned or leased independently of the ownership of a Unit and may be sold only to another Unit Owner or Purchaser who is simultaneously purchasing a Unit; provided however, that the foregoing restrictions shall not apply to Sponsor. The Suite Units may be used only as a residence occupied by domestic employees of a Unit Owner, as well as Family Members and non-paying guests of Unit Owners. Occupancy of the Suite Units by non-paying guests cannot exceed 3 months, without the prior written consent of the Condominium Board.

(b)     The Grolier Club shall have a right of first offer to purchase two (2) Suite Units, at the purchase prices set forth in the Section of the Plan entitled "Schedule A – Purchase Prices and Related Information," which right must be exercised within thirty (30) days' notice to the Grolier Club. The Suite Units purchased by the Grolier Club, if applicable, can only be used as a residence for the superintendent of the Grolier Club. Sponsor shall have a right of first refusal to purchase such Suite Units from the Grolier Club prior to any resale by the Grolier Club of any such Suite Unit within a thirty (30) day exercise period.

## Financial Performance

14.     To the best of Sponsor's knowledge, as of the Filing Date of the Plan, Sponsor has sufficient resources to fund its obligations set forth in the Plan. However, no bond or other security has been posted by Sponsor to secure Sponsor's obligation under the Plan. The ability of Sponsor to perform Sponsor's obligations under the Plan will partly depend upon its financial condition at the time Sponsor is called upon to perform. Notwithstanding the foregoing, no representation is made that Sponsor will be financially able to perform any or all of such obligations. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for details.)

## Services and Facilities

15.     Prospective Purchasers are advised that any or all of the services and facilities described in the Plan may not be available until approximately 12 months after the First Closing, with the exception of the swimming pool located in the fitness center which may not be available for use until

approximately 24 months after the First Closing. Purchasers will not be entitled to any credit or abatement against the Purchase Price or the Common Charges if any of the services and/or facilities are not available for use on or after Purchaser's Closing. Purchasers should also be aware that the hours and dates for move-ins, move-outs and/or alterations, as well as the use of the passenger and/or service elevators, will be restricted during the period that Sponsor is performing work in the Building. However, at all times after the First Closing, the lobby will be attended 24 hours a day, 7 days a week by a lobby attendant. Notwithstanding the foregoing, the Condominium Board shall have the right but not the obligation, in its sole and absolute discretion, to adjust the First Year's Budget to reduce the Common Charges for the period in which such services and/or facilities are not available. (See the Section of the Plan entitled "Description of Property and Improvements" subsection "Services and Facilities" for details.)

## Temporary Certificate of Occupancy

16. (a) Purchasers are advised that in New York City, newly constructed and newly renovated buildings are sometimes offered as condominium projects without a permanent certificate of occupancy ("PCO") covering the entire building but with only a temporary certificate of occupancy ("TCO"), and sometimes with several successive temporary certificates of occupancy. Certificates of occupancy are generally governed by Section 301 of the New York Multiple Dwelling Law and local building codes and rules. Both TCOs and PCOs are issued by the Buildings Department. A TCO is intended to indicate that the property is safe for occupancy, but means that not all of the construction work and/or inspections have been performed, or that not all of the required documents have been submitted to the DOB. All TCOs have an expiration date. A TCO typically expires 90 days after the date of issuance. When a TCO expires and is not renewed, it may be difficult or impossible to buy insurance, refinance, or sell units. In New York City, it is common for sponsors to commence unit closings when some or all units are covered by a TCO rather than a PCO. Sponsor anticipates this scenario will occur. Sponsor will undertake the responsibility for extending each TCO received prior to expiration thereof, and will endeavor to obtain a PCO covering the entire Building within approximately 2 years from the date of the issuance of the first TCO, subject, however, to (i) Force Majeure, (ii) actions by Unit Owners or tenants of Unit Owners, (iii) work undertaken in a Unit by a Unit Owner, except in instances where Sponsor or Sponsor-controlled Condominium Board have given their consent to a Unit Owner to perform alterations in such Unit Owner's Unit, (iv) work undertaken in Common Elements by the Condominium Board after Sponsor no longer controls the Condominium Board or (v) any other cause over which Sponsor has no control. Sponsor makes no representation or guarantee that the Buildings Department will issue the PCO within such 2 year period. Notwithstanding the foregoing, Sponsor is obligated to procure the PCO for the entire Building, and shall exercise best efforts to obtain the PCO within such 2-year period while keeping the TCO current. Unit Owners and the Condominium Board shall be obligated to cooperate with and refrain from obstructing Sponsor in these undertakings.

Furthermore, because Sponsor and the By-laws of the Condominium may permit Unit Owners to undertake renovations prior to the procurement of a PCO, such renovations may cause additional delays in the issuance of a PCO. Nevertheless, Sponsor is obligated to procure the PCO. However, Sponsor or the Condominium Board may refuse to permit a Unit Owner to perform alterations until such time as a PCO has been obtained.

Purchasers are advised to visit the DOB website for further recommendations when purchasing a Unit in a building that does not have a PCO. A Factsheet on Certificates of Occupancy is currently available on the DOB website at: http://www.nyc.gov/html/dob/downloads/pdf/co_factsheet.pdf. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for further details.)

(b) No Closing of a Unit will occur prior to the issuance of a TCO or PCO for the particular Unit. Notwithstanding the foregoing, Sponsor shall have the right to negotiate with an individual Purchaser of a "raw space" Unit to deliver such "raw space" Unit prior to the issuance of a Temporary or

Permanent Certificate of Occupancy. In such instance, the Purchaser of such "raw space" Unit, shall not be permitted to occupy such Unit until such time as a Temporary Certificate of Occupancy has been issued for such Unit. Purchasers of such "raw space" Unit will be obligated to comply with the provisions of the Bylaws pertaining to alterations of Units prior to commencing any build-out of such "raw space" Unit. Additionally, the Closing of Title to such "raw space" Unit shall not constitute the First Closing as defined herein, if such "raw space" Unit is delivered prior to the issuance of a Temporary Certificate of Occupancy. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for further details.)

(c)  The only construction prerequisite to Closing is the issuance of a Temporary Certificate of Occupancy. As such, each Purchaser shall be required to close title to their particular Unit once a Temporary Certificate of Occupancy is issued irrespective of outstanding items of work, provided Sponsor has satisfied the closing conditions set forth in the Section of the Plan entitled "Terms of Sale."

## On-Going Construction

17.  (a)  It is anticipated that for a significant period of time following the First Closing through, including and beyond the Closing of Title to any Unit, work should be expected to be undertaken and performed by or on behalf of Sponsor to complete construction of the Building, including without limitation, the Units, the amenities and facilities, Ancillary Amenities, the decoration or finishing of the lobby, corridors, elevator finishes and other portions of the Building, including installing light fixtures, painting, hanging wall coverings or laying carpeting. All of the foregoing work and conditions may create a noisy or otherwise disruptive condition in the Building. The Condominium Board may refuse to permit a Unit Owner to perform alterations in a Unit until such time as the Building has been completed and a PCO has been obtained. Certain services, such as telecommunications, and other similar services may be provided by outside suppliers and delays in providing these services shall not be the responsibility of Sponsor or the Condominium Board. Such suppliers may not provide these services until occupancy in the Building has reached certain levels. In addition, the presence of scaffolding, hoists or construction elevator shafts or similar temporary construction facilities may delay the Closing of Title to certain Units or lines of Units until such scaffolding, hoists, elevators or temporary facilities are no longer needed and are removed. (See the Section of the Plan entitled "Description of Property and Improvements" subsection "Services and Facilities" for details.)

(b)  Construction is a complicated process requiring the coordination of numerous tasks, contractors and suppliers and the balancing of complex mechanical and architectural systems. It is both customary and anticipated that certain issues will arise during the course of the construction process that warrant the taking of corrective action, including the repair or replacement of construction defects in order to satisfy Sponsor's obligations under the Plan.

(c)  No assurance can be given with regard to the accuracy of any projected completion dates set forth in the Plan. It is anticipated that during the first few years of Condominium operation, construction workers and related personnel will be at the Building from time to time, completing construction of the Building, making adjustments and corrections and performing various tasks relating to the completion of construction. During this period, various building systems, including but not limited to, water supply, air conditioning, heating, cooling, ventilating and elevators, may require substantial time to complete and may need to be shut down temporarily. Various other adjustments to windows and elevators and other systems may require substantial time to be completed after the First Closing. With regard to the foregoing, in executing an Option Agreement, Purchaser is acknowledging that Sponsor shall not be liable to Purchaser or any third party, nor will Purchaser be entitled to any credit, offset or reduction in the Purchase Price of the Unit or otherwise be relieved from any obligation under the Option Agreement: (i) as a result of any of the conditions described above; (ii) in the event of non-completion of any item of construction on any projected date; or (iii) compensation for the presence of scaffolding on any portion of the Building or any interruption of services in the Building. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for details.)

(d)     As is typical and customary in new construction buildings, the Building will be subject to normal settling, deflection, expansion and shifting. Sponsor will not be obligated to correct, and will not be liable to the Condominium Board or any Unit Owner as a result of any defects in construction, including without limitation, minor gapping in the flooring, uneven ceilings or floors and floor buckling resulting from such conditions. Additionally, Purchasers should note that since the ceramic, marble, stone and wood finishing installed throughout the Units (in areas including, but not limited to, flooring, walls, countertops, backsplash and vanity tops) are cut from different slabs and are comprised of natural materials, there will be variations in the tone and color of such finishes.

(e)     Since the Building is expected to be occupied by tenants and/or Unit Owners prior to the issuance of a PCO for the Building, a tenant protection plan will be distributed to each occupant who will be occupying any dwelling units in the Building during construction if required by the Buildings Department.

(f)     (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for further details.)

## Mechanical Equipment

18.     (a)     The Building will contain certain major mechanical equipment, including, but not limited to, elevator machine rooms, fans, pumps, emergency generator, domestic water tanks, chillers, packaged units and cooling towers (collectively, "Equipment") located throughout the Building.

(b)     The Condominium Board and Sponsor have the right to operate the emergency generator as necessary, as well as to activate the emergency generator for testing on a periodic basis, normally once per month. During such testing periods, which may occur at any time, Unit Owners may experience excessive noise and vibration, which may exceed applicable NYC noise requirements. The Condominium Board and Sponsor will attempt to minimize any potential disruption.

(c)     While Sponsor will endeavor to reduce excessive noise and vibration emanating from the Equipment, it is impossible to eliminate such noise and vibration entirely.

## Apportionments with the Condominium

19.     At the First Closing, certain apportionments will be made between Sponsor and the Condominium. If the result of the Closing adjustments is a net credit in favor of Sponsor, the payment of any net credit shall be deferred and paid to Sponsor by the Condominium in one installment on the first anniversary of the First Closing, without interest, pursuant to an unsecured, negotiable, promissory note to be executed by the Condominium Board and delivered to Sponsor at the First Closing. The promissory note may be prepaid by the Condominium in full at any time, or in part from time to time, without penalty. (See the Section of the Plan entitled "Working Capital Fund and Apportionments" for details.)

## Window Treatments

20.     In order to preserve the architectural harmony of the Building, the By-Laws provide that all Unit Owners shall be obligated, regardless of the type of window treatment they use, to provide for a white backing on the window treatment so that when the shades are down or curtains drawn, the effect from the outdoors is a visually harmonious white appearance.

## Effectiveness of the Plan

21.     Pursuant to Law, Sponsor may declare the Plan effective by entering into Option Agreements for the sale of a minimum of 15% of the Units offered for sale (excluding the Resident Manager's Unit and the Suite Units) (i.e. 5 Units).  Even if the Plan is declared effective with a minimum number of sales, it is possible that Sponsor may be able to create a Condominium with fewer than the minimum number of sales, if Purchasers counted towards effectiveness do not ultimately close title to their Units.  (See the Section of the Plan entitled "Effective Date" for details.)

## Option Agreement Not Contingent on Financing

22.     (a)     Although a Purchaser may obtain financing from any lending institution or other source, Purchaser's obligation to purchase a Unit is not contingent on Purchaser obtaining financing.  Neither Sponsor nor Selling Agent makes any representation as to the availability or terms of any financing.  Purchasers may want to finalize their financing arrangements before signing an Option Agreement.  While the First Closing is projected to occur on or around November 1, 2017, neither Sponsor nor Selling Agent makes any representation as to the actual closing date for any particular Unit.  In addition, as set forth in the Plan and the Option Agreement, Sponsor has the right to adjourn the Closing Date from time to time and prospective Purchasers should be aware that if the Closing Date is adjourned, Purchaser's financing terms may be adversely affected, the interest rate may increase and the loan commitment could expire.  Sponsor shall have no liability as a result of any scheduling or adjournment of closing beyond the expiration of a loan commitment.

(b)     Purchasers should note that in the current real estate market, banks and other lenders are imposing various restrictions on purchase financing.  Such restrictions include, among others, requiring that a certain percentage (such as 70% or more) of the units in a building or group of buildings be sold before a lender will consider making a loan.  Thus, it may be possible for a Purchaser to experience difficulties in obtaining a loan in a building or group of buildings where the percentage of units purchased and owner-occupancy is lower than a lender's particular sales or owner-occupancy minimum.  It also may be difficult for a Purchaser to resell a Unit if prospective buyers are unable to obtain a loan due to the same sales or owner-occupancy minimum requirements of lenders.  Moreover, some lenders will not provide financing in a building or group of buildings where an investor other than the original sponsor has an ownership of 10% or more.

(c)     Even after the Building has been submitted to a condominium regime, lenders may still impose minimum sales and/or owner-occupancy requirements before granting a loan.  It then may be difficult for a Purchaser to resell a Unit if prospective buyers are unable to obtain a loan due to such minimum sales and/or owner-occupancy requirements.

(d)     See the Section of the Plan entitled "Procedure to Purchaser" for details.

## Special Rights of Sponsor

23.     (a)     Sponsor shall have an exclusive right and easement (i) to erect, use, lease, maintain, repair, replace and operate (a) antennae, satellite dishes and other communications equipment, and (b) pipes, risers, ducts, flues and equipment necessary or desirable to provide heat, air-conditioning, exhaust, or ventilation as required or, as permitted by Law, on any part of the roof and/or façade of the Building and elsewhere on the Common Elements (excluding Terraces and Ancillary Amenities appurtenant to Units) and to utilize any risers, conduits, piping, cables, ducts and electrical panels and rooms, telephone/cable panels and rooms in connection therewith; and (ii) to erect, maintain, replace and/or repair any sign and/or lighting permitted by Law on the Property for the purposes of advertising the sale of any Unit, the leasing of space in any Unit or the operation of any business of a tenant or occupant of any Unit.  Sponsor shall be entitled to permit any one or more of such easements to be

utilized by Permitted Users. Sponsor reserves the right to install additional fireplace flues and mechanical equipment on the roof of the Building. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for details.)

(b)     Sponsor reserves the right, in its sole and absolute discretion, to sell, lease, license or otherwise transfer to a Unit Owner, any non-material portion of the Common Elements for the exclusive use of such Unit Owner, provided that (i) such Common Element was not offered in the Plan as a lobby or as an amenity for the shared use of the Unit Owners of the Condominium, and that (ii) such transfer does not interfere with the ingress or egress to any Unit. Any such sale, lease, license or transfer will be disclosed in a duly filed amendment to the Plan, and the Declaration and Floor Plans will be amended, if required. (See the Sections of the Plan entitled "Changes in Prices and Units" and "Rights and Obligations of Sponsor" for details.)

(c)     During the Sponsor Control Period, the Condominium Board shall have the right, in its sole discretion, to waive Unit Owner obligations to pay Common Charges from and after the First Closing for a period to be determined by the Condominium Board, provided the basic operating costs of the Condominium (inclusive of insurance premiums and reserves required by lenders) are paid by Sponsor. If the Condominium Board elects to waive payment of Common Charges pursuant to the foregoing, Sponsor shall disclose such waiver of Common Charges and the expected period of time of such waiver of Common Charges ("Waiver Period") in the post closing amendment to the Plan filed. In the event the Condominium Board elects to extend the Waiver Period, Sponsor will amend the Plan to disclose the extended Waiver Period. Sponsor shall file an amendment to the plan disclosing the expiration of the Waiver Period at least thirty (30) days prior to such expiration. Upon commencement of collection of Common Charges from all Unit Owners, there will not be a Special Assessment for any expense set forth in the approved budget for which Common Charges were not collected during the Waiver Period. The Condominium Board, which shall be under Sponsor's control during the Sponsor Control Period, shall remain obligated to update the budget for the Condominium in accordance with the terms of the Plan. (See the Section of the Plan entitled "Rights and Obligations of Unit Owners" subsection "Common Charge Determinations and Assessments" for details.)

(d)     Sponsor reserves the right to make any changes in the proposed Condominium Documents and modifications to the Plans and Specifications as may be necessary in Sponsor's sole discretion to conform to Law or to expedite the sale of the Units, or due to structural, architectural or mechanical considerations provided, however, that any such amendments, additions, or changes shall not materially and adversely affect a Unit Owner or Purchaser, increase any obligation of a Unit Owner or Purchaser to any adverse and material degree and any substitution of appliances, equipment or materials shall be of substantially equal or better quality. Any such material and adverse modification, addition or change will be reflected in a duly filed amendment to Plan. There is a rebuttable presumption that an increase or decrease in the square footage of a Unit, as set forth in the Schedule A, by 5% or less (excluding interior partitions) is not a material and/or adverse change. (See the Sections of the Plan entitled "Changes in Prices and Units" and "Rights and Obligations of Sponsor" for details).

(e)     No amendment, modification, addition or deletion of the terms of the Declaration, By-Laws or any Rules and Regulations (other than those required by Law) shall be effective against Sponsor unless Sponsor has given its prior written consent. (See the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-Laws" for details.)

## Lot Line Windows/Special Conditions Windows

24.     (a)     Lot line windows exist on the West façade of the Building. Purchasers should be advised that the following Units shall each contain lot line windows: Units 21–36, 39, 41, 43, 45, 47, 49, 51, 53, and 54; DP-PH Units 38, 40, 42, 44, 46, 48, and 50; and TRI-PH Unit 52. Purchasers wishing to identify specifically the lot line windows within each respective Unit should refer to the Floor Plans set forth in Part II of the Plan. Lot line windows are windows located on an exterior wall abutting (or less

than 30' 0" away from) a property line, where the adjacent property is owned by others. While such windows provide views, light and air to spaces in the Unit, they cannot be utilized to meet light and ventilation required by the Building Code of the City of New York. Units having lot line windows have other windows which satisfy requirements for the lawful use of such Units for habitation. Lot line windows are considered amenities that potentially can be lost. Should an abutting property owner redevelop such property with one or more buildings of different configurations, it may be necessary to close the affected lot line windows and seal them in a manner and with such materials as are acceptable to the Buildings Department and the Condominium. The cost to close-up any lot line windows, if necessary, shall be borne by the affected Unit Owner (including Sponsor with respect to Unsold Units, which cost is currently estimated to be approximately $5,000 per window. Neither Sponsor, Sponsor's architect, the Condominium Board nor any other Person who took part in this offering will have any liability or obligation if the closing-up of any or all lot line windows is required.

(b)     The east and south facing windows in Units14 through TRI-PH52 are located on the tax lot line that separates the new building (lot 9031) and the adjacent lot 31. These windows will provide legal light and air to the surrounding rooms for the purpose of permissible occupancy of those rooms. These windows will be protected with sprinklers and have safety glass to a height of 60'above the highest point of the current building on adjacent lots. Louvers within that height will have fire dampers. An agreement has been signed with the Owners of Lots 31, 42, and 36 that provides a perpetual easement for light and air over its property and a limitation not to build higher than its present height.

(c)     (See the "Description of Property and Improvements" set forth in Part II of the Plan for details.)

## Future Construction

25.     No representation is made that future construction in the neighborhood surrounding the Property will not result in obstruction of the views from any windows and/or Terraces in the Building. (See the Section of the Plan entitled "Location and Area Information" for details.)

## Unit Measurements

26.     (a)     Each Unit (with the exception of the Suite Units and the Resident Manager's Unit) is measured horizontally from the exterior side of the exterior walls to the centerline of the partitions separating mechanical equipment spaces or any Common Elements not within a Unit or to the exterior side of the opposite exterior walls, provided, however, (i) columns, mechanical pipes, shafts, shaftways, chases, chaseways and conduits in all Units; and (ii) elevator shafts, elevator lobby, and stairwells on the floors containing full floor units are not deducted from the measurement of each Unit. Each Unit is measured vertically from the top of the floor (located under the finished flooring and sub-flooring materials) to the underside of the ceiling. The corridor adjacent to the stairs is part of the Unit.

(b)     Each Suite Unit and the Resident Manager's Unit is measured horizontally from the exterior side of the exterior walls to the centerline of the partitions separating one Unit from another Unit, or separating one Unit from corridors, stairs, elevators and other mechanical equipment spaces or any Common Elements not within a Unit or to the exterior side of the opposite exterior walls, provided, however, columns, mechanical pipes, shafts, shaftways, chases, chaseways and conduits in all Units are not deducted from the measurement of each Unit. Each Unit is measured vertically from the top of the floor (located under the finished flooring and sub-flooring materials) to the underside of the ceiling.

(c)     As is customary in New York, these square foot areas exceed the usable floor area of each Unit and the usable floor area of the Unit may be substantially less than the square footage listed in the Schedule A. Measurements are approximate, within reasonable tolerances. (See the Footnotes to Schedule

A in Part I of the Plan and the "Description of Property and Improvements" set forth in Part II of the Plan for details.)

(c)    Floor Plans depicting the layouts of Units and the Ancillary Amenities appear in Part II of the Plan.

**Fire Door System**

27.    As is reflected on the Floor Plans set forth in Part II of the Plan, the Units are equipped with a fire door system as required by Law. The fire door system includes magnetic hold opens, automatic door closer, push button door open, fail open electronic strike and smoke detection system within the corridor (collectively, the "Fire Door System"). The doors are designed to automatically close in the event of a fire or alarmed event and create an emergency egress for the Building. Once closed, these doors serve as barriers to limit the spread of fire, restrict the movement of smoke and will not open until the alarmed event is rectified. Purchasers should note that since the fire doors are located within the Unit, in the event that the closing devices are activated, Purchasers who are located within the corridor at such time will not be able to re-enter the remaining sealed portions of the Unit and the corridor will become a common corridor which all Unit Owners can access until the situation is rectified. Purchasers are advised to refrain from keeping any valuables within such corridor. All maintenance and repair of the Fire Door System shall be performed by the Condominium Board and the cost and expense thereof will be charged to all Unit Owners as a Common Expense. Unit Owners are prohibited from modifying the Fire Door System in any way without the prior written approval of the Condominium Board. (See the "Description of Property and Improvements" set forth in Part II of the Plan for details.)

**Window Guards/Legally Compliant Window Stops**

28.    It is the responsibility of each Unit Owner to notify the Managing Agent in writing when a child or children under the age of eleven (11) years lives or resides (even temporarily) in the Unit. In the event that window guards or legally compliant window stops to be installed in the Unit, such installation shall be performed at the direction of the Managing Agent and the cost thereof (for the window guards or legally compliant window stops and installation thereof and of any additional equipment required by Law) shall be charged to and paid by the Purchaser/Unit Owner of the Unit. It is the responsibility of each Unit Owner to ensure that all operable windows opening into the Unit comply with Laws relating to window guards and, if necessary, install, operate and maintain, at the Unit Owner's expense, any additional equipment required by Law. Sponsor makes no representation, warranty or assurance whether Unit Owners will comply with the foregoing obligations. (See the Section of the Plan entitled "Terms of Sale" for details.)

**Development Rights**

29.    (a)    Sponsor (X) is the owner of development rights and easements in connection with that certain real estate having a street address of 520 Park Avenue, New York, NY and as set forth on the Tax Map as Block 1375 Lot 36 pursuant to a Zoning Lot Development and Easement Agreement dated as of February 27, 2013, and recorded under CRFN 2013000125786 on March 27, 2013 between Christ Church, Methodist, of New York City and Sponsor; and (Y) as the successor in interest to 43-45 East 60th, LLC and 43-45 East 60th LLC, is the owner of: (a) development rights and easements in connection with that certain real estate having a street address of 47 East 60th Street, New York, NY and as set forth on the Tax Map as Block 1375 Lot 31 pursuant to a Zoning Lot Development and Easement Agreement dated as of May 31, 2006, and recorded under CRFN 2006000364368 on July 1, 2006 between The Grolier Club of The City of New York and 43-45 East 60th, LLC; (b) development rights and easements in connection with that certain real estate having a street address of 46 East 61st Street, New York, NY and as set forth on the Tax Map as Block 1375 Lot 42 pursuant to a Zoning Lot

00019719.DOC.v9

Development and Easement Agreement dated as of December 21, 2010, and recorded under CRFN 2011000098344 on March 18, 2011 between New York 61st Street Estate Inc. and 43-45 East 60th LLC.

(b)     Sponsor does not anticipate that any Excess Development Rights will remain upon completion of the Building. However, if the applicable provisions of the Zoning Resolution change in the future, such changes may generate transferable Excess Development Rights which will not be included in the Property and shall be the exclusive property of Sponsor. Sponsor cannot represent the amount of transferable Excess Development Rights that could result from such changes. Neither the Condominium Board nor any Unit Owner (other than Sponsor or a Development Rights Owner) shall have any right or interest in any Excess Development Rights.

(c) See the Section of the Plan entitled "Rights and Obligations of Sponsor" for details.

**Use and Occupancy**

30.     Sponsor reserves the right with respect to any Unsold Unit, to enter into a pre-closing Use and Occupancy Agreement with the Purchaser of such Unsold Unit on an interim basis on such terms and conditions as may be agreed to between Sponsor and Purchaser. Purchasers are advised that the occupancy under such Use and Occupancy Agreement is not subject to any governmental regulations, including, without limitation, rent regulations or continued occupancy. Upon the execution of the Use and Occupancy Agreement, Sponsor will require Purchaser to execute a Stipulation of Settlement Holdover, by which Purchaser will consent to a final judgment of possession of the Unsold Unit in favor of Sponsor and to the immediate issuance of a warrant of eviction, in the event of a default under the Use and Occupancy Agreement. Purchaser should refer to the Section of the Plan entitled "Use and Occupancy Agreements" as well as the form of Use and Occupancy Agreement and Stipulation of Settlement Holdover set forth in Part II of the Plan.

**Principals of Sponsor Have Executed The Certification of Sponsor and Principals for Compliance with the Martin Act and Governing Regulations**

31.     Consistent with a recent First Department decision, the principals of Sponsor expressly disclaim the existence of any private right of action for contract claims by individual unit owners (or a board on their behalf) in connection with or arising solely from their execution of the Certification of Sponsor and Principals, absent liability under another statute or under an alter-ego or other veil-piercing theory. See Board of Managers of 184 Thompson Street Condominium v. 184 Thompson Street Owner LLC. et al, 2013 N.Y. Slip Op 03574 (1st Dept. May 16,2013).

**Insurance Premiums**

32.     The insurance line item set forth in the Footnotes to Schedule B, represents current insurance premiums at current rates. In recent years, premiums for insurance (especially fire, liability and flood insurance) have increased significantly. Although the projection is believed to be reasonable, Purchasers should note that insurance premiums could increase depending on market and weather conditions. It is not possible to predict whether future premiums will continue to escalate at the same substantial rate or will level off. No guaranty is given that the Budget item will not increase. (See the Footnotes to Schedule B for details.)

**Marketing Materials**

33.     In no event shall the presence of any furniture, furnishings, finishes, equipment or decorations, wall coverings, window treatments, carpeting and the like ("FFE") in any portion of the Building or Units set forth in any marketing materials and/or advertisements, and/or websites used in connection with the sales and marketing of the Units imply or represent that any such FFE will be located within any portion of the Building or Units. The presence of FFE in such marketing materials is for illustrative purposes only. In addition, marketing materials may designate or label or use nomenclature to describe certain areas or rooms within Units that differs from the designations utilized on the Floor Plans of the Units set forth in Part II of the Plan, including, without limitation, closets, hallways, dens/media rooms and powder rooms. The use of such designations, labels or nomenclature is for marketing purposes only and does not obligate Sponsor to deliver such areas or rooms designed or fitted out in the manner depicted or implied in the marketing materials.

**Fire Suppression Tank Room**

34.     At floors 48 and 49, there will be a double height room containing a fire suppression tank and accessory pumps for the Building's fire protection system ("Fire Suppression Tank Room"). The Fire Suppression Tank Room, which can only be accessed from inside Unit DP-PH 48, shall be a General Common Element. In addition to all other easements and rights granted in the Declaration, Sponsor, the Managing Agent, and the Condominium Board, and each of their respective Permitted Users shall have an easement in, through and upon both floors of Unit DP-PH 48 for the purpose of accessing, servicing, maintaining and utilizing the Fire Suppression Tank Room. It is anticipated that such easement will be exercised three (3) times per year. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" set forth in Part I of the Plan as well as the "Description of Property and Improvements" and "Declaration of Condominium" set forth in Part II of the Plan.)

**Tuned Mass Damper**

35.     As a result of the Building's overall dimensions, a tuned mass damper will be located at the roof level of the Building in order to mitigate the lateral movement of the Building and reduce such movement to levels acceptable in the industry. The tuned mass damper will function only to improve occupant comfort to acceptable industry levels and should not be relied upon in any way to structurally reinforce the building. Sponsor has been advised by its constructional professionals that the tuned mass damper should not increase any noise levels in the Building. (See the Description of Property and Improvements set forth in Part II of the Plan for details.)

**Decorative Fountains/Display Pool**

36.     There will be three decorative vessel stone fountains at the garden adjacent to the lobby on the first floor, providing a water overflow into a display pool. The decorative fountains and the display pool are provided solely for aesthetic value and are not designed for occupancy of any kind. (See the Section of the Plan entitled "Description of the Property and Improvements.")

**Marketing Floors**

37.     Purchasers are advised that while construction necessitates a sequential numbering of floors for a building, common in New York City is to designate floor numbers solely for marketing purposes. Purchasers should note that the Building does not contain floors designated with the numbers 8 through 13. As such, the Units (excluding the Suite Units) will start on floor 14 (construction floor 8). Purchasers should note that a Unit may be located on floor designated with a higher number than the actual construction level that it is located on. All floor numbers referenced in the Offering Plan refer to

the marketing floors and not the construction floors. (See the Description of Property and Improvements set forth in Part II of the Plan for details.)

# INTRODUCTION

## Nature of the Transaction

41-45 Property Owner, LLC ("Sponsor") is a limited liability company organized and existing under the laws of the State of Delaware. Sponsor acquired the Property on February 27, 2013 from 40 East 60th Associates and 43-45 East 60th LLC.

Sponsor presents this offering plan, as the same may be amended from time to time ("Plan") for the establishment of condominium ownership of the Land and Building pursuant to the Condominium Act. The Condominium will be known as 520 Park Avenue Condominium and located at 520 Park Avenue, New York, New York 10022 ("Property").

The principals of Sponsor who will be actively involved in this offering are William Lie Zeckendorf, Arthur Zeckendorf, Rafael Nasser, and Samuel Kellner. (See the Sections of the Plan entitled "Identity of Parties" and the "Certification of Sponsor and Principals" in Part II of the Plan for details.)

The Condominium will consist of: (a) 32 Units (including 1 Resident Manager's Unit); (b) 7 Suite Units; (c) 15 Storage Lockers; and (d) 10 Wine Storage Lockers. The Storage Lockers and Wine Storage Lockers are collectively referred to as the "Ancillary Amenities."

## The Offering Plan

The purpose of the Plan is to set forth in detail all material facts relating to the offering by Sponsor. The Plan contains all of the detailed terms of the transaction.

Sponsor may from time to time amend the Plan by filing an amendment with the New York State Department of Law ("Department of Law") and serving such amendment on Purchasers and Unit Owners.

The Plan is presented in two parts that, together with all documents filed with the Department of Law, constitute the entire offer of Sponsor. Part I sets forth a general description of the offering and the Condominium and Part II contains the basic documents necessary to create the Condominium and otherwise effectuate the Plan. Also included in Part II is a detailed physical description of the Property and certifications as to certain matters discussed in the Plan.

In addition, Sponsor has filed with the Department of Law, Exhibits to the Plan which, along with the Plan, constitute the entire offer of Sponsor. Copies of the Plan and all documents referred to in the Plan and all Exhibits submitted to the Department of Law in connection with the Plan shall be available for inspection by prospective Purchasers and their attorneys without charge and for copying at a reasonable charge by any Person who shall have purchased a Unit offered by the Plan at the office of the Selling Agent or the Sales Office and available for inspection and copying at the office of the Department of Law. A prospective Purchaser may borrow the Plan upon payment of a $300 deposit, which amount will be fully refunded upon either (i) the prompt return of the Plan in good condition or (ii) the execution by the prospective Purchaser of an Option Agreement subsequently accepted by Sponsor. Prospective Purchasers are also advised to consult with their own attorneys or other advisers before agreeing to purchase. All documents are important and should be carefully read by prospective Purchasers.

All capitalized terms used in the Plan shall have the meanings ascribed thereto in the Section entitled "Definitions," unless otherwise defined.

**The Property**

The Building will be newly constructed. Based upon the current construction schedule, Sponsor contemplates that, unless delayed by Force Majeure, construction of the Building will be sufficiently completed to permit closings of Units to begin on or about November 1, 2017. Purchasers should note however that: (i) Units will be completed at different times over a period that may begin prior to and/or extend significantly beyond such projected date, and (ii) Units on higher floors generally close later than Units on lower floors. Sponsor will have no liability to any Purchaser, nor will any Purchaser be entitled to any credit, offset or reduction in the Purchase Price or otherwise be relieved from any obligations under the Option Agreement, if the First Closing occurs earlier or later than the projected date, or the time to complete or to close title to any Unit is delayed or postponed by Sponsor. Sponsor has the right to change the projected First Year of Condominium Operation from time to time by an amendment to the Plan. If the First Closing does not occur within 12 months after the date set forth in Schedule B for the commencement of the First Year of Condominium Operation in effect on the date a Purchaser and Sponsor entered into a Option Agreement, Sponsor will offer those affected Purchasers only a right to rescind their Option Agreements for 15 days from the Presentation Date of the amendment disclosing Sponsor's failure to close within such time frame. Any Purchasers electing rescission will have their Deposits returned together with any interest earned thereon, except for any Unit Upgrade Funds.

A detailed description of the Property is contained in the Section of the Plan entitled "Description of the Property and Improvements" and in the Description of Property and Improvements set forth in Part II of the Plan.

**Offering of Units for Sale**

Sponsor hereby offers the Units for sale pursuant to the Plan. The Purchase Prices for each of the Units are listed in the Section of the Plan entitled "Schedule A - Purchase Prices and Related Information" ("Schedule A"). THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENTAL AGENCY.

The Grolier Club shall have a right of first offer to purchase two (2) Suite Units, at the purchase prices set forth in Schedule A – Purchase Prices and Related Information, which right must be exercised within thirty (30) days' notice to the Grolier Club. The Suite Units purchased by the Grolier Club, if applicable, can only be used as a residence for the superintendent of the Grolier Club. Sponsor shall have a right of first refusal to purchase such Suite Units from the Grolier Club prior to any resale by the Grolier Club of any such Suite Unit within a thirty (30) day exercise period.

**Offering of Ancillary Amenity Licenses for Sale**

Certain portions of sub-cellar 3 will be designated as Ancillary Amenity Areas in which the Ancillary Amenities will be located. Sponsor hereby offers the Ancillary Amenities for sale pursuant to the Plan and pursuant to a licensing arrangement ("Ancillary Amenity License"). An Ancillary Amenity may only be purchased by a Purchaser of a Unit. The Purchase Price for each of the Ancillary Amenities are listed in Schedule "A." THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENTAL AGENCY. The Condominium Board has the right to impose monthly license fees in connection with Ancillary Amenity Licenses.

Purchasers should note that the Closing of an Ancillary Amenity License does not require the issuance of a Temporary Certificate of Occupancy. Purchasers will be required to consummate the purchase of the Unit and the Ancillary Amenity License simultaneously at Closing even though a Temporary Certificate of Occupancy has not been issued (and access may not be available) to the Ancillary Amenity Area in which the Ancillary Amenity is located. In such event, the proceeds from the sale of the Ancillary

Amenity License will be held in escrow ("Ancillary Amenity Escrow") by Escrow Agent until such time as a Temporary Certificate of Occupancy has been issued for the Ancillary Amenity Area in which the Ancillary Amenity is located. The Ancillary Amenity Escrow will be held in an Interest-On-Lawyer's-Account ("IOLA")_pursuant to New York Judiciary Law Section 497. Purchasers will earn no interest on the Ancillary Amenity Escrow.

Sponsor reserves the right to offer as many Ancillary Amenity Licenses as it determines and to withhold one or more for future sale. Sponsor reserves the right to designate at Closing the specific Ancillary Amenity which will be subject to the Ancillary Amenity License. In addition, Sponsor has the right to limit the number of Ancillary Amenity Licenses sold to any single Purchaser of a Unit or to make bulk sales, as it deems fit.

Although the Ancillary Amenity Areas are Common Elements, the Condominium Board has granted Sponsor the exclusive right, without charge, to sell Ancillary Amenity Licenses located therein. The Condominium will not be entitled to any of the proceeds from the sale of the Ancillary Amenity Licenses. The Condominium Board has the right to impose monthly license fees and Special Assessments in connection with the Ancillary Amenity Licenses.

### Conveyance of Title

In the event of the existence of any lien, encumbrance or title defect other than Permitted Encumbrances which Sponsor fails or refuses to correct, the sole remedy of Purchaser under the Plan, provided Purchaser is not then in default, will be to either (i) take title subject to the title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (ii) terminate the Option Agreement, within 15 days after receipt of notice or an amendment disclosing such lien, encumbrance or title defect. If Purchaser fails to notify Sponsor of Purchaser's election within 15 days after Sponsor notified Purchaser of Sponsor's failure or refusal to remedy the title defect, it will be conclusively deemed that Purchaser elected to acquire title subject to the title defect. Sponsor has no obligation to institute any action or proceeding or to expend any sum of money in excess of ½ of 1% of the Purchase Price of the affected Unit to make title insurable or to eliminate any encumbrances or title defects. (See the Section of the Plan entitled "Terms of Sale" for details.)

### Sponsor's Reservation of Right to Rent Rather than Sell Units

Sponsor intends, in good faith, to sell rather than rent Units. However under the Plan, Sponsor has reserved the unconditional right to rent Units rather than sell Units. Because Sponsor is not limiting the conditions under which it will rent rather than sell Units, Sponsor is not committed to sell more Units than the 15% necessary to declare the Plan effective and, therefore, owner-occupants may never gain effective control and management of the Condominium.

Sponsor intends to offer Units for sale both to Purchasers for personal occupancy and Purchasers who are purchasing for investment or resale. Purchasers for investment or resale may, in turn, rent such Units and accordingly, such Units will not be used for the personal occupancy of the owner thereof. As a result, some and possibly many Units may be occupied by renters instead of Unit Owners. Since the Condominium Board does not have the right to approve or disapprove potential purchasers of Units, the Condominium Board is unable to limit the number of purchasers who purchase Units for investment or resale rather than for personal occupancy and there may always be a substantial percentage of Unit Owners who are not occupants. It is possible that those Unit Owners who occupy their Units may have different interests than those Unit Owners who purchased such Units as an investment.

Sponsor reserves the right to offer the Units in such order of priority as it may determine, and to withhold one or more Units for future sale or rental. In addition, Sponsor has the right to limit the number of Units sold to any Purchaser and to make Bulk Sales of Units. The Purchaser of such Units shall be bound by Sponsor's representations set forth herein with regard to its commitment to sell Units. The term "Bulk Sales"

shall mean the transfer of 10 or more Units or 20% of the total number of Units in the Condominium, whichever is less.

Purchasers should note that in the current real estate market, banks and other lenders are imposing various restrictions on purchase financing. Such restrictions include, among others, requiring that a certain percentage (such as 70% or more) of the units in a building or group of buildings be sold before a lender will consider making a loan. Thus, it may be possible for a Purchaser to experience difficulties in obtaining a loan in a building or group of buildings where the percentage of units purchased and owner-occupancy is lower than a lender's particular sales or owner-occupancy minimum. It also may be difficult for a Purchaser to resell a Unit if prospective buyers are unable to obtain a loan due to the same sales or owner-occupancy minimum requirements of lenders.

Sponsor has not yet procured financing for the construction of the Building. Subsequent to Sponsor's acquisition of construction financing, Sponsor will amend the Plan to disclose any requirements imposed by the construction lender with respect to the sale of the Units.

## Basic Aspects of Condominium Ownership

The ownership of a Unit is similar in many respects to the ownership of a private home. Each Unit Owner owns fee title to the Unit and is entitled to the exclusive possession and use thereof and is obligated to comply, with the terms of the Condominium Documents and any other requirements implemented by the Condominium Board. Each Unit Owner also owns, in common with the owners of all other Units, an undivided interest in (and right to use) the Common Elements. The Common Elements are comprised of: (i) portions of the Property serving and benefiting all Units, generally, including, for example, the Land upon which the Building stands, foundations and supports of the Building, and hallways, corridors and elevators, these Common Elements being more specifically designated as "General Common Elements," and (ii) portions of the Building exclusively serving and benefiting one Unit, such as a Terrace, these Common Elements being specifically designated as "Limited Common Elements."

Subject to certain conditions contained in the By-Laws, each Unit Owner may mortgage the Unit with such lender and in such amount as the Unit Owner chooses. However, Sponsor makes no representations about the financeability of any Unit. There are no limitations or restrictions upon the rights of Sponsor to mortgage Unsold Units. Each Unit is separate and will not be subject to the lien of any mortgage placed by other Unit Owners on their respective Units.

Operation of the Condominium will be vested in a Condominium Board, the members of which will be elected by the Unit Owners, subject to the rights of Sponsor to designate members of the Condominium Board, as set forth in the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-Laws." When voting for members of the Condominium Board, each Unit Owner shall be entitled to cast one vote for each .0001% of Common Interest attributable to the Unit per Member to be elected.

A Unit Owner may decorate and construct the interior of the Unit in any way the Unit Owner desires, subject to compliance with the Condominium Documents and Law, and will be solely responsible for the cost of maintenance and interior repairs to the Unit after Closing.

Each Unit will be taxed as a separate tax lot for real estate tax purposes and a Unit Owner will not be responsible for the payment of, nor will the Unit be subjected to any lien arising from the non-payment of real estate taxes assessed against any other Unit. In the opinion of Tax Counsel, which opinion is set forth in full in Part II of the Plan, a Unit Owner who itemizes deductions may be eligible, under current Law, to deduct from income for income tax purposes, real estate taxes and interest paid on the Unit Owner's mortgage, subject to certain exceptions and limitations discussed in the "Attorney's Income Tax Opinion" set forth in Part II of the Plan. (See the Section of the Plan entitled "Income Tax Deductions to Unit Owners and Tax Status of the Condominium" for details.)

Each Purchaser of a Unit will be required to pay, as a closing cost, a portion of the purchase price and associated closing costs with respect to Sponsor's sale of the Resident Manager's Unit to the Condominium Board, as set forth in Schedule A.

The statute concerning condominiums in effect in the State of New York pursuant to which the Condominium will be organized by Sponsor is Article 9-B of the Real Property Law of the State of New York, as amended, commonly known, and hereinafter referred to as the "Condominium Act." The Property will be submitted to the provisions of the Condominium Act by recording the Declaration in the Register's Office by Sponsor. The Condominium will comply with all Laws applicable to condominiums in the State of New York.

The cost of operating the Condominium will be borne entirely by the Unit Owners in accordance with allocations set forth in the "Schedule B -- Projected Budget for First Year of Condominium Operation." As more particularly set forth in the By-Laws, the Condominium Board will determine the amount of Common Expenses. On a monthly basis or at such other times as the Condominium Board determines, the Condominium Board will assess Unit Owners for Common Charges to meet Common Expenses. Common Charges will be assessed against Unit Owners in the same proportion their respective Units bear to the aggregate Common Interests of all Units. The estimated Common Charges for each Unit for the First Year of Condominium Operation are set forth in Schedule A. Purchasers are obligated to pay monthly Common Charges pursuant to the Condominium Act (RPL Sections 339 (i) and (m)).

The Common Interests of each Unit in the Common Elements have been allocated pursuant to the method set forth in Real Property Law Section 339-i(l) based upon the approximate proportion that the floor area of the Unit at the date of the Declaration bears to the then aggregate floor area of all the Units, but such proportion reflecting the substantially exclusive advantages enjoyed by one or more but not all Units in a part or parts of the Common Elements in accordance with subsection (ii).

Unit Owners will have no interest in any rents, net profits or revenues derived from the rental or use of any Unit owned by another. The aggregate Common Interest of all Units equals 100%. The percentage of Common Interests are the basis for determining a Unit Owner's share of distribution upon termination of the Condominium with Unit Owners then sharing pro rata in the proceeds of the Condominium. Each Unit's Common Interest and estimate of the Common Charges that will be payable by the Unit Owner during the First Year of Condominium Operation of the Property subsequent to the First Closing are set forth in the Section of the Plan entitled "Schedule A – Purchase Prices of Units and Related Information."

After the Closing of Title to a Unit, a Unit Owner will be solely responsible for maintaining casualty insurance with respect to the Unit, including, without limitation, the flooring, fixtures, furniture, furnishings, equipment, appliances and personal property located within the Unit, any Limited Common Elements appurtenant thereto, and any Ancillary Amenity licensed by the Unit Owner, as well as liability insurance with respect to occurrences in or about the Unit, any Limited Common Elements appurtenant thereto, and any Ancillary Amenity licensed by the Unit Owner. The Condominium Board will be solely responsible for maintaining casualty and liability insurance with respect to the Common Elements (except for Ancillary Amenities), in accordance with the provisions of the By-Laws. (See the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-Laws" for details.)

Each Purchaser of a Unit will be required to make a non-refundable contribution to the Working Capital Fund of the Condominium. Such contribution, to be made at the time of Closing of the Unit, shall be in an amount equal to 2 months' Common Charges assessed against the Unit at Closing. (See the Section of the Plan entitled "Working Capital Fund and Apportionments" for details.)

In addition to the payment of Common Charges, each Unit Owner will be responsible for the payment of the real estate taxes with respect to the Unit (both before and after such taxes are separately assessed and billed against the Unit by the City of New York), interest and amortization payments on any mortgage and charges for electricity consumed in the Unit.

A Unit shall be used for residential purposes only, including permitted "home occupation" as defined in the Zoning Resolution of the City of New York, as may be amended from time to time, (except as described below), and not more than one family may occupy a Unit at one time. A Unit may not be used for any "dormitory," "bed and breakfast" or other transient hotel-type use. A Unit owned or leased by an individual, corporation, partnership, limited liability company, fiduciary or any other entity (including, but not limited to, embassies and consulates of foreign governments) may only be occupied by such individual, an officer, director, stockholder or employee of such corporation, a partner or employee of such partnership, a member of such limited liability company, the fiduciary or beneficiary of such fiduciary, a principal or employee or such other entity, respectively, or by members of the immediate family or guests of any of the foregoing. A Unit may be used for any other purpose, provided such use is permitted by, and complies with Law, does not violate the then existing Temporary or Permanent Certificate of Occupancy covering the Building, and the Condominium Board, in its sole discretion, grants permission for such use. Use and occupancy of the Unit shall be subject to the Rules and Regulations of the Condominium which may be amended from time to time.

The Suite Units may be used only as a residence occupied by domestic employees of a Unit Owner, as well as Family Members and non-paying guests of Unit Owners. Occupancy of the Suite Units by non-paying guests cannot exceed 3 months, without the prior written consent of the Condominium Board. Except for Sponsor and any Suite Units owned by the Grolier Club, no Unit Owner may own a Suite Unit independently of a Unit. Each Suite Unit will be equipped with a kitchenette and bathroom. A Suite Unit cannot be leased independently of a Unit.

A Storage Locker may be used only for the storage of personal effects of a Unit Owner, and in no event shall any food or other perishable item, or any flammable or explosive item or any item which would impose a health or safety threat or cause noxious odors, dirt or other sanitary problems or create a nuisance, be stored therein. Except for Sponsor and the Condominium Board, a Storage Locker may not be licensed independently of a Unit.

A Wine Storage Locker may be used only for the storage of wine and other beverages, subject to the provisions of the By-laws, and in no event shall any food or other perishable item, or any flammable or explosive item or any item which would impose a health or safety threat or cause noxious odors, dirt or other sanitary problems or create a nuisance, be stored therein. Except for Sponsor and the Condominium Board, a Wine Storage Locker may not be licensed independently of a Unit.

With certain exceptions, as set forth in the By-Laws, any sale or rental of a Unit will be subject to a right by the Condominium Board to acquire or lease such Unit or to produce a third party to acquire or lease such Unit on the same terms as were offered to the owner of such Unit. Sponsor may sell or lease any of its Units, or portions thereof, without any restriction or limitation. Since the Condominium Board does not have the right to approve or disapprove potential purchasers of Units, the Condominium Board is unable to limit the number of purchasers who purchase Units for investment or resale rather than for personal occupancy and there may always be a substantial percentage of Unit Owners who are not occupants. It is possible that those Unit Owners who occupy their Units may have different interests than those Unit Owners who purchased such Units as an investment. (See the Section of the Plan entitled "Rights and Obligations of Unit Owners" subsection "Sales and Leases of Units" for details.)

Each Unit Owner has exclusive use, subject to any and all Rules and Regulations implemented by the Condominium Board, of any Limited Common Element appurtenant to the Unit, as shown on the Floor Plans included in Part II of the Plan, and is responsible for all normal maintenance, repairs and replacements thereto. However, the costs and expenses of any structural or extraordinary repairs or replacements to any Limited Common Element (including any leaks which are not caused by the negligence of the Unit Owner having access to same) shall be charged to all Unit Owners as a Common Expense. The type, size, weight, location and quantity of plantings and other installations to be placed on Terraces shall be subject to the prior written approval of the Condominium Board and shall be in compliance with Law.

There are no limitations on who may purchase Units, except as set forth herein. Under the New York Real Property Law, a condominium unit may be owned by an individual, a corporation, a partnership, limited liability company, an association, a trust or any other entity which is permitted to take title pursuant to Law. Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, without the consent of any of the Condominium Board, any Unit Owner or mortgagee, to refuse to approve and execute Option Agreements for one or more Units to any Person. Sponsor shall not discriminate against any person because of race, creed, color, sex, sexual orientation, disability, marital status, age, ancestry, national origin or other ground proscribed by Law. No binding obligation will arise for the sale of a Unit unless and until an Option Agreement executed by both Purchaser and Sponsor has been exchanged and Sponsor has collected the funds constituting Purchaser's required Premium Payment thereunder (see the Section of the Plan entitled "Procedure to Purchase" for details). Sponsor will not accept an offer of purchase from an individual younger than 18 years of age or an incompetent under Law.

The Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§1701 et seg. ("Act") is a federal statute that requires sponsors of certain new construction condominiums to file a disclosure statement or property report ("Report") with the U.S. Department of Housing and Urban Development ("HUD") and provide the Report to purchasers unless the condominium is exempt from this requirement.

Unless an exemption applies, the Report must be provided to prospective purchasers in advance of or contemporaneous with the purchaser executing an Option Agreement. Any exemption a sponsor claims is self-determined unless the sponsor states it has previously obtained an advisory opinion from HUD. If a sponsor is required to file a Report for that condominium and fails to do so, or fails to provide a purchaser with a Report in advance of the purchaser executing the option agreement, the purchaser may be entitled to rescission of the option agreement. Purchasers are advised to consult with their attorneys regarding Act and any rights that may be available to them pursuant to the Act.

The Condominium qualifies for the exemption specified in 1702(b)(1) of the Act, commonly known as the "100 lot exemption". Pursuant to the "100 Lot exemption", sales of units in a condominium building containing less than 100 residential units are exempt from the Act's registration and disclosure requirements. Since the Condominium will consist of 39 Units (including the Suite Units), this offering is exempt from those requirements and no Report will be provided to Purchasers.

The Attorney General's office has not verified or approved the disclosure set forth above.

**THE PURCHASE OF A CONDOMINIUM HAS MANY SIGNIFICANT LEGAL AND FINANCIAL CONSEQUENCES AND MAY BE ONE OF THE MOST IMPORTANT FINANCIAL TRANSACTIONS OF YOUR LIFE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK STRONGLY URGES YOU TO READ THIS OFFERING PLAN CAREFULLY AND TO CONSULT WITH AN ATTORNEY BEFORE SIGNING AN AGREEMENT TO PURCHASE A CONDOMINIUM UNIT.**

## DEFINITIONS

For convenience of presentation, general definitions of certain of the terms used in the Plan are set forth below, which definitions are subject in most cases to the more particular definitions of such terms set forth in the Declaration, the By-Laws and the Condominium Act. They include the following:

"<u>Adverse Effect</u>," or "<u>adverse effect</u>" shall mean any action or proposed change with respect to any Unit Owner(s), that such action or change could, if realized, (i) increase the Common Charges payable over those set forth in the budget in effect at the time in question by 25% or more, (ii) materially and permanently interfere with such Unit Owner's access to the Unit, (iii) materially and permanently obstruct or degrade the view from the windows and/or Terraces of the Unit (excluding the lot line windows) or (iv) otherwise materially diminish the use and enjoyment of the Unit.

"<u>Ancillary Amenities</u>" shall mean the Storage Lockers and Wine Storage Lockers.

"<u>Ancillary Amenity Area</u>" shall mean the areas located on sub-cellar 3 containing the Wine Storage Lockers and Storage Lockers. The Ancillary Amenity Areas are General Common Elements.

"<u>Ancillary Amenity License</u>" shall mean the agreement pursuant to which an Ancillary Amenity is licensed to a Unit Owner.

"<u>Ancillary Amenity Licensee</u>" shall mean any Unit Owner who licenses an Ancillary Amenity at the time in question. All such Unit Owners are, collectively, referred to as "Ancillary Amenity Licensees."

"<u>Appurtenant Interest</u>" shall mean, with respect to any Unit, the undivided interest of the owner thereof, pursuant to the terms of Section 339-x of the Condominium Act, in and to: (i) the Common Elements; (ii) any other Units owned or leased at the time in question by the Condominium Board or its designee, corporate or otherwise, on behalf of all Unit Owners; (iii) any proceeds of the sale or rental of Units of the nature described in subdivision (ii) above; and (iv) any other assets of the Condominium.

"<u>Building</u>" shall mean the building located at 520 Park Avenue, New York, New York 10022.

"<u>Buildings Department</u>" shall mean the office of the New York City Department of Buildings or any successor agency.

"<u>By-Laws</u>" shall mean the by-laws governing the operations of the Condominium, which are set forth as Exhibit D to the Declaration, as the same may be amended from time to time, which are set forth in Part II of the Plan.

"<u>Christ Church</u>" shall mean the religious not-for-profit corporation Christ Church, Methodist, of New York City, which is organized under the laws of the State of New York and has an address at 524 Park Avenue, New York, New York, 10022.

"<u>Closing</u>" or "<u>Closing of Title</u>" shall mean the date, time, place and procedure by which, among other things, fee title to a Unit and its appurtenant Common Interest is conveyed pursuant to a fully-executed Option Agreement.

"<u>Closing Date</u>" shall mean the date on which a Closing occurs.

"<u>Common Charges</u>" shall mean the charges allocated and assessed by the Condominium Board to the Unit Owners, pro-rata, in accordance with their Schedule B allocations and as provided in the Declaration or in the By-Laws to meet the Common Expenses.

"<u>Common Elements</u>" shall mean the Property, other than the Units themselves, being comprised of the General Common Elements and the Limited Common Elements.

"Common Expenses" shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Declaration and/or the By-Laws in connection with: (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Common Elements; (ii) the establishment and/or maintenance of a general operating reserve, or a reserve fund for working capital, for replacements with respect to the Common Elements, or to make up any deficit in the Common Charges for any prior year(s); and (iii) generally, the conduct of the affairs of the Condominium.

"Common Interest" shall mean the proportionate undivided interest, expressed as a numerical percentage, in the Common Elements appurtenant to each Unit, as determined in accordance with the Declaration. The total of all Common Interest percentages appurtenant to all Units equals 100%. The Common Interest attributable to each Unit is set forth on Exhibit B annexed to the Declaration.

"Condominium" shall mean the 520 Park Avenue Condominium which will be established pursuant to the terms of the Declaration and which is governed pursuant to the terms of the By-Laws.

Condominium Act" shall mean the New York Condominium Act, as amended from time to time (New York Real Property Law, Article 9-B).

"Condominium Board" shall mean the board of managers of the Condominium who will manage the affairs of the Condominium.

"Condominium Documents" shall mean the Declaration, the By-Laws, the Rules and Regulations and the Floor Plans.

"Declarant" shall mean 41-45 Property Owner, LLC and its successors and assigns.

"Declaration" shall mean the instrument creating the Condominium, as the same may be amended from time to time, which is set forth in Part II of the Plan.

"Department of Law" shall mean the Real Estate Finance Bureau of the Department of Law of the State of New York.

"Development Rights Owner" shall mean Sponsor or any Person which acquires all or any portion of the Excess Development Rights from Sponsor.

"Effective Date" shall mean the date upon which the Plan is declared effective.

"Excess Development Rights" shall mean certain rights, as determined by the Zoning Resolution of the City of New York ("Zoning Resolution"), that are available as of the date of the Declaration or may become available thereafter by any means, and are appurtenant to a zoning lot, whereby (a) contiguous tax lots may be merged into a single zoning lot ("Combined Zoning Lot") and the Combined Zoning Lot or a portion thereof may be developed by erecting thereon one or more structures with (i) "floor area" (as such term is defined in the Zoning Resolution); (ii) any bulk and density development rights permitted under the Zoning Resolution, (iii) any so-called bonus redevelopment rights hereafter appurtenant to the Property; or (b) excess "floor area" not utilized by the Building as of the date of the Declaration may be utilized on the zoning lot or transferred to other zoning lots as permitted by the Zoning Resolution.

"Exercise Price" shall mean the amount due at Closing to pay the difference between the Premium Payments under the Option Agreement and the Purchase Price for the Unit.

"Facilities" shall mean all personal property and fixtures now or hereafter existing in, on, or under the Land or the Building and either existing for the common use of one or more of the Units or the Unit Owners or necessary or convenient for the existence, maintenance, or safety of the Property. For purposes of illustrating the broad scope of such term and without intention to limit the generality of the foregoing in any respect, the term "Facilities" shall include all systems, equipment, apparatus, convectors, radiators,

heaters, converters, heat exchangers, mechanisms, devices, machinery, induction units, fan coil units, motors, pumps, controls, tanks, tank assemblies, installations, condensers, compressors, fans, dampers, blowers, thermostats, thermometers, coils, vents, sensors, shut off valves, other valves, gongs, panels, receptacles, outlets, relays, alarms, sprinkler heads, electric distribution facilities, wiring, wireways, switches, switchboards, circuit breakers, transformers, fittings, siamese connections, hoses, plumbing fixtures, lighting fixtures, other fixtures, bulbs, signs, antennae, telephones, intercom equipment, playground equipment, meters, meter assemblies, scaffolding, piping, lines, ducts, conduits, cables, risers, mains, shafts, pits, flues, locks, hardware, racks, screens, strainers, traps, drainage systems, sewers and/or storm pipes, drywalls, or detention tanks, drains, catch basins, leaders, filters, incinerators, canopies, closets, cabinets, doors, railings, copings, steps, furniture, mirrors, furnishings, appurtenances, urns, baskets, mail chutes, mail boxes, carpeting, tiles, floor coverings, sheetrock, interior walls, draperies, shades, window coverings, wallpaper, wallcoverings, trees, shrubbery, flowers, plants, horticultural tubs and horticultural boxes, sockets, davits and rigs for window cleaning.

"Family Members" shall mean the spouse, domestic partner, their children, stepchildren, grandchildren, siblings, nieces, nephews, parents, stepparents, parents-in-law and grandparents of a Unit Owner who reside in such Unit Owner's Unit.

"Filing Date" shall mean the date a letter is issued by the Department of Law accepting the Plan or an amendment to the Plan, as the case may be, for filing.

"First Annual Meeting" shall mean the first annual meeting of the Unit Owners.

"First Closing" shall mean the Closing of Title with respect to the first Unit to be conveyed to a Purchaser pursuant to the terms of the Plan.

"First Year of Condominium Operation" shall mean the first 12 months of operation of the Condominium beginning on the date of First Closing, which may be a calendar or fiscal year.

"First Year's Budget" shall mean the Section of the Plan entitled "Schedule B - First Year's Budget." The First Year's Budget is sometimes referred to as "Schedule B."

"Floor Plans" shall mean the floor plans of the Units certified by a professional engineer or licensed architect, filed in the Register's Office simultaneously with the recording of the Declaration, together with any supplemental or amended floor plans thereto.

"Force Majeure" shall mean unavoidable delays due to acts of God, weather, fire, flood, explosion, war, riot, sabotage, epidemics, quarantine, acts of terrorism, freight embargos, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, unavailability of utilities, failure of transportation, governmental restrictions, preemptions or approvals, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the control of Sponsor, however for purposes of this definition, lack of funds or inability to obtain financing shall not be deemed to be a cause beyond control.

"GBL" shall mean Section 352-e of the New York State General Business Law.

"General Common Elements" shall mean those certain portions of the Property (other than the Units), as well as those Facilities therein, either existing for the common use of the Units or the Unit Owners or necessary for, or convenient to, the existence, maintenance, or safety of the Property, as more particularly described in the Declaration and the Floor Plans, except with respect to the Ancillary Amenities, which are only available for use by the licensee of the particular Ancillary Amenity.

"Grolier Club" shall refer to the not-for-profit corporation The Grolier Club of The City of New York, which is organized under the laws of the State of New York and has an office at 47 East 60th Street, New York, New York 10022.

"Institutional Lender" shall mean (i) a savings bank, savings and loan association, bank or trust company, insurance company, real estate investment trust, mortgage trust or a group of lenders which shall include one of the foregoing, or (ii) a federal, state, municipal, teacher's or union employee, welfare, pension or retirement fund or system, or (iii) Sponsor, (x) without in any way limiting the scope of the foregoing and for the sake of clarity, any real estate mortgage investment conduit within the meaning of Section 860D of the Internal Revenue Code, (y) any entity not included within any of the foregoing that is regularly engaged in the business of making, owning or servicing mortgage loans, including, without limitation, a so-called "conduit lender," or (z) any group of lenders which shall include one or more of the foregoing.

"Institutional Mortgage" shall mean any first mortgage covering one or more Units that is a Permitted Mortgage and the initial holder of which is either Sponsor or an Institutional Lender.

"Insurance Trustee" shall mean a bank or trust company, in either event having both an office in the City of New York and a capital surplus and undivided profits of $500,000,000 or more, from time to time appointed to serve as such by the Condominium Board.

"Land" shall mean the land located in the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of The City of New York as Block 1375, Lot 28 and Lot 9031, more particularly described in Exhibit A to the Declaration.

"Law" shall mean the laws and ordinances of any or all of the Federal, New York State, New York City, County and Borough governments, including, without limitation, the Buildings Department, the Landmarks Preservation Commission, the rules, regulations, orders and directives of any or all departments, subdivisions, bureaus, agencies, or offices thereof or of any other governmental, public or quasi-public authorities having jurisdiction over the Property and/or the Condominium and/or the direction of any public officer pursuant to Law which are applicable at the time in question.

"Limited Common Elements" shall mean those portions of the Property (other than the Units and the General Common Elements), existing for the use and enjoyment of certain Unit Owners to the exclusion of all other Unit Owners, as more particularly described in the Declaration and the Floor Plans.

"Majority of Unit Owners" shall mean shall mean Unit Owners of more than fifty percent (50%) in aggregate Common Interests appurtenant to all Units or Unit Owners of more than fifty percent (50%) in aggregate Common Interests of only those Unit Owners who are present, in person or by proxy, and voting at a duly constituted meeting of Unit Owners at which a quorum is present.

"Managing Agent" shall mean the managing agent or manager named in the Plan or any successor managing agent at the time in question.

"Option Agreement" shall mean the agreement to purchase a Unit, the form of which is set forth in the Part II of the Plan.

"Permanent Certificate of Occupancy" shall mean the permanent certificate of occupancy for the Building issued by the Buildings Department.

"Permitted Encumbrances" shall mean those matters encumbering title to a Unit subject to which a Purchaser agrees to take title, as more particularly described on Schedule A annexed to the form of Option Agreement.

"Permitted Mortgage" shall mean a first mortgage permitted to be placed upon a Unit pursuant to the provisions of the By-Laws.

"Permitted Mortgagee" shall mean any holder or guarantor of a Permitted Mortgage at the time in question.

"Permitted User" shall mean any officer, director, member, stockholder, principal, partner, employee, agent (including managing, sales and leasing agent), guest, tenant, occupant, customer, invitee, licensee, contractor, Permitted Mortgagee or any other Person related, affiliated or designated by Sponsor, the Condominium Board or a Unit Owner who has permission to use a Unit and/or a portion of the Common Elements, subject to the terms of the Condominium Documents, whether written or oral, granted by: (i) a Unit Owner in the case of such Unit Owner's Unit and its appurtenant Common Elements; or (ii) the Condominium Board; or (iii) the Condominium Documents; or (iv) Sponsor.

"Person" shall mean any natural person, partnership, corporation, limited liability company, trust, estate, fiduciary, unincorporated association, syndicate, joint venture, organization, government or any department or agency thereof, or any other entity.

"Plan" shall mean that certain Condominium Offering Plan relating to the Property, as accepted for filing by the Department of Law of the State of New York pursuant to the GBL and any and all amendments thereto.

"Plans and Specifications" shall mean the plans and specifications for the construction of the Building which (to the extent required by Law) have been or will be filed with the Buildings Department and which may from time to time be amended in accordance with the provisions of the Plan.

"Premium Payment" shall mean all downpayments, deposits, advances and payments made by Purchasers prior to the Closing of a Unit.

"Presentation Date" shall mean the date on which the Plan or an amendment thereto, as the case may be, is personally delivered or the fifth day after mailing to prospective Purchasers and Unit Owners following acceptance of the Plan or an amendment thereto for filing with the Department of Law.

"Property" shall mean the Land, the Building (and any structures attached thereto), the Units, all the improvements erected or to be erected on the Land, all easements, rights and appurtenances pertaining thereto and all other property, real, personal, or mixed, used or intended to be used in connection therewith.

"Purchaser" shall mean any Person named as a Purchaser in an Option Agreement which has been duly executed by such Person accepted by Sponsor.

"Register's Office" shall mean the Office of the Register of the City of New York of the County in which the Property is located.

"Resident Manager's Unit" shall mean the Unit designated as the Resident Manager's Unit in the Declaration together with its Common Interest.

"Rules and Regulations" shall mean the Rules and Regulations of the Condominium promulgated in accordance with the By-Laws, as any of such Rules and Regulations may be amended, added to, or deleted from time to time pursuant to the terms of the By-Laws.

"Sales Office" shall mean the sales office for Sponsor or Selling Agent, at a location to be designated by either Sponsor or Selling Agent from time to time.

"Schedule A" shall mean the Section of the Plan entitled "Schedule A - Purchase Prices and Related Information."

"Schedule B" shall mean the Section of the Plan entitled "Schedule B - First Year's Budget." Schedule B is sometimes referred to herein as the "First Year's Budget."

"Schedule B-1" shall mean the Section of the Plan entitled "Schedule B-1 for Individual Energy Costs."

"Selling Agent" shall mean the Selling Agent named in the Plan or any successor Selling Agent at the time in question.

"Special Assessments" shall mean the charges allocated and assessed by the Condominium Board to the Unit Owners, pro-rata in accordance with their respective Common Interest (except as otherwise provided in the Declaration or in the By-Laws), in accordance with the By-Laws of the Condominium.

"Sponsor" shall mean 41-45 Property Owner, LLC and its successors and assigns as well as any Person(s) designated by Sponsor in a writing to the Condominium Board or by amendment to the Plan, to retain Sponsor's rights under the Plan and the Condominium Documents.

"Sponsor Control Period" shall mean the period ending on the later to occur of: (i) the Closing of Title with Purchasers under the Plan to Units representing at least 95% in number of all Units offered for sale, or (ii) the issuance of a Permanent Certificate of Occupancy.

"Storage Locker" shall mean any Storage Locker located in the Storage Locker Area and shall include the structural framework and materials out of which the Storage Locker is constructed. Each Storage Locker is a General Common Element. Any reference in the Plan to "owning a Storage Locker" means the Unit Owner has entered into an Ancillary Amenity License for the Storage Locker.

"Storage Locker Area" shall mean an area located on sub-cellar 3 containing the Storage Lockers. The Storage Locker Area is a General Common Element.

"Suite Unit" shall mean any of the Suite Units designated as Suite Units in the Declaration together with its Common Interest. All such Suite Units are, collectively, referred to as "Suite Units".

"Suite Unit Owner" shall mean any Unit Owner of a Suite Unit at the time in question. All such Unit Owners are, collectively, referred to as the "Suite Unit Owners".

"Temporary Certificate of Occupancy" shall mean a temporary certificate of occupancy for the Building issued by the Buildings Department.

"Terrace" shall mean any terrace, balcony, or garden which is appurtenant to a Unit as a Limited Common Element and shall include any pavers, decking and drains, hose bibs, electrical outlets, lighting and light fixtures, enclosures and dividers installed as part of the original construction of the Building. All such terraces, balconies or gardens are, collectively, referred to as the "Terraces".

"Title Company" shall mean First American Title Insurance Company, having an office at 633 Third Avenue, New York, New York 10017. (212) 551-9402, or any successor Title Company at the time in question.

"Unit" shall mean any of the Units (including Suite Units as the context requires) designated as a Unit in the Declaration together with its Common Interest. All such Units are, collectively, referred to as the "Units."

"Unit Owner" shall mean any Person (including Sponsor, if Sponsor owns any Unit) who holds fee title, of record, to one or more Units at the time in question. All such Unit Owners are, collectively, referred to as the "Unit Owners."

"Unit Upgrade Funds" shall mean all amounts expended by, or reimbursable to, Sponsor for upgrades or extras ordered by Purchaser and agreed to in writing by Sponsor.

"Unsold Ancillary Amenity" shall mean any Ancillary Amenity owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained by Sponsor or a principal of Sponsor at the time in question. All such Unsold Ancillary Amenities are, collectively, referred to as the "Unsold Ancillary Amenities."

"Unsold Ancillary Amenity Licensee" shall mean Sponsor or a principal of Sponsor and (if applicable) a Person designated by Sponsor.

"Unsold Unit" shall mean any Unit (including Suite Units) owned or retained, by way of lease or any other arrangement by which management and/or financial responsibility is retained by Sponsor or a principal of Sponsor at the time in question. All such Unsold Units are, collectively, referred to as the "Unsold Units."

"Unsold Unit Owner" shall mean Sponsor or a principal of Sponsor and (if applicable) a Person designated by Sponsor.

"Wine Storage Locker" shall mean any Wine Storage Locker located in the Wine Storage Locker Area and shall include the structural framework and materials out of which the Wine Storage Locker is constructed. Each Wine Storage Locker is a General Common Element. Any reference in the Plan to "owning a Wine Storage Locker" means the Unit Owner has entered into an Ancillary Amenity License for the Wine Storage Locker.

"Wine Storage Locker Area" shall mean an area located on sub-cellar 3 containing the Wine Storage Lockers. The Wine Storage Locker Area is a General Common Element.

"Zoning Resolution" shall mean the Zoning Resolution of the City of New York, as amended from time to time, or replacement rule, regulation or resolution pertaining to development of a zoning lot.

## DESCRIPTION OF PROPERTY AND IMPROVEMENTS

The following is a general description of the Property as well as certain facilities and services to be provided at the Condominium. For a more detailed description of the Property, see the "Description of Property and Improvements" contained in Part II of the Plan.

## Location

The Property is located at 520 Park Avenue in the Borough of Manhattan, City and State of New York.

## Improvements - General Description of Units

The Condominium will consist of 32 Units (including 1 Resident Manager's Unit), 7 Suite Units, 15 Storage Lockers and 10 Wine Storage Lockers located within a 57 story structure above grade with a roof level and 4 cellar levels. There will also be various amenities for the benefit of the Unit Owners, including a fitness center, playroom, multi-purpose room and various utility and service areas located throughout the Building. (See the subsection entitled "Services and Facilities" for details.)

Purchasers should refer to the Description of Property and Improvements contained in Part II of the Plan for more details.

## Units

There will be 31 Units located on Floor 14 through Floor 54, the approximate square footages of which are set forth on Schedule A. Purchasers are advised that while construction necessitates a sequential numbering of floors for a building, common in New York City is to designate floor numbers solely for marketing purposes. Purchasers should note that the Building does not contain floors designated with the numbers 8 through 13. As such, the Units (excluding the Suite Units) will start on floor 14 (construction floor 8). Purchasers should note that a Unit may be located on floor designated with a higher number than the actual construction level that it is located on. All floor numbers referenced in the Offering Plan refer to the marketing floors and not the construction floors.

There will be 7 Suite Units located on Floors 4 and 5 and one Resident Manager's Unit located on Floor 5, the approximate square footages of which are set forth on Schedule A.

Purchasers are urged to consult the Floor Plans and Description of Property and Improvements contained in Part II of the Plan for details regarding the Units.

## Ancillary Amenities

Storage Lockers will be located in the Storage Locker Area of the Building. Wine Storage Lockers will be located in the Wine Storage Locker Area of the Building. The approximate square footages and Purchase Prices of the Storage Lockers and Wine Storage Lockers are set forth on Schedule A. A Storage Locker may be used only for the storage of personal effects of a Unit Owner, and in no event shall any food or other perishable item, or any flammable or explosive item or any item which would impose a health or safety threat or cause noxious odors, dirt or other sanitary problems or create a nuisance, be stored therein. Sponsor shall have the right to use any unassigned Storage Locker for any purpose permitted by Law or to change the permitted use of any unassigned Storage Locker, subject, to the provisions of the By-Laws. Except for Sponsor and the Condominium Board, a Storage Locker may not be licensed independently of a Unit.

A Wine Storage Locker may be used only for the storage of wine and other beverages, subject to the provisions of the By-laws, and in no event shall any food or other perishable item, or any flammable or explosive item or any item which would impose a health or safety threat or cause noxious odors, dirt or other sanitary problems or create a nuisance, be stored therein. Sponsor shall have the right to use any unassigned Wine Storage Locker for any purpose permitted by Law or to change the permitted use of any unassigned Wine Storage Locker, subject to the provisions of the Bylaws. Except for Sponsor and the Condominium Board, a Wine Storage Locker may not be owned independently of a Unit.

The Storage Lockers and Storage Locker Area will not be serviced by an emergency generator to maintain proper temperatures in the event of a power outage as a consequence of whatever cause, including, without limitation, water infiltration. Any resulting damage and/or spoilage to and/or inability to access the contents located in the Storage Lockers will be at the sole cost of the licensee of such Storage Locker. Neither Sponsor nor the Condominium Board shall be responsible for any damage and/or spoilage caused by power outages, temperature fluctuations, or other causes (whether by mechanical or as a consequence of natural causes), including, without limitation, water infiltration, in the Storage Locker Area.

The Wine Storage Locker Area will be serviced by an emergency generator to maintain proper temperatures in the event of a power outage.

## Suite Units

The Suite Units may be used only as a residence occupied by domestic employees of a Unit Owner, as well as Family Members and non-paying guests of Unit Owners. Occupancy of the Suite Units by non-paying guests cannot exceed 3 months, without the prior written consent of the Condominium Board. Except for Sponsor and any Suite Units owned by the Grolier Club, no Unit Owner may own a Suite Unit independently of a Unit. Each Suite Unit will be equipped with a kitchenette and bathroom.

## Resident Manager's Unit

At or subsequent to, the First Closing, but in no event later than five (5) years from the First Closing, Sponsor shall sell and convey Unit 5B to the Condominium to be used by the Resident Manager and designated as the "Resident Manager's Unit". The Purchase Price for the Resident Manager's Unit will be $4,354,000. At the Closing of each Unit (exclusive of a Suite Unit), Purchaser will be required to pay on behalf of the Condominium Board, Purchaser's share of the cost of the Resident Manager's Unit, plus all closing costs associated with the purchase of the Resident Manager's Unit, including, without limitation, recording fees, title insurance, legal fees, transfer taxes and other transaction fees (estimated to be approximately $148,060) determined in accordance with the Common Interest of the Unit acquired, in proportion to the Common Interest of all Units (other than the Resident Manager's Unit and the Suite Units). The amount of this closing cost is set forth in the Section of the Plan entitled "Schedule A – Purchase Prices and Related Information". There is no guarantee or assurance that the taxing authorities will not require that each Purchaser's allocable portion of the cost of the Resident Manager's Unit be included in the total consideration deemed to have been paid by Purchaser at Closing, in which case additional transfer taxes may be payable by Purchaser. (See the Footnotes to Schedule A and the Section of the Plan entitled "Closing Costs and Adjustments" for details.)

Sponsor reserves the right prior to the First Closing, in its sole discretion, to choose a different Unit other than Unit 5B to sell to the Condominium as the Resident Manager's Unit, provided, however, that such sale shall only be made pursuant to an amendment to the Plan and shall not result in an increase of each Purchaser's share of the cost of the Resident Manager's Unit by more than 25%.

From the date of the First Closing until the transfer of title of the Resident Manager's Unit, (i) the Resident Manager will be permitted to reside in the Resident Manger's Unit pursuant to a use and occupancy agreement between the Condominium Board and Sponsor, and (ii) the Condominium Board shall be

obligated to pay all costs and expenses associated with the Resident Manager's Unit, including, without limitation, common charges, utilities, and real estate taxes, as more specifically set forth in Schedule B.

All costs and expenses attributable to the Resident Manager's Unit, including, without limitation, utilities, parking fees, real estate taxes, cost of repairs, alterations and improvements shall be borne without limitation, by all Unit Owners as a Common Expense.

See the Section of the Plan entitled "Schedule B, "Budget for First Year of Condominium Operation" for details regarding the costs of housing the Resident Manager.

## **Construction Data for Units and Common Elements**

Sponsor has engaged SLCE Architects as architect of record, Robert A.M. Stern Architects, LLP as design architect, WSP Building Structures (f/k/a WSP Cantor Seinuk) as structural engineer and WSP Building Systems (f/k/a WSP Flack & Kurtz) as mechanical engineer. The Plans and Specifications have been prepared by such architects and engineers. (See the Section of the Plan entitled "Identity of Parties" for further detail.)

The construction of the Building will be completed in accordance with the Plans and Specifications, and applicable Law. However, Sponsor reserves the right to amend or modify, in any way, the Plans and Specifications (including, without limitation, changing materials, appliances, equipment, fixtures and other construction details) and substitute in place of any materials, appliances, equipment and fixtures set forth in the "Description of Property and Improvements," items of substantially equal or better quality, provided, however: (i) any material change shall be set forth in an amendment to the Plan; (ii) any necessary approval of any governmental authority having jurisdiction is first obtained; and (iii) no such amendments, modifications or substitutions may be made if the same would materially and adversely affect any binding Option Agreement unless the same is dictated by construction conditions at the Property, and in such event, Sponsor will, in the amendment disclosing such change and delivered to the Purchaser(s), offer the affected Purchaser(s) the right, for 15 days, to rescind their Option Agreement(s) and receive a refund of their Premium Payments, together with all interest earned thereon, except for Unit Upgrade Funds.

Based upon the current construction schedule, Sponsor presently contemplates that, unless delayed by Force Majeure, construction of the Building will be sufficiently completed to permit closings of Units to begin on or about November 1, 2017. Purchasers will not be excused from paying their full Purchase Prices (without credit or set-off), and will have no claim against Sponsor for damages or losses, in the event that the First Closing occurs earlier or later than the projected date or the time to complete or to close title to any Unit is delayed or postponed by Sponsor. Sponsor has the right to change the projected First Year of Condominium Operation from time to time by an amendment to the Plan. If the First Closing does not occur within 12 months after the date set forth in Schedule B as the commencement date for the First Year of Condominium Operation in effect on the date a Purchaser and Sponsor entered into an Option Agreement, Sponsor will offer those affected Purchasers only a right to rescind their Option Agreements for 15 days from the Presentation Date of the amendment disclosing Sponsor's failure to close within such time frame. Any Purchasers electing rescission will have their Premium Payments returned together with any interest earned thereon, except for any Unit Upgrade Funds. In the event the actual or anticipated commencement date of the First Year of Condominium Operation is to be delayed by 6 months or more, Sponsor will amend the Plan to include a revised budget with updated projections. If the Common Charges in the amended budget exceed those in the latest budget set forth in the Plan by 25% or more, Sponsor will, in the amendment disclosing such updated budget, offer all Purchasers the right, for 15 days, to rescind their Option Agreements and receive a refund of their Premium Payments, together with any interest earned thereon (provided, however, that after the Plan has been declared effective and the amendment disclosing the same has been accepted by the Department of Law, a Purchaser who is in default under the Option Agreement beyond the expiration of any applicable grace period will not have the right to rescind).

**Services and Facilities**

The services and facilities described below will be provided to all Unit Owners and are included in the Common Charges, unless otherwise specified below.

a.     Doorman and Concierge

There will be a doorman stationed in the lobby 24 hours a day, 7 days a week. There will also be a concierge stationed in the lobby between the hours of 7:00 a.m. and 12:00 a.m. The hours and duties of the doorman and concierge may be reduced until certain occupancy levels in the Condominium are achieved. However, at all times after the First Closing of a Unit, the lobby will be attended 24 hours a day, 7 days a week by a lobby attendant.

b.     Building Staff

The staff of the Condominium will be supervised by the Resident Manager. Purchasers should refer to the Footnotes to Schedule B for a completed description of the Building Staff.

c.     Elevator Service

Purchasers should refer to the Description of the Property and Building Condition set forth in Part II for details concerning the elevators.

Sponsor reserves the right to restrict access to any full floor Unit, solely to the individual owner/occupant of such Unit, by way of elevator lock off, or other means permissible by Law.

d.     Telecommunications

The Building will be pre-wired for telephone, cable television and internet services to the Units. Residents will be able to subscribe for telephone, television and internet services. Charges for activating cable television, installing and attaching appropriate receptacles, additional installations and monthly usage charges will be determined by and payable directly to the cable company by each resident subscribing for and activating such service. Sponsor reserves the right to enter into an agreement with a service provider to provide a building wide internet access package, the monthly cost of which will be paid by the Condominium Board and billed to each Unit Owner as a Common Expense.

e.     Mail

All incoming mail will be delivered to the Building and will either, as determined by the Condominium Board, be delivered to the individual Units by Building Staff or placed by the United States Postal Service in mail boxes located in the lobby of the Building on Floor 1.

f.     Laundry Facilities

Each Unit (excluding Suite Units and the Resident Manager's Unit) will contain a washing machine and dryer. There will be a common laundry room located at sub-cellar 2.

g.     Refuse Disposal

There will be access to a refuse chute located in the kitchen of each Unit. The refuse chute will lead directly to a compactor located in the compactor rooms on sub-cellar 2. Units at the 4th and 5th Floors will share a refuse room located at the 5th floor off of the common corridor.

h.    Communication Facilities and Intercom System

Each Unit will be equipped with an intercom system which will enable the occupants to communicate directly with the concierge over a standard touch tone telephone. The system will not have any video capabilities. The intercom system additionally connects the concierge desk to the main and service entrances. Sponsor reserves the right to substitute an alternate service to enable communication between the concierge and the residents.

i.    Smoke and Carbon Monoxide Detector/Sprinklers

A combination smoke and carbon monoxide detector will be provided in each Unit in compliance with the Law. Additionally, the Building will be fully sprinklered in compliance with the Law.

j.    Service Entrance

There will be a service entrance located on 60th Street. Hours of access to the service entrance may be regulated by the Condominium Board in its sole discretion.

k.    Fitness Center

A fitness center will be located in the cellar and sub-cellar 1. The fitness center will include exercise equipment, including cardio vascular and resistance machines, as well as a swimming pool, men's and women's lockers, steam areas, a sauna and stretching room.

l.    Children's Playroom

An unattended playroom will be located in the Cellar. Furnishings will not be provided by Sponsor.

m.    Multi-Purpose Room

A multi-purpose room will be located in sub-cellar 3.

n.    Cold Storage

There will be a refrigerated storage area located in sub-cellar 2. All perishable items and goods stored therein shall be at the Unit Owners' risk. Neither Sponsor nor the Condominium Board shall be liable for any spoilage caused by the failure of HVAC, power outages, temperature fluctuations or other causes.

o.    Garden

There will be a landscaped garden containing a display pool and three decorative stone fountains at the 1st floor which is accessible from the lobby. The display pool and decorative fountains are provided solely for aesthetic value and are not designed for occupancy of any kind. A skylight will be located at the garden providing natural light to the swimming pool at the cellar level.

p.    Lobby

The lobby will contain furniture and furnishings for the use and enjoyment of the residents of the Condominium. The fireplaces located within the lobby will be for decorative purposes only.

q.    Sales Center Furniture, Furnishings and Equipment

Sponsor reserves the right to utilize the furniture, furnishings and equipment through-out various parts of the Building which were used in the Sales Center. All such furniture, furnishings and equipment, however, will be re-conditioned, if needed.

r.    Marketing Material

In no event shall the presence of any furniture, furnishings, finishes, equipment or decorations, wall coverings, window treatments, carpeting and the like ("FFE") in any portion of the Building or Units set forth in any marketing materials and/or advertisements, and/or websites used in connection with the sales and marketing of the Units imply or represent that any such FFE will be located within any portion of the Building or Units. The presence of FFE in such marketing materials is for illustrative purposes only. In addition, marketing materials may designate or label or use nomenclature to describe certain areas or rooms within Units that differs from the designations utilized on the Floor Plans of the Units set forth in Part II of the Plan, including, without limitation, closets, hallways, dens/media rooms and powder rooms. The use of such designations, labels or nomenclature is for marketing purposes only and does not obligate Sponsor to deliver such areas or rooms designed or fitted out in the manner depicted or implied in the marketing materials.

s.    General

Use of the services and facilities shall be available only to individuals who reside in a Unit in the Building (i.e, a Unit Owner or permitted tenant) and such individual's guests, provided that such Unit Owner or tenant accompanies the guest during such use. In addition, use of the services and facilities are subject to such Rules and Regulations as may be promulgated from time to time by the Condominium Board, including, without limitation, the right to impose fees and restrictions on hours of access and use.

While it is anticipated that these services and facilities will be available at the time of the First Closing, Purchasers are advised that any or all of the services and facilities described in the Plan may not be available until approximately 12 months after the First Closing, with the exception of the swimming pool located in the fitness center which may not be available for use until approximately 24 months after the First Closing.

Purchasers will not be entitled to any credit or abatement against the Purchase Price or the Common Charges if any of the services and/or or facilities are not available for use on or after Purchaser's Closing. Notwithstanding the foregoing, the Condominium Board shall have the right, but not the obligation, in its sole and absolute discretion, to adjust the First Year's Budget to reduce the Common Charges for the period in which such services and/or facilities are not available.

Purchasers should also be aware that the hours and dates for move-ins, move-outs and/or alterations, as well as the use of the passenger and/or service elevators will be restricted during the period that Sponsor is performing work in the Building. However, at all times after the First Closing, the lobby will be attended 24 hours a day, 7 days a week by a lobby attendant.

Additionally, as more fully set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor," it is anticipated that for a significant period of time following the First Closing through, including and beyond the Closing of Title to any Unit, work should be expected to be undertaken and performed by or on behalf of Sponsor to complete construction of the Building, including without limitation, the Units, the amenities and facilities, Ancillary Amenities, the decoration or finishing of the lobby, corridors, elevator finishes and other portions of the Building, including installing light fixtures, painting, hanging wall coverings or laying carpeting. All of the foregoing work and conditions may create a noisy or otherwise disruptive condition in the Building. The Condominium Board may refuse to permit a Unit Owner to perform alterations in a Unit until such time as the Building has been completed and a PCO

has been obtained. Certain services, such as telecommunications, and other similar services may be provided by outside suppliers and delays in providing these services will not be the responsibility of Sponsor. Such suppliers may not provide these services until occupancy in the Building has reached certain levels. In addition, the presence of scaffolding, hoists or construction elevator shafts or similar temporary construction facilities, may delay the Closing of Title to certain Units or lines of Units until such scaffolding, hoists, elevators or temporary facilities are no longer needed.

## LOCATION AND AREA INFORMATION

### Location

The Property is located at 45 East 60th Street, with an expected mailing address of 520 Park Avenue, in the Borough of Manhattan in the City and State of New York.

The entrance to the Building is located on East 60th Street between Park Avenue and Madison Avenue at 45 East 60th Street, which is approximately 150 feet from the northwest corner of Park Avenue and 60th Street. The Building will be constructed on the property located at 41-45 East 60th Street between Park Avenue and Madison Avenue on building lot 28. The Building will also cantilever 25 feet over the Grolier Club (47 East 60th Street) to the east into Lot 9031 which is a vertical tax lot owned by Sponsor that is located above the Grolier Club parcel. The Building is the beneficiary of a light and air easement over the Christ Church parcel (Lot 36, 524 Park Avenue) that extends to Park Avenue.

### Transportation

New York City is served by three major airports: LaGuardia Airport, Kennedy International Airport and Newark Liberty International Airport. Passenger railroad service is provided from Pennsylvania Station, located at Seventh Avenue and 33rd Street, and from Grand Central Station, located at Lexington Avenue and 42nd Street.

Transportation to and from the Condominium, and through New York City, is available by taxi and limousine services. Public transportation is readily available. A number of commercial parking garages are located nearby.

### Medical, Educational and Religious Facilities

A number of medical centers such as New York Hospital, Cornell Medical Center, Memorial Sloan Kettering, Lenox Hill Hospital, New York University Medical Center, Mount Sinai Medical Center and Columbia Presbyterian Medical Center are readily accessible.

Numerous private schools, public schools and parochial schools on the elementary, middle school and high school levels are located in close proximity to the Condominium.

There are houses of worship of most major denominations in the vicinity of the Condominium.

### Municipal Services

The City of New York will provide water, sanitation, police and fire services to the Building.

The local police station is located at 19th Precinct, 153 East 67th Street, New York, New York.

The local fire station is located at Engine 39 Ladder 16, 157 East 67th Street, New York, New York.

### Mailing Address

The current address of the Building is 45 East 60th Street. Sponsor has an agreement with Christ Church to issue an irrevocable license in favor of Sponsor to utilize the 520 Park Avenue address. Sponsor has obtained initial approval from the Manhattan Borough President's Office ("MBPO"), through the issuance of a reservation letter, to use 520 Park Avenue, New York, New York as the address of the Building in lieu of 45 East 60th Street. The reservation letter indicates that MBPO has found the request to be

appropriate and the address can't be used by another party. Final approval is not provided until an inspection has been conducted following the completion of the Building's front entrance.

Upon issuance of the final approval by MBPO, the license agreement with Christ Church will commence for a term of 100 years in exchange for an annual payment of $30,000, which amount shall be included in Schedule B.

## Zoning

The Property is located within C-5-1 zoning district in which residential use is permitted.

## Landmark Designation

The Building does not have landmark status.

## General

Sponsor makes no representations to the continued existence of any of the named establishments or transportation lines. Additionally, no representation is made that future construction in the neighborhood surrounding the Condominium will not result in the obstruction of the views from any windows and/or Terraces.

**SCHEDULE A – PURCHASE PRICES OF UNITS AND RELATED INFORMATION**

# SCHEDULE A

### 520 PARK AVENUE
New York, NY 10022

OFFERING PRICES AND RELATED INFORMATION
PROJECTED COMMON CHARGES AND REAL ESTATE TAXES ARE FOR
THE FIRST YEAR OF CONDOMINIUM OPERATION November 1, 2017 TO October 31, 2018

| Unit Number [1] | Bedrooms / Bathrooms [1] | Approx Unit Square Feet [2] | Approx. Terrace Square Feet [2] | OFFERING PRICE [3] | | Net Sq. Ft. (Incl. Terrace) | Share of Purchase Price for Resident Manager's Unit 5B [4] | | Common Interest Percentage [5] | Projected Monthly Common Charges [6] | | Projected Monthly Real Estate Taxes [7] | | Projected Total Monthly Carrying Charges [8] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5B | 2 / 2 | 1,244 | - | $ | 4,354,000 | 1,244 | | | 0.6627% | $ | 1,993.31 | $ | 2,687.71 | $ | 4,681.02 |
| 14 | 4 / 5.5 | 4,613 | - | $ | 16,200,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 15 | 4 / 5.5 | 4,613 | - | $ | 16,400,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 16 | 4 / 5.5 | 4,613 | - | $ | 16,600,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 17 | 4 / 5.5 | 4,613 | - | $ | 16,950,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 18 | 4 / 5.5 | 4,613 | - | $ | 17,300,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 19 | 4 / 5.5 | 4,613 | - | $ | 17,600,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 20 | 4 / 5.5 | 4,613 | - | $ | 17,950,000 | 4,613 | $ | 110,307 | 2.4613% | $ | 7,403.26 | $ | 9,982.27 | $ | 17,385.53 |
| 21 | 4 / 5 | 4,628 | - | $ | 18,450,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 22 | 4 / 5 | 4,628 | - | $ | 18,950,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 23 | 4 / 5 | 4,628 | - | $ | 19,650,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 24 | 4 / 5 | 4,628 | - | $ | 20,850,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 25 | 4 / 5 | 4,628 | - | $ | 22,350,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 26 | 4 / 5 | 4,628 | - | $ | 23,850,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 27 | 4 / 5 | 4,628 | - | $ | 25,100,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 28 | 4 / 5 | 4,628 | - | $ | 26,350,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 29 | 4 / 5 | 4,628 | - | $ | 27,600,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 30 | 4 / 5 | 4,628 | - | $ | 28,850,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 31 | 4 / 5 | 4,628 | - | $ | 30,100,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 32 | 4 / 5 | 4,628 | - | $ | 31,350,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 33 | 4 / 5 | 4,628 | - | $ | 32,600,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 34 | 4 / 5 | 4,628 | - | $ | 33,850,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 35 | 4 / 5 | 4,628 | - | $ | 35,100,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| 36 | 4 / 5 | 4,628 | - | $ | 36,350,000 | 4,628 | $ | 110,666 | 2.4693% | $ | 7,427.32 | $ | 10,014.71 | $ | 17,442.03 |
| DP-PH 38 | 6 / 7.5 | 9,138 | - | $ | 67,000,000 | 9,138 | $ | 218,509 | 4.8756% | $ | 14,665.15 | $ | 19,773.92 | $ | 34,439.07 |
| DP-PH 40 | 6 / 7.5 | 9,138 | - | $ | 70,000,000 | 9,138 | $ | 218,509 | 4.8756% | $ | 14,665.15 | $ | 19,773.92 | $ | 34,439.07 |
| DP-PH 42 | 6 / 7.5 | 9,138 | - | $ | 73,000,000 | 9,138 | $ | 218,509 | 4.8756% | $ | 14,665.15 | $ | 19,773.92 | $ | 34,439.07 |
| DP-PH 44 | 6 / 7.5 | 9,138 | - | $ | 76,000,000 | 9,138 | $ | 218,509 | 4.8756% | $ | 14,665.15 | $ | 19,773.92 | $ | 34,439.07 |
| DP-PH 46 | 6 / 7.5 | 9,138 | - | $ | 79,000,000 | 9,138 | $ | 218,509 | 4.8756% | $ | 14,665.15 | $ | 19,773.92 | $ | 34,439.07 |
| DP-PH 48 | 5 / 6.5 | 8,522 | - | $ | 74,000,000 | 8,522 | $ | 203,780 | 4.5469% | $ | 13,676.46 | $ | 18,440.81 | $ | 32,117.27 |

## SCHEDULE A

**520 PARK AVENUE**
New York, NY 10022

OFFERING PRICES AND RELATED INFORMATION
PROJECTED COMMON CHARGES AND REAL ESTATE TAXES ARE FOR
THE FIRST YEAR OF CONDOMINIUM OPERATION November 1, 2017 TO October 31, 2018

| Unit Number [1] | Bedrooms / Bathrooms [1] | Approx Unit Square Feet [2] | Approx. Terrace Square Feet [2] | OFFERING PRICE [3] | Net Sq. Ft. (Incl. Terrace) | Share of Purchase Price for Resident Manager's Unit 5B [4] | Common Interest Percentage [5] | Projected Monthly Common Charges [6] | Projected Monthly Real Estate Taxes [7] | Projected Total Monthly Carrying Charges [8] |
|---|---|---|---|---|---|---|---|---|---|---|
| **DP-PH 50** | 6 / 7.5 | 9,138 | – | $ 83,000,000 | 9,138 | $ 218,509 | 4.8756% | $ 14,665.15 | $ 19,773.92 | $ 34,439.07 |
| **TRI-PH 52** | 8 / 9 Full / 2 Half Baths | 12,394 | 1,259 | $ 130,000,000 | 13,653 | $ 296,367 | 7.2846% | $ 21,911.09 | $ 29,544.07 | $ 51,455.16 |
| **SUITES** | | | | | | | | | | |
| **4A** | 0 / 1 | 390 | – | $ 1,500,000 | 390 | | 0.2081% | $ 625.94 | $ 843.99 | $ 1,469.93 |
| **4B** | 0 / 1 | 405 | – | $ 1,560,000 | 405 | | 0.2161% | $ 650.00 | $ 876.43 | $ 1,526.43 |
| **4C** | 0 / 1 | 408 | – | $ 1,575,000 | 408 | | 0.2177% | $ 654.81 | $ 882.92 | $ 1,537.73 |
| **4D** | 0 / 1 | 398 | – | $ 1,450,000 | 398 | | 0.2124% | $ 638.87 | $ 861.43 | $ 1,500.30 |
| **4E** | 0 / 1 | 429 | – | $ 1,550,000 | 429 | | 0.2289% | $ 688.50 | $ 928.35 | $ 1,616.85 |
| **5A** | 0 / 1 | 387 | – | $ 1,500,000 | 387 | | 0.2065% | $ 621.12 | $ 837.50 | $ 1,458.62 |
| **5C** | 0 / 1 | 421 | – | $ 1,550,000 | 421 | | 0.2246% | $ 675.57 | $ 910.91 | $ 1,586.48 |
| **RESIDENTIAL Subtotal** | | 186,165 | 1,259 | 1,217,389,000 | 187,424 | $ 4,354,000 | 100.0000% | $ 300,786.51 | $ 405,568.89 | 706,355.40 |
| **TOTAL** | | 186,165 | 1,259 | $ 1,217,389,000 | 187,424 | $ 4,354,000 | | $ 300,786.51 | $ 405,568.89 | 706,355.40 |

**STORAGE**

| | | | |
|---|---|---|---|
| **S-1** | 46 | $ | 95,000 |
| **S-2** | 43 | $ | 90,000 |
| **S-3** | 26 | $ | 55,000 |
| **S-4** | 32 | $ | 65,000 |
| **S-5** | 38 | $ | 75,000 |
| **S-6** | 32 | $ | 65,000 |
| **S-7** | 30 | $ | 60,000 |
| **S-8** | 35 | $ | 70,000 |
| **S-9** | 31 | $ | 65,000 |
| **S-10** | 31 | $ | 65,000 |
| **S-11** | 31 | $ | 65,000 |
| **S-12** | 32 | $ | 65,000 |

# SCHEDULE A

**520 PARK AVENUE**
New York, NY 10022

OFFERING PRICES AND RELATED INFORMATION
PROJECTED COMMON CHARGES AND REAL ESTATE TAXES ARE FOR
THE FIRST YEAR OF CONDOMINIUM OPERATION November 1, 2017 TO October 31, 2018

| Unit Number [1] | Bedrooms / Bathrooms [1] | Approx Unit Square Feet [2] | Approx. Terrace Square Feet [2] | OFFERING [3] | PRICE | Net Sq. Ft. (Incl. Terrace) | Share of Purchase Price for Resident Manager's Unit 5B [4] | Common Interest Percentage [5] | Projected Monthly Common Charges [6] | Projected Monthly Real Estate Taxes [7] | Projected Total Monthly Carrying Charges [8] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S-13 | | 40 | | $ | 80,000 | | | | | | |
| S-14 | | 39 | | $ | 80,000 | | | | | | |
| S-15 | | 42 | | $ | 85,000 | | | | | | |
| STORAGE Subtotal | | | | $ | 1,080,000 | | | | | | |
| | | | | | | | | | | | |
| WINE STORAGE | | | | | | | | | | | |
| W-1 | | 50 | | $ | 275,000 | | | | | | |
| W-2 | | 22 | | $ | 125,000 | | | | | | |
| W-3 | | 46 | | $ | 250,000 | | | | | | |
| W-4 | | 36 | | $ | 200,000 | | | | | | |
| W-5 | | 38 | | $ | 210,000 | | | | | | |
| W-6 | | 28 | | $ | 155,000 | | | | | | |
| W-7 | | 28 | | $ | 155,000 | | | | | | |
| W-8 | | 28 | | $ | 155,000 | | | | | | |
| W-9 | | 29 | | $ | 160,000 | | | | | | |
| W-10 | | 32 | | $ | 180,000 | | | | | | |
| WINE STORAGE Subtotal | | | | $ | 1,865,000 | | | | | | |
| | | | | | | | | | | | |
| GRAND TOTAL | | | | $ | 1,220,334,000 | | | | | | |

**Notes to Schedule A**

(1)     Purchasers should refer to the Floor Plans included in Part II of the Plan for an approximation of the dimensions and typical layouts of the Units. The number of bedrooms and bathrooms for each Unit was determined by Sponsor's architect in accordance with industry practice for new construction condominiums and does not necessarily conform to the zoning room count or the method utilized by the Real Estate Board of New York. Each Unit should be inspected to determine its actual dimensions, layout and physical condition prior to Closing.

(2)     The square footage and dimensions of the Units listed in Schedule A or in the Declaration are approximate and may change due to field conditions, construction variances and tolerances and were obtained by using the method customarily used in New York City to measure condominium units. There is a rebuttable presumption that an increase or decrease in the square footage of a Unit by 5% or less (excluding interior partitions) is not a material and/or adverse change. In the absence of such proof to the contrary, Sponsor's sole obligation if the net square footage of the Unit is so decreased shall be to refund the Premium Payment made under the Option Agreement and any interest earned thereon, except for Unit Upgrade Funds. Each Unit (with the exception of the Suite Units and the Resident Manager's Unit) is measured horizontally from the exterior side of the exterior walls to the centerline of the partitions separating mechanical equipment spaces or any Common Elements not within a Unit or to the exterior side of the opposite exterior walls, provided, however, (i) columns, mechanical pipes, shafts, shaftways, chases, chaseways and conduits in all Units; and (ii) elevator shafts, elevator lobby, and stairwells on the floors containing full floor units are not deducted from the measurement of each Unit. Each Unit is measured vertically from the top of the floor (located under the finished flooring and sub-flooring materials) to the underside of the ceiling. The corridor adjacent to the stairs is part of the Unit.

Each Suite Unit and the Resident Manager's Unit is measured horizontally from the exterior side of the exterior walls to the centerline of the partitions separating one Unit from another Unit, or separating one Unit from corridors, stairs, elevators and other mechanical equipment spaces or any Common Elements not within a Unit or to the exterior side of the opposite exterior walls, provided, however, columns, mechanical pipes, shafts, shaftways, chases, chaseways and conduits in all Units are not deducted from the measurement of each Unit. Each Unit is measured vertically from the top of the floor (located under the finished flooring and sub-flooring materials) to the underside of the ceiling.

As is customary in New York, these square footages exceed the usable floor area of each Unit. The method of measurement is applicable to all Units. Any Common Elements located within or appurtenant to any Unit shall not be considered as part of that Unit. Terraces shown on Schedule A are Limited Common Elements.

(3)     The Purchase Prices and other terms of sale (as more fully set forth in the Section of the Plan entitled "Changes in Prices and Units") of Units may be negotiated by Sponsor and, therefore, may be changed. Accordingly, Purchasers may pay different Purchase Prices for similar Units. The effect of this, as well as the right of Sponsor to change Purchase Prices, is more particularly discussed in the Section entitled "Changes in Prices and Units." In addition to the payment of the Purchase Price, each Purchaser will be responsible for the payment of certain closing costs and expenses at the time of Closing, as explained in the Section of the Plan entitled "Closing Costs and Adjustments" (and for a portion of the Purchase Price and the associated closing costs for the Resident Manager's Unit as set forth on Schedule A). If Purchaser obtains a mortgage loan, Purchaser will be responsible for the payment of additional closing costs and expenses relating to

such loan. There will be an apportionment of certain charges relating to the Units at the Closing. THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY. The Condominium Board has the right to impose license fees and Special Assessments in connection with the Ancillary Amenity License.

(4)     At or subsequent to the First Closing, Sponsor will execute, acknowledge and deliver to Starr Associates LLP, a deed conveying fee title to the Resident Manager's Unit to the Condominium Board, which will own the Resident Manager's Unit on behalf of Unit Owners for use as the residence of the Resident Manager. The Purchase Price for the Resident Manager's Unit (plus all closing costs) shall be paid in the following manner: at the Closing of each Unit (except for the Suite Units), each Purchaser will be required to pay on behalf of the Condominium Board, Purchaser's share of the cost of the Resident Manager's Unit (plus closing costs) determined in accordance with the Common Interest of the Unit purchased in proportion to the Common Interest of all Units (after excluding the Common Interest attributable to the Resident Manager's Unit and the Suite Units). Each payment shall be made payable to Starr Associates LLP, as Escrow Agent who shall hold such payment in escrow for the benefit of Sponsor in an interest-bearing escrow account. Escrow Agent shall release the escrowed funds (together with all interest earned thereon) to Sponsor at such time as Sponsor delivers the deed to Escrow Agent for delivery to the Condominium Board for recording upon: (i) the Closing of Title to all Units (excluding Suite Units); and (ii) the discharge by Sponsor of all then-existing mortgage(s) encumbering the Resident Manager's Unit ("Resident Manager's Unit Release Date"). Sponsor reserves the right, in its sole discretion, to direct Escrow Agent to release the escrowed funds (together with all interest earned thereon) to Sponsor and the deed to the Condominium Board prior to the Resident Manager's Unit Release Date. Thereafter, Sponsor shall continue to receive directly from each Purchaser at the Closing, Purchaser's pro-rata portion of the Purchase Price (plus closing costs). Once the deed to the Resident Manager's Unit is delivered to the Condominium Board, all costs and expenses, including utilities, parking fees and real estate taxes attributable to the Resident Manager's Unit will be payable by the Condominium Board and included in the Common Charges payable by Unit Owners, and each Unit Owner will be individually liable therefore to the extent of the Unit's Common Interest.

(5)     The Common Interest of each Unit in the Common Elements has been allocated pursuant to the method set forth in Real Property Law Section 339-i(l) based upon the approximate proportion that the floor area of the Unit at the date of the Declaration bears to the then aggregate floor area of all the Units, but such proportion reflecting the substantially exclusive advantages enjoyed by one or more but not all Units in a part or parts of the Common Elements in accordance with subsection (ii).

(6)     The estimated monthly Common Charges for each Unit are based on Schedule B - First Year's Budget prepared by Sponsor's Condominium Budget Expert on the assumption that the First Year of Condominium Operation will commence November 1, 2017. The actual First Year of Condominium Operation may be earlier or later than such year. In addition to these estimated payments, each Unit Owner will be responsible for real estate taxes on the Unit, mortgage payments under a loan, if any, obtained to finance the purchase of the Unit, the cost of electricity supplied to the Unit which will be separately metered and payable either directly to the utility company or to the Condominium Board for payment to the utility company, the cost of any insurance which the Unit Owner obtains for the Unit and the cost of interior repairs and decorations to the Unit. See the Section of the Plan entitled "Schedule B-1 - Budget for Individual Energy Costs" concerning estimates of certain electric costs for the Units.

Sponsor may make an application to the New York State Public Service Commission in order to permit the Condominium Board to purchase electricity from Con Edison at a "bulk rate" (which may result in a savings to Unit Owners). In the event that such application is made, and subsequently granted, the Condominium Board will assess the cost of electricity provided to the Unit Owners. Each Unit will be billed by the Condominium Board for actual consumption on the basis of its submeter and the Condominium Board will, in turn, pay Con Edison. Alternatively, the cost of electricity supplied to each Unit will be separately metered and payable by the Unit Owner directly to Con Edison.

As discussed in the Section of the Plan entitled "Description of Property and Improvements" subsection "Services and Facilities," the full range of services and facilities described in the Plan may not be available until approximately 12 months after the First Closing, with the exception of the swimming pool located in the fitness center which may not be available for use until approximately 24 months after the First Closing.

(7) It is estimated that the aggregate real estate taxes payable with respect to all Units for the First Year of Condominium Operation will total approximately $3,973,349, assuming (a) a transitional assessed valuation for the Property of $18,891,933 for the three months of 2016/2017 tax year and a transitional assessed valuation for the property of $34,005,459 for the nine months of 2017/2018 tax year reflecting the assessment for a partially constructed property based on the real estate tax projection opinion prepared by Marcus & Pollack LLP dated January 20, 2014 set forth in Part II of the Plan, and (b) a tax rate of $13,145 per $100 of assessed valuation for the 2016/2017 and 2017/2018 tax years. However, the Schedule A reflects estimated real estate taxes of $4,966,686 based on a fully constructed assessment of the Building.

In arriving at the assessed valuation for each Unit in the Condominium, the Building is first assessed as an entity. This overall assessment is then apportioned among the Units, each of which will be assigned a tax lot designation once the Declaration has been recorded and the Floor Plans are filed with the Register's office. For purposes of Schedule A, the projected real estate taxes for the Building were apportioned among the Units based on Common Interest percentages. There is no assurance that the City of New York tax assessor will allocate taxes among Units in proportion to their respective Common Interest percentages. If it does not, Owners of Units having the same Common Interest percentages will pay different amounts of real estate taxes. It is possible that the apportionment will be based in part upon the proportion the projected selling price presented in the Plan for each Unit bears to the gross sellout price for all Units available for purchase in the Condominium and in part upon extrinsic indicia of value, including location, square footage, amenities, income producing potential and existing leases on particular Units. Although the estimate of New York City real estate taxes is a good faith estimate, it is not possible to estimate same with any degree of certainty. Assessed valuations, apportionment or taxes among the Units and tax rates, when actually established by the City of New York, may be lesser or greater. Accordingly, these estimates are to be considered opinions and are not intended, and should not be construed as, warranties as to future assessed valuations, tax rates or the actual real estate taxes to be assessed. In no event will Sponsor, Tax Counsel, Real Estate Tax Counsel, or any other person be liable to any Purchaser, nor will any Purchaser have the right to rescind the Option Agreement if the assessed valuations, tax rates or taxes, when actually established, are lesser or greater than that projected herein or if the Administrative Code and the applicable rules and regulations of the City of New York are changed in the future.

At such time as the Units have been separately assessed for real estate tax purposes, each Unit will be taxed as a separate tax lot for real estate tax purposes and a Unit Owner will not be responsible for the payment of, nor will the Unit be subjected to any lien arising from the non-payment of real estate taxes assessed against other Units.

In the opinion of Olshan Frome Wolosky LLP a copy of which is set forth in Part II of the Plan, a Unit Owner who uses the Unit as a personal residence will, under present Law, for Federal, New York State and New York City income tax purposes, be entitled to a deduction for mortgage interest and real estate taxes in the year paid in the case of cash basis taxpayers or accrued in the case of other taxpayers, subject to certain exceptions and limitations which are more particularly discussed in the Attorney's Income Tax Opinion. Purchasers should note that deductions, if applicable, may vary in future years due to changes in the interest rate or the Unit Owner's mortgage or from changes in the allocation of the constant debt service payments to interest and principal, or due to changes in real property taxes resulting from the expiration of real estate tax benefits, or from changes in the assessed value, the tax rate or the method of assessing real property. Sponsor makes no guaranty or warranty concerning the availability of any tax deductions. (See the Section of the Plan entitled "Income Tax Deductions to Unit Owners and Tax Status of the Condominium" for more details.)

(8)     These figures represent the aggregate estimated monthly carrying charges which include estimated Common Charges and estimated real estate taxes. Reference should be made to note (5) of these Notes for certain other "home ownership" costs that may be incurred by Unit Owners.

A Purchaser of a Unit will be required to make a non-refundable contribution at the Closing of Title to the Working Capital Fund in an amount equal to 2 months' Common Charges with respect to the Unit based on the Condominium budget in effect on the Closing Date of the Unit. (See the Section of the Plan entitled "Working Capital Fund and Apportionments" for details.)

## SCHEDULE B – BUDGET FOR FIRST YEAR OF CONDOMINIUM OPERATION

## SCHEDULE B

The 520 Park Avenue Condominium
520 Park Avenue
New York, New York
Projected Budget for
the First Year of Condominium Operation
November 1, 2017 to October 31, 2018

### PROJECTED INCOME

A.  Common Charges                    3,609,438

### PROJECTED EXPENSES

| | | |
|---|---|---|
| 1. | Labor | 1,194,560 |
| 2. | Heat/Hot Water | 606,210 |
| 3. | Electricity | 602,246 |
| 4. | Cooking Gas | 6,478 |
| 5. | Water & Sewer Charges | 96,063 |
| 6. | Administration | 53,200 |
| 7. | Repairs & Maintenance | 107,500 |
| 8. | Services & Supplies | 170,000 |
| 9. | Insurance | 259,500 |
| 10. | Management Fee | 72,000 |
| 11. | Legal, Audit & Professional Fees | 20,000 |
| 12. | Amenity Operations | 320,936 |
| 13. | Resident Manager's Unit | 50,746 |
| 14. | Contingency | 50,000 |

TOTAL EXPENSES        3,609,438

The accompanying notes are an integral part of this Schedule B
and should be read in conjunction herewith.

# FOOTNOTES TO SCHEDULE B

Amounts are projected on the assumption that the first year of Condominium operation will be the 12 month period from November 1, 2017 through October 31, 2018. The actual first year of operation may be earlier or later than said 12-month period. In the event the projected commencement date of the First Year of Condominium Operation is to be delayed by 6 months or more, Sponsor will amend the Plan to include a revised budget with updated projections. If the Common Charges in the amended budget exceed those in the latest budget set forth in the Plan by 25% or more, Sponsor will, in the amendment disclosing such updated budget, offer all Purchasers the right, for 15 days, to rescind their Option Agreement and receive a refund of their Premium Payment, together with any interest earned thereon. Sponsor will not declare the Plan effective if any material changes to the budget are not yet disclosed in an amendment to the Plan.

Projected Receipts

A.      **Common Charges Allocable to Residential Units ($3,609,438)**

The total income projected to be required to meet Common Expenses for the first year of Condominium operation is $3,609,438. Common Charges will be used by the Board of Managers to pay the Common Expenses for the building.

## Projected Expenses

1.    **Labor ($1,194,560)**

**Wages**

| Building Staff (#) | Wages/Yr./Person | Total Wages |
|---|---|---|
| Resident Manager (1) | $ 190,144 | $ 190,144 |
| Handyman (1) | $   60,241 | $   60,241 |
| Doormen (4) | $   54,452 | $ 217,808 |
| Concierge (4) | $   54,452 | $ 217,808 |
| Porters (2) | $   54,452 | $ 108,904 |
| Subtotal | | $ 794,904 |

**Taxes and Benefits**

| | |
|---|---|
| Workers Comp @ 4.53% of applicable wages | $     36,009 |
| FICA @ 6.20% of applicable wages | $     49,284 |
| Medicare @ 1.45% of applicable wages | $     11,526 |
| NYS Unemployment Insurance @ 3.60% of applicable wages | $       6,969 |
| Federal Unemployment Insurance @ .80% of applicable wages | $       1,549 |
| Metro Commuter Mobility Tax @.34% | $       2,703 |
| Subtotal | $   108,039 |

**Union Welfare/Pension**

| | |
|---|---|
| Welfare | $   212,504 |
| Pension | $     68,444 |
| Annuity, Training, Legal, etc. | $     10,668 |
| Subtotal | $   291,616 |

The projected level of staffing for the Building complies with all applicable housing and labor laws. It is anticipated that the Building staff employees will be union members. Accordingly, the Building staff wages and Welfare and Pension figures described are in accordance with the industry pattern contract currently in effect with local 32B-32J of the Service Employees International Union, AFL-CIO. It is possible that the full staff may not be employed until certain Building occupancy levels are achieved and that all employees may not, immediately upon hire, be eligible for certain union benefits.

2. **Heat and Hot Water** ($606,210)

Domestic hot water will be provided by steam fired storage type hot water heaters.

Space heating will be provided by a steam/hot water shell and tube exchanges.

Heating hot water will be provided to dwelling units through 4-Pipe Fan Coil Units. The electric cost associated with operating the fan coil units will be payable by each unit owner and does not constitute part of the common charges.

Based on estimates in a letter dated January 13, 2014 by WSP, 512 Seventh Avenue, New York, NY 10008 the following projections are made for steam consumption and cost for heat and hot water for the Residential Units and General Common Elements. The projections are based on consumption estimates provided by WSP, multiplied by the average current rate with a 10% inflation factor for the rate.

Steam for Domestic Hot Water and Heat
18,370 MLBS of Steam per year @ $33/MLBS = $606,210

It is not possible to predict how closely the budgeted figure will reflect the actual cost of steam for heat and hot water during the first year of condominium operation, because such cost will vary with the level of consumption and the price of steam. Consumption will be affected by the severity of the weather and by any conservation measures adopted by the Condominium Board or individual unit owners.

3. **Electricity** ($602,246)

Based on estimates in a letter dated January 13, 2014 by WSP, the following projections are made for Common Area Electricity. The projections are based on consumption estimates provided by WSP, multiplied by the average current rate with a 10% inflation factor for the rate. Electricity costs can vary depending upon consumption and demand.

Common Area Electricity
2,488,618 KWH per year @ $0.242 per KHW = $602,246

The electricity estimate does not include the cost of electricity in each Residential Unit.

4. **Cooking/Fireplace/Dryer Gas** ($6,478)

Based on estimates in a letter dated January 13, 2014 by WSP, the following projections for gas consumption are made for cooking, fireplace and dryer gas. The projections are based on consumption estimates provided by WSP, multiplied by the average current rate with a 10% inflation factor for the rate.

Cooking/Fireplace Gas
4,711 Therms per Year @ $1.375 per Therm = $6,478

5.    **Water and Sewer Charges ($96,063)**

Water provided to the Property will be measured by a single water meter. Based on estimates in a letter dated January 13, 2014 by WSP, the following projections for water and sewer consumption are made. The projections are based on consumption estimates provided by WSP, multiplied by the current rate with a 10% inflation factor for the rate.

Water & Sewer Charges

| | |
|---|---|
| 2,596 HCF of cooling tower water consumption at a rate of $3.73 per HCF = | $ 9,683 |
| 8,942 HCF of domestic water consumption at a rate of $3.73 per HCF = | $33,354 |
| 8,942 HCF of domestic sewer usage at a rate of $5.93 per HCF = | $53,026 |
| Total | $96,063 |

6.    **Administration & Address License ($53,200)**

This figure includes anticipated costs of:

| | |
|---|---|
| Office Supplies & Expenses | $ 2,500 |
| Telephone & Internet | $12,000 |
| Permits | $ 5,000 |
| Dues | $ 1,200 |
| Address License Fee | $30,000 |
| Misc. Administrative | $ 2,500 |
| Total | $53,200 |

7.    **Repairs and Maintenance ($107,500)**

Since the building will be newly constructed it has no operating history upon which to project future costs of repairs and maintenance. No major capital repairs are included in this budget since all major construction and mechanical systems will be new. Future major capital repairs to the Common Elements will be borne by all unit owners.

This figure includes projected expenses for normal maintenance and repair costs of Common Elements (i.e., mechanical equipment, fans, pumps, valves, roofs, exterior walls, doors, etc.). Unit Owners will be responsible for the cost of repairs and painting in the interior of their Units.

The estimate includes projected expenses for:

| | |
|---|---|
| Plumbing repairs | $ 10,000 |
| HVAC Repairs | $ 50,000 |
| Fire & Safety Equipment | $ 25,000 |
| Pump, Motor & Fan Repairs | $10,000 |
| Miscellaneous Repairs | $12,500 |
| Total | $107,500 |

**8.      Services and Supplies ($170,000)**

This figure represents the estimated annual cost of services and supplies (including service contracts) provided to and for the benefit of the General Common Elements. It includes the following items:

| | |
|---|---|
| Building Supplies | $40,000 |
| Elevator Maintenance | $50,000 |
| Exterminating | $ 7,500 |
| Lobby Expense | $ 6,000 |
| Metal & Stone Maintenance | $12,000 |
| Fire Alarm Maintenance | $12,000 |
| Uniform Expense | $10,000 |
| Meter Reading | $ 5,000 |
| Landscaping | $15,000 |
| Water Treatment | $10,000 |
| Snow Removal Supplies | $ 2,500 |
| Total | $170,000 |

All of the mechanical systems within the Building will be new, and some will be under a full service maintenance contractor for the first year of Condominium operation from the contractor who will install the system.   No maintenance or service contracts have been entered into as of the date of the plan.   The budgeted amounts are based upon the experience of the Budget Expert in operating similar buildings.   While this Schedule B includes a reasonable allowance for possible increases in cost that may occur prior to and during the first year of operations, no warranty is made that the actual cost for these or other services will be in accordance with this projection.   **As such, the budget in the 2nd year of Condominium operation will be increased by the necessary amount.**

**9.      Insurance ($259,500)**

This figure is based on an estimate from Vanderbilt Properties Insurance Brokerage, LLC as detailed below:

**Terrorism Coverage:**

•      TRIA – The Federal Terrorism Risk Insurance Act expires December 2014. As of today, it is difficult to predict the renewal of this important Federal Government reimbursement backstop, for certified acts of Terrorism. Keeping in mind that if TRIA is not renewed by Congress, one can expect an increase in Insurance cost related to Terrorism coverage for 520 Park Avenue, which is located in TIER-1 zone.

Please be guided by the fact that at this time, we are "estimating" the Insurance related expense for Terrorism coverage, that which may change by fall 2014.

*Insurance Proposal*
*from*
**Vanderbilt Properties Insurance Brokerage/Risk Management**
*for*
**520 Park Avenue Condominium**

| INSURED LOCATION (S): 520 Park Ave, New York, NY 10022 (45 E 60th St) |
|---|
| **RESIDENTIAL UNITS:** 39 |
| **COMMERCIAL SQ. FT.:** 0 |

| I.   PROPERTY- CARRIER | TBD (A XV) |
|---|---|
| Special Form, Replacement Cost Valuation, Agreed Amount (No Co-ins.) | |
| TOTAL INSURED VALUE (TIV): | $236,500,000 |
| BUILDING LIMIT: | $232,000,000 |
| BUSINESS INCOME LIMIT: | $3,000,000 |
| PERSONAL PROPERTY: | $1,500,000 |
| ORDINANCE OR LAW | |
| LOSS TO UNDAMAGED PORTION OF BUILDING: | Included in Building Limit |
| DEMOLITION: | $25,000,000 |
| INCREASED COST OF CONSTRUCTION: | Included in Demolition Limit |
| EARTHQUAKE -- ANNUAL POLICY AGGREGATE: | $185,000,000 |
| FLOOD -- ANNUAL POLICY AGGREGATE: | $185,000,000 |
| (EXCLUDING LOCATIONS WITHIN FLOOD ZONES PREFIXED A, B & V, AS CLASSIFIED UNDER NAT'L FLOOD INS. PROG.) | |
| EXTRA EXPENSE: | $1,000,000/ OCCURRENCE |
| EDP EQUIPMENT: | $ 500,000/ OCCURRENCE |
| EDP DATA/MEDIA | $50,000/OCCURRENCE |
| POLLUTANT CLEANUP AND REMOVAL: | $ 100,000/   AGGREGATE |
| LIMITED FUNGUS COVERAGE: | $100,000/   AGGREGATE |
| UTILITY SERVICES TIME ELEMENT: | $500,000/ OCCURRENCE |
| VALUABLE PAPERS: | $ 500,000/ OCCURRENCE |
| ACCOUNTS RECEIVABLE: | $ 1,000,000/ OCCURRENCE |
| FINE ARTS: | $ 500,000/ OCCURRENCE |
| DEBRIS REMOVAL: | $5,000,000/ OCCURRENCE |
| | |
| **BOILER & MACHINERY:** | $200,000,000/OCCURRENCE |
| HAZARDOUS SUBSTANCES: | $25,000/OCCURRENCE |
| AMMONIA CONTAMINATION: | $25,000/OCCURRENCE |
| CONSEQUENTIAL DAMAGE: | $25,000/OCCURRENCE |
| WATER DAMAGE: | $25,000/OCCURRENCE |
| EXTRA EXPENSE: | $25,000/OCCURRENCE |
| DEDUCTIBLES -- PER OCCURRENCE | |
| UTILITY SERVICES - TIME ELEMENT: | 72-HOURS |
| CIVIL AUTHORITY - TIME ELEMENT: | 72-HOURS |
| EARTHQUAKE: | $100,000 |
| FLOOD: | $100,000 |
| ALL OTHER COVERED PROPERTY PERILS: | $25,000 |

| **TERRORISM INSURANCE:** |
|---|
| Terrorism Risk Insurance Act of 2002 Disclosure: |
| Please note that the coverages contained in this proposal <u>do not</u> contain an exclusion that specifically excludes coverage for *Insured Losses*. The charge for this exposure is included in the total premium for this policy. The charge that has been included for this exposure under this policy is <u>$23,650</u> |
| This coverage may be declined. If declined, the premium for this policy will be: $221,850. |

| TOTAL PROPERTY & BOILER & MACHINERY QUOTE: | $236,500. |
|---|---|

*This is a coverage summary for your convenience, not a legal contract.  It is provided to facilitate your understanding of the insurance program proposal.  Please refer to the actual policies when issued for specific terms, conditions, limitations and exclusions that will govern in the event of a loss.*

*Insurance Proposal*
*from*
***Vanderbilt Properties Insurance Brokerage/Risk Management***
*for*
***520 Park Avenue Condominium***

---

**INSURED LOCATION (S): 520 Park Ave, New York, NY 10022 (45 E 60th St)**

**RESIDENTIAL UNITS:    39**
**COMMERCIAL SQ. FT.:    0**

---

| **II.    GENERAL LIABILITY – CARRIER** | **TBD (A XV)** |
|---|---|
| GENERAL LIABILITY -- GENERAL AGGREGATE: | $2,000,000 |
| PRODUCTS/COMPLETED OPS AGGREGATE: | $1,000,000 |
| PERSONAL/ADVERTISING INJURY: | $1,000,000 |
| NON-OWNED/HIRED AUTOMOBILES: | $1,000,000 |
| PER OCCURRENCE: | $1,000,000 |
| FIRE DAMAGE LEGAL LIABILITY: | $1,000,000 |
| MEDICAL EXPENSES: | $5,000 |
| EMPLOYEE BENEFITS LIABILITY: | $1,000,000 |

Your quoted policy premium includes the following premium charge for losses resulting from certified acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002: **$1,400**

| **TOTAL GENERAL LIABILITY QUOTE:** | **$10,000.00** |
|---|---|

---

| **III.    FIDELITY (EMPLOYEE THEFT) – CARRIER** | **TBD (A XV)** |
|---|---|
| EMPLOYEE DISHONESTY / FORGERY & ALTERNATION LIMITS: | $1,000,000/OCCURRENCE |
| DEDUCTIBLE - ALL PERILS – PER OCCURRENCE: | $2,500 |

Your quoted policy premium includes the following premium charge for losses resulting from certified acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002: $0

| **TOTAL FIDELITY (EMPLOYEE THEFT) QUOTE:** | **$2,000.00** |
|---|---|

---

| **IV.    DIRECTORS & OFFICERS LIABILITY -- CARRIER** | **TBD (A XV)** |
|---|---|
| LIMIT OF LIABILITY: | $1,000,000/ OCCURRENCE |
| | $1,000,000/AGGREGATE |
| SELF INSURED RETENTION: | $2,500 |

Your quoted policy premium includes the following premium charge for losses resulting from certified acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002: $0

| **TOTAL DIRECTORS & OFFICERS LIABILITY QUOTE** | **$5,000.00** |
|---|---|

---

| **V.    UMBRELLA LIABILITY -- CARRIERS** | **TBD (A XV)** |
|---|---|
| LIMIT OF LIABILITY: | $200,000,000/ OCCURRENCE |
| | $200,000,000/ AGGREGATE |
| SELF INSURED RETENTION: | $10,000 |

Your quoted policy premium includes the following premium charge for losses resulting from certified acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002: $0

| **TOTAL $200,000,000 UMBRELLA QUOTE:** | **$6,000.00** |
|---|---|

---

| **TOTAL ANNUAL QUOTE:** | **$259,500.00** |
|---|---|
| | **+ NY Fire Insurance Fee** |

---

*This is a coverage summary for your convenience, not a legal contract. It is provided to facilitate your understanding of the insurance program proposal. Please refer to the actual policies when issued for specific terms, conditions, limitations and exclusions that will govern in the event of a loss.*

*Insurance Proposal*
*from*
***Vanderbilt Properties Insurance Brokerage/Risk Management***
*for*
***520 Park Avenue Condominium***

---

**INSURED LOCATION (S): 520 Park Ave, New York, NY 10022 (45 E 60th St)**

**RESIDENTIAL UNITS: 39**
**COMMERCIAL SQ. FT.: 0**

---

## CONTRACTOR INSURANCE REQUIREMENTS

Building owners and managers must comply with the following requirements prior to allowing any contractor on their premises:

- Written agreements/contracts must be in place with all contractors; which require that the contractor name as Additional Insured, hold harmless and defend the owner, manager and their agents in the event of a claim; as well as provide a certificate of insurance complying with the requirements in the agreement.
- Maintain a certificate program for all contractors; expiration dates must be tracked and updated/renewal certificates must be obtained accordingly. The owner and manager must be named as Additional Insured on the contractor's policy and this must be evidenced on the certificate.

## POLICY TERM

- To Be Determined

## PAYMENT TERMS:

- Our office must be in receipt of full payment within 30 days of binding.

*This is a coverage summary for your convenience, not a legal contract. It is provided to facilitate your understanding of the insurance program proposal. Please refer to the actual policies when issued for specific terms, conditions, limitations and exclusions that will govern in the event of a loss.*

**10.**     **Management ($72,000)**

At or prior to the First Closing, the Condominium will enter into a management agreement with Brown Harris Stevens Residential Management LLC having an office address at 770 Lexington Avenue, New York, NY 10065 a Real Estate management firm affiliated with certain principals of Sponsor. The management agreement will be for an initial term of 2 years. Thereafter, the agreement will be automatically renewed from month to month, but may be cancelled by either party without cause, upon not less than sixty (60) days' prior written notice. The Managing Agent will receive an annual fee of $72,000 payable in equal monthly installments of $6,000. The Managing Agent's fee for the first year of Condominium operation is comparable to the "going rate" for similar services in comparable buildings.

See the Section of the Plan entitled "Management Agreement" for further details.

**11.**     **Legal, Audit & Professional Fees ($20,000)**

This figure is budgeted to provide $10,000 for auditing and accounting fees in connection with the preparation of the first year's audited financial statements and tax returns for the Condominium, based on an estimate prepared by Kleiman & Weinshank, LLP, 2 Penn Plaza, 5th Floor, New York, NY 10121. The budget amount also projects $7,500 for minor legal services rendered in connection with the operation of the Condominium and $2,500 for other professional services.

**12.**     **Amenity Operations ($320,936)**

The condominium will have an amenities facility which will include a fitness center, swimming pool, lounge, and other activities. Based on an estimate from The Wright Fit, having an address of 900 Broadway, Suite 700, New York, NY 10003, it is anticipated that the cost to operate the fitness center during the first year of Condominium operation will be approximately $310,936. This fee includes the cost of lifeguards, health club management, and supplies associated with operating the health club and pool. An additional $10,000 has been budgeted for miscellaneous repairs and operating expenses outside of the contract with the third party operator.

**13.**     **Resident Manager Unit ($50,746)**

The Condominium Board will own unit 5B for the use of the Resident Manager and is responsible for all expenses associated with the Unit. The budgeted amount for the Resident Manager's Unit includes the following costs: Common Charges at approximately $23,000 per year, utilities at approximately $3,000 per year and real estate taxes at approximately $24,746 per year.

**14.**     **Operating Contingency ($50,000)**

This amount, to be used at the discretion of the Board, is intended to benefit the Condominium Unit Owners by providing a fund for unanticipated expenses not included in the budget and for possible increases in one or more items of operating expense above the amounts projected.

The foregoing projected budget may be modified from time to time prior to the commencement of, or during, Condominium operation to add or increase one or more items of operating expense. If additional funds are required over and above these funds, it may be necessary to increase Common Charges or separately assess all Unit Owners.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
IN THE OPINION OF ROSE ASSOCIATES, INC. THE FOREGOING ESTIMATED COMMON CHARGES ARE SUFFICIENT TO PAY THE PROJECTED OPERATING EXPENSES FOR THE CONDOMINIUM'S FIRST YEAR OF OPERATION, ASSUMING SUCH FIRST YEAR TO BE THE 12-MONTH PERIOD COMMENCING NOVEMBER 1, 2017. THE FOREGOING BUDGET, HOWEVER, IS NOT INTENDED AND SHOULD NOT BE TAKEN AS A GUARANTEE BY ANYONE THAT THE ANNUAL COMMON CHARGES OR COMMON EXPENSES FOR THE FIRST OR ANY SUBSEQUENT YEAR OF CONDOMINIUM OPERATION WILL BE PRECISELY AS SET FORTH IN THIS BUDGET.

## SCHEDULE B-1 - PROJECTED INDIVIDUAL ENERGY COSTS BUDGET

## SCHEDULE B-1
### Projected Individual Energy Costs Budget

WSP Building Systems (f/k/a WSP Flack & Kurtz), having an office at 512 Seventh Avenue, New York, New York 10018 provided the attached estimate of annual electric energy costs for lighting and for operating the typical electrical appliances located in each Unit.

The projected rates are not guaranteed and it must be expected that these rates will increase with the passage of time and may be affected by many factors which are beyond the control of Sponsor. Purchasers are advised that the projections are only estimates and actual consumption will be metered and will vary based on the personal needs of Unit Owners and weather conditions.



512 Seventh Avenue
13th Floor
New York, NY 10018
Main: 212 532 9600
www.wspgroup.com/usa

April 14, 2014


Mr. Bryan Ramm
Zeckendorf Development
445 Park Avenue, Suite 1902
New York, NY 10022


Re:     Residential Building at 520 Park Avenue
        WSP Reference Number: N12.11480.00

Dear Mr. Ramm:

We have prepared estimated annual electric energy cost for lighting and operating the typical appliances located in each apartment.

The estimated average KWH per year per square foot and annual cost of electricity per square foot utilized by individual apartments are 6.29/KWH/Square Foot/Year and $1.39 per square foot, based on a projected Con Edison rate of $0.22 per KWH for 2013. The following table sets forth the estimated annual costs of electricity for typical Residential Units:

| Apartment Type (Floor | Area (SF) | KWH/YR | Cost/Apt/YR | # of Apts. |
|---|---|---|---|---|
| Apartment 4A (4) | 390.0 | 2,453.10 | $539.68 | 1 |
| Apartment 4B (4) | 402.0 | 2,528.58 | $556.29 | 1 |
| Apartment 4C (4) | 412.0 | 2,591.48 | $570.13 | 1 |
| Apartment 4D (4) | 400.0 | 2,516.00 | $553.52 | 1 |
| Apartment 4E (4) | 420.0 | 2,641.80 | $581.20 | 1 |
| Apartment 5A (5) | 387.0 | 2,434.23 | $535.53 | 1 |
| Apartment 5B (5) | 1,242.0 | 7,812.18 | $1,718.68 | 1 |
| Apartment 5C (5) | 420.0 | 2,641.80 | $581.20 | 1 |
| Simplex (14-20) | 4,613.0 | 29,015.77 | $6,383.47 | 7 |
| Upper Simplex (21-36) | 4,628.0 | 29,110.12 | $6,404.23 | 16 |
| Duplex (DP-PH38, DP-PH40, DP-PH42, DP-PH44, DP-PH46, DP-PH50) | 9,138.0 | 57,478.02 | $12,645.16 | 6 |
| Duplex (DP-PH48) | 8,522.0 | 53,603.38 | $11,792.74 | 1 |
| Triplex (TRI-PH52) | 13,653.0 | 85,877.37 | $18,893.02 | 1 |

Should you have any questions, please do not hesitate to contact me directly at 212.951.3939.

Very truly yours,

WSP


George M. Santonas
Vice President

**OPINION OF COUNSEL RE: REAL PROPERTY LAW SECTION 339-i**

**STARR ASSOCIATES LLP**
ATTORNEYS AT LAW

245 FIFTH AVENUE
NEW YORK, NY 10016
TEL 212 620 2680
FAX 212 696 5013
www.starr-lawfirm.com

August 11, 2014

41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, New York 10022

     Re:    520 Park Avenue Condominium
              520 Park Avenue
              New York, New York 10022 ("Property")

Ladies and Gentlemen:

You have requested our opinion regarding the allocation of Common Interests to the Units at the Property as required by NYCRR Section 20.3(y)(5). Except where otherwise indicated, the terms used in this opinion shall have the same meaning as set forth in the Condominium Offering Plan ("Plan") for the Property.

In connection with the rendering of this opinion we have reviewed the allocation of Common Interests as shown on Schedule A of the Plan and the Declaration establishing the Condominium. We have also considered the relevant sections of the New York State Condominium Act and such other materials as we deemed relevant. Our opinion is also based upon the factual determinations made by Rose Associates Inc. ("Real Estate Broker") set forth in its opinion contained in the Plan as required by NYCRR Section 20.3(i). We have made no independent investigation of the truth or accuracy of the factual determinations of Real Estate Broker. Accordingly, in the event that facts presented by Real Estate Broker were or prove incorrect in no event will Starr Associates LLP be liable.

Based upon our review of the foregoing, we have determined that the method selected by Real Estate Broker to calculate the percentage of Common Interests is permissible under Real Property Law ("RPL") Section 339-i(l) based upon the approximate proportion that the floor area of the Unit at the date of the Declaration bears to the then aggregate floor area of all the Units, but such proportion reflecting the substantially exclusive advantages enjoyed by one or more but not all Units in a part or parts of the Common Elements in accordance with subsection (ii).

This opinion, while based upon existing rules of law applied to the facts and documents referred to above, is not a guarantee to Purchasers. In no event will Sponsor, Starr Associates LLP, Selling Agent, Managing Agent or the Condominium Board be liable if there are changes in the facts on which we have relied in issuing this opinion or if there are changes in RPL Section 339 or other applicable Law.

The opinion expressed herein is based solely on New York Law.

Very truly yours,

STARR ASSOCIATES LLP

By: _____
    Name:  Samantha Sheeber
    Title:    Partner

---

**REAL PROPERTY LAW SECTION 339-i COMPLIANCE LETTER**

---

200 Madison Avenue, 5th Floor
New York, NY 10016-3912
Direct: (212) 210-6626
mgelberg@rosenyc.com
ROSENYC.COM

ROSE ASSOCIATES

**Mitchell S. Gelberg**
Managing Director

PART 20: LETTER TO ATTORNEY GENERAL
RE: REAL PROPERTY LAW SECTION 339-i.1 COMPLIANCE

Dated: August 12, 2014

New York State Department of Law
120 Broadway, 23rd Floor
New York, New York 10271

Attention: Investment Protection Bureau

Re: Condominium Offering Plan
520 Park Avenue Condominium
520 Park Avenue
New York, New York 10022 ("Property")

Dear Sir/Madam:

The Sponsor of the Condominium Offering Plan ("Offering Plan") for the Property retained Rose Associates, Inc. ("Firm") to review the percentage of Common Interest in the Common Elements allocated to each Unit in the Property set forth in Schedule A of the Offering Plan.

The Firm is licensed as a real estate brokerage firm in the State of New York. The principals of the Firm have been engaged in the real estate and brokerage business for over 45 years and have been actively associated with sale and management of condominium and cooperative buildings.

The Firm has been advised by Sponsor that the Common Interest of each Unit has been determined in accordance with Real Property Law Section 339-i.1 based upon floor space, subject to the location of such space and the additional factors of relative value to other space in the Condominium, the uniqueness of the Unit, the availability of Common Elements for exclusive or shared use, and the overall dimensions of the particular Unit in accordance with subsection (iv).

In the Firm's opinion, within the framework of Real Property Law Section 339-i.1, this method of determining Common Interest is reasonable and equitable.

The Firm certifies that it is not owned or controlled by Sponsor and that it has no financial interest in the offering other than its fee for services rendered in connection with the preparation of this letter (and acting as Selling Agent under the Offering Plan). The Firm understands that a copy of this letter is intended to be incorporated into the Offering Plan.

All capitalized terms not defined in this letter shall have the meaning ascribed to them in the Offering Plan.

Very truly yours,

Rose Associates, Inc.

By: ______________________
Mitchell S. Gelberg
Managing Director

## CHANGES IN PRICES AND UNITS

Purchase prices for the Units offered hereby are negotiable and Sponsor reserves the right, at any time and from time to time before and after the recording of the Declaration, without giving prior notice (except as otherwise provided herein) and without the consent of the Condominium Board, any Unit Owner or mortgagee, to change the price, by a duly filed amendment to the Plan including, without limitation, the manner of payment thereof and other terms of sale of any Unit, except that no such change with respect to any Unit for which an Option Agreement is then in effect may be made without the consent of the Purchaser. However, Sponsor reserves the right to decrease Purchase Prices or modify other terms of sale without filing an amendment to the Plan at any time during the offering period if such a decrease in the Purchase Price or modification of such other terms of sale does not constitute a general offering or an advertised price but is rather the result of an individually negotiated transaction. If any such change is made, a Purchaser of a Unit affected thereby may pay more or less than other Purchasers under the Plan for similar Units, but this will not affect any prior or subsequent sale of Units which are not the subject of such change. However, the Purchase Prices set forth in Schedule A must be changed by a duly filed amendment to the Plan when the change in Purchase Price (i) is an across the board increase or decrease affecting one or more lines of Units or Unit models, (ii) are to be advertised or (iii) is a Purchase Price increase for an individual Purchaser.

Sponsor reserves the right to negotiate with each Purchaser the following terms and conditions of the Option Agreement among other terms: Purchase Price; the amount and timing of the Premium Payment; the availability of financing; the payment of Purchaser's financing fees and other closing costs; the availability of Common Charge rebates, Purchase Price rebates and subsidies payable as a credit against the Purchase Price or on a periodic basis; extensions of time periods within which to perform obligations under the Option Agreement; the availability of use and occupancy agreements and the amount of interim use and occupancy fees thereunder; and the application of interim use and occupancy fees towards the Purchase Price, and upgrades on extras to the Unit finishes and equipment.

Sponsor reserves the right from time to time to add and/or delete negotiable terms from the list set forth above for all or some Purchasers. No Purchaser will benefit from any terms and conditions negotiated with any other Purchaser, and a Purchaser's failure to so benefit will not give rise to any right of rescission under an Option Agreement.

The location in the Building, approximate size and layout of the Units are shown on the Floor Plans set forth in Part II of the Plan. In order to meet the possible varying demand for number and type of Units, or to meet particular requirements of Purchasers, or for any other reason, Sponsor reserves the right (except to the extent prohibited by Law) at any time and from time to time, before and after the recording of the Declaration, without giving prior notice and without the consent of the Condominium Board, any Unit Owner or mortgagee, to (a) change the size, layout and square footage of, or number of rooms in, any Unsold Unit, (b) change the size and/or number of Unsold Units by dividing one or more such Units into two or more separate Unsold Units, combining separate Unsold Units (including those resulting from such subdivision or otherwise) into one or more Unsold Units, altering any boundary walls between one or more Unsold Units, or otherwise, including incorporating Common Elements (such as a portion of a hallway) which exclusively benefit an Unsold Unit into such Unsold Unit without changing the percentage of Common Interest of such Unit, and (c) if appropriate, reapportion among the Unsold Units affected by any such change, their aggregate Common Interests. In the event of any change pursuant to either (b) or (c) above, such change shall be disclosed in a duly filed amendment to the Plan. No such change, including any change in the Common Interest or in the amount or quality of Common Elements directly affecting or servicing a Unit, will be made with respect to such Unsold Unit for which an Option Agreement is then in effect which increases or decreases the square footage (excluding interior partitions) or Common Interest by more than 5%, or materially changes the Unsold Unit size, the layout or Common Interest of such Unsold Unit, unless the Purchaser consents to such changes. There is a rebuttable presumption that an increase or decrease in the square footage of a Unit, as set forth in the Schedule A, by 5% or less (excluding interior partitions) is not a

material and/or adverse change. Provided Purchaser's consent is not required, a Purchaser will not be excused from purchasing the Unit and will not have any claim against Sponsor as a result of any such change and will not affect a Purchaser's obligations under the Option Agreement or the Plan. If Purchaser's consent is required as a result of such change and such change Purchaser refuses to consent, then in such event, Sponsor's sole obligation shall be to refund to Purchaser the Premium Payment made under the Option Agreement and any interest earned thereon, except for Unit Upgrade Funds.

Sponsor will have no liability to any Purchaser, nor will any Purchaser be entitled to a credit, offset or reduction in the Purchase Price of the Unit or otherwise be relieved from any obligations under the Option Agreement, by virtue of a non-material inaccuracy or error in the Floor Plans.

Once the Declaration is recorded, no change may be made in the number of Units or number of rooms within a Unit, nor may the size of any Unit be changed by subdivision or combination or alteration of boundary walls as aforesaid or otherwise, nor may the Common Interest of any Unit be changed, unless, in each such event, the Declaration and Floor Plans and the Plan are amended with the consent of each Unit Owner whose Unit is directly affected by such change. In the case of a material and adverse change in the size or quality of the Common Elements, no such change shall be made without the consent of every Unit Owner. In such event, Sponsor will have the right to amend or to cause the Condominium Board to amend the Declaration to reflect any such material and adverse change and to file such amendment and any necessary plans and specifications in connection therewith.

Sponsor reserves the right, in its sole and absolute discretion, to sell, lease, license or otherwise transfer to a Unit Owner, any non-material portion of the Common Elements for the exclusive use of such Unit Owner, provided that (i) such Common Element was not offered in the Plan as a lobby or as an amenity for the shared use of the Unit Owners of the Condominium, and that (ii) such transfer does not interfere with the ingress or egress to any Unit. Any such sale, lease, license or transfer will be disclosed in a duly filed amendment to the Plan and the Declaration and Floor Plans will be amended, if required.

The provisions set forth in this Section of the Plan shall also apply to Ancillary Amenities, as applicable.

## USE AND OCCUPANCY AGREEMENTS

Sponsor reserves the right with respect to any Unsold Unit, to enter into a pre-closing Use and Occupancy Agreement with the Purchaser of such Unsold Unit on an interim basis on such terms and conditions as may be agreed to between Sponsor and Purchaser. Purchasers are advised that the occupancy under such Use and Occupancy Agreement is not subject to any governmental regulations, including, without limitation, rent regulations or continued occupancy. Such use and occupancy fees shall be determined by Sponsor in its sole and absolute discretion. No occupancy in any Unit may commence until (i) a Temporary Certificate of Occupancy has been obtained for such Unsold Unit and (ii) the First Closing has occurred.

The Use and Occupancy Agreement will provide, among other things, that an uncured default by the Purchaser under the Option Agreement with respect to the Unsold Unit which is the subject of the Use and Occupancy Agreement will constitute a default under the Use and Occupancy Agreement entitling Sponsor, at its option, to terminate such Use and Occupancy Agreement in accordance with Law. In addition, each Option Agreement will provide that a default by the Purchaser under any Use and Occupancy Agreement with respect to the Unsold Unit which is the subject of the Option Agreement will constitute a default under the Option Agreement entitling Sponsor, at its option, to terminate such Option Agreement. If, as a result of a default by Purchaser under the Use and Occupancy Agreement, Sponsor elects to cancel the Option Agreement, Purchaser shall have 30 days from the giving of the notice of cancelation to cure the default, TIME BEING OF THE ESSENCE, for which failure to cure will entitle Sponsor to exercise any remedy provided for in the Option Agreement. However, prior to Sponsor utilizing the default under the Use and Occupancy Agreement to declare a default under the Option Agreement, Sponsor must obtain an order of eviction or other judgment or order from a court or agency of competent jurisdiction against the Purchaser unless the Purchaser has vacated the Unit. Upon the execution of the Use and Occupancy Agreement, Sponsor will require Purchaser to execute a Stipulation of Settlement Holdover, by which Purchaser will consent to a final judgment of possession of the Unsold Unit in favor of Sponsor and to the immediate issuance of a warrant of eviction, in the event of a default under the Use and Occupancy Agreement. In addition, in the event a Purchaser is permitted to take possession of the Unsold Unit prior to Closing, such Purchaser will be required to obtain casualty and liability insurance for their own benefit in such amounts as determined by Sponsor.

In the event (i) that Purchaser defaults under the terms of the Use and Occupancy Agreement which default is not cured within 10 days of notice (other than Purchaser's failure to make a Payment within ten (10) days of the first day of the month in which such Payment is due, in which event Sponsor shall not be required to send notice of default and the event of default shall be deemed to have occurred on the 11th day after the date on which such Payment is due) or (ii) that the term of the Use and Occupancy Agreement expires, Purchaser agrees to vacate and deliver full possession of the Unit to Sponsor in broom-clean condition within 10 days of written notice from Sponsor or its attorney. The Use and Occupancy Agreement shall be substantially in the form set forth in Part II of the Plan.

Purchasers entering into a Use and Occupancy Agreement for an Unsold Unit will be required to pay the legal fees of Attorney for Sponsor in connection therewith upon execution of the Use and Occupancy Agreement. All other charges or other fees due under the Use and Occupancy Agreement will be adjusted as of the Closing of Title to the Unsold Unit and no portion of the Use and Occupancy fee paid under the Use and Occupancy Agreement will be credited towards the Purchase Price of an Unsold Unit unless the Use and Occupancy Agreement expressly provides. Notwithstanding the foregoing, Sponsor will be under no obligation to enter into any Use and Occupancy Agreement.

## PROCEDURE TO PURCHASE

A Purchaser desiring to purchase a Unit will be required to execute an Option Agreement, which will be in the form set forth in Part II of the Plan. A Purchaser also interested in acquiring an Ancillary Amenity will be required to execute the form of Rider annexed to the Option Agreement set forth in Part II of the Plan.

Purchasers shall be afforded not less than 3 business days to review the Plan prior to executing an Option Agreement. A Purchaser may obtain the Plan upon payment of a $200 deposit, which amount will be fully refunded upon either (i) the prompt return of the Plan in good condition or (ii) the execution by the Purchaser of an Option Agreement subsequently accepted by Sponsor. If a Purchaser has not received the Plan at least 3 business days prior to executing an Option Agreement, a Purchaser shall have the right to rescind the Option Agreement within 7 days from the date Purchaser delivers an executed Option Agreement together with the required Premium Payment to Selling Agent. The Option Agreement sets forth in detail the terms of sale with respect to each Unit and should be read carefully by Purchaser. Purchasers should be aware that if any conflict exists between the Plan and the Option Agreement, the provisions of the Plan shall in all events control.

Although a Purchaser may obtain financing from any lending institution or other source, Purchaser's obligation to purchase a Unit is not contingent on Purchaser obtaining financing. Neither Sponsor nor Selling Agent makes any representation as to the availability or terms of any financing. Purchasers may want to finalize their financing arrangements before signing an Option Agreement. While the First Closing is projected to occur on or around November 1, 2017, neither Sponsor nor Selling Agent makes any representation as to the actual closing date for any particular Unit. In addition, as set forth in the Plan and the Option Agreement, Sponsor has the right to adjourn the Closing Date from time to time and prospective Purchasers should be aware that if the Closing Date is adjourned, Purchaser's financing terms may be adversely affected, the interest rate may increase and the loan commitment could expire. Sponsor shall have no liability as a result of any scheduling or adjournment of Closing beyond the expiration of a loan commitment.

Option Agreements will not be binding on Sponsor until approved and executed by it, and delivered by Sponsor to the Purchaser. Sponsor reserves the right to request thorough identification and financial information (including credit reports and litigation searches) concerning any Purchaser, subject to any limitations and requirements imposed by Law.

Sponsor will have 30 days after delivery by Purchaser of an executed Option Agreement and the required Premium Payment, within which to accept or reject the Option Agreement. If an Option Agreement is not accepted by Sponsor within the 30 day period, the Option Agreement shall be deemed to have been rejected and cancelled and the Premium Payment shall be returned to Purchaser within 30 days thereafter. Sponsor hereby reserves the right at any time and from time to time for any reason whatsoever, to refuse to approve and execute (a) an Option Agreement for any Unit, except as prohibited by Law, and (b) an Option Agreement for more than one Unit to any Person.

The signing of the Option Agreement signifies Purchaser's acceptance of the condition of the Property (as represented by Sponsor in the Plan), including, but not limited to, the Unit, the Ancillary Amenities, the Building and all Common Elements contained in the Building. In the event of any inconsistency between the provisions of the Option Agreement and the Plan, the provisions of the Plan will govern and be binding. The Option Agreement shall not contain, and shall in no event be modified to contain, a provision waiving the Purchaser's rights or abrogating Sponsor's obligations under the Plan or under Article 23-A of the General Business Law of the State of New York.

At the time of execution of an Option Agreement, Purchaser will be required to make an initial Premium Payment in an amount equal to 15% of the Purchase Price and an additional Premium Payment in an amount equal to 10% of the Purchase Price upon the earlier to occur of (i) 6 months after Purchaser

executes the Option Agreement or (ii) within 15 days of the Presentation Date of the amendment declaring the Plan effective. A Purchaser executing an Option Agreement after the date the Plan is declared effective is required to make the full Premium Payment in an amount equal to 25% of the Purchase Price by an official bank check drawn on or issued by a bank or trust company which is a member of The New York Clearinghouse Association. Sponsor may require that Purchasers of more than 1 Unit deliver a Premium Payment in excess of that set forth in the Plan, which amount shall be on terms individually negotiated with each Purchaser. All Premium Payments must be made payable to the direct order of "Starr Associates LLP, as escrow agent." All checks delivered in payment of the Premium Payment shall be accepted by Sponsor subject to collection, and if any such check is returned for insufficient funds or any other reason, Sponsor shall have the right, among other things, to deem such Option Agreement to be cancelled and of no further force or effect.

All Premium Payments made pursuant to an Option Agreement are subject to the requirements of Section 71a(3) of the State of New York Lien Law and 352-e(2)(b) and 352-h of the General Business Law of the State of New York. Pursuant to these laws, Sponsor will cause all Premium Payments received by it directly or by its agents or employees to be promptly deposited and held in accordance with the procedures set forth in the Section of the Plan entitled "Escrow and Trust Fund Requirements."

The Exercise Price shall be payable simultaneously with the delivery of the deed to the Unit and, if applicable, the Ancillary Amenity License by wire transfer (at Sponsor's sole option) or, official bank check drawn on or issued by a bank or trust company which is a member of The New York Clearinghouse Association and shall be payable to the direct order of Sponsor, or otherwise if Sponsor shall so notify Purchaser. Any wiring fees charged by the initiating and/or receiving bank shall be paid by Purchaser. The deed and Ancillary Amenity License will be substantially in the form as set forth in Part II of the Plan. Interest, if any, on Purchaser's Premium Payment will be credited or paid to Purchaser at Closing.

Based upon the current construction schedule, Sponsor presently contemplates that, unless delayed by Force Majeure, construction of the Building will be sufficiently completed to permit closings of Units to begin on or about November 1, 2017. Purchasers will not be excused from paying their full Purchase Prices (without credit or set-off), and will have no claim against Sponsor for damages or losses, in the event that the First Closing occurs earlier or later than the projected date or the time to complete or to close title to any Unit is delayed or postponed by Sponsor. Sponsor has the right to change the projected First Year of Condominium Operation from time to time by an amendment to the Plan. If the First Closing does not occur within 12 months after the date set forth in Schedule B for the First Year of Condominium Operation in effect on the date a Purchaser and Sponsor entered into an Option Agreement, Sponsor will offer those affected Purchasers only a right for 15 days from the Presentation Date of the amendment disclosing Sponsor's failure to close within such time frame, to rescind their Option Agreement. Any Purchasers electing rescission will have their Premium Payments returned together with any interest earned thereon, except for any Unit Upgrade Funds. In the event the actual or anticipated commencement date of the First Year of Condominium Operation is to be delayed by 6 months or more, Sponsor will amend the Plan to include a revised budget with updated projections. If the Common Charges in the amended budget exceed those in the latest budget set forth in the Plan by 25% or more, Sponsor will, in the amendment disclosing such updated budget, offer all Purchasers the right, for 15 days, to rescind their Option Agreements and receive a refund of their Premium Payments, together with any interest earned thereon (provided, however, that after the Plan has been declared effective and the amendment disclosing the same has been accepted by the Department of Law, a Purchaser who is in default under the Option Agreement beyond the expiration of any applicable grace period will not have the right to rescind).

Following the Plan being declared effective, Sponsor will deliver to each Purchaser a written notice of the time and place of Closing at least 30 days prior to the Closing Date specified therein ("Scheduled Closing Date"). In the event a Purchaser defaults under the Option Agreement, time being of the essence with regard to the obligations of Purchaser under the Option Agreement, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel the Option Agreement. If Sponsor elects to cancel, Purchaser shall

have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then the Option Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds. Upon the cancellation of the Option Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though the Option Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

If Purchaser fails for any reason to close title to the Unit on the Scheduled Closing Date, other than due to Sponsor's failure or inability to Close: (a) the Closing apportionments described in the Section of the Plan entitled "Closing Costs and Adjustments" will be made as of midnight of the day preceding the Scheduled Closing Date, regardless of when the actual Closing occurs ("Actual Closing Date"), and (b) Purchaser will be required to pay to Sponsor an amount equal to .03% of the Purchase Price of the Unit per day commencing with the Scheduled Closing Date through the Actual Closing Date, as a reimbursement of Sponsor's increased carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under the Option Agreement and the Plan. If through no fault of Purchaser, Sponsor postpones the Scheduled Closing Date, these provisions shall apply to the Rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the Rescheduled Closing Date.

TIME IS OF THE ESSENCE AS TO PURCHASER'S OBLIGATIONS UNDER THE OPTION AGREEMENT, INCLUDING, WITHOUT LIMITATION, FOR THE PAYMENT OF ALL PREMIUM PAYMENTS AND THE EXERCISE PRICE. FUNDS DRAWN ON FOREIGN BANKS WILL NOT BE ACCEPTED IN PAYMENT OF THE PURCHASE PRICE.

If a Purchaser has entered into Option Agreements to purchase more than one Unit, a default by Purchaser in the payment or performance of any obligations under any of such Option Agreements, beyond any applicable grace periods, shall be deemed a default under the other Option Agreements. In the event of such a default, Sponsor may, at its option, cancel each such Option Agreements and retain, as liquidated damages, all of the entire Premium Payments made by Purchaser, together with any interest earned thereon, if any, under each of the Option Agreements.

Any Purchaser that is a foreign government, a resident representative of a foreign government or other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity) ("Foreign Government Purchaser") shall be required to expressly and voluntarily waive such immunity and consent to any suit, action or proceeding arising out of or relating to the Option Agreement or the Condominium Documents being brought in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with the Option Agreement or the Condominium Documents. Any Foreign Government Purchaser shall designate and authorize a lawful agent to receive process for and on behalf of the Foreign Government Purchaser in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with the Option Agreement or the Condominium Documents.

Prior to the Closing of Title to a Unit, the Option Agreement prohibits a Purchaser from listing the Unit for sale or rental with any broker or placing or authorizing any listing in any brokers listing system or other listing service or from advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or rental, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion. Any such action by Purchaser in violation of the terms of the Plan will be deemed a material default under the Option Agreement, and Sponsor may, at its option, cancel the Option Agreement and retain, as liquidated damages, the entire Premium Payment made by Purchaser, together with interest earned thereon.

If the Plan is withdrawn or abandoned, all Premium Payments previously paid to and actually collected by Sponsor, together with any interest earned thereon, shall be returned to Purchaser in accordance with the provisions set forth in the Section of the Plan entitled "Effective Date."

From and after the Closing of each Unit, Purchaser will become obligated for the payment of Common Charges (once Common Charges are assessed by the Condominium Board), real estate taxes and assessments whether or not separately assessed (including water charges and sewer rents, if separately assessed) and all other expenses with respect to the Unit, whether or not Purchaser has taken possession of the Unit, and whether or not all work required to be performed by anyone in or to the Unit has been completed.

The risk of loss to any Unit by fire or other casualty until the Closing for such Unit is assumed by Sponsor (unless and until Purchaser takes possession of the Unit, at which time such risk, to the extent not covered by existing insurance, shall be assumed by Purchaser), but without any obligation or liability by Sponsor to repair or restore any Unit. In the event of damage or destruction of a Unit due to fire or other casualty prior to the Closing, but subsequent to the signing of an Option Agreement, provided Sponsor elects (which election shall be in its sole discretion) to repair or restore the Unit, the Option Agreement shall continue in full force and effect, and, thereafter, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price for the Unit. In such event, Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration, and any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners, belong entirely to Sponsor. In the event of damage or destruction to any Unit by fire or other casualty prior to the Closing, but subsequent to the signing of an Option Agreement, if Sponsor notifies Purchaser that it does not elect (which election shall be in its sole discretion) to repair or restore the Unit or if the Unit Owners do not resolve to make such repair or restoration pursuant to the By-Laws (see the Section of the Plan entitled "Rights and Obligations of the Condominium Board/Summary of By-Laws"), the Option Agreement shall be deemed cancelled and of no further force or effect and Sponsor shall return the Premium Payment, together with any interest earned thereon, except for Unit Upgrade Funds, to Purchaser, whereupon Sponsor and Purchaser shall be released and discharged from all obligations and liability under the Option Agreement and the Plan; provided, however, if Purchaser is then in default under the Option Agreement (beyond any applicable grace period), Sponsor shall retain all such sums as and for liquidated damages.

If the Option Agreement covers both a Unit and one or more Ancillary Amenities and Sponsor does not elect, or the Unit Owners do not resolve to make such repair or restoration to the affected Ancillary Amenity or Ancillary Amenity Area pursuant to the By-Laws following the fire or casualty, then the Option Agreement shall only be cancelled, as described above, with respect to the particular Ancillary Amenity in question, and Purchaser shall remain obligated to purchase the Unit. At the Closing of Title to the Unit, Purchaser will receive a credit against the Exercise Price equal to the amount allocated to the affected Ancillary Amenity, to the extent any such money has been delivered to Sponsor.

Sponsor is obligated to provide only the equipment, fixtures and furnishings set forth in the "Description of Property and Improvements" set forth in Part II of the Plan. If a Person desiring to purchase a Unit requests that Sponsor perform special or additional work in the Unit or provide extra or upgraded fixtures or finishes, including, but not limited to, any deviation from the materials or specifications described in the Description of Property and Improvements set forth in Part II of the Plan, and Sponsor agrees in writing to perform such work and/or provide such fixtures and finishes, then Sponsor may require such Person to deposit an amount greater than the Premium Payment required under the Option Agreement.

SPONSOR SHALL IN NO EVENT BE OBLIGATED TO PERFORM ANY WORK TO THE PROPERTY, THE BUILDING, THE UNITS OR THE COMMON ELEMENTS OTHER THAN AS REQUIRED BY THE TERMS OF THE PLAN AND THE "DESCRIPTION OF PROPERTY AND IMPROVEMENTS" SET FORTH IN PART II OF THE PLAN.

Each Purchaser shall be given an opportunity to examine the Unit prior to the Closing during normal business hours and in the company of Sponsor's representative and is urged to make a careful inspection thereof, as more fully set forth in the Option Agreement set forth in Part II of the Plan. At the Closing, each Purchaser of a Unit shall be required to sign and deliver to Sponsor an Inspection Statement in substantially the form set forth in Part II of the Plan wherein Purchaser acknowledges the condition in which Purchaser has inspected the Unit. Under no circumstances shall any item included on an Inspection Statement (i) constitute grounds for a Purchaser to postpone or otherwise delay the date scheduled for the Closing nor (ii) obligate Sponsor to deposit any monies in escrow at Closing.

At Closing, each Purchaser will be required to execute and deliver a Unit Power of Attorney in favor of the Condominium Board and Sponsor, the failure of which shall be a default under the Option Agreement entitling Sponsor to all of the remedies set forth in the Plan and the Option Agreement.

## ESCROW AND TRUST FUND REQUIREMENTS

All deposits, down payments, advances and payments made by Purchasers prior to the Closing ("Premium Payments") will be held in escrow in conformity with the disclosure contained in this Section of the Plan and in accordance with the escrow provisions contained in the Option Agreement.

Sponsor will comply with the escrow and trust fund requirements of General Business Law Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated pursuant thereto. The Department of Law may perform random reviews and audits of any records involving escrow accounts to determine compliance with statute and regulation.

Any provision of any contract or agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of Escrow Agent holding trust funds is absolutely void. The provisions of the Attorney General's regulations concerning escrow/trust funds shall prevail over any conflicting or inconsistent provision in the Plan or in the escrow agreement or Option Agreement. Purchasers shall not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds. However, notwithstanding anything to the contrary set forth herein or anywhere else in the Plan, in the Event of Default by Purchaser, as that term is defined the Option Agreement, Purchaser shall be obligated to reimburse Sponsor for any legal fees, expenses and disbursements incurred by Sponsor in defending Sponsor's rights under the Option Agreement or otherwise enforcing Purchaser's obligations thereunder.

All Premium Payments made by Purchasers prior to the Closing of each individual transaction will be placed in a segregated special escrow account of Starr Associates LLP, the escrow agent ("Escrow Agent"), whose address is 245 Fifth Avenue, Suite 1102, New York, New York 10016 and whose telephone number is (212) 620-2680. The attorneys who are signatories on these accounts authorized to withdraw funds, acting singly, are: Allan Starr, Esq., Andrea L. Roschelle, Esq., Samantha Sheeber, Esq. and Jane Rosenberg, Esq. ("Authorized Signatories"). All Authorized Signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any Authorized Signatory is the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

Escrow Agent has established a master escrow account entitled "Starr Associates LLP, Escrow Account" ("Master Escrow Account") at JPMorgan Chase Bank located at 270 Park Avenue, New York, New York 10017 and Citibank located at 717 Sixth Avenue, New York, New York 10010 ("Escrow Banks"). Each Escrow Bank is authorized to do business in the State of New York. Premium Payments properly made payable to "Starr Associates LLP, as Escrow Agent" will be placed in one of the Master Escrow Accounts within 5 business days after tender by Purchaser to Sponsor or Selling Agent. Any subsequent Premium Payment tendered by Purchaser after the Initial Premium Payment will be placed in any one of the Master Escrow Accounts within 10 business days after tender by Purchaser to Sponsor or Selling Agent. Escrow Agent shall execute the Option Agreement Escrow Rider with respect to its obligations in this Section.

All Premium Payments will be placed initially in the non-interest bearing portion of the Master Escrow Account (including Unit Upgrade Funds). Each Purchaser is required to deliver a completed and signed Form W-9 (Request for Taxpayer Identification Number) or a Form W-8 (Certificate of Foreign Status) in the forms set forth in Part II to the Plan, to Sponsor or Selling Agent at the time Purchaser tenders the Premium Payment and the Option Agreement. If a Premium Payment is accompanied by a completed and signed Form W-9 or Form W-8, the Premium Payment will thereafter be promptly transferred to an individual interest bearing sub-escrow account in the name of Purchaser (except for Premium Payments for Unit Upgrade Funds). If a Purchaser does not deliver the Form W-9 or Form W-8, the Premium Payment will remain in the non-interest bearing portion of the Master Escrow Account. At such time as the Premium Payment is released, the Premium Payment will be transferred from the individual sub-escrow account to the

non-interest bearing portion of the Master Escrow Account so that checks may be drawn thereon. The Master Escrow Account is not an IOLA account.

All Premium Payments, except for Unit Upgrade Funds, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, until such time as Sponsor is entitled to the Premium Payment as per GBL § 352-h. Unit Upgrade Funds will initially be placed in the Master Escrow Account. However, Purchasers should note that such funds may be released from the Master Escrow Account by Escrow Agent to Sponsor to pay, or reimburse Sponsor, for such upgrades or extras. As a result, in the event Sponsor cancels the Option Agreement or Purchaser is entitled to rescind the Option Agreement in accordance with the Plan, Purchaser will not receive a refund of any of the Unit Upgrade Funds. Escrow Agent shall be under no duty to verify that Sponsor used or committed such funds for Unit Upgrade Funds.

The sub-escrow account number and the initial interest rate, if any, will be disclosed to each Purchaser, as appropriate, in a letter from Escrow Agent to each Purchaser sent within 10 business days after the tender of the Premium Payment. If Purchaser does not receive notice that the Premium Payment has been placed in the Master Escrow Account within 15 business days after tender of the Premium Payment, Purchaser may cancel the Purchase and rescind the Option Agreement so long as the right to rescind is exercised within 90 days after tender or crediting of the Premium Payment by notice delivered to Sponsor and to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, New York 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Premium Payment was timely deposited and requisite notice was timely mailed to Purchaser in conformity with the Attorney General's regulations. Escrow Agent will not be required to send the letter referred to above to each Purchaser in connection with any additional Premium Payments tendered by Purchaser after the Initial Premium Payment (or in connection with any changes in the interest rate).

Escrow Agent shall maintain the Master Escrow Account under its direct supervision and control. A fiduciary relationship shall exist between Escrow Agent, and Purchaser, and as set forth in the Escrow Agreement Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352(e)(2-b) and 352(h).

Under current Law, the sub-accounts at the Escrow Bank are insured by the Federal Premium Payment Insurance Corporation ("FDIC") to a maximum of $250,000 per individual Premium Payment. The following are SPECIAL RISKS of this offer: (i) if a Purchaser makes a Premium Payment in excess of $250,000 such Premium Payment will not be FDIC insured in excess of $250,000; and (ii) while the Premium Payment is in the non-interest bearing portion of the Master Escrow Account, the Premium Payment may not be fully FDIC insured even if the Premium Payment does not exceed $250,000. No representation is made with respect to any further changes in Law which may increase or decrease such limit.

The Premium Payment may be tendered by Purchaser to Sponsor or Selling Agent by either personal delivery, delivery by messenger or courier service or mailed by certified mail, return receipt requested, overnight courier or express mail service. The Premium Payment shall be deemed tendered by Purchaser on the date it is actually received by Sponsor or Selling Agent.

Acceptance of the Premium Payment by Sponsor or Selling Agent and the Premium Payment thereof by Escrow Agent into escrow shall not be deemed a binding agreement by Sponsor to sell to Purchaser unless and until Purchaser executes an Option Agreement and Sponsor or Selling Agent executes a duplicate thereof and delivers the Option Agreement to Purchaser in accordance with the terms of the Plan. All Premium Payments made by check are subject to collection.

If a Purchaser tenders a Premium Payment without an executed Option Agreement, Sponsor shall have the right to reject the Premium Payment and return it to Purchaser: (i) within 5 business days after

tender, if the Premium Payment has not been deposited into escrow, and (ii) within 10 business days, if the Premium Payment has been deposited into escrow and the Option Agreement has not yet been delivered by Purchaser. In the event a Premium Payment or portion thereof is delivered by wire transfer to Escrow Agent, any wiring fees charged by the initiating and/or receiving banks will be Purchaser's obligation.

The checking account portion of the Master Escrow Account will not be interest-bearing. The sub-escrow account portion of the Master Escrow Account will be interest-bearing. All interest will be credited to Purchaser at such time as: (i) there is a closing under the Option Agreement, or (ii) Purchaser is entitled to a return of the Premium Payment. All interest will be credited to Sponsor only in the event there is a "Consummation of the Plan" (as such term is defined in the Attorney General's regulations) and Purchaser defaults. The interest rate to be earned will be the prevailing rate for these accounts. As of April 11, 2014, the interest rate for the Escrow Bank is 0.15%. The interest rate is subject to change by the Escrow Bank. Sponsor makes no guarantee of, and shall have no liability to Purchaser for changes to, the interest rate. Interest will begin to accrue within: (x) 3 business days, if the Premium Payment is cash or cash equivalent, or (y) 5 business days, if the Premium Payment is other than cash or cash equivalent, of the transfer of the Premium Payment from the checking account portion of the Master Escrow Account into the sub-escrow account portion of the Master Escrow Account, as determined by whether and when the Premium Payment clears.

All instruments shall be made payable directly to the order of "Starr Associates LLP, as escrow agent." Endorsed instruments will not be accepted.

If a check delivered by a Purchaser fails for collection, the Option Agreement will be deemed void ab initio (as if the Option Agreement had never been executed).

Sponsor or its agents, including any selling agents, shall deliver to Escrow Agent all Premium Payments within two (2) business days of tender of the Premium Payment by a Purchaser, using such transmittal forms as required by Escrow Agent from time to time. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary and statutory obligations set forth in GBL §§ 352(e)(2-b) and 352(h) and the Department of Law's regulations promulgated thereto.

Under no circumstances shall Sponsor seek the release of the Premium Payments of a defaulting Purchaser until after Consummation of the Plan (as such term is defined in the Attorney General's Regulations). Consummation of the Plan does not relieve Sponsor of its obligations pursuant to General Business Law Section 352-h.

Escrow Agent shall release the Premium Payments if so directed:

(i) pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit; or

(ii) in a subsequent writing signed by both Sponsor and Purchaser; or

(iii) by a final, non-appealable order or judgment of a court.

If the Premium Payments are not released pursuant to this paragraph and Escrow Agent receives a request by Sponsor or Purchaser to release the Premium Payments, Escrow Agent shall give both parties prior written notice of not fewer than 30 days before releasing the Premium Payments. If Escrow Agent has not received notice of objection to the release of the Premium Payments at the expiration of the 30 day period, the Premium Payments shall be released and Escrow Agent shall provide further written notice to both parties informing them of the release of the Premium Payments. If Escrow Agent receives a written notice from either party objecting to the release of the Premium Payments within the 30 day period set forth in the notice, Escrow Agent shall continue to hold the Premium Payments until otherwise directed pursuant to subsections (i) through (iii) of this paragraph. However, Escrow Agent shall also

have the right at any time to deposit the Premium Payments with the clerk of a court in the county in which the Unit is located and shall give written notice to both parties of such Premium Payment.

Sponsor will not object to the release of the Premium Payments to:

(i) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan,

(ii) all Purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

The Option Agreement provides that Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Premium Payment to Sponsor in the event Sponsor and Purchaser close title under the Option Agreement.

If Sponsor elects to change the Escrow Bank and/or Escrow Agent, such change will be disclosed in a duly filed amendment to the Plan prior to transferring any Premium Payments.

Sponsor may, upon application approved by the Department of Law, elect to withdraw Premium Payments from the Master Escrow Account and secure all or any portion of the Premium Payments withdrawn by delivering to Escrow Agent or another escrow agent designated by Sponsor, one or more irrevocable letters of credit (collectively, "Letter of Credit") or other alternate security approved by the Department of Law, in accordance with the terms and conditions set forth below. All Premium Payments withdrawn from the Master Escrow Account shall be paid to the Construction Lender pursuant to a collateral assignment and pledge by Sponsor to the Construction Lender or disbursed to Sponsor subject to the approval by the Construction Lender of the amount of the withdrawal. The amount of the Letter of Credit will be at least 125% of the aggregate of all Premium Payments expected to be received from Purchasers, and not retained in escrow, during such period of time as the Letter of Credit will be needed. Sponsor reserves the right at any time and from time to time to increase or decrease the amount of the Letter of Credit, by a duly filed amendment to the Plan provided, however, the aggregate amount of the Letter of Credit shall at no time be less than the aggregate of all Premium Payments, if any, withdrawn by Sponsor for use in construction, less any sums returned to Purchasers or otherwise disbursed in accordance with the Plan. Premium Payments will cease to earn interest upon withdrawal from the Master Escrow Account.

**PURCHASERS WILL EARN NO INTEREST ON PREMIUM PAYMENTS WHICH ARE DEPOSITED IN SPONSOR'S CONSTRUCTION FUND ACCOUNT, EXCEPT DURING SUCH PERIODS AS THE PREMIUM PAYMENTS ARE PLACED IN THE INTEREST BEARING PORTION OF THE MASTER ESCROW ACCOUNT.**

The Letter of Credit shall name Escrow Agent as beneficiary to act as a fiduciary for the benefit of all Purchasers under the Plan. The Letter of Credit will provide that Escrow Agent shall have sole power to draw upon the Letter of Credit without the consent or despite the objection of Sponsor or the issuer bank, at such times or upon such events as set forth below.

The Letter of Credit will continue in effect, or shall be periodically renewed, until the Closing of Title to all Units for which Premium Payments have been placed in Sponsor's construction fund account.

Escrow Agent shall be entitled to release the Premium Payments to Sponsor provided that the Escrow Agent has documentation showing that the Letter of Credit or renewal or replacement Letter of Credit has been issued in accordance with this Section of the Plan and is in effect.

Escrow Agent, as the beneficiary of the Letter of Credit, acting as fiduciary for the benefit of Purchasers under the Plan whose Premium Payments were released from escrow, shall have the duty and the right to draw upon and collect the proceeds of the Letter of Credit, 10 business days after notice to Sponsor

and Sponsor's failure or refusal to restore such Premium Payments to Escrow Agent, without the consent or despite the objection of Sponsor or the issuer bank, upon the following events or circumstances:

(i) timely rescission of an Option Agreement by a Purchaser pursuant to an offer of rescission contained in the Plan or an amendment to the Plan;

(ii) acceptance for filing by the Department of Law of an amendment abandoning the Plan;

(iii) pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit;

(iv) in a subsequent writing signed by both Sponsor and Purchaser;

(v) by a final, non-appealable order or judgment of a court;

(vi) failure by Sponsor to obtain a renewal or replacement Letter of Credit no later than 60 days prior to the expiration of the existing Letter of Credit;

(vii) direction by Sponsor upon request of Purchaser; or

(viii) notice of impending cancellation of the Letter of Credit has been given or received, or the issuer bank has filed a bankruptcy or insolvency petition or has been taken over by a federal or state authority, and no proper replacement of the Letter of Credit has been furnished.

Upon payment to Escrow Agent of a drawing under the Letter of Credit, to the extent that Escrow Agent has no further obligation to hold the proceeds of such Letter of Credit in accordance with this Section of the Plan, Escrow Agent shall remit the Premium Payments to the relevant Purchaser to the extent required by this Section of the Plan and shall remit the excess amount (if any) of such proceeds over the Premium Payment to the Construction Lender (or, if no Construction Lender shall exist, to Sponsor).

The sole obligation of the issuer bank under or in connection with the Letter of Credit is to pay to Escrow Agent the amount drawn under the Letter of Credit pursuant to a conforming drawing thereunder. In no event shall the issuer bank, or the Construction Lender be liable for the use of the proceeds of any drawing by Escrow Agent and no Purchaser shall have any recourse whatsoever to the issuer bank, or the Construction Lender with respect to the use of such Premium Payments, other than the issuer bank's liability on the fronting bank for such Letters of Credit.

Escrow Agent is acting merely as a stakeholder. Escrow Agent makes no representation with regard to and shall not be responsible for the maintenance by Sponsor of the Letter of Credit. Upon payment of the Premium Payment pursuant to the Plan, Escrow Agent shall be fully released from all liability and obligation with respect to the Premium Payment. Escrow Agent shall accept a Premium Payment made by check made payable subject to collection.

Set forth in Part II of the Plan is a copy of the form of escrow agreement between Sponsor and Escrow Agent which incorporates the terms of the Attorney General's regulations. Purchaser's execution of the Option Agreement shall be deemed to constitute Purchaser's acceptance of the terms of the escrow provisions set forth herein and the escrow agreement set forth in the Plan. Escrow Agent shall be a signatory to the Option Agreement solely with respect to Escrow Agent's obligations as set forth herein and the escrow agreement set forth in the Plan

Escrow Agent shall be permitted to act as counsel to Sponsor in any dispute as to the disbursement of the Premium Payment or any other dispute between Sponsor and a Purchaser whether or not Escrow Agent is in possession of the Premium Payment and continues to act as Escrow Agent.

Escrow Agent may rely upon any document which may be submitted to it in connection with its duties under this Section and which is believed by Escrow Agent to be genuine and to have been signed or

presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof.

Sponsor has agreed to indemnify Escrow Agent from all claims, losses, judgments, costs, expenses and damages, including those brought by third-parties, including purchasers, incurred in connection with or arising out of the escrow agreement or the performance or non-performance of Escrow Agent's duties under the Escrow Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the Escrow Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, professional fees, including attorneys' fees, court costs and disbursements, either paid to retain attorneys or representing the value of all legal services rendered by Escrow Agent to itself and any and all attorneys' and professional fees, court costs, expenses and disbursements incurred by Escrow Agent in connection with a bankruptcy case filed by Sponsor for protection under the United States Bankruptcy Code, the enforcement of any rights, or defense of any claims against Escrow Agent in any bankruptcy proceeding, or any other matter arising in or in connection with Sponsor's bankruptcy case.

Sponsor has agreed to compensate Escrow Agent for services rendered in connection with Escrow Agent's duties under the escrow agreement. Escrow Agent's fees and disbursements will neither be paid by Sponsor from the Premium Payment nor deducted from the Premium Payment by any financial institution under any circumstance.

Escrow Agent and all Authorized Signatories submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of their obligations with respect to this Section or otherwise concerning the maintenance of or release of the Premium Payments from escrow.

Escrow Agent will maintain all records concerning the Master Escrow Account for 7 years after the release of Premium Payments.

# ASSIGNMENT OF OPTION AGREEMENTS

## No Third-Party Assignment

Purchaser does not have the right to assign the Option Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Section will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel the Option Agreement or give rise to any claim for damages against Sponsor. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of the Option Agreement, or for the addition, deletion or substitution of names on the Option Agreement, then Purchaser shall be required to pay to Starr Associates LLP a fee of $1,250, in advance, for preparation of an assignment and assumption agreement. Any purported assignment by Purchaser in violation of this Section shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in the Section of the Plan entitled "Procedure to Purchase," and shall be voidable at the option of Sponsor.

## EFFECTIVE DATE

The offering by Sponsor of the Units under the Plan is contingent upon the Plan being declared effective. The First Closing shall not occur until the Plan has been declared effective. The Plan may be declared effective, at Sponsor's option by (i) an amendment to the Plan or (ii) notice to each Purchaser stating that the Plan is declared effective and submission of an amendment to the Department of Law within 5 days confirming that the Plan was declared effective on a specified date. The Plan may be declared effective, at Sponsor's option, at any time when bona fide purchasers, including investors, have executed Option Agreements with respect to not less than 15% of the Units (i.e. 5 Units) (excluding the Resident Manager's Unit and the Suite Units). The Plan must be declared effective at such time as Option Agreements have been executed and are in effect with respect to 80% of the Units (i.e. 25 Units).

The Plan will not be declared effective based on Option Agreements: (i) signed by Purchasers who have been granted a right of rescission that has not yet expired or been waived; or (ii) signed by Purchasers who have not been afforded at least 3 business days to review the Plan and all filed amendments prior to executing an Option Agreement or, in lieu thereof, at least 7 days to rescind after executing an Option Agreement; or (iii) signed by any Purchaser who is Sponsor, Selling Agent, Managing Agent or a principal of either, or is related by blood, marriage or adoption or as a business associate, an employee, a shareholder or a limited partner of Sponsor, Selling Agent, Managing Agent or a principal of either, except that such a Purchaser (other than Sponsor or a principal of Sponsor) may be counted only if Sponsor has submitted proof satisfactory to the Department of Law establishing that Purchaser is bona fide.

Once the Plan has been declared effective, it may not thereafter be abandoned or withdrawn, except that, prior to the First Closing, the Plan may, at the option of Sponsor, be abandoned in the event of: (1) the existence of one or more title defects (including violations of record or work orders of a mortgagee or insurance carrier) affecting any one or more Units or the Property that cannot be removed, complied with or cured without litigation or for less than 1/2 of 1% of the total offering amount in the aggregate, and which are not waived by the Purchasers thereof; (2) a substantial damage to or destruction of the Building (or any portion thereof) by fire or other casualty that cannot be repaired prior to the date set for the First Closing for less than 1/2 of 1% of the total offering amount in the aggregate; or (3) a taking of a material portion of the Property in condemnation proceedings or by eminent domain. Excluded from the dollar amounts set forth in (1) and (2) above are attorneys fees and title defects (including violations of record or work orders) or determinations of any authority or regulatory association which existed on the Filing Date of the Plan and were either known to Sponsor or were a matter of public record.

If the Plan is abandoned and Sponsor has accepted Option Agreements, then Sponsor shall file an amendment with the Department of Law abandoning the Plan together with a form RS-3. If Sponsor has accepted Option Agreement, all Premium Payments, together with any interest earned thereon, except for Unit Upgrade Funds, will be returned to Purchasers 5 days after the Filing Date of the amendment abandoning the Plan. Upon the return of the Premium Payments, as aforesaid, the Option Agreement will be null and void and Sponsor will have no further obligation or liability to Purchaser under the Plan or the Option Agreement. If the Plan is abandoned and Sponsor has not accepted Option Agreements, then Sponsor shall file a form RS-3 with the Department of Law without an amendment.

**TERMS OF SALE**

The term "Closing" refers to the conveyance of title to a Unit from Sponsor to Purchaser by the delivery to Purchaser of a deed upon payment by Purchaser to Sponsor of the Exercise Price for such Unit. The Closing to each Unit shall be held at the office of Starr Associates LLP, 245 Fifth Avenue, Suite 1102, New York, New York or at such other place as Sponsor may designate.

Purchasers are required to close title upon the occurrence of the following events:

(a)     the Plan has been declared effective in accordance with its terms and the amendment to the Plan disclosing same has been accepted for filing by the Department of Law.

(b)     a Temporary or Permanent Certificate of Occupancy for the Unit is in effect. Issuance of a Temporary or Permanent Certificate of Occupancy for the Unit shall be deemed presumptive evidence of substantial completion of the Unit and is the only construction-related prerequisite that must occur before Sponsor may require the closing of title. A Temporary Certificate of Occupancy is not required for the closing of Ancillary Amenity Licenses. A Purchaser will be required to consummate the purchase of the Unit and an Ancillary Amenity License simultaneously at Closing even though a Temporary Certificate of Occupancy has not been issued (and access may not be available) for the Ancillary Amenity Area in which the Ancillary Amenity is located. In such event, the proceeds from the sale of the Ancillary Amenity License will be held in the Ancillary Amenity Escrow" by Escrow Agent until such time as a Temporary Certificate of Occupancy has been issued for the Ancillary Amenity Area in which the Ancillary Amenity is located. The Ancillary Amenity Escrow will be held in an Interest-On-Lawyer's Account ("IOLA") pursuant to New York Judciary Law Section 497. Purchasers will earn no interest on the Ancillary Amenity Escrow.

(c)     the recording or filing of the Declaration, By-Laws, Floor Plans and architect and tax authority certifications required by Section 339-p of the New York Condominium Act or other applicable Law and such other documents as may be required by Law.

(d)     the release of the Unit and its appurtenant Common Interest from the lien of all mortgages, if any.

(e)     the delivery to Purchaser of written notice of the time and place of the Closing at least 30 days prior to the Closing Date specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal business hours and in the company of Sponsor's representative, prior to Closing. So long as a Temporary Certificate of Occupancy for the Unit is in effect, Purchaser will be obligated to close title irrespective of the nature of the items that may be included on Purchaser's Inspection Statement which Sponsor agreed to complete as part of its post-closing obligations. (See the Section of the Plan entitled "Rights and Obligations of Sponsor" for further details regarding the Inspection Statement and Sponsor's post-closing obligations following Closing.)

(f)     the installation by Sponsor of a smoke and carbon monoxide detector in the Unit.

(g)     the conveyance of title to the Unit free and clear of all liens and encumbrances except for (1) Permitted Encumbrances and standard printed exceptions and (2) liens and encumbrances other than Permitted Encumbrances to which the Unit's title is subject, either (a) which have been expressly accepted by Purchaser, or (b) for which the instrument required to remove it of record has been delivered to the Title Company for recording in the proper office, together with the requisite recording or filing fees or delivered to the representative of Purchaser's title insurance company (or, if none, to Purchaser's attorney); or (c) as to which the Title Company will insure (without additional premium to Purchaser) that such lien or encumbrance will not be collected out of or enforced against the Unit; or (d) as to which Sponsor, at its sole option, pays and discharges from monies paid by Purchaser at Closing.