minimum pressure delivered to the fixture will be 30PSI and maximum 85 PSI. The top eight floors along with the roof (DP-PH 50 to roof) will be supplied by a triplex constant pressure 150GPM system. Two of the pumps will be in operation and one will be locked to facilitate general maintenance. Each domestic water pump will be Peerless manufacture model # MSL50A-2, located on 55th floor along with a PVI Steam to domestic Water Storage Heater. The six other zones will be supplied by gravity from the roof tanks. For five of the gravity zones PRV stations will be provided in order to prevent more than 85PSI pressure at the fixtures. Duplex PVI Steam to Water Storage Heaters will be provided for each zone. Material of water pipes will be Type "L" copper. 1" Fiberglass insulation will be provided on ALL domestic water piping.

## Equipment Schedule:

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| House tank Fill pump | P-1 | Cellar Level | (3) Pumps, 199gpm ea, 75hp ea. , 740ft head,, 480v, 3p | Peerless | MSM50B-5 |
| Domestic water booster pump | P-2 | 55th floor | (3) Pumps, 75gpm each , 3hp each, 80ft head, 480v, 3p | Peerless | C615JM |
| Sewage Ejector Pumps | P-EJ-1 | Sub- Cellar 3 level | (2) Pumps 150 GPM each 55ft head, 7.5HP | Flyght | Model # NP-3127.489 |
| Sump Pumps | P-SP-1 | Sub- Cellar 3 level | (2) Pumps 100 GPM each 55ft head, 4HP | Flyght | Model # NP-3085-256 |
| Elevator Sup Pumps | ESP-1 | Sub- Cellar 3 level | (2) Pumps 50 GPM each 20ft head, 0.5HP | STANCOR | Model # STANCOR SE-50 |

2.   FIRE PROTECTION SYSTEMS:

  a.   Fire Water Services:   One (1) 8-inch fire service will supply water to the fire protection system from the main in East 60th Street. This service will supply a 750 GPM automatic fire pump located at Cellar 1 level.

  b.   Combination system:   The building will be protected by a combined automatic wet fire standpipe and sprinkler system. The combined risers will be 6 inch black steel (Schedule 10 or 40) and located in each fire stair. A hose connection will be provided in the stair at each floor. Sprinklers will only be provided where required by Code. The Building will be fully sprinklered except for transformer vaults, switch gear rooms, elevator machine rooms, electrical closets, closets (less than 12 square feet in area), and bathrooms (less than 55 square feet in area) noted as exceptions in code. The trash chute will be provided with sprinkler at every other floor. Fire Department Siamese connections will be provided for the combined automatic wet

**SLCE** *Architects*

standpipe and sprinkler system. A three way roof manifold will be provided

c. **Equipment Schedule:**

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| Automatic Fire Pump | FP-1 | Sub-Cellar 1 Level | 750gpm, 163psi head, 125hp, 208v, 3p | Peerless or equivalent | 4AEF10 |
| Automatic fire pump | FP-2 | 37th floor | 750gpm, 80psi head, 50hp, 480v, 3p | Peerless or equivalent | 5AEF8 |
| Automatic fire pump | FP-3 | 48th floor | 750gpm, 132si head, 100hp, 480v, 3p | Peerless or equivalent | 4EF10 |
| Automatic fire pump (Special Service) | FP-4 | 57th floor | 750gpm, 70psi head, 40hp, 480v, 3p | Peerless or equivalent | 5AEF8 |

3.    DOMESTIC WATER SYSTEM:    Domestic water pressure will be maintained by a combination of Constant Pressure Booster pumps and gravity feed from house tanks in order to provide a minimum of 30 psi at all fixtures. Maximum pressure will be limited to 85psi through the use of pressure regulating devices.

4.    SANITARY SEWAGE SYSTEM:

a.    Sewage Piping:    Sanitary sewage will be conveyed by gravity via vented soil and waste branches, stacks and house drains to combined house sewer.

Drainage and vent piping will be no-hub cast iron piping with stainless steel couplings and rubber gaskets.

Fixtures above sewer level will discharge to the 15 inch New York City Combined Sewer in East 60th Street by gravity. Fixtures below street sewer level will discharge to an ejector pit with a duplex pump system rated at 150 gpm (each pump) that will dispose of sanitary originating below street level.

c.    Sewage Disposal:    One (1) 8 inch combined sewer connected to street municipal sewer at East 60th Street.

d.    Equipment Schedule:

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| Sewage Ejector Pump | P-EJ-1 | Sub- Cellar 3 level | 150gpm, 55ft head, 7.5hp, 480v, 3p | FLYGT | NP-3127.489 |

5.    PERMITS REQUIRED:    All permits will be obtained by the plumbing contractor.

**SLCE** *Architects*

6.     **STORM DRAINAGE SYSTEM:**      Storm drainage from all roofs and setbacks will be conducted down the building in cast iron piping and will be conveyed to approved DEP storm water detention tanks located on the 7th floor and the Cellar 1 level. Rainwater will be captured in the storm water detention tanks and will discharge to the city sewer in east 60th Street by gravity.

     a.      **Storm Detention Tanks:**      There will be two (2) tanks that will retain water for DEP requirements. The tanks are located in the Cellar 1 level and at the 7th floor. The tank required capacities are 1,264 gallons (Cellar 1 level) and 3,299 gallons (7th floor tank). Storm water will be discharge via gravity in a 2" orifice pipe which will increase to an 8" connection to the sewer in East 60th Street.

     b.      **Roof and Terrace**      Roof and terrace drains will be located on the roof and terraces.

     c.      **Storm Piping:**      Cast iron pumping with hub and spigot fittings and push-on joints.

     d.      **Sump Pumps:**      One duplex sump pump is provided at the Sub- Cellar 3 level to collect and dispose of groundwater as well as areas not able to be conveyed to the city sewers through gravity. All elevator pits are also provided with simplex sump pumps.

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| | ESP-1 | Sub- Cellar 3 level | (2) Pumps, 10gpm, 20ft head, 0.5hp, 115v, 1p | Stancor | SE-50 |
| Sump Pump (groundwater / storm water pit) | P-SP-1 | Sub- Cellar 3 level | (2) Pumps 100 GPM each 55ft head, 4HP | Flyght | Model # NP-3085-256 |
| | | | | | |

## K.   **HEATING**

     1.      **DOMESTIC HOT WATER HEATING:**      Domestic hot water will be provided by steam fired storage type hot water heaters. The heaters will be located at the 6th floor, 37th floor and the 55th floor Mechanical Room. Each domestic water zone will be provided with duplex domestic water heaters. There will be three duplex heaters on the 6th floor, two duplex heaters on the 37th floor and two duplex heaters on the 55th floor.

     a.      **Equipment Schedule:**

**SLCE** *Architects*

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|-----------|-------------|----------|---------|--------------|-----------|
| Duplex Domestic Hot Water Heaters | DWH-1 | 6th Floor | ZONE-1 (SC3 - 3rd Floor) | PVI | 450 L 150A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-2 | 6th Floor | ZONE-2 (4th - 10th Floor) | PVI | 450 L 250A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-3 | 6th Floor | ZONE-3 (17th - 26th Floor) | PVI | 1200 L 300A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-4 | 37th Floor | ZONE-4 (27th - 36th Floor) | PVI | 1200 L 300A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-5 | 37th Floor | ZONE-5 (37th – 45th Floor) | PVI | 700 L 250A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-6 | 55th Floor | ZONE-6 (DP-PH 46th – 49th Floor) | PVI | 450 L 150A-QS (AQUAPLEX) |
| Duplex Domestic Hot Water Heaters | DWH-7 | 55th Floor | ZONE-7 (DP-PH 50th – 55th Floor) | PVI | 450 L 150A-QS (AQUAPLEX) |

2.    SPACE HEATING:

Space heating will be provided by two steam/hot water shell and tube exchangers each pair located on the 7th floor, 37th floor and 56th floor Mechanical Equipment Rooms. Steam shall be provided by Consolidated Edison (Con Ed) from East 60th street. Two (2) meters will be provided. A PRV station on the 2nd floor will be provided to reduce the steam from high pressure to low pressure for all uses.

a.    Equipment Schedule:

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|-----------|-------------|----------|---------|--------------|-----------|
| Shell & Tube Steam Converter | HX-07-1 | 7th Floor MER | LOW RISE FCUS | TACO | H06208-S |
| Shell & Tube Steam Converter | HX-07–2 | 7th Floor MER | LOW RISE FCUS | TACO | H16208-S |
| Shell & Tube Steam Converter | HX-07-3 | 7th Floor MER | LOW RISE HEATING | TACO | H06212-S |
| Shell & Tube Steam Converter | HX-07-4 | 7th Floor MER | LOW RISE HEATING | TACO | H06212-S |
| Shell & Tube Steam Converter | HX-31-1 | 37th Floor MER | HIGH RISE FCUS | TACO | H10208-S |
| Shell & Tube Steam Converter | HX-31-2 | 37th Floor MER | HIGH RISE FCUS | TACO | H10208-S |
| Shell & Tube Steam Converter | HX-31-3 | 37th Floor MER | HIGH RISE HEATING | TACO | H08206-S |
| Shell & Tube Steam Converter | HX-31-4 | 37th Floor MER | HIGH RISE HEATING | TACO | H08206-S |
| Shell & Tube Steam Converter | HX-50-1 | 56th Floor MER | HIGH RISE HEATING | TACO | Go6406-S |

Hot water will be provided to the Units through 4-Pipe Fan Coil Unit System. The electric cost associated with operating fan coil for heating will be payable by each Unit Owner to the Utility Company and does not constitute part of the Common Expenses. Supplemental perimeter heating shall be provided in selective rooms of the Units via a perimeter heating system

**SLCE** *Architects*

using electric radiators. Power shall be provided to this equipment via risers located in each Unit that connect to the panels. The Perimeter Heating System is designed to meet the New York City and State Energy Code. Total heating and cooling capacities of the fan coil equipment serving the Units shall be as shown on the schedule below.

Operation and Maintenance (O&M) manuals shall be provided by sponsor.

Original balancing report shall be provided by sponsor

The fan-coil equipment will be provided in various sizes as indicated on the plans. The total capacities in each of the various Units are as follows:

| Level | Unit Type | Total Heating per Unit BTU | Total Cooling per Unit BTU |
|---|---|---|---|
| 4 & 5 | Suite Units, Resident Manager Unit | 57040 | 49770 |
| 14 to 20 | Low Rise Simplex Units | 116,713 | 109,513 |
| 21 to 36 | Mid Rise Simplex Units | 104428 | 94665 |
| DP-PH 38 to DP-PH 50 | Duplex Units | 210094 | 195513 |
| TRI-PH 52 | Triplex Unit | 251186 | 236999 |

Air Handling Equipment will serve Public Areas, Lobby, Fitness Center, Residential Corridors, the main Lobby Vestibule will be supplied with a four pipe fan coil system.

Public stair bulkhead and other miscellaneous common areas requiring heat during the winter season are heated with hot water unit heaters.

3.    PIPING, INSULATION SCHEDULE    40 steel and/or copper tubing with standard weight fittings will be used. Hot water, chilled water and steam piping is insulated.

L.    **GAS SUPPLY**

1.    TYPE:    A (2) two inch gas service will enter the building at East 60th Street. Gas meter will be provided by Con Edison with sizes. Gas meter will be in the Cellar 1 level. The gas will supply Unit cooking ranges and fireplaces.

**SLCE** *Architects*

2.    METERS:                     One master meter will be provided to collectively meter resident cooking and fireplaces.

3.    PIPING MATERIAL:         Black steel Schedule 40 pipe with malleable fittings.

## M.   AIR CONDITIONING

1.    TYPE OF SYSTEM:         Four (4) Pipe Fan Coil. The Fan Coil Equipment shall be manufactured by International Environmental (or equal) 115 volts, 1 Ph, 60Hz, as follows:

                                          a. Horizontal Hideaway Ceiling Units shall be either IEC Model HPY or CPY Series.

2.    COOLING TOWER AND PUMPS:   There will be one (1) two (2) cell open cooling tower at the roof level.
The Cooling Tower shall be manufactured by SPX Model NC 8402 460V, 3Ph, 60 Hz, 1,200 GPM. Cooling Tower is capable of handling complete building cooling loads under conditions of NYS Energy Code.

3.    CHILLERS                      There will be two (2) modular chillers. Each chiller will have 10 modules for a total of twenty (20) 30 ton modules in both chillers located on the 7th floor.

                                          The chillers shall be manufactured by Clima-Cool Model UCW 030 AF 300 tons each, 460V, 3Ph, 60 Hz. The chillers are capable of handling complete building cooling loads under conditions of NYS Energy Code.

                                          Three (3) split coupled vertical in-line pumps provided, three (3) Chilled water pumps (one standby) at 520 GPM each and three (3) condenser water pumps (one standby) at 600 GPM each. The pumps shall serve all floors

                                          The cooling tower plant and water circulating pumps are based on peak "bulk" cooling load for the residential areas of the Building in accordance with ASHRAE Guide recommendations.

                                          Cooling tower and rooftop equipment are provided with spring isolators and structural dunnage to mitigate vibration and noise from reverberating into the Units.

                                          Condenser water exposed on the roof is provided with 2" glass fiber insulation and covered with aluminum jacket for protection.

4.    INDIVIDUAL HVAC EQUIPMENT    Individual Equipment is designed to meet all requirements of NY State Energy Code.

**SLCE** *Architects*

HVAC equipment will provide air conditioning for the Main Entrance Lobby, Elevator Machine Rooms, Telephone Rooms, Pool, Wine Storage Lockers, Multipurpose Room, Fitness Center and Back-of the House Rooms with chilled water coils.

Equipment will be provided with four-pipe fan coil units of capacities shown on Plans and Specifications. Numbers of units of each type are shown on Construction Documents plans, EER ratings meet requirements of State Energy Code dated 2002. Fan Coil units are sized for the calculated individual peak cooling requirements. Each fan coil unit will be thermostatically controlled.

Cooling and heating of corridor ventilation air will be provided by packaged air conditioning units located in the 37th and 2nd floor mechanical spaces. Each unit will have chilled water cooling coil and steam heating coil.

The building HVAC systems shall be capable of maintaining the following environmental standards:

1. Outdoor design conditions:

   | Summer | Winter |
   |--------|--------|
   | 89°F DB | 5°F DB |
   | 73°F WB | |
   | (78°F WB cooling tower design) | |

2. Units design conditions

   | Summer | Winter |
   |--------|--------|
   | 72°F | 72°F DB |
   | 50% RH | Not Controlled |

**N.** **VENTILATION**

**1.** **KITCHENS:**

Kitchens at residential floors 14th to 54th will be exhausted with a centrally ducted system through the hood over the stove top. When the user activates the hood exhaust fan, a motorized damper will open and conditioned ventilation air will be provided to the residence. The outside air will provide make up air to offset the air being exhausted through the kitchen exhaust system. When the hood is not activated by the user, air will be exhausted at a reduced rate through the kitchen exhaust system.

Kitchens at floors 4th and 5th will have recirculating kitchen hoods.

**3.** **UNIT BATHROOMS:**

Unit bathrooms will be ventilated with an exhaust ventilation system exhausting 125 cubic feet of air per minute

**SLCE** *Architects*

from master bathrooms and 75 cubic feet of air per minute from secondary bathrooms and powder rooms.

Conditioned make-up air is supplied to each Unit ranging from 160 CFM to 600 CFM per Unit corresponding to the number of bathrooms installed.

4. **NON-RESIDENTIAL BATHROOMS:** Interior non-residential bathrooms located at 1st Floor, Cellar and Sub-Cellars will be ventilated with an exhaust ventilation system exhausting a minimum of 75 cubic feet of air per minute for each water closet.

5. **LOCKER ROOMS:** Locker rooms will be ventilated with exhaust ventilation capable of exhausting a minimum of 75 cubic feet of air per minute per room.

6. **PUBLIC CORRIDORS:** Interior corridors are provided with heating and air-conditioned supply air at a minimum of 0.5 cubic feet of air per square foot. This is in accordance with code requirements.

7. **RESIDENTIAL LAUNDRY ROOM:** Individual washer/dryers are provided in all Units except at those Suite Units located in floors 4 and 5. Units on floors 14th through TRI-PH 52 will be provided with ducted dryer exhaust of 180 CFM.

8. **COMMON LAUNDRY ROOM:** Individual commercial washer/dryers for the building residents only, are provided in the building Sub-Cellar 2. The dryers will be ventilated with an exhaust ventilation system exhausting 600 cubic feet of air per minute.

9. **TRASH ROOM:** A nominal 2 ton water cooled air conditioning unit cools this room and a 500 CFM exhaust fan located in the 6th Floor ventilates the room.

10. **GAS METER ROOM:** Gas meter room will be vented to the outside.

11. **EMERGENCY GENERATOR** The emergency generator room on the 3rd floor will be provided with one (1) exhaust louver and two (2) intake louvers on the North facade of the building. A generator exhaust flue will run vertically from the emergency generator room and exhaust through the 6th floor facade.

12. Equipment Schedule:

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| Toilet Exhaust Fan | TX-06-1 | 6th Floor MER | LOW RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-06--2 | 6th Floor MER | LOW RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-06-3 | 6th Floor MER | LOW RISE TX | GREENHECK | SWB |
| Kitchen Exhaust Fan | KX-06-1 | 6th Floor MER | LOW RISE KX | GREENHECK | SWB |

**SLCE** *Architects*

| Dryer Exhaust Fan | DX-06-1 | 6st Floor MER | LOW RISE DX | GREENHECK | SWB |
|---|---|---|---|---|---|
| Toilet Exhaust Fan | TX-31-1 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-2 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-2 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-3 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-4 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-52-1 | Roof MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-49-1 | 55th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-52-3 | Roof MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-52-4 | Roof MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-2 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Toilet Exhaust Fan | TX-31-2 | 37th Floor MER | HIGH RISE TX | GREENHECK | SWB |
| Kitchen Exhaust Fan | KX-31-1 | 37th Floor MER | HIGH RISE KX | GREENHECK | SWB |
| Kitchen Exhaust Fan | KX-52-1 | Roof MER | HIGH RISE KX | GREENHECK | SWB |
| Kitchen Exhaust Fan | KX-52-2 | Roof MER | HIGH RISE KX | GREENHECK | SWB |
| Dryer Exhaust Fan | DX-31-1 | 37th Floor MER | HIGH RISE DX | GREENHECK | SWB |
| Dryer Exhaust Fan | DX-49-1 | 55th Floor MER | HIGH RISE DX | GREENHECK | SWB |

## O.    ELECTRICAL SYSTEM

1.   SERVICE FROM MAIN SWITCHGEAR:

Electrical service will be provided at 208/120V – 3 phase, via one 5000A distribution board to be located on the 3rd floor. Three Con Edison transformer vaults and one bus compartment will be constructed on the 3rd floor. Two primary (13.2KV) services will enter the Cellar level at a cable support box and rise to a second box on the 2nd floor, and from there to the transformer vaults. Distribution to all electrical panel boards and distribution panels will be provided. All feeders to be insulated copper conductors in metal conduits. One service utility take-off will be provided with dedicated utility meters for common spaces, public spaces, and each Unit.

2.   SERVICE TO UNITS:

Feeders are to run to each Unit from distribution centers. Feeders vary in size as required by load and voltage drop.

3.   COMPARTMENT SWITCHGEAR:

The distribution centers are provided on mechanical floors, 3, 6, 37, and 56.

4.   UNIT SERVICE ADEQUACY:

The equipment will be rated to comply with the New York City Electrical Code and takes into account all equipment provided in Units such as washing machines, clothes

**SLCE** *Architects*

dryers, dishwashers, and microwaves

a. Service: Capacity provided for each Unit will be in accordance with Code requirements in various sizes from 100 to 200A at 120/208V, single phase or three phase, 3 wire or 4 wire. Number of circuits per Unit panel board will be an average of 42 circuits. Service will be adequate to meet normal Unit appliance load and lighting.

b. Lighting and fixtures Switched lighting fixtures will be provided in bathrooms, foyers, galleries, and kitchens. Fixtures will be incandescent or fluorescent type. Junction boxes dedicated for light fixtures will be provided in ceilings in bedrooms and living rooms

c. Convenience outlets, appliance outlets: Receptacles will be provided in all rooms to meet the New York City Electrical Code. Ground fault receptacles will be provided in kitchens and bathrooms. Arc fault circuit interrupters will be provided for Unit branch circuits that supply 125-volt, single-phase, 15 amperes and 20 ampere receptacles. All receptacles in Units will be provided with tamper-proof receptacles.

d. Lightning Protection A complete UL Master Label lightning protection system will be provided.

5. EMERGENCY GENERATOR: A 600 kW diesel generator will be provided on the 3rd Floor. Fuel oil is provided from a 1,000 gallon tank located on the Sub-Cellar 3. The generator serves the following loads if the utility power is not available.

1. All exit lights, egress lighting and stair lighting.

2. Smoke exhaust fans.

3. Fire alarm system.

4. Elevators (all will be connected, but only one (1) will run at one time).

5. Security system.

6. Telecommunication systems.

7. Fire pump for below grade building.

8. Sump pump.

9. Sewage ejector pump.

10. Building Maintenance System (BMS).

**SLCE** *Architects*

11. Wine Storage Lockers A/C unit.

12. HPS PRV station and A/C.

13. Cooling tower basin heater.

14. Heat tracing of roof piping.

15. Circulating pumps for heating and cooling.

**P.    TELEPHONE, INTERNET, TELEVISION, AND INTERCOM**

Telephone, internet and television services will enter the building from 60th Street and be fed to a telephone room located in the Cellar level.   It will then be distributed throughout the Building through risers and sleeves. Each Unit will receive telephone, Internet and television services pre-wired to a riser closet located within their Unit on their floor. The cost to activate the Unit network to the service provider will be at the Owner's expense.

In each Unit, outlets for television, data and telephone will be provided in the living room, bedrooms, and library and kitchen areas.

Each Unit will be provided with an intercom linked to concierge's desk through a telephone line by Trigon or equivalent.

There will be an intercom from the Main Entrance and from the Service Entrance to the Concierge Desk and from the Concierge Desk to the individual Units.

There will be a surveillance system with cameras monitored at the concierge desk and located at the mechanical floors, elevators and certain areas of the amenity spaces.

**Q.    PUBLIC AREA LIGHTING**

Lighting will be furnished to the public areas of the building. Fluorescent light fixtures will be provided at all Mechanical and Utility Rooms, back of the house areas and service corridors. Typical light fixtures for these areas will be manufactured by Lightolier, Bartco, Lucifer or equivalent.
The Corridors and Elevator Lobbies at amenities areas in the Cellars will be provided with recessed LED downlights as manufactured by Specialty Lighting or equivalent.
The Pool Room, the Exercise Rooms, the Lobby , the Vestibule will have a combination of LED downlights as manufactured by Specialty Lighting and custom decorative sconces or

**SLCE** *Architects*

pendant lanterns as manufactured by Crenshaw or equivalent.

**R.**     **GARAGE**

No garage or parking areas will be provided.

**S.**     **SWIMMING POOL**

    1.     TYPE AND LOCATION IN PROPERTY

There will be an approximately 33'-6" by 13'-8" pool located at the Fitness Center at the Sub-Cellar 1 for use of the building residents. The pool vessel will be made of stainless steel with tile finish. The approximate water depth will be four feet. The pool will be surrounded on four sides with a deck with a minimum dimension of five feet.

**T.**     **RECREATION FACILITIES**

Indoor recreation space is provided in the Fitness Center located at the Cellar level, as described in I.3.

**U.**     **UNIT INFORMATION**

    1.     UNIT INFORMATION:

There will be 31 Residential Units, 7 Suite Units and 1 Resident Manager Unit.

Except in areas with dropped ceilings and soffits, the heights of the residential levels from top of floor slab to underside of slab above, based on marketing floor numbers, are approximately as follows:

| | |
|---|---|
| 4th and 5th | 21'-0" |
| 14th to 36th | 11'-0" |
| Duplex PH 38 /50 | |
|     Lower Level | 15'-0" |
|     Upper Level | 11'-0" |
| Triplex PH 52 | |
|     Lower Level | 15'-0" |
|     Intermediate Level | 15'-0" |
|     Upper Level | 15'-0" |

Ceiling heights from finished floor to finished ceiling at bathrooms, kitchens, halls and public corridors in the Units may vary from 8'-0" to 9'-0

    2.     DIMENSION OF THE UNITS:

Each unit is measured horizontally from the exterior side of the exterior walls to the centerline of the partitions separating one Unit from another Unit, or separating one Unit from corridors, stairs, elevators and other mechanical equipment spaces or any common elements not within a Unit

**SLCE** *Architects*

or to the exterior side of the opposite exterior walls; provided, however (i) columns, mechanical pipes, shafts, shaftways, chases, chaseways and conduits in all Units; and (ii) elevator shafts, elevator lobby and stairwells on the full floor units and units containing multiple floors are not deducted from the measurement of each Unit.

Each Unit consists of the area measured vertically from the top of the floor (located under the finished flooring and sub-flooring materials) to the underside of the ceiling. The corridor adjacent to the stairs is part of the Unit.

The Terraces will be measured from the exterior face of the curtain wall to the exterior face of the parapet.

Each Storage Locker and Wine Storage Locker will consist of the area measured horizontally from the innermost face of the foundation wall or centerline of partition to the centerline of the partitions or enclosure separating one locker from another locker or one locker from the common elements. Columns, mechanical pipes and shafts are not deducted for the purpose of floor area measurements.

Each Storage Locker and Wine Storage Locker will consist of a volume measured vertically from the top of the concrete floor to the underside of the locker enclosure except that any common elements located within any locker shall be considered as part of that locker.

All dimensions are approximate and subject to normal construction variances and tolerances. Dimensions are maximum overall within a room or space, not subtracting cutouts.

3.      **FINISH SCHEDULE FOR TYPICAL UNITS**

| SPACE | FLOOR | BASE | WALL | CEILING |
|---|---|---|---|---|
| Foyer | Stone, Polished | WD | P GWB*** | K/GWB |
| Living Room | Solid Wood Floor * | WD | P GWB*** | K/GWB |
| Dining Room | Solid Wood Floor * | WD | P GWB*** | K/GWB |
| Bedrooms | Solid Wood Floor * | WD | P GWB*** | K/GWB |
| Kitchen | Solid Wood Floor * | WD | P GWB*** | K/GWB |
| Master Bathroom | Marble ** | Marble** | Marble** and P GWB*** | K /GWB |
| Secondary Bathroom | Marble ** | Marble** | Marble ** and P GWB*** | K /GWB |
| Powder Room | Marble ** | Marble** | Marble ** and P GWB*** | K/ GWB |
| Closets | Solid Wood Floor * | WD | P GWB*** | K/GWB |
| Washer/dryer closet | CT | CT | P GWB*** | K/GWB |

**SLCE** *Architects*

*Standing water will cause cupping, swelling, and subsequent gapping.

** Maintenance and cleaning of all stone by Unit Owners should be done in accordance with the recommendations of the Marble Institute of America

*** 2 Coats of paint over a primer.

### 4. FINISH SCHEDULE FOR 1st FLOOR

| SPACE | FLOOR | BASE | WALL | CEILING |
|-------|-------|------|------|---------|
| LOBBY SITTING AREA | Polished Stone | Stone | P/ Stone / Wood | GWB |
| SERVICE ENTRANCE | Ceramic Tiles | CT | CT / Steel Plate | ACT |

### 5. FINISH SCHEDULE FOR COMMON SPACES

| SPACE | FLOOR | BASE | WALL | CEILING |
|-------|-------|------|------|---------|
| STAIRS | DP | P | P | P Concrete |
| PUBLIC CORRIDOR | CPT: Broadloom carpet on underlayment | WD | P | GWB |
| SERVICE LOBBY | CT | CT | P | GWB |

### 6. FINISH SCHEDULE FOR AUXILIARY SPACES

| SPACE | FLOOR | BASE | WALL | CEILING |
|-------|-------|------|------|---------|
| MULTIPURPOSE ROOM | CARPET | WD | WALL COVER/ P GWB*** | ACT |
| RESIDENT STORAGE LOCKERS | DP | VINYL | P CMU / CONCRETE | P CONCRETE |
| WINE STORAGE LOCKERS | CORK FLOOR | WD | P GWB*** | P GWB *** |
| BIKE STORAGE ROOM | DP | VINYL | P CMU / CONCRETE | P CONCRETE |
| LAUNDRY ROOM | CT | CT | CT | |
| EXERCISE ROOMS | RUBBER FLOOR | WD | P GWB *** and | P GWB*** |

**SLCE** *Architects*

|  |  |  | Mirrors, Glass |  |
| --- | --- | --- | --- | --- |
| POOL ROOM | STONE |  | STONE & <br> P GWB *** | P GWB*** |
| LOCKER ROOMS | STONE | STONE | STONE, GLASS, WD. <br> P GWB *** | P GWB *** |
| CHILDREN'S    PLAY ROOM | CARPET | WD | P GWB*** | PGWB *** |

## 7. BATHROOM FIXTURES & FITTINGS

Subject to Sponsor's right to make substitutions as set forth in the Offering Plan, the Units will be equipped with the following fixtures:

| BATHROOMS AT FLOORS 4 AND 5 | | | |
| --- | --- | --- | --- |
| **FIXTURE** | **MANUFACTURER** | **DESCRIPTION** | **MODEL** |
| WC | TOTO | ELONGATED CAROLINA FLOOR MTD. |  |
| LAVATORY | KOHLER |  | K-2210 |
| LAVATORY TRIM | DORNBRACHT | POLISHED CHROME | 20.700.370 <br> 11.170.370 |
| TUB | KOHLER |  | MAESTRO |
| TUB TRIM | DORNBRACHT | WALL MOUNTED POLISHED CHROME | 36900370 <br> 35901970-90 <br> 36104370 <br> 36104970-90 <br> 11170370 <br> 13801380 |
| SHOWER TRIM | DORNBRACHT | POLISHED CHROME | 28508380 |

| MASTER BATHROOMS AT FLOORS 14 TO 36 (Bath 1) | | | |
| --- | --- | --- | --- |
| **FIXTURE** | **MANUFACTURER** | **DESCRIPTION** | **MODEL** |
| WC | DURAVIT | HAPPY D <br> Wall Mounted | 017109 |
| LAVATORY | KOHLER |  | K-2210 |
| LAVATORY TRIM | DORNBRACHT | PLATINUM | 20.700.370 <br> 11.170.370 |
| TUB | KOHLER |  | TEA FOR TWO |
| TUB TRIM | DORNBRACHT | PLATINUM | 27.502.370 <br> 35.910.970-90 <br> 11.170.370 |

**SLCE** *Architects*

| SHOWER TRIM | DORNBRACHT | PLATINUM | 36.416.977 |
| | | | 35.517.970-90 |
| | | | 36.310.370 |
| | | | 35.627.970-90 |
| | | | 11.170.370 |
| | | | 28.508.360 |
| | | | 28.518.360 |

**MASTER BATHROOMS AT PENTHOUSES ( Bath 1)**

| FIXTURE | MANUFACTURER | DESCRIPTION | MODEL |
| --- | --- | --- | --- |
| WC | DURAVIT | HAPPY D<br>Wall Mounted | 017109 |
| LAVATORY | KOHLER | | K-2210 |
| LAVATORY TRIM | DORNBRACHT | PLATINUM | 20.700.370<br>11.170.370 |
| TUB | VICTORIA AND ALBERT | Free Standing | AMALFI |
| TUB TRIM | DORNBRACHT | PLATINUM | 25.943.360<br>35.944.970-90<br>35.910.970-90<br>11.170.370 |
| SHOWER TRIM | DORNBRACHT | PLATINUM | 36.416.977<br>35.517.970-90<br>36.310.370<br>35.627.970-90<br>11.170.370<br>28.508.360<br>28.518.360 |

**MASTER BATHROOMS AT ALL FLOORS ( Bath 2)**

| FIXTURE | MANUFACTURER | DESCRIPTION | MODEL |
| --- | --- | --- | --- |
| WC | DURAVIT | HAPPY D<br>Wall Mounted | 017109 |
| LAVATORY | KOHLER | | K-2210 |
| LAVATORY TRIM | DORNBRACHT | PLATINUM | 20.700.370<br>11.170.370 |
| SHOWER TRIM | DORNBRACHT | PLATINUM | 36.416.977<br>35.517.970-90<br>36.310.370<br>35.627.970-90<br>11.170.370 |

**SLCE** *Architects*

| | | | 28.508.360<br>28.518.360 |
|---|---|---|---|

**SECONDARY BATHROOM  w/ TUB, ALL RESIDENTIAL UNITS**

| FIXTURE | MANUFACTURER | DESCRIPTION | MODEL |
|---|---|---|---|
| WC | DURAVIT | HAPPY D<br>Wall Mounted | 017109 |
| LAVATORY | KOHLER | | K-2210 |
| LAVATORY<br>TRIM | DORNBRACHT | POLISHED CHROME | 20.700.370<br>11.170.370 |
| TUB | KOHLER | | MAESTRO |
| TUB<br>TRIM | DORNBRACHT | POLISHED CHROME | 36.900.370<br>35.901.970-90<br>11.170.370<br>28.508.360<br>27.803.370<br>13.801.380<br>36.104.370<br>35.104.970.90 |

**SECONDARY BATHROOM w/ SHOWER, ALL RESIDENTIAL UNITS**

| FIXTURE | MANUFACTURER | DESCRIPTION | MODEL |
|---|---|---|---|
| WC | DURAVIT | HAPPY D<br>Wall Mounted | 017109 |
| LAVATORY | KOHLER | | K-2210 |
| LAVATORY<br>TRIM | DORNBRACHT | POLISHED CHROME | 20.700.370<br>11.170.370 |
| SHOWER<br>TRIM | DORNBRACHT | POLISHED CHROME | 36.900.370<br>35.901.970-90<br>11.170.370<br>26.403.370<br>36.104.370<br>35.104.970.90 |

**SLCE** *Architects*

| POWDER ROOM ALL UNITS | | | |
|---|---|---|---|
| **FIXTURE** | **MANUFACTURER** | **DESCRIPTION** | **MODEL** |
| WC | TOTO | ELONGATED CAROLI FLOOR MTD. | |
| LAVATORY | KOHLER | | K-2210 |
| LAVATORY TRIM | DORNBRACHT | DURABRASS | 20700370 11170370 |

**8. KITCHEN APPLIANCES**

Subject to Sponsor's right to make substitutions as set forth in the Offering Plan, the Units will be equipped with the following appliances:

| KITCHENS | APPLIANCE | MANUFACTURER | DESCRIPTION | UNIT @ FLOOR |
|---|---|---|---|---|
| | REFRIGERATOR | SUB-ZERO | 700 TCI | 14 to 20<br>21 to 36 |
| | REFRIGERATOR | SUB-ZERO | 736 TC (2) | D-PH 38 to D-PH 50<br>T-PH 52<br>Pantry 54 |
| | REFRIGERATOR DRAWER | SUB-ZERO | 700 BR | D-PH 38 to D-PH 50<br>T-PH 52<br>Pantry 54 |
| | WINE STORAGE | MIELE | KWT 4145 UG.1 | 14 to 20<br>21 to 36 |
| | WINE STORAGE | MIELE | KWT-1611 SF | D-PH 38 to D-PH 50<br>T-PH 52<br>Pantry 54 |
| | ICE MAKER | SUB-ZERO | UC-15IP | Pantry 54 |
| | DISHWASHER | MIELE | DIAMOND G5975 SCVI | 14 to 20<br>21 to 36<br>D-PH 38 to D-PH 50<br>T-PH 52<br>Pantry 54 |
| | DISHWASHER | MIELE | SLIMLINE G4580SCVI | 14 to 20<br>21 to 36<br>D-PH 38 to D-PH 50<br>T-PH 52 |

**SLCE** *Architects*

| | RANGE W/ OVEN | WOLF | DF486 G | 14 to 20<br>21 to 36<br>Pantry 54 |
|---|---|---|---|---|
| | SEALED BURNER RANGETOP | WOLF | SRT486 G | D-PH 38 to D-PH 50<br>T-PH 52 |
| | OVEN | MIELE | H4884 BP | 14 to 20<br>21 to 36 |
| | OVEN | MIELE | H4886 BP | D-PH 38 to D-PH 50<br>T-PH 52 |
| | SPEED OVEN | MIELE | H4084 BM | 14 to 20<br>21 to 36 |
| | SPEED OVEN | MIELE | H4086 BM | D-PH 38 to D-PH 50<br>T-PH 52 |
| | STEAM OVEN | MIELE | DG4086 | D-PH 38 to D-PH 50<br>T-PH 52 |
| | WARMING DRAWER | MIELE | ESW4824 | 14 to 20<br>21 to 36 |
| | WARMING DRAWER | MIELE | ESW4826 | D-PH 38 to D-PH 50<br>T-PH 52<br>Pantry 54 |
| | HOOD | WOLF | PI543418 | 21 to 36<br>D-PH 38 to D-PH 50<br>T-PH 52 |
| | HOOD | WOLF | PW542418 | 14 to 20<br>Pantry 54 |
| | GARBAGE DISPOSAL | KITCHEN AID | KBDS100 T | All Units |
| | WASHER | ELECTROLUX | EWFLS70JSS | All Units |
| | DRYER | ELECTROLUX | EWMGD70J SS/IW | All Units |
| | SINK | JUST MFG | USXD 1830 A | All Units |
| | SINK | JUST MFG | US 1616-A | 14 to 20<br>T-PH 52 |

**SLCE** *Architects*

| | TRIM | DORNBRACHT | 33.826.888 27.718.970 PLATINUM MATTE | All Units |
|---|---|---|---|---|
| | UNIT KITCHEN | DWYER | SACO66BHR | 4A & 5A |
| | UNIT KITCHEN | DWYER | SASO86BBR | 4B, 4C, 4D, 4E & 5C |
| | UNIT KITCHEN | DWYER | SASO81BBR | 5B |

## ABBREVIATIONS FOR FINISHES

| | |
|---|---|
| AT | ACOUSTICAL TILE |
| CMU | CONCRETE MASONRY UNIT |
| CT | CERAMIC TILE |
| CPT | CARPET |
| CONC | CONCRETE |
| DP | DUSTPROOFING AND HARDENER |
| DE | DECK ENAMEL |
| GT | GRANITE TILE |
| GWB | GYPSUM WALLBOARD |
| HC | HUNG CEILING |
| K | KADEX |
| L | LIMESTONE |
| LWP | LIQUID WATERPROOFING |
| MT | MARBLE TILE |
| MP | METAL PAN |
| P | PAINT |
| POR | PORCELIN |
| QT | QUARRY TILE |
| SP | SPRAY PAINT |
| ST | STUCCO |
| T | TILE |
| TCP | TEXTURED CEILING PAINT |
| TER | TERRAZO |
| V | VINYL |
| VCT | VINYL COMPOSITION TILE |
| VWC | VINYL WALL COVERING |
| GWB | GYPSUM WALL BOARD |
| WRWB | WATER RESISTANT GYPSUM WALLBOARD |
| WD | WOOD |

## W.   FIRE ALARM AND SMOKE DETECTING DEVICES

1.   FIRE ALARM:   The building will be provided with a high rise residential fire alarm system. The system shall be manual and automatic type in accordance with the 2008 New York City Building Code. The system will include control panels,

**SLCE** *Architects*

sprinkler tamper and waterflow switches, smoke detection, and audio/visual communication systems as required by the Code.

**2. UNIT SMOKE AND CARBON MONOXIDE DETECTION SYSTEM:**

Each Unit will be provided with a hard-wired local smoke and carbon monoxide detection device located in bedrooms and within 15 feet outside of bedrooms as per Code. The detector will be wired to a 120-volt local power supply and will be self-contained with its own sounding device. Combination smoke/carbon monoxide detectors will also be provided at fireplaces.

**Emergency Voice Communication in Units :**

Units and stairwells will be provided with speakers for emergency voice communication. The speakers will be connected to the building fire alarm control system.

Documents to be transferred from the Sponsor to the Condo Board:
(i)     Final as-built drawings, i.e. mechanical, electrical, plumbing and sprinklers
(ii)    Operation and Maintenance manuals, as applicable
(iii)   Electronic system manuals
(iv)    Equipment warranties
(v)     Manufacturer's roof warranty
(vi)    Major equipment commissioning start-up sheets
(vii)   Original test and balance report for HVAC system

General Note: In accordance with the terms of the Offering Plan, the Sponsor reserves the right to make any substitutions of equipment, materials, finishes or fixtures as stated herein, provided that the changes are substantially equal or better quality as recognized by industry standards of performance, efficiency, longevity and other classifications as applicable.

GLORIA B. GLAS, AIA

PARTNER
SLCE ARCHITECTS LLP

Sign before me this _8th_ day

Of ___September___ 201_4_

PUBLIC NOTARY

SHERRY LYNN EID
Notary Public, State of New York
No. 01EI6113413
Qualified in New York County
Commission Expires July 26, 2016

**SLCE** *Architects*

---

**FLOOR PLANS**

---



520 PARK AVENUE

South Elevation

East Elevation

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-06-14



SUB CELLAR 3

SCALE
0    4'    8'    12'

**9** 29 sf
**8** 28 sf
**7** 25 sf
**6** 25 sf
**5** 35 sf
**4** 35 sf
**3** 46 sf
**2** 22 sf

WINE CELLAR

**10** 32 sf
PROJ. RM. STORAGE
STORAGE
**1** 50 sf

PR-C4
HALL

MECH. RM.

**6** 35 sf
**9** 31 sf
**10** 31 sf
**11** 31 sf
**12** 32 sf
**13** 40 sf
**14** 39 sf
**15** 42 sf

RESIDENTS STORAGE

**1** 48 sf
**2** 43 sf

**3** 28 sf
**4** 32 sf
**5** 38 sf
**6** 32 sf
**7** 30 sf

RESIDENTIAL MULTI-PURPOSE/ SCREENING ROOM
17'-2" X 12'-0"
(5.23 m X 3.65 m)

FOYER

ELEV. LOBBY

PE1
PE2

CORRIDOR

BICYCLE STORAGE

SERV. ELEV. LOBBY

PANTRY
PAN-1

STAIR A

STAIR B

SE3

FUEL OIL TANK RM.

220

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

08-09-14



SUB CELLAR 2

SCALE
0    4'    8'    12'

POOL/
GARDEN WATER FEATURE
MECHANICAL ROOM

SPARE PARTS
WORKSHOP

JAN.

REFG.
STORAGE

WOMENS
LOCKER RM.

MENS
LOCKER
RM.

FOLDING
IRONING
TABLE

LAUNDRY RM.

SUPER'S
OFFICE

LOUNGE
FAN-2

ELEV. LOBBY

MULTIPURPOSE/SCREENING
ROOM BELOW

STAGING
AREA

STEAM METER ROOM

COMPACTOR ROOM

PE1

PE2

STAIR A

STAIR B

SE3

221

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



SUB CELLAR 1

SCALE
0    4'    8'    12'

POOL
46'-5" X 24'-8"
(13.92 m X 7.52 m)

MULTI PURPOSE ROOM
17'-2" X 12'-0"
(5.23 m X 3.65 m)

STRECHING ROOM
10'-10" X 8'-7"
(3.30 m X 2.61 m)

W.C.

WOMEN'S LOCKER ROOM
22'-9" X 16'-0"
(6.99 m X 4.87 m)

SAUNA

CHANGING RM.

STEAM RM.

EXERCISE ROOM
45'-8" X 16'-7"
(13.92 m X 7.52 m)

ELEVATOR LOBBY

GALLERY

SAUNA

CHANGING RM.

STEAM RM.

PE1

PE2

SE3

MEN'S LOCKER ROOM
22'-4" X 16'-0"
(6.80 m X 4.87 m)

STAIR A

STAIR B

W.C.

STEAM ROOM

222

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



# CELLAR FLOOR

SCALE

0    4'    8'    12'

CHILDREN'S PLAYROOM
12'-5" X 17'-2"
(3.26 m X 5.23 m)

FIRE PUMP ROOM

PLUMBING ROOM

ELEC. SERVICE #2

OPEN TO LEVEL SC I BELOW
POOL AREA

EXERCISE ROOM
44'-9" X 16'-7"
(13.64 m X 5.05 m)

ELEVATOR LOBBY

SERVICE
CORRIDOR

IT ROOM

JAN.

STORM
TANK

PE1      PE2

SERVICE
ELEVATOR
LOBBY

GAS
METER RM.

STAIR A      STAIR B

SES

TEL ROOM
RM.

ELEC.
SERVICE #1

223

## NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
**41-45 Property Owner, LLC**
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



# FIRST FLOOR

SCALE
0  4  8  12

GARDEN
58'-4" X 32'-5"
( 17.78 m X 9.88 m )

LOBBY
21'-6" X 31'-8"
( 6.55 m X 9.65 m )

VESTIBULE
20'-8" X 16'-4"
( 6.55 m X 9.65 m )

LOBBY
44'-3" X 13'-9"
( 13.49 m X 4.19 m )

ELEVATOR LOBBY

RECEPTION

HALL

MAILROOM

PE1    PE2

SE3

STAIR A    STAIR B

VESTIBULE
14'-2" X 14'-8"
( 4.20 m X 4.47 m )

EAST 60TH STREET

224

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



2ND FLOOR -
MECHANICAL

SCALE
0   4'   8'   12'

GROLIER  CORRIDOR

MECHANICAL ROOM

VEST.

PE-1

MECHANICAL ROOM

PE-2

ELEVATOR LOBBY

SE-3

MECHANICAL ROOM

MECHANICAL ROOM

ELEC.
CLOSET

ELEC.
CLOSET

225

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



# 3RD FLOOR - MECHANICAL

SCALE
0    4'    8'    12'

GENERATOR ROOM

ATS RM.

VEST.

PE 1

ELECTRICAL ROOM

PE 2

SE 3

ELEVATOR
LOBBY

ELECTRICAL ROOM

AIR PLENUM

DUCT SHAFT AREA

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

226

03-05-14

# SUITE UNIT
## 4TH FLOOR
## APARTMENT 4A

LIVING / SLEEPING AREA
1 BATH

| 390 SF |
|--------|
| 36 M² |



SCALE

0    4'    8'    12'



LIVING / SLEEPING AREA
16'-9" X 12'-2"
( 5.10 m X 3.70 m )

BATH

KITTE.

4A



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

227

09-08-14

# SUITE UNIT
## 4TH FLOOR
## APARTMENT 4B

LIVING / SLEEPING AREA
1 BATH

| 405 SF |
| 38 M² |





KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

08-05-14

# SUITE UNIT
# 4TH FLOOR
# APARTMENT 4C

LIVING / SLEEPING AREA
1 BATH

408 SF
38 M²



SCALE
0    4'    8'    12'



LIVING / SLEEPING AREA
11'-6" X 13'-6"
( 3.50 m X 4.11 m )

KITTE.

FOYER    BATH

4C



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

# SUITE UNIT
# 4TH FLOOR
# APARTMENT 4D

LIVING / SLEEPING AREA
1 BATH

398 SF
37 M²



SCALE
0    4'    8'    12'



BATH

FOYER

KITTE.

LIVING / SLEEPING AREA
11'-10" X 17'-0"
( 3.60 m X 5.18 m )



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14

## SUITE UNIT
## 4TH FLOOR
## APARTMENT 4E

LIVING / SLEEPING AREA
1 BATH

429 SF
40 M²



SCALE
0    4'    8'    12'



FOYER

KITE.

LIVING / SLEEPING AREA
15'-4" X 16'-6"
( 4.67 m X 5.03 m )

BATH



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14

## SUITE UNIT
## 5TH FLOOR
## APARTMENT 5A

LIVING / SLEEPING AREA
1 BATH

| 387 SF |
|--------|
| 36 M² |



SCALE
0    4'    8'    12'



LIVING / SLEEPING AREA
17'-3" X 12'-2"
( 5.25 m X 3.70 m )

BATH

KITTE.

5A



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

00-06-14

## RESIDENT MANAGER UNIT
## 5TH FLOOR
## APARTMENT 5B

2 BEDROOMS
2 BATHS

1,244 SF
116 M²



LIVING / DINING ROOM
14'-6" X 16'-6"
( 4.42 m X 5.03 m )

BEDROOM 2
11'-6" X 14'-2"
( 3.50 m X 4.31 m )

KITE.

FOYER

BATH

BATH

5B

BEDROOM 1
11'-8" X 14'-0"
( 3.58 m X 4.26 m )



EAST 60th STREET

KEY PLAN

SCALE
0    4'    8'    12'

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14

## SUITE UNIT
## 5TH FLOOR
## APARTMENT 5C

LIVING / SLEEPING AREA
1 BATH

421 SF
39 M²



SCALE
0    4'    8'    12'



5C

KITE.

LIVING / SLEEPING AREA
15'-6" X 16'-6"
( 4.72 m X 5.03 m )

BATH



EAST 60th STREET

KEY PLAN

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-06-14



6TH FLOOR -
MECHANICAL

SCALE

0    4'    8'    12'

MECHANICAL AREA

MECHANICAL AREA

PE-1

MECHANICAL AREA

MECHANICAL AREA

PE-2

SE-3

WATER STORAGE TANKS

235

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



# 7TH FLOOR - MECHANICAL

SCALE
0    4'    8'    12'

MECHANICAL ROOM

MECHANICAL AREA

PE 1

MECHANICAL AREA

WATER TANK

PE 2

MECHANICAL AREA

EMR + EOR

236

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-05-14



# 14TH - 20TH FLOORS

SCALE
0    4'    8'    12'

4 BEDROOMS
5 BATHS
1 POWDER ROOM

4,613 SF
429 M²

BEDROOM 2
12'-10" X 11'-6"
(3.91 m X 3.50 m)

BATH

BEDROOM 3
12'-0" X 12'-2"
(3.65 m X 3.70 m)

BATH

W.I.C.

M. BATH 1

MASTER BEDROOM
17'-2" X 19'-6"
(5.23 m X 5.94 m)

P. R.

M. BATH 2

BATH

FOYER

PET

PET

PRIVATE CORRIDOR

ELEC. / TEL.

GALLERY
28'-0" X 8'-4"
(8.53 m X 2.54 m)

BEDROOM 4 / LIBRARY
16'-10" X 13'-6"
(5.13 m X 4.11 m)

PANTRY

KITCHEN
16'-0" X 16'-2"
(4.87 m X 4.92 m)

FAMILY ROOM/BREAKFAST
15'-3" X 12'-4"
(4.64 m X 3.76 m)

DINING ROOM
19'-10" X 16'-4"
(6.04 m X 4.97 m)

LIVING ROOM
27'-5" X 18'-8"
(8.35 m X 5.69 m)

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

237

09-08-14



# 21ST - 36TH FLOORS

4 BEDROOMS
5 BATHS

4,628 SF
430 M²

KITCHEN
14'-4" X 16'-6"
(4.36 m X 5.03 m)

FAMILY ROOM
13'-3" X 16'-6"
(4.03 m X 5.03 m)

DINING ROOM
15'-2" X 16'-6"
(4.62 m X 5.03 m)

LIBRARY / BEDROOM 4
11'-6" X 16'-6"
(3.50 m X 5.03 m)

LIVING ROOM
24'-2" X 29'-0"
(7.36 m X 8.84 m)

GALLERY
27'-9" X 8'-2"
(8.46 m X 2.48 m)

PRIVATE CORRIDOR

PE1

PE2

FOYER

BATH

W.I.C.

M. BATH 2

ELEC. / TEL.

D   W

BEDROOM 3
13'-0" X 12'-4"
(3.96 m X 3.76 m)

BATH

BATH

BEDROOM 2
12'-4" X 16'-4"
(3.76 m X 4.97 m)

M. BATH 1

MASTER BEDROOM SUITE
19'-8" X 16'-10"
(5.99 m X 5.13 m)

SCALE
0    4'    8'    12'

238

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-06-14



# DUPLEX
## LOWER FLOOR
### 38, 40, 42, 44, 46 & 50TH FLOORS

6 BEDROOMS
7 BATHS
1 POWDER ROOM

9,138 SF
849 M²

**SCALE**
0   4'   8'   12'

N

239

KITCHEN
31'-2" X 16'-9"
( 9.50 m X 5.10 m )

DINING ROOM
23'-10" X 17'-0"
( 7.26 m X 5.18 m )

LIVING ROOM
24'-6" X 35'-4"
( 7.46 m X 10.77 m )

PANTRY

PRIVATE CORRIDOR

FOYER

GALLERY
30'-10" X 16'-8"
( 9.40 m X 5.08 m )

ELEC. / TEL.

UP

ELEV. / CL.

FAMILY ROOM
21'-0" X 12'-3"
( 6.40 m X 3.73 m )

P.R.

BATH

BEDROOM 6
12'-3" X 14'-3"
( 3.73 m X 4.34 m )

LIBRARY
21'-6" X 18'-0"
( 6.55 m X 5.48 m )

**NOTE:**
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES.  PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-05-14



**DUPLEX**
**UPPER FLOOR**
**39, 41, 43, 45, 47 & 51TH FLOORS**

SCALE
0   4'   8'   12'

BEDROOM 2
25'-10" X 17'-0"
( 7.25 m X 5.18 m )

BATH

M. BATH 2

DRESSING

MASTER BEDROOM SUITE
24'-0" X 18'-8"
( 7.31 m X 5.69 m )

W.I.C.

PRIVATE CORRIDOR

FOYER

OPEN TO BELOW

DN

W.I.C.

M. BATH 1

W.I.C.

BEDROOM 3
14'-4" X 12'-4"
(4.36 m X 3.76 m)

BATH

BATH

BEDROOM 4
18'-3" X 13'-0"
( 5.56 m X 3.96 m )

BATH

BEDROOM 5
17'-0" X 16'-10"
( 5.18 m X 5.13 m )

BATH

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

240

00-08-11



# DUPLEX
## LOWER FLOOR
## 48TH FLOOR

5 BEDROOMS
6 BATHS
1 POWDER ROOM

8,522 SF
792 M²



SCALE
0    4'    8'    12'

KITCHEN
31'-6" X 16'-9"
( 9.60 m X 5.10 m )

DINING ROOM
23'-10" X 17'-0"
( 7.26 m X 5.18 m )

LIVING ROOM
24'-4" X 35'-4"
( 7.41 m X 10.77 m )

PANTRY

PRIVATE CORRIDOR

FOYER

GALLERY
30'-10" X 16'-8"
( 9.40 m x 5.08 m )

MECHANICAL

LIBRARY
21'-6" X 18'-0"
( 6.55 m X 5.48 m )

BEV. CL.

BEDROOM 5
12'-3" X 14'-3"
( 3.73 m X 4.34 m )

P. R.

BATH

241

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



**DUPLEX**
**UPPER FLOOR**
**49TH FLOOR**

SCALE
0    4'    8'    12'

BEDROOM 2
23'-10" X 17'-0"
( 7.26 m X 5.18 m )

BATH

M. BATH
2

DRESSING

MASTER BEDROOM SUITE
24'-0" X 18'-8"
( 7.31 m X 5.69 m )

W.I.C.

PRIVATE CORRIDOR

FOYER

OPEN TO BELOW

DN

W.I.C.

M. BATH
1

W.I.C.

ELEC. / TEL.

MECHANICAL

W/D

PL.

LIN.

BEDROOM 3
18'-3" X 13'-0"
( 5.56 m X 3.96 m )

BATH

BEDROOM 4
17'-0" X 16'-10"
( 5.18 m X 5.13 m )

BATH

242

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022



TRIPLEX
LOWER FLOOR
52ND FLOOR

8 BEDROOMS
9 BATHS
2 POWDER ROOM

INTERIOR AREA
12,394 SF
1,152 M²

EXTERIOR AREA
1,259 SF
117 M²



SCALE
0    4'    8'    12'

BEDROOM 2
23'-10" X 17'-0"
( 7.26 m X 5.18 m )

BATH

M. BATH
2

DRESSING

MASTER BEDROOM SUITE
24'-0" X 20'-0"
( 7.31 m X 6.09 m )

W.I.C.

PET

PET

PRIVATE CORRIDOR

FOYER

ELEC./ TEL.

GALLERY
30'-4" X 16'-8"
( 9.24 m X 5.08 m )

UP

W.I.C.

W.I.C.

W.I.C.

M. BATH
1

UN.

PLA

M. SITTING RM./
BEDROOM 5
17'-0" X 16'-10"
( 5.18 m X 5.13 m )

STAFF'S ROOM
13'-10" X 12'-4"
( 4.21 m X 3.76 m )

BATH

BATH

BATH

BEDROOM 4
18'-5" X 13'-0"
( 5.66 m X 3.96 m )

BATH

243

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



**TRIPLEX**
**MID FLOOR**
**53RD FLOOR**

SCALE
0    4'    8'    12'

KITCHEN
31'-6" X 16'-9"
( 9.50 m X 5.10 m )

DINING ROOM
23'-10" X 17'-0"
( 7.26 m X 5.18 m )

LIVING ROOM
24'-4" X 35'-6"
( 7.41 m X 10.82 m )

PANTRY

PRIVATE CORRIDOR

FOYER

OPEN TO BELOW

DN

UP

ELEC./TEL.

ELEV. CL.

LIBRARY
20'-8" X 18'-0"
( 6.30m X 5.48 m )

BEDROOM 7
15'-6" X 12'-2"
( 4.72 m X 3.70 m )

BATH

P.R.

BATH

BEDROOM 6
12'-3" X 14'-3"
( 3.73 m X 4.34 m )

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14



TRIPLEX
UPPER FLOOR
54TH FLOOR

SCALE
0    4'    8'    12'

SITTING ROOM
24'-6" X 17'-0"
( 7.41 m X 10.82 m )

SALON
32'-6" X 35'-6"
( 9.90 m X 10.97 m )

ROOF TERRACE
24'-6" X 53'-0"
( 7.52 m X 16.15 m )

PRIVATE CORRIDOR

PE1

PE2

OPEN TO BELOW

DN

BEDROOM 8
18'-5" X 12'-4"
( 5.84 m X 3.76 m )

W.I.C.

PL.4

BATH

P. R.

PANTRY -
CATERING
11'-10" X 16'-10"
3.60m X 5.13 m )

245

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
520 Park Avenue Condominium
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-05-14

# 55TH FLOOR -
# MECHANICAL

MECHANICAL
AREA

PE 1

TUNED MASS DAMPER

VEST.

PE 2

STAIR B

MECHANICAL
AREA

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-09-14

# 56TH FLOOR - MECHANICAL





NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

09-08-14

# 57TH FLOOR -
# MECHANICAL







MECHANICAL
MEZZANINE

VEST.

PE1
ELEVATOR
OVERRUN

PE2
ELEVATOR
OVERRUN

OPEN TO BELOW

MECHANICAL
MEZZANINE

VESTIBULE

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41–45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

08-08-14



# MAIN ROOF

SCALE
0  4'  8'  12'

STAIR B

STAIR A

ELEVATOR
MACHINE
ROOM

NOTE:
ALL DIMENSIONS ARE APPROXIMATE AND SUBJECT TO
CONSTRUCTION VARIANCES. PLANS AND DIMENSIONS MAY
CONTAIN MINOR VARIATIONS FROM FLOOR TO FLOOR.

Condominium:
**520 Park Avenue Condominium**
520 Park Avenue
New York, NY 10022

Sponsor:
41—45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, NY 10022

249

09-06-14

---

## USE AND OCCUPANCY AGREEMENT

---

# USE AND OCCUPANCY AGREEMENT

This use and occupancy agreement ("Use and Occupancy Agreement") for Unit _____ ("Unit") at the 520 Park Avenue Condominium, located at 520 Park Avenue, New York, New York 10022 ("Premises") is made as of _____, 20___ between 41-45 Property Owner, LLC ("Sponsor") and _____ ("Purchaser") (collectively the "Parties").

## B A C K G R O U N D

A.   Sponsor is the sponsor of an offering plan to convert the Premises to condominium ownership ("Offering Plan").

B.   The Parties executed an Option Agreement for the Unit dated _____, 20___ as the same may be amended from time to time ("Option Agreement").

C.   The Parties executed a Rider to the Option Agreement ("Rider") pursuant to which Purchaser was granted the right to enter into a Use and Occupancy Agreement and obtain pre-closing occupancy of the Unit.

NOW THEREFORE, it is agreed by the Parties as follows:

1.   All capitalized terms used in this Use and Occupancy Agreement shall have the same meanings ascribed to them in the Offering Plan, the Option Agreement and Rider as amended.

2.   The term ("Term") of the Use and Occupancy Agreement shall commence on _____, 20___ ("Occupancy Date") and end on a date occurring on the earlier of: (a) the Closing of Title to the Unit pursuant to the terms of the Option Agreement, (b)_____, 20___, unless such date is extended in accordance with the terms of this Agreement or (c) the date that either Sponsor or Purchaser cancels the Option Agreement in accordance with the terms thereof.

3.   Purchaser shall pay to Sponsor payments (each a "Payment") in the amount of $_____ per month to be paid on the first day of each month of the Term.  If this Use and Occupancy Agreement terminates as result of the Closing of Title to the Unit, any Payment received by Sponsor for the month in which the Closing of Title takes place shall be adjusted between Sponsor and Purchaser at Closing.

4.   Purchaser warrants that the Unit has been inspected and examined and Purchaser shall accept title to the Unit at Closing in the same condition "as is" on the Occupancy Date, except for any items set forth on the Inspection Statement executed by Purchaser prior to the Occupancy Date, if any.

5.   During the Term, Purchaser shall keep the Unit clean and in good condition and no other persons other than Purchaser and Purchaser's family may occupy the Unit (subject in all events to the Declaration of Condominium, the By-Laws and the Rules and Regulations of the Condominium) and the Unit may not be sublet, and/or occupied by any other person without the express prior written consent of Sponsor.  Purchaser shall not be permitted to harbor any pets in the Unit without Sponsor's prior written consent.  Purchaser shall not be permitted to perform any alterations, modifications, renovations and/or repairs to or in the Unit without Sponsor's prior written consent. Purchaser acknowledges that while the Unit may be legally occupiable, certain other services and facilities in the Building may be subject to shut-off or otherwise unavailable as a result of ongoing construction.  Purchaser agrees that the interruption or failure of any such services or facilities shall not be an objection or defense by Purchaser to any of the conditions or obligations stated hereunder or under the Option Agreement.

6.   It is specifically understood and agreed that Sponsor and the Condominium Board shall be exempt from any and all liability for any damage or injury to persons or property or arising from any cause or happening whatsoever in, on, or to the Unit from and after the Occupancy Date, except if caused by the willful, affirmative acts on the part of Sponsor, the Condominium Board or their respective agent(s). Commencing on the Occupancy Date and throughout the Term, Purchaser shall obtain and maintain (a) personal general liability insurance against any and all claims for bodily injury death or property damage (including, but not limited to, loss due to water damage) occurring in, upon or from the Unit thereto or any part thereof, with limits not less than $_____ for bodily injury or death arising out of any one occurrence and $_____ for damage to property plus at least $_____ umbrella liability coverage and (b) tenant's "all-risk" property insurance in respect of property damage occurring in upon, or from the Unit or any part thereof (including, but not limited to appropriate coverage for additions, alterations, improvements and betterments and personal property). Such insurance shall name Sponsor and the Condominium Board as additional insureds and may not be cancelable without prior notification to Sponsor. Purchaser shall indemnify, defend and hold Sponsor and the Condominium Board harmless from and against any and all expenses, liabilities and/or obligations (including, without limitation, reasonable attorneys' fees and disbursements) arising therefrom except if caused by the willful, affirmative acts on the part of Sponsor or the Condominium Board or their respective agents.

7.   It is specifically understood and agreed that nothing contained herein shall waive or modify the rights of Sponsor or Purchaser under the Option Agreement in the event the parties hereto fail to close title in accordance with the terms of the Option Agreement.

8.   The Parties acknowledge that this Use and Occupancy Agreement is not a lease and that a landlord/tenant relationship is not established by virtue of Purchaser's occupancy of the Unit, which occupancy is provided as an accommodation to Purchaser only.

9.   In the event (i) that Purchaser defaults under the terms of this Use and Occupancy Agreement which default is not cured within 10 days of notice (other than Purchaser's failure to make a Payment within ten (10) days of the first day of the month in which such Payment is due, in which event Sponsor shall not be required to send notice of default and the event of default shall be deemed to have occurred on the 11th day after the date on which such Payment is due) or (ii) of the expiration of the Term, Purchaser agrees to vacate and deliver possession of the Unit to Sponsor in broom-clean condition within 10 days of written notice from Sponsor or its attorney ("Vacate Date").

10.  In the event Purchaser fails to surrender possession of the Unit to Sponsor in accordance with the terms of this Use and Occupancy Agreement by the Vacate Date:

     a.   Purchaser shall pay Sponsor, an additional sum of $____ per day, as penalty (and not as an occupancy charge), for each day or part thereof that Purchaser remains in possession of the Unit beyond the Vacate Date. At Sponsor's option, such amount may be deducted from the Security Deposit (defined below). This penalty shall be in addition to the Payment and any other charges set forth in this Agreement and all of the Sponsor's remedies under the Option Agreement, without limitation; and

     b.   Purchaser agrees (i) that Sponsor, without notice, may forthwith commence a summary holdover proceeding for the purpose of enforcing this Use and Occupancy Agreement; (ii) to agree in said holdover proceeding to consent to the personal and subject matter jurisdiction of the court and to waive any and all substantive defenses to the proceeding; and (iii) that Sponsor may file the Stipulation of Settlement (a copy of which is annexed

hereto) with a court of competent jurisdiction and prepare a final judgment of possession and execute a warrant of eviction forthwith without any further notices to Purchaser; and

c. Purchaser shall be liable for any and all actual and incidental costs incurred by Sponsor in recovering possession of the Unit, including, but not limited to, storage and/or disposal fees for Purchaser's belongings and reasonable attorneys' fees. At Sponsor's option, such amounts may be deducted from the Security Deposit, and Purchaser shall be liable for the remainder of such costs in excess of the Security Deposit.

11. As security for the performance of Purchaser's obligations hereunder including, without limitation, attorneys' fees, occupancy charges, repairs to the Unit caused by Purchaser's occupancy, penalties and other incidental costs and expense, Sponsor hereby acknowledges receipt of $_____ ("Security Deposit"). The Security Deposit will be returned to Purchaser (less deductions for any charges, fees outstanding payments or reimbursements permitted under this Use and Occupancy Agreement) either upon Closing or, if the Option Agreement has been terminated, within 15 days after the Unit is surrendered to Sponsor.

12. Any default by Purchaser under the Use and Occupancy Agreement (which is not cured as set forth herein) shall constitute an Event of Default by Purchaser under the Option Agreement entitling Sponsor, to exercise any remedies provided for in the Option Agreement on account of such Event of Default, provided however that any default by Purchaser under the Option Agreement (which is not cured as set forth in the Option Agreement) shall constitute a default by Purchaser under the Use and Occupancy Agreement entitling Sponsor, in its sole option, to terminate the Use and Occupancy Agreement in accordance with Law. In addition to the foregoing, simultaneously with the execution of this Agreement, Purchaser shall execute and deliver to Sponsor a stipulation in the form annexed hereto ("Stipulation"), the terms of which are incorporated herein. It is expressly understood that upon any default under this Use and Occupancy Agreement or under the Option Agreement beyond their respective cure periods, Sponsor may commence without further notice a summary holdover proceeding in the Civil Court, New York County based on the terms of this Use and Occupancy Agreement. Purchaser consents to the jurisdiction of the Court and to the entry of a judgment of possession in favor of Sponsor and to the immediate entry of a warrant of eviction in accordance with the Stipulation.

13. Purchaser expressly acknowledges Purchaser's obligation to comply with the Condominium Declaration, By-laws and Rules and Regulations.

14. If any Payment due under this Use and Occupancy Agreement is received after the 10th of the month, Purchaser shall pay to Sponsor a $_____ late fee. If any check delivered by Purchaser to Sponsor is uncollectible for any reason, Purchaser shall pay to Sponsor a $___ returned check fee.

15. This Use and Occupancy Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York.

16. In the event of any inconsistency between the provisions of this Use and Occupancy Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.

17. This Use and Occupancy Agreement may be executed in any number of original, pdf or facsimile counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Use and Occupancy Agreement.

**PURCHASER(S):**

_____

_____

**SPONSOR:**

**41-45 Property Owner, LLC**

By: _____
Name:
Title:

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

41-45 Property Owner, LLC
           Petitioner-Owner/Landlords,

     - against -

Premises: 520 Park Avenue Condominium
          520 Park Avenue, Unit _____
          New York, New York

          Respondent-Tenant.

Index No.
L&T -

STIPULATION OF SETTLEMENT
HOLDOVER

WHEREAS, Petitioner and Respondent entered into a certain Option Agreement ("Option Agreement"), dated as of _____, 20___, pursuant to which Petitioner agreed to convey and Respondent agreed to purchase the captioned Premises; and

WHEREAS, Respondent has been occupying the Premises pursuant to an use and occupancy agreement ("Use and Occupancy Agreement"); and

WHEREAS the term under the Use and Occupancy Agreement have expired, but Respondent continues to occupy and possess the Premises without the permission of the Petitioner after the expiration of said term; and

WHEREAS, Respondent has agreed to vacate the Premises;

NOW, THEREFORE, in for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and of the mutual covenants contained herein, the parties hereto wish to settle all claims and resolve all disputes and differences among them and do hereby stipulate and agree as follows:

     1.     Respondent acknowledges having received and having been duly served with the Notice of Petition and Petition Holdover by which the Petitioner seeks a final judgment of possession for and a warrant of eviction removing Respondent from the Premises.

2. Respondent accepts service, waives traverse and all objections to personal and subject matter jurisdiction, if any. Respondent admits as true each and every allegation set forth in the petition, waive trial by jury, waive all defenses, affirmative defenses and counterclaims of any kind or nature and the service of any notice before the Warrant may be executed.

3. Respondent expressly acknowledges the following: (i) Respondent waives any and all objections of any kind or nature to the service, substance or sufficiency of notices, if any, served prior to the commencement of this proceeding, (ii) the term granted to Respondent under the Agreement has expired; (iii) Respondent has no further right, title or interest in and to the Premises and (iv) Respondent remains in possession of the Premises as a "holdover Tenant".

4. Respondent consents to and Petitioner may enter a final judgment of possession for the Premises and to the immediate issuance of a warrant of eviction. Any personal property remaining in the Premises upon eviction shall be deemed abandoned.

5. The terms of the Agreement shall govern the obligations of the parties, except as modified by the terms of this Stipulation.

6. Respondent hereby waives, abandons, relinquishes and surrenders any rights they may have to (i) an extension of time to cure any breach of condition as set forth in this Stipulation and Order (ii) any stay, order or injunction preventing the execution of the Warrant (iii) judicial intervention of any kind or nature to extend, modify, toll the time periods set forth herein or collaterally attack the enforceability of any of the terms or provisions hereunder (iv) appeal from any order of the Court resulting from this Stipulation and Order.

7. If Petitioner shall employ counsel to enforce any of Respondent's obligations under this Stipulation and Order or to defend any litigation commenced by Respondent seeking (i) an extension of time to cure any breach of condition as set forth in this Stipulation and Order (ii) any stay, order or injunction preventing the execution of the Warrant, (iii) judicial intervention of any kind or nature to extend, modify, toll the time periods set forth herein or collaterally attack the enforceability of any of the terms or provisions hereunder (iv) to appeal from any order of the Court

resulting from this Stipulation and Order, notwithstanding the prohibition of seeking any such relief as set forth herein, and if Petitioner shall be compelled to enforce Petitioner's rights hereunder, respondents shall pay all of the Petitioner's costs and expenses in connection therewith, including, without limitation, reasonable attorneys' fees and disbursements.

8.      The parties hereto expressly agree that the Court shall retain jurisdiction over the enforcement of the provisions of this Stipulation.

9.      The parties hereto shall cooperate fully so as to facilitate the compliance with all of the obligations set forth in this Stipulation. All documents required to be executed by Respondent shall be delivered to the Petitioner so requesting within three (3) business days, delivery to be made by hand or overnight courier.

10.      In the event of a conflict between the terms of the Agreement and those of this Stipulation and Order, the terms of this Stipulation and Order shall prevail.

11.      This Stipulation and Order constitutes the entire agreement between the Petitioner and Respondent with respect to the subject matter hereof and there are no oral representations existing between the parties with respect thereto. This Stipulation and Order shall constitute an Order of the Court, subjecting a party who violates its provisions to all rights and remedies available for the violation of a Court order.

12.      This Stipulation and Order is the product of substantial negotiations between the parties and, as such, no negative inferences shall be drawn against either party as the drafter hereof.

13.   This Stipulation and Order shall be filed with the Court and shall become an Order of the Court upon signature of any judge sitting in the civil court without further notice to either party.

Dated:  New York

_____, 20___

_____

By: _____          By: _____

STARR ASSOCIATES LLP

Attorneys for Petitioner          By: _____

245 Fifth Avenue, Suite 1102

New York, New York 10016

(212) 620-2680

SO ORDERED:

_____

JUSTICE OF THE CIVIL COURT

## OPTION AGREEMENT

# OPTION AGREEMENT

## 41-45 PROPERTY OWNER, LLC

Sponsor

With

_____

Purchaser

Unit Number _____

**520 PARK AVENUE CONDOMINIUM**
**520 PARK AVENUE**
**NEW YORK, NEW YORK 10022**

**TABLE OF CONTENTS**

| **Section** | | **Page** |
|---|---|---|
| 1. | THE PLAN | 1 |
| 2. | DEFINITIONS | 1 |
| 3. | THE UNIT | 2 |
| 4. | PURCHASE PRICE | 2 |
| 5. | PREMIUM PAYMENT TO BE HELD IN TRUST | 2 |
| 6. | CLOSING DATE AND PLACE | 3 |
| 7. | DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY | 3 |
| 8. | STATUS OF TITLE | 4 |
| 9. | CLOSING ADJUSTMENTS | 4 |
| 10. | MORTGAGE TAX CREDIT | 5 |
| 11. | CLOSING COSTS | 5 |
| 12. | AGREEMENT NOT A LIEN OR ENCUMBRANCE | 6 |
| 13. | DEFAULT BY PURCHASER | 6 |
| 14. | AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE | 7 |
| 15. | SPONSOR'S INABILITY TO CONVEY THE UNIT | 7 |
| 16. | FIXTURES, APPLIANCES AND PERSONAL PROPERTY | 7 |
| 17. | NEW CONSTRUCTION | 8 |
| 18. | INSPECTION OF THE UNIT | 8 |
| 19. | DAMAGE TO THE UNIT | 9 |
| 20. | NO REPRESENTATIONS | 9 |
| 21. | PROHIBITION AGAINST ADVERTISING | 10 |
| 22. | BROKER | 10 |
| 23. | AGREEMENT MAY NOT BE ASSIGNED | 10 |
| 24. | BINDING EFFECT | 10 |
| 25. | NOTICES | 11 |
| 26. | JOINT PURCHASERS | 11 |
| 27. | LIABILITY OF SPONSOR | 11 |
| 28. | FURTHER ASSURANCES | 12 |
| 29. | AGREEMENT NOT CONTINGENT UPON FINANCING | 12 |
| 30. | COSTS OF ENFORCING AND DEFENDING AGREEMENT | 12 |
| 31. | SEVERABILITY | 12 |
| 32. | STRICT COMPLIANCE | 12 |
| 33. | GOVERNING LAW | 12 |

| | | |
|---|---|---|
| 34. | WAIVER OF JURY | 12 |
| 35. | ENTIRE AGREEMENT | 13 |
| 36. | CERTAIN REFERENCES | 13 |
| 37. | CAPTIONS | 13 |
| 38. | SUCCESSORS AND ASSIGNS | 13 |
| 39. | CONFIDENTIALITY | 13 |
| 40. | LETTER OF CREDIT IN LIEU OF PREMIUM PAYMENTS IN ESCROW | 13 |
| 41. | NO ORAL CHANGES | 13 |
| 42. | PERFORMANCE | 14 |
| 43. | COUNTERPARTS | 14 |
| 44. | WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY. | 14 |
| 45. | CERTIFICATION OF SPONSOR AND PRINCIPAL | 14 |

SCHEDULE A – PERMITTED ENCUMBRANCES

SCHEDULE B – INSPECTION STATEMENT

SCHEDULE C – RIDER TO OPTION AGREEMENT RE: ESCROW PROVISIONS

SCHEDULE D – RIDER TO OPTION AGREEMENT RE: ANCILLARY AMENITY

# OPTION AGREEMENT

## UNIT NUMBER _____

### 520 PARK AVENUE CONDOMINIUM
### 520 PARK AVENUE
### NEW YORK, NEW YORK 10022

AGREEMENT, made as of _____, _____, between Sponsor and Purchaser (defined below).

## W I T N E S S E T H :

### 1.    THE PLAN

Purchaser acknowledges having received and read a copy of the Offering Plan for the 520 Park Avenue Condominium and all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") at least 3 business days prior to Purchaser's signing this Agreement. If Purchaser has not received and read the Plan and all amendments thereto at least 3 business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement, by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within 7 days from the date Purchaser delivers an executed Option Agreement together with the required Premium Payment to the Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.

### 2.    DEFINITIONS

Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1    "Sponsor" means 41-45 Property Owner, LLC, having an office at 445 Park Avenue, Suite 1902, New York, New York 10022. Sponsor's taxpayer identification number is 46-1878456.

2.2.    "Purchaser" means _____ having an address at _____,_____ . Purchaser's social security number is _____.

2.3    "Attorney for Sponsor" means Starr Associates LLP, having an address at 245 Fifth Avenue, Suite 1102, New York, New York 10016; Attention: Samantha Sheeber, Esq. Telephone Number: (212) 620-2682. Fax Number: (212) 696-5013. E-mail address: ssheeber@starr-lawfirm.com.

2.4    "Attorney for Purchaser" means _____, having an address at _____,_____. Attention: _____, Esq. Telephone Number: (____)_____. Fax Number (____)____.E-mail address: _____.

2.5    "Selling Agent" means Zeckendorf Marketing, LLC, having an address at 770 Lexington Avenue, New York, New York 10065. Telephone Number: (212) _____. Facsimile Number: (212) _____. E-mail address: _____.

2.6     "Co-Broker" means _____.

2.7     "Escrow Agent" means Attorney for Sponsor.

2.8     "Title Company" means First American Title Insurance Company, having and office at 633 Third Avenue, New York, New York 10017. Telephone Number: (212) 551-9402.

## 3.    THE UNIT

Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser hereby acquires from Sponsor, an option to purchase the Unit designated as Unit _____ in the Declaration ("Unit"), together with its undivided _____% interest in the Common Elements appurtenant to such Unit.

## 4.    PURCHASE PRICE

4.1     The Purchase Price for the Unit ("Purchase Price") is $_____.

The Purchase Price is payable as follows:

      (a)     $_____, ("Initial Premium Payment"), due upon Purchaser's signing and delivering this Agreement, by check (subject to collection), receipt of which is hereby acknowledged;

      (b)     $_____ ("Additional Premium Payment;" the term "Premium Payment," as used herein, refers to both the Initial Premium Payment and, if the same has been paid at the time in question, the Additional Premium Payment), is due upon the earlier to occur of (i) 6 months after Purchaser executes this Agreement, or (ii) within 15 days of the Presentation Date of the amendment declaring the Plan effective.

      (c)     $_____ ("Exercise Price"), by good certified check of Purchaser or official bank check, payable on the delivery of the deed as hereinafter provided.

      (d)     If Purchaser is signing this Agreement after the Plan is declared effective, the Initial Premium Payment and Additional Premium Payment shall be due upon Purchaser's signing this Agreement.

4.2     All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the New York Clearing House Association and shall be unendorsed. The Premium Payment shall be made payable to the direct order of "Starr Associates LLP, as Escrow Agent." The Balance shall be made payable to the direct order of "41-45 Property Owner, LLC"(or such other party as Sponsor directs to Purchaser, in writing, at least 1 business day prior to the date of Closing of Title). If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 13 hereof. Notwithstanding the foregoing, if the check representing the Initial Premium Payment is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and this Agreement shall automatically be deemed cancelled. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 5.    PREMIUM PAYMENT TO BE HELD IN TRUST

All Premium Payments made pursuant to this Agreement are subject to the requirements of Sections 352-e(2) (b) and 352-h of the New York General Business Law and the Attorney General's regulations

promulgated pursuant thereto. All monies received from Purchaser towards the Premium Payment shall be delivered to Escrow Agent and shall be held in accordance with the Section of the Plan entitled "Escrow and Trust Fund Requirements" a copy of which is annexed hereto as Schedule C and made a part hereof. By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Premium Payment to Sponsor in the event Sponsor and Purchaser close title under this Agreement. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchaser's default, the Premium Payment shall be returned to Purchaser, within 30 business days of Sponsor's notification to Purchaser that it cannot convey title.

## 6. CLOSING DATE AND PLACE

6.1     The Closing of Title shall be held at the offices of Starr Associates LLP, 245 Fifth Avenue, Suite 1102, New York, New York (or such other place in the City and State of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than 30 days' prior notice ("Initial Closing Notice"). After the Initial Closing Notice, Sponsor may, from time to time, adjourn and reschedule the date and hour for Closing at any time on notice to Purchaser, which new Closing notice shall fix a new date, hour and place for the Closing. The rescheduled Closing shall not be earlier than: (a) the date set forth in the Initial Closing Notice or, (b) 5 days from the date of Sponsor's Closing adjournment notice. These notice provisions may be modified or waived by an agreement signed by Sponsor and Purchaser. If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Attorney for Sponsor at Closing an extra fee as set forth in the Plan.

6.2     The term "Closing Date" "Closing" "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Unit is delivered to Purchaser.

## 7. DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY

7.1     At the Closing of Title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances, and title conditions set forth on Schedule A annexed hereto and made a part hereof. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly complete and execute before a notary public the New York City and New York State Transfer Tax Return Forms and any other forms then required by law, all of which shall be prepared by Sponsor.

7.2     At the Closing of Title and simultaneously with the delivery of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part II of the Plan, as well as whatever other documents are reasonably necessary or customary in connection with the conveyance of a condominium unit, including but not limited to title affidavits, real property transfer tax forms, etc.

7.3     The executed deed, transfer tax forms and power of attorney shall be delivered at the Closing to the representative of the Title Company insuring Purchaser's title (or, if no such representative is present, then to the Attorney for Sponsor) for recording in the Office of the City Register, which recording shall be at Purchaser's expense. After being recorded the deed shall be returned to Purchaser and the power of attorney shall be returned to the Condominium Board.

7.4     Purchaser's payment of the Exercise Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the Closing, and nothing herein shall be in derogation of the rights of purchasers

under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued by the Department of Law.

## 8. STATUS OF TITLE

8.1    At the Closing of Title, Sponsor shall convey to Purchaser fee simple title to the Unit, free and clear of all liens and encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof. Any lien and encumbrance or condition to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Closing of Title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Title Company (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien. Sponsor shall not be obligated to cause Purchaser's title company to omit any exceptions if the Title Company is willing to insure, without additional premium, Purchaser's title with such exception.

8.2    Sponsor shall be entitled to adjourn the Closing to remove or correct any defect in title which is not set forth in Schedule A. However, if such defect existed at least 10 days prior to the Closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the Closing of Title, then, for purposes of Article 13 below, Purchaser shall be deemed at fault for not having sent timely notice, and the Closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

8.3    If, subsequent to the Closing of Title, Purchaser claims that Sponsor did not convey fee simple title to the Unit in accordance with the Plan, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor. Sponsor and Purchaser agree that Sponsor's liability will be limited to any loss or damage not covered by Purchaser's title insurance company. If Purchaser did not obtain title insurance at the Closing, for purposes of this subparagraph, the amount and coverage which Purchaser could have obtained from Purchaser's title insurance company shall be deducted from the loss or damage collectable against Sponsor. Nothing contained in this subparagraph shall be construed to waive any of Purchaser's rights or abrogate any of Sponsor's obligations under the Plan or Article 23-A of the General Business Law. This provision shall survive Closing.

## 9. CLOSING ADJUSTMENTS

9.1    The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)    real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)    common charges (if common charges have been assessed by the Condominium Board) and assessments for the month in which title closes; and

(c)    if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent and any other charges pursuant to a use and occupancy agreement, if any, covering the Unit.

9.2    If the Unit has been separately assessed for real estate taxes but the Closing of Title occurs before the tax rate is fixed, adjustment of real estate taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for real estate tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title. If the Unit has not been separately assessed for real estate taxes as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the percentage interest in the Common Elements appurtenant to the Unit. In addition, Purchaser shall pay the

Unit's proportionate share of real estate taxes for the next ensuing tax period and Sponsor or the Condominium will pay such real estate taxes directly to the City of New York. Sponsor shall not be obligated to reimburse Purchaser after the Closing on account of any difference between the amount of real estate taxes for the then current tax period paid by Purchaser at Closing calculated according to the above formula and the amount of real estate taxes subsequently billed by the City of New York to such Purchaser (as Unit Owner).

9.3     Purchaser agrees that, if Sponsor obtains a refund for real estate taxes paid (or a credit for such real estate taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the Closing of Title.

9.4     Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to the Unit on the originally scheduled Closing Date (a) the Closing apportionments described in Section 9.1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual Closing of Title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's increased carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to .03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at Closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the Closing of Title.

## 10.    **MORTGAGE TAX CREDIT**

In the event a mortgage recording tax credit becomes available pursuant to Section 339- ee(2) of the New York Condominium Act, it is specifically understood that such credit shall enure to the benefit of Sponsor. Accordingly, at Closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. At the Closing of Title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

## 11.    **CLOSING COSTS**

In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at Closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association.

## 12.   AGREEMENT NOT A LIEN OR ENCUMBRANCE

No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or Building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

## 13.   DEFAULT BY PURCHASER

13.1     The following shall constitute "Events of Default" hereunder:

(i)      Purchaser's failure to close title to the Unit on the scheduled Closing Date; or

(ii)     Purchaser's failure to pay when due the Additional Premium Payment, the Exercise Price, any closing adjustment, closing cost or fee, including, without limitation, attorneys' fees required to be paid by Purchaser as set forth in the Plan or in this Agreement, or the dishonor of any check given by Purchaser to Sponsor; or

(iii)    Purchaser's failure to pay, perform or observe any of Purchaser's other obligations under this Agreement or the Plan; or

(iv)     if Purchaser is permitted to become the tenant or occupant of the Unit, Purchaser's failure to pay rent or to otherwise comply with some other lease or occupancy obligation; or

(v)      Purchaser's assignment or transfer of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(vi)     if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vii)    if a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the judgment or lien; or

(viii)   Purchaser's assignment or transfer of this Agreement without the prior written consent of Sponsor; or

(ix)     Purchaser's listing the Unit for sale or rental with any broker or placing or authorizing any listing in any broker's listing system or any other listing service or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or rental without Sponsor's prior written consent; or

(x)    an Event of Default by Purchaser beyond any applicable grace period under an Option Agreement between Purchaser and Sponsor for another Unit at the Property.

13.2    **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Additional Premium Payment, the Exercise Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 14.    AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE

The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan. The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Premium Payment, together with interest earned thereon, shall be returned to Purchaser within 30 days from the filing date of the amendment abandoning the Plan. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

## 15.    SPONSOR'S INABILITY TO CONVEY THE UNIT

If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in title, substantial damage or destruction of the Building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, and if Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return to Purchaser all sums Premium Payments and all other sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment, this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice of Purchaser in writing to Sponsor within 15 days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to acquire title subject to such inability).

## 16.    FIXTURES, APPLIANCES AND PERSONAL PROPERTY

Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

## 17. NEW CONSTRUCTION

17.1 The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications, subject to the right of Sponsor to amend the Plan and the Plans and Specification in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a Permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

17.2 The new construction of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor. Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

17.3 The Closing of Title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Terms of Sale" in Part I of the Plan. As a result, if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without provision for escrow), notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit.

17.4 The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the Plan entitled "Terms of Sale." Purchaser acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of Building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

## 18. INSPECTION OF THE UNIT

18.1 Upon receipt of the Initial Closing Notice, Purchaser shall arrange an appointment with a representative of Sponsor to inspect the interior of the Unit within the 7 days prior to the Closing Date. Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the interior of the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Exercise Price when due and shall constitute Purchaser's full acceptance of the Unit as is. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

18.2    Any work set forth on the Inspection Statement shall be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be obligated to provide Sponsor and its contractors, subcontractors agents and employees, unfettered access to the Unit and any Limited Common Elements appurtenant thereto after Closing in order to complete the work on the Inspection Statement, failing which Sponsor shall be relieved of its obligations to complete the work set forth on the Inspection Statement. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any work set forth on the Inspection Statement.

## 19.    DAMAGE TO THE UNIT

If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, the following shall apply:

19.1    The risk of loss to the Unit by fire or other casualty until the earlier of Closing of Title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. If Sponsor elects to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the Closing of Title.

19.2    In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all Premium Payments and other sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all Premium Payments and other such sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

## 20.    NO REPRESENTATIONS

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit, or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on Purchaser's own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Sponsor makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Unit, the Common Elements or any other part of the Property other than as set forth herein or in the Plan. Except as otherwise set forth in the Plan, Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof,

or of the Common Elements, as shown on the Floor Plans is accurate or correct, and (b) that Purchaser shall not be relieved of any Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article shall survive the Closing of Title.

## 21.  **PROHIBITION AGAINST ADVERTISING**

21.1    Prior to the Closing of Title, Purchaser agrees not to list the Unit for sale or rental with any broker or place or authorize any listing in any broker's listing system or other listing service or to advertise or otherwise offer, promote or publicize the availability of the Unit for sale or rental, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion.  Any such action by Purchaser prior to Closing of title shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

21.2    Prior to the first anniversary of the Sponsor Sale, Purchaser is prohibited from listing the Unit for sale with any broker or placing or authorizing any listing in any broker's listing system or other listing service or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion. The provisions of this Section shall survive the Closing of Title.

## 22.  **BROKER**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than the Selling Agent and the Co-Broker, if any, named in this Agreement, whose commissions shall be paid by Sponsor.  Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than the Selling Agent and the Co-Broker.  Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker, other than the Selling Agent or the Co-Broker, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including legal fees.  The provisions of this Article shall survive the Closing of Title.

## 23.  **AGREEMENT MAY NOT BE ASSIGNED**

Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed.  Any purported assignment by Purchaser in violation of this Agreement will be voidable at the option of Sponsor.  Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor.  If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement, then Purchaser shall have such right, provided that (i) Purchaser designates such assignee at least 10 business days prior to the Closing Date; (ii) Purchaser delivers to Attorney for Sponsor the fee set forth in the Plan for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing is not delayed as a result of such assignment , (iv) the assignee of this Agreement assumes in writing, by an instrument prepared by Attorney for Sponsor, the obligations of Purchaser under this Agreement and (v) the assignment is made without consideration.  Any purported assignment by Purchaser in violation of this Agreement shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement, and shall be voidable at the option of Sponsor.

## 24.  **BINDING EFFECT**

The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor.  This Agreement shall not be binding on Sponsor until a fully executed counterpart hereof has been delivered to Purchaser or the Attorney for Purchaser.  If this Agreement is not accepted within 30 days from the delivery to Sponsor of this Agreement executed by Purchaser together with the Premium Payment by the

delivery to Purchaser of a fully executed counterpart, this Agreement shall be deemed to have been rejected and cancelled and the Premium Payment shall be returned to Purchaser within 30 days thereafter. Upon such refund being made, neither party shall have any further rights, obligations liability to or against the other hereunder or under the Plan. Prior to Sponsor's countersigning and returning this Agreement to Purchaser, and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's race, creed, color, sex, sexual orientation, disability, marital status, age, ancestry, national origin or other ground proscribed by Law.

## 25.  **NOTICES**

25.1  Any notice, election, demand, request, letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to the Attorney for Purchaser at the address given at the beginning of this Agreement with a copy to the Purchaser at the address given at the beginning of this Agreement by regular mail, and to the Attorney for Sponsor at the address given at the beginning of this Agreement, with a copy to Sponsor at the address given at the beginning of this Agreement by regular mail. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent. Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the 3 business days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address. Any notice either of the parties hereto receives from the other party's attorneys shall be deemed to be notice from such party itself.

25.2  Sponsor hereby designates and empowers both the Selling Agent and Attorney for Sponsor, as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

25.3  Purchaser hereby designates and empowers the Attorney for Purchaser, as Purchaser's agent to give any notice to Sponsor under this Agreement in Purchaser's name, which notice so given shall have the same force and effect as if given by Purchaser.

## 26.  **JOINT PURCHASERS**

The term "Purchaser" shall be read as "Purchasers" if more than one person are Purchasers, in which case their obligations shall be joint and several.

## 27.  **LIABILITY OF SPONSOR**

Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, weather, fire, flood, explosion, war, riot, sabotage, epidemics, quarantine, acts of terrorism, freight embargos, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, unavailability of utilities, failure of transportation, governmental restrictions, preemptions or approvals, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

## 28.  FURTHER ASSURANCES

Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

## 29.  AGREEMENT NOT CONTINGENT UPON FINANCING

The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement and Sponsor shall have no liability as a result of any scheduling or adjournment of the Closing beyond the expiration of the loan commitment.

## 30.  COSTS OF ENFORCING AND DEFENDING AGREEMENT

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

## 31.  SEVERABILITY

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

## 32.  STRICT COMPLIANCE

Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

## 33.  GOVERNING LAW

The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

## 34.  WAIVER OF JURY

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert

any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

## 35. ENTIRE AGREEMENT

This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

## 36. CERTAIN REFERENCES

A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The terms "herein," "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections or other provisions are references to Articles, Sections, subsections or other provisions of this Agreement.

## 37. CAPTIONS

The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

## 38. SUCCESSORS AND ASSIGNS

The provisions of this Agreement shall bind and enure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and enure to the benefit of Sponsor and its successors and assigns.

## 39. CONFIDENTIALITY

Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of this Agreement confidential, except that Sponsor shall be permitted to disclose that an Option Agreement has been executed for the Unit and the purchase price thereunder, but not the identity of Purchaser or its principals. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, brokers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement. Any failure by Purchaser to keep the terms and conditions of this Agreement confidential shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

## 40. LETTER OF CREDIT IN LIEU OF PREMIUM PAYMENTS IN ESCROW

Purchaser acknowledges and agrees that Sponsor has the right, in its sole discretion, to elect to withdraw the Premium Payment and secure it with a Letter of Credit as more fully set forth in the Plan and Purchaser hereby consents to such withdrawal of the funds from escrow.

## 41. NO ORAL CHANGES

This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

## 42.    PERFORMANCE

Where this Agreement by its terms requires the payment of money or the performance of a condition on a Saturday, Sunday or public holiday, such payment may be made or condition performed on the next business day succeeding such Saturday, Sunday or such public holiday, with the same force and effect as if made or performed in accordance with the terms of this Agreement.

## 43.    COUNTERPARTS

This Agreement may be executed in any number of original, email, pdf or facsimile counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Agreement.

## 44.    WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY.

44.1    The provisions of this Article shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement or the Condominium Documents.

44.2    If Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to diplomatic or sovereign immunity, Purchaser expressly and voluntarily waives such immunity and consents to any suit, action or proceeding arising out of or relating to this Agreement or the Condominium Documents being brought in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents, and hereby designates and authorizes a lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents.

44.3    If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. Section 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

## 45.    CERTIFICATION OF SPONSOR AND PRINCIPAL

Consistent with a recent First Department decision, the principal of Sponsor expressly disclaims the existence of any private right of action for contract claims by individual unit owners (or a board on their behalf) in connection with or arising solely from such principal's execution of the Certification of Sponsor and Principal, absent liability under another statute or under an alter-ego or other veil-piercing theory. See Board of Managers of 184 Thompson Street Condominium v. 184 Thompson Street Owner LLC. et al, 2013 N.Y. Slip Op 03574 (1st Dept. May 16, 2013).

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

<strong>PURCHASER(S):</strong>

_____
(signature)

_____
(signature)

**SPONSOR:**

**41-45 Property Owner, LLC**

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC, its member

By:_____
Name:        Arthur Zeckendorf
Title:        Member

By: WLZ 43-45 East 60th, LLC, its member

By:_____
Name:        William Lie Zeckendorf
Title:        Member

By: 41 East 60th Street Associates, L.P., its member

By: 41-60 Genpar Corp., its general partner

By:_____
Name:        Peter Allen
Title:        Vice President

By: Park Sixty LLC, its member

By:_____
Name:        Rafael Nasser
Title:        Member

## SCHEDULE A

## PERMITTED ENCUMBRANCES

1.  Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.  Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not render title uninsurable without additional premium to Purchaser and would not prevent the use of the Unit for dwelling purposes.

3.  The terms, burdens, covenants, restrictions, conditions, easements and Rules and Regulations, all as set forth in the Declaration, the By-laws (and the Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4.  Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.  Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6.  Revocability of licenses for vault space, if any, under the sidewalks and streets.

7.  Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8.  Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9.  Leases and service, maintenance, employment, concessionaire and Ancillary Amenity Licenses, if any, of other Units or portions of the Common Elements.

10. The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the Closing of Title.

11. The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12. Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13. Any encumbrance as to which the Title Company (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such

encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien.

14. Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes.

15. Any lease covering the Unit(s) made from Sponsor to the Purchaser.

16. Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17. Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18. Any Temporary or Permanent Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

19. Any encumbrance, covenant, easement, agreement, or restriction against the Property set forth in the form of Unit Owner's Specimen Title Policy prepared by the Title Company set forth in Part II of the Plan, as the same may be updated from time to time.

**SCHEDULE B**

**INSPECTION STATEMENT**

Date: _____

41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, New York 10022

    Re:    Unit No: _____ ("Unit")
            520 Park Avenue Condominium
            520 Park Avenue
            New York, New York 10022 ("Condominium")

Ladies and Gentlemen:

1.    On the date hereof, the undersigned purchaser(s) ("Purchaser") inspected the Unit which Purchaser is acquiring from Sponsor and have found the Unit to be in good condition, except as otherwise noted below.

2.    Purchaser acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date Purchaser moves into the Building. Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.    In the event Purchaser performs work in the Unit of any kind affecting any of the areas or items listed above after the Closing, Sponsor will be relieved of any and all obligations related to the items listed herein.

**PURCHASER(S):**

_____
(signature)

_____
(signature)

_____
    Sponsor's Representative

## SCHEDULE C

## RIDER TO OPTION AGREEMENT RE: ESCROW PROVISIONS

This Rider is made as of _____, _____ between Sponsor, Purchaser and Escrow Agent.

Re:    Unit No: _____ ("Unit")
520 Park Avenue Condominium
520 Park Avenue
New York, New York 10022 ("Condominium")

## 1.    ESCROW AND TRUST FUND REQUIREMENTS

All deposits, down payments, advances and payments made by Purchasers prior to the Closing ("Premium Payments") will be held in escrow in conformity with the disclosure contained in this Section of the Plan and in accordance with the escrow provisions contained in the Option Agreement.

Sponsor will comply with the escrow and trust fund requirements of General Business Law Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated pursuant thereto. The Department of Law may perform random reviews and audits of any records involving escrow accounts to determine compliance with statute and regulation.

Any provision of any contract or agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of Escrow Agent holding trust funds is absolutely void. The provisions of the Attorney General's regulations concerning escrow/trust funds shall prevail over any conflicting or inconsistent provision in the Plan or in the escrow agreement or Option Agreement. Purchasers shall not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds. However, notwithstanding anything to the contrary set forth herein or anywhere else in the Plan, in the Event of Default by Purchaser, as that term is defined the Option Agreement, Purchaser shall be obligated to reimburse Sponsor for any legal fees, expenses and disbursements incurred by Sponsor in defending Sponsor's rights under the Option Agreement or otherwise enforcing Purchaser's obligations thereunder.

All Premium Payments made by Purchasers prior to the Closing of each individual transaction will be placed in a segregated special escrow account of Starr Associates LLP, the escrow agent ("Escrow Agent"), whose address is 245 Fifth Avenue, Suite 1102, New York, New York 10016 and whose telephone number is (212) 620-2680. The attorneys who are signatories on these accounts authorized to withdraw funds, acting singly, are: Allan Starr, Esq., Andrea L. Roschelle, Esq., Samantha Sheeber, Esq. and Jane Rosenberg, Esq. ("Authorized Signatories"). All Authorized Signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any Authorized Signatory is the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

Escrow Agent has established a master escrow account entitled "Starr Associates LLP, Escrow Account" ("Master Escrow Account") at JPMorgan Chase Bank located at 270 Park Avenue, New York, New York 10017 and Citibank located at 717 Sixth Avenue, New York, New York 10010 ("Escrow Banks"). Each Escrow Bank is authorized to do business in the State of New York. Premium Payments properly made payable to "Starr Associates LLP, as Escrow Agent" will be placed in one of the Master Escrow Accounts within 5 business days after tender by Purchaser to Sponsor or Selling Agent. Any subsequent Premium Payment tendered by Purchaser after the Initial Premium Payment will be placed in any

one of the Master Escrow Accounts within 10 business days after tender by Purchaser to Sponsor or Selling Agent.

All Premium Payments will be placed initially in the non-interest bearing portion of the Master Escrow Account (including Unit Upgrade Funds). Each Purchaser is required to deliver a completed and signed Form W-9 (Request for Taxpayer Identification Number) or a Form W-8 (Certificate of Foreign Status) in the forms set forth in Part II to the Plan, to Sponsor or Selling Agent at the time Purchaser tenders the Premium Payment and the Option Agreement. If a Premium Payment is accompanied by a completed and signed Form W-9 or Form W-8, the Premium Payment will thereafter be promptly transferred to an individual interest bearing sub-escrow account in the name of Purchaser (except for Premium Payments for Unit Upgrade Funds). If a Purchaser does not deliver the Form W-9 or Form W-8, the Premium Payment will remain in the non-interest bearing portion of the Master Escrow Account. At such time as the Premium Payment is released, the Premium Payment will be transferred from the individual sub-escrow account to the non-interest bearing portion of the Master Escrow Account so that checks may be drawn thereon. The Master Escrow Account is not an IOLA account.

All Premium Payments, except for Unit Upgrade Funds, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, until such time as Sponsor is entitled to the Premium Payment as per GBL § 352-h. Unit Upgrade Funds will initially be placed in the Master Escrow Account. However, Purchasers should note that such funds may be released from the Master Escrow Account by Escrow Agent to Sponsor to pay, or reimburse Sponsor, for such upgrades or extras. As a result, in the event Sponsor cancels the Option Agreement or Purchaser is entitled to rescind the Option Agreement in accordance with the Plan, Purchaser will not receive a refund of any of the Unit Upgrade Funds. Escrow Agent shall be under no duty to verify that Sponsor used or committed such funds for Unit Upgrade Funds.

The sub-escrow account number and the initial interest rate, if any, will be disclosed to each Purchaser, as appropriate, in a letter from Escrow Agent to each Purchaser sent within 10 business days after the tender of the Premium Payment. If Purchaser does not receive notice that the Premium Payment has been placed in the Master Escrow Account within 15 business days after tender of the Premium Payment, Purchaser may cancel the Purchase and rescind the Option Agreement so long as the right to rescind is exercised within 90 days after tender or crediting of the Premium Payment by notice delivered to Sponsor and to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, New York 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Premium Payment was timely deposited and requisite notice was timely mailed to Purchaser in conformity with the Attorney General's regulations. Escrow Agent will not be required to send the letter referred to above to each Purchaser in connection with any additional Premium Payments tendered by Purchaser after the Initial Premium Payment (or in connection with any changes in the interest rate).

Escrow Agent shall maintain the Master Escrow Account under its direct supervision and control. A fiduciary relationship shall exist between Escrow Agent, and Purchaser, and as set forth in the Escrow Agreement Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352(e)(2-b) and 352(h).

Under current Law, the sub-accounts at the Escrow Bank are insured by the Federal Deposit Insurance Corporation ("FDIC") to a maximum of $250,000 per individual Premium Payment. The following are SPECIAL RISKS of this offer: (i) if a Purchaser makes a Premium Payment in excess of $250,000 such Premium Payment will not be FDIC insured in excess of $250,000; and (ii) while the Premium Payment is in the non-interest bearing portion of the Master Escrow Account, the Premium Payment may not be fully FDIC insured even if the Premium Payment does not exceed $250,000. No representation is made with respect to any further changes in Law which may increase or decrease such limit.

The Premium Payment may be tendered by Purchaser to Sponsor or Selling Agent by either personal delivery, delivery by messenger or courier service or mailed by certified mail, return receipt requested, overnight courier or express mail service. The Premium Payment shall be deemed tendered by Purchaser on the date it is actually received by Sponsor or Selling Agent.

Acceptance of the Premium Payment by Sponsor or Selling Agent and the Premium Payment thereof by Escrow Agent into escrow shall not be deemed a binding agreement by Sponsor to sell to Purchaser unless and until Purchaser executes an Option Agreement and Sponsor or Selling Agent executes a duplicate thereof and delivers the Option Agreement to Purchaser in accordance with the terms of the Plan. All Premium Payments made by check are subject to collection.

If a Purchaser tenders a Premium Payment without an executed Option Agreement, Sponsor shall have the right to reject the Premium Payment and return it to Purchaser: (i) within 5 business days after tender, if the Premium Payment has not been deposited into escrow, and (ii) within 10 business days, if the Premium Payment has been deposited into escrow and the Option Agreement has not yet been delivered by Purchaser. In the event a Premium Payment or portion thereof is delivered by wire transfer to Escrow Agent, any wiring fees charged by the initiating and/or receiving banks will be Purchaser's obligation.

The checking account portion of the Master Escrow Account will not be interest-bearing. The sub-escrow account portion of the Master Escrow Account will be interest-bearing. All interest will be credited to Purchaser at such time as: (i) there is a closing under the Option Agreement, or (ii) Purchaser is entitled to a return of the Premium Payment. All interest will be credited to Sponsor only in the event there is a "consummation of the Plan" (as such term is defined in the Attorney General's regulations) and Purchaser defaults. The interest rate to be earned will be the prevailing rate for these accounts. As of December 31, 2012 , the interest rate for the Escrow Bank is .15%. The interest rate is subject to change by the Escrow Bank. Sponsor makes no guarantee of, and shall have no liability to Purchaser for changes to, the interest rate. Interest will begin to accrue within: (x) 3 business days, if the Premium Payment is cash or cash equivalent, or (y) 5 business days, if the Premium Payment is other than cash or cash equivalent, of the transfer of the Premium Payment from the checking account portion of the Master Escrow Account into the sub-escrow account portion of the Master Escrow Account, as determined by whether and when the Premium Payment clears.

All instruments shall be made payable directly to the order of "Starr Associates LLP, as escrow agent." Endorsed instruments will not be accepted.

If a check delivered by a Purchaser fails for collection, the Option Agreement will be deemed void ab initio (as if the Option Agreement had never been executed).

Sponsor or its agents, including any selling agents, shall deliver to Escrow Agent all Premium Payments within two (2) business days of tender of the Premium Payment by a Purchaser, using such transmittal forms as required by Escrow Agent from time to time. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary and statutory obligations set forth in GBL §§ 352(e)(2-b) and 352(h) and the Department of Law's regulations promulgated thereto.

Under no circumstances shall Sponsor seek the release of the Premium Payments of a defaulting Purchaser until after consummation of the Plan (i.e., the Effective Date). Consummation of the Plan does not relieve Sponsor of its obligations pursuant to General Business Law Section 352-h.

Escrow Agent shall release the Premium Payments if so directed:

(i)     pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit; or

(ii)    in a subsequent writing signed by both Sponsor and Purchaser; or

(iii)     by a final, non-appealable order or judgment of a court.

If the Premium Payments are not released pursuant to this paragraph and Escrow Agent receives a request by Sponsor or Purchaser to release the Premium Payments, Escrow Agent shall give both parties prior written notice of not fewer than 30 days before releasing the Premium Payments. If Escrow Agent has not received notice of objection to the release of the Premium Payments at the expiration of the 30 day period, the Premium Payments shall be released and Escrow Agent shall provide further written notice to both parties informing them of the release of the Premium Payments. If Escrow Agent receives a written notice from either party objecting to the release of the Premium Payments within the 30 day period set forth in the notice, Escrow Agent shall continue to hold the Premium Payments until otherwise directed pursuant to subsections (i) through (iii) of this paragraph. However, Escrow Agent shall also have the right at any time to deposit the Premium Payments with the clerk of a court in the county in which the Unit is located and shall give written notice to both parties of such deposit.

Sponsor will not object to the release of the Premium Payments to:

(i)      a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan,

(ii)     all Purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

The Option Agreement provides that Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Premium Payment to Sponsor in the event Sponsor and Purchaser close title under the Option Agreement.

If Sponsor elects to change the Escrow Bank and/or Escrow Agent, such change will be disclosed in a duly filed amendment to the Plan prior to transferring any Premium Payments.

Sponsor may, upon application approved by the Department of Law, elect to withdraw Premium Payments from the Master Escrow Account and secure all or any portion of the Premium Payments withdrawn by delivering to Escrow Agent or another escrow agent designated by Sponsor, one or more irrevocable letters of credit (collectively, "Letter of Credit") or other alternate security approved by the Department of Law, in accordance with the terms and conditions set forth below. All Premium Payments withdrawn from the Master Escrow Account shall be paid to the Construction Lender pursuant to a collateral assignment and pledge by Sponsor to the Construction Lender or disbursed to Sponsor subject to the approval by the Construction Lender of the amount of the withdrawal. The amount of the Letter of Credit will be at least 125% of the aggregate of all Premium Payments expected to be received from Purchasers, and not retained in escrow, during such period of time as the Letter of Credit will be needed. Sponsor reserves the right at any time and from time to time to increase or decrease the amount of the Letter of Credit, by a duly filed amendment to the Plan provided, however, the aggregate amount of the Letter of Credit shall at no time be less than the aggregate of all Premium Payments, if any, withdrawn by Sponsor for use in construction, less any sums returned to Purchasers or otherwise disbursed in accordance with the Plan. Premium Payments will cease to earn interest upon withdrawal from the Master Escrow Account.

**PURCHASERS WILL EARN NO INTEREST ON PREMIUM PAYMENTS WHICH ARE DEPOSITED IN SPONSOR'S CONSTRUCTION FUND ACCOUNT, EXCEPT DURING SUCH PERIODS AS THE PREMIUM PAYMENTS ARE PLACED IN THE INTEREST BEARING PORTION OF THE MASTER ESCROW ACCOUNT.**

The Letter of Credit shall name Escrow Agent as beneficiary to act as a fiduciary for the benefit of all Purchasers under the Plan. The Letter of Credit will provide that Escrow Agent shall have sole power to draw upon the Letter of Credit without the consent or despite the objection of Sponsor or the issuer bank, at such times or upon such events as set forth below.

The Letter of Credit will continue in effect, or shall be periodically renewed, until the Closing of Title to all Units for which Premium Payments have been placed in Sponsor's construction fund account.

Escrow Agent shall be entitled to release the Premium Payments to Sponsor provided that the Escrow Agent has documentation showing that the Letter of Credit or renewal or replacement Letter of Credit has been issued in accordance with this Section of the Plan and is in effect.

Escrow Agent, as the beneficiary of the Letter of Credit, acting as fiduciary for the benefit of Purchasers under the Plan whose Premium Payments were released from escrow, shall have the duty and the right to draw upon and collect the proceeds of the Letter of Credit, 10 business days after notice to Sponsor and Sponsor's failure or refusal to restore such Premium Payments to Escrow Agent, without the consent or despite the objection of Sponsor or the issuer bank, upon the following events or circumstances:

(i)     timely rescission of an Option Agreement by a Purchaser pursuant to an offer of rescission contained in the Plan or an amendment to the Plan;

(ii)    acceptance for filing by the Department of Law of an amendment abandoning the Plan;

(iii)   pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit;

(iv)    in a subsequent writing signed by both Sponsor and Purchaser;

(v)     by a final, non-appealable order or judgment of a court;

(vi)    failure by Sponsor to obtain a renewal or replacement Letter of Credit no later than 60 days prior to the expiration of the existing Letter of Credit;

(vii)   direction by Sponsor upon request of Purchaser; or

(viii)  notice of impending cancellation of the Letter of Credit has been given or received, or the issuer bank has filed a bankruptcy or insolvency petition or has been taken over by a federal or state authority, and no proper replacement of the Letter of Credit has been furnished.

Upon payment to Escrow Agent of a drawing under the Letter of Credit, to the extent that Escrow Agent has no further obligation to hold the proceeds of such Letter of Credit in accordance with this Section of the Plan, Escrow Agent shall remit the Premium Payments to the relevant Purchaser to the extent required by this Section of the Plan and shall remit the excess amount (if any) of such proceeds over the Premium Payment to the Construction Lender (or, if no Construction Lender shall exist, to Sponsor).

The sole obligation of the issuer bank under or in connection with the Letter of Credit is to pay to Escrow Agent the amount drawn under the Letter of Credit pursuant to a conforming drawing thereunder. In no event shall the issuer bank, or the Construction Lender be liable for the use of the proceeds of any drawing by Escrow Agent and no Purchaser shall have any recourse whatsoever to the issuer bank, or the Construction Lender with respect to the use of such Premium Payments, other than the issuer bank's liability on the fronting bank for such Letters of Credit.

Escrow Agent is acting merely as a stakeholder. Escrow Agent makes no representation with regard to and shall not be responsible for the maintenance by Sponsor of the Letter of Credit. Upon payment of the Premium Payment pursuant to the Plan, Escrow Agent shall be fully released from all liability and obligation with respect to the Premium Payment. Escrow Agent shall accept a Premium Payment made by check made payable subject to collection.

Set forth in Part II of the Plan is a copy of the form of escrow agreement between Sponsor and Escrow Agent which incorporates the terms of the Attorney General's regulations. Purchaser's execution of the Option Agreement shall be deemed to constitute Purchaser's acceptance of the terms of the escrow

provisions set forth herein and the escrow agreement set forth in the Plan. Escrow Agent shall be a signatory to the Option Agreement solely with respect to Escrow Agent's obligations as set forth herein and the escrow agreement set forth in the Plan

Escrow Agent shall be permitted to act as counsel to Sponsor in any dispute as to the disbursement of the Premium Payment or any other dispute between Sponsor and a Purchaser whether or not Escrow Agent is in possession of the Premium Payment and continues to act as Escrow Agent.

Escrow Agent may rely upon any document which may be submitted to it in connection with its duties under this Section and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof.

Sponsor has agreed to indemnify Escrow Agent from all claims, losses, judgments, costs, expenses and damages, including those brought by third-parties, including purchasers, incurred in connection with or arising out of the escrow agreement or the performance or non-performance of Escrow Agent's duties under the Escrow Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the Escrow Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, professional fees, including attorneys' fees, court costs and disbursements, either paid to retain attorneys or representing the value of all legal services rendered by Escrow Agent to itself and any and all attorneys' and professional fees, court costs, expenses and disbursements incurred by Escrow Agent in connection with a bankruptcy case filed by Sponsor for protection under the United States Bankruptcy Code, the enforcement of any rights, or defense of any claims against Escrow Agent in any bankruptcy proceeding, or any other matter arising in or in connection with Sponsor's bankruptcy case.

Sponsor has agreed to compensate Escrow Agent for services rendered in connection with Escrow Agent's duties under the escrow agreement. Escrow Agent's fees and disbursements will neither be paid by Sponsor from the Premium Payment nor deducted from the Premium Payment by any financial institution under any circumstance.

Escrow Agent and all Authorized Signatories submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of their obligations with respect to this Section or otherwise concerning the maintenance of or release of the Premium Payments from escrow.

Escrow Agent will maintain all records concerning the Master Escrow Account for 7 years after the release of Premium Payments.

## 2. DEFINITIONS

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Option Agreement to which this Rider is annexed or in the Plan.

## 3. CONFLICTS

In the event of any inconsistency between the provisions of this Rider and those contained in the Option Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

## 4. FULL FORCE AND EFFECT

Except as set forth in this Rider, all of the terms and conditions of the Option Agreement remain unchanged and in full force and effect.

## 5.    COUNTERPARTS

This Rider may be executed in any number of original, e-mail, pdf or facsimile counterparts.  Each such counterpart shall for all purposes be deemed an original.  All such counterparts shall together constitute but one and the same Rider.

**PURCHASER(S):**

_____
(signature)

_____
(signature)

**SPONSOR:**

41-45 Property Owner, LLC

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC
its member

By:_____
Name:Arthur Zeckendorf
Title:  Member

By: WLZ 43-45 East 60th, LLC, its member

By:_____
Name:William Lie Zeckendorf
Title:  Member

By:  41 East 60th Street Associates, L.P.
its member

By: 41-60 Genpar Corp., its general partner

**ESCROW AGENT:**

Executed solely in connection with the provisions set forth in this Escrow Rider.

STARR ASSOCIATES LLP

By:_____
Name:   Samantha Sheeber
Title:   Partner

By:_____
Name:Peter Allen
Title:  Vice President

By:  Park Sixty LLC, its member

By:_____
Name:   Rafael Nasser
Title:   Member

**SCHEDULE D**

**RIDER TO OPTION AGREEMENT RE: ANCILLARY AMENITY**

This Rider is made as of _____, _____ between Sponsor and Purchaser.

Re:  Unit No: _____ ("Unit")
520 Park Avenue Condominium
520 Park Avenue
New York, New York 10022 ("Condominium")

1.  ANCILLARY AMENITY LICENSE

Sponsor agrees to sell and Purchaser agrees to purchase [ANCILLARY AMENITY TYPE] #_____ for a Purchase Price of $_____.  The Ancillary Amenity License to use the [ANCILLARY AMENITY TYPE] shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan.

The Purchase Price is payable as follows:

(a)  $_____ ("Initial Premium Payment"), due upon Purchaser's signing and delivering this Agreement, by check (subject to collection), receipt of which is hereby acknowledged;

(b)  $_____ ("Additional Premium Payment;" the term "Premium Payment," as used herein, refers to both the Initial Premium Payment and, if the same has been paid at the time in question, the Additional Premium Payment), is due upon the earlier to occur of (i) 6 months after Purchaser executes this Agreement, or (ii) within 15 days of the Presentation Date of the amendment declaring the Plan effective; and

(c)  $_____ (the "Exercise Price"), by good certified check of Purchaser or official bank check, payable on the delivery of the deed as hereinafter provided.

(d)  If Purchaser is signing this Agreement after the Plan is declared effective, the Initial Premium Payment and Additional Premium Payment shall be due upon Purchaser's signing this Agreement.

2.  RE-DESIGNATION OF [ANCILLARY AMENITY TYPE]

Sponsor reserves the right at or prior to Closing to designate a different [ANCILLARY AMENITY TYPE] in lieu of the [ANCILLARY AMENITY TYPE] set forth above, provided the new [ANCILLARY AMENITY TYPE] is equal to or greater in size and has the same Purchase Price.

3.  TEMPORARY CERTIFICATE OF OCCUPANCY

Purchaser will be required to consummate the purchase of the Unit and the [ANCILLARY AMENITY TYPE] simultaneously at Closing, even though a Temporary Certificate of Occupancy has not been issued, and access may not be available for the [ANCILLARY

AMENITY TYPE] Area of the Building. In such event, the proceeds from the sale of the Ancillary Amenity License will be held in escrow ("Ancillary Amenity Escrow") by Escrow Agent until such time as a Temporary Certificate of Occupancy has been issued for the [ANCILLARY AMENITY TYPE] Area in which the [ANCILLARY AMENITY TYPE] is located. The Ancillary Amenity Escrow will not be held in an interest bearing escrow account for the benefit of Purchaser. Purchaser will earn no interest on the Ancillary Amenity Escrow.

4.    DAMAGE TO THE [ANCILLARY AMENITY TYPE] AREA

If there is a fire or other casualty to the [ANCILLARY AMENITY TYPE] Area and Sponsor does not elect to repair or restore such area following such fire or casualty, then the Option Agreement shall be deemed modified to provide for the Closing of Title with respect to the Unit only. In such event, the Exercise Price of the Unit shall be reduced by the amount of the Premium Payment paid pursuant to the terms of this Rider.

5.    WITHDRAWAL OF [ANCILLARY AMENITY TYPE]

As set forth in the Plan, Sponsor reserves the right to withdraw the offering of the [ANCILLARY AMENITY TYPE]. The withdrawal of the offering of the [ANCILLARY AMENITY TYPE] will be disclosed by Sponsor in an amendment to the Plan and Purchaser shall only be relieved of Purchaser's obligation to purchase the [ANCILLARY AMENITY TYPE], but shall remain obligated to purchase the Unit. At Closing, Purchaser will receive a credit against the Exercise Price equal to the amount allocated to the withdrawn [ANCILLARY AMENITY TYPE], to the extent any such money has been delivered to Sponsor.

6.    DEFINITIONS

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Option Agreement to which this Rider is annexed or in the Plan.

7.    CONFLICTS

In the event of any inconsistency between the provisions of this Rider and those contained in the Option Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

8.    FULL FORCE AND EFFECT

Except as set forth in this Rider, all of the terms and conditions of the Option Agreement remain unchanged and in full force and effect.

**PURCHASER(S):**

_____
(signature)

_____
(signature)

**SPONSOR:**

**41-45 Property Owner, LLC**

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC, its member

By:_____
Name:    Arthur Zeckendorf
Title:    Member

By: WLZ 43-45 East 60th, LLC, its member

By:_____
Name:    William Lie Zeckendorf
Title:    Member

By: 41 East 60th Street Associates, L.P., its member

By: 41-60 Genpar Corp., its general partner

By:_____
Name:    Peter Allen
Title:    Vice President

By: Park Sixty LLC, its member

By:_____
Name:    Rafael Nasser
Title:    Member

**UNIT DEED**