# EXHIBIT B

## OPTION AGREEMENT

## 41-45 PROPERTY OWNER, LLC

**Sponsor**

**With**

## CDM1, LLC

**Purchaser**

**Unit Number PH-58**

**520 PARK AVENUE CONDOMINIUM**
**520 PARK AVENUE**
**NEW YORK, NEW YORK 10022**

{v.5}

| | | |
|---|---|---|
| 34. | WAIVER OF JURY | 14 |
| 35. | ENTIRE AGREEMENT | 14 |
| 36. | CERTAIN REFERENCES | 14 |
| 37. | CAPTIONS | 14 |
| 38. | SUCCESSORS AND ASSIGNS | 14 |
| 39. | CONFIDENTIALITY | 15 |
| 40. | LETTER OF CREDIT IN LIEU OF PREMIUM PAYMENTS IN ESCROW | 15 |
| 41. | NO ORAL CHANGES | 15 |
| 42. | PERFORMANCE | 15 |
| 43. | COUNTERPARTS | 15 |
| 44. | WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY. | 15 |
| 45. | CERTIFICATION OF SPONSOR AND PRINCIPAL | 16 |
| 46. | PURCHASER'S REPRESENTATIONS | 16 |
| 47. | PURCHASE BY AN ENTITY [IF APPLICABLE] | 17 |

SCHEDULE A – PERMITTED ENCUMBRANCES
SCHEDULE B – INSPECTION STATEMENT
SCHEDULE C – RIDER TO OPTION AGREEMENT RE: ESCROW PROVISIONS
SCHEDULE D – RIDER TO OPTION AGREEMENT

**520 PARK AVENUE CONDOMINIUM**
**520 PARK AVENUE**
**NEW YORK, NEW YORK 10022**

-- OCT 06 2017 ---------

AGREEMENT, made as of _____ , ____ . , between Sponsor and Purchaser (defined below).

W I T N E S S E T H :

1.    **THE PLAN**

Purchaser acknowledges having received and read a copy of the Offering Plan for the 520 Park Avenue Condominium and all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") at least 3 business days prior to Purchaser's signing this Agreement. If Purchaser has not received and read the Plan and all amendments thereto at least 3 business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement, by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within 7 days from the date Purchaser delivers an executed Option Agreement together with the required Premium Payment to the Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.

2.    **DEFINITIONS**

Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1    "Sponsor" means 41-45 Property Owner, LLC, having an office at 445 Park Avenue, Suite 1902, New York, New York 10022. Sponsor's taxpayer identification number is 46-1878456.

2.2.    "Purchaser" means CDM1, LLC, a Delaware Limited Liability Company, having an address at 4455 E. Camelback Rd., Suite D145, Phoenix, AZ 85018. Purchaser's social security number is 94-3380346.

2.3    "Attorney for Sponsor" means Starr Associates LLP, having an address at 220 East 42 Street, Suite 3302, New York, New York 10017; Attention: Samantha Sheeber, Esq. Telephone Number: (212) 620-2682. Fax Number: (212) 696-5013. E-mail address: ssheeber@starr-lawfirm.com.

2.4    "Attorney for Purchaser" means Ogeka Associates, LLC, having an address at 110 Mill Rd., Suite 2, Westhampton Beach, New York 11978. Attention: Charles Ogeka, Esq. Telephone number: (631)

288-3200. Facsimile number: (631) 288-8500. E-mail address: charlesogeka@gekaassociates.com. **Purchaser has the exclusive right to change the "Attorney for Purchaser" at any time, and will notify Sponsor of any such change.**

2.5 "Selling Agent" means Zeckendorf Marketing, LLC, having an address at 770 Lexington Avenue, New York, New York 10065.

2.6 "Co-Broker" means N/A.

2.7 "Escrow Agent" means Attorney for Sponsor.

2.8 "Title Company" means First American Title Insurance Company, having and office at 633 Third Avenue, New York, New York 10017. Telephone Number: (212) 551-9402.

## 3. **THE UNIT**

Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser hereby acquires from Sponsor, an option to purchase the Unit designated as Unit **PH-58** in the Declaration ("Unit"), together with its undivided 2.3715% interest in the Common Elements appurtenant to such Unit.

## 4. **PURCHASE PRICE**

4.1 The Purchase Price for the Unit ("Purchase Price") is $34,000,000.00.

The Purchase Price is payable as follows:

(a) $8,500,000.00 ("Premium Payment"), due upon Purchaser's signing and delivering this Agreement, by check (subject to collection) **or wire transfer,** receipt of which is hereby acknowledged; and

(b) $25,500,000.00 ("Exercise Price"), by good certified check of Purchaser or official bank check **or wire transfer,** payable on the delivery of the deed as hereinafter provided.

4.2 All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the New York Clearing House Association and shall be unendorsed. The Premium Payment shall be made payable to the direct order of "Starr Associates LLP, as Escrow Agent." The Balance shall be made payable to the direct order of "41-45 Property Owner, LLC"(or such other party as Sponsor directs to Purchaser, in writing, at least 1 business day prior to the date of Closing of Title). If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 13 hereof. Notwithstanding the foregoing, if the check representing the Premium Payment is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and this Agreement shall automatically be deemed cancelled. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 5. **PREMIUM PAYMENT TO BE HELD IN TRUST**

All Premium Payments made pursuant to this Agreement are subject to the requirements of Sections 352-e(2) (b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto. All monies received from Purchaser towards the Premium Payment shall be delivered to Escrow Agent and shall be held in accordance with the Section of the Plan entitled "Escrow and Trust Fund Requirements" a copy of which is annexed hereto as Schedule C and made a part hereof. By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Premium Payment to Sponsor in the event Sponsor and Purchaser close title under this Agreement. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchaser's default, the Premium Payment shall be returned to Purchaser, within 30 business days of Sponsor's notification to Purchaser that it cannot convey title.

## 6. **CLOSING DATE AND PLACE**

6.1     The Closing of Title shall be held at the offices of Starr Associates LLP, 220 East 42 Street, Suite 3302, New York, New York (or such other place in the City and State of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than 30 days' prior notice ("Initial Closing Notice"). After the Initial Closing Notice, Sponsor may, from time to time, adjourn and reschedule the date and hour for Closing at any time on notice to Purchaser, which new Closing notice shall fix a new date, hour and place for the Closing. The rescheduled Closing shall not be earlier than: (a) the date set forth in the Initial Closing Notice or, (b) 5 days from the date of Sponsor's Closing adjournment notice. These notice provisions may be modified or waived by an agreement signed by Sponsor and Purchaser. If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Attorney for Sponsor at Closing an extra fee as set forth in the Plan.

6.2     The term "Closing Date" "Closing" "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Unit is delivered to Purchaser.

## 7. **DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY**

7.1     At the Closing of Title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances, and title conditions set forth on Schedule A annexed hereto and made a part hereof. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly complete and execute before a notary public the New York City and New York State Transfer Tax Return Forms and any other forms then required by law, all of which shall be prepared by Sponsor.

7.2     At the Closing of Title and simultaneously with the delivery of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part II of the Plan, as well as whatever other documents are reasonably necessary or customary in connection with the conveyance of a condominium unit, including but not limited to title affidavits, real property transfer tax forms, etc.

7.3     The executed deed, transfer tax forms and power of attorney shall be delivered at the Closing to the representative of the Title Company insuring Purchaser's title (or, if no such representative is present, then to the Attorney for Sponsor) for recording in the Office of the City Register, which recording shall be at Purchaser's expense. After being recorded the deed shall be returned to Purchaser and the power of attorney shall be returned to the Condominium Board.

7.4     Purchaser's payment of the Exercise Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the Closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued by the Department of Law.

## 8.     **STATUS OF TITLE**

8.1     At the Closing of Title, Sponsor shall convey to Purchaser fee simple title to the Unit, free and clear of all liens and encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof. Any lien and encumbrance or condition to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Closing of Title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Title Company (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien. Sponsor shall not be obligated to cause Purchaser's title company to omit any exceptions if the Title Company is willing to insure, without additional premium, Purchaser's title with such exception.

8.2     Sponsor shall be entitled to adjourn the Closing to remove or correct any defect in title which is not set forth in Schedule A. However, if such defect existed at least 10 days prior to the Closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the Closing of Title, then, for purposes of Article 13 below, Purchaser shall be deemed at fault for not having sent timely notice, and the Closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

8.3     If, subsequent to the Closing of Title, Purchaser claims that Sponsor did not convey fee simple title to the Unit in accordance with the Plan, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor. Sponsor and Purchaser agree that Sponsor's liability will be limited to any loss or damage not covered by Purchaser's title insurance company. If Purchaser did not obtain title insurance at the Closing, for purposes of this subparagraph, the amount and coverage which Purchaser could have obtained from Purchaser's title insurance company shall be deducted from the loss or damage collectable against Sponsor. Nothing contained in this subparagraph shall be construed to waive any of Purchaser's rights or abrogate any of Sponsor's obligations under the Plan or Article 23-A of the General Business Law. This provision shall survive Closing.

## 9.     **CLOSING ADJUSTMENTS**

9.1     The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)     real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)     common charges (if common charges have been assessed by the Condominium Board) and assessments for the month in which title closes; and

(c)     if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent and any other charges pursuant to a use and occupancy agreement, if any, covering the Unit.

9.2     If the Unit has been separately assessed for real estate taxes but the Closing of Title occurs before the tax rate is fixed, adjustment of real estate taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for real estate tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title. If the Unit has not been separately assessed for real estate taxes as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the percentage interest in the Common Elements appurtenant to the Unit. In addition, Purchaser shall pay the Unit's proportionate share of real estate taxes for the next ensuing tax period and Sponsor or the Condominium will pay such real estate taxes directly to the City of New York. Sponsor shall not be obligated to reimburse Purchaser after the Closing on account of any difference between the amount of real estate taxes for the then current tax period paid by Purchaser at Closing calculated according to the above formula and the amount of real estate taxes subsequently billed by the City of New York to such Purchaser (as Unit Owner).

9.3     Purchaser agrees that, if Sponsor obtains a refund for real estate taxes paid (or a credit for such real estate taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the Closing of Title.

9.4     Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to the Unit on the originally scheduled Closing Date (a) the Closing apportionments described in Section 9.1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual Closing of Title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's increased carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to .03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect

of Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at Closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the Closing of Title.

## 10.     MORTGAGE TAX CREDIT

In the event a mortgage recording tax credit becomes available pursuant to Section 339- ee(2) of the New York Condominium Act, it is specifically understood that such credit shall enure to the benefit of Sponsor. Accordingly, at Closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. At the Closing of Title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

## 11.     CLOSING COSTS

In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at Closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association, **or by wire transfer**.

## 12.     AGREEMENT NOT A LIEN OR ENCUMBRANCE

No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or Building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

## 13.     DEFAULT BY PURCHASER

13.1     The following shall constitute "Events of Default" hereunder:

(i)     Purchaser's failure to close title to the Unit on the scheduled Closing Date; or

(ii)     Purchaser's failure to pay when due the Exercise Price, any closing adjustment, closing cost or fee, including, without limitation, attorneys' fees required to be paid by Purchaser as set forth in the Plan or in this Agreement, or the dishonor of any check given by Purchaser to Sponsor; or

(iii)     Purchaser's failure to pay, perform or observe any of Purchaser's other obligations under this Agreement or the Plan; or

(iv)     if Purchaser is permitted to become the tenant or occupant of the Unit, Purchaser's failure to pay rent or to otherwise comply with some other lease or occupancy obligation; or

(v)     Purchaser's assignment or transfer of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(vi)     if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vii)     if a judgment or tax lien is or has been filed against Purchaser and Purchaser does not pay or bond the judgment or lien as and when demanded by Sponsor; or

(viii)     Purchaser's assignment or transfer of this Agreement without the prior written consent of Sponsor; or

(ix)     Purchaser's listing the Unit for sale or rental with any broker or placing or authorizing any listing in any broker's listing system or any other listing service or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or rental without Sponsor's prior written consent; or

(x)     an Event of Default by Purchaser beyond any applicable grace period under an Option Agreement between Purchaser and Sponsor for another Unit at the Property.

13.2     **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Exercise Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 14.     AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE

The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan. The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this

Agreement shall be deemed cancelled and the Premium Payment, together with interest earned thereon, shall be returned to Purchaser within 30 days from the filing date of the amendment abandoning the Plan. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

## 15.    SPONSOR'S INABILITY TO CONVEY THE UNIT

If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in title, substantial damage or destruction of the Building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, and if Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return to Purchaser all sums, **including** Premium Payments and all other sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment, this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice of Purchaser in writing to Sponsor within 15 days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to acquire title subject to such inability).

## 16.    FIXTURES, APPLIANCES AND PERSONAL PROPERTY

Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

## 17.    NEW CONSTRUCTION

17.1    The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications, subject to the right of Sponsor to amend the Plan and the Plans and Specification in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a Permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

17.2    The new construction of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor. Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain

variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

**17.3     Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.**

17.4     The Closing of Title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Terms of Sale" in Part I of the Plan. As a result, if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without provision for escrow), notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit.

17.5     The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the Plan entitled "Terms of Sale." Purchaser acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of Building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

## 18.     INSPECTION OF THE UNIT

18.1     Upon receipt of the Initial Closing Notice, Purchaser shall arrange an appointment with a representative of Sponsor to inspect the interior of the Unit within the 7 days prior to the Closing Date. Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the interior of the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Exercise Price when due and shall constitute Purchaser's full acceptance of the Unit as is. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

18.2     Any work set forth on the Inspection Statement shall be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be obligated to provide Sponsor and its contractors, subcontractors agents and employees, unfettered access to the Unit and any Limited Common Elements appurtenant thereto after Closing in order to complete the work on the Inspection Statement, failing which Sponsor shall be relieved of its obligations to complete

the work set forth on the Inspection Statement. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any work set forth on the Inspection Statement.

## 19. DAMAGE TO THE UNIT

If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, the following shall apply:

19.1     The risk of loss to the Unit by fire or other casualty until the earlier of Closing of Title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. If Sponsor elects to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the Closing of Title.

19.2     In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all Premium Payments and other sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all Premium Payments and other such sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

## 20. NO REPRESENTATIONS

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit, or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on Purchaser's own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Sponsor makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Unit, the Common Elements or any other part of the Property other than as set forth herein or in the Plan. Except as otherwise set forth in the Plan, Purchaser agrees (a) to purchase the Unit, without offset or any

claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the Floor Plans is accurate or correct, and (b) that Purchaser shall not be relieved of any Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article shall survive the Closing of Title.

21. **PROHIBITION AGAINST ADVERTISING**

21.1    Prior to the Closing of Title, Purchaser agrees not to list the Unit for sale or rental with any broker or place or authorize any listing in any broker's listing system or other listing service or to advertise or otherwise offer, promote or publicize the availability of the Unit for sale or rental, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion. Any such action by Purchaser prior to Closing of title shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

21.2    Prior to the first anniversary of the Sponsor Sale, Purchaser is prohibited from listing the Unit for sale with any broker or placing or authorizing any listing in any broker's listing system or other listing service or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale, without Sponsor's prior written consent, which consent may be unreasonably withheld or delayed in Sponsor's sole and absolute discretion. The provisions of this Section shall survive the Closing of Title.

22. **BROKER**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than the Selling Agent and the Co-Broker, if any, named in this Agreement, whose commissions shall be paid by Sponsor. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than the Selling Agent and the Co-Broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker, other than the Selling Agent or the Co-Broker, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including legal fees. The provisions of this Article shall survive the Closing of Title.

23. **AGREEMENT MAY NOT BE ASSIGNED**

See Sched D. 2.1

Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Agreement will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement, or for the addition, deletion or substitution of names on this Agreement, then Purchaser shall have such right, provided that (i) Purchaser designates such assignee at least 10 business days prior to the Closing Date; (ii) Purchaser delivers to Attorney for Sponsor the fee set forth in the Plan for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing is not delayed as a result of such assignment , (iv) the assignee of this Agreement assumes in writing, by an instrument prepared by Attorney for Sponsor, the obligations of Purchaser under this Agreement and (v) the assignment is made without consideration. Any purported assignment by Purchaser in violation of this Agreement shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement, and shall be voidable at the option of Sponsor.

## 24.  **BINDING EFFECT**

The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor. This Agreement shall not be binding on Sponsor until a fully executed counterpart hereof has been delivered to Purchaser or the Attorney for Purchaser. If this Agreement is not accepted within 30 days from the delivery to Sponsor of this Agreement executed by Purchaser together with the Premium Payment by the delivery to Purchaser of a fully executed counterpart, this Agreement shall be deemed to have been rejected and cancelled and the Premium Payment shall be returned to Purchaser within 30 days thereafter. Upon such refund being made, neither party shall have any further rights, obligations liability to or against the other hereunder or under the Plan. Prior to Sponsor's countersigning and returning this Agreement to Purchaser, and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's race, creed, color, sex, sexual orientation, disability, marital status, age, ancestry, national origin or other ground proscribed by Law.

## 25.  **NOTICES**

25.1    Any notice, election, demand, request, letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to the Attorney for Purchaser at the address given at the beginning of this Agreement with a copy to the Purchaser at the address given at the beginning of this Agreement by regular mail, and to the Attorney for Sponsor at the address given at the beginning of this Agreement, with a copy to Sponsor at the address given at the beginning of this Agreement by regular mail. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent. Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the 3 business days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address. Any notice either of the parties hereto receives from the other party's attorneys shall be deemed to be notice from such party itself.

25.2    Sponsor hereby designates and empowers both the Selling Agent and Attorney for Sponsor, as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

25.3    Purchaser hereby designates and empowers the Attorney for Purchaser, as Purchaser's agent to give any notice to Sponsor under this Agreement in Purchaser's name, which notice so given shall have the same force and effect as if given by Purchaser.

## 26.  **JOINT PURCHASERS**

The term "Purchaser" shall be read as "Purchasers" if more than one person are Purchasers, in which case their obligations shall be joint and several.

## 27. LIABILITY OF SPONSOR

Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, weather, fire, flood, explosion, war, riot, sabotage, epidemics, quarantine, acts of terrorism, freight embargos, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, unavailability of utilities, failure of transportation, governmental restrictions, preemptions or approvals, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

## 28. FURTHER ASSURANCES

Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

## 29. AGREEMENT NOT CONTINGENT UPON FINANCING

The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement and Sponsor shall have no liability as a result of any scheduling or adjournment of the Closing beyond the expiration of the loan commitment.

## 30. COSTS OF ENFORCING AND DEFENDING AGREEMENT

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

## 31. SEVERABILITY

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

## 32. STRICT COMPLIANCE

Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

## 33. GOVERNING LAW

The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

## 34. WAIVER OF JURY

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

## 35. ENTIRE AGREEMENT

This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

## 36. CERTAIN REFERENCES

A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The terms "herein," "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections or other provisions are references to Articles, Sections, subsections or other provisions of this Agreement.

## 37. CAPTIONS

The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

## 38. SUCCESSORS AND ASSIGNS

The provisions of this Agreement shall bind and enure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and enure to the benefit of Sponsor and its successors and assigns.

**39.** **CONFIDENTIALITY**

Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of this Agreement confidential, except that Sponsor shall be permitted to disclose that an Option Agreement has been executed for the Unit and the purchase price thereunder, but not the identity of Purchaser or its principals. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, brokers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement.

**40.** **LETTER OF CREDIT IN LIEU OF PREMIUM PAYMENTS IN ESCROW**

Purchaser acknowledges and agrees that Sponsor has the right, in its sole discretion, to elect to withdraw the Premium Payment and secure it with a Letter of Credit as more fully set forth in the Plan and Purchaser hereby consents to such withdrawal of the funds from escrow.

**41.** **NO ORAL CHANGES**

This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

**42.** **PERFORMANCE**

Where this Agreement by its terms requires the payment of money or the performance of a condition on a Saturday, Sunday or public holiday, such payment may be made or condition performed on the next business day succeeding such Saturday, Sunday or such public holiday, with the same force and effect as if made or performed in accordance with the terms of this Agreement.

**43.** **COUNTERPARTS**

This Agreement may be executed in any number of original, email, pdf or facsimile counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Agreement.

**44.** **WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY.**

44.1     The provisions of this Article shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement or the Condominium Documents.

44.2     If Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to diplomatic or sovereign immunity, Purchaser expressly and voluntarily waives such immunity and consents to any suit, action or proceeding arising out of or relating to this Agreement or the Condominium Documents being brought in any State or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents, and hereby designates and authorizes a lawful agent to receive process for and on

behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents.

44.3    If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. Section 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

## 45.    **CERTIFICATION OF SPONSOR AND PRINCIPAL**

Consistent with a recent First Department decision, the principal of Sponsor expressly disclaims the existence of any private right of action for contract claims by individual unit owners (or a board on their behalf) in connection with or arising solely from such principal's execution of the Certification of Sponsor and Principal, absent liability under another statute or under an alter-ego or other veil-piercing theory. See Board of Managers of 184 Thompson Street Condominium v. 184 Thompson Street Owner LLC. et al, 2013 N.Y. Slip Op 03574 (1st Dept. May 16, 2013).

## 46.    **PURCHASER'S REPRESENTATIONS**

46.1    Purchaser is not now, nor shall at any time prior to or at the Closing of Title, be a Person with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser, is now nor shall be at any time prior to or at the Closing of Title, be a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended, (i) is prohibited from transacting business; or (ii) with whom U.S. Persons may only, subject to the imposition of significant fines and/or penalties, transact business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC or otherwise.

46.2    Purchaser has taken, and until the Closing of Title shall continue to take, such measures as are required by applicable Law to assure that the funds used to pay to Sponsor the Purchase Price are derived: (i) from transactions that do not violate United States law, and to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated. Purchaser is, and at Closing will be, in compliance with any and all applicable provisions of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq.; and the International Emergency Economic Powers Acts, 50 U.S.C. Section 1701 et. seq., and the sanctions and regulations promulgated pursuant thereto by OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957, as amended from time to time.

46.3    The provisions of this Section shall survive the Closing of Title to the Unit or the earlier termination of this Agreement.

**47.** **PURCHASE BY AN ENTITY [IF APPLICABLE]**

47.1     Purchaser represents that as of the date hereof, the individual(s) that control Purchaser [is][are] _Carole D. Moreno_ [and _Artura R. Moreno_ ] ([each a ]"Controlling Individual"). Purchaser acknowledges that at Closing, Purchaser shall deliver to Attorney for Sponsor (i) a designation of agent for service of process in form prepared by Attorney for Sponsor and (ii) all required organizational documents, as determined by Sponsor in its sole discretion, in order to confirm that as of the date of Closing, Purchaser is still under the Control of [a ]Controlling Individual. Purchaser's failure to comply with the provisions of this Paragraph shall be deemed an event of default under the Option Agreement, entitling Sponsor to exercise the remedies set forth in Section 13 of the Option Agreement.

47.2     The term "Control" shall mean, with respect to any person or entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person or entity, through ownership of 100% voting securities or 100% of partnership or other ownership or membership interests, by contract or otherwise, or as a result of being the sole beneficiary of a trust.

[SIGNATURE PAGES TO FOLLOW]

**[PURCHASER SIGNATURE PAGE TO OPTION AGREEMENT]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**PURCHASER:**

**CDM1, LLC**

By: _____
Name:  Charles J. Carey
Title:    Secretary

**SPONSOR:**

**41-45 Property Owner, LLC**

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC, its member

By: _____

Name:    Arthur Zeckendorf

Title:      Member

By: WLZ 43-45 East 60th, LLC, its member

By: _____

Name:    William Lie Zeckendorf

Title:      Member

{V.5}
00060815.DOCX

## SCHEDULE A

## PERMITTED ENCUMBRANCES

1. Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2. Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not render title uninsurable without additional premium to Purchaser and would not prevent the use of the Unit for dwelling purposes.

3. The terms, burdens, covenants, restrictions, conditions, easements and Rules and Regulations, all as set forth in the Declaration, the By-laws (and the Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4. Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5. Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6. Revocability of licenses for vault space, if any, under the sidewalks and streets.

7. Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8. Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9. Leases and service, maintenance, employment, concessionaire and Ancillary Amenity Licenses, if any, of other Units or portions of the Common Elements.

10. The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the Closing of Title.

11. The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12. Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13. Any encumbrance as to which the Title Company (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such

encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien.

14. Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes.

15. Any lease covering the Unit(s) made from Sponsor to the Purchaser.

16. Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17. Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18. Any Temporary or Permanent Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

19. Any encumbrance, covenant, easement, agreement, or restriction against the Property set forth in the form of Unit Owner's Specimen Title Policy prepared by the Title Company set forth in Part II of the Plan, as the same may be updated from time to time.

**SCHEDULE B**

**INSPECTION STATEMENT**

Date: _____

41-45 Property Owner, LLC
445 Park Avenue, Suite 1902
New York, New York 10022

      Re:     Unit No: **PH-58** ("Unit")
            520 Park Avenue Condominium
            520 Park Avenue
            New York, New York 10022 ("Condominium")

Ladies and Gentlemen:

1.      On the date hereof, the undersigned purchaser(s) ("Purchaser") inspected the Unit which Purchaser is acquiring from Sponsor and have found the Unit to be in good condition, except as otherwise noted below.

2.      Purchaser acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date Purchaser moves into the Building. Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.      In the event Purchaser performs work in the Unit of any kind affecting any of the areas or items listed above after the Closing, Sponsor will be relieved of any and all obligations related to the items listed herein.

                                **PURCHASER:**

                                **CDM1, LLC**

                                By:_____
                                Name:  Charles J. Carey
                                Title:    Secretary

_____
      Sponsor's Representative

**SCHEDULE C**

## RIDER TO OPTION AGREEMENT RE: ESCROW PROVISIONS

This Rider is made as of **OCT 0 6 2017** _____, _____, between Sponsor, Purchaser and Escrow Agent.

> Re: Unit No: **PH-58** ("Unit")
> 520 Park Avenue Condominium
> 520 Park Avenue
> New York, New York 10022 ("Condominium")

## 1. ESCROW AND TRUST FUND REQUIREMENTS

All deposits, down payments, advances and payments made by Purchasers prior to the Closing ("Premium Payments") will be held in escrow in conformity with the disclosure contained in this Section of the Plan and in accordance with the escrow provisions contained in the Option Agreement.

Sponsor will comply with the escrow and trust fund requirements of General Business Law Sections 352-e(2-b) and 352-h and the Attorney General's regulations promulgated pursuant thereto. The Department of Law may perform random reviews and audits of any records involving escrow accounts to determine compliance with statute and regulation.

Any provision of any contract or agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of Escrow Agent holding trust funds is absolutely void. The provisions of the Attorney General's regulations concerning escrow/trust funds shall prevail over any conflicting or inconsistent provision in the Plan or in the escrow agreement or Option Agreement. Purchasers shall not be obligated to pay any legal or other expense of Sponsor in connection with the establishment, maintenance or defense of obligations arising from the handling or disposition of trust funds. However, notwithstanding anything to the contrary set forth herein or anywhere else in the Plan, in the Event of Default by Purchaser, as that term is defined the Option Agreement, Purchaser shall be obligated to reimburse Sponsor for any legal fees, expenses and disbursements incurred by Sponsor in defending Sponsor's rights under the Option Agreement or otherwise enforcing Purchaser's obligations thereunder.

All Premium Payments made by Purchasers prior to the Closing of each individual transaction will be placed in a segregated special escrow account of Starr Associates LLP, the escrow agent ("Escrow Agent"), whose address is 220 East 42 Street, Suite 3302, New York, New York 10017 and whose telephone number is (212) 620-2680. The attorneys who are signatories on these accounts authorized to withdraw funds, acting singly, are: Allan Starr, Esq., Andrea L. Roschelle, Esq. and Samantha Sheeber, Esq. ("Authorized Signatories"). All Authorized Signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any Authorized Signatory is the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

Escrow Agent has established a master escrow account entitled "Starr Associates LLP, Escrow Account" ("Master Escrow Account") at JPMorgan Chase Bank located at 270 Park Avenue, New York, New York 10017 and Citibank located at 717 Sixth Avenue, New York, New York 10010 ("Escrow Banks"). Each Escrow Bank is authorized to do business in the State of New York. Premium Payments properly made payable to "Starr Associates LLP, as Escrow Agent" will be placed in one of the Master Escrow Accounts within 5 business days after tender by Purchaser to Sponsor or Selling Agent. Any subsequent Premium Payment tendered by Purchaser after the Premium Payment will be placed in any one of the Master Escrow Accounts within 10 business days after tender by Purchaser to Sponsor or Selling Agent.

All Premium Payments will be placed initially in the non-interest bearing portion of the Master Escrow Account (including Unit Upgrade Funds). Each Purchaser is required to deliver a completed and signed Form W-9 (Request for Taxpayer Identification Number) or a Form W-8 (Certificate of Foreign Status) in the forms set forth in Part II to the Plan, to Sponsor or Selling Agent at the time Purchaser tenders the Premium Payment and the Option Agreement. If a Premium Payment is accompanied by a completed and signed Form W-9 or Form W-8, the Premium Payment will thereafter be promptly transferred to an individual interest bearing sub-escrow account in the name of Purchaser (except for Premium Payments for Unit Upgrade Funds). If a Purchaser does not deliver the Form W-9 or Form W-8, the Premium Payment will remain in the non-interest bearing portion of the Master Escrow Account. At such time as the Premium Payment is released, the Premium Payment will be transferred from the individual sub-escrow account to the non-interest bearing portion of the Master Escrow Account so that checks may be drawn thereon. The Master Escrow Account is not an IOLA account.

All Premium Payments, except for Unit Upgrade Funds, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, until such time as Sponsor is entitled to the Premium Payment as per GBL § 352-h. Unit Upgrade Funds will initially be placed in the Master Escrow Account. However, Purchasers should note that such funds may be released from the Master Escrow Account by Escrow Agent to Sponsor to pay, or reimburse Sponsor, for such upgrades or extras. As a result, in the event Sponsor cancels the Option Agreement or Purchaser is entitled to rescind the Option Agreement in accordance with the Plan, Purchaser will not receive a refund of any of the Unit Upgrade Funds. Escrow Agent shall be under no duty to verify that Sponsor used or committed such funds for Unit Upgrade Funds.

The sub-escrow account number and the initial interest rate, if any, will be disclosed to each Purchaser, as appropriate, in a letter from Escrow Agent to each Purchaser sent within 10 business days after the tender of the Premium Payment. If Purchaser does not receive notice that the Premium Payment has been placed in the Master Escrow Account within 15 business days after tender of the Premium Payment, Purchaser may cancel the Purchase and rescind the Option Agreement so long as the right to rescind is exercised within 90 days after tender or crediting of the Premium Payment by notice delivered to Sponsor and to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, New York 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Premium Payment was timely deposited and requisite notice was timely mailed to Purchaser in conformity with the Attorney General's regulations. Escrow Agent will not be required to send the letter referred to above to each Purchaser in connection with any additional Premium Payments tendered by Purchaser after the Premium Payment (or in connection with any changes in the interest rate).

Escrow Agent shall maintain the Master Escrow Account under its direct supervision and control. A fiduciary relationship shall exist between Escrow Agent, and Purchaser, and as set forth in the Escrow Agreement Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352(e)(2-b) and 352(h).

Under current Law, the sub-accounts at the Escrow Bank are insured by the Federal Deposit Insurance Corporation ("FDIC") to a maximum of $250,000 per individual Premium Payment. The following are SPECIAL RISKS of this offer: (i) if a Purchaser makes a Premium Payment in excess of $250,000 such Premium Payment will not be FDIC insured in excess of $250,000; and (ii) while the Premium Payment is in the non-interest bearing portion of the Master Escrow Account, the Premium Payment may not be fully FDIC insured even if the Premium Payment does not exceed $250,000. No representation is made with respect to any further changes in Law which may increase or decrease such limit.

The Premium Payment may be tendered by Purchaser to Sponsor or Selling Agent by either personal delivery, delivery by messenger or courier service or mailed by certified mail, return receipt requested,

overnight courier or express mail service. The Premium Payment shall be deemed tendered by Purchaser on the date it is actually received by Sponsor or Selling Agent.

Acceptance of the Premium Payment by Sponsor or Selling Agent and the Premium Payment thereof by Escrow Agent into escrow shall not be deemed a binding agreement by Sponsor to sell to Purchaser unless and until Purchaser executes an Option Agreement and Sponsor or Selling Agent executes a duplicate thereof and delivers the Option Agreement to Purchaser in accordance with the terms of the Plan. All Premium Payments made by check are subject to collection.

If a Purchaser tenders a Premium Payment <u>without</u> an executed Option Agreement, Sponsor shall have the right to reject the Premium Payment and return it to Purchaser: (i) within 5 business days after tender, if the Premium Payment has not been deposited into escrow, and (ii) within 10 business days, if the Premium Payment has been deposited into escrow and the Option Agreement has not yet been delivered by Purchaser. In the event a Premium Payment or portion thereof is delivered by wire transfer to Escrow Agent, any wiring fees charged by the initiating and/or receiving banks will be Purchaser's obligation.

The checking account portion of the Master Escrow Account will not be interest-bearing. The sub-escrow account portion of the Master Escrow Account will be interest-bearing. All interest will be credited to Purchaser at such time as: (i) there is a closing under the Option Agreement, or (ii) Purchaser is entitled to a return of the Premium Payment. All interest will be credited to Sponsor only in the event there is a "consummation of the Plan" (as such term is defined in the Attorney General's regulations) and Purchaser defaults. The interest rate to be earned will be the prevailing rate for these accounts. As of December 31, 2016, the interest rate for the Escrow Bank is .15%. The interest rate is subject to change by the Escrow Bank. Sponsor makes no guarantee of, and shall have no liability to Purchaser for changes to, the interest rate. Interest will begin to accrue within: (x) 3 business days, if the Premium Payment is cash or cash equivalent, or (y) 5 business days, if the Premium Payment is other than cash or cash equivalent, of the transfer of the Premium Payment from the checking account portion of the Master Escrow Account into the sub-escrow account portion of the Master Escrow Account, as determined by whether and when the Premium Payment clears.

All instruments shall be made payable directly to the order of "Starr Associates LLP, as escrow agent." Endorsed instruments will not be accepted.

If a check delivered by a Purchaser fails for collection, the Option Agreement will be deemed void ab initio (as if the Option Agreement had never been executed).

Sponsor or its agents, including any selling agents, shall deliver to Escrow Agent all Premium Payments within two (2) business days of tender of the Premium Payment by a Purchaser, using such transmittal forms as required by Escrow Agent from time to time. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary and statutory obligations set forth in GBL §§ 352(e)(2-b) and 352(h) and the Department of Law's regulations promulgated thereto.

Under no circumstances shall Sponsor seek the release of the Premium Payments of a defaulting Purchaser until after consummation of the Plan (i.e., the Effective Date). Consummation of the Plan does not relieve Sponsor of its obligations pursuant to General Business Law Section 352-h.

Escrow Agent shall release the Premium Payments if so directed:

(i)     pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit; or

(ii)    in a subsequent writing signed by both Sponsor and Purchaser; or

(iii)   by a final, non-appealable order or judgment of a court.

If the Premium Payments are not released pursuant to this paragraph and Escrow Agent receives a request by Sponsor or Purchaser to release the Premium Payments, Escrow Agent shall give both parties prior written notice of not fewer than 30 days before releasing the Premium Payments. If Escrow Agent has not received notice of objection to the release of the Premium Payments at the expiration of the 30 day period, the Premium Payments shall be released and Escrow Agent shall provide further written notice to both parties informing them of the release of the Premium Payments. If Escrow Agent receives a written notice from either party objecting to the release of the Premium Payments within the 30 day period set forth in the notice, Escrow Agent shall continue to hold the Premium Payments until otherwise directed pursuant to subsections (i) through (iii) of this paragraph. However, Escrow Agent shall also have the right at any time to deposit the Premium Payments with the clerk of a court in the county in which the Unit is located and shall give written notice to both parties of such deposit.

Sponsor will not object to the release of the Premium Payments to:

(i)     a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan,

(ii)    all Purchasers after an amendment abandoning the Plan is accepted for filing by the Department of Law.

The Option Agreement provides that Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Premium Payment to Sponsor in the event Sponsor and Purchaser close title under the Option Agreement.

If Sponsor elects to change the Escrow Bank and/or Escrow Agent, such change will be disclosed in a duly filed amendment to the Plan prior to transferring any Premium Payments.

Sponsor may, upon application approved by the Department of Law, elect to withdraw Premium Payments from the Master Escrow Account and secure all or any portion of the Premium Payments withdrawn by delivering to Escrow Agent or another escrow agent designated by Sponsor, one or more irrevocable letters of credit (collectively, "Letter of Credit") or other alternate security approved by the Department of Law, in accordance with the terms and conditions set forth below. All Premium Payments withdrawn from the Master Escrow Account shall be paid to the Construction Lender pursuant to a collateral assignment and pledge by Sponsor to the Construction Lender or disbursed to Sponsor subject to the approval by the Construction Lender of the amount of the withdrawal. The amount of the Letter of Credit will be at least 125% of the aggregate of all Premium Payments expected to be received from Purchasers, and not retained in escrow, during such period of time as the Letter of Credit will be needed. Sponsor reserves the right at any time and from time to time to increase or decrease the amount of the Letter of Credit, by a duly filed amendment to the Plan provided, however, the aggregate amount of the Letter of Credit shall at no time be less than the aggregate of all Premium Payments, if any, withdrawn by Sponsor for use in construction, less any sums returned to Purchasers or otherwise disbursed in accordance with the Plan. Premium Payments will cease to earn interest upon withdrawal from the Master Escrow Account.

**PURCHASERS WILL EARN NO INTEREST ON PREMIUM PAYMENTS WHICH ARE DEPOSITED IN SPONSOR'S CONSTRUCTION FUND ACCOUNT, EXCEPT DURING SUCH PERIODS AS THE PREMIUM PAYMENTS ARE PLACED IN THE INTEREST BEARING PORTION OF THE MASTER ESCROW ACCOUNT.**

The Letter of Credit shall name Escrow Agent as beneficiary to act as a fiduciary for the benefit of all Purchasers under the Plan. The Letter of Credit will provide that Escrow Agent shall have sole power to draw upon the Letter of Credit without the consent or despite the objection of Sponsor or the issuer bank, at such times or upon such events as set forth below.

The Letter of Credit will continue in effect, or shall be periodically renewed, until the Closing of Title to all Units for which Premium Payments have been placed in Sponsor's construction fund account.

Escrow Agent shall be entitled to release the Premium Payments to Sponsor provided that the Escrow Agent has documentation showing that the Letter of Credit or renewal or replacement Letter of Credit has been issued in accordance with this Section of the Plan and is in effect.

Escrow Agent, as the beneficiary of the Letter of Credit, acting as fiduciary for the benefit of Purchasers under the Plan whose Premium Payments were released from escrow, shall have the duty and the right to draw upon and collect the proceeds of the Letter of Credit, 10 business days after notice to Sponsor and Sponsor's failure or refusal to restore such Premium Payments to Escrow Agent, without the consent or despite the objection of Sponsor or the issuer bank, upon the following events or circumstances:

(i) timely rescission of an Option Agreement by a Purchaser pursuant to an offer of rescission contained in the Plan or an amendment to the Plan;

(ii) acceptance for filing by the Department of Law of an amendment abandoning the Plan;

(iii) pursuant to terms and conditions set forth in the Plan and Option Agreement upon closing of title to the Unit;

(iv) in a subsequent writing signed by both Sponsor and Purchaser;

(v) by a final, non-appealable order or judgment of a court;

(vi) failure by Sponsor to obtain a renewal or replacement Letter of Credit no later than 60 days prior to the expiration of the existing Letter of Credit;

(vii) direction by Sponsor upon request of Purchaser; or

(viii) notice of impending cancellation of the Letter of Credit has been given or received, or the issuer bank has filed a bankruptcy or insolvency petition or has been taken over by a federal or state authority, and no proper replacement of the Letter of Credit has been furnished.

Upon payment to Escrow Agent of a drawing under the Letter of Credit, to the extent that Escrow Agent has no further obligation to hold the proceeds of such Letter of Credit in accordance with this Section of the Plan, Escrow Agent shall remit the Premium Payments to the relevant Purchaser to the extent required by this Section of the Plan and shall remit the excess amount (if any) of such proceeds over the Premium Payment to the Construction Lender (or, if no Construction Lender shall exist, to Sponsor).

The sole obligation of the issuer bank under or in connection with the Letter of Credit is to pay to Escrow Agent the amount drawn under the Letter of Credit pursuant to a conforming drawing thereunder. In no event shall the issuer bank, or the Construction Lender be liable for the use of the proceeds of any drawing by Escrow Agent and no Purchaser shall have any recourse whatsoever to the issuer bank, or the Construction Lender with respect to the use of such Premium Payments, other than the issuer bank's liability on the fronting bank for such Letters of Credit.

Escrow Agent is acting merely as a stakeholder. Escrow Agent makes no representation with regard to and shall not be responsible for the maintenance by Sponsor of the Letter of Credit. Upon payment of the Premium Payment pursuant to the Plan, Escrow Agent shall be fully released from all liability and obligation with respect to the Premium Payment. Escrow Agent shall accept a Premium Payment made by check made payable subject to collection.

Set forth in Part II of the Plan is a copy of the form of escrow agreement between Sponsor and Escrow Agent which incorporates the terms of the Attorney General's regulations. Purchaser's execution of the Option Agreement shall be deemed to constitute Purchaser's acceptance of the terms of the escrow provisions set forth herein and the escrow agreement set forth in the Plan. Escrow Agent shall be a signatory to the Option Agreement solely with respect to Escrow Agent's obligations as set forth herein and the escrow agreement set forth in the Plan

Escrow Agent shall be permitted to act as counsel to Sponsor in any dispute as to the disbursement of the Premium Payment or any other dispute between Sponsor and a Purchaser whether or not Escrow Agent is in possession of the Premium Payment and continues to act as Escrow Agent.

Escrow Agent may rely upon any document which may be submitted to it in connection with its duties under this Section and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity thereof.

Sponsor has agreed to indemnify Escrow Agent from all claims, losses, judgments, costs, expenses and damages, including those brought by third-parties, including purchasers, incurred in connection with or arising out of the escrow agreement or the performance or non-performance of Escrow Agent's duties under the Escrow Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the Escrow Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, professional fees, including attorneys' fees, court costs and disbursements, either paid to retain attorneys or representing the value of all legal services rendered by Escrow Agent to itself and any and all attorneys' and professional fees, court costs, expenses and disbursements incurred by Escrow Agent in connection with a bankruptcy case filed by Sponsor for protection under the United States Bankruptcy Code, the enforcement of any rights, or defense of any claims against Escrow Agent in any bankruptcy proceeding, or any other matter arising in or in connection with Sponsor's bankruptcy case.

Sponsor has agreed to compensate Escrow Agent for services rendered in connection with Escrow Agent's duties under the escrow agreement. Escrow Agent's fees and disbursements will neither be paid by Sponsor from the Premium Payment nor deducted from the Premium Payment by any financial institution under any circumstance.

Escrow Agent and all Authorized Signatories submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of their obligations with respect to this Section or otherwise concerning the maintenance of or release of the Premium Payments from escrow.

Escrow Agent will maintain all records concerning the Master Escrow Account for 7 years after the release of Premium Payments.

## 2.    DEFINITIONS

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Option Agreement to which this Rider is annexed or in the Plan.

## 3.    CONFLICTS

In the event of any inconsistency between the provisions of this Rider and those contained in the Option Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

## 4.    FULL FORCE AND EFFECT

Except as set forth in this Rider, all of the terms and conditions of the Option Agreement remain unchanged and in full force and effect.

5. **COUNTERPARTS**

This Rider may be executed in any number of original, e-mail, pdf or facsimile counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Rider.

**[SIGNATURE PAGES TO FOLLOW]**

**[PURCHASER SIGNATURE PAGE TO ESCROW RIDER]**

**PURCHASER:**

**CDM1, LLC**

By: _____

Name:   Charles J. Carey

Title:   Secretary

[SPONSOR AND ESCROW AGENT SIGNATURE PAGE TO ESCROW RIDER]

ESCROW AGENT:

SPONSOR:

Executed solely in connection with the
provisions set forth in this Escrow Rider.

41-45 Property Owner, LLC

By: 41-45 Land Assemblage, LLC, its sole member

STARR ASSOCIATES LLP

By: Z East 60th Mgr., LLC, its manager

By:
Name: Samantha Sheebe
Title: Partner

By: AZ East 60th Street Manager, LLC
its member

By:
Name: Arthur Zeckendorf
Title: Member

By: WLZ 43-45 East 60th, LLC, its member

By:
Name: William Lie Zeckendorf
Title: Member

**SCHEDULE D**

**RIDER TO OPTION AGREEMENT**

This Rider is made as of _____  **OCT 06 2017**   )etween Sponsor and Purchaser.

  Re:  Unit No: **PH-58** ("Unit")
     520 Park Avenue Condominium
     520 Park Avenue
     New York, New York 10022 ("Condominium")

1.  REVISED FLOOR PLAN AND UNIT MODIFICATIONS

  1.1  At Purchaser's request, Sponsor has agreed to deliver the Unit at Closing, at Sponsor's sole cost and expense, substantially in accordance with (i) (a) the revised Floor Plan annexed hereto as Exhibit A ("Revised Floor Plan") and (ii) the following modifications set forth below. The modifications described in the foregoing provisions (i) and (ii) are collectively referred to as "Modifications."

Kitchen:

- Eliminate all cabinetry and appliances.
- Install the bare minimum fixtures, finishes and appliances in the kitchen necessary to receive a temporary certificate of occupancy ("TCO") and move exhaust duct to approximate location per attached Revised Floor Plan.
- Eliminate the door to kitchen and create new opening, without doors, to align with doorway between Living room and Dining room.
- Eliminate millwork at North West breakfast window and replace spandrel glass with vision glass.

Living Room:

- Eliminate pocket doors between Dining room and Living room.
- Eliminate walls and closets between Living room and Library.

Master Bedroom:

- Remove closet. Install sheetrock to enclose mechanicals and risers in southwest corner of the room.

Master Bathroom:

- Toilet; relocate plumbing per attached Revised Floor Plan.
- Build new wall to bathroom per attached Revised Floor Plan.
- Install freestanding shower to relocate plumbing per attached Revised Floor Plan.
- Relocate plumbing and accommodate relocated tub per attached Revised Floor Plan. Purchaser has until Monday October 16th to decide upon location of plumbing line for tub in master bathroom, failing which Sponsor shall chose the location in its sole discretion.
- NOTE: Stone quality and installation in Master Bathroom may not be consistent with building standard with the understanding that stone will be replaced by Purchaser.

Power Room:

- Eliminate powder room and frame out walk-in closet (to be delivered without rods and shelves).
- Deliver uninstalled powder vanity and hardware to unit.

Guest bedroom #2 bath / Powder bath:

- Relocate electric panel and NID boxes to corridor wall to facilitate washer/dryer location, per attached Revised Floor Plan.
- Open new entrance to bathroom #2.
- Relocate washer/dryer per attached Revised Floor Plan.
- NOTE: new entrance vestibule to bathroom #2 will not have wainscot or marble floor. Wainscot and floor will end at limits of original bathroom. Transition to concrete will be provided for building department approval.

General:

- Elimination of wood flooring system throughout the Unit (including the sub-flooring). The flooring and sub-flooring will be delivered off-site for purchaser to install post-closing. NOTE: there is no guarantee as to finish and quality of individual pieces. Sponsor will be delivering the exact amount of wood required for the original plan. Purchaser acknowledges that the elimination of the wood flooring system may void any warranty with respect to the flooring, to the extent any such warranty exists. Purchaser hereby waives all rights with respect to any suit, cause of action or claim against Sponsor, its principals and affiliates, of or relating to any damage or defect concerning the flooring in the Unit. This provision shall survive Closing.
- Eliminate all base and crown molding.

The make, model, design and material of all items necessary to furnish the Modifications shall be chosen by Sponsor and approved by Purchaser. There shall be no change to the Modifications, except by a written agreement between Sponsor and Purchaser. The Modifications shall be substantially completed by Closing, except for punchlist items which may be completed by Sponsor after Closing. The room designations mentioned in this Rider refer to those depicted on the Revised Floor Plan.

1.2     Purchaser shall receive a credit at Closing equal to the amount of any saving realized by Sponsor as a result of the elimination of all (i) cabinetry in the kitchen, (ii) kitchen appliances (less the cost of TCO kitchen cabinetry and appliances) and (iii) base and crown molding (the "Modification Credit"). Sponsor shall provide Purchaser with reasonable evidence of the calculation of the Modification Credit.

1.4     If any item that is not installed would prevent Sponsor from obtaining a TCO for the Unit, Purchaser agrees that Sponsor may install alternative items (i.e. install minimum cooking and bathroom facilities, etc.) without using building standard finishes ("Temporary Finishes"). The Temporary Finishes shall be accepted by Purchaser in their "as is" condition as of the date of Purchaser's inspection of the Unit and Sponsor shall have no obligation to make any repairs to the Temporary Finishes. The condition of the Temporary Finishes shall not be the subject of any pre-closing or post-closing punchlist and shall not be referred to on the Inspection Statement in order to obtain a TCO.

2. ASSIGNMENT OF OPTION AGREEMENT BY AN ENTITY TO AN ENTITY

2.1     Purchaser represents that as of the date hereof, the individuals that control Purchaser are Carole Moreno and Arte Moreno ("Purchasing Individuals"). Notwithstanding anything to the contrary contained in Paragraph 23 of the Option Agreement, Purchaser shall have the right at Closing to assign Purchaser's rights under the Option Agreement, in whole, but not in part, to an entity which is under the Control of Purchasing Individual and/or the spouse, adult child(ren), parent(s) and/or in-law(s) of Purchasing Individual (each, a "Controlling Individual"), provided (i) Purchaser designates such assignee no later than 15 days before the Closing Date, time being of the essence; (ii) the Closing will not be delayed as a result of the assignment; (iii) the assignee assumes in writing, by an instrument prepared by Attorney for Sponsor, the obligations of Purchaser under the Option Agreement, which instrument shall provide that the original-named Purchaser, and any assignee thereof, shall remain fully and primarily liable for all of the obligations of Purchaser under the Option Agreement; (iv) Purchaser delivers to Attorney for Sponsor a fee in the amount set forth in the Plan for its services rendered in connection with the preparation of the assignment and assumption agreement; (v) the assignee is an entity organized and existing under the laws of the United States, is in good standing, and is under the Control of a Controlling Individual; (vi) the assignment is made without consideration; (vii) Purchaser shall not be in default under the Option Agreement; and (viii) the assignee designates the Secretary of State of the State of New York to receive service of process in connection with any action which may be brought by either the Sponsor and/or the Condominium against Purchaser. Unless Purchaser complies with the provisions of this Paragraph, any purported assignment by Purchaser shall be null and void and of no effect as against Sponsor and, at Sponsor's election, shall be deemed an event of default under the Option Agreement, entitling Sponsor to exercise the remedies set forth in Section 13 of the Option Agreement.

2.2     The term "Control" shall mean, with respect to any person or entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person or entity, through ownership of 100% voting securities or 100% of partnership or other ownership or membership interests, by contract or otherwise, or as a result of being the sole beneficiary of a trust.

3. DEFINITIONS

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Option Agreement to which this Rider is annexed or in the Plan.

4. CONFLICTS

In the event of any inconsistency between the provisions of this Rider and those contained in the Option Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

5. FULL FORCE AND EFFECT

Except as set forth in this Rider, all of the terms and conditions of the Option Agreement remain unchanged and in full force and effect.

## 6.     COUNTERPARTS

This Rider may be executed in any number of original, facsimile or pdf counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Rider.

**[SIGNATURE PAGES TO FOLLOW]**

**[PURCHASER SIGNATURE PAGE TO RIDER]**

**PURCHASER:**

**CDM1, LLC**

By: _____
Name:  Charles J. Carey
Title:    Secretary

**SPONSOR:**

**41-45 Property Owner, LLC**

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC, its member

By:
Name: Arthur Zeckendorf
Title: Member

By: WLZ 43-45 East 60th, LLC, its member

By:
Name: William Lie Zeckendorf
Title: Member

**EXHIBIT "A"**

---

**REVISED FLOOR PLAN**

---



**01** 42nd FLOOR PLAN (Simplex & TANK)
SCALE 1/8" = 1'-0"

**B** FLOOR LOCATION DIAGRAM

EAST 60th STREET

ARCHITECT OF RECORD

**SLCE** *Architects*
1359 BROADWAY
NEW YORK, NY 10018
TEL: 212.979.8400
FAX: 212.979.8387

DESIGN ARCHITECT

Robert A.M. Stern Architects
460 WEST 34th STREET
NEW YORK, NY 10001
TEL: 212.967.5100
FAX: 212.967.5588

STRUCTURAL ENGINEER

WSP · CANTOR SEINUK
STRUCTURAL ENGINEERS
228 EAST 45th STREET
NEW YORK, NY 10017
TEL: 212.687.9888
FAX: 646.487.5501

MEP ENGINEER

**WSP · FLACK+KURTZ**
512 SEVENTH AVENUE
New York, NY 10018
212.951.2600 MAIN
WSPGROUP.COM

GEOTECHNICAL ENGINEER

**MUESER RUTLEDGE**
**CONSULTING ENGINEERS**
14 PENN PLAZA, 225 WEST 34th STREET
New York, NY 10122
917.339.9300 MAIN
MRCE.COM

FACADE / EXTERIOR CONSULTANT

**GMS**
GILSANZ MURRAY STEFICEK LLP
129 WEST 27th STREET
NEW YORK, NY 10001
TEL: 212.254.0300



PROJECT

**45 East 60th Street**
**New York, NY**

TITLE

42ND (CONSTR. FL)
58TH (MARKETING FL)

SEAL & SIGNATURE



**A-117.02**

## ADDITIONAL RIDER TO OPTION AGREEMENT

This Additional Rider is made as of ___NOVEMBER 10, 2017___, _____ between Sponsor and Purchaser.

Re:     Unit No: **PH-58** ("Unit")
        520 Park Avenue Condominium
        520 Park Avenue
        New York, New York 10022 ("Condominium")

1.      REVISED FLOOR PLAN AND UNIT MODIFICATIONS

Paragraph 1 of that certain Rider to Option Agreement dated October 6, 2017 is deleted in its entirety and replaced with the following text:

1.1     At Purchaser's request, Sponsor has agreed to deliver the Unit at Closing, at Sponsor's sole cost and expense, substantially in accordance with (i) (a) the revised Floor Plan annexed hereto as Exhibit A ("Revised Floor Plan") and (ii) the following modifications set forth below. The modifications described in the foregoing provisions (i) and (ii) are collectively referred to as "Modifications."

Kitchen:

- Eliminate all cabinetry and appliances.
- Install the bare minimum fixtures, finishes and appliances in the kitchen necessary to receive a temporary certificate of occupancy ("TCO") and move exhaust duct to approximate location per attached Revised Floor Plan.
- Eliminate the door to kitchen and create new opening, without doors, to align with doorway between Living room and Dining room.
- Eliminate millwork at North West breakfast window and replace spandrel glass with vision glass.

Living Room:

- Eliminate pocket doors between Dining room and Living room.
- Eliminate walls and closets between Living room and Library.

Master Bedroom:

- Remove closet. Install sheetrock to enclose mechanicals and risers in southwest corner of the room.

Master Bathroom:

- Toilet; relocate plumbing per attached Revised Floor Plan.
- Build new wall to bathroom per attached Revised Floor Plan.
- Install freestanding shower to relocate plumbing per attached Revised Floor Plan.
- Relocate plumbing and accommodate relocated tub per attached Revised Floor Plan. Purchaser has until Monday October 16th to decide upon location of plumbing line for tub in master bathroom, failing which Sponsor shall chose the location in its sole discretion.

{V 2}
00062412.DOCX

- NOTE: Stone quality and installation in Master Bathroom may not be consistent with building standard with the understanding that stone will be replaced by Purchaser.

General:

- Elimination of wood flooring system throughout the Unit (including the sub-flooring). The flooring and sub-flooring will be delivered off-site for purchaser to install post-closing. NOTE: there is no guarantee as to finish and quality of individual pieces. Sponsor will be delivering the exact amount of wood required for the original plan. Purchaser acknowledges that the elimination of the wood flooring system may void any warranty with respect to the flooring, to the extent any such warranty exists. Purchaser hereby waives all rights with respect to any suit, cause of action or claim against Sponsor, its principals and affiliates, of or relating to any damage or defect concerning the flooring in the Unit. This provision shall survive Closing.
- Eliminate all base and crown molding.

The make, model, design and material of all items necessary to furnish the Modifications shall be chosen by Sponsor and approved by Purchaser. There shall be no change to the Modifications, except by a written agreement between Sponsor and Purchaser. The Modifications shall be substantially completed by Closing, except for punchlist items which may be completed by Sponsor after Closing. The room designations mentioned in this Rider refer to those depicted on the Revised Floor Plan.

1.2     Purchaser shall receive a credit at Closing equal to the amount of any saving realized by Sponsor as a result of the elimination of all (i) cabinetry in the kitchen, (ii) kitchen appliances (less the cost of TCO kitchen cabinetry and appliances) and (iii) base and crown molding (the "Modification Credit"). Sponsor shall provide Purchaser with reasonable evidence of the calculation of the Modification Credit.

1.4     If any item that is not installed would prevent Sponsor from obtaining a TCO for the Unit, Purchaser agrees that Sponsor may install alternative items (i.e. install minimum cooking and bathroom facilities, etc.) without using building standard finishes ("Temporary Finishes"). The Temporary Finishes shall be accepted by Purchaser in their "as is" condition as of the date of Purchaser's inspection of the Unit and Sponsor shall have no obligation to make any repairs to the Temporary Finishes. The condition of the Temporary Finishes shall not be the subject of any pre-closing or post-closing punchlist and shall not be referred to on the Inspection Statement in order to obtain a TCO.

2.     DEFINITIONS

All capitalized terms used in this Additional Rider not defined herein shall have the same meanings ascribed to them in the Option Agreement to which this Additional Rider is annexed or in the Plan.

3.     CONFLICTS

In the event of any inconsistency between the provisions of this Additional Rider and those contained in the Option Agreement to which this Additional Rider is annexed, the provisions of this Additional Rider shall govern and be binding.

4.     FULL FORCE AND EFFECT

Except as set forth in this Additional Rider, all of the terms and conditions of the Option Agreement remain unchanged and in full force and effect.

5.    COUNTERPARTS

This Additional Rider may be executed in any number of original, facsimile or pdf counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Rider.

[SIGNATURE PAGES TO FOLLOW]

[PURCHASER SIGNATURE PAGE TO RIDER]

PURCHASER:

CDMI, LLC

By: _____
Name: Charles J. Carey
Title: Secretary

**[SPONSOR SIGNATURE PAGE TO RIDER]**

**SPONSOR:**

**41-45 Property Owner, LLC**

By: 41-45 Land Assemblage, LLC, its sole member

By: Z East 60th Mgr., LLC, its manager

By: AZ East 60th Street Manager, LLC, its member

By:_____

Name:    Arthur Zeckendorf

Title:     Member

By: WLZ 43-45 East 60th LLC, its member

By:_____

Name:    William Lie Zeckendorf

Title:     Member

## EXHIBIT "A"

---

## REVISED FLOOR PLAN

---



01  42nd FLOOR PLAN (Simplex & 'AAA')

EAST 60th STREET

SLCE Architects

Robert A.M. Stern Arch

WSP · FLACK+KURTZ

MUESER RUTLEDGE
CONSULTING ENGINEER

CMS

121 329 213

45 East 60th Street
New York, NY

A-117.02