

**ArentFox Schiff LLP**
1301 Avenue of the Americas
42nd Floor
New York, NY 10019

212.484.3900 **MAIN**
212.484.3990 **FAX**

afslaw.com

**Brittany H. Sokoloff**
Associate
212.745.9555 **DIRECT**
brittany.sokoloff@afslaw.com

December 7, 2022

VIA ECF

Honorable Lorna G. Schofield
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: <u>Case No. 1:22-cv-08634 (LGS), 41-45 Property Owner, LLC v. CDM1, LLC, Pre-Conference Letter</u>**

Dear Judge Schofield:

We represent Defendant and Counter-Plaintiff CDM1, LLC ("CDM1") in this case. Pursuant to the Court's October 28, 2022 Order, we write jointly with counsel for Plaintiff and Counter-Defendant 41-45 Property Owner, LLC to provide the Court with this Pre-Conference Letter and the accompanying Proposed Civil Case Management Plan and Scheduling Order.

1. **<u>Plaintiff's Position</u>** – Plaintiff 41-45 Property Owner, LLC ("Plaintiff") is the sponsor of a new construction condominium located at 520 Park Avenue, New York, New York (the "Condominium"). In October 2017, Plaintiff and defendant CDM1 LLC ("Defendant") entered into an agreement for the purchase and sale of Condominium unit PH-58 (the "Agreement") for billionaire Arturo R. Moreno ("Moreno") and his wife Carole D. Moreno.

   Pursuant to the Agreement, Defendant agreed to pay the sum of $34 million for PH-58, with a deposit in the amount of $8,500,000 (the "Premium Payment") which would be forfeited to Plaintiff upon Defendant's failure to close title to the unit. Defendant requested and negotiated two revisions to the Agreement: (i) a rider and additional rider which required Plaintiff to make specific modifications to PH-58 at Plaintiff's expense; and (ii) Section 17.3 which concerned sound emitted from the portion of the Condominium's fire suppression system located on the same floor as PH-58. Specifically, Section 17.3 provides that Plaintiff "will have taken all reasonable measures to test, verify and specifically ensure" Defendant that the fire suppression system "does not create any sound or noise that will impair [Defendant's] quiet enjoyment and use of the Unit, except in any emergency or routine maintenance." Plaintiff agreed to include Section 17.3 because the fire suppression system would rarely be activated, if ever, and the language did not expressly grant any additional rights to Defendant, did not impose any additional obligations on Plaintiff, and only prohibited noise which would "impair [Defendant's] quiet enjoyment and use of the Unit." In New York, "quiet enjoyment" does not preclude noise or other nuisances unless they rise to a level that substantially interferes with the possession of real property.





Plaintiff performed all of its obligations under the Agreement and was ready, willing, and able to close when it noticed the closing to occur on November 27, 2018. At Defendant's request, Plaintiff agreed to adjourn the closing to January 4, 2019. On the eve of closing, Defendant demanded to know what steps Plaintiff took to comply with Section 17.3 of the Agreement. Even though it had no obligation to do so, Plaintiff obtained a report from an acoustical technology and consulting firm to confirm there was no noise coming from the fire suppression system, to assuage Defendant's pre-close jitters. Defendant arbitrarily and unreasonably rejected Plaintiff's report, demanded substantial additional information and testing to prove that Plaintiff complied with Section 17.3, and refused to close title to the unit. Prior to the date of closing, Defendant or its representatives made frequent visits to the unit and never made any prior requests relating to the fire pump. This is a classic case of "buyer's remorse" where Purchaser used Section 17.3 as a pretext to escape its explicit contractual obligations in response to a declining real estate market and/or a likely desire to purchase an alternative apartment.

Pursuant to the terms of the Agreement, Defendant's failure to close tittle to the unit entitles Plaintiff to retain the Premium Payment. Plaintiff is also entitled to an award of money damages compensating Plaintiff for Defendant's breach of the implied covenant of good faith and fair dealing. Defendant unilaterally and arbitrarily imposed additional terms, criteria, and requirements to Section 17.3 and manufactured a breach of Section 17.3 for a pretext to terminate the Agreement. Plaintiff relied on Defendant's implied promises when it agreed to Defendant's requested revisions to the Agreement and made Defendant's required modifications to the unit. Plaintiff incurred additional costs of approximately $2,400,000 in connection with Defendant's required modifications and to restore the unit to its original completed and marketable state.

**Defendant's Position** – In October 2017, CDM1 paid $8.5 million towards the purchase of apartment PH-58 at 520 Park Avenue, New York, New York ("Premium Payment"). The deal never closed because Sponsor failed to comply with specifically-negotiated pre-closing obligations. Central to this dispute is Paragraph 17.3 of the Option Agreement, which states, in the only bold typeface in the Option Agreement:

> **Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.**

CDM1 enforced its contractual rights and made clear it would not close until Sponsor fulfilled its pre-closing obligations. CDM1 retained engineers, at its own expense, to assess potential sound and noise from the Tank and Pump System. Those engineers found that





not only was it impossible to determine from the limited information provided by the Sponsor the type of pump and whether it would cycle on and off to maintain pressure, but it was impossible to know whether the building had installed vibration isolators on the pumps, inertia pads, or flex connections; each of which could affect the amount of noise heard in the apartment. When CDM1 sought to inspect the unit, Sponsor denied it access to the apartment, stating that CDM1 could not inspect the unit unless CDM1 agreed that it would attend the closing. Instead of taking "all reasonable measures to test, verify and specifically ensure Purchaser" as the Option Agreement required, Sponsor sent Purchaser a notice of default for refusing to close and cancelled the Option Agreement. Sponsor's failure to perform its pre-closing obligations before the scheduled closing date was a breach of contract. That breach entitles CDM1 to a full refund of its Option Payment, any interest accrued on that payment, plus New York statutory pre-judgment interest.

Nor is Sponsor entitled to recover damages under the implied covenant of good faith and fair dealing. Central to the question of damages under the implied covenant of good faith and fair dealing is Paragraph 13.2 of the Option Agreement, which states:

> TIME IS OF THE ESSENCE with respect to Purchaser's obligations to pay the Exercise Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of ail further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

First, by the plain language of Paragraph 13.2, because Sponsor cancelled the contract and is suing for liquidated damages under the Option Agreement, Sponsor is not entitled to damages for breach of the implied covenant of good faith and fair dealing. Second, Sponsor's claim under the implied covenant fails because it is duplicative of its claim for breach of contract.





2. Both parties agree that this Court has Subject Matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The citizenship of the parties is diverse (New York and Arizona) and the value of the Option Payment ($8.5 million) exceeds $75,000 exclusive of interest and costs. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred in this District—specifically the subject property is located in this County.

   Plaintiff commenced an action against Defendant by filing a Summons with Notice with the Supreme Court of New York, County of New York on June 27, 2022 (the "State Action"). The State Action is entitled *41-45 Property Owner, LLC v. CDM1, LLC, Arturo R. Moreno, and Carole D. Moreno* and bears Index No. 656970/2011. On October 11, 2022, Defendant filed a Notice of Removal seeking removal of the State Action to the District Court for the Southern District of New York based on diversity jurisdiction. (Dkt. 1.).

3. Sponsor is a Delaware Limited Liability Company that has its principal place of business in New York at 445 Park Avenue, Suite 1902, New York, New York 10022 and whose members are all domiciled in New York. CDM1 is a Delaware Limited Liability Company that has its principal place of business in Phoenix, Arizona at 4455 E. Camelback Road, Suite C140, Phoenix, Arizona, 85018. All of its members are domiciled in Arizona. Excluding interest for purposes of diversity, Sponsor is seeking to retain the $8.5 million Option Payment plus $2.4 million under the implied covenant of good faith and fair dealing, whereas Purchaser is seeking the return of its $8.5 million Option Payment.

4. **Plaintiff's Position** – Plaintiff anticipates moving for summary judgment on its claims. Plaintiff reserves the right to make a determination as to what additional motions are necessary, if any, after receiving and reviewing potential counterclaims by Defendant.

   **Defendant's Position** – On December 2, 2022, CDM1 will file a motion to dismiss the Second Cause of Action in the Complaint for breach of the covenant of good faith and fair dealing, which fails because it is entirely based in the Option Agreement and therefore is duplicative of Sponsor's claim for breach of contract. It is further barred by the liquidated damages provision in Paragraph 13.2 the Option Agreement, which specifically limits Sponsor's entitlement to damages.

5. No discovery has been requested or exchanged at this time.

6. Damages:

   **Plaintiff's Position** – Pursuant to the terms of the Parties' Agreement, Plaintiff is entitled to (i) retain the $8,500,000 Premium Payment as liquidated damages as a result of Defendant's refusal to close title to PH-58; and (ii) reimbursement of its





legal fees and disbursements incurred defending its rights under the Agreement. Plaintiff is also entitled to an award compensating Plaintiff for its actual damages, currently estimated to exceed $2,400,000, resulting from the cost of Defendant's required modifications to PH-58 and the additional work that was required to restore the PH-58 to its original and marketable state.

a. **Defendant's Position** - Under Paragraph 13.2 of the Option Agreement, if CDM1 prevails on its Counterclaim (to be filed December 2, 2022), CDM1 is entitled to return of the Option Payment. If Sponsor prevails, it is only entitled to Liquidated Damages comprised of the "(a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds" (of which there are none). Sponsor is seeking liquidated damages in the form of the Option Payment on its first cause of action for breach of contract. Sponsor is also seeking interest. The Premium Payment has been held in trust and earning interest since it was first paid by CDM1 in 2017. Sponsor is not entitled to interest beyond that which has been earned while the money has been held in trust, as is required under the Option Agreement.

7. Settlement:

**Plaintiff's Position** - Since the Parties recently conducted an unsuccessful private mediation before the Honorable John M. Mott, a retired judge for the D.C. Superior Court, further mediation should await completion of document exchanges and depositions.

**Defendant's Position** - CDM1 is willing to participate in a settlement conference before a Magistrate Judge when Plaintiff believes it would be constructive to do so.

Sincerely,

*/s/ Brittany H. Sokoloff*

Brittany H. Sokoloff

BHS