UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\------------------------------------------------------ X

41-45 PROPERTY OWNER, LLC,

                     Plaintiff and Counter-
                     Defendant

     -against-

CDM1, LLC,

                     Defendant and
                     Counter-Plaintiff

\------------------------------------------------------ X

Case No. 1:22-cv-08634 (LGS)

**ANSWER TO PLAINTIFF'S FIRST CAUSE OF ACTION AND COUNTERCLAIM**

Defendant and Counter-Plaintiff CDM1, LLC ("CDM1"), by its attorneys, for its Answer to Plaintiff and Counter-Defendant 41-45 Property Owner, LLC's Complaint for Breach of Contract and for CDM1's Counterclaim against Plaintiff and Counter-Defendant, states as follows:

## NATURE OF ACTION

1.     This is an action for money damages incurred by Plaintiff as a result of Defendant's deliberate and bad faith breach of its agreement to purchase a condominium unit from Plaintiff.

**ANSWER:**    CDM1 admits Plaintiff filed this action for money damages, but denies the remaining allegations in Paragraph 1.

2.     Under the terms of the Parties' agreement, Defendant was obligated to close title and provide complete payment upon Plaintiff's satisfaction of certain terms of sale.

**ANSWER:**    CDM1 admits that the Parties entered into the Option Agreement and that Defendant was obligated to close title and provide complete payment as long as Plaintiff fulfilled its obligations under the Option Agreement, but CDM1 denies that Plaintiff satisfied its obligations under the Option Agreement.

3.     Rather than fulfilling its contractual obligations, Defendant deliberately breached the implied covenant of good faith and fair dealing by unilaterally and arbitrarily imposing additional terms, criteria, and requirements on Plaintiff's performance in an effort to manufacture a breach by Plaintiff that would serve as Defendant's pretext to terminate the Parties' agreement.

**ANSWER:** CDM1 denies the allegations in Paragraph 3.

4. Plaintiff suffered significant financial harm as a result of Defendant's failure to act in good faith and failure to close title to the unit. Pursuant to the Parties' agreement, Plaintiff is entitled to retain Defendant's contract deposit and to reimbursement of its attorneys' fees and all costs incurred to enforce its its [sic] contractual rights. Plaintiff is also entitled to compensation for its out-of-pocket damages caused by Defendant's breach of the implied covenant of good faith and fair dealing.

**ANSWER:** CDM1 admits that the Option Agreement allows Plaintiff to retain CDM1's deposit and to be paid attorneys' fees and costs if CDM1 breached the Option Agreement and defaulted, which it did not. CDM1 denies the remaining allegations in Paragraph 4.

## PARTIES

5. Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware, authorized to do business in New York, with a principal place of business located at 445 Park Avenue, Suite 1902, New York, New York 10022. All of Plaintiff's members are domiciled in New York.

**ANSWER:** CDM1 admits the allegations in Paragraph 5.

6. Upon information and belief, Defendant CDM1, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business in Phoenix, Arizona at 4455 E. Camelback Road, Suite D145, Phoenix, Arizona 85018. Upon information and belief, all of Defendant's members are domiciled in Arizona.

**ANSWER:** CDM1 admits the allegations in Paragraph 6 except that the Suite is incorrect. The correct Suite is C140.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a dispute between citizens of different States. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

**ANSWER:** CDM1 admits the allegations in Paragraph 7.

8. The Court has personal jurisdiction over Defendant pursuant to the Notice of Removal filed by Defendant on October 11, 2022.[1] (Dkt. 1.)

---

[1] Plaintiff commenced an action against Defendant by filing a Summons with Notice with the Supreme Court of New York, County of New York on June 27, 2022 (the "State Action"). The

**ANSWER:**  CDM1 admits the allegations in Paragraph 8 and Footnote 1.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this District and the subject real property is located in this District.

**ANSWER:**  CDM1 admits the allegations in Paragraph 9.

10.      Pursuant to the written agreement between the Parties, New York law applies.

**ANSWER:**  CDM1 admits the allegations in Paragraph 10.

## FACTUAL BACKGROUND

### 520 Park Avenue

11.      Plaintiff is the Sponsor of a new construction luxury condominium project known as 520 Park Avenue Condominium located at 520 Park Avenue, New York, New York 10018 ("520 Park Avenue").

**ANSWER:**  CDM1 admits the allegations in Paragraph 11.

12.      520 Park Avenue consists of 35 residential units that were offered for sale to the public, along with suite units, storage units, and wine storage, through an offering plan that was accepted by the New York State Department of Law on September 16, 2014 (the "Offering Plan"). A true and correct copy of the Offering Plan is attached hereto as Exhibit A.

**ANSWER:**  CDM1 lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 12.

13.      520 Park Avenue is an ultra-luxury residential skyscraper which is currently the tallest building on Manhattan's Upper East Side.  Thoughtfully designed by world renowned Architect Robert A.M. Stern, 520 Park Avenue offers floor-through apartments and 15,000 square feet of world class amenities, including a fitness center and an indoor swimming pool.

State Action is entitled *41-45 Property Owner, LLC v. CDM1, LLC, Arturo R. Moreno, and Carole D. Moreno* and bears Index No. 656970/2011. On October 11, 2022, Defendant filed a Notice of Removal seeking removal of the State Action to the District Court for the Southern District of New York based on diversity jurisdiction. (Dkt. 1.)



**ANSWER:** CDM1 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14. 520 Park Avenue's sales launched in the spring of 2017, at a time when NYC luxury real estate was setting record high prices. By early summer, two of 520 Park Avenue's duplex units were in contract for over $60,000,000 each.

**ANSWER:** CDM1 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

**<u>Defendant's Agreement to Purchase PH-58</u>**

15. On or around October 6, 2017, Sponsor and Purchaser entered into an agreement for the purchase and sale of 520 Park Avenue's unit PH-58 (the "Option Agreement"). A true and correct copy of the Option Agreement dated October 6, 2017 is attached hereto as Exhibit B.

**ANSWER:** CDM1 admits the allegations in Paragraph 15.

16.     Purchaser is a limited liability company that was used to privately purchase 520 Park Avenue's unit PH-58 ("PH-58")[2] for billionaire Arturo R. Moreno ("Moreno") and his wife Carole D. Moreno.

**ANSWER:**     CDM1 admits the allegations in Paragraph 16 and Footnote 2.

17.     Moreno, a self-made billionaire with significant real estate, business, and contract experience, was represented by counsel during the negotiation of the Option Agreement.

**ANSWER:**     CDM1 admits the allegations concerning Mr. Moreno, but denies that Mr.

Moreno, who was not a party to the Option Agreement, was represented by counsel during

negotiation of the Option Agreement.   CDM1 was represented by counsel during the

negotiation of the Option Agreement.

18.     Purchaser agreed to pay the sum of $34 million for PH-58, with a deposit in the amount of $8,500,000 due upon the execution of the agreement (the "Premium Payment").

**ANSWER:**     CDM1 admits the allegations in Paragraph 18.

19.     In the Option Agreement, Purchaser acknowledged it had received and read a copy of the Offering Plan and further agreed that:

> The [Offering] Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length.  In the event of any inconsistency between the provisions of this Agreement and the [Offering] Plan, the provisions of the [Offering] Plan will govern and be binding.  Purchaser hereby adopts, accepts and approves the [Offering] Plan (including, without limitation, the Declaration, By-laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the [Offering] Plan duly filed by Sponsor.

**ANSWER:**     CDM1 admits that it received and read a copy of the Offering Plan and that

the language in Paragraph 19 is included in the Option Agreement.

20.     Before the Parties entered into the Option Agreement, they negotiated modifications that Purchaser required Sponsor to make to PH-58.  Purchaser also requested the insertion of ¶ 17.3 which states that:

> Prior to the date of the Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the

---

[2] PH-58 is a simplex unit located on 520 Park Avenue's 42nd Floor.

mechanical function of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in any emergency or routine maintenance.

**ANSWER:** CDM1 admits that it negotiated modifications to PH-58 and states that it insisted on the inclusion of Paragraph 17.3 in the Option Agreement, which is the only bolded provision in the Option Agreement.

21. Though the term "Tank and Pump system" is not defined in the Option Agreement, Sponsor understood that the clause referenced the portion of 520 Park Avenue's Fire Suppression System which was located on the same floor as PH-58 (the "Automatic Fire Pump").

**ANSWER:** CDM1 lacks knowledge or information sufficient to form a belief as to what Sponsor understood but states that the Option Agreement required Sponsor to "take[] all reasonable measures to test, verify and specifically ensure" that the Tank and Pump System would not create any sound or noise that would impair CDM1's quiet enjoyment and use of the Unit.

22. The Offering Plan granted the condominium an easement to access the fire corridor located on the 42nd Floor adjacent to PH-58[3] "for the purpose of accessing, servicing, maintaining and utilizing the Fire Suppression Tank Room . . . [and] anticipated that such easement will be exercised three (3) times per year." Ex. A. at 17.

**ANSWER:** CDM1 admits the quoted language is in the Offering Plan and lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 3.

23. As explained in the Offering Plan, 520 Park Avenue's Fire Suppression System consisted of the following equipment:

---

[3] Plaintiff notes that the relevant documents refer to units by both their designated marketing floor number and by their construction floor number. At the time the Offering Plan was drafted, PH-58 was designated as PH-48 or the "48th floor."

c. **Equipment Schedule:**

| Equipment | Designation | Location | Service | Manufacturer | Model No. |
|---|---|---|---|---|---|
| Automatic Fire Pump | FP-1 | Sub-Cellar 1 Level | 750gpm, 163psi head, 125hp, 208v, 3p | Peerless or equivalent | 4AEF10 |
| Automatic fire pump | FP-2 | 37th floor | 750gpm, 80psi head, 50hp, 480v, 3p | Peerless or equivalent | 5AEF8 |
| Automatic fire pump | FP-3 | 48th floor | 750gpm, 132si head, 100hp, 480v, 3p | Peerless or equivalent | 4EF10 |
| Automatic fire pump (Special Service) | FP-4 | 57th floor | 750gpm, 70psi head, 40hp, 480v, 3p | Peerless or equivalent | 5AEF8 |

**ANSWER:** CDM1 admits that this language is in the Offering Plan but denies that it is sufficient to identify the equipment actually used in 520 Park Avenue's Fire Suppression System.

24. Sponsor agreed to the inclusion of ¶ 17.3 because the Automatic Fire Pump would rarely be activated, if ever, because it was installed only for use during a fire emergency or infrequent routine maintenance. Furthermore, the language requested by Purchaser only prohibited noise which would "impair Purchaser's quiet enjoyment and use of the Unit," a seemingly inapplicable and very forgiving standard which does not preclude noise or other nuisances unless they rise to a level that substantially interferes with the possession of real property. Accordingly, Purchaser's requested language did not expressly grant any additional rights to Purchaser or impose any additional obligations on Sponsor.

**ANSWER:** CDM1 lacks knowledge or information sufficient to form a belief as to why Sponsor agreed to include Paragraph 17.3 in the Agreement. CDM1 further lacks knowledge or information sufficient to form a belief as to when the Automatic Fire Pump would be activated. CDM1 could not know this information because, despite repeatedly requesting it in advance of the scheduled closing, CDM1 was not provided any information about the Automatic Fire Pump, including the frequency with which it would be run for maintenance, whether it would cycle on and off, or how much noise it would make when it was activated. CDM1 denies the remaining allegations in Paragraph 24.

25. Sponsor also agreed to make certain modifications to PH-58 as requested by Purchaser as set forth in Schedule D – Rider to Option Agreement dated October 6, 2017 (the "Rider").

**ANSWER:** CDM1 admits that the parties agreed to enter into the October 6, 2017 Rider to the Option Agreement, which included CDM1's request that Sponsor make certain modifications to PH-58 before the closing, none of which required the payment of any Unit Upgrade Funds.

26. The Rider included Purchaser's specific and detailed modifications such as: (i) revising the unit's floorplan; (ii) eliminating the door to the kitchen and creating a new opening to align with the doorway between the living room and dining room; (iii) replacing spandrel glass with vision glass; (iv) eliminating pocket doors between the dining room and living room; (v) relocating plumbing in the master bathroom; and (vii) eliminating a powder room to frame out a walk-in closet. **Notably, Purchaser did not make any effort to request any additional soundproofing measures, modifications, or additional construction specifications for the wall adjoining the mechanical room.**

**ANSWER:** CDM1 admits that it requested that Plaintiff make the stated modifications to PH-58 (all of which would have reduced construction costs to Sponsor) and admits that it did not ask for additional soundproofing because CDM1 was relying on Sponsor to take "all reasonable measures to specifically ensure" that the apartment was quiet, as required under Paragraph 17.3.

27. On or around October 6, 2017, Purchaser executed the Option Agreement and duly provided the Premium Payment to Sponsor.

**ANSWER:** CDM1 admits the allegations in Paragraph 27.

28. On or around November 10, 2017, the Parties entered into an Additional Rider to the Option Agreement which further addressed PH-58's revised floor plan and unit modifications ("Additional Rider"). Similar to the Rider, the Additional Rider did not include any additional soundproofing measures, modifications, or additional construction specifications for the wall adjoining the mechanical room.

**ANSWER:** CDM1 admits that it entered into the Additional Rider to the Option Agreement. CDM1 admits that it did not ask for additional soundproofing because CDM1 was relying on Sponsor to "take all reasonable measures to specifically ensure" the apartment was quiet, as required under Paragraph 17.3.

## Sponsor Completes its Obligations and Notices Closing for PH-58

29.     After completing the required construction and obtaining a temporary certificate of occupancy, Sponsor provided notice to Purchaser, as required by the Option Agreement and Offering Plan, that the closing was scheduled to occur on November 27, 2018 (the "Original Closing Date").

**ANSWER:**     CDM1 admits that the original closing was scheduled to occur on November 27, 2018, but denies the remaining allegations in Paragraph 29.

30.     Pursuant to the Offering Plan's Terms of Sale, the Sponsor's "delivery to Purchaser of written notice of the time and place of the Closing at least 30 days prior to the Closing Date Specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal business hours and in the company of Sponsor's representative, prior to Closing" obligated Purchaser to close title.

**ANSWER:**     CDM1 admits that the quoted language is in the Offering Plan. CDM1 denies that it was obligated to close title in a situation, as the one that existed, where Sponsor failed to comply with a material provision of the Option Agreement and therefore breached the Option Agreement.

31.     While it was not required to, Sponsor agreed to adjourn the Original Closing Date, at Purchaser's request, to January 4, 2019 (the "Adjourned Closing"), in light of the holidays. Though Purchaser had visited PH-58 several times, it did not indicate that there were any issues when it requested the adjournment.

**ANSWER:**     CDM1 admits that Sponsor agreed to adjourn the Original Closing Date to January 4, 2019 in light of the holidays. CDM1 denies that it was allowed to visit PH-58 several times. To the contrary, despite a member of CDM1 attempting to schedule visits and flying across the country to visit PH-58, CDM1 was refused entry into the unit. CDM1 admits that, in November 2018, it did not indicate there were any issues.

## Purchaser's Refusal to Close

32.     Sponsor was ready, willing, and able to close at the Adjourned Closing.

**ANSWER:**     CDM1 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

33.     Pursuant to ¶ 18.1 of the Option Agreement, Purchaser had the waivable right to:

[a]rrange an appointment with a representative of Sponsor to inspect the interior of the Unit within the 7 days prior to the Closing Date. Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement . . . and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such an appointment or to inspect the interior of the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Exercise Price when due and shall constitute Purchaser's full acceptance of the Unit as is. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

**ANSWER:**     CDM1 admits that the Option Agreement contains the language quoted in Paragraph 33.

34.     Upon information and belief, Purchaser did not arrange or attend any such pre-closing inspection of the unit. Accordingly, Purchaser waived its right to the inspection which constituted Purchaser's full acceptance of the PH-58 as is.

**ANSWER:**     CDM1 denies that it waived its right to the inspection of the unit. To the contrary, despite a member of CDM1 attempting to schedule visits and flying across the country to visit PH-58, CDM1 was refused entry into the unit. In advance of closing, CDM1 sought permission for the consultant it retained to inspect the Tank and Pump system, but that was denied. Moreover, CDM1 denies that inspection of PH-58 without inspection of the Tank and Pump System would have specifically ensured it that it would have quiet enjoyment and use of the unit.

35.     On or around January 3, 2019 (the day before the Adjourned Closing), Purchaser's counsel provided written notice that Purchaser would not attend the Adjourned Closing. Purchaser also demanded to know what steps Sponsor had taken to comply with ¶ 17.3 of the Option Agreement.

**ANSWER:**     CDM1 admits the allegations in Paragraph 35. Further answering, CDM1's counsel previously notified Sponsor's counsel that Sponsor had not provided any assurances with respect to the Tank and Pump system as required under Paragraph 17.3.

CDM1 made clear that it remained ready, willing, and able to close if Sponsor complied with its obligations.

36.    Even if Purchaser had inspected PH-58 and provided an inspection statement alleging that additional work was required by Sponsor, pursuant to ¶ 18.2 of the Option Agreement, "[a]ny work set forth on the Inspection Statement shall be completed by Sponsor in a reasonable period of time following the Closing and **shall not be grounds for delaying the Closing**."

> **ANSWER:**    CDM1 admits that the quoted language is included in Paragraph 18.2 of the
>
> Option Agreement, but does not admit that it is bolded.  Paragraph 17.3 is the only bolded
>
> provision in the Option Agreement.  CDM1 denies all other allegations in Paragraph 36.

37.    Pursuant to ¶ 15 of the Option Agreement, Purchaser was only entitled to terminate the agreement "[i]f Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan **by reason of a defect in title, substantial damage or deconstruction of the Building**."

> **ANSWER:**    CDM1 denies that Paragraph 15 sets forth the only circumstances in which
>
> CDM1 was entitled to terminate the agreement.  Paragraph 15 only deals with situations in
>
> which Sponsor is unable to "convey title."  CDM1 otherwise admits that the quoted
>
> language is included in Paragraph 15 of the Option Agreement, but does not admit that it
>
> is bolded.  Paragraph 17.3 is the only bolded provision in the Option Agreement.  CDM1
>
> denies all other allegations in Paragraph 37.

38.    Even if Sponsor had failed to comply with ¶ 17.3 of the Option Agreement, Purchaser would not have been entitled to delay the Adjourned Closing or terminate the agreement.

> **ANSWER:**    CDM1 denies the allegations in Paragraph 38.

39.    Purchaser had no right to delay the Adjourned Closing and was obligated to close title and provide complete payment of the full purchase price.  As set forth in ¶ 17.4 of the Option Agreement:

> The Closing of Title shall occur only after, or concurrently with, compliance with
> the prerequisites set forth under "Terms of Sale" in Part 1 of the Plan.  As a result,
> **if all such prerequisites are met, Purchaser shall be obligated to close and
> complete payment of the full Purchase Price** (without provision for escrow),
> notwithstanding any construction items noted on Purchaser's Inspection Statement
> (as hereinafter defined) remaining for Sponsor to complete and/or correct in

accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit.

**ANSWER:** CDM1 admits that the quoted language is included in Paragraph 17.4 of the Option Agreement, but does not admit that it is bolded. Paragraph 17.3 is the only bolded provision in the Option Agreement. CDM1 denies all other allegations in Paragraph 39.

40. The Offering Plan's Terms of sale further confirm that:

Purchasers are required to close title upon the occurrence of the following events:

\*        \*        \*

(b) . . . . a Temporary or Permanent Certificate of Occupancy for the Unit shall be deemed presumptive evidence of substantial completion of the Unit and **is the only construction-related prerequisite that must occur before Sponsor may require the closing of title**.

\*        \*        \*

(e) the delivery to Purchaser of a written notice of the time and place of the closing at least 30 days prior to the Closing Date specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal business hours and in the company of Sponsor's representative, prior to Closing. **So long as a Temporary Certificate of Occupancy for the Unit is in effect, Purchaser will be obligated to close title irrespective of the nature of the items that may be included on Purchaser's Inspection Statement**.

**ANSWER:** CDM1 admits that the quoted language is included in the Offering Plan along with sub-paragraphs (a), (c), and (d), but does not admit that it is bolded. CDM1 denies that it was required to close if Sponsor breached the Option Agreement and denies all other allegations in Paragraph 40.

41. Purchaser's failure to close title on the Adjourned Closing date constituted an event of default pursuant to ¶ 13.1 of the Option Agreement.

**ANSWER:** CDM1 denies the allegations in Paragraph 41.

42. Notwithstanding Purchaser's default, Sponsor again acted in good faith and agreed to reschedule the closing to February 8, 2019 (the "Third Scheduled Closing"), in an effort to accommodate Purchaser.

**ANSWER:** CDM1 admits that Sponsor rescheduled the closing to February 8, 2019

because Sponsor had not complied with Paragraph 17.3 of the Option Agreement. CDM1

denies all other allegations in Paragraph 42.

43. Although it had no obligation to do so, Sponsor also obtained a report from SM&W, an integrated communications technology and consulting firm, to assuage Purchaser's pre-close jitters. The SM&W report confirmed that there was no noise coming from the mechanical room adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though the unit was empty without any furniture, fixtures, or carpet to dampen any sound.

**ANSWER:** CDM1 admits that Sponsor provided it with a report from SM&W on

January 7, 2019, three days after the Adjourned Closing and months after the Original

Closing Date and only after CDM1 stated that it would not close unless Sponsor complied

with Paragraph 17.3 of the Option Agreement. CDM1 admits the allegations as to what

SM&W's report contained but adds that the report was conducted when the pump in the

mechanical room was inactive. CDM1 denies that the SM&W report established anything

about the noise levels while the pump was activated or about the installed equipment.

CDM1 denies the remaining allegations in Paragraph 43 of the Complaint.

44. On January 15, 2019, Purchaser arbitrarily and unreasonably rejected the SM&W report claiming it failed to satisfy ¶ 17.3 of the Option Agreement. Notwithstanding Purchaser's arguments to the contrary, ¶ 17.3 does not contain any criteria or requirements.

**ANSWER:** CDM1 admits that it rejected the SM&W Report because the SM&W report

only tested the pump while it was not activated. Therefore, the SM&W Report did not

satisfy Paragraph 17.3 of the Option Agreement. CDM1 denies the remaining allegations

in Paragraph 44.

45. Purchaser further objected to the SM&W report because the Automatic Fire Pump, which is only active during emergencies or infrequent routine maintenance, was not active during the testing. Logically, the Automatic Fire Pump was not active because there was no fire emergency or routine maintenance while the testing was conducted.

**ANSWER:** CDM1 admits that it objected to the SM&W Report because it tested noise levels from the Automatic Fire Pump while the pump was inactive. CDM1 lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations because CDM1 does not know when and how frequently the Automatic Fire Pump would be activated. CDM1 could not know this information because, despite repeatedly requesting it in advance of the scheduled closing, CDM1 was not provided any information about the Automatic Fire Pump, including the frequency with which it would be run for maintenance, whether it would cycle on and off, or how much noise it would make when it was activated. CDM1 was also refused entry into the unit. In advance of closing, CDM1 sought permission for the consultant it retained to inspect the Tank and Pump system, but Sponsor denied that request.

46.     Purchaser demanded additional information and testing such as:

(i)     baseline readings with the Automatic Fire Pump in operation and not in operation;

(ii)    a description of the installed equipment;

(iii)   complete plans and specifications for the Automatic Fire Pump;

(iv)    engineered documents for the Automatic Fire Pump;

(v)     original design documents and details;

(vi)    written specifications;

(vii)   approved shop drawings;

(viii)  commissioning reports;

(ix)    sign offs;

(x)     approvals stating that the systems are finished and fully operational;

(xi)    complete operating instructions for the Automatic Fire Pump;

(xii)   the Automatic Fire Pump's maintenance and testing requirements;

(xiii)  details regarding the adjacent wall;

(xiv)  specific acoustical design criteria utilized and implemented in the adjacent wall's construction; and

(xv)  additional acoustical testing performed by Sponsor with the specific criteria spelled out by the Purchaser's acoustical consultant.

**ANSWER:**  CDM1 admits that it requested information, including the above, regarding the Automatic Fire Pump and states that Plaintiff failed to provide the requested information.

47.  None of Purchaser's demands were founded in any right under the Option Agreement or the Offering Plan.[4]

**ANSWER:**  CDM1 admits that Paragraph 20 of the Option Agreement contains language to the effect of what is included in Footnote 4, but denies that the no representation clause prevented CDM1 from relying on the plain language of the Option Agreement, including Paragraph 17.3.  CDM1 denies all remaining allegations in Paragraph 47.

48.  On February 11, 2019, Sponsor served Purchaser with a notice of default due to Purchaser's failure to close title to the unit at the Third Scheduled Closing (the "Notice of Default").  A copy of the Notice of Default dated February 11, 2019 is attached hereto as Exhibit C.

**ANSWER:**  CDM1 admits that Sponsor served it with a notice of default dated February 11, 2019 but denies that it defaulted under the Option Agreement.

49.  The Notice of Default advised Purchaser of its right under the Option Agreement and Offering Plan to cure the default within 30 days (on or before March 15, 2019) with time being of the essence and that, upon Purchaser's failure to cure its default, Sponsor is entitled to retain Purchaser's Premium Payment as liquidated damages and to seek repayment of all legal fees and costs relating to Purchaser's default.

---

[4] Furthermore, ¶ 20 of the Option Agreement contains a no representation clause whereby Purchaser acknowledges that it is not relying on any plans, representations, statements, or warranties relating to the description or physical condition of the building.

**ANSWER:** CDM1 admits that the allegations in Paragraph 49 are included in the Notice of Default. CDM1 denies that it defaulted and that Plaintiff is entitled to liquidated damages or legal fees and costs.

50. Pursuant to ¶ 13 of the Option Agreement:

**TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Exercise Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving the notice cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment . . . Upon cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

**ANSWER:** CDM1 denies that the language quoted in Paragraph 50 is included in Paragraph 13 of the Option Agreement. It is in Paragraph 13.2 of the Option Agreement.

51. Pursuant to ¶ 4 of the Special Risks contained in the Offering Plan:

(b) Purchasers should note that the agreement pursuant to which they will purchase the Unit is referred to as an Option Agreement . . . A Purchaser is not receiving any "options" not included in a standard real estate contract and if Purchaser does not close on the Option Agreement, Purchaser will forfeit Purchaser's Premium payment as liquidated damages . . . Sponsor cannot compel specific performance as a remedy against Purchaser. Sponsor is bound, however, to sell to a Purchaser that elects to perform all of Purchaser's obligations under the Option Agreement.

\*     \*     \*

(d) In the event a Purchaser defaults under the Option Agreement, time being of the essence with regard to the obligations of Purchaser under the Option Agreement, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel the Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then the Option Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest

earned on the Premium Payment . . . Upon the cancellation of the Option Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though the Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of the sale.

*       *       *

(e) TIME IS OF THE ESSENCE as to Purchaser's obligations under the Option Agreement, including, without limitation, for the payment of all Premium Payments and the Exercise Price. According to Black's Law Dictionary (Revised Fifth Edition), "time is of the essence of contract" means generally that punctual performance by one party at one precise time named or within a period specified in the contract is essential to enable the party to require performance by the other party.

**ANSWER:** CDM1 admits that the language quoted in Paragraph 51 is included in Paragraph 4 of the Offering Plan, along with additional sub-paragraphs.

52.     Pursuant to ¶ 30 of the Option Agreement:

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

**ANSWER:** CDM1 admits that the language quoted in Paragraph 52 is included in Paragraph 30 of the Option Agreement.

53.     Purchaser failed to cure its default and close the transaction on or before March 15, 2019. Instead, Purchaser argued that Sponsor's tendering of the Notice of Default constituted Sponsor's repudiation of the Option Agreement entitling Purchaser to the return of its Premium Payment.

**ANSWER:** CDM1 admits that it never closed but denies that it defaulted. CDM1 admits that it stated that Sponsor's tendering of the Notice of Default constituted Sponsor's repudiation of the Option Agreement entitling CDM1 to return of its Premium Payment.

54.     Upon information and belief, Purchaser no longer desired to purchase PH-58 at this time and was acting in bad faith to manufacture duties and a breach thereof pursuant to ¶ 17.3 of the Option Agreement.

**ANSWER:** CDM1 denies the allegations in Paragraph 54.

55. Upon information and belief, Purchaser – a shrewd businessman with significant experience in real estate – perceived a softening in New York City's luxury real estate market based on some press reports and used the Automatic Fire Pump as an excuse to back out of the transaction to either not purchase an apartment at that time or possibly get a better deal on a different apartment.

**ANSWER:** CDM1 is an LLC and not a businessman. CDM1 lacks knowledge or information sufficient to form a belief as to whether there was a softening of the luxury real estate market and denies that this was its basis for not closing on PH-58. CDM1 denies the remaining allegations in Paragraph 55.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

56. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

**ANSWER:** CDM1 incorporates its answers as set forth in the above Paragraphs marked 1-55 as though fully set forth herein.

57. The Option Agreement is a valid, binding, and enforceable contract between Sponsor and Purchaser.

**ANSWER:** CDM1 admits the allegations in Paragraph 57.

58. Sponsor fully performed its obligations under the Option Agreement and constructed PH-58 in accordance with Purchaser's requirements set forth in Rider and Additional Rider to the Option Agreement.

**ANSWER:** CDM1 denies the allegations in Paragraph 58.

59. Sponsor was ready, willing, and able to close when it noticed and scheduled the closing to occur on November 27, 2018.

**ANSWER:** CDM1 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.

60. In an effort to accommodate Purchaser, Sponsor adjourned the closing twice to January 4, 2019 and then February 8, 2019.

**ANSWER:** CDM1 admits that the closing was adjourned twice to the dates stated in Paragraph 60 but denies that the adjournments were done in an effort to accommodate CDM1.

61. Purchaser materially breached its obligations to Sponsor under the Option Agreement by failing [sic] appear on or before February 8, 2019 and tender sufficient funds to Sponsor to close title.

**ANSWER:** CDM1 denies the allegations in Paragraph 61.

62. On February 11, 2019, Sponsor served Purchaser with a notice of default, due to Purchaser's failure to appear at the February 8, 2019 closing, with time being of the essence.

**ANSWER:** CDM1 admits that Sponsor served it with a notice of default, but denies that it defaulted under the Option Agreement.

63. Purchaser failed to cure its default within 30 days as required by ¶ 13.2 of the Option Agreement.

**ANSWER:** CDM1 denies that it defaulted under the Option Agreement and therefore denies that it had anything to cure.

64. As a result of the Purchaser's breach of the Agreement, Sponsor is entitled to retain the Premium Payment in the sum of $8,500,000 in accordance with ¶ 13.2 of the Option Agreement.

**ANSWER:** CDM1 denies the allegations in Paragraph 64.

65. In addition to the foregoing, pursuant to ¶ 30 of the Option Agreement, Sponsor is also entitled to reimbursement of any attorneys' fees and disbursements incurred by Sponsor while canceling this Agreement or otherwise enforcing Purchaser's obligations in a sum to be determined.

**ANSWER:** CDM1 denies the allegations in Paragraph 65.

66. In addition to the foregoing, Sponsor is also entitled to 9% prejudgment interest from March 15, 2019 to the date judgment is entered pursuant to N.Y. C.P.L.R. §§ 5001 and 5004.

**ANSWER:** CDM1 denies the allegations in Paragraph 66.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

Because CDM1 has submitted a pre-motion letter in anticipation of moving to dismiss Plaintiff's Second Cause of Action, no answer is required at this time.

## COUNTERCLAIM OF CDM1, LLC AGAINST 41-45 PROPERTY OWNER, LLC

### NATURE OF THE CASE

1.      CDM1 brings this counterclaim to recover $8.5 million for breach of the Option Agreement it entered into with 41-45 Property Owner, LLC ("Sponsor") for the purchase of apartment PH-58 at 520 Park Avenue, New York, New York (the "Premium Payment").  A true and accurate copy of the Option Agreement is attached as Exhibit 1.

2.      The deal never closed because Sponsor failed to comply with specifically-negotiated pre-closing obligations.  Rather than perform those obligations, Sponsor sent CDM1 a notice of default for refusing to close and cancelled the Option Agreement.

3.      Sponsor's failure to perform its pre-closing obligations before the scheduled closing date was a breach of contract.  Sponsor's decision not to postpone the closing while it cured that breach, and to instead declare an event of default and cancel the contract without satisfying its pre-closing obligations, constitutes a repudiation of the contract.  That breach and repudiation entitle CDM1 to a full refund of its Premium Payment and any interest accrued on that payment.

4.      Apartment PH-58 is immediately adjacent to a large mechanical equipment room designed to hold a massive, two-story fire suppression tank and pump system (the "Tank and Pump System").  CDM1 was concerned that being next to such large equipment would disrupt quiet enjoyment of the apartment, and was interested in purchasing the unit only if it could be assured that whatever was installed in the equipment room would not be disruptive.

5.      To induce CDM1 to purchase the apartment, Sponsor agreed to add a clause to CDM1's Option Agreement.  Under the Option Agreement, Sponsor agreed that, *prior to closing*, Sponsor would take "all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of" the Tank and Pump System would "not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance." (Option Agreement § 17.3.)

6.      Despite its clear obligation under Section 17.3 of the Option Agreement, Sponsor never did *anything* to test, to verify, or to ensure CDM1 concerning the Tank and Pump System before it sought to schedule a closing.

7.      CDM1 objected to closing without the assurance to which it was entitled under Section 17.3 of the Option Agreement.  In response, Sponsor provided a report (the "SM&W Report") that is plainly insufficient to satisfy Section 17.3.

8.      The SM&W Report is dated January 7, 2019, three days *after* the scheduled closing date of January 4, 2019, demonstrating that the report was a hasty attempt by Sponsor to paper over the breach of its pre-closing obligations in order to schedule a new closing as soon as possible.

9.      Moreover, the SM&W Report does not satisfy Section 17.3, most notably because it offers the results of only one sound test performed *while the Tank and Pump System was not operating*.  Thus, the test provides no assurance that quiet enjoyment will remain unimpaired during "mechanical functioning" of the system, as required by Section 17.3.

10.     CDM1 retained engineers, at its own expense, to assess potential noise and sound from the Tank and Pump System.  CDM1 provided its engineers with a copy of the Condominium Offering Plan for 520 Park Avenue (the "Plan"), which sets forth Sponsor's entire offer to sell units in 520 Park, including Unit PH-58, and purports to disclose all material information about

the sale offering. CDM1's engineers reviewed the limited information in the Plan about the Tank and Pump System and explained that systems of the sort described can include equipment that cycles on and off as part of its routine operation, presenting a real risk of disturbance. The engineers could not determine whether the Tank and Pump System would make noise, or how often or how much noise, without access to the equipment room for an inspection or at least a detailed technical description of the equipment in the room.

11.     CDM1 informed Sponsor that the SM&W Report was insufficient, provided the explanation from CDM1's own engineers, and requested information CDM1 needed to obtain assurance at its own expense.

12.     In response, Sponsor:

   a)     refused to provide CDM1 with a technical description of the Tank and Pump System;

   b)     refused to permit an inspection by CDM1's engineers;

   c)     failed to provide any information concerning noise levels in PH-58 when the Tank and Pump System was operating; and

   d)     failed to provide a report from anyone with technical understanding of the Tank and Pump System, to verify that it would not make noise except in an emergency or for maintenance.

13.     CDM1 notified Sponsor that because Sponsor failed to meet its pre-closing obligation to "test, verify and specifically ensure Purchaser" as required under Section 17.3 of the Option Agreement, CDM1 would not attend the scheduled closing. As a result of Sponsor's failure to comply with its pre-closing obligation, CDM1 did not attend the scheduled closing.

14.     Rather than acknowledge or cure its breach of Section 17.3, Sponsor sent CDM1 a default notice declaring that the Option Agreement was terminated without any further action by Sponsor or CDM1. Sponsor's decision to terminate in lieu of satisfying Section 17.3 was a

repudiation of the contract, as a result of which CDM1 is entitled to a return of the Premium Payment and any interest accrued on that payment.

## PARTIES, JURISDICTION, AND VENUE

15.     Counter-Plaintiff CDM1, LLC is a Delaware Limited Liability Company that has its principal place of business in Phoenix, Arizona at 4455 E. Camelback Road, Suite C140, Phoenix, Arizona, 85018.  All of its members are domiciled in Arizona.

16.     Counter-Defendant 41-45 Property Owner, LLC is a Delaware Limited Liability Company that has its principal place of business in New York at 445 Park Avenue, Suite 1902, New York, New York 10022 and whose members are domiciled in New York.

17.     The subject property, Unit PH-58 of the 520 Park Avenue Condominium ("Unit PH-58"), is located at 520 Park Avenue, New York, New York, 10022.

18.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a). The citizenship of the parties is diverse and the value of the Premium Payment exceeds $75,000 exclusive of interest and costs.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in this Counterclaim occurred in this District— specifically the subject property is located in this County.

20.     Pursuant to the Option Agreement, New York law applies.

## STATEMENT OF FACTS

21.     In 2017, CDM1 was shown Unit PH-58 at 520 Park Avenue.  520 Park Avenue is a skyscraper located on East 60th Street near Park Avenue on the Upper East Side of Manhattan, New York City.  The building was completed in 2018, but it was still under construction when CDM1 viewed the apartment in 2017.

22.     In or around August 2017, during an early visit to 520 Park Avenue, CDM1

expressed concern that there was a large mechanical room immediately adjacent to the unit on the same floor. CDM1 specifically raised concern that equipment in the mechanical room—the Tank and Pump System—might make noise that was audible in Unit PH-58.

23. In order to induce CDM1's purchase, Sponsor's agent agreed that, prior to closing, Sponsor would take "all reasonable measures to test, verify, and specifically ensure Purchaser" that the equipment room would not impair CDM1's quiet enjoyment of the unit. That agreement was fundamental to the parties' contract. Without that agreement, CDM1 would not have entered into the Option Agreement.

24. In October 2017, CDM1 entered into an Option Agreement with Sponsor to purchase Unit PH-58.

25. The Option Agreement provides a total purchase price for Unit PH-58 of $34 million, payable in two installments: $8,500,000 (i.e. 25%) due upon signing of the Option Agreement, and $25,500,000 (i.e. 75%) payable on the delivery of the deed.

26. The Option Agreement memorialized the parties' agreement concerning the equipment room with a provision, drafted specifically to address CDM1's concerns and inserted into the Option Agreement in bold typeface, as follows:

> **17.3 Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.**

(Ex. 1, § 17.3, emphasis in original.)

27. Section 17.3 was a material provision of the Option Agreement. Its fundamentality is evidenced by the fact that it is the only bolded provision in the 38-page Option Agreement.

28. The Option Agreement also sets forth several other rights and obligations,

including:

a)      Sponsor agreed to "execute, acknowledge and deliver to Purchaser such instruments, and take such other actions . . . as Purchaser may reasonably request in order to effectuate the provisions of this Agreement." (Ex. 1, § 28.)

b)      Sponsor agreed that Purchaser had the right "to insist upon the strict performance by the other party of any and all provisions of this Agreement to be performed by such party." (Ex. 1, § 32.)

c)      Sponsor agreed that "[i]n the event Sponsor cannot convey title to the Unit to Purchaser by reason other than the Purchaser's default, the Premium Payment shall be returned to the Purchaser." (Ex. 1, § 5.)

29.      CDM1 made the initial payment of $8,500,000 pursuant to the terms of the Option Agreement, payable to the direct order of "Star Associates LLP, as Escrow Agent." On information and belief, the funds paid by CDM1 remain in the custody of Star Associates LLP, as escrow agent.

30.      Sponsor sought to schedule the closing approximately one year after entering into the Option Agreement. Sponsor provided a notice on October 24, 2018 seeking to schedule the closing date for November 27, 2018. CDM1 asked to reschedule in light of the holidays, and Sponsor ultimately agreed to adjourn until just after the holidays, on January 4, 2019.

31.      As the scheduled closing date of January 4, 2019 approached, it became clear that Sponsor had no intention of complying with its obligations under Section 17.3. Throughout the nearly fifteen months from the signing of the Option Agreement up to the scheduled closing date on January 4, 2019, Sponsor had not done anything to test, verify, or ensure CDM1 concerning the Tank and Pump System in satisfaction of Section 17.3.

32.      Approximately two weeks before the scheduled closing date, on December 27, 2018, CDM1's counsel notified Sponsor's counsel that CDM1 was frustrated with Sponsor for failing to provide any assurances with respect to the Tank and Pump system as required under

Section 17.3. CDM1 made clear that it remained ready, willing, and able to close if Sponsor complied with its obligations.

33. In a December 31, 2018 email, Sponsor disregarded its failure to comply with Section 17.3 and did not provide any further information or assurances in satisfaction of its obligations under Section 17.3.

34. The day before the scheduled closing date of January 4, 2019, CDM1's counsel sent Sponsor's counsel another written notice informing Sponsor that CDM1 intended to enforce its contractual rights under Section 17.3, demanding to know what steps Sponsor had taken to comply with its obligations thereunder, and making clear that it would not attend the closing in light of Sponsor's failure to satisfy its pre-closing obligations.

35. Sponsor agreed to reschedule the closing, which was ultimately set for February 8, 2019. In the interim, Sponsor sought to paper over its failure to comply with Section 17.3.

36. Sponsor provided CDM1 a report from Sponsor's sound consultant Shen, Milsom and Wilke, LLC—the SM&W Report. The SM&W Report is dated January 7, 2019, which is three days *after* the previously scheduled closing date. The SM&W Report from Sponsor's counsel is attached as Exhibit 2. On information and belief, Sponsor took no steps to comply with its pre-closing obligations under Section 17.3 before the scheduled closing date of January 4, 2019.

37. The SM&W Report, which purports to summarize "the recently-measured sound levels within the 58th floor apartment at 520 Park," is manifestly insufficient to satisfy Sponsor's obligation under Section 17.3 and as such does not cure Sponsor's breach. The SM&W Report does not satisfy Section 17.3, most notably because it offers the results of only one sound test performed *while the Tank and Pump System was not operating*. Thus, the test provides no assurance that quiet enjoyment will remain unimpaired during "mechanical functioning" of the

system, as required by Section 17.3.

38.     Nor does the SM&W Report "specifically ensure Purchaser that the . . . system does not create any sound or noise that will impair Purchaser's quiet enjoyment," and that the Tank and Pump System will only create sound during emergencies.  (Ex. 1, § 17.3.)  The Report states:  "It should also be noted that there was no noise coming from the pump room adjacent to the bedroom, since the pumps in this room are activated only during emergencies."  (Ex. 2 at p. 1.)  But there is no indication that the author of the SM&W Report had any basis to state that "the pumps in this room are activated only during emergencies."

39.     As CDM1 made clear to Sponsor, the SM&W Report did not provide CDM1 with any assurances that there will be no noise from the pumps except in emergencies and failed to provide any testing to verify it.

40.     It is not just that Sponsor failed to take "all *reasonable* measures to . . . specifically ensure Purchaser" of the system's noise; Sponsor failed to provide CDM1 with *any* assurances. (Ex. 1, § 17.3, emphasis added.)

41.     The SM&W Report is useless because it assumes the very thing that it is supposed to verify—that there will be no noise from the pumps except in emergencies—while failing to provide any support for that assumption or any testing to verify it.

42.     CDM1 hired its own expert engineering consultants, Form Space Image Architecture PC ("FSI"), to assess potential sound and noise from the Tank and Pump System. (FSI Reports, attached as Exhibits 3 and 4.)

43.     The First FSI Report explains that the SM&W Report is insufficient, most obviously because "the [SM&W] report does not address noise or vibrations caused by the pumps in operation as no testing while in operation was performed."  The First FSI Report advised that

"acoustical testing should consist of Base line readings with Pumps in operation and not in operation, and from within the pump room and the adjacent space at [Unit PH-58]." (Ex. 3.)

44. The First FSI Report also requested that "a clear description of the installed equipment should be provided" to allow CDM1 to assess "[whether] the tanks maintain pressure [with] Jockey pumps that turn on and off periodically" and "[h]ow and when [] the equipment [will] be exercised." (*Id.*) The First FSI Report concluded that "[a]ll of these conditions must be defined and tested acoustically to determine how the Tank and Pump unit will perform and to determine if quiet enjoyment can actually be achieved as required by article 17.3." (*Id.*)

45. FSI also confirmed that CDM1 had good reasons to be concerned about potential noise from the Tank and Pump System. The only information about the Tank and Pump Systems available from the building's Plan documentation is a general description of a Fire Suppression Tank and Fire Pump that indicates there will be accessory pumps in the building's Fire Protection System. Accessory pumps could run intermittently to satisfy pressure requirements in the system, and the cycling of pumps on and off could occur at almost any time depending on the design and operation of the system. The Second FSI Report advised that it was impossible to tell from the Plan and supporting documents what specific machinery comprises the Tank and Pump System, so further information was necessary to verify one way or the other. (Ex. 4.)

46. CDM1 provided the First FSI report to counsel for Sponsor to explain why the SM&W Report was insufficient and to identify the additional information and testing necessary to satisfy Section 17.3. (*See* Ex. 1, § 17.3 ("Sponsor will . . . specifically ensure Purchaser that the mechanical functioning of said Tank and Pump System does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit . . . .") and § 28 (Sponsor must "deliver to Purchaser such instruments, and take such other actions . . . as Purchaser may reasonably request

in order to effectuate the provisions of this Agreement.").)

47. Even after receiving the First FSI report, Sponsor still

  a) refused to provide CDM1 with a technical description of the Tank and Pump System;

  b) refused to permit an inspection by CDM1's engineers;

  c) failed to provide any information concerning noise levels in Unit PH-58 when the Tank and Pump System was operating; and

  d) failed to provide a report from anyone with technical understanding of the Tank and Pump System to verify that it would not make noise except in an emergency or for maintenance.

48. CDM1 again informed Sponsor that it would not close before Sponsor fulfilled its obligations under Section 17.3.

49. On February 11, 2019, Sponsor sent CDM1 a default notice (the "Default Notice"), for failure to close title on Unit PH-58 as scheduled on February 8, 2019. The Default Notice states that, in the event CDM1 "fails to cure the Default by closing title" before March 15, 2019, "the Option Agreement shall be deemed *cancelled without further notice*" (emphasis added) and asserts Sponsor's right to retain the initial $8.5 million payment.

50. On February 26, 2019, CDM1 communicated to Sponsor that CDM1 was not in default because Sponsor had failed to satisfy its pre-closing obligations per § 17.3 of the Option Agreement, and thus CDM1 did not yet have any obligation to close.

51. In a March 1, 2019, Sponsor reiterated its position that CDM1 had defaulted for failing to close on Unit PH-58 and that the Option Agreement was cancelled.

52. On April 19, 2022, Sponsor sold PH-58. On information and belief, Sponsor was paid approximately $32.5 million for PH-58.

## COUNTERCLAIM
## (BREACH OF CONTRACT)

53.     CDM1 realleges and incorporates by reference Paragraphs 1 through 52 of this Counterclaim.

54.     The Option Agreement was a valid and binding contract between CDM1 and Sponsor.

55.     Sponsor breached the Option Agreement, including a breach of its material pre-closing obligations set forth in Section 17.3 of the Option Agreement.

56.     The plain text of Section 17.3 obligates Sponsor to take all reasonable measures to specifically ensure CDM1 that it has tested and verified that the "Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use" of PH-58 *prior to the date of Closing.* (Ex. 1, § 17.3.) Yet Sponsor failed to test the noise that the Tank and Pump System make; Sponsor only conducted a sound test while the Tank and Pump System was not operating.

57.     CDM1 made express requests for assurance, which it was entitled to under Sections 17.3 and 28, which Sponsor ignored. Section 32 provides CDM1 with the right "to insist upon the strict performance by the other party of any and all provisions of this Agreement to be performed by such party." (Ex. 1, § 32.) Nevertheless, Sponsor failed to perform this obligation prior to or after the scheduled closing date. In doing so, Sponsor breached a material provision of the Option Agreement.

58.     Notwithstanding Sponsor's failure to comply with its own pre-closing obligations, Sponsor declared an Event of Default by CDM1 for failure to attend the scheduled closing on February 4, 2019. In the Default Notice, Sponsor further declared that the Option Agreement was terminated (absent cure) without further notice.

59.     The Default Notice constitutes a repudiation of the Option Agreement by Sponsor.

60.     Because Sponsor elected to repudiate the Option Agreement instead of curing its breach of Section 17.3, CDM1 is entitled to return of its Premium Payment, together with interest accrued on the payment.

## REQUEST FOR RELIEF

WHEREFORE, Counter-Plaintiff CDM1, LLC requests that judgment be entered in its favor against Counter-Defendant 41-45 Property Owner, LLC:

a)     Awarding CDM1 $8,500,000 in damages, plus any interested accrued, and costs; and

b)     Granting CDM1 such other and further relief as this Court deems just and proper.


Dated: New York, New York                          ARENTFOX SCHIFF LLP
       December 9, 2022


                                        By: */s/ Brittany H. Sokoloff*
                                            Brittany H. Sokoloff
                                            1301 Avenue of the Americas
                                            42nd Floor
                                            New York, NY 10019
                                            brittany.sokoloff@afslaw.com
                                            Telephone: 212.745.9555
                                            Facsimile: 212.484.3990

                                            Frederick J. Sperling
                                            Adam Diederich
                                            ArentFox Schiff LLP
                                            233 South Wacker Drive
                                            Suite 7100
                                            Chicago, IL 60606
                                            frederick.sperling@afslaw.com
                                            adam.diederich@afslaw.com
                                            *Admitted Pro Hac Vice*

                                            *Attorneys for Defendant and Counter-Plaintiff CDM1, LLC*