UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
41-45 PROPERTY OWNER, LLC,

               Plaintiff,

     -against-

CDM1, LLC,

               Defendant.

------------------------------------x

Index No.: 22-CV-8634 (LGS)

# AMENDED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

 

Scott E. Mollen, Esq.
Alan D. Kaplan, Esq.
Jennifer M. Muller, Esq.
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016

*Counsel to Plaintiff 41-45 Property Owner LLC*

HF 14847137v.1

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND .................................................................................................. 2

ARGUMENT ............................................................................................................................ 7

CONCLUSION ...................................................................................................................... 12

# **TABLE OF AUTHORITIES**

*Anexia Inc. v. Horizon Data Sol. Ctr.*
   74 Misc. 3d 1233(A) (N.Y. Cty. Sup. Ct. 2022) ...................................................................12

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ................................................................................................................8

*Badding v. Inglis*
   112 A.D.3d 1329 (4th Dep't 2013) .........................................................................................3

*Bell Atlantic Corp. v. Twombly*
   127 S. Ct. 1955 (2007) ............................................................................................................8

*Charles Schwab & Co. v. Retrophin, Inc.*
   2015 WL 5729498 (S.D.N.Y. 2015) .......................................................................................8

*Dalton v Educ. Testing Serv.*
   87 NY2d 384 (1995) ............................................................................................................ 12

*Gary Friedrich Enter., LLC v. Marcel Characters, Inc.*
   716 F.3d 302 (2d Cir. 2013) ...................................................................................................9

*Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*
   62 F.3d 69 (2d Cir. 1995) .......................................................................................................9

*Richbell Info. Servs. Inc. v. Jupiter Partners, L.P*
   309 A.D.2d 288, 302 (1st Dep't 2003) .................................................................................11

*Richter v. Novo Corp.*
   43 A.D.2d 1 (1st Dep't 1973) ......................................................................................... 9, 10

*Schwartz v. Hotel Carlyle Owners Corp.*
   132 A.D. 3d 541 (1st Dep't 2015) ......................................................................................... 3

*Smith v. Putnam*
   145 A.D.2d 383 (1st Dep't 1988) .........................................................................................10

*Walker v. Shult*
   717 F.3d 119 (2d Cir. 2013) ...................................................................................................7

HF 14847137v.1

Plaintiff 41-45 Property Owner LLC ("Plaintiff") respectfully submits this memorandum of law in opposition to the partial motion to dismiss filed by Defendant CDM1, LLC ("Defendant").

## PRELIMINARY STATEMENT

Defendant argues is that it is immune from all liability for its bad faith actions because the parties' agreement contains a liquidated damages provision which allows the Plaintiff to retain Defendant's deposit. Defendant just ignores the provision's limiting language and its own arguments why Plaintiff is not entitled to retain the deposit. The liquidated damages provision does not immunize Defendant from liability for the additional damages its bad faith actions caused Plaintiff to sustain.

Defendant's pre-discovery motion to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be denied because (a) the liquidated damages provision does not preclude Plaintiff's claim; (b) Defendant's motion is premature; and (c) Plaintiff's claim can be asserted independently of Plaintiff's breach of contract claim and would entitle Plaintiff to a set-off against any recovery by Defendant. Moreover, the liquidated damages provision is clearly not as broad and "all encompassing" as Defendant asserts. Rather, it is specifically limited to only address a breach by Defendant of the parties' written purchase agreement or the offering plan. The liquidated damages provision does not include language which makes it applicable to any and all claims by the Parties relating to the purchase and sale of PH-58.

Accordingly, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety.

**FACTUAL BACKGROUND**

<u>Defendant's Agreement to Purchase PH-58</u>

Plaintiff is the sponsor of a new construction condominium project located at 520 Park Avenue, New York, New York (the "Condominium"). (Compl. ¶ 11). In October 2017, Plaintiff and Defendant entered into an agreement for the purchase and sale of Condominium unit PH-58 (the "Agreement") for billionaire Arturo R. Moreno ("Moreno") and his wife Carole D. Moreno. (Compl. ¶ 15).

Pursuant to the Agreement, Defendant, agreed to pay the sum of $34 million for PH-58, with a deposit in the amount of $8,500,000 due upon the execution of the agreement (the "Premium Payment"). (Compl. ¶ 18). Mr. Moreno is an extremely sophisticated business person who was represented by counsel with respect to the subject transaction. (Compl. ¶ 17). According to the terms of the Agreement, Defendant would forfeit the Premium Payment if it failed to close title to the unit. (Compl. ¶ 50).

Defendant requested and negotiated two revisions to the Agreement: (i) two riders which required Plaintiff to make specific modifications to PH-58 at Plaintiff's expense; and (ii) § 17.3 which concerned the sound emitted from the portion of the Condominium's fire suppression system that was located on the same floor as PH-58 (the "Automatic Fire Pump"). (Compl. ¶ 20, 25, 26). Specifically, § 17.3 provides that Plaintiff "will have taken all reasonable measures to test, verify and specifically ensure" Defendant that the Automatic Fire Pump, a fire suppression system, "does not create any sound or noise that will impair [Defendant's] quiet enjoyment and use of the Unit, except in any emergency or routine maintenance." (Compl. ¶ 20).

Plaintiff agreed to include § 17.3 because the Automatic Fire Pump would rarely be activated, if ever, and only prohibited noise which would "impair [Defendant's] quiet enjoyment

2

and use of the Unit," a seemingly inapplicable and very forgiving standard which does not preclude noise or other nuisances unless they rise to a level that substantially interferes with the possession of real property.[1] (Compl. ¶ 24). Defendant agreed to the inclusion of Section 17.3, even though it did not require Plaintiff to undertake any particular test, did not require the Plaintiff to retain an independent third party to conduct a test, and did not require that Plaintiff provide any test result to Defendant. Defendant could have negotiated for such terms but did not. Now, despite failing to negotiate for any such specific terms with respect to Section 17.3, Defendant is asking the Court to re-write the Agreement.

The riders included Defendant's specific and detailed modifications such as: (i) revising the unit's floorplan; (ii) eliminating the door to the kitchen and creating a new opening to align with the doorway between the living room and dining room; (iii) replacing spandrel glass with vision glass; (iv) eliminating pocket doors between the dining room and living room; (v) relocating plumbing in the master bathroom; and (vii) eliminating a powder room to frame out a walk-in closet. (Compl. ¶¶ 26, 28). Notably, Defendant did not make any effort to request any additional

---

[1] In *Badding v. Inglis*, the Fourth Department explained that:

> [the covenant of quiet enjoyment] can be broken only by an eviction, actual or constructive, from the premises conveyed, or some portion thereof . . . In those situations, however, the owner's possession is disturbed by the actions of someone with a superior right to use the property, whether the grantor or a third party. The presence of a defective condition on the property is not equivalent to the impairment of the value of the property based on the existence of such superior rights.

112 A.D.3d 1329, 1331 (4th Dep't 2013) (internal citations omitted). *See also Schwartz v. Hotel Carlyle Owners Corp.*, 132 A.D.3d 541, 542 (1st Dep't 2015) (explaining that "for breach of the covenant of quiet enjoyment, a tenant must show an ouster, or if the eviction is constructive, an abandonment of the premises Constructive or actual eviction requires that there must be a wrongful act by the landlord which deprives the tenant of the beneficial enjoyment or actual possession of the demised premises").

soundproofing measures, modifications, or additional construction specifications for the wall adjoining the mechanical room. (Compl. ¶¶ 26, 28). Moreover, the Offering Plan fully discloses that PH-58 was located adjacent to a mechanical room which contained the Automatic Fire Pump. Also salient, is the fact that the Defendant, its representatives, agents or consultants made at least five visits to PH-58 before Defendant made its belated demand with respect to Section 17.3.

**Defendant's Bad Faith Effort to Manufacture a Breach by Plaintiff**

Plaintiff performed all of its obligations under the Agreement and was ready, willing, and able to close when it noticed the closing to occur on November 27, 2018. (Compl. ¶ 29). At Defendant's request, Plaintiff agreed to adjourn the closing to January 4, 2019. (Compl. ¶ 31). On the eve of closing, Defendant's counsel provided written notice that Defendant would not attend the Adjourned Closing. (Compl. ¶ 35). Defendant suddenly and belatedly demanded to know what steps Sponsor had taken to comply with ¶ 17.3 of the Option Agreement. (Compl. ¶ 35). Notwithstanding Defendant's default, Sponsor again acted in good faith and agreed to reschedule the closing to February 8, 2019 (the "Third Scheduled Closing"), in an effort to accommodate Defendant. (Compl. ¶ 42).

Although it had absolutely no obligation to do so, Plaintiff obtained a report from a third party acoustical technology and consulting firm, SM&W to confirm there was no noise coming from the Automatic Fire Pump to assuage Defendant's purported pre-closing jitters. (Compl. ¶ 43). The SM&W report confirmed that there was no noise coming from the mechanical room adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though the unit was empty, without any furniture, fixtures, or carpet to dampen any sound. *Id.*

On January 15, 2019, Defendant arbitrarily and unreasonably rejected the SM&W report, claiming it failed to satisfy ¶ 17.3 of the Option Agreement. (Compl. ¶ 44). Defendant further objected to the SM&W report because the Automatic Fire Pump, which is only active during emergencies or infrequent routine maintenance, was not active during the testing and demanded substantial additional information regarding the Automatic Fire Pump. (Compl. ¶¶ 45-46). Defendant requested a slew of additional information and testing such as: (i) baseline readings with the Automatic Fire Pump in operation and not in operation; (ii) a description of the installed equipment; (iii) complete plans and specifications for the Automatic Fire Pump; (iv) engineered documents for the Automatic Fire Pump; (v) original design documents and details; (vi) written specifications; (vii) approved shop drawings; (vii) commissioning reports; (viii) sign offs; (ix) approvals stating that the systems are finished and fully operational; (x) complete operating instructions for the Automatic Fire Pump; (xi) the Automatic Fire Pump's maintenance and testing requirements; (xii) details regarding the adjacent wall; (xiii) specific acoustical design criteria utilized and implemented in the adjacent wall's construction; and (xiv) additional acoustical testing performed by Sponsor with the specific criteria spelled out by the Purchaser's acoustical consultant. (Compl. ¶ 46). None of which was required by the Agreement and all of which could have been sought before the agreement was executed by the Parties (Compl. ¶ 47).

On February 11, 2019, Plaintiff served Defendant with a notice of default due to Defendant's failure to close title to the unit at the Third Scheduled Closing. (Compl. ¶ 48). Pursuant to Section 13.2 of the Agreement, Plaintiff was entitled to retain the Premium Payment if Defendant failed to cure its default within 30 days from the date the notice was provided. (Compl. ¶ 50). Specifically, Section 13.2 states that:

> TIME IS OF THE ESSENCE with respect to Purchaser's obligations to pay the Exercise Price and to pay, perform or comply

> with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment and (b) Unit Upgrade Funds. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged from all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

(the "Liquidated Damages Provision") (Compl., Ex. B. § 13.2).

Defendant failed to cure its default and close the transaction on or before March 15, 2019. (Compl. ¶ 53). Instead, Defendant argued that Sponsor's tendering of the Notice of Default constituted Sponsor's repudiation of the Option Agreement entitling Defendant to the return of its Premium Payment. (Compl. ¶ 53). Upon information and belief, Defendant no longer desired to purchase PH-58 at this time and was acting in bad faith by embarking on a scheme to wrongfully manufacture a breach thereof pursuant to ¶ 17.3 of the Option Agreement. (Compl. ¶ 54). Upon information and belief, Defendant– a shrewd businessman with significant experience in real estate – perceived a softening in New York City's luxury real estate market based on press reports and used the Automatic Fire Pump provision as an excuse to back out of the transaction in order to either not purchase a Manhattan apartment at that time or possibly to purchase a different apartment in a different building. (Compl. ¶ 55). At this stage of the litigation, discovery has not yet taken place and this information is solely within the knowledge of Defendant.

HF 14847137v.1

**The Instant Action**

Plaintiff commenced the instant action, seeking damages for Defendant's breach of the Agreement and for damages arising from Defendant's bad faith scheme to manufacture a breach of the Agreement by Plaintiff in an effort to seek the return of the Premium Payment. Pursuant to Plaintiff's breach of contract claim, Plaintiff is entitled to retain Defendant deposit because Defendant failed to cure its default by closing title to PH-58. Plaintiff is also entitled to its actual damages that were sustained as direct result of Defendant's bad faith actions and the need to eliminate Defendant's modifications and restore PH-58 to its original completed state to render the unit marketable to future purchasers. (Compl. ¶ 81). Plaintiff's additional costs were substantial because Plaintiff's construction of the Condominium had already progressed to the point where the crane that was used and subcontractors who had been working in the building had been demobilized. Completing PH-58 required Plaintiff to essentially restart construction. As a result of Defendant's bad faith actions, Plaintiff incurred additional costs of approximately $2,400,000.

## ARGUMENT[2]

When deciding a Rule 12 (b)(6) motion to dismiss, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiffs. *See Walker v. Shult*, 717 F.3d 119, 124 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly

---

[2] Plaintiff notes that Defendant's pre-motion letter dated December 7, 2022 sought permission to file a motion to dismiss on two grounds: (i) that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is duplicative of Plaintiff's claim for breach of contract; and (ii) that Plaintiff's recovery under the implied covenant of good faith and fair dealing is precluded by Plaintiff's decision to recover liquidated damages under the Agreement. (ECF Doc. No 22). Defendant appears to have abandoned its first argument and instead moves solely on the basis that Plaintiff's claim is precluded by the liquidated damages provision contained in the Agreement. Accordingly, Plaintiff is only addressing those arguments raised in Defendant's Memorandum of Law in Support of its Partial Motion to Dismiss. (ECF Doc. No 32).

give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint should only be dismissed if it does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Charles Schwab & Co. v. Retrophin, Inc.,* 2015 U.S. WL 5729498, at *5 (S.D.N.Y. 2015).

Defendant seeks dismissal of Plaintiff's bad faith claim based on its incorrect assumption that the Liquidated Damages Provision applies to all claims between Plaintiff and Defendant. This argument is factually and legally incorrect, as is Defendant's argument that the language in Section 17.3 which prohibits sound or noise from the Automatic Fire Pump "that will impair [Defendant's] quiet enjoyment and use of the Unit" required Plaintiff to prove that the Automatic Fire Pump would make zero noise whatsoever. Defendant's motion to dismiss should be denied because Plaintiff has sufficiently plead its claim for breach of the implied covenant of good faith and fair dealing (Count 2)[3] and because Plaintiff's claim is not barred by the Liquidated Damages Provision.

The Liquidated Damages Provision was not drafted broadly to encompass all potential claims between the parties. Defendant's memorandum of law happens to omit the pertinent language which specifies that upon cancellation of the Agreement, "Purchaser and Sponsor will be released and discharged of all further liability **and obligations hereunder and under the Plan**". (emphasis added). The language of the Liquidated Damages Provision in the Agreement is clear: it only applies to liability and obligations arising under the Agreement or the Offering Plan.

---

[3] Plaintiff notes that Defendant has failed to raise the argument that any of Plaintiffs' claims were insufficiently plead. Defendant has not raised any argument concerning the adequacy of the pleadings as to any cause of action.

*Gary Friedrich Enter., LLC v. Marcel Characters, Inc*. 716 F.3d 302, 313 (2d Cir. 2013) ("When interpreting a contract [under New York law], the intention of the parties should control, and the best evidence of intent is the contract itself.").

In *Richter*, one of the two cases that Defendant's motion relies upon, the court highlighted the fact that the parties' agreement specifically stated that the seller was entitled to retain the contract deposit as liquidated damages "and thereafter, each party shall be **free and clear of all claims against the other**." *Richter v. Novo Corp.*, 43 A.D.2d 1, 1 (1st Dep't 1973) (emphasis added). The Liquidated Damages Provision does not contain any to indicate that it was intended to discharge and preclude all potential claims between the parties, beyond those arising under the Agreement or the Offering Plan. If that was the parties' intention, the language could have stated that: (i) Purchaser and Sponsor will be released and discharged of all further liability and obligations *and be free and clear of all claims against the other*; or (ii) Purchaser and Sponsor will be released and discharged of all further liability and obligations *relating to or arising from the Purchase of PH-58*. The parties did not include such broad language in the Liquidated Damages Provision. Notwithstanding the foregoing, if the Court does find the Liquidated Damages Provision to be ambiguous, such ambiguity should be resolved in Plaintiff's failure and the claim should survive dismissal. *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (a court interpreting a contract pursuant to a motion to dismiss should "strive to resolve any contractual ambiguities in [the non-moving party's] favor").

Defendant's reliance on *Richter* and *Smith* to support its argument that a seller can never retain a down payment and seek compensation for actual damages is entirely misplaced. Neither case considers whether a seller can seek damages, in addition to the retention of a down payment, that were incurred as a result of the buyer's bad faith actions. In *Richter* and *Smith* both seller-

plaintiffs sought to recoup the decrease in the market value of the property following the buyer's default in consummating the transaction. *Smith v. Putnam*, 145 A.D.2d 383, 383-384 (1st Dep't 1988) (denying additional damages when the seller sought the "difference between contract price and price for which premises were ultimately sold to third party, less down payment"); *Richter,* 43 A.D.2d at 1 (denying additional damages when the seller sought additional damages because "the market value of the stock decreased materially"). Plaintiff has not asserted a separate cause of action, as the sellers did in *Richter* and *Smith*, for damages resulting from the additional carrying and financing costs incurred or the decrease of the purchase price when PH-58 ultimately sold to another buyer. It is understood by all parties that the Premium Payment's purpose is to compensate Plaintiff for such losses. Instead, Plaintiff's bad faith claim seeks compensation for damages resulting from Defendant's alleged bad faith scheme to manufacture a breach of the Agreement by Plaintiff in an effort to seek the return of the Premium Payment which Plaintiff was entitled to as a result of Defendant's failure to cure its default.

As direct result of Defendant's alleged bad faith scheme, Plaintiff had to eliminate Defendant's modifications and restore PH-58 to its original completed state to render the unit marketable to future purchasers. Plaintiff's additional costs were substantial because Plaintiff's construction of the Condominium had already concluded and the crane that was used and subcontractors who had been working in the building had been demobilized. Completing PH-58 required Plaintiff to essentially restart construction. As a result of Defendant's bad faith, Plaintiff incurred additional costs of approximately $2,400,000.

Finally, even assuming *arguendo* that the Liquidated Damages Provision could ultimately preclude Plaintiff from recovery under both of its claims (which it does not), Defendant's motion is premature at this early stage of the proceedings. The question of whether Section 13.2 applies

and entitles Plaintiff to retain the Premium Payment is vigorously contested by the parties. Defendant argues that Plaintiff is not entitled to the Premium Payment because Plaintiff purportedly repudiated the Agreement and, thus, Defendant is entitled to the return of the Premium Payment. (Counterclaim ¶¶ 3, 14). If Plaintiff is not entitled to retain the Premium Payment as Liquidated Damages for Defendant's breach, then the provision cannot preclude recovery on Plaintiff's bad faith claim.

Furthermore, Plaintiff can prevail on its bad faith claim and be entitled to a set-off against any recovery by Defendant even if it does not prevail on its breach of contract claim. Defendant argues that Plaintiff's claim must be dismissed because the covenant of raises good faith and fair dealing cannot be used to imply obligations that are inconsistent with the terms of the Agreement. That is not what is occurring in this case. In *Richbell Info. Servs. Inc. v. Jupiter Partners, L.P.,* the First Department addressed the same argument:

> Jupiter urges the rigorous application of the rule in *Murphy v American Home Prods. Corp.* that the implied covenant of good faith cannot create new duties that negate explicit rights under a contract. We recognize that there is clearly some tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other hand, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract. However, the allegations here clearly go beyond claiming only that Jupiter should be precluded from exercising a contractual right; they support a claim that Jupiter exercised a right malevolently, for its own gain as a part of a purposeful scheme designed to deprive plaintiff of the benefits of the joint venture and the value of their pre-existing holdings in Harpur. These allegations do not create new duties that negate Jupiter's explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad faith targeted malevolence in the guise of business dealings.

309 A.D.2d 288, 302 (1st Dep't 2003). Even if the Court determines that Defendant had a right to terminate the Agreement (which it did not), Plaintiff's bad faith claim can stand on its own and

11

Defendant should still be liable for its alleged bad faith scheme. As the New York Court of Appeals explained in *Dalton v Educ. Testing Serv.,*

> Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included. This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.

87 N.Y.2d 384, 389 (1995) (internal citations omitted); *Anexia Inc. v. Horizon Data Sol. Ctr.,* 74 Misc. 3d 1233(A), *2 (N.Y. Cty. Sup. Ct. 2022) ("New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith or fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as a part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain.").

## CONCLUSION

Plaintiffs respectfully requests that the Court deny Defendants' motion to dismiss.

Dated: February 3, 2023
      New York, New York

HERRICK, FEINSTEIN LLP

By: */s/ Scott E. Mollen*
Scott. E. Mollen

Scott. E. Mollen
Alan D. Kaplan, Esq.
Jennifer M. Muller, Esq.
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016

*Counsel to Plaintiff 41-45 Property Owner LLC*

12

HF 14847137v.1