UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 41-45 PROPERTY OWNER, LLC, | Case No. 1:22-cv-08634 (LGS) |
| Plaintiff and Counter-Defendant, | |
| - against - | |
| CDMI, LLC, | |
| Defendant and Counter-Plaintiff. | |

# 41-45 PROPERTY OWNER, LLC'S

# EXHIBIT 23

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ---------------------------------------------X

5   41-45 PROPERTY OWNER, LLC,

6                                    Plaintiff,

7          -against-                 Case No.:

                                     1:22-cv-08634

8   CDM1, LLC,

9                                    Defendant.

10  ---------------------------------------------X

11                      2 Park Avenue

                        New York, New York 10016

12                      March 31, 2023

                        10:06 a.m.

13

14

15        REALTIME VIDEOTAPED EXAMINATION BEFORE

16  TRIAL of CDM1, LLC, the Defendant, taken by a

17  witness, ARTURO MORENO, in the above-entitled

18  action, taken on behalf of the Plaintiff, held

19  at the above time and place, and taken before

20  Dorene Glover, an RSR Reporter and Notary

21  Public within and for the State of New York.

22

23

24

25

MORENO

1
2    MR. SPERLING:  I asked if they are
3  adults.
4    THE WITNESS:  And I said yes.
5    Q.  Okay.  Now --
6    A.  I'm sarcastic.  I almost said
7  sometimes.
8    Q.  Did there come a time around 2017
9  that you and your wife became interested in
10  purchasing a residential property in New York
11  City for your own use?
12    A.  Yes, sir.
13    Q.  And do you recall how that came
14  about?
15    A.  Are you asking me the thought
16  process --
17    Q.  Yes, correct.  Thank you.
18    A.  -- of purchasing?  Well, we spent a
19  lot of time in New York.  We did -- I used to
20  have quite a bit of business here.  Actually,
21  lived in New Jersey for three years a long time
22  ago.  Worked in midtown.  Had an office in the
23  Chrysler building for quite a while, but with
24  my business, because we're public, we came to
25  see banks -- banks and investors a lot.  And

MORENO

1
2  with MLB, offices are here, so I was in and
3  town -- in and out of town a lot.  So I spent a
4  lot of years in hotels.  And, you know, love
5  New York.  Love to come to New York, so --
6    Q.  When you made the decision to
7  purchase a residential property, did you retain
8  the services of a broker or anyone else to help
9  you out?
10    A.  Originally, it was the internet.
11    Q.  Right.
12    A.  Spent a lot of time on the
13  internet.  Excuse me.  Spent a lot of time
14  looking at areas and units and costs and, you
15  know, neighborhoods, and we when we got really,
16  sort of, close to thinking that that's what we
17  want to do, we spent a lot of time.  I would
18  say we looked -- probably, you know, always
19  even when I was in and out of town, I was
20  always looking at what areas, what buildings,
21  et cetera.
22    Q.  How was it that you came to look at
23  the building at 520 Park Avenue?
24    A.  A broker.
25    Q.  And what was that broker's name?

MORENO

1
2    A.  Her name -- her first name was
3  Nikki.  I -- I can't recall the last name.
4    Q.  Would the name Field refresh --
5    A.  Yes.
6    Q.  -- your recollection?
7    A.  Yes, Nikki Fields.
8    Q.  Did -- did she stay on through the
9  whole process with you as your broker, or did
10  there come a time when you parted ways?
11    A.  Yes.  Well, I would say most of the
12  time she was there.
13    Q.  Was the -- was the ending
14  acrimonious or pleasant?  How would you
15  describe it?
16    A.  It was pleasant.
17    Q.  Okay.  Was there ever a lawsuit
18  involved between you and Ms. Field regarding a
19  commission that she claimed was owed?
20    A.  There was no lawsuit that I recall.
21    Q.  Was there a claim made by her that
22  didn't make it into a lawsuit?
23    A.  I -- I don't recall.
24    Q.  Okay.  So approximately when was it
25  that Nikki Field introduced you and your wife

MORENO

1
2  to 520 Park Avenue?
3    A.  I believe somewhere around 2017,
4  '16, '17 in that period.  I don't recall the --
5  the dates or time.
6    Q.  If -- if I represent to you that
7  the option agreement was signed October 6th,
8  2017, does that help you figure out when you
9  first were introduced to the building?  Was it
10  six months before that?
11    A.  I -- I would probably say somewhere
12  in that four to six months.  I -- I don't
13  recall exactly.  We -- we looked at a lot of
14  properties.
15    Q.  Okay.  Did you look at other units
16  within that building in 520 Park Avenue?
17    A.  Yes, sir.
18    Q.  How many?
19    A.  I don't recall, but there were
20  quite a few.
21    Q.  Ultimately, though, you began to
22  focus on the unit that's described as PH,
23  Penthouse 58; is that correct?
24    A.  Yes, sir.
25    Q.  Okay.  And ultimately, you came to

MORENO

1
2 the conclusion that that was the unit that you
3 wished to purchase; is that correct?
4      A.  Correct.
5      Q.  Who was part of the decision making
6 process?  As a married man, I'd assume your
7 wife was very involved?
8      A.  Very involved.
9      Q.  Did anybody else weigh in other
10 than you and -- and your wife?
11      A.  Can you explain the question?
12      Q.  Was anybody else involved with the
13 decision making process other than you and your
14 wife?  In other words, the decision making
15 process, this is the unit we want, we want to
16 pursue --
17      A.  It -- it was my wife and I.
18      Q.  Okay.  And do you recall when that
19 was approximately?
20      A.  I don't recall.
21      Q.  Again, if we use that October 6th
22 date as a bench --
23          THE REPORTER:  October?
24      Q.  -- 6th, 2017 date as a benchmark,
25 was it a month prior, two months prior, three

MORENO

1
2 months prior?
3      A.  That we started looking at the
4 apartment?
5      Q.  No, that you had made the decision
6 that that was the unit that you would like to
7 purchase?
8      A.  Pardon me.  I can't remember the
9 exact date when we made the decision.  We spent
10 a lot of -- we put a -- we spent a lot of time
11 on it.  Once we made the decision, we spent a
12 lot of time.
13      Q.  Who, if anyone, did you deal
14 with -- by the way, you were dealing with a
15 sponsor that was presenting the unit for sale,
16 correct?
17      A.  Yes, sir.
18      Q.  And do you recall the specific name
19 of the sponsor?
20      A.  Yes, Louie.
21      Q.  Okay.  Louie the -- an individual?
22      A.  Louis, yeah, Louie Buckworth.  They
23 had an office there on -- on 5th, 5th and
24 about -- excuse me.  About 5th and 60th about a
25 block and a half away from the unit.

MORENO

1
2      Q.  Was that Louis Buckworth?
3      A.  Yes.
4      Q.  Okay.  And you described him as
5 Louie?
6      A.  I -- I called him Louie.
7      Q.  Okay.  When you said that you spent
8 a lot of time, are you referring to time before
9 you signed the option agreement in October of
10 2017?
11      A.  Yes, sir.
12      Q.  And -- and what did -- what did you
13 do during that -- that time?
14      A.  Well, once we decided that we -- we
15 thought, you know, we believed that this was
16 the unit we wanted to purchase.  You know, we
17 liked the area, and we liked the building.  And
18 at that time, there were a lot of -- a lot of
19 drawings.  I had drawings of the entryway to
20 the hotel, the exercise, the pool, a lot of the
21 services that the hotel had.
22      Q.  I'm sorry, you used the word -- the
23 term hotel, did you mean --
24      A.  I mean -- I'm sorry, the apartment
25 building.

MORENO

1
2      Q.  Okay.
3      A.  Anyway, the -- so we spent a lot of
4 time looking at drawings, and then, we looked
5 at the drawings of a lot of apartments.  And
6 they had some models in their workplace
7 photographs, designs of kitchens and floor
8 layouts, you know, bedrooms, and et cetera, et
9 cetera.
10      Q.  Did you look at floor plans of --
11 of the units?
12      A.  Yes, sir.
13      Q.  Do you recall what stage of
14 construction the building was in at this time?
15      A.  A shell.
16          THE REPORTER:  I'm sorry, say that
17 again.
18      A.  A shell.
19      Q.  Were -- were any of the apartments
20 constructed to the extent that you could go in
21 them and see, actually, the room layouts and --
22 and how the flow was in the -- in the
23 apartment?
24      A.  Early on, no.
25      Q.  At what point in time would you say

8 (Pages 26 - 29)

<br>

Page 30

MORENO

1
2 you were able to do that?
3     A.  Probably, and this -- this is an
4 estimate or a guess.
5     Q.  Okay.  I don't want you to guess.
6 If you can give sort of an educated estimate,
7 that's fine.
8     A.  I would probably say 60 to 90 days
9 prior to signing.
10     Q.  Okay.  And on how many occasions
11 did you or your wife visit the unit prior to
12 signing?
13     A.  I don't recall exactly.  I -- I
14 really -- I would say, you know, probably six,
15 eight, I'm just estimating.
16     Q.  Okay.  Five to eight times?
17     A.  I would say multiple times.
18     Q.  And did you visit the unit
19 together, you and your wife, or were there
20 occasions where she would go alone or you would
21 go alone?
22     A.  Most of the time together.
23     Q.  And do you recall how much time you
24 would spend in the units -- in the unit when
25 you visited?

Page 31

MORENO

1
2     A.  Well, I -- really a little bit of a
3 sore spot.
4     Q.  Tell me, please.
5     A.  A lot of times, we had an
6 appointment, and they wouldn't let us in the
7 building.
8     Q.  Okay.  But ultimately, you -- you
9 did see the unit five to eight times prior to
10 --
11     A.  We --
12     Q.  -- the signing?
13     A.  Let's -- let's call it the -- the
14 building.
15     Q.  Got it.  How many times in the unit
16 itself?
17     A.  When we first saw it, it was just a
18 pure skeleton where we --
19     Q.  Okay.
20     A.  -- rode up an outside elevator and
21 hard hat and get -- got a feeling for the
22 height and the views, really what we were
23 looking.
24     Q.  Okay.  And how about the later
25 visits?

Page 32

MORENO

1
2     A.  Basically, the same.  Starting to
3 get a little bit more of an idea of the floor
4 layout.
5     Q.  When -- when you made the visits,
6 were you accompanied by other individuals?
7     A.  Always.
8     Q.  Who -- who went with you on these
9 visits?
10     A.  Most of the time, it was Louis,
11 Louie, and a few times a foreman.
12     THE REPORTER:  I'm sorry?
13     Q.  A construction foreman?
14     A.  Construction foreman.
15     Q.  Okay.  Did anyone else that you
16 understood to be a representative of the
17 sponsor ever attend those visits other than Mr.
18 Buckworth?
19     A.  I -- I don't recall.
20     Q.  Is it possible there may have been,
21 or is it just that you don't remember?
22     A.  I -- I don't remember.
23     Q.  Okay.  Now, during this period of
24 time, did you become aware that the building
25 plans called for the placement of a tank and

Page 33

MORENO

1
2 pup -- pump room, which would be used for a
3 fire suppression system?
4     A.  Yes, sir.
5     Q.  At what point in time did you
6 become aware that that room was going to be
7 adjacent to one of the bedrooms in PH 58?
8     A.  Immediately.
9     Q.  Immediately, okay.  And do you
10 recall the questions that you asked when you
11 first found out that such a room was going to
12 be adjacent to one of the bedrooms?
13     A.  Yes.
14     Q.  And what -- what were those
15 questions?
16     A.  Noise.
17     Q.  And who did you ask those questions
18 to -- present those questions to?
19     A.  Louie, or Louis.
20     Q.  Okay.  And do you recall what Louis
21 told you?
22     A.  I don't recall exactly what he told
23 us.
24     Q.  Could you tell me generally what
25 he --

9 (Pages 30 - 33)

MORENO

1
2 sound issues or potential sound issues?
3    A.  I don't recall.  I do not recall.
4    Q.  Were there situations where you,
5 before purchasing a building, found that there
6 were issues which you needed to have resolved
7 pursuant to the contracts before the purchase
8 took place?
9    A.  Always.
10    Q.  So in other words, if you had a
11 concern about an electrical system that had had
12 prior issues, would you put specific assurances
13 in a -- in a contract that was -- and into
14 purchase that property that you had reps and
15 warranties --
16    A.  Yes.
17    Q.  -- that protected you?
18    A.  Always.
19    Q.  And was it important to put
20 specific language in those contracts --
21    A.  Yes.
22    Q.  -- about those issues?  After you
23 learned of the existence of the tank room that
24 was going to be adjacent -- I think it was
25 bedroom number two.  Does that refresh your

MORENO

1
2 recollection?
3    A.  Really, bedroom number three, I
4 believe.
5    Q.  Bedroom number three?
6    A.  Yeah, master bedroom, the second
7 one, and the third was the pump room.
8    Q.  Okay so the bedroom that was
9 adjacent to the pump room was bedroom number
10 two?
11    A.  Correct.
12    Q.  Okay.  Was any other portion of the
13 unit adjacent to any of the walls of the pump
14 room?
15    A.  I don't recall.  It was on the
16 corner, and I -- I want to believe there was a
17 hallway close.  And then, the elevator shaft
18 was there.
19    Q.  What, if any, due diligence did you
20 perform other than speaking to Mr. Buckworth
21 about what a pump and tank room was and what
22 potential noise would emanate from it prior to
23 your signing the option agreement?
24    A.  Well, really, had never -- had
25 never been around a pump room.  When we looked

MORENO

1
2 at the unit, there was just a big hole in the
3 floor.
4    Q.  Right.
5    A.  In fact, there was a couple of
6 holes, you know, for plumbing, and it was, you
7 know, a pretty good size bedroom.  So you
8 figure it wasn't a small pump, but enough
9 concern that my wife was not sure she wanted to
10 purchase that particular unit because she's a
11 light sleeper and really didn't want to be in a
12 situation where if she ever went into the other
13 bedroom or we had guests in the other bedroom,
14 that, you know, this large water pump -- and I
15 want to believe it was multiple floors, I mean
16 at least two --
17    Q.  Okay.
18    A.  -- didn't create any sound.
19    Q.  Did the presence of the tank and
20 pump room factor into the price that you
21 ultimately negotiated for the unit?
22    A.  No, sir.
23    Q.  You didn't get any price reduction?
24    A.  No, sir.
25    Q.  Okay.  Was the square footage

MORENO

1
2 encompassed by the tank and pump room, was that
3 part of the square footage of your unit or was
4 that separate?
5    A.  I do not know how that was
6 measured.
7    Q.  Okay.  So you don't know if the
8 existence of the tank and pump room reduced the
9 square footage that you were paying for?
10    A.  I don't recall.
11    Q.  Okay.  Now, being that this was a
12 concern of yours, did you do any -- strike
13 that.
14        Did you ever ask to see from the
15 sponsor any plans or specifications regarding
16 what was going to actually go into that pump
17 and tank room before you signed the option
18 agreement?
19        MR. SPERLING:  So Counsel, as you
20    know, Mr. Moreno did not sign the option
21    agreement, Mr. Carey did.
22        MR. KAPLAN:  Right.
23        MR. SPERLING:  You keep saying in
24    your questions that Mr. Moreno signed
25    the option agreement.  That's not

11 (Pages 38 - 41)

Page 42

```
1              MORENO
2      correct.
3      Q.  Right, right.  Well, when I'm
4  saying signed the option agreement through a
5  representative of CDM1, which you're a member
6  of obviously.  Prior to the signing of that
7  option agreement, did you ever ask any of
8  the -- did you ever ask the sponsor to provide
9  you any plans or specifications regarding what
10 was actually going to go into that pump and
11 tank room?
12     A.  Well the specifications would have
13 meant -- wouldn't have meant anything to me
14 because I'm not familiar with those kind of
15 specifications, but I really was asking what's
16 the size -- round figures what the size was.
17 And obviously, they were pumping a tremendous
18 amount of water, so we talked about timing, a
19 little bit of the timing.  But as far as just
20 straight specifications, I had multiple
21 questions to the point that I told Louie that
22 unless they could guarantee no sound, that I
23 was not going to sign.
24     Q.  Are you saying that you didn't have
25 access to individuals who could have reviewed
```

Page 43

```
1              MORENO
2  the plans and specifications for you to tell
3  you what was going to go into that pump and
4  tank room?
5      A.  So, you're asking me questions
6  about approximately six years ago.  I really --
7  I can't remember other than the fact that to
8  the point where I had conversations with Chip
9  that I needed language in that -- that contract
10 to ensure that we would not sign anything until
11 that particular paragraph went in, so we spent
12 a lot of time.  That was really our only
13 contingency in that agreement, so we spent
14 enough time that, you know, we had been working
15 on the layout and my wife had our designers
16 from Arizona fly out, do drawings, and -- but
17 the one hang up was always the pump room.  And
18 I don't recall exactly the timing, but we did
19 hire someone -- it was a specialist -- to
20 inspect the equipment, and they were not
21 allowed access.
22     Q.  Now, based on Mr. Carey's testimony
23 yesterday, that did not occur until December of
24 2018 over 14 months after the option agreement
25 was signed, is that --
```

Page 44

```
1              MORENO
2      A.  About right.
3      Q.  Okay.  So based on your prior
4  experience with purchasing properties, wouldn't
5  the engagement of an expert to help you
6  determine what equipment was going into that
7  tank and pump room be something that you
8  normally would have done?
9      A.  I -- I can't answer that.  I just
10 don't recall.  I just don't recall that thought
11 process.  I was very comfortable with -- with
12 Louie and -- and how he handled and serviced us
13 that I guess I did not, you know -- I just
14 don't recall saying I want you to hire -- you
15 know, before I do anything, I need to hire an
16 expert.
17     Q.  You don't recall saying that to
18 Louie?
19     A.  I did not.
20     Q.  You did not, or you don't recall
21 saying that?
22     A.  I don't recall.  All I -- the thing
23 I recall the most over and over and over,
24 asking the question about the sound of the
25 equipment, and I was being guaranteed.  I felt
```

Page 45

```
1              MORENO
2  very comfortable that they accepted -- they
3  accepted my contingency into the contract that
4  the equipment would not create any noise.  And
5  it -- that was a specific thing in that
6  contract.
7      Q.  What did you do to prepare, if
8  anything, for your deposition today?
9      A.  Couple of weeks ago we had --
10        MR. SPERLING:  So you can answer
11     who you met with and when you met, but
12     you shouldn't disclose the substance of
13     any communications with counsel.
14     A.  I understand that.
15     Q.  Let me -- let me focus it in, so
16 it'll be more helpful.  Did you look at
17 documents when you prepared for your
18 deposition?
19     A.  A few, I guess.
20     Q.  Okay.  Is it safe to say that no
21 expert was hired by you or by CDM1 to
22 investigate any aspect of PH 58 prior to the
23 signing of the option agreement in October 6th,
24 2017?
25     A.  I -- I believe that.
```

12 (Pages 42 - 45)

MORENO

1
2 we had appointment, double checked, taking --
3    Q.  Right, right.
4    A.  -- time, and they wouldn't let them
5 in.
6    Q.  Okay.
7    A.  So for sure twice.
8    Q.  Did they eventually get into the
9 unit, the designer?
10    A.  One time, they got onto the floor.
11    Q.  Right.  Did they actually get into
12 the unit itself?
13    A.  Well, the unit was still a slab.
14    Q.  Okay.
15    A.  You know, with -- with some walls.
16    Q.  Were there safety issues that --
17    A.  Yes.
18    Q.  Okay.  Did you ever do any internet
19 searches regarding the tank and pump room?
20    A.  I did not.
21    Q.  Did you ever do any internet search
22 regarding the specifics of fire suppression
23 systems?
24    A.  I don't recall.
25    Q.  Based on -- on your experience in

MORENO

1
2 the real estate industry, do water tanks in and
3 of themselves make any noise?
4    A.  I -- I really am not familiar with
5 all, you know, the water.  You know, obviously
6 we have someone check the plumbing, but usually
7 when you have a water tank, you have something
8 that's much higher.  And where we are, like I
9 said, I want to say our highest is like three
10 stories or something, two or 3 stories.
11    Q.  Did you -- I'm sorry.
12    A.  Two or three stories.
13    Q.  Did you engage any plumbers or
14 similar tradesmen to review the plans regarding
15 the tank and pump room that was going to be
16 next to the unit prior to the time that the
17 option agreement was signed?
18    A.  I did not.
19    Q.  And just for the record, when I
20 refer to the unit, you understand that I'm
21 referring to PH 58?
22    A.  Yes.
23    Q.  Okay, good.  Did you have anyone on
24 your behalf or CDM1's behalf research the
25 pertinent New York City noise code before the

MORENO

1
2 option agreement was signed?
3    A.  No, sir.
4    Q.  Did you or anyone on CDM1's behalf
5 engage anyone to research the New York City
6 building codes and what application they may
7 have to a tank and pump room prior to the
8 signing of the -- the operation agreement?
9    A.  No, sir.
10    Q.  Did you engage any architects or
11 design experts to provide you information or
12 review plans or specifications regarding the
13 tank and pump room that was going to be
14 adjacent to Penthouse 58 prior to the signing
15 of the October 2017 operation agreement?
16    A.  I -- I don't recall.
17    Q.  Other than your conversations with
18 Mr. Buckworth, to your knowledge, did you or
19 did anyone on CDM1's behalf do any due
20 diligence regarding the tank and pump room or
21 potential noise emanating from the pump room
22 other than your conversations with
23 Mr. Buckworth prior to the signing of the
24 October 2017 option agreement?
25    A.  Can you repeat the question,

MORENO

1
2 please?
3        (Whereupon, the referred question
4    was read back by the Reporter.)
5    A.  I did not -- did not.
6    Q.  Okay.  Did -- did you have
7 conversations with Mr. Carey regarding concerns
8 you might have had relating to potential sound
9 and noise emanating from the tank and pump room
10 prior to the signing of the option agreement?
11    A.  Yes, sir.
12    Q.  And do you recall what, in essence,
13 you said to him and what he said to you?
14    A.  Not exactly.  It, you know, was
15 quite a few years ago --
16    Q.  I understand.
17    A.  -- but I told him that it was
18 number one concern.
19    Q.  Okay.
20    A.  And -- and I was guaranteed by
21 Louie, or Louis Buckworth, that -- that they
22 would take care of it.  And I just said -- they
23 were really pushing hard you as, you know, most
24 salespeople are, just to make sure they sold
25 the unit, and I -- you know, so I talked to

14 (Pages 50 - 53)

Page 54

MORENO

2 chip about it to make sure we had the proper
3 language that if they did not meet the sound
4 requirement, that we would not close the unit,
5 and we weren't going to buy it. That was the
6 only issue, the number one issue that I had,
7 and just a simple contingency of saying, you
8 know, we want to -- want to buy this unit, like
9 the building, like everything you're doing. We
10 just have an issue that there would -- it would
11 be a sound problem.
12     Q. Two things that you said I want to
13 follow-up with. You mentioned sound condition.
14 When you say sound condition, could you explain
15 what you mean?
16     A. That -- that there was not any
17 noise going to be coming from the equipment.
18     Q. In your experience in the real
19 estate industry, are mechanical rooms totally
20 soundless, or do they make some noise?
21     A. I really couldn't -- I really
22 couldn't tell you if this was a -- this was a
23 specific personal use unit, and like I said,
24 the -- the units that we have usually the --
25 the equipment room has electrical where the,

Page 55

MORENO

2 you know, electrical people can go in.
3     Q. Right.
4     A. But -- but just -- just a complete
5 separate issue here. I mean, this is a
6 personal use apartment, and, you know, one of
7 the things we liked about it was the height.
8 It had a balcony. There are few units that
9 have balconies. We liked the views, liked the
10 building. Had an issue with the -- you know,
11 and we -- if you -- you know, obviously, you've
12 looked at the agreement up and down. I mean,
13 it just -- it's put in bold letters, the one
14 issue that they had to -- to comply with. If
15 they complied with that, there wouldn't have
16 been any problems.
17     Q. Had you ever lived prior to this in
18 buildings that had elevators?
19     A. I don't -- that I don't recall.
20     Q. Do elevators make noise in
21 residential buildings?
22     A. That I can't tell you. I can tell
23 you hotels do.
24     Q. How about --
25        THE REPORTER: I'm sorry. I can

Page 56

MORENO

2     tell you?
3     A. Hotels do.
4     Q. How about air conditioning and HVAC
5 units, do they make noise?
6     A. I -- I don't recall.
7     Q. How about air vents, does noise
8 come out of air vents in buildings?
9     A. I mean, sometimes. I mean, I've
10 been in a lot of unit -- a lot of hotel rooms
11 where they were really quiet, and I've been in
12 other ones that, you know -- and then, a lot
13 of -- I travel a lot, so, you know, they're not
14 all perfect rooms.
15     Q. When -- when you said before that
16 Mr. Buckworth guaranteed you, was this in a --
17 a verbal conversation you had with him?
18     A. Verbal conversation.
19     Q. Okay. Did he use that word
20 guarantee?
21     A. I don't know if he used that word.
22 I mean, he just assured us that -- that they
23 would take care of it. I mean, they -- excuse
24 me. Obviously when -- I believe, just my
25 personal belief is when we put -- when we gave

Page 57

MORENO

2 them a contract with our changes, I believe
3 that -- that they were accepting the contract
4 because I've been in a situation where I put
5 contingencies in, and the other side said we
6 will not live by these contingencies. They
7 didn't come back and just say. They accepted
8 the contract with the big contingency, and to
9 me, it was a big contingency. It was our only
10 issue. It wasn't -- we weren't talking about
11 air vents and elevator noise, whatever. We
12 were talking about the pump room and where it
13 was located and how that'll affect us.
14     Q. And -- and did Mr. Buckworth tell
15 you that the unit, the tank room would only
16 emanate noise during an emergency or during the
17 operation of the pump for routine maintenance
18 and inspections?
19     A. I don't -- I don't recall.
20     Q. Did he tell you if the pump or
21 pumps in the tank room made noise other -- or
22 did make noise other than when they were
23 operating during an emergency or routine
24 maintenance or testing?
25     A. I don't recall.

15 (Pages 54 - 57)

Page 70

MORENO

1
2    Q.  Right.
3    A.  Yeah.  I don't -- you know, I -- I
4  really can't answer, you know, what Chip was
5  asking for or what he was trying to accomplish
6  here.  I know he was going to visit, and he
7  basically was handling a lot of issues on the
8  apartment for us.
9    Q.  Now, you've worked with Mr. Carey
10  for many years, right?
11    A.  Yes, sir.
12    Q.  So what -- what would your
13  estimation be of what he meant by the term
14  modest diligence?
15        MR. SPERLING:  I object to the
16      extent you're asking the witness to
17      guess or speculate.
18    Q.  You can answer.
19    A.  That's -- you know, that's a guess
20  or a speculation.
21    Q.  So you don't -- okay.  Prior to
22  your purchase of any real estate, did you ever
23  perform modest due diligence as opposed to a
24  robust diligence?
25    A.  There's a play on words.

Page 71

MORENO

1
2    Q.  Well, one means middling, and the
3  other means to a more extreme level.
4    A.  That -- that really --
5    Q.  I'm sorry?
6    A.  I really can't explain what his
7  word or thought process with -- was with.
8    Q.  Before you purchased your
9  investment properties, would you do a thorough
10  due diligence?
11    A.  We do due diligence, and depending
12  on the property, there's different kinds of due
13  diligence.  So -- and that -- that's really a
14  big general question.
15    Q.  What -- what different kinds of due
16  diligence are there before you purchase a
17  property?
18    A.  Well, if it's new construction --
19  excuse me.
20    Q.  That's okay.
21    A.  If it's new construction, you have
22  less things to worry about because there's
23  not -- has anything been used and very
24  typically, you have a big process of
25  inspections.  And inspectors are always in

Page 72

MORENO

1
2  there looking at, you know, foundations and
3  plumbing, electrical, and it's brand new.  So
4  it's just a huge difference.  If you're buying
5  a property that's used or aged, you know, maybe
6  you know, mid -- mid-income property, then
7  you're -- you really have to do a little bit
8  more, you know, depending on the age, have more
9  inspections done on some of the electrical or
10  plumbing and et cetera.
11    Q.  Was the fact that you were going to
12  use this unit as a residence imply to you or
13  speak to you as being one that required a
14  higher level of diligence than normal?
15    A.  Again, to me, new building, you
16  know, you -- it's a brand new building, and
17  you're, you know -- my belief was it was being
18  inspected, and we're looking at something, you
19  know, 50 stories up.
20    Q.  Got it.  Got it.  Okay.
21        MR. KAPLAN:  I'd like to turn your
22      attention to what's been previously
23      marked as Exhibit 37.  Do you guys need
24      a copy?  It's the option agreement.
25      Okay.

Page 73

MORENO

1
2        MR. DIEDERICH:  Actually, is this
3      the Exhibit you marked?
4        MS. MULLER:  37.
5        MR. DIEDERICH:  Okay.  Thank you.
6        MR. KAPLAN:  Right, this is one
7      with 3686.
8    Q.  Now, Mr. Moreno, this has been
9  identified by Mr. Carey as a copy of the option
10  agreement that was signed on October 7th, 2017.
11  Is that what it appears to you as well?
12    A.  Yeah, I haven't checked every page
13  or --
14    Q.  Okay.
15    A.  So I -- I would be --
16    Q.  I'll --
17    A.  -- I would be guessing.
18    Q.  I'll represent to you that this
19  exhibit has been identified by other witnesses
20  in the case, including Mr. Carey.
21    A.  Okay.
22    Q.  Okay.  So I'd like to turn your
23  attention to -- and if you look in the bottom
24  right-hand corner -- page 03719.
25    A.  3719?

19 (Pages 70 - 73)

Page 110

```
            MORENO
1
2       A.  We -- we had a lot of
3   conversations.
4       Q.  During the conversations that
5   Mr. Buckworth was having with Mr. Carey, did
6   Mr. Carey keep you advised of what the subject
7   matter and progress of those conversations
8   were?
9       A.  We -- I don't know specifically
10  about those specific conversations.  I -- I
11  said once before, I talked to Chip pretty much
12  every day.
13      Q.  Okay.  Now, about that time, the
14  middle of December with the January 4th date
15  coming up for the closing, do you recall
16  speaking with Mr. Carey or Mr. -- Mr. Buckworth
17  about what your options would be regarding the
18  unit?
19      A.  I don't recall.
20      Q.  Do you recall being privy to any
21  conversations or feedback from Mr. Carey, in
22  which the discussion of your flipping PH 55 --
23  58 was discussed?
24      A.  If we were flipping it?
25      Q.  Yeah.  Do you recall that there
```

Page 111

```
            MORENO
1
2   were any discussions about instead of your
3   moving in to reside in the unit, that you were
4   going to close and then sell it?
5       A.  I -- I don't recall that.
6       Q.  Is that something that you recall
7   being on your mind at all during that period of
8   time?
9       A.  I -- I really never bought anything
10  to flip.  I have never bought anything, and I'm
11  using ever, bought something to flip.
12      Q.  Okay.  Do -- do you know if Mr.
13  Carey ever told you that he had conversations
14  about that with Mr. Buckworth and that
15  Mr. Buckworth recommended to him that it would
16  not be a financially sound thing to do?
17      A.  I don't recall that.
18      Q.  Do you recall whether or not Mr.
19  Carey told you about conversations he had with
20  Mr. Buckworth in which it was suggested by
21  Mr. Buckworth that instead of flipping the
22  unit, that you purchase it and then rent it out
23  for a period of time?
24      A.  I don't recall.
25      Q.  Do you recall having any
```

Page 112

```
            MORENO
1
2   conversations with either Mr. Buckworth or with
3   Mr. Carey in that December 2018 period of time
4   about the state of the real estate market in
5   New York?
6       A.  I -- I can't recall.
7       Q.  Was that a concern of yours in
8   December 2018 that the market might have taken
9   a downturn and that that might affect the value
10  of Penthouse 58 which you were presumably about
11  to close on?
12      A.  I -- I don't recall.
13      Q.  Now, do you remember why experts,
14  acoustical experts were retained in December of
15  2018?
16      A.  Why they were retained?
17      Q.  In 2000 -- in December of 2018.
18      A.  I don't recall the month or the
19  time.  I just -- I go back to this paragraph.
20  I've said it numerous times.  My wife had a big
21  issue about the noise, the sound, and up until
22  that time, we -- we had not had the
23  clarification on -- on whether or not they
24  accomplished what we needed to have
25  accomplished.  And I remember telling Chip, I
```

Page 113

```
            MORENO
1
2   said, I'm not going to close until they have us
3   100 percent comfortable with this -- with this
4   particular noise and sound of the equipment,
5   and -- and I know Chip was working on it a lot,
6   but I told him, I said, I'm not going to close
7   something.  And, you know, I was already -- had
8   a substantial down payment, and all along we
9   we're planning to move in.  Why would -- why
10  would I put that kind of money done, one,
11  $8,500,000 that they were holding and -- and be
12  in a situation that they weren't servicing our
13  needs.  I mean, it just was, like, a very
14  simple thing to do as far as I was concerned.
15  It wasn't like anything else.  I mean, they
16  were already really delayed, and service was
17  crazy, bad.  And other units had been being
18  delivered, but, you know, it's -- it's like a
19  simple thing that we're sitting here spending
20  all this time and effort on is the fact is, you
21  know, there's a few units that -- that this
22  tank comes into play with.
23      Q.  Prior to Christmas time that year,
24  had you or anyone on your behalf or on CDM1's
25  behalf sent a letter to the sponsor
```

29 (Pages 110 - 113)

MORENO

1
2 before?
3     A.  I have not.
4     Q.  Were you ever advised that this
5 e-mail was -- was sent?
6     A.  I -- I don't recall.
7     Q.  Okay.  If you look in the e-mail,
8 does it include the -- the numbers reflecting
9 the kitchen credit amount?
10     A.  It does.
11     Q.  And if you look a little bit
12 further, it talks about, with respect to 17.3
13 of the option agreement, we confirmed that
14 sponsor has consulted with its sound
15 consultant, who has confirmed that the tank and
16 pump system is not anticipated to create sounds
17 or noise that would impair purchaser's quiet
18 enjoyment and use of the unit except
19 potentially during an emergency or routine
20 maintenance.  Did that -- did I read that
21 correctly?
22     A.  You did.
23     Q.  Were you ever told that -- that the
24 sponsor sent this type of an e-mail after the
25 December 27th e-mail was sent out by

MORENO

1
2 Ms. Rabinovich?
3     A.  I don't recall this e-mail.
4     Q.  Okay.
5     A.  And again, I don't recall this
6 e-mail.
7     Q.  And -- and just to be sure,
8 January 3rd was the day prior to the
9 January 4th closing, correct?
10     A.  I guess so.
11     Q.  Okay.  Did you ever schedule a
12 walkthrough of the unit after December 27th,
13 knowing that the closing was scheduled for
14 January the 4th?
15     A.  No.
16     Q.  Did anyone on CDM -- on behalf of
17 CDM1 ever schedule a -- a walkthrough prior to
18 the January 4th closing?
19     A.  Not that I'm aware of.
20     Q.  Mr. Carey indicated yesterday that
21 such a walkthrough would have allowed you to
22 have access to the tank and pump room as well;
23 is that your recollection also?
24     A.  No.
25     Q.  If that was the case, would it have

MORENO

1
2 been an occasion for you to bring in any sound
3 of acoustical experts to accompany you on the
4 walkthrough?
5     A.  At the time, our communication --
6 you know, obviously it was the holiday season.
7     Q.  In -- in response to this --
8     A.  The timeline.
9     Q.  Okay.  Well, January 2nd,
10 January 3rd?
11     A.  You're looking at January --
12 December 27th to January 3rd, that's holiday
13 season.
14     Q.  I understand.
15     A.  And so all of a sudden now, I'm
16 supposed to get a plane and get here for a
17 walkthrough when for that last year and a half
18 they haven't complied with anything, and so no,
19 I did not schedule a walkthrough at that time.
20     Q.  Did -- weren't you aware of the
21 January 4th closing date as early as the end of
22 November 2018?
23     A.  Yes.
24     Q.  And weren't you aware, pursuant to
25 the documents, that you were allowed to have a

MORENO

1
2 final walkthrough within seven days of the
3 closing?
4     A.  I -- I don't recall that.
5     Q.  Either way, there was no protest
6 letter sent when January 4th was scheduled as
7 the closing date that that's too close to the
8 holiday season and that you would be unable to
9 perform a walkthrough; is that correct?
10     A.  If you look at number nine -- if
11 you look at number nine which is December 27th.
12     Q.  Right.
13     A.  I have a very unhappy client.
14 They're very unhappy with the way the sponsor's
15 treated, so that is on December 27th.
16     Q.  Right.
17     A.  And here we had something on the
18 3rd which I did not see, and I'm supposed to
19 make a decision here to have a walkthrough when
20 they have not satisfied us the buyer on 17.3.
21     Q.  So you're just giving me your
22 reasons for not scheduling a walkthrough within
23 the seven days --
24     A.  That's correct.
25     Q.  -- Prior to January 4th, right?

34 (Pages 130 - 133)