UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

41-45 PROPERTY OWNER, LLC,

                  Plaintiff,

        -against-

CDM1, LLC,

                Defendant.

Index No.: 22-CV-8634 (LGS)

------------------------------------x


**PLAINTIFF 41-45 PROPERTY OWNER, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CDM1, LLC'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT**

HERRICK, FEINSTEIN LLP
*Attorneys for 41-45 Property Owner LLC*
    Scott E. Mollen, Esq.
Alan D. Kaplan, Esq.
Jennifer M. Muller, Esq.
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Fax: (212) 592-1500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 5

The Building ................................................................................................................. 5

Purchaser Decides to Purchase PH-58 ........................................................................ 6

The Option Agreement ................................................................................................. 8

Purchaser Fails to Close Title to PH-58 and Threatens Litigation .............................. 9

ARGUMENT ............................................................................................................... 11

I.       Legal Standard ................................................................................................. 11

II.      Sponsor Is Entitled To Summary Judgment On Its Breach Of Contract
         Claim Because Purchaser Failed To Close Title To The Unit As Required
         By The Option Agreement ............................................................................... 12

         A.       Purchaser Was Obligated To Close After Sponsor Properly Noticed
                  The Closing ............................................................................................ 13

         B.       Purchaser's Failure To Close Was Not Excused By Sponsor's
                  Purported Breach of Section 17.3 .......................................................... 15

III.     Purchaser's Motion For Summary Judgment Should Be Denied Because
         Sponsor Did Not Breach Section 17.3 .............................................................. 18

         A.       Purchaser Determines It No Longer Desired To Purchase PH-58
                  And Demands The Return Of Its Premium Payment ............................... 20

         B.       Purchaser's Arguments As To Sponsor's Purported Breach Are
                  Contrary To The Plain Terms Of The Option Agreement ...................... 22

         C.       Purchaser Improperly Relies On Extrinsic and Inadmissible Evidence
                  Which Should Not Be Considered On A Motion For Summary Judgment ........ 27

CONCLUSION ............................................................................................................. 29

# **TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................11

*Cayuga Nation v. Tanner*,
6 F.4th 361 (2d Cir. 2021) .............................................................................................12

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
784 F.3d 78 (2d Cir. 2015) .............................................................................................17

*Morefun v. Mario Badescu Skin Care*,
2014 WL 2560608 (S.D.N.Y. 2014), *aff'd judgment*, 588 F. App'x 54 (2d Cir. 2014) .........27

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
875 F.3d 107 (2d Cir. 2017)...........................................................................................11

*Porter v. Quarantillo*,
722 F.3d 94 (2d Cir. 2013)..............................................................................................12

*Saleem v. Corp. Transp. Grp.*,
854 F.3d 131 (2d Cir. 2017)...........................................................................................11

*Starr Indem. & Liab. Co. v. Brightstar Corp.*,
388 F. Supp. 3d 304 (S.D.N.Y. 2019), *aff'd*, 828 F. App'x 84 (2d Cir. 2020) ........................12

*Wagner v. Chiari & Ilecki, LLP*,
973 F.3d 154 (2d Cir. 2020)...........................................................................................12

**State Cases**

*150 Broadway N.Y. Assocs. v. Bodner*,
14 A.D.3d 1 (1st Dep't 2004) .........................................................................................22

*159 MP Corp. v. Redbridge Bedford, LLC*,
33 N.Y.3d 353 (2019) .....................................................................................................19

*61 W. 62 Owners Corp. v. CGM EMP LLC*,
77 A.D.3d 330 (1st Dep't 2010), *aff'd as mod. & remanded*, 16 N.Y.3d 822 (2011).............28

*Ashkenazi v. Kent S. Assoc.*,
51 A.D.3d 611 (2d Dep't 2008)......................................................................................16

*B&H Assocs. v. Fairley*,
148 A.D.3d 1097 (2d Dep't 2017) ..................................................................................12

ii

*Badding v. Inglis*,
  112 A.D.3d 1329 (4th Dep't 2013) .........................................................................23

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*,
  100 A.D.3d 100 (1st Dep't 2012) .....................................................................20, 26

*Bernard v. 345 E. 73rd Owners Corp.*,
  181 A.D.2d 543 (1st Dep't 1992) ..........................................................................28

*Brad v. City of N.Y.*,
  17 N.Y.3d 180 (2011) ............................................................................................23

*Chimart Assoc. v. Paul*,
  66 N.Y.2d 570 (1986) ............................................................................................22

*Da Silva v. Musso*,
  53 N.Y.2d 543 (1981) ......................................................................................24, 25

*DirecTV Latin America, LLC v RCTV Int'l. Corp.*,
  38 Misc. 3d 1212(A), 2013 WL 203397 (Sup. Ct. N.Y. Cty. 2013),
  *aff'd*, 115 A.D.3d 539 (1st Dep't 2014) ................................................................16

*Ermenegildo Zegna Corp. v. L&M 825 LLC*,
  2018 WL 1226058 ( Sup. Ct. N.Y. Cty.), *aff'd*, 166 A.D.3d 562 (2d Dep't 2018) ................25

*First Ave. Owners, Inc. v. Valentina Enters.*,
  25 Misc. 3d 1219(A) (Sup. Ct. N.Y. Cty. 2009)....................................................28

*First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr, Inc.*,
  21 N.Y.2d 630 (1968) ............................................................................................22

*Goldner v. Doknovitch*,
  88 Misc. 2d 88 (1st Dep't 1976) ............................................................................24

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (2002) ............................................................................................18

*Innophos, Inc. v. Rhodia, S.A.*,
  10 N.Y.3d 25 (2008) ..............................................................................................23

*Jacobson v. Sassower*,
  66 N.Y.2d 991 (1985) ............................................................................................24

*Lawrence v. Miller*,
  86 N.Y. 131 (1881) ..........................................................................................12, 13

*Maxton Builders, Inc. v. Lo Gabo*,
  68 N.Y.2d 373 (1986) ............................................................................................12

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ........................................................................15

*P.K. Dev., Inc. v. Elvem Dev. Corp.*,
    226 A.D.2d 200 (1st Dep't 1996) ...................................................25

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
    98 N.Y.2d 29 (2002) .................................................................14, 27

*Schwartz v. Hotel Carlyle Owners Corp.*,
    132 A.D.3d 541 (1st Dep't 2015) ...................................................23

*Uzan v. 845 Ltd.*,
    10 A.D.3d 230 (1st Dep't 2004) .....................................................13

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) .................................................................19, 26

*W.W.W. Assocs. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ......................................................................22

*Wallace v. 600 Partners Co.*,
    86 N.Y.2d 543 (1995) ......................................................................19

*World Ambulette Transp., Inc. v. Lee*,
    161 A.D.3d 1028 (2d Dep't 2018) ...................................................27

## Statutes

Fed. R. Civ. P. 56(a) .............................................................................11

FRE Rule 408 .........................................................................................21

Plaintiff 41-45 Property Owner LLC ("Sponsor") respectfully submits this memorandum of law in support of its cross-motion for summary judgment and in opposition to Defendant CDM1, LLC's ("Purchasers") motion for summary judgment.

## PRELIMINARY STATEMENT

This Action involves a straightforward breach of contract. The Parties entered into a purchase and sale contract (the "Option Agreement") whereby Arturo Moreno ("Moreno"), a highly sophisticated and successful businessman represented by counsel, agreed to purchase certain real property, a condominium unit ("PH-58"), from Sponsor for $34 million through his LLC, CDM1. Purchaser provided an $8.5m deposit (the "Premium Payment") which, pursuant to the plain terms of the Option Agreement, would be forfeited to Sponsor upon Purchaser's failure to close title to PH-58. Purchaser failed to close title to PH-58. The Option Agreement is clear and unambiguous: Purchaser's failure to close title to the unit entitles Sponsor to retain the Premium Payment. Given the lack of ambiguity in the Option Agreement, governing case law precludes the Court from looking beyond the four corners of the Option Agreement, utilizing extrinsic evidence, or considering the Parties' respective intent to determine the Parties' rights and obligations.

Having determined that it no longer desired to purchase PH-58, Purchaser endeavored to "manufacture" a breach by Sponsor of the Option Agreement. At the eleventh hour before the closing, Purchaser's counsel provided written notice to Sponsor that Purchaser would not attend the closing. Purchaser's counsel unequivocally stated that Purchaser no longer desired to purchase the unit, demanded the Parties split the deposit (under threat of litigation to be brought by a lawyer with a documented past of utilizing "over-the-top" litigation tactics), and demanded to know (for the first time despite multiple prior visits to the PH-58) what steps Sponsor had taken to comply with § 17.3, a provision concerning the sound emitted from the tank and pump system located

1

immediately adjacent to PH-58 (the "Tank and Pump"). According to that email, which constituted a clear repudiation of the Option Agreement, Purchaser's decision not to move forward in the transaction was based on the allegedly "unsatisfactory treatment" of Purchaser during the construction process. At that time, Purchaser had not even alleged that Sponsor had breached § 17.3 of the Option Agreement, which Purchaser now claims is the reason it did not close title to PH-58. The Court should not countenance Purchaser's transparent attempt to avoid liability for its failure to fulfill its obligations under the Option Agreement. The Option Agreement clearly and unambiguously provides that Sponsor is entitled to retain the Premium Payment due to Purchaser's failure to close title to PH-58.

Even if Purchaser's arguments as to Sponsor's breach of § 17.3 are correct (and they are not), such breach would not relieve Purchaser of its express obligations under the Option Agreement which expressly and clearly states that Sponsor's obtainment of a certificate occupancy is the only construction related condition precedent to Purchaser's obligation to close title. There is no basis for the Court to disregard the Option Agreement's plain and express terms.

When Purchaser entered into the Option Agreement, it was fully aware that PH-58 was located immediately next door to, and PH-58's second bedroom shared a wall with, a mechanical room that contained a portion of the fire suppression system (the "Tank and Pump"). This was disclosed in the Offering Plan. Purchaser still contracted to purchase the unit notwithstanding that information, because it appreciated the special benefits that the unit had due to the construction of the mechanical room; unlike other units PH-58 had 15' ceilings and was the only simplex unit with outdoor space. Purchaser admitted in deposition that it failed to perform any due diligence regarding the Tank and Pump before entering into the Option Agreement. Instead, Purchaser requested, negotiated, and drafted, through its counsel, a clause in the Agreement, § 17.3,

concerning the sound emitted from the Tank and Pump.

The only noise standard included in § 17.3 is that the Tank and Pump will not create noise that will impair Purchaser's "quiet enjoyment and use of the Unit, except in an emergency or routine maintenance." Under well-established New York law, a violation of "quiet enjoyment" requires conduct that essentially amounts to a constructive eviction. Case law holds that mere inconvenience or annoyance does not and cannot amount to a constructive eviction or a breach of the covenant of quiet enjoyment. By its very nature, the Tank and Pump are only activated and make noise during emergencies and routine maintenance which would be scheduled at a convenient time and, most saliently, is expressly allowed by § 17.3. The evidence Purchaser relies on to argue that the Tank and Pump violates the covenant of quiet enjoyment is of no legal significance. The Parties' sound testing was performed, as demanded by Purchaser, while the Tank and Pump was operated by the Condominium's staff to simulate the noise that could be emitted during an emergency or routine maintenance. The sound testing does not reflect the normal sound levels observed within PH-58. As Purchaser is aware, the unit has sold and is currently owner occupied. To date, there have been no complaints regarding the sound emitted from the Tank and Pump.

Contrary to Purchaser's arguments, the plain language of § 17.3 did not require Sponsor to perform any particular specified action, undertake any particular test, retain a third party to conduct a sound test, or provide any test result to Purchaser. Nor did § 17.3 require Sponsor to provide any "assurances" to Purchaser or to "insure" Purchaser regarding the Tank and Pump. The Purchaser has produced no evidence to the contrary. The record is clear that Purchaser did not negotiate, or even request, language that requires Sponsor to perform any specific action because, according to Purchaser, such language was not needed since § 17.3 "encompasses" all of Purchaser's

3

Defendant's subjective post-facto demands. Review of the 21 demands by Purchaser's belatedly hired expert, made after Purchaser refused to close and demanded the return of its deposit, illustrates the kind of requirements that could have been embodied in the contract. Here, the Purchaser admittedly never even asked that such requirements be included in the contract.

Purchaser's argument that it did not have sufficient information regarding the Tank and Pump is baseless. Moreno, Purchaser's principal, is a billionaire with significant resources at his disposal and could have contacted an architect, engineer, acoustician, or other professional prior to entering into the Option Agreement (as Moreno testified he has done in other real estate purchases). There is no shortage of such experts in New York City and there was no time constraint to execute the Option Agreement. Here, Purchaser simply chose to not perform any due diligence despite Moreno's testimony as to the importance of, and his experience in conducting due diligence in his business and real estate dealings. Purchaser cannot now blame Sponsor for its own willful blindness and failure to conduct even basic due diligence.

The evidentiary record demonstrates that Purchaser decided not to purchase PH-58 well before any of Purchaser's acoustical and engineering experts were belatedly hired and demanded a "laundry list" of requirements that Sponsor had to meet to comply with § 17.3. These experts, who were only hired by Purchaser after the decision not to purchase PH-58 and to support Purchaser's claims, made approximately 21 demands, none of which are even mentioned in § 17.3 and, therefore, certainly not required by § 17.3. These *post facto* demands illustrate the types of information Purchaser could have requested before entering into the Option Agreement or could have requested be included in the Option Agreement. However, they were never requested by Purchaser and were not included in the Option Agreement. Purchaser now, in essence, asks this court to re-write the Option Agreement and insert contractual obligations and conditions precedent

4

that Purchaser never requested and Sponsor never agreed to. It is not the role of the Courts to reform contracts entered into by sophisticated parties represented by counsel, or to add provisions that a party first sought after it already entered into the contract.

## FACTUAL BACKGROUND

### The Building

Plaintiff is the sponsor of a new construction condominium project located at 520 Park Avenue, New York, New York (the "Condominium"). (SUMF ¶ 1). The Condominium's units were offered to the public through an offering plan which was filed on September 26, 2014 and amended as needed (the "Offering Plan"). (*Id.* ¶ 3).

Under New York City Building and Fire Codes, the Condominium was required to provide an automatic fire pump due to the height of the building. (*Id.* ¶ 8). An automatic fire pump is part of a building's fire suppression system that consists of a large tank of water, a pump that activates during emergencies to distribute the water, and a small "jockey" pump that maintains the pressure in the tank. (*Id.* ¶ 9). Its purpose is to make sure sufficient water is available for the sprinkler systems (located on higher floors) to function properly in an emergency. (*Id.* ¶ 12). An automatic fire pump does not serve any other purpose and cannot be used as a building's domestic water supply. (*Id.* ¶13). Accordingly, these pumps are always "on" and ready to respond instantaneously to an emergency, but the pumps only "run" or "activate" when called upon in an emergency (*i.e.* when a sprinkler system is activated and causes the water levels to drop significantly in the tank) or when manually activated (*i.e.* to perform routine maintenance and testing). (*Id.* ¶¶ 10-11).

As disclosed in the Offering Plan, the Condominium's fire suppression system includes an automatic fire pump located in a double height mechanical room that occupies a portion of construction floors 42 and 43 (the "Tank and Pump"). (*Id.* ¶ 6). The Offering Plan contained a

detailed description of the type of equipment that would be installed: it would have 100hp and that the pump's manufacturer would be "Peerless or equivalent." (*Id*. ¶¶ 7). The Tank and Pump are adjacent to and share a wall with PH-58[1] and PH-59 (the "Tank and Pump"). (*Id*. ¶ 20).[2] Due to the presence of the Tank and Pump, PH-58 has several unique positive features: PH-58 has 15 foot ceilings and is the only simplex unit in the Condominium with outdoor space (*Id*. ¶¶ 21-22).

**Purchaser Decides to Purchase PH-58**

In mid-2017, Moreno and his wife Carole Moreno (the "Morenos") visited the Condominium's sales office and expressed interest in purchasing one of the Condominium's units. (*Id*. ¶ 23). Moreno testified that they considered several units in the Condominium but, despite being aware of the location of the Tank and Pump they chose PH-58 because of the high ceilings, the balcony, and the view. (*Id*. ¶¶ 24-27). The parties began negotiating the Option Agreement whereby the Morenos would purchase PH-58 through Purchaser. (*Id*. ¶ 28). Purchaser's agent Charles Carey ("Carey") negotiated and finalized the general terms of the purchase with the director of sales for the Condominium, Louis Buckworth ("Buckworth"). (*Id*. ¶ 29). Though Purchaser now claims that it was greatly concerned about the Tank and Pump, to the extent any such concern actually existed it was downplayed by both Carey and Moreno in their dealings with Buckworth. (*Id*. ¶¶ 30-35). In a September 21, 2017 email, Carey expressed to Buckworth that "there are just a few areas where we'd like some more information or comfort" which covered a

---

[1] Sponsor notes that the documents referenced herein and in Purchaser's opening brief vary in their use of the construction versus marketing floor. PH-58 is located on the 42nd construction floor and was previously known as as PH-48.

[2] To access the Tank and Pump, one enters floor through the service elevator which opens into a service/fire corridor. It was also disclosed in the Offering Plan that it was "anticipated" that maintenance would be performed three times per year. This language was intended to provide an *estimate* regarding the frequency with which the maintenance would be performed and was not intended to limit the rights of Sponsor, or subsequently the condominium association, from performing any maintenance that deemed necessary to ensure the safety and functioning of the Condominium.

wide range of topics including the Tank and Pump, temporary storage for packages and deliveries, and workers the Moreno's intended to deploy (*Id*. ¶ 31). Carey continued that "as you can see, and probably have discerned from your conversations with us, there is nothing we are overly concerned about but rather, just want some additional guidance and comfort about." (*Id*. ¶ 32). Based on his dealings with Carey and Moreno, Buckworth testified that his "general understanding of the situation was that they were not concerned when they signed the contract about there being any noise from the pump system." (*Id*. ¶ 35).

Moreno, is a billionaire who is admittedly in the real estate business (owning and developing residential real estate) and has significant resources at his disposal. (*Id*. ¶ 36). Moreno and Carey both testified that they are experienced in real estate transactions and about the due diligence they normally perform. (*Id*. ¶¶ 37). Moreno also testified that he didn't believe due diligence was required when purchasing new construction, like PH-58, unlike older real estate:

Q:      Before you purchased your investment properties, would you do a thorough due diligence?

A:      We do due diligence, and depending on the property, there's different kinds of due diligence. So – and that – that's really a big general question.

Q:      What – what different kinds of due diligence are there before you purchase a property?

                    *           *           *

A:      If it's new construction, you have less things to worry about because there's not – has anything been used and very typically, you have a big process of inspections. And inspectors are always in there looking at, you know, foundations and plumbing, electrical, and it's brand new. So it's just a huge difference. If you're buying a property that's used or aged, you know, maybe you know, mid – mid-income property, then you're – you really have to do a little bit more, you know, depending on the age, have more inspections done on some of the electrical or plumbing and et cetera.

Q.      Was the fact that you were going to use this unit as a residence imply to you

or speak to you as being one that required a higher level of diligence than normal?

A.    Again, to me, new building, you know, you – it's a brand new building, and you're, you know -- my belief was it was being inspected, and we're looking at something, you know, 50 stories up.

(*Id*. ¶ 39). Mr. Moreno confirmed that he did no diligence here concerning the Tank and Pump system. Mr. Moreno testified that he did not ask for any plans or specifications because "[w]ell the specifications . . . wouldn't have meant anything to me because I'm not familiar with those kinds of specifications." (*Id*. ¶ 41). Mr. Moreno also testified that he did not engage any experts, plumbers, architects, or design experts to review the tank and pump, or otherwise do any due diligence regarding the tank and pump room or the potential noise before the Option Agreement was executed. (*Id*. ¶ 42).

**The Option Agreement**

On, October 6, 2017, the Parties executed an option agreement whereby Purchaser agreed to pay the sum of $34 million for PH-58 (the "Option Agreement"). (*Id* ¶¶ 43, 46). Pursuant to the Option Agreement, Purchaser agreed to pay a deposit in the amount of $8,500,000 due upon the execution of the agreement (the "Premium Payment") which would be forfeited as liquidated damages if Purchaser failed to close title to the unit. (*Id*. ¶ 48).

Purchaser, a sophisticated party, was represented by counsel with respect to the transaction and requested and negotiated two revisions to the Agreement: (i) two riders which required Sponsor to make specific modifications to PH-58 at Sponsor's expense; and (ii) § 17.3 which concerned the sound emitted from the Tank and Pump. (*Id*. ¶ 45). Specifically, § 17.3 provides that:

Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the

mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.

(*Id*. ¶ 51).

### Purchaser Fails to Close Title to PH-58 and Threatens Litigation

Shortly after obtaining a temporary certificate of occupancy (the only construction related obligation that Sponsor was required to complete before noticing the closing), Sponsor provided 34 days' notice to Purchaser that the closing would occur on November 27, 2018. (*Id*. ¶ 55). Purchaser's counsel immediately responded indicating that the closing would move forward but requesting that the closing be adjourned to January 4, 2019 due to the holidays. (*Id*. ¶ 56). Though it was not required to, Sponsor agreed to accommodate Purchaser and adjourn the closing. (*Id*. ¶¶ 57). Purchaser did not schedule its pre-close walk-through inspection or respond to any communications regarding the inspection. Thus, Purchaser failed to exercise its right to perform a pre-close inspection under the Option Agreement and willingly waived such right. (*Id.* ¶58).

Out of the blue, and at the eleventh hour before closing, on December 27, 2017, Purchaser's counsel sent Sponsor's counsel an email stating that the Morenos were "unhappy with the way the sponsor has treated them throughout the process . . . Accordingly, they have reassessed the situation and now would prefer not to live in the building." (*Id*. ¶ 59). In a transparent effort, Purchaser attempted to intimidate Sponsor by advising that they retained a nationally known real estate litigator known for his aggressive tactics[3] and threatening to sue if Sponsor wouldn't let Purchaser break the contract and return a portion of the Premium Payment. (*Id*.). Only then, in a

---

[3] Penton, Kevin, *Atty Suspended for Urging Client's Tenant to Kill Himself* (Law360 Apr. 3, 2019), https://www.law360.com/articles/1145781/atty-suspended-for-urging-client-s-tenant-to-kill-himself ("A real estate attorney who encouraged a tenant of his client to kill himself and who burst into an arbitration hearing, snapping pictures and making threats, has been suspended from practicing law for four months, according to a New York court order. A New York appeals court on Tuesday suspended Adam L. Bailey of Adam Leitman Bailey PC…").

communication where Purchaser demanded that Sponsor return its Premium Payment under threat of litigation, did Purchaser ask, for the first time, what Sponsor had done to comply with § 17.3 of the Option Agreement. (*Id.*).

Although it had absolutely no obligation to do so, Sponsor adjourned the closing from January 4, 2019 to February 8, 2019 and obtained a report from a third-party acoustical technology and consulting firm, SM&W. (*Id.* ¶ 62). The SM&W report confirmed that there was no noise coming from the Tank and Pump adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though the unit was empty, without any furniture, fixtures, or carpet to dampen any sound. (*Id.* ¶ 63).

On January 17, 2019, Purchaser rejected the SM&W report, claiming it failed to satisfy § 17.3 of the Option Agreement. (*Id.* ¶ 64). Purchaser further objected to the SM&W report because the Tank and Pump, which is only active during emergencies or infrequent routine maintenance, was not active during the testing and demanded substantial additional information regarding the Tank and Pump. (*Id.*)  Purchaser, for the first time, requested a slew of additional information and testing such as: (i) baseline readings with the Tank and Pump in operation and not in operation; (ii) a description of the installed equipment; (iii) complete plans and specifications for the Tank and Pump; (iv) engineered documents for the Tank and Pump; (v) original design documents and details; (vi) written specifications; (vii) approved shop drawings; (vii) commissioning reports; (viii) sign offs; (ix) approvals stating that the systems are finished and fully operational; (x) complete operating instructions for the Tank and Pump; (xi) the Tank and Pump's maintenance and testing requirements; (xii) details regarding the adjacent wall; (xiii) specific acoustical design criteria utilized and implemented in the adjacent wall's construction; and (xiv) additional acoustical testing performed by Sponsor with the specific criteria spelled out by the Purchaser's

acoustical consultant. (*Id.*) None of which are required by the Agreement and all of which could have been embodied in the Option Agreement that was executed by the Parties.

On February 11, 2019, following Purchaser's failure to close title to PH-58 at the third scheduled closing which was set for February 8, 2019, Sponsor served Purchaser with a notice of default. (*Id.* ¶ 66). Pursuant to Section 13.2 of the Agreement, Purchaser had 30 days to cure its default and Purchaser would forfeit its Premium Payment as liquidated damages if it failed to do so. (*Id.* ¶¶ 48, 68). Purchaser failed to cure its default by closing title to PH-58 on or before March 15, 2019. (*Id.* ¶ 70). Instead, Purchaser argued that Sponsor's tendering of the Notice of Default constituted Sponsor's repudiation of the Option Agreement entitling Purchaser to the return of its Premium Payment. (*Id.* ¶ 69).

## ARGUMENT

### I.  Legal Standard[4]

Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); accord *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "constru[e] the evidence in the

---

[4] Pursuant to the terms of the Option Agreement, the "Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly within the State of New York, without regard to principles for conflicts of law." Mollen Aff. Ex. A, § 33 (Governing Law).

light most favorable to the nonmoving party and draw[ ] all reasonable inferences and resolv[e] all ambiguities in its favor." *Wagner v. Chiari & Ilecki, LLP*, 973 F.3d 154, 164 (2d Cir. 2020) (internal quotation marks omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Cayuga Nation v. Tanner*, 6 F.4th 361, 373–74 (2d Cir. 2021). "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013); accord *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 323 (S.D.N.Y. 2019), *aff'd*, 828 F. App'x 84 (2d Cir. 2020).

## II. Sponsor Is Entitled To Summary Judgment On Its Breach Of Contract Claim Because Purchaser Failed To Close Title To The Unit As Required By The Option Agreement

Sponsor is entitled to retain the Premium Payment due to Purchaser's inexcusable failure to close title to PH-58 as required by the Option Agreement. Under New York law, to establish a claim for breach of contract a movant must show: (i) the existence of a contract; (ii) the plaintiff's performance pursuant to the contract; (iii) the defendant's breach of its contractual obligations; and (iv) damages resulting from the breach. *B&H Assocs. v. Fairley*, 148 A.D.3d 1097, 1098 (2d Dep't 2017) (finding plaintiff established its *prima facie* entitlement to judgment as a matter of law on its breach of contract claim by submitting a copy of the agreement and evidence as to plaintiff's performance under the contract as well as the fact that plaintiff was not paid the monies owed). "For more than a century it has been well settled in this State that a vendee who defaults on a real estate contract without lawful excuse, cannot recover the down payment." *Maxton Builders, Inc. v. Lo Gabo*, 68 N.Y.2d 373, 378 (1986). In *Lawrence v. Miller*, the New York Court of Appeals established the bright-line rule that a defaulting purchaser of real estate may not recover

its deposit:

> To allow a recovery of this money would be to sustain an action by a party on his own breach of his own contract, which the law does not allow. When we once declare in this case that the vendor has done all that the law asked of him, we also declare that the vendee has not so done on his part. And then to maintain this action would be to declare that a party may violate his agreement, and make an infraction of it by himself a cause of action. That would be ill doctrine.

86 N.Y. 131, 140 (1881); *Uzan v. 845 Ltd.*, 10 A.D.3d 230, 239-40 (1st Dep't 2004) ("It is clear that plaintiffs are not entitled to a return of any portion of their down payment. Here the 25% down payment was a specifically negotiated element of the contracts. There is no question that this was an arm's length transaction. The parties were sophisticated businesspeople, represented by counsel, who spent two months at the bargaining table before executing the amended purchase agreements.").

There is no dispute among the Parties that the Option Agreement is a valid and enforceable contract or Plaintiff's breach of the Option Agreement, if established, would entitle Sponsor to retain Plaintiff's Premium Payment as liquidated damages. The only issues before the Court are whether: (1) Purchaser breached the Option Agreement by failing to close title to PH-58; and (2) Purchaser's breach of the Option Agreement was excused. Though the Parties dispute the meaning and significance of § 17.3, the Parties agree that the Option Agreement is a clear and unambiguous contract that may be interpreted by the Court to resolve the legal questions through the instant summary judgment motions.

### A. Purchaser Was Obligated To Close After Sponsor Properly Noticed The Closing

The rights and obligations of the Parties pursuant to the Option Agreement are clear and unambiguous: (i) Sponsor had the right to notice the closing of PH-58 following its satisfaction of certain conditions precedent; (ii) Purchaser was obligated to close title to PH-58 following

Sponsor's notice of closing; and (iii) Sponsor is entitled to retain Purchaser's Premium Payment as a result of Purchaser's failure to close title. Given the lack of ambiguity in the Agreement, case law precludes looking beyond the four corners of the Agreement, utilizing extrinsic evidence, or considering the Parties' subjective intent to determine the Parties' rights and obligations. *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (2002) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.").

A plain reading of the Option Agreement and the Offering Plan demonstrates that each and every condition precedent occurred and triggered Purchaser's obligation to close title to PH-58. Pursuant to §17.4 of the Option Agreement:

> The Closing of Title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Terms of Sale" in Part 1 of the Plan. As a result, **if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price** (without provision for escrow), **notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit**.

(SUMF ¶ 49) (emphasis added). The Offering Plan's "Terms of Sale" list, *inter alia*, the following occurrences that trigger Purchaser's requirement to close title to the unit:

> (b)      a Temporary or Permanent Certificate of Occupancy for the Unit is in effect. A Temporary or Permanent Certificate of Occupancy for the Unit shall be deemed presumptive evidence of substantial completion of the Unit and **is the only construction-related prerequisite that must occur before Sponsor may require the closing of title** . . .

>                *             *             *

> (e)      the delivery to Purchaser of a written notice of the time and place of the closing at least 30 days prior to the Closing Date specified therein, including a reasonable opportunity for Purchaser to examine the Unit, during normal

business hours and in the company of Sponsor's representative, prior to Closing. **So long as a Temporary Certificate of Occupancy for the Unit is in effect, Purchaser will be obligated to close title irrespective of the nature of the items that may be included on Purchaser's Inspection Statement**.

(SUMF ¶ 5) (emphasis added). Neither the Option Agreement nor the Offering Plan establish any other condition precedent to Purchaser's obligation to close. It is undisputed that Sponsor had obtained a temporary certificate of occupancy prior to noticing the closing and that Sponsor had delivered the written notice of closing more than 30 days prior to the November 27, 2018 closing date. (*Id*. ¶ 55). Thus, Sponsor had fully performed the requisite conditions precedent which triggered Purchaser's obligation to close title to PH-58. It is also undisputed that Purchaser did not close title to PH-58. (*Id*. ¶ 70).

### B. Purchaser's Failure To Close Was Not Excused By Sponsor's Purported Breach of Section 17.3

Purchaser incorrectly argues that Sponsor's compliance with § 17.3 was a condition precedent to Purchaser's obligation to close title to PH-58. This is simply not true. Purchaser does not (because it cannot) identify any language contained in the Option Agreement that elevates § 17.3 from a standard contractual obligation or duty to a condition precedent.

"A condition precedent is an act or event, other than the lapse of time, which, unless the condition is excused, must occur, before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*., 86 N.Y.2d 685, 690 (1995). "[C]ourts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition." *Id.* "If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent. A contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition

precedent." *Ashkenazi v. Kent S. Assoc.*, 51 A.D.3d 611, 611-612 (2d Dep't 2008); *see also DirecTV Latin America, LLC v. RCTV Int'l. Corp.*, 2013 WL 203397, at *5 (Sup. Ct. N.Y. Cty. 2013), *aff'd*, 115 A.D.3d 539 (1st Dep't 2014) (finding no condition precedent where the contract's description of the alleged condition lacked prefacing language, such as "if" or "unless and until").

There is no language, let alone clear language, showing that the parties intended to make § 17.3 a condition precedent. On the contrary, the very next provision (§ 17.4) specifies that "Closing of title shall occur **only after or concurrently with"** the satisfaction of the prerequisites set forth in the Offering Plan's Terms of Sale which trigger Purchaser's obligation to close notwithstanding any construction items which remain for Sponsor to complete or correct. (SUMF ¶ 5) (emphasis added). This language is clear and unambiguous: Purchaser expressly agreed that it would be obligated to close title to PH-58 once the conditions set forth in the Terms of Sale were completed. This clear language of § 17.4 was not in any way modified by § 17.3. Nor does § 17.3 contain any language evidencing that the parties intended to make § 17.3 a condition precedent. *Compare* § 17.3 ("Prior to the date of Closing of Title") *with* § 17.4 ("Closing of title shall occur only after or concurrently with"). Even if there were a legitimate question as to the parties' intent with respect to § 17.3, such provision would be inconsistent with and contradict the Offering Plan's Terms of Sale which unequivocally specifies that the obtainment of a Temporary or Permanent Certificate of Occupancy "is the only construction-related prerequisite that must occur before Sponsor may require the closing of title . . ." (SUMF ¶ 5). The Option Agreement makes it clear that any such inconsistency must be resolved in favor of the Offering Plan:

> In the event of any inconsistency between the provisions of this Agreement and the [Offering] Plan, the provisions of the [Offering] plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan . . . and agrees to abide and be bound by the terms and conditions thereof.

(SUMF ¶ 47).

Furthermore, the Court cannot interpret the language contained in § 17.3 in a manner that would render superfluous the contractual provisions which limit the conditions precedent to those specifically stated. In *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, a case relied on by Purchaser (ECF 72 at 16), the Second Circuit instructed that when interpreting a contractual provision, the trial court's interpretation must not render the other express provisions of the agreement superfluous. 784 F.3d 78, 90 (2d Cir. 2015). In *Luitpold*, the parties' agreement contained three specific provisions which governed the parties' respective rights to terminate the agreement. However, the agreement also contained two provisions that referenced the termination of the agreement "for any reason." The Second Circuit concluded that, as to not render the other termination provisions superfluous, the provisions referencing termination for any reason can "be construed only within the bounds of the concept of termination as expressly defined elsewhere in the agreement, and do not in themselves give rise to separate permissible grounds for termination." The same cardinal rule of construction applies here. There is no basis for the Court to conclude that § 17.3 was a condition precedent to Purchaser's obligation to close title to PH-58. Any such interpretation is improper as it would render the express limiting language of § 17.4 superfluous.

Furthermore, the Option Agreement clearly and unambiguously sets forth both Parties' rights with respect to the Premium Payment. The Option Agreement expressly provides that *any* Event of Default by Purchaser – which expressly includes Purchaser's failure to fulfill any of its obligations under the Option Agreement (§ 13.2) – entitles Sponsor to terminate the agreement

and retain the Premium Payment:

> Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement . . . If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain as and for liquidated damages, (a) the entire Premium Payment and any interest earned on the Premium Payment . . .

(SUMF ¶ 48). As to the Purchaser's rights, there is no language in the Option Agreement pursuant to which Purchaser is entitled to the return of its Premium Payment following a breach by Sponsor (which in any event did not occur). Instead, the Option Agreement establishes four specific and narrowly tailored scenarios in which Purchaser is entitled to the return of its Premium Payment:

(i)     if "Sponsor cannot convey title to the Unit to Purchase" (§ 5);
(ii)    if the Sponsor abandons or fails to consummate the Offering Plan (§ 14);
(iii)   if the unit sustains damage by fire or other casualty which Sponsor elects not to repair (§ 19); and
(iv)   if the Option Agreement is not accepted within 30 days of delivery of Agreement executed by Purchaser to sponsor (§ 24).

(SUMF ¶ 53).

The Court cannot ignore the Option Agreement's plain language and re-write its terms to make § 17.3 a condition precedent to closing. *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") Nor can the Court rewrite § 17.3 to provide Purchaser an additional right to seek the return of its Premium Payment. Accordingly, Purchaser's failure to close title to PH-58 was not excused and Purchaser is not entitled to the return of its Premium Payment even if Purchaser is correct that Sponsor failed to satisfy its duties under § 17.3 (which Sponsor fully complied with).

18

### III. Purchaser's Motion For Summary Judgment Should Be Denied Because Sponsor Did Not Breach Section 17.3

Purchaser asserts one counterclaim through which it effectively asks the Court to rewrite the terms of the Agreement by imposing obligations on Sponsor and benefits to Purchaser that are not found in the Parties' Agreement in an effort to avoid its liability under the Option Agreement.

The record reflects that Purchaser determined it no longer desired to purchase PH-58, repudiated the agreement, and then attempted to manufacture a breach of § 17.3 by Sponsor after Sponsor refused to return its Premium Payment.

Contrary to Purchaser's arguments, the plain language of § 17.3 *did not* require Sponsor to perform any particular specified action, undertake any particular test, retain a third party to conduct a sound test, or provide any test result to Defendant. Numerous courts have held that courts should not, in essence, read provisions into contracts that represented and counseled parties failed to negotiate and include in contracts, and instead must enforce the agreements based on their plain language. *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 356 (2019) ("In New York, agreements negotiated at arm's length by sophisticated, counseled parties are generally enforced according to their plain language pursuant to our strong public policy favoring freedom of contract."); *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004) (refusing to add terms to a contract where sophisticated parties could have done so but failed to do so); *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed . . . The rule has even greater force in the context of real property transactions, where commercial certainty is a paramount concern and where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length.")

(internal citations omitted); *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 108-09 (1st Dep't 2012) (finding that "commercially sophisticated" plaintiffs could have easily "expressed [their] intent in the language" of the agreement).

Even if such obligations were found in the Option Agreement (which they are not), neither § 17.3 nor any other provision contained in the Option Agreement or Offering Plan entitle Purchaser to the return of its Premium Payment in the event Sponsor failed to meet those purported obligations. Instead, Plaintiff would be entitled to have Sponsor complete any work needed in a reasonable time after closing. (SUMF ¶ 15) ("Any work set forth on the Inspection Statement **shall be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the Closing**.") (emphasis added). Accordingly, Plaintiff's counterclaim should be dismissed because the relief it seeks is in direct contravention of the plain and unambiguous terms of the Agreement.

### A. Purchaser Determines It No Longer Desired To Purchase PH-58 And Demands The Return Of Its Premium Payment

At no time between signing the Option Agreement in October 2017 and December 27, 2018 (the eleventh hour before the scheduled closing, despite several visits to the unit) did Purchaser raise any objection, issue, or question regarding Sponsor's compliance with Section 17.3. (*Id.* ¶ 60).[5] On the contrary, when Sponsor noticed the closing for November 27, 2018, Purchaser's attorney indicated that the closing would move forward but requested that it be adjourned to early January due to the holidays. (*Id.* ¶ 56). Sponsor did not receive any communication from Purchaser during that time period. Purchaser failed to return emails from

---

[5] Purchaser did, however, have discussions with Buckworth in late 2018 about their desire to sell PH-58. Exhibit 26, Buckworth Dep. 78:17-84:9. Neither Moreno nor Carey could recall these conversations. Exhibit 23, Moreno Dep. 110:20-112:12; Exhibit 24, Carey Dep. 151:18-152:22.

Sponsor's representatives seeking to schedule a walk through of the unit in advance of the closing. Notwithstanding the foregoing, on December 27, 2018, Purchaser's counsel wrote to Sponsor's counsel, out of the blue, stating that Purchaser no longer desired to live in the building and demanding the partial return of the Premium Payment under threat of litigation:

**FOR SETTLEMENT PURPOSES ONLY – ALL RIGHTS RESERVED[6]**

Samantha, please give me a call to discuss PH 58. I have a very unhappy client. They are unhappy with the way the sponsor has treated them throughout the process. For example, they have repeatedly asked about the kitchen credit, so that they could plan their replacement kitchen, and are yet to receive a response. They've had very limited access to the apartment and have not been able to see the progress of the unit even though the option agreement has a number of agreed upon design modifications.

No one has reached out to them to evidence sponsor's compliance with Section 17.3 of the option agreement . . . In this respect, by now, sponsor should have provided a copy or copies of all reports obtained by sponsor from acoustical engineers it employed for this purpose. Sponsor's failure to do so suggests, disturbingly, that sponsor may not have complied with Section 17.3.

**I am not privy to all of their grievances but, bottom line, they feel that the sponsor has not been cooperative and has impeded their performance of the option agreement. Accordingly, they have reassessed the situation and now would prefer not to live in the building.**

---

[6] Sponsor notes that while despite Purchaser's counsel's effort to exclude the December 27, 2018 e-mail as a settlement communication, the communication is not subject to any such privilege. Perhaps most salient, this e-mail communication was cited by Purchaser in its Answer and Counterclaim (ECF 25 ¶ 32) and in its 56.1 Statement of Material and Undisputed Facts (ECF 73 ¶ 29), expressly waiving any possible claim of privilege or inadmissibility. Furthermore, FRE Rule 408 only protects against the disclosure of "compromise negotiations." At the time that this email was sent, there was no existing legal dispute (or any dispute) between the parties. No issue or dispute had been raised before this e-mail and, thus, no compromise discussions or negotiations had begun. General discussion between parties about a contract and performance are not compromise negotiations. FRE Rule 408 does not afford any protections or privilege to business negotiations between parties or render such communications inadmissible.

> With the closing scheduled for Jan 4, 2019, they have retained
> Adam Leitman Bailey as their litigation counsel but have asked
> me to reach out to you first to see if you and I could work out a
> speedy and amicable resolution.
>
> Their proposal, provided we have a speedy and amicable
> resolution, is to terminate the option agreement and forfeit the
> $3.4m of the premium payment, with the balance returned to
> them . . .

(SUMF ¶ 59) (emphasis added). Contrary to Purchaser's assertions, this email constituted complete repudiation and breach of the contract. That email was a repudiation of the Option Agreement – Purchaser demanded that Sponsor return a significant portion of its premium payment under threat of litigation by a notoriously difficult and public facing attorney, a clear effort to intimidate Sponsor, especially since Purchaser was already represented by a significant and highly capable law firm with more than 700 attorneys. It is clear from this communication that Purchaser refused to close title to PH-58 and that such refusal did not relate to Sponsor's alleged breach of § 17.3.

### B. Purchaser's Arguments As To Sponsor's Purported Breach Are Contrary To The Plain Terms Of The Option Agreement.

It is black letter law in New York that courts must enforce contracts as written. *First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr, Inc.,* 21 N.Y.2d 630, 638 (1968) ("Stability of contract obligations must not be undermined by judicial sympathy"). This is consistent with the "bedrock principle that it is a court's task to enforce a clear and complete written agreement according to the plain meaning of its terms …." *150 Broadway N.Y. Assocs. v. Bodner*, 14 A.D.3d 1, 6 (1st Dep't 2004). A contract is ambiguous if the terms are "reasonably susceptible of more than one interpretation." *Chimart Assoc. v. Paul,* 66 N.Y.2d 570, 573 (1986). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs. v. Giancontieri*, 77

N.Y.2d 157, 162 (1990). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'" *Brad v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011) (quoting *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008).

Section 17.3 states in full that:

> Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.

(SUMF ¶ 51).

The only standard included in § 17.3 is that the Tank and Pump will not create noise that will "impair Purchaser's **quiet enjoyment** and use of the Unit, *except in an emergency or routine maintenance.*". *Id.* (emphasis added). Under well-established New York law, the legal term "quiet enjoyment" is not used in a real estate contract to describe general sound levels or enjoyment in general, but rather conduct that essentially amounts to a constructive eviction. These terms were negotiated and drafted by lawyers in a real estate contract, § 17.3 was not some vague general decision made by laypeople. In *Badding v. Inglis*, the Fourth Department explained that:

> [the covenant of quiet enjoyment] can be broken only by an eviction, actual or constructive, from the premises conveyed, or some portion thereof . . . In those situations, however, the owner's possession is disturbed by the actions of someone with a superior right to use the property, whether the grantor or a third party. The presence of a defective condition on the property is not equivalent to the impairment of the value of the property based on the existence of such superior rights.

112 A.D.3d 1329, 1330-01 (4th Dep't 2013) (internal citations omitted). *See also Schwartz v. Hotel Carlyle Owners Corp.*, 132 A.D.3d 541, 542 (1st Dep't 2015) (explaining that "for breach of the

covenant of quiet enjoyment, a tenant must show an ouster, or if the eviction is constructive, an abandonment of the premises Constructive or actual eviction requires that there must be a wrongful act by the landlord which deprives the tenant of the beneficial enjoyment or actual possession of the demised premises"). "Mere temporary inconveniences and annoyances to the tenant by an act of the landlord do not ordinarily constitute a breach of the covenant' of quiet enjoyment." *Goldner v. Doknovitch*, 88 Misc. 2d 88, 91 (1st Dep't 1976). Absent a well-established legal standard, which neither represented party specified, the non-term of art use of the language would render the provision subject to a completely subjective standard as to what "enjoyment" means. That would be a commercially unreasonable and absurd result. To the extent any such ambiguity does exist in § 17.3, such ambiguity must be construed against the party who drafted the language of the provision. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985). Here, that party was the Purchaser.

Purchaser's argument that it did not have sufficient information regarding the Tank and Pump is equally unavailing. Purchaser's member, Moreno, is a billionaire, who is admittedly in the real estate business and has significant resources at his disposal. Moreno, or his agent Carey, could have contacted an architect, engineer, acoustician, or other professional prior to entering into the Agreement. This is especially so since the Offering Plan fully disclosed the location of the mechanical room adjacent to PH-58 and that it contained a portion of the Condominium's fire suppression system. There is no shortage of such experts in New York City and there was no time pressure to execute the Agreement. Here, Purchaser simply chose to not perform any due diligence despite Moreno's testimony as to the importance of and experience in conducting due diligence in his business and real estate dealings. (SUMF ¶¶ 36-42.) Purchaser cannot now blame Sponsor for its own conscious ignorance and failure to conduct even basic due diligence. *See Da Silva v.*

*Musso*, 53 N.Y.2d 543, 550-51 (1981) (explaining that a party may also assume the risk of a potential mistake if it fails to utilize readily accessible means of knowledge to investigate the issue); *P.K. Dev., Inc. v. Elvem Dev. Corp.*, 226 A.D.2d 200, 201-02 (1st Dep't 1996) (explaining that a party who does not "go beyond its own efforts to ascertain relevant facts (such as obtaining experts' reports)," may be held to "bear the risk of mistake if it chooses to act on its otherwise limited knowledge."); *Ermenegildo Zegna Corp. v. L&M 825 LLC*, 2018 WL 1226058, at *3 (Sup. Ct. N.Y. Cty.), *aff'd*, 166 A.D.3d 562 (2d Dep't 2018) (explaining that a party entering into a real estate contract consciously ignorant "when it is aware that its knowledge is limited and nonetheless enters into the contract.")

Although it had absolutely no obligation to do so, Sponsor obtained a report from a third-party acoustical technology and consulting firm, prior to the adjourned closing date, to confirm there was no noise coming from the Automatic Fire Pump to assuage Purchaser's purported pre-closing jitters. (SUMF ¶ 62). The SM&W report confirmed that there was no noise coming from the mechanical room adjacent to PH-58 and that the sound levels measured in PH-58 were quieter than industry recommended levels, even though the unit was empty, without any furniture, fixtures, or carpet to dampen any sound. Purchaser arbitrarily and unreasonably rejected the SM&W report, claiming it failed to satisfy § 17.3 of the Option Agreement. (SUMF ¶ 63). Purchaser further objected to the SM&W report because the Automatic Fire Pump, which is always turned on and running, but only active during emergencies or infrequent routine maintenance (which was expressly permitted by § 17.3), was not active during the testing. *Id.* At that time, Purchaser's expert belatedly (after the contract already was signed and Purchaser refused to close) demanded 21 categories of information, all of which could have been negotiated by Purchaser before the Option Agreement was signed. Purchaser's arguments are simply not supported by 17.3, and in

fact contradicted by the Agreement. The Court should not rewrite the Option Agreement to include the terms that Purchaser could have but failed to add to the agreement. *Vermont Teddy Bear*, 1 N.Y.3d at 470 (refusing to add terms to a contract where sophisticated parties could have done so but failed to do so); *Banco Espirito.*, 100 A.D.3d 100, 108-09 (finding that "commercially sophisticated" plaintiffs could have easily "expressed [their] intent in the language" of the agreement).

Purchaser also failed to negotiate, or even request language that encompassed any of the testing, information, or additional access that Purchaser now argues is required by § 17.3. The Court should deny Purchaser's request to essentially re-write § 17.3. Purchaser's reliance on *Morefun v. Mario Badescu Skin Care* for the proposition that each and every demand made by Purchaser is encompassed within § 17.3 is unavailing. In *Morefun* the parties entered into a settlement agreement that broadly concerned a certain "product" rather than the specific batch of the product that was at issue in the litigation. 2014 WL 2560608 (S.D.N.Y. 2014), *aff'd judgment*, 588 F. App'x 54 (2d Cir. 2014). There, the court held that the sophisticated party could have included language to narrow the broad definition of product that was included in the agreement but failed to do so. *Id.* at *4. This holding is inapposite. Purchaser's argument presupposes that the language contained in § 17.3 *has* the broad meaning it is now demanding the Court rewrite into the Agreement, i.e. that Sponsor is required to take *all* steps and measures demanded by Purchaser No such language exists. No definition, let alone a broad definition like that at issue in *Morefun* exists in § 17.3. If anything, *Morefun* instructs that Purchaser, a highly sophisticated and counseled party, could have negotiated what it specifically wanted § 17.3 to encompass.

### C. Purchaser Improperly Relies On Extrinsic and Inadmissible Evidence Which Should Not Be Considered On A Motion For Summary Judgment

In an effort to obfuscate the actual issues before the Court (which are much more limited than those presented by Purchaser), Purchaser improperly relies on extrinsic and inadmissible evidence regarding the Tank and Pump System's use and operation. Purchaser does not argue the Option Agreement is ambiguous (it in fact argues the opposite) which would allow the Court to consider extrinsic evidence, yet Purchaser relies on extrinsic evidence to establish the meaning of the provisions and the parties' intent. Insofar as Purchaser seeks to create ambiguity through such extrinsic evidence, it should be disregarded. *R/S Assocs*, 98 N.Y.2d at 33 ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (internal quotation omitted); *World Ambulette Transp., Inc. v. Lee*, 161 A.D.3d 1028 (2d Dep't 2018) (reversing trial court's decision which relied on extrinsic evidence because "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." The only questions before the Court are (1) whether Purchaser breached the Option Agreement by failing to close title to PH-58 and (2) whether Purchaser's breach of the Option Agreement was excused. Thus, the extrinsic evidence presented by Purchaser demonstrating how often the system runs and the results of sound testing performed, are irrelevant to the actual issues in this Action.

Nonetheless, even if this evidence is considered, it does not establish that Sponsor violated § 17.3. Section 17.3's language is simply a standard that Purchaser does not want to be held to and must be enforced as written: Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance. Even if Purchaser is correct that the monthly testing (which the Condominium (not Sponsor) is required to perform to confirm that the Tank and Pump System is functioning properly

and will respond appropriately in the event of an emergency) falls outside the scope of the exception in § 17.3 for emergencies and routine maintenance, there is simply no legal basis for Purchaser's assertion that the test which lasts mere minutes can rise to the level of a breach of quiet enjoyment. Sponsor does not argue that noise can never rise to the level of a breach of quiet enjoyment, but rather that, such sound would have to be persistent and pervasive and rise to the level of a constructive eviction to breach the covenant of quiet enjoyment. None of the cases cited by Purchaser (ECF 72 at 18) prove otherwise. *Bernard v. 345 E. 73rd Owners Corp.*, 181 A.D.2d 543 (1st Dep't 1992) (explaining that "the cause of action for breach of the covenant of quiet enjoyment, **predicated upon a partial constructive eviction**, should not have been dismissed . . . where, as here, an issue of fact exists as to whether, as plaintiff alleges, **a portion of the disturbed premises has been abandoned"**) (emphasis added); *61 W. 62 Owners Corp. v. CGM EMP LLC*, 77 A.D.3d 330, 334 (1st Dep't 2010), *aff'd as mod. & remanded*, 16 N.Y.3d 822 (2011) (preliminary injunction based on a nuisance claim (not a breach of quiet enjoyment) should have been granted because the defendant bar operated nightly and played music at levels audible in the plaintiff's apartments until 3:00 a.m.); *First Ave. Owners, Inc. v. Valentina Enters.*, 25 Misc. 3d 1219(A) (Sup. Ct. N.Y. Cty. 2009) (granting summary judgment on a nuisance claim (not a breach of quiet enjoyment) based on sound emitted from a cooling tower which did not operate only on demand or in emergencies like the Tank and Pump System).

Even if additional soundproofing measures could have been or could be taken, the Option Agreement explicitly provides that additional work or any defects are not a basis to postpone closing and shall be corrected by Sponsor *after* closing. (SUMF ¶ 52) ("Any work set forth on the Inspection Statement **shall be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the closing**") (emphasis added). If the

Sponsor failed to take necessary remedial action, the Purchaser could then sue for damages, not vitiate the entire purchase.

Accordingly, there is no basis for the Court to find that Sponsor breached § 17.3 and, thus, Purchaser's motion for summary judgment should be denied, and summary judgment should be granted in Sponsor's favor on its cross-motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiff 41-45 Property Owner LLC respectfully requests that the Court enter an Order: (i) granting Plaintiff's cross-motion for summary judgment; (ii) denying Defendant's motion for summary judgment, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 25, 2023

HERRICK, FEINSTEIN LLP

By: */s/ Scott E. Mollen*
    Scott E. Mollen, Esq.
Alan D. Kaplan, Esq.
Jennifer M. Muller, Esq.
2 Park Avenue
New York, New York 10016
Tel: (212) 592-1400
Fax: (212) 592-1500

*Attorneys for 41-45 Property Owner LLC*

HF 17082333v.6