UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
41-45 PROPERTY OWNER, LLC,

*Plaintiff*,

- against -

CDM1, LLC,

*Defendant.*
---------------------------------------------------X

Docket No.: 22-CV-8634 (LGS)

**PLAINTIFF'S POST-TRIAL REPLY BRIEF**

OVED & OVED LLP
*Attorneys for Plaintiff*
Darren Oved, Esq.
Aaron J. Solomon, Esq.
Oved & Oved LLP
401 Greenwich Street
New York, NY 10013
Tel.: 212.226.2700
darren@oved.com
aaron@oved.com

As demonstrated at Trial, and in Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law ("Plaintiff's Brief" or "Pl.Br"), it is now undisputed that:

- the Fire Suppression Sub-System was properly constructed and functioning;
- a properly constructed Fire Suppression Sub-System will not make any noise unless it is pumping;[1]
- The Fire Suppression Sub-System is only pumping: (i) in an emergency, in which case the Main Pump activates; (ii) during testing of that Main Pump, which occurs at a mutually-convenient pre-scheduled time for a mere ten minutes per month, and for an additional ten minutes once per year, as required by the NFPA; (iii) in the event of a leak, in which case the Jockey Pump—which makes less noise than suburban area at night (and is, indeed, quieter than the ambient level of the Unit)—activates; and (iv) for a matter of seconds to repressurize a sprinkler pipe after the completion of apartment renovations that require movement of a sprinkler head/pipe, which is handled by exclusively the Jockey Pump. Pl.Br. 10, 11.

Thus, a properly-functioning Fire Suppression Sub-System will never disturb Purchaser's quiet enjoyment outside of an emergency or maintenance (which, as detailed in Plaintiff's Brief, expressly includes testing). *Id*.

As such, Sponsor more than satisfied whatever obligation it had under § 17.3 to "take[] all reasonable measures to test, verify and specifically *ensure* Purchaser that the [Fire Suppression Sub-System] . . . will not . . . impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance," by ensuring that the Fire Suppression Sub-System was a properly functioning system. Indeed, to *ensure* this was so Sponsor:

- hired a highly-competent and internationally recognized engineering firm, WSP, to design, *inter alia*, the Fire Suppression Sub-System;
- WSP performed measurements and calculations to design the Fire Suppression Sub-System and then verified the construction of same to ensure it was built as designed;
- On June 26, 2018, the NYC Fire Department tested the Fire Suppression Sub-System and verified it to be functioning as required and issued a certification to that effect (**PX-52**);
- To further reduce the potential of any noise, Sponsor deliberately (a) constructed the wall separating the Unit and the Fire Suppression Sub-System out of thick concrete cinderblock as opposed to studs and sheet rock; (b) installed a separate, additional wall to separate the concrete encapsulating the Fire Suppression Sub-System from the Unit; (c) filled that wall with sound

[1] All capitalized terms herein shall have the same meaning as in Pl.Br. and emphasis is deemed added throughout.

attenuating material; (d) intentionally de-coupled that wall from the masonry wall to increase sound attenuation; and (e) utilized a "high sound-rated," "full-thickness" access door;

- WSP conveyed to Sponsor's selling agent, Mr. Buckworth, and Sponsor's counsel, Ms. Sheeber, that the Fire Suppression Sub-System was a passive system and would not make noise unless it is activated for an emergency or maintenance—similar to a smoke detector;

- On January 3, 2019, Sponsor's counsel conveyed to Purchaser's counsel, in writing, that the Fire Suppression Sub-System was a passive system and would not make noise unless it is activated for an emergency or maintenance (**PX-8**);

- And, after being advised that the Fire Suppression Sub-System makes no noise when it is not activated for an emergency or maintenance, Purchaser requested a sound test verifying same, which was performed and provided to Purchaser (**PX-12**).

Purchaser itself confirmed this first hand when Mr. and Mrs. Moreno both toured the Unit with Mr. Buckworth in August 2018—months after the Fire Suppression Sub-System was operational—and did not express any concerns about it, nor did Purchaser request to conduct a sound measurement, view the system itself, or request additional time to observe the sound (or lack thereof) emanating from it. **PX-38**; **DX-36**. Tellingly, in November, 2018, Purchaser's response to Sponsor's scheduling of a closing was to send three emails regarding that closing, none of which even referenced §17.3.

Despite Sponsor's efforts, and despite Purchaser having received on January 4, 2019 (**PX-8**), the very thing it claimed at Trial it wanted—*i.e.* "[a] writing and not from [Sponsor's] sales representative that this unit was going to be enjoyable within reasonable expectations of Mr. and Mrs. Moreno" (Tr. 205:19-21)—Purchaser refused to close because it no longer desired the Unit and, given the undisputed down turn in the real estate market, thought it was a better strategy to attempt to manufacture a pretext to its breach of the Option Agreement, rather than close and sell the Unit at a loss. Purchaser then sought to gain leverage by relying upon a list of disclosures regarding the Fire Suppression Sub-System from FSI Architects, who admitted at Trial were unnecessary.[2] Tr. 196:13-18.

[2] Despite Purchaser's attempt (¶ 64) to make FSI's request seem as reasonable as possible, their absurdity—such as requests for design details and when the equipment will be tested/exercised, despite these systems being ubiquitous throughout New York City and their testing schedule mandated by statute—demonstrates that the true goal was to manufacture a pretext.

In opposition, Purchaser's post-trial briefing (Dkt. Nos. 173 and 174 collectively "Purchaser's Briefing") repeatedly contends that, because Sponsor did not test the sound output of the Fire Suppression Sub-System *when it was pumping*, Sponsor could never have complied with §17.3. *See e.g., Id.* ¶¶ 123, 135. However, that is the wrong analysis. Sponsor did not need to test the Fire Suppression Sub-System while it was pumping because, if properly constructed and functioning (which it undisputedly is), it only makes noise that could possibly disturb Purchasers during the express exclusions to § 17.3: an emergency (*i.e.* a fire) or maintenance (*i.e.* code-mandated testing).

Recognizing the foregoing, Purchaser's Briefing also repeats its now-disproven refrain that "testing" falls outside of the scope of "maintenance." ¶ 161. However, as uncontradicted at Trial, even the NFPA that Purchaser cites (which is not referenced in § 17.3) states that "testing" is a subset of "maintenance."[3] Tr.140:9-141:4 ("testing is part of maintenance"); **DX-50**; Pl.Br.27.

Desperate to try and manufacture a scenario in which the Fire Suppression Sub-System might still disturb Purchaser's quiet enjoyment (though none exists), Purchaser deliberately mischaracterizes the testimony of Mr. Confeiterio regarding the audibility of the Main Pump *during testing*—which is an express exclusion of § 17.3—to be representative of the Jockey Pump as well (¶104, 114) by utilizing the word "system" to conflate the Main Pump and the Jockey Pump. However, the Jockey Pump is nearly inaudible and only activated during a leak or repressurizing of a closed pipe. Pl.Br. p. 11, 22, 27.

Purchaser also attempts to invent a fifth scenario when the system may make noise: "draining of the system." ¶ 93. However, such an event was never discussed at Trial., and this appears to be a deliberate mischaracterization of testimony that concerned the rare instance of a pipe being repressurized after a shut-off, which is handled exclusively by the Jockey Pump (at a decibel level that is quieter than the ambient level of the Unit). While Purchaser attempts to rely on Mr. Clemente's testimony that he

[3] Purchaser's Brief (¶ 163) attempts to bolster its assertion that testing is not maintenance because a different portion of the Offering Plan that discusses the building's generators specifically calls out maintenance. However, this is irrelevant and the "testing" for generators may have been specifically called out because such "testing" is significantly louder, and goes on for prolonged periods because the generators need to be "exercised" as opposed to just "tested."

"heard the jockey pump come on very clearly," the decibel levels reported by Purchaser's actual sound expert reveal that the Jockey Pump is quieter than the ambient level in the Unit and the same dBA as a Suburban area at night.[4] **PX-54**.

Realizing that Purchaser's tour of the Unit in August 2018, *after the Fire Suppression Sub-System was operational*, is devastating to its case, Purchaser's Brief asserts that it "was never in the Unit after the pump was installed." ¶ 80. However, this is contradicted by **PX-38**, **DX-36**, and Mr. Buckworth's testimony (Tr. 45-:21-47:23), that on August 20, 2018, he took Purchase on a tour of the Unit. Tellingly, Mr. Moreno eventually conceded on cross-examination that Mr. Buckworth's testimony was truthful.[5]

Searching for an end-run to its liability, Purchaser's Brief (¶142) attempts to elevate the undisputedly-low "all reasonable measures" standard in §17.3 (Pl.Br. p.30) to a "high" threshold by citing an inapplicable case regarding a person who perished on a hijacked plane on 9/11 and that case's interpretation of Article 20 the Warsaw Convention which concerns strict liability for air carriers. *Falkenberg, (In re Sept. 11 Litig.),* 500 F Supp 2d 356, 359-360 (SDNY 2007).

Next, Purchaser's Brief attempts to skirt the fact that, irrespective of §17.3, the Offering Plan mandated that Purchaser close or lose the Deposit, and that Purchaser's sole remedies were post-closing, by intentionally citing to a mere portion of 7.4 of the Option Agreement to claim that closing would constitute a waiver of §17.3 However, that is belied by the balance of 7.4, which Purchaser deliberately omitted, which expressly states that "nothing herein . . shall excuse Sponsor from performing those obligations . . .herein or in the [Offering] Plan to be performed subsequent to the Closing . . . ."[6] [7]

---

[4] Indeed, if the Jockey Pump really was that loud, there would have been no reason for Purchaser's acoustic expert to furtively attempt to depress the true ambient level in the Unit, which exceeds the Jockey Pump's dBA. Pl.Br. pp.22-23.

[5] Q. When you went there on August 20, 2018, Mr. Buckworth says you were at the apartment, that he took you to the apartment. Do you have any reason to think that he's lying? A. No. I wouldn't say that. I'm just saying that I do not have a calendar in front of me, and I can't tell you exactly the dates that we went to the apartment. Tr. 174:18-23.

[6] Purchaser's attempt to bolster this argument with the statement that it is an "undisputed material fact . . . that CDM1 was ready, willing, and able to close on the Unit" is untrue and not something that was supported by any evidence or testimony at Trial. Rather, it is undisputed that Purchaser repeatedly asked to adjourn the closing.

[7] Similarly, Purchaser's newly-minted defense, that it could not have closed without the Kitchen Credit, is eviscerated by the fact that Purchaser received the Kitchen Credit on January 3, 2019 and still failed to close months later. **PX-8**.

For the reasons stated herein and in Plaintiff's Brief, the Deposit should be released to Sponsor, with interest, and attorney's fees as provided for by the Option Agreement.

Dated: New York, New York
November 24, 2025

Respectfully submitted,

____________________________
Darren Oved, Esq.
Aaron J. Solomon, Esq.
OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013