UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

41-45 PROPERTY OWNER, LLC,

Plaintiff,

v. 22 Civ. 8634 (LGS)

CDM1, LLC,

Defendant. Non-Jury Trial

------------------------------x

New York, N.Y.
October 6, 2025
10:00 a.m.

Before:

HON. LORNA G. SCHOFIELD,

District Judge

APPEARANCES

OVED & OVED LLP
Attorneys for Plaintiff
DARREN OVED
AARON J. SOLOMON

ARENTFOX SCHIFF LLP
Attorneys for Defendant
FREDERICK J. SPERLING
ADAM J. DIEDERICH
BRITTANY H. SOKOLOFF

(Case called)

MR. SOLOMON: Good morning, your Honor. Aaron Solomon, from Oved & Oved LLP, for the plaintiff.

THE COURT: Good morning.

MR. OVED: Good morning, your Honor. Darren Oved, Oved & Oved, LLP, for plaintiff as well.

THE COURT: Good morning.

MR. DIEDERICH: Good morning. Adam Diederich, for the defendant.

MR. SPERLING: Good morning, your Honor, Frederick Sperling, for the defendant CDM1.

THE COURT: Good morning.

MS. SOKOLOFF: Good morning, your Honor, Brittany Sokoloff, for defendant CDM1.

THE COURT: Welcome, everyone.

As you know, we are here for a bench trial. I said we would start promptly at 10, and we will.

Just to review what I had said at the final pretrial conference, each side will be allotted two and a half hours. Basically any time you are on your feet, that is time allotted to you. So direct, cross, argument, or shuffling paper, that is all your own time.

We will break for lunch around 1, but the time will vary depending on what we need to do. I understand there is a difficulty with a remote witness who is out of the country and

cannot appear at 3 per my order on Friday, so we will be doing that witness around noon.

We will be doing the expert witness at I believe 3:30. Both of those are remote witnesses.

We will break briefly for 15 minutes, ten or 15 minutes midmorning as well as mid afternoon.

We should be out of here or we should be finished at or before 4:30 if we stay on our schedule. I know at least some people have timing constraints, so you should be out of here well before you need to be.

So I know there is a dispute about deposition designations. Rather than get into that, this is a bench trial. I will allow either side to put in basically whatever they want. It is on your time. If it is inappropriate for me to consider, I will take that up when I am thinking about it later. That way we don't have to spend time arguing here. You can just use your time in the way that you think is most efficient and best for the presentation of your evidence.

So when we talked before, I had inquired about opening statements. I think the parties said that they wanted between two and five minutes to do that. So we can begin with the plaintiff.

MR. SOLOMON: Judge, we are going to forgo opening statements. You are familiar with the case, and we are limited in time.

THE COURT: That is fine.

MR. SOLOMON: The only issue is we do have a lot of witnesses in the courtroom right now. So we would ask that they be --

THE COURT: I do have a rule. You should look at my individual trial rules, which are online, if you haven't already. I am talking about counsel.

First of all, do we have a corporate representative for each side.

MR. SPERLING: Yes.

THE COURT: Who is that? Can you stand up and identify yourself.

MR. CAREY: Charles Carey, for CDM1.

THE COURT: Good morning.

Anyone else?

MR. SOLOMON: No. Plaintiff's corporate representative is late.

THE COURT: Mr. Carey may stay in the courtroom. Anyone who is a fact witness is excused. You should be outside the courtroom until you testify, except for expert witnesses.

Who are our expert witnesses?

Anyone in the courtroom?

All right. Expert witnesses may stay in the courtroom. Mr. Carey may stay in the courtroom. Any other fact witnesses need to excuse themselves. We will come and get

you when it is time for you to testify.

MR. OVED: Your Honor, just a point of clarification in terms of the witness.

THE COURT: Yes.

MR. OVED: Originally defendants had proffered their witness for 3:00 remotely. It was moved to 3:30 because our witness was 3, and then we moved them to 3. Considering my time constraints, is it possible, since he available at 3 to move him to 3 instead of 3:30, if time permits.

THE COURT: It depends on our tech ability. As you may have gleaned this morning, all is not seamless on the tech side in federal court. We will see what we can do. We have several hours between now and then, and we will see the tech people at noon.

MR. OVED: Thank you.

THE COURT: Let me just hear from the defendants.

Any issue with 3:00 if we are able logistically to do that?

MR. SPERLING: We will reach out to the witness and see if he can do that, your Honor.

THE COURT: Okay.

MR. SPERLING: Judge, the plaintiff had asked for brief opening statements. I understand the plaintiff just indicated --

THE COURT: You may make a brief opening statement if

you would like.

MR. SPERLING: I would like to do that.

THE COURT: Okay. Please do.

MR. SPERLING: This Court's September 12 order held that "the sole issue is whether plaintiff performed under Section 17.3 of the option agreement."

Section 17.3 begins, "Prior to the date of closing of title to the unit, sponsor will have taken all reasonable measures to test, verify, and specifically ensure purchaser."

Section 17.3 which was added to the option agreement at CDM1's insistence out of concern about noise from the fire protection system and is the only section of the option agreement that is in bold, imposed four requirements on sponsor. Sponsor satisfied none of those requirements.

First, it required sponsor prior to closing to test the system to determine whether it would create noise or noise that would impair CDM1's client enjoyment for use of the unit. Sponsor breached that requirement when it falsely stated in writing on January 3, 2019, that its sound consultant had confirmed that the system "is not anticipated to create sounds or noise that would impair purchaser's quiet enjoyment of the unit except potentially during emergency or routine maintenance."

That statement was untrue both because sponsor's sound consultant had not done any testing or provided any opinion as

of that date and because the system also makes noise during monthly testing and duration renovations of other units. Sponsor knew that its statement was untrue. In internal e-mails at this time sponsor's representative admitted that "no sound testing has been done." When they finally tested it, they didn't activate the system, so there was no noise to measure.

Second, having failed to test, sponsor was unable to verify the results that it didn't have, nor was sponsor able to verify its inaccurate statement that the system would only run during an emergency or routine maintenance.

Third, sponsor did not take any measures, let alone "all reasonable measures," to specifically ensure CDM1 that the system would not create sounds or noise that would impair CDM1's quiet enjoyment or use of the unit.

In fact, sponsor failed to provide any of the information CDM1's consultant requested or allow him to inspect the system as requested, even though sponsor had most, if not all, of the requested information and even though sponsor provided similar information to its consultant and allowed him to inspect the system, as he said was necessary to be able to render an opinion about the system.

Fourth, the system runs for reasons other than the only two exceptions provided for in Section 17.3, emergencies and routine maintenance.

Your Honor, sponsor forgot about its obligations under Section 17.3, and when CDM1 asked for information, which it was entitled to before closing, sponsor lied about what had been done and refused to provide any of the requested information, all or most of which it had, or to allow an inspection of the system.

Incredibly, Kathryn Brandvold, Zeckendorf Developments' CFO and sponsor's designated witness, testified that sponsor could satisfy its obligations to specifically ensure CDM1 without communicating any information to CDM1. CDM1 was fully justified in not closing due sponsor's failure to satisfy its preclosing obligations under Section 17.3 and entitled to the return of its deposit and statutory prejudgment interest.

THE COURT: Thank you.

Okay. Thank you.

Plaintiffs may call their first witness.

MR. SOLOMON: Thank you, Judge. Plaintiffs call as the first witness Gary Pomerantz.

GARY POMERANTZ,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOLOMON:

MR. SOLOMON:

MR. SPERLING: May I inquire your Honor?

THE COURT: You may.

MR. SOLOMON: Thank you.

BY MR. SOLOMON:

Q. Good morning, Mr. Pomerantz.

A. Good morning.

Q. Can you tell the Court your title and your background, please.

A. My title is executive vice president, and my background is I am an engineer I have been designing building with WSP, coming up on 34 years this month. I typically do large mixed-use tall buildings and luxury residential buildings.

Q. What kind of engineer are you?

A. By degree?

Q. Yes.

A. Chemical engineer by degree.

Q. What kind of engineering do you practice?

A. Mechanical engineering.

THE COURT: Who is your employer?

THE WITNESS: WSP.

THE COURT: P as in Peter?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MR. SOLOMON:

Q. What is WSP?

A. It is an engineering consulting company of all disciplines, and I'm in the building services, or MEP, as it's known in New York practice.
Q. For how long have you done that?
A. With WSP coming up on 34 years. Before that -- I got out of school in '79, you can do the math.
Q. Do you have any licenses, sir?
A. I am licensed in New York, yes.
Q. Are you licensed as an engineer in New York?
A. I am licensed as a professional engineer in New York, yes.
Q. Okay. Do you have a license to practice professional engineering in any other states?
A. I am licensed in I think about 20 other -- 20 states in total.
Q. Are you familiar with the construction project at 520 Park Avenue?
A. I am.
Q. Was WSP engaged in connection with that project?
A. Say it again, please.
Q. Was WSP engaged in connection with that project?
A. Yes, we were.
Q. What did WSP do in connection with that project?
A. We were hired to do the engineering for the mechanical, electrical, plumbing, and fire protection systems.
Q. Did WSP do anything to make sure that I am -- we are going

to focus on the fire protection system, okay?

Did WSP do anything to make sure that what it designed for the fire protection system was actually what was built in the fire protection system?

A. We reviewed shop drawings, submittals, and did periodic field observations.

Q. Okay. Did WSP liaise with the NYC department of building or fire in connection with the fire suppression system?

A. We did as required, yes.

Q. Okay. Were the designs for the fire suppression system -- and let me be more specific. We are only going to talk in this case, at least I am, about the fire suppression system next to Penthouse 58. Are you with me?

A. I'm with you.

Q. Were the designs WSP did for the fire suppression system adjacent to Penthouse 58 approved by the city?

A. They were.

Q. And what was done to design the fire suppression systems next to Penthouse 58?

A. What was done to design it?

Q. What did you have to do to do that?

A. We understand the code requirements, we do whatever calculations are necessary to come up with the flow rates and pressures for that pump and tank system. We design the piping for the main distribution and for the distribution for

Penthouse 58. And we did our -- like I said, during construction we did our shop drawing review and our periodic site inspections.

Q. Is it you or your firm that selects what equipment goes into the fire suppression room?

A. We select equipment that is representative of what is required to do the job.

Q. Okay. The fire suppression system that is adjacent to Penthouse 58, what is it? What is it composed of?

A. Two large tanks.

Q. Okay.

A. A fire pump.

Q. Okay.

A. And a so-called jockey pump, slang term for a small pump.

Q. So there's two pumps, a main pump and a jockey pump. Is that a standard configuration?

A. For New York City it's very standard, yes.

Q. Is there always a main pump and a jockey pump in a fire suppression system in a building like this?

A. I believe so, yes.

Q. And is the fire suppression system tested prior to being activated so that it is available to give water and put out fires when it's necessary?

A. I need you to clarify what you mean by "tested."

Q. Okay. Does anyone -- your job is to do the calculations,

right?

You are nodding. He can't take down nods.

A. Yes. Sorry about that.

Q. No worries. It happens to everybody.

Does the fire department come out and give the system a seal of approval at any point?

A. Yes, they do.

Q. Do you know when that occurred in connection with the fire suppression system adjacent to Penthouse 58?

A. I think -- from memory, it is a while ago -- I think it was the summer of 2018.

Q. Do you know if it was June, July, or August?

A. I will say June.

Q. Okay. Is one able to get a temporary certificate of occupancy without fire suppression equipment being approved by the fire department?

A. That is a requirement to get a TC -- temporary certificate of occupancy, TCO.

Q. So you can't get a TCO without the fire suppression system working?

A. Correct.

Q. Just so we are all clear, when I say the fire suppression system is on, what I mean is it's in sentry mode. It is available to provide water if there was a call for water. Is that a fair way to characterize it?

A. That's fair. It's available, yes.
Q. Is it fair to liken it to a smoke alarm that is on, but not beeping because there is no fire?
A. Yes, it's on. It's not pumping.
Q. When the fire department approves the fire suppression system, that means the fire suppression system is available, it's running, it is available to provide water if there were a fire. Is that fair?
A. Yes.
Q. Okay. Who at WSP in particular worked in connection with designing and ensuring that what was built at 520 Park Avenue complied with your designs for the fire suppression system?
A. Ashado Smith worked for me at this time.
Q. So it was you and Ashado?
A. And Rob Sedlak is the head of the plumbing and fire detection department.
Q. Ashado Smith, what is his degree or title?
THE COURT: Could you pell the first name.
THE WITNESS: A-s-h-a-d-o.
MR. SOLOMON: Thank you, Judge.
BY MR. SOLOMON:
Q. What is Ashado's title, or what was his title?
A. He's one below me. I'll -- I think he's a vice president.
Q. Okay.
A. Yes. He was a vice president.

Q. I misspoke. I don't care so much about his ranking. Is he an engineer?
A. Yes, he is an engineer, a degreed engineer.
Q. Okay. In connection with Ashado's work on the fire suppression system adjacent to Penthouse 58, what was your role? Were you supervisor? Was he super --
A. I oversaw his work.
Q. Okay. And the plans you filed in connection with the fire suppression system, they're filed with the department of buildings?
A. They are filed with DOB, yeah.
Q. If one filed the appropriate request, could one obtain those plans from the DOB?
A. I am not sure what you mean by that.
Q. If I was a buyer, could I go to the DOB and make a request to see the plans?
A. I am not sure.
Q. All right. Now, you mentioned that the fire suppression system adjacent to Penthouse 58 has a water tank, a large pump, a main fire pump, and a jockey pump. Is that it?
A. That is correct.
Q. Where is the fire suppression system adjacent to Penthouse 58 located physically in comparison to Penthouse 58?
A. Just to the east of, I think it was the second bedroom.
Q. Okay. Is that fire suppression system the only one in the

building?
A. No. There are several. I mean just to the west now that I am thinking of the plans, but it is one of -- there is one fire suppression system for the building, and within it there are several subsystems.
Q. Is this a subsystem?
A. Yes.
Q. So the one adjacent to Penthouse 58 was a subsystem?
A. Correct.
Q. There are other fire suppression systems on other parts of the building?
THE COURT: There are other subsystems in other parts of the building?
THE WITNESS: Yes.
MR. SOLOMON: When in doubt, always answer her questions, not mine.
THE WITNESS: She's good.
MR. SOLOMON: Okay. If we could just put up for the witness PX 24, which is a joint exhibit. It's JX 17. The first one is always a rough one. Let's give it a shot.
THE DEPUTY CLERK: Just make it larger, please.
MR. SOLOMON: Your Honor, we haven't zoomed into it. As it is a joint exhibit, we move to --
THE COURT: It is admitted.
(Joint Trial Exhibit 17 received in evidence)

BY MR. SOLOMON:
Q. Mr. Pomerantz, you have before you what is in evidence as PX 24.
MR. SOLOMON: If we can zoom in a little more -- actually stop right there.
BY MR. SOLOMON:
Q. On the bottom left-hand corner, what does it say?
A. The bottom left says "Fire Protection Schedules."
MR. SOLOMON: Okay. If we can zoom in, Darren, a little bit on the right.
Let's go up to the top.
BY MR. SOLOMON:
Q. Do you see your firm's name on there?
A. I do. WSP Flack & Kurtz.
Q. Great. What are we looking at here?
A. This is a schedule of the fire protection pumps.
MR. SOLOMON: If we go in a little closer over here. Okay.
BY MR. SOLOMON:
Q. Do you see the pump schedule?
A. Yes.
MR. SOLOMON: Okay. On the -- stop moving.
BY MR. SOLOMON:
Q. On the fourth column, do you see it says "location"?
A. I see it.

Q. Okay. It lists one, two, three, four different locations. Are you with me?
A. I'm with you.
Q. There's the cellar, level 31, 42, and 51. Do you see that?
A. I see that.
Q. On the left each one has a fire pump and a jockey jump, right?
A. Yes. That's correct.
Q. This was a document filed with the DOB?
A. Yes.
MR. SOLOMON: Thank. You can take that down.
BY MR. SOLOMON:
Q. Now, the fire suppression system, or should I say the fire suppression subsystem adjacent to Penthouse 58, is that a unique feature of this building?
A. It is not unique to this building, no.
Q. Are there fire suppression systems like this with a main pump and a jockey pump and a water tank in buildings throughout New York City?
A. Yes, there are.
Q. Is it fair to say this is the same type of system that is in buildings throughout New York City?
A. That's fair to say, yes.
Q. And there is always in your experience a main pump and a jockey pump?

A. Yes.
Q. All right. Now, just so we get this out of the way, the plumbing for a fire suppression system next to Penthouse 58, are the pipes for that system connected to the pipes that service the units' sinks, and toilets and showers?
A. This is a fire protection system. It does not serve sinks, toilets, and showers.
Q. So if I am taking a long shower in my apartment or there is a leak from my apartment, will that affect the fire suppression system next to Penthouse 58?
A. No.
Q. They're independent?
A. Say again, please.
Q. They are independent?
A. Yes.
Q. Can you briefly explain for the Court how the fire suppression system next to Penthouse 58, and in all the other systems throughout the city, how it functions, what happens?
MS. SOKOLOFF: Objection. Lack of foundation.
THE COURT: Overruled.
A. Okay. There's water stored in the tank, right, and that's the reserve. So if there is a fire, you can observe the standpipe, and that is in the stairs, that's what the fire department connects their houses to, and puts the fire out. And it serves sprinklers, which is what we see up on the

ceilings and walls. I know, I can't point.

And the pumps are off. They are waiting for a fire, so to speak, right?

Q. Okay.

A. The small pump is there, the jockey pump.

Q. I am going to stop you. How big is the small pump?

A. Ten gallons a minute, two horsepower, in that range.

Q. With your hands, how big?

A. Foot and a half, two feet.

Q. And the main pump?

A. It's big a 100-horsepower pump.

Q. So when does one or the other pump turn on? When do they activate?

A. The smaller pump, the jockey pump, if the system requires filling, it will come on for a very brief period of time. If the pressure continues to drop, that means you have multiple heads open, you got a firehose open, you have an event going on, then the big pump comes on.

Q. So if, God forbid, there is a fire and the sprinklers in this room are going off, which pump is pumping them?

A. At that point the main pump.

Q. Okay. And if there is a leak in the system and that is not a leak in someone's apartment unit, but a leak in the fire suppression system, which pump goes on?

THE COURT: Let me just understand. If there is a

fire, both pumps are working?
THE WITNESS: The big pump is on.
THE COURT: The jockey pump is not working anymore?
THE WITNESS: I think it will turn off. The big pump takes over.
THE COURT: All right.
BY MR. SOLOMON:
Q. If there is a leak in the fire suppression systems, not in someone's apartment, which pump handles that?
A. The small pump, the jockey pump.
Q. If there is maintenance being done on the system, you are running the system every month, which pump do you have to run?
A. You test the main pump every month.
Q. Is that because you want to, or is that required by statute?
A. It's required by the code of the City of New York.
Q. And so we have addressed an actual fire, we have addressed a leak. We have addressed maintenance and testing. You mentioned about filling. You mentioned about refilling. What do you mean? What are you talking about?
A. Let's say a resident was modifying their apartment -- their residence, sorry. They turned off the fire protection on their floor so they can do their work. And they have to energize the system to refill it again when they are done. You have to make the order to their section of the piping, the small pump may

come on.
Q. So you are saying if we moved a wall over and we had to extend the pipe to have the sprinkler head in the middle because it is not covered by a wall or something, the jockey pump does that?
A. Correct.
Q. Okay. Now, you mentioned the main pump being run because there's testing required by statute or by code.
How many times a month, a day, a year, how often does that happen?
A. I believe it's once a month.
Q. Okay. For how long?
A. A short period of time just to show that it is functional.
THE COURT: A short period of time is how many minutes.
THE WITNESS: Maybe 15 minutes, in that range. I don't know the exact time.
THE COURT: Okay.
BY MR. SOLOMON:
Q. Okay. And actual testing is done by the fire department?
A. No. I think it's done by an approved contractor.
Q. Do you hire a service that comes and does this kind of thing? You're nodding.
A. Yes.
Q. Does that have to be a particular day, or can you schedule

that?
A. You can schedule it.
Q. Penthouse 58 is adjacent to a fire suppression subsystem. You say in June of 2018 it was approved by the fire department. To get that approval, do they have to come out and examine the system?
A. There is a flow test done on the system to make sure it meets the flow and pressure requirements of the job, yes.
Q. So it's tested?
A. It's tested.
Q. And it is tested by the fire department?
A. By -- I don't know if it's the fire department. Again, an authorized person.
Q. So as of June 2018, the fire suppression system adjacent to Penthouse 58 was -- I don't want to say active, but it was up and running and ready to provide water if there was a fire?
A. That's my understanding, yes.
Q. The tank that holds the water, does that make any noise?
A. No. Tanks don't make noise.
Q. Does the main pump make noise when it is pumping?
A. The big 100-horsepower pump?
Q. Yes.
A. Yes. You will hear that when it's on.
Q. When it's not pumping does it make noise?
A. It does not.

Q. If it's pumping in an emergency?
A. It pumps in an emergency.
Q. And during the test?
A. And during the monthly test.
Q. And it does not pump during a refilling or a leak?
A. That is correct.
Q. Does it pump any other time?
A. Catastrophic leak of a pipe.
Q. Okay. If you have a catastrophic leak of a pipe in your fire suppression system, is that a big problem or a little problem?
A. That is a big problem.
Q. Okay. Now, the jockey pump, when it's not pumping, does it make noise?
A. It does not make noise.
Q. When it is pumping does it make noise?
A. It may. It is a small pump so you have to define what noise is, but yes.
Q. You tell me. If it was next to Penthouse 58 and you were in Penthouse 58, how loud would it be if you know?
A. I don't think it would be very loud.
Q. Not very loud.

THE COURT: I am just going to interrupt for a second.

I did the summary judgment motions, I did the proposed findings of fact and law. You have two and a half hours. You

are almost a half hour into it. You can do it however you would like. I just don't want you to use time that you don't need to.

MR. SOLOMON: I appreciate it, Judge.

THE COURT: Okay.

BY MR. SOLOMON:

Q. Now, everything you just told us about how the jockey pump works, the main pump works, the fire suppression system and the sound associated with it, was that ever conveyed to sponsor?

A. By us?

Q. Yes.

A. I don't believe we have anything in the drawings that would say what the sound levels are.

Q. Okay. But the functioning of the fire suppression system was that ever conveyed to sponsor?

A. Oh, the function?

Q. Yes.

A. Yes.

Q. Who at sponsor did you convey that?

A. The sequence of operations on the drawings and most of my day-to-day contacts was with Mr. Ron Noll.

Q. You explained to Ron Noll. Who is Ron Noll?

A. Ron knoll was hired by the Zeckendorfs to run the project.

Q. You explained to Ron Noll that that is, I believe, I would call it a passive system. Is that fair?

A. I described it it's waiting for an event to activate.
Q. Okay. While it's waiting, it is not doing anything?
A. It's waiting, correct.
Q. So it's always ready, but the pumps only activate in those times that you described to us.
A. Correct.
Q. Other than conveying that to Ron Noll, did you convey it to anyone else at sponsor?
A. I may have.
Q. Did you ever convey it to Katie?
A. I may have.
Q. Katie, when I say Katie I mean Katie Brandvold?
A. I understand.
Q. If you spoke to Katie, it would be to convey the same information you gave to Ron?
A. Of course, yes.
THE COURT: Katie's last name is what?
MR. SOLOMON: Brandvold.
THE COURT: B-r-a-n-d-v-o-l-d?
MR. SOLOMON: Correct.
BY MR. SOLOMON:
Q. Do you recall having a discussion with Katie or Ron in 2018 about the functioning of the fire suppression system next to Penthouse 58?
A. I recall Ron called me, yes.

Q. So you spoke to him on the phone?
A. Correct.
Q. And what did you tell him?
A. I told him the pumps are not running, not -- you know, they are available to run, but they're not running and went over the whole sequence with him.
Q. The whole sequence being what you just told the Court?
A. Correct. What I told the Court.
Q. After you spoke to Ron Noll on the phone about the system did you or WSP send an e-mail confirming what you just spoke to him about?
A. Ashado Smith sent an e-mail.

MR. SOLOMON: Can we put before the witness PX 14, which is not a joint exhibit.

THE COURT: It goes to weight, not admissibility, so it's admitted.

(Plaintiff's Exhibit 14 received in evidence)

MR. SOLOMON: Thank you, your Honor.

BY MR. SOLOMON:
Q. So you have before you PX 14.

Is this the e-mail you just mentioned?

THE COURT: Can we get it in focus a little bit.

MR. SOLOMON: Yeah. Here we go.

BY MR. SOLOMON:
Q. This is a January 4, 2019, e-mail from Ashado Smith at

WSP.com to Ron Noll at zeckendorfdevelopment.com.
Do you see that?
A. I see that, yes.
Q. It goes through how the fire suppression system next to Penthouse 58 operates, is that fair?
A. Yes.
Q. Okay. This e-mail was sent after a telephone conference you had you said with Ron Noll?
A. Correct.
Q. About the same thing in the e-mail?
A. Was that a question.
Q. About the same topic that's in the e-mail?
A. Yes.
MR. SOLOMON: Okay. I have nothing further for Mr. Pomerantz at this time.
THE COURT: Okay. Cross.
CROSS-EXAMINATION
BY MS. SOKOLOFF:
MS. SOKOLOFF: May I proceed?
THE COURT: You may.
MS. SOKOLOFF: Thank you, your Honor.
BY MS. SOKOLOFF:
Q. Good morning, Mr. Pomerantz. You understand that among the principals of sponsor were William Zeckendorf and Arthur Zeckendorf. Correct?

A. Correct.
Q. 520 Park Avenue your fifth project for Zeckendorfs, correct?
A. I didn't count, but it was one of the projects I did for the Zeckendorfs, yes.
Q. You previously worked on 15 Central Park West?
A. Yes.
Q. And 50 UN Plaza?
A. Yes.
Q. Clarkson Square.
A. That is subsequent on 520.
Q. 86th street?
A. Yes.
Q. And you continued to work as an engineer on projects for the Zeckendorfs, correct?
A. That is correct.
Q. In fact, when you received your deposition subpoena in this case, you were in a meeting with William Zeckendorf, correct?
A. I'm sorry. I was distracted.
Q. Of course. In fact, when you received your deposition subpoena in this case, you were in a meeting with Will Zeckendorf, correct?
A. Correct.
Q. WSP was not asked to provide sound attenuation on the fire protection pumps in the building, correct?

A. I don't recall being asked, correct.
Q. When you designed the pump room adjacent to PH-58, you did not take any sound attenuation measurements to prevent noise from being transmitted outside of the pump room on the 42nd 43rd construction floors, correct?
A. I am not sure what you mean by sound attenuation measures.
Q. Measures taken to prevent sound from transmitting from the tank and pump room adjacent to PH-58 outside of that room?
A. So we do not have design scope related to the partition, the wall that separates the pump room from the residence. So we didn't take any -- if that's what you are getting at. So it is not that we didn't put any attenuation there. It is not our scope of work to design the partition between the rooms.
Q. You and your colleagues at WSP were not involved in installing equipment in the pump room, correct?
A. Physically installing it with tools?
Q. Yes.
A. We do not do that.
Q. The contractors handled installation, correct?
A. Correct.
Q. During your time working on 520 Park Avenue, you never spoke with any of the representatives at CDM1, correct?
A. I don't even know who the representatives of CDM1 are, so I will say correct.
Q. Let's talk about some of the documents you said you

provided to sponsor.

WSP provided sponsor with copies of all documents it reviewed relating to specifications for constructing the fire suppression system, correct?

A. We provided the sponsor with plans and specifications for the fire protection system.

Q. WSP provided sponsor with specifications on the pumps in the building, correct?

A. Correct.

Q. WSP provided sponsor with shop drawings, correct?

A. We reviewed the shop drawings provided by contractors.

Q. And WSP provided those to sponsor, correct?

A. We provided those back to the construction manager.

Q. WSP provided sponsor with the equipment that it reviewed, correct?

A. I missed that.

Q. WSP provided sponsor with a list of the equipment it reviewed, correct?

A. It was on the schedule sheet that we saw before.

Q. WSP provided sponsor with the operating instructions for the tank and pump system?

A. We provided sequence of operation.

Q. You stated on your direct examination that testing was performed in 2018 by either the fire department or some other professionals. That testing is not an acoustical test,

correct?
A. That's correct.
Q. During your direct examination you were shown PX 14, correct?

MS. SOKOLOFF: If you could put PX 14 on the screen.

THE COURT: That is the schedule of fire protection pumps?

MS. SOKOLOFF: Your Honor, it was an e-mail from Mr. Noll to Ashado Smith.

THE COURT: Sorry. I misspoke.

THE WITNESS: Yes.

Q. You are not copied on that e-mail, correct?
A. That is correct.

MS. SOKOLOFF: I am going to put up Exhibit DX 74, please.

If I could have this admitted into evidence, your Honor.

THE COURT: It is admitted.

(Defendant's Exhibit 74 received in evidence)

MS. SOKOLOFF: Thank you.

Q. The cover e-mail is from Ron Noll to Ashado Smith, correct?
A. Yes. That is correct.
Q. Mr. Noll writes, "Ashado, see corrections and additions."

Correct?

A. Correct.
Q. Turning to the next page, Mr. Noll's revision, Mr. Noll added language to the third paragraph stating that the operation of the fire suppression system occurs only in an emergency situation, right?
A. Correct.
MS. SOKOLOFF: You can remove that exhibit from the screen.
BY MS. SOKOLOFF:
Q. Mr. Pomerantz, you did not conduct, WSP was not asked to provide or did not conduct any acoustical testing of the system, correct?
A. That is correct. It is not our scope of work.
MS. SOKOLOFF: No further questions.
THE COURT: Thank you.
Five minutes of direct, max. If you want it. You don't have to use it.
MR. SOLOMON: Very briefly.
THE COURT: Okay.
REDIRECT EXAMINATION
BY MR. SOLOMON:
Q. Going right back to the exhibit that was just put up, which is DX 74, those revisions make it into the final e-mail, right?
A. I believe they did, yes.
Q. Would they have made it in if they were inaccurate?

A. No.
Q. Is it your understanding that e-mail was being drafted at the request of sponsor because the buyer at that point was asking questions about the fire suppression system?
A. That is correct.
Q. Okay. That is after your discussion with Ron Noll about the fire suppression system?
A. That was the phone call that I had with Ron Noll, yes.

(Continued on next page)

BY MR. SOLOMON:
Q. And the document that reflects that the fire suppression system next to penthouse 58 was up and running in June 2018, would that be a publicly available document?
A. I do not know.
MR. SOLOMON: Your Honor, we've pulled it off the publicly available system. Could we show it to the witness to refresh his recollection?
THE COURT: Well, he doesn't know, so no.
MR. SOLOMON: All right. Could we put it into evidence then?
THE COURT: You may.
MR. SOLOMON: Thank you, Judge.
THE COURT: Just say what exhibit it is.
MR. SOLOMON: We're going to mark it as Plaintiff's 52.
THE COURT: It's admitted. Would you identify it for the record, please.
(Plaintiff's Exhibit 52 received in evidence)
MR. SOLOMON: Thank you. It is a letter of approval from the New York City Fire Department dated June 26, 2018, and it is a letter of approval signed by the chief of fire prevention, after an inspection, combination fire pump for floors cellar, 31, 42 and 51. One of those corresponds with penthouse 58.

THE COURT: Okay. Thank you.

MR. SOLOMON: Nothing further of Mr. Pomerantz.

THE COURT: You may be excused. Thank you.

Please call your next witness.

MR. SOLOMON: We call Mr. Buckworth, who's probably outside.

THE COURT: Okay.

MR. SOLOMON: May I go out to get him?

THE COURT: You sure may.

(Witness sworn)

THE DEPUTY CLERK: Please state and spell your first and last name for the record.

THE WITNESS: Louis Buckworth, L-O-U-I-S, B-U-C-K-W-O-R-T-H.

THE COURT: You may inquire.

MR. SOLOMON: Thank you, Judge.

LOUIS BUCKWORTH,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOLOMON:

Q. Good morning, Mr. Buckworth.

A. Good morning.

Q. Are you familiar with the real estate development at 520 Park Avenue?

A. I am, yes.
Q. How are you familiar with it?
A. I was the sales agent for Zeckendorf Marketing that represented the sponsor.
Q. Okay. And did there come a time when you met Mr. and Mrs. Moreno, or Chip Carey?
A. Yes.
Q. Okay. In connection with penthouse 58.
A. In connection with the building, which soon became penthouse 58, yes.
Q. When was that?
A. That was probably earlier part of 2017.
Q. All right. And did there come a time when the purchaser eventually signed an option agreement to purchase penthouse 58?
A. Yes.

MR. SOLOMON: Okay. I'd like to move into evidence PX 16, which is JX, Joint Exhibit 13. That's the option agreement that was signed.

THE COURT: It's admitted. It's JX what? 13?

MR. SOLOMON: 13, your Honor.

THE COURT: Thank you.

(Plaintiff's Exhibit 16 received in evidence)

BY MR. SOLOMON:
Q. Let's look at paragraph 17.3. That's the paragraph we're all here to talk about.

Do you see it? I don't see it.

All right. Mr. Buckworth, you have before you PX 16. This is paragraph 17.3. Can you read it to us, please, so we'll all hear it once in the courtroom.

A. "Prior to the date of closing title to the unit, sponsor will have taken all reasonable measures to test, verify, and specifically ensure purchaser that the mechanical functioning of said tank and pump system does not create any sound or noise that will impair purchaser's quiet enjoyment and use of the unit, except in an emergency or routine maintenance."

Q. Okay. Thank you. At the time you first met purchaser, what state of construction was the building in, 520 Park Avenue?

A. Superstructure was up, so probably not, you know——so concrete in place; I imagine maybe the lower half of the building had some windows in, potentially.

Q. So it was under construction.

A. Yeah, very much so.

Q. Okay. And how many times would you say you met or spoke with purchaser prior to him entering into the option agreement?

A. Met probably two or three times. I would imagine. We spoke multiple more than that, could be as many as ten times on the phone.

Q. Okay. When you met purchaser, did you discuss the fact that penthouse 58, instead of having a third bedroom, had a

fire suppression system where that bedroom would otherwise be?
A. Of course. I mean, it was the unique nature of that particular apartment, and the one above, actually.
Q. Okay. Was that a——in your mind, was that fire suppression system being there a bug or a feature of penthouse 58?
A. A bug or a feature? You mean, was it considered to be a problem?
Q. Yeah.
A. Well, in a weird way, it actually made it more attractive to some buyers because the capital sum of the apartment came down a bit because there's a little less square footage, and so technically that was the best apartment in the building——single-floor, anyway. It had higher ceilings and a balcony and it was the highest——second highest single-floor in the building, so it was definitely one of the best, for the right buyer who didn't need the third bedroom. In fact, weirdly enough, very little people needed the third bedroom.
Q. What, if anything, did you tell the purchasers about how the fire suppression system next to penthouse 58 functioned?
A. I just told them the same thing I would have told anybody else at the time, which is that it's a passive system and that in essence, it doesn't come on at all. It's off, essentially. There's no noise unless there is routine maintenance or——or an emergency of some kind. You know, it's kind of like a fire alarm in that——in that regard, right? It's off until it's on.

Q. And how did you come to have that knowledge?
A. Well, obviously I was marketing the building, so I needed to know as much as I could. I made it my business to understand what it was I was selling, and that was a particularly unique feature of that, so, you know, I——I was familiar, not in great detail, but familiar with the offering plan, and information specific to that unit was given to me usually through Ron Noll, who was one of our construction managers, who would have received that information, obviously from our engineers, who were WSP.
Q. And you mentioned maintenance would make the fire suppression system come on. Did the purchasers ever care to understand, when you were speaking with them, the extent and regularity of that maintenance?
MR. SPERLING: Objection, your Honor. Speculation as to what other people understood.
THE COURT: Overruled.
Did you ever speak to the purchaser about how often maintenance would be done?
THE WITNESS: I don't believe so. I don't think that was a concern. I think we discussed access.
BY MR. SOLOMON:
Q. And do you know why they didn't bring up to you how often maintenance would need to be done?
A. No. I mean, the question here was that obviously, as you

can see in this language, the question was, would there be any unreasonable noise, and obviously, routine maintenance or an emergency would be considered reasonable, in my view.
Q. And you've been in penthouse 58 after the fire suppression system was up and running; is that fair?
A. Sure. Many, many times.
Q. Okay. And did you hear any noises, any clicking, any pumping, any sounds?
A. There is no noise. It's not——it's only activated when there's——when there's an emergency or maintenance, so it's passive. No is the answer. Sorry.
Q. Okay. And you said you received the information from Ron Noll about how the system works and the noise it would make. When did you receive that?
A. For the first time, I couldn't tell you, but it would have been well before I met Mr. Carey and Mr. Moreno.
Q. How many other people do you recall showing penthouse 58 to?
A. We never——when you say show, shown it to, we were at the time marketing the units in our sales gallery, so they'd be looking at a floor plan. I would have mentioned to——I probably mentioned it to half a dozen on the low end, maybe a dozen people by that point.
Q. Did they express any concerns about sound coming from the fire suppression system?

MR. SPERLING: Objection, relevance, your Honor.
THE COURT: Sustained.
You shouldn't answer.
Q. Are there any other units in 520 Park Avenue that are similarly adjacent to a fire suppression system?
A. Yeah, the floor directly above it is——it's a——58 and 59 both have exactly the same system in there.
Q. Okay. And did the other unit get sold?
A. Yes.
MR. SPERLING: Objection, relevance, your Honor.
THE COURT: I'll allow it.
Q. And have the owners ever made any complaints to you or the sponsor regarding any noise?
MR. SPERLING: Objection, relevance, your Honor.
THE COURT: Overruled.
A. Not to me they haven't. I sold that unit and I know the purchasers well. They're very happy there.
Q. Okay. Now I want to talk about after——let's go up to the top.
The option agreement was signed in October of 2017.
A. Yes.
Q. Let's go to the very top.
Signed on October?
A. 6.
Q. October 6, 2017. Okay. And do you know when the closing

of penthouse 58 was originally first scheduled to occur?
A. I think it was November or December of 2018.
Q. Okay.
A. Yeah.
Q. So I want to focus on between October 6, 2017, and November whatever, 2018, okay?
A. Yup.
Q. Okay. Between those two time periods, did you speak to purchaser or Mr. Carey about the unit at all?
A. About the unit?
Q. Yeah.
A. Yes, many times.
Q. Okay. How many times would you say you spoke about the unit?
A. To the purchaser or Mr. Carey?
Q. Yes.
A. I——I'd be guessing, but I spoke to the purchaser——in the beginning I spoke to the purchaser a lot more on the phone. At least a dozen times.
Q. Okay. And——
A. And then Mr. Carey subsequently became more involved.
THE COURT: And Mr. Carey was acting as a representative of the purchaser, correct?
THE WITNESS: That's correct, but my communication was originally with the purchaser directly, and then it became more

with Mr. Carey.

THE COURT: Thank you.

BY MR. SOLOMON:

Q. And you spoke so many times. What did you talk about?

A. A lot of it was personal, actually. My father was rather unwell at the time, and he used to call to check in on that. But he was usually calling to check on construction, timelines, which is what everyone does, you know, when am I going to get my apartment. He wanted to be the first one to close in the building, which was difficult because we were at the top of the building. I forget the construction schedule, but I think he would have been one of the first upper floors to close. So it was mainly that and——and things like the alterations in the apartment. This was a highly custom unit. We didn't normally do that, but in this instance, there were certain items that were admitted, like flooring and marbles and so on, but there were also floor plan changes that were made specifically for this purchaser, which wasn't normal for the sponsor to do. So we had a lot to talk about.

Q. Okay. Were there any discussions between October 6, 2017 and November 2018 about the fire suppression system?

A. It did come up, yes.

Q. And what, if anything, did you tell them?

A. Same as I'd always told them. Obviously prior to it being installed——I think it was installed in the summer, maybe June

of 2018, after that. I told them the same, you know, that it was——it was exactly the same system as designed, and after——after June, I think they were in the apartment twice after that date. And we were actually able to witness it in person, that it was a passive system and it would only come on if there were an emergency or maintenance.

THE COURT: Just a question. When you talk about conversations with the purchaser, you're talking about Mr. Moreno? There were two purchasers, right, Mr. Moreno and his wife?

THE WITNESS: Yes. I apologize. I only communicated with Mr. Moreno, not his wife. Sorry. Yes.

THE COURT: Okay. Thank you.

BY MR. SOLOMON:

Q. Technically the purchaser was a company, CDM1.

A. Yes.

THE COURT: He was the principal of the purchaser.

A. Yes, the LLC, which was represented by Mr. Moreno in this case. He was——it was clearly him that was leading the discussions.

Q. Okay. And you said the fire suppression system was operational in June of 2018.

A. Correct.

Q. How many times was purchaser or its rep in the unit between that time and November, or between that time——let me rephrase

the question.

How many times were purchaser or its rep in the unit after the fire suppression system was already operational and running?

A. I believe it was twice.

Q. Okay.

A. I believe there was both——both Mr. Carey and Mr. Moreno had——had visited the apartment, in that period.

Q. And did they have an occasion to go into bedroom two, which is the one close to the fire suppression system?

A. Yes, and the back corridor which leads to it, yeah.

Q. Did they ever ask to go into the pump room?

A. No.

Q. Had they, would you have let them?

A. Of course.

Q. Did they ask any questions——let me rephrase that.

When they were in the unit after it was up and running, the fire suppression system? Did they ask any questions about the fire suppression system?

A. No. Apart from the fact that, had it been installed, and I said yes, it had and it was operating correctly. That was it.

Q. Did they seem satisfied with your response?

MR. SPERLING: Objection, your Honor, speculating about someone else's——

THE COURT: I'll allow it. What was the reaction?

What did they do or say?

THE WITNESS: They always seemed satisfied about this particular part. It wasn't really the focus. The focus was elsewhere. I think the language in the contract satisfied them, quite frankly. Had there been a problem, we would have put——sponsor would have put, you know, some sound testing requirements in there. But there is no——there is nothing to be done so I think they were satisfied, yes.

BY MR. SOLOMON:

Q. Okay. And did they ever ask you to provide any documentation to them about the fire suppression system?

A. No.

Q. Did they ever ask you if they could bring a sound tester in to test it?

A. No.

Q. Did they ever ask you if they could be in the space other than when you took them to penthouse 58, bedroom 2? After the pumps were on, did they ever ask to stay in longer than you would let them to listen?

A. No. No, no.

Q. Did they ask you any follow-up questions that gave you the impression that they had more questions about the system?

A. No.

Q. Did you have any discussions with purchaser or Mr. Carey after or around the time of the tours they made of the

penthouse 58 in late summer or November, December of 2018, that discussed a topic other than the fire suppression system?
A. I met with Mr. Carey. The meeting was at, you know——in the building. I met him in the building. And we discussed the marketing of his apartment.
Q. What do you mean?
A. When I say his apartment, sorry, the——the apartment belonging to the entity. What do I mean? They were——the implication was that they wanted to hire me to potentially sell the apartment for them, after closing.
Q. Why did they want? Why were they discussing selling the apartment after closing?
A. I wasn't sure of the exact reason. I did ask the question. And the——the answer was that, for personal reasons. There was no explanation whatsoever. And the question was asked of me what, you know, what would the apartment be worth, what would it take to get it into a position to sell it, and so time frames, that sort of thing, and market-related questions as well, you know, how good is the market. That was something that Mr. Moreno was also interested in a lot of the time.
Q. Did you tell them that if they hired you to sell the unit, they would make money or lose money?
A. I told them they would probably lose money. Because it was——I said to them even if I got them in that same number they paid, there would be a loss because there would be taxes on the

way in, taxes on the way out, my fee, and the cost actually to put the apartment back into a sellable condition, because it was not, you know——we'd admitted many things, like flooring and kitchens and many things, so I said there would probably be a loss of some kind.
Q. Can you give us a rough number.
A. I think I said a few million dollars at the time. You add up the taxes into that, assuming it's where we'd end up.
Q. And after the purchaser failed to close on penthouse 58, what happened to penthouse 58?
A. It was renovated or finished, I would say, to a very high standard, and then it was sold.
Q. Okay. And has the owner ever complained about any noise from the fire suppression system?
A. Not that I know of.
Q. All right. Let's put in front of you very briefly, just to close the loop, it's Plaintiff's 38, which is JX 21.
MR. SOLOMON: If we can move that into evidence, your Honor.
THE COURT: It's admitted.
MR. SOLOMON: Thank you, Judge.
(Plaintiff's Exhibit 38 received in evidence)
Q. You have in front of you Plaintiff's Exhibit 38. It's a February 15, 2019, letter from Starr Associates, who is the attorneys for sponsor in connection with the transaction. If

you go down, it lists——one, two, three, four, five——six times purchaser or its rep was in the unit. Do you see that?
A. Yes, I see it.
Q. Okay. The last two numbers, 5, August 20, 2018, and December 5th, 2018, those are after the fire suppression system's already up and running?
A. That's my understanding, yes.
MR. SOLOMON: Thank you. I have nothing further for Mr. Buckworth at this time.
THE COURT: Okay. Thank you.
Cross?
Just let me ask two questions not on anybody's time.
So we looked and it was put into evidence, the option agreement. The purchase price for the apartment was 34 million and the deposit was 8.5 million?
THE WITNESS: 25 percent.
THE COURT: 25 percent. Okay. Thank you.
All right. You may cross.
CROSS EXAMINATION
BY MR. SPERLING:
Q. You've never been in the unit when the pump was activated, have you?
A. Sorry?
Q. You have never been in the unit when the pump was activated, have you?

MR. SOLOMON: Objection as to form.
A. As in on or operational? As in pumping some water?
Q. Correct.
A. I don't believe so, no.
MR. SOLOMON: Objection. Judge, which pump?
THE WITNESS: Oh, sorry.
MR. SPERLING: That's fine. Let's be clear about that.
THE COURT: All right.
Q. Well, have you been in the unit when either the Jockey pump or the main pump were activated and running and pumping water?
A. Not to my knowledge. They may have been.
Q. Now you mentioned that you had a number of conversations with both Mr. Moreno and Mr. Carey about the unit, correct?
A. That's correct.
Q. And actually, in your first conversation with Mr. Moreno, he brought up the issue of the noise that the pump system would make, correct?
A. Which conversation? Sorry.
Q. Your initial conversation. You said you first spoke with Mr. Moreno in 2017.
A. Yes.
Q. In that first conversation.
A. So you said Mr. Moreno; first you said Mr. Carey.
Q. Let me start over.

A. Thank you.
Q. Who was your first conversation with?
A. Ever?
Q. Concerning the unit.
A. Concerning the unit, Mr. Moreno, in the sales gallery, when we first met.
Q. And in one of your first conversations with Mr. Moreno, he brought up the issue of noise from the pump system, correct?
A. I wouldn't say it was in the first conversations. I would say that came up after he'd——I'd say that came up later in the piece.
Q. Actually, it was the subject of conversation a number of times, correct?
A. Yes. During the——during the negotiation of the contract, it obviously came up quite a bit because it ended up in the contract.
Q. And it ended up becoming part of the contract because CDM1 said they needed it to be in the contract, correct?
A. That's my understanding.
Q. And you agree that sponsor was required to meet its obligations under Section 17.3 prior to closing of the unit, correct?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. Sponsor was required to meet all its obligations under the

option agreement, yes.
Q. And you've testified that you consistently reassured Mr. Moreno and Mr. Carey that sponsor would meet its obligations, correct?
A. Under the whole option agreement?
Q. Yes.
A. I wouldn't say I consistently reassured them that they would meet all the obligations because that's not——that wasn't necessary.
Q. Whenever they brought up the issue——
A. Yes.
Q. ——of noise from the pump system, you told them that sponsor would meet its obligations, right?
A. If it was ever brought up, that's exactly what I would have said, yes.
Q. And don't you recall it having been brought up?
A. Yes.
Q. You did give them that reassurance, correct?
A. I gave them the reassurance.
Q. You expected them to rely on it, didn't you?
A. On that reassurance?
Q. Yes.
A. Yes.
Q. Now you agree that it would have been reasonable for sponsor to provide CDM1 with a specifications of the system,

right?

MR. SOLOMON: Objection.

THE COURT: Overruled.

A. If asked for the specifications of the system, I would say that is reasonable.

Q. And you know that those would have been readily available, correct?

A. I would assume. I don't know that, but I would assume so.

Q. And it would have been reasonable for sponsor to provide CDM1 with design drawings, correct?

MR. SOLOMON: Objection.

THE COURT: Overruled.

A. I——possibly. I'm not sure if that's——this is not really my department so I'm not sure whether giving detailed design drawings about pieces of equipment is——is common practice or not, but to me it sounds reasonable.

Q. And it certainly would have been reasonable to allow CDM1 to actually see the system, right?

A. If they'd asked, yes.

Q. Now you understand under Section 17.3 it's sponsor's obligation to test, verify, and specifically ensure purchaser, correct?

MR. SOLOMON: Objection. Judge, it's a legal conclusion. He's not even the sponsor.

THE COURT: I'll overrule it. You can answer it.

A. Sorry. Will you ask the question again.
Q. Sure. You've made a number of comments that if CDM1 would have requested something.
A. Yes.
Q. And I'm asking you, you do understand that it was sponsor's obligation to test, verify, and specifically ensure purchaser under 17.3, right?
A. That's what it says, yes.
Q. Now Katheryn Brandvold has said that sponsor can satisfy its preclosing obligations to specifically ensure CDM1 without communicating any information to CDM1. You don't agree with that, do you?
MR. SOLOMON: Objection.
THE COURT: Sustained. Now we're getting into an interpretation of the contractual language.
Q. You don't think it would have been reasonable for sponsor not to provide any information to CDM1, do you?
MR. SOLOMON: Objection.
THE COURT: Sustained.
THE WITNESS: You want me to answer that? Sorry.
THE COURT: No. When I say sustained, you don't need to answer; in fact, you should not answer.
THE WITNESS: Thank you.
BY MR. SPERLING:
Q. Now you testified about some conversations you had with

Mr. Carey about the possibility of selling the unit, correct?
A. Yes.
Q. You would agree with me that you can't sell the unit unless you purchased it in the first place, right?
A. I'm aware, yes. I would agree.
MR. SPERLING: Thank you.
THE COURT: All right. Any redirect?
REDIRECT EXAMINATION
BY MR. SOLOMON:
Q. Opposing counsel asked you if, when purchaser inquired about the fire suppression system, your response was, sponsor will comply with its obligations under the contract. Was that how you responded to purchaser?
A. No.
Q. Okay. And rather, you gave purchaser information about the fire suppression system.
A. Yeah. I mean, I considered it part of my role to——to reassure my purchaser about things they were buying. I mean, under a contract, legally, it has to come from the sponsor, but I was very much the mouthpiece.
MR. SOLOMON: And could we please put up JX 21.
Q. While that's going up, because I'm on a shot clock——
A. Yes.
Q. ——in fact you took purchaser into bedroom 2 in penthouse 58 after the fire suppression system was operational and let them

physically observe or listen or take in the functioning of the tank system.

A. Yeah, we were in all areas of the apartment, and we went specifically into that room, and the back corridor, actually, which was closer to it.

Q. And you were there on August 20, 2018, and December 5, 2018.

A. That sounds correct.

Q. And after being there in the unit with the pumps, ready to pump, and the purchaser observing what they observed, did they ask you for any other information?

A. I never had a request for any information.

THE COURT: We've been over all this.

MR. SOLOMON: Thank you.

Thank you, Mr. Buckworth. I appreciate you coming in.

THE COURT: Okay. You're excused. Thank you.

(Witness excused)

THE COURT: Please call your next witness.

MR. SOLOMON: Plaintiffs call Samantha Sheeber.

(Witness sworn)

THE DEPUTY CLERK: Please state and spell your full name for the record.

THE WITNESS: Samantha Sheeber. S-A-M-A-N-T-H-A, last name S-H-E-E-B-E-R.

SAMANTHA SHEEBER,

called as a witness by the Plaintiff,
having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOLOMON:

Q. Good morning, Ms. Sheeber.

A. Good morning.

Q. What do you do for a living?

A. I'm a real estate attorney.

Q. Okay. And how long have you been a real estate attorney?

A. My god.

THE COURT: A long time?

A. 30 years. 30 years.

Q. Has that always been your specialty?

A. Yes.

Q. And are you familiar with the sale of penthouse 58 at 520 Park Avenue to purchaser CDM1?

A. Yes, I am.

Q. Okay. And how are you familiar with that transaction?

A. My firm represented the sponsor and we drafted the purchase agreement and represent the sponsor in that transaction.

Q. Did your firm also——what's the name of your firm?

A. Starr Associates.

Q. And did your firm also draft the offering plan?

A. We did.

MR. SOLOMON: I'd just like to move it into evidence,

because we'll probably both be relying on it, as PX 40.

THE COURT: Okay. PX 40 is admitted as the offering plan.

(Plaintiff's Exhibit 40 received in evidence)

Q. And your firm was also involved in the transactional work for selling the unit to the purchaser.

A. Correct.

Q. Okay. And the purchase agreement is actually called an option agreement in this case, right?

A. Yes.

Q. Did there come a time when someone on behalf of the purchaser sent red lines to the option agreement?

A. Yes, a proposed change.

Q. Proposed changes. And with whom on behalf of purchaser did you interact?

A. I believe it was Chip Carey.

Q. Okay.

THE COURT: What was the name?

THE WITNESS: Chip Carey.

THE COURT: Chip Carey. Thank you.

MR. SOLOMON: Okay. Could we please put up PX 2. Which is also Joint Exhibit 2.

THE COURT: It's admitted.

MR. SOLOMON: Thank you, Judge.

(Plaintiff's Exhibit 2 received in evidence)

MR. SOLOMON: Could we publish it to the witness.

THE COURT: Yes.

MR. SOLOMON: Thank you.

BY MR. SOLOMON:

Q. Okay. So you have a September 29, 2017 email, from Chip Carey to you and Louis Buckworth. If we go down, it attaches the comments about the option agreement.

MR. SOLOMON: Let's go to 17.3, please.

Q. This is their proposed 17.3. Do you see that?

A. I do.

Q. Okay. Let's——could you read it out loud, please.

A. "Sponsor acknowledges that the location of the fire suppression water tank and pump in penthouse 58 is a unique and specific feature of the unit. Prior to the date of first closing, sponsor will have, to the best of its abilities, taken all reasonable measures to test, verify, specifically ensure purchaser that the mechanical functioning of said tank pump system does not and will not create any sound or noise that will impair purchaser's quiet enjoyment and use of the unit."

Q. Did sponsor approve those changes?

A. They did not.

Q. Okay. Did sponsor propose a different version of this document?

A. They did.

Q. Okay. And the final version is in PX 4, which is already

in evidence.

I'm sorry. PX 16, which is already in evidence. 17.3, of the actually signed document.

What did sponsor reject or change?

A. They rejected——without going back, but they rejected the I think first provision, which noted that the system is specific and unique to this unit. That was removed.

Q. Why?

A. Because the system wasn't specific and unique to this unit.

Q. Okay.

A. Just a system.

Q. And then at the end of 17.3, it now provides, "except in an emergency or routine maintenance." Do you see that?

A. Correct.

Q. It also changed——it says, "prior to date of closing title" instead of "first closing." What does that demonstrate?

A. Because it was just simply——first closing is really before the building opens. This was really just whenever their closing was going to occur, or just prior to their specific closing.

Q. And purchaser accepted this language.

THE COURT: Well, and "best of its abilities" was changed also; is that right?

THE WITNESS: Yes.

Q. And purchaser accepted this language.

A. Purchaser accepted this language.
Q. Okay. And why was the "except in an emergency or routine maintenance" clause added on?
A. It was added on because in discussions in the drafting of this, whether it was with, you know——there was a host of people. Whether it was Ron Noll, who was their construction; whether it was Gary Pomerantz, who I believe designed the system; whether it was Katy Brandvold, who really was my intermediary; it was told and understood that the system in general was really just a simple——it was a passive system, that it wasn't going to create any noise but in instances where there were emergency and routine maintenance. So it had to be added.
Q. And you drafted this?
A. Mm-hmm.
Q. You're nodding your head.
A. Sorry. I did. Sorry.
Q. You drafted this language?
A. I did.
Q. Okay. Maintenance includes testing or not?
A. Yeah, it's general. It would be all sorts of maintenance.
Q. Okay. And it says "test, verify, and specifically ensure purchaser," with an "e." Do you see that?
A. I do.
Q. Okay. Did you mean to write "assure," with an "a"?

A. Hundred percent not.
Q. Why not?
A. Because it's an impossible standard. I would never, in drafting anything, add language that is subjective to a purchaser, or to assure anybody. We have to do what we have to do. I would never close a deal if I had to make every single purchaser subjectively comfortable.
Q. So your understanding is that——what was your understanding of what sponsor had to do to comply with this?
A. I just had to put in a functioning system that would not make noise other than in these instances.
Q. Did you have to give buyer anything?
A. Absolutely not.
Q. So it's not that it wouldn't make any noise; it wouldn't affect their quiet enjoyment and use of the unit, right?
A. Correct.
Q. You weren't guaranteeing silence.
THE COURT: Well, it says what it says.
MR. SOLOMON: Thank you, Judge. Okay.
Q. So this is signed in October of 2017. Do you know when, about, the closing was originally supposed to occur?
A. I believe we scheduled the closing with a closing notice in October '18, scheduling an end of November '18 closing date.
Q. Got it.
MR. SOLOMON: Okay. Let's put up, please, Plaintiff's

Exhibit 17.
Q. Okay. All right. Ms. Sheeber, you have before you what's marked as Plaintiff's Exhibit 17. It's a November 15——or November 2018 series of emails from Marina Rabinovich to you. Do you see that?
A. My computer just went down. Uh, there it goes. It's back.
Q. Do you see that it's a series of emails from Marina Rabinovich and you back and forth in November of 2018?
A. Yes.
MR. SOLOMON: I'd like to offer this in evidence as Plaintiff's Exhibit 17.
THE COURT: It's admitted.
MR. SOLOMON: Thank you, Judge.
(Plaintiff's Exhibit 17 received in evidence)
Q. Let's go to the bottom. So you say you sent a notice in October scheduling the closing; we're going to close in November. And you have an email from Marina Rabinovich, November 2, 2018. Who's Marina Rabinovich?
A. She was counsel for the purchaser.
Q. Okay. And she writes that, to you, "Our client spoke with Louis Buckworth, who suggests that I reach out to you with a request for an adjournment. The closing is scheduled for Tuesday, November 22nd, which is right around the Thanksgiving holiday, it would be rather difficult for the client to timely inspect the unit. The client's in Arizona, and the parties

still have to agree on the kitchen credit. The client would greatly appreciate an adjournment ending in 60 days, and if not, the longest sponsor is able to extend as a courtesy. Looking forward to hearing from you."

Do you see that?

A. I do.

Q. Did purchaser's attorney mention in that email anything about 17.3?

A. Not a word.

Q. Prior to this email had you received any correspondence from purchaser or purchaser's counsel about anything to do with the unit?

A. Say? Without anything what?

Q. Prior to this email. So you signed in October 2017. It's now a year later; it's November 2018. In between those two dates, did you receive any correspondence from purchaser or their rep or their attorney about the unit?

A. No.

Q. Okay. This is the first time they reached out to you.

A. For an adjournment.

Q. For an adjournment. And they don't mention 17.3.

A. Not at all.

Q. They don't request any documents about the fire suppression system.

A. They do not.

Q. Let's go up.

You respond, on November 7th, "Please call me to discuss. I just tried you." Okay?

And then Marina writes back on November 13th, "Samantha, did the sponsor sign off on the extension to December 12? Our client is also inquiring about the amount of the kitchen credit. Please advise ASAP. As they said, they need the money," with a dollar sign, "to figure out what to do about the kitchen." Do you see that?

A. I do.

Q. What are they talking about with the kitchen credit?

A. The original purchase option agreement, as executed, there were a variety of things in the rider that the purchaser had requested not be delivered, and sponsor had agreed not to deliver those things and was going to provide a credit to be determined at the closing; credit against, like, the purchase price.

Q. So sponsor was delivering a more blank canvas and giving you credit for it.

A. Correct.

Q. So it's the second email she sends you. Second one asks about an extension and a kitchen credit?

A. Correct.

Q. No one's asking about 17.3?

A. No one is asking about 17.3.

Q. Let's go up. And then she writes to you on November 15th. You write you're waiting to hear back from ownership. And then she follows up on November 15th, "Would greatly appreciate if you would follow up." Do you see that?
A. I do.
Q. So three emails. Any mention of 17.3?
A. No.
Q. Okay. So they ask for an extension. Does sponsor give them an extension?
A. Ultimately?
Q. Yeah.
A. Mm-hmm.
THE COURT: Yes.
A. Yes. Sorry.
THE COURT: That's all right.
MR. SOLOMON: Let's go to Plaintiff's 6, which is also JX 6.
I'd like to move that into evidence, your Honor.
THE COURT: It's admitted.
MR. SOLOMON: Thank you, Judge.
(Plaintiff's Exhibit 6 received in evidence)
BY MR. SOLOMON:
Q. You have before you what's been put into evidence as Plaintiff's 6. It's a November 29, 2018, letter from you to Ms. Rabinovich, rescheduling the closing to January 4, 2019.

Do you see that?
A. I do.
Q. And you write in the——one, two——third paragraph, at the top, that the purchaser should complete a preclosing inspection within seven days of the closing date. Do you see that?
A. I do.
Q. Is that a preclosing inspection for 17.3 compliance or a general come look at the apartment, see if there's anything that needs to be touched up?
A. Standard provision in every single option agreement, purchase agreement to allow a buyer to come to just do a general inspection of the apartment.
Q. In fact, it says they're entitled, under paragraph 18.1 of the option agreement.
A. Mm-hmm.
Q. Okay. Okay. So did they close on January 4, 2019?
A. They did not.
MR. SOLOMON: Okay. Let's go to Plaintiff's Exhibit 7, which is also JX 7.
We'd like to move that into evidence, your Honor.
THE COURT: It's admitted.
(Plaintiff's Exhibit 7 received in evidence)
MR. SOLOMON: Thank you, Judge.
BY MR. SOLOMON:
Q. Oh, before we get into it, did they schedule an inspection

within seven days of January 4, 2019?
A. Not with me; not that I'm aware of.
Q. Okay. So let's go to the bottom. This is an email you got from Ms. Rabinovich, December 27, 2018. Do you see that?
A. Yeah.
MR. DIEDERICH: Your Honor, renew our objection to the settlement portion of the email.
THE COURT: Are you trying to offer what the settlement discussions were?
MR. SOLOMON: We're not offering it for them agreeing that they're wrong and that they should have closed and they're trying to settle it, but we will be using the figure.
THE COURT: Be using the?
MR. SOLOMON: The figure that they offer later on in our briefing. So I agree. Obviously you don't admit——
THE COURT: I don't think that's appropriate. These are settlement discussions. The numbers shouldn't be relevant. And so I will exclude that portion of it.
MR. SOLOMON: Okay.
BY MR. SOLOMON:
Q. So let's go to the top. She writes, "Samantha, please give me a call to discuss penthouse 58. I have a very unhappy client." Let's stop there, okay?
Prior to December 27th, did you receive any word from purchaser's counsel, purchaser, their rep, Mr. Buckworth, or

anyone at sponsor that buyers were unhappy?
A. Not at all.
Q. In fact, prior to the last email exchange had you heard from buyer at all?
A. I had not.
Q. So they said they're unhappy, they're——back on Plaintiff's Exhibit 7. They're unhappy with the way sponsor has treated them throughout the process. Had you heard that before?
A. Not at all.
Q. "For example, they have repeatedly asked about the kitchen credit so that they could plan their replacement kitchen and have yet to receive a response." Do you see that?
A. I do.
Q. Okay. So this kitchen credit has been brought up now in——one, two, three——this is the fourth email that they're talking about the kitchen credit.
A. Yes, since the——since it was scheduled for closing.
Q. For closing.
A. Right.
Q. "They have had very limited access to the apartment and have not been able to see the progress of the unit even though the option agreement has a number of agreed-upon design modifications." Do you see that?
A. I do.
Q. Had you heard of any issue with access to the unit?

A. Not at all. To the contrary.

Q. To the contrary. In your view had buyer been provided an atypically large amount of access to the building?

A. Buyer had been provided quite a number of access despite the fact that they did not negotiate any access rights in their contract.

Q. And then they write, "So they're unhappy about the kitchen, unhappy about access, they're unhappy about how they were treated," and then——so that's——one, two——three things they're not happy about. Then she writes, "No one has reached out to them to evidence sponsor's compliance with 17.3 of the option agreement, which requires sponsor to take all reasonable measures to test, verify, and specifically ensure to buyer that the mechanical functioning of the tank and pump system does not create any sound or noise that would interfere with buyer's enjoyment of the apartment." Okay? "In this respect, by now, sponsor should have provided a copy or copies of all reports obtained by sponsor from acoustical engineers it employed for this purpose. Sponsor's failure to do so suggests, disturbingly, that sponsor may not have complied with 17.3. I'm not privy to all the grievances, but bottom line, they feel that sponsor has not been cooperative and has impeded their performance of the option agreement. Accordingly, they have reassessed the situation and now would prefer not to live in the building. With the closing scheduled for January 4, 2019,

they have retained Adam Leitman Bailey as their litigation counsel, but asked me to first reach out to you to see if we could find a speedy and amicable resolution." And I'll stop there, okay?
A. Mm-hmm.
Q. You wrote the contract. Do you believe sponsor had an obligation to deliver any documentation to buyer to comply with 17.3?
MR. DIEDERICH: Objection as to the relevance of her belief.
THE COURT: I'm sorry. I didn't hear your objection. Objection to the relevance of?
MR. DIEDERICH: Of her belief.
THE COURT: I'll allow it.
MR. SOLOMON: Thank you, Judge.
A. Not at all.
Q. Okay. What did you do after receiving——oh.
A. Can I elaborate on that?
Q. Please. Go ahead.
A. Any time we're negotiating these types of transactions, if there is something of import that sponsor is required or purchaser seeks, it would be negotiated, it would be discussed, it would be memorialized, sponsor shall deliver, buyer to. This was——there was nothing.
Q. When you received this email, what did you think was

happening?

MR. DIEDERICH: Objection. Calls for speculation.

MR. SOLOMON: Doesn't call for speculation.

THE COURT: Sustained. It says what it says. I can read it. And you just read it.

MR. SOLOMON: But I want to know how she perceived it, Judge.

THE COURT: I don't know how that's——but go ahead. You can go ahead.

A. "I have a very unhappy client" is saying, I don't want to proceed.

THE COURT: They want to back out. They don't want to live in the building is what it says.

THE WITNESS: They have no interest anymore. Buyer's remorse.

Q. What did you do after you received this email?

A. I spoke to my client. I'm sure I forwarded it to my client.

Q. Okay.

A. Explained what I believed it meant.

Q. And did you respond to this email?

A. I believe I——above.

MR. SOLOMON: Let's go up a little bit, if we could, please.

So a little bit lower.

Can we get rid of that in the middle. Double click on that line. There we go.

BY MR. SOLOMON:

Q. Okay. You write, December 31st, "Marina, in reference to your email, your settlement proposal is unacceptable. Sponsor intends to enforce all its contractual rights with respect to the sale of the above-referenced unit."

And she writes back to you on January 3rd, "Samantha, thank you for your reply. Buyer's position is a little different from sponsor's. To that effect, buyer would like to know what actions sponsor took to comply with sponsor's preclosing obligation with respect to 17.3 of the option agreement. Please provide ASAP. Buyer also still hasn't received the amount of the kitchen credit confirmed during inspection agreed-upon modifications to the unit were properly executed." Do you see that?

A. I do.

Q. So buyer didn't want to go in to inspect regarding 17.3; they wanted to go in and inspect regarding modifications of the unit.

MR. DIEDERICH: Objection.

Q. You're nodding. You can't nod.

A. Agreed.

THE COURT: The question is fine. But I can read it. You're just characterizing it.

Q. Was it your understanding that sponsor was required to deliver anything to purchaser to comply with this provision?
A. No.
MR. SOLOMON: Now let's go to Plaintiff's Exhibit 8. Plaintiff's 8 is also JX 8. I'd like to move that into evidence, your Honor.
THE COURT: It's admitted.
(Plaintiff's Exhibit 8 received in evidence)
MR. SOLOMON: Thank you, Judge.
BY MR. SOLOMON:
Q. So this is an email from you to——or excuse me.
MR. SOLOMON: Go up a little bit further.
Q. Okay. From you to Ms. Rabinovich again——and she was buyer's counsel——on January 3, 2019. And you write, "It's my understanding that you've received the updated closing statement from John Rodriguez, which reflects a kitchen credit in the amount of" 172,000 and change. And you go on to explain what the kitchen credit is comprised of, right?
A. Mm-hmm yes.
Q. And then you attach an excerpt of a letter from Lendlease detailing the kitchen credits and how they break it down, right?
A. Yes.
Q. Then you write, "With respect to 17.3 of the option agreement, we confirm that sponsor's consulted with its sound

consultant, who has confirmed that the tank and pump system is not anticipated to create sound or noise that would impair purchaser's quiet enjoyment and use of the unit except potentially during an emergency or routine maintenance. Finally, as referred in your email, purchaser can confirm during its preclosing walk-through the agreed-upon modifications have been properly executed."

Let's stop there. Let's work backwards. Did they ever do a walk-through?

A. Not that I'm aware of, no.

Q. The sentence above is you telling buyer that sponsor's complied with 17.3. Did you speak with anyone from sponsor or their representatives prior to making this statement?

A. I'm certain I did.

Q. Okay. With whom do you believe you spoke?

A. I would have spoken with one or more of——it could have been at the time Ron Noll, who was their construction professional; I could have very well spoken to Gary Pomerantz, who designed the system; I am sure included in those conversations was Katy Brandvold, who was really my go-to person, who liaises between, before I would send any email.

Q. And what do you recall sponsor or the representatives told you about the fire suppression system that made you write this email?

A. That the system as designed was a passive system, it was

not going to make any noise, interfere with the quiet enjoyment, and from what I recall, it is only activated to make noise in an emergency or routine maintenance, testing, etc.

Q. Okay. And then in response to your email, Ms. Rabinovich writes that they'll share the kitchen credit amount with their client and she wants to see the copy of the sound consultant's report.

Now you mention in your email that sponsor has consulted with its sound consultant. Did you mean to write sound consultant?

A. I don't know if I meant to write consultant. I don't know if I thought Gary at the time is the sound consultant. W——he designed the system. I can't speak to who I really meant.

Q. But you definitely spoke with sponsor and their reps.

A. A hundred percent.

MR. SOLOMON: So let's go to Plaintiff's Exhibit 10. I'm sorry. Yeah, Plaintiff's Exhibit 10, which is also Joint Exhibit 10.

If we could move that into evidence, your Honor.

THE COURT: It's admitted.

(Plaintiff's Exhibit 10 received in evidence)

MR. SOLOMON: Thank you, Judge.

BY MR. SOLOMON:

Q. So this is a January 4, 2019, letter, where you write to purchaser's counsel, "I left you a message earlier this

morning. My clients are clearly disappointed that purchaser has had a change of heart with respect to the purchase of the unit. As the closing of title is scheduled for today, January 4th, rather than proceeding down an adversarial path, we will be adjourning the closing until next Friday, January 11, 2019. In a show of good faith and as sponsor's previously done, providing purchaser with two penalty-free adjournments, sponsor will again waive the penalties and adjustments which would otherwise have——"

THE COURT: Could you not read so fast. The court reporter can't do it.

MR. SOLOMON: Sorry.

Q. "As a showing of good faith and as sponsor has previously done by providing purchaser with two penalty-free adjournments, sponsor will again waive the penalties and adjustments that sponsor would otherwise have begun to accrue by virtue of purchaser's failure to appear at the closing today."

So sponsor adjourns the closing to January 11th, right?

A. Correct.

MR. SOLOMON: And then let's go to Plaintiff's Exhibit 12, which is also Joint Exhibit 11.

If we can move that into evidence, your Honor.

THE COURT: It's admitted.

(Plaintiff's Exhibit 12 received in evidence)

MR. SOLOMON: Thank you, Judge.

BY MR. SOLOMON:

Q. That is an email, January 10th, where you send buyer's counsel——I'm sorry——where Benjamin Siegel of your firm sends buyer's counsel an attachment, 520 Park Avenue 58th Floor Sound Levels. Do you see that?

A. I do.

Q. Who's Benjamin Siegel?

A. He is my now partner at the firm, previously an associate.

Q. Okay. And you write, "Marina, attached is the report generated by sponsor's sound consultant regarding the testing performed in unit penthouse 58. The report is being provided without prejudice to our position that neither the option agreement nor the offering plan requires this report be provided to you. The report is being provided solely as a courtesy in response to your request. Sponsor remains ready, willing, and able to close title to penthouse 58." Do you see that?

A. Yes.

Q. Okay. And we could introduce all the exhibits, but is it fair to say that the closing was adjourned several times after this?

A. Yes.

Q. According to my book, it's adjourned from January 25th; is that right?

A. I believe so.

Q. And then to February 1st?

A. Mm-hmm.

Q. And then to February 8th; is that right?

A. I believe so. I don't see it, but——

THE COURT: What prompted all the adjournments?

THE WITNESS: They didn't want to close. We were trying to avoid a situation on each closing date where we were going to have to send a default notice, so it was really just trying to be amicable and avoid——

THE COURT: Hoping to work it out.

THE WITNESS: Yeah.

THE COURT: Okay.

MR. SOLOMON: Okay. Let's put up, if we could, Plaintiff's Exhibit 13, which is Joint Exhibit 12. If we can move that into evidence, your Honor, I'd appreciate it.

THE COURT: Admitted.

(Plaintiff's Exhibit 13 received in evidence)

MR. SOLOMON: Thank you, Judge.

BY MR. SOLOMON:

Q. You have in front you Plaintiff's Exhibit 12. It's a February 11——

THE COURT: Plaintiff's Exhibit 12 and Joint Exhibit 12?

MR. SOLOMON: I'm sorry. Joint Exhibit 12. It's

Plaintiff's 13.

THE COURT: Okay.

BY MR. SOLOMON:

Q. It's a February 11, 2019 letter from your firm to purchaser's counsel. If we go down, fair to say this is your "time is of the essence" letter to purchaser?

A. Yes, it's our default notice giving them 30 days within to cure, time being of the essence.

Q. So the second paragraph says that they're in default, and the third paragraph says, "You can have a closing on or before March 15, 2019, time being of the essence," right?

A. Correct.

Q. Okay. And then——

All right. Let's bring up Plaintiff's Exhibit 38, which is already in evidence, if we could.

Okay. This is a letter from you to buyer, February 15, 2019, in which you explain that they've waived their access rights and they've already been in the unit six times; is that right?

A. Correct.

Q. Okay. And you're getting this information about when they were in the unit. Where do you get that information from?

A. I would think I probably got the——or I know that I got the information from Katy Brandvold, who would have had it from whatever the building gave her.

Q. A log or something?
A. Yeah, I think.
Q. So you actually write at the bottom, "Given the circumstances, i.e., that purchaser is now in default of the agreement, unless purchaser is ready to commit to a confirmed closing date and close title to the unit, purchaser's request to access to the unit to walk through will not be accommodated at this time." Do you see that?
A. I do.
Q. But had they agreed they were going to close, would sponsor have permitted a walk-through?
A. Sure.

MR. SOLOMON: Let's go to Plaintiff's——I just want to put into evidence 'cause we'll need it for subsequent briefing, Plaintiff's Exhibit 39, which is not a joint exhibit. It is a letter from your firm, and from you, dated March 1, 2019, to buyer's counsel, who's now Schiff Hardin LLP.

THE COURT: It's admitted.

MR. SOLOMON: Thank you, Judge.

(Plaintiff's Exhibit 39 received in evidence)

MR. SOLOMON: And then I want to put into evidence Plaintiff's 41, which is an email regarding setting the closing date and time that your firm sent to purchaser to set the actual closing date and time for March 2019——March 15, 2019.

THE COURT: The date of the email is what?

MR. SOLOMON: The date of the email is March 11, 2019.

THE COURT: It's admitted.

MR. SOLOMON: Thank you, Judge.

(Plaintiff's Exhibit 41 received in evidence)

BY MR. SOLOMON:

Q. And in this document you advise purchaser, "We're having a closing. It's going to be March 15, 2019, at 11 a.m." And you give the location and the types of checks and everything you give to set up a closing, right?

A. Correct.

MR. SOLOMON: Okay. And our last exhibit is Plaintiff's Exhibit 35, which is not a joint exhibit. And it is a transcript, statement on the record dated March 15, 2019, taking purchaser's default for not appearing at the closing of title. We move that into evidence, your Honor.

MR. DIEDERICH: Objection. This is filled with hearsay, your Honor.

THE COURT: Can you just scroll up. I don't understand what it is.

MR. SOLOMON: So at the default, when you take a buyer's default, you have a stenographer appear at the closing table and take note that there's no buyer.

THE COURT: That no one is there. I'll admit it.

MR. SOLOMON: Thank you, Judge.

(Plaintiff's Exhibit 35 received in evidence)

THE COURT: Anything else for this witness?

MR. SOLOMON: I have nothing else for Ms. Sheeber at this time.

THE COURT: All right. Let's take a 10-minute break and then we'll have cross-examination. And I'm wondering if this might not be a good time to get the next witness lined up and waiting so that as soon as this witness is done, we can proceed with the virtual witness. Okay?

All right. It is 11:38. We'll reconvene at 11:50.

(Recess)

THE DEPUTY CLERK: Before we begin I want to give the parties their times. Plaintiff has used 75 minutes, you have 75 minutes remaining. The defendant has used 15 minutes you have 135 minutes remaining.

THE COURT: Come on up.

(Witness resumed)

THE COURT: It is cross, right?

MR. SOLOMON: It is. I am just waiting for my partner to come back. I believe we are logged in for the remote link and Ms. Brandvold is ready to go.

THE DEPUTY CLERK: Yes.

MR. SOLOMON: She is in the waiting room.

THE DEPUTY CLERK: Yes.

CROSS-EXAMINATION

BY MR. DIEDERICH:

Q. Nice to see you again. Let's turn to JX 13, which is the option agreement and has already been admitted.

Looking at Section 17.3, Ms. Sheeber, you have testified about your view of Section 17.3. You will admit that this specific provision imposes obligations on sponsor, not CDM1, right?

A. My reading of this is that it doesn't impose obligations on the sponsor to deliver something.

THE COURT: I can read it.

BY MR. DIEDERICH:

Q. Let's turn to JX 7, please.
You recall that prior to closing Ms. Rabinovich had asked you what actions sponsor had taken to comply with Section 17.3, right?
A. You are talking about in this e-mail below?
Q. I am talking about JX 7, so you have that in front of you. I'm asking you that Ms. Rabinovich asked you what actions sponsor had taken prior to closing to comply with Section 17.3?
A. I see that.
Q. I just want to know what actions, okay.
And then in response, let's go to JX 8, and before I ask you about that, Ms. Sheeber, you agree that prior to that January 3, 2019, e-mail that we just looked at that you had not informed CDM1 of any actions that sponsor had taken to comply with Section 17.3, right?
A. Can you go back to the prior one?
Q. Sure. That was JX 7.
A. I'm trying to follow. Okay.
Q. I will ask again.
A. Thanks.
Q. As of this date, January 3, 2019, you had not informed CDM1 of any action sponsor had taken to comply with Section 17.3, right?
A. Correct. Other than the action of just installing the system.

Q. Let's go to JX 8 now, please.

Do you see the sentence in this e-mail that you wrote on January 3, 2019, that is highlighted beginning "with respect to Section 17.3 of the option agreement"?

A. I see it.

Q. The action that you shared with Ms. Rabinovich was sponsor having consulted with its sound consultant, right?

A. Uh-huh.

Q. That statement was inaccurate, correct?

A. Inaccurate as to that it was a sound consultant as opposed to just a professional consultant? Where the information came from? Is that --

Q. Sponsor?

A. Is that the inaccuracy?

THE COURT: Wait. You are the witness. You can't ask questions.

THE WITNESS: Oh.

THE COURT: You only answer them.

THE WITNESS: Okay. I was trying to clarify.

THE COURT: You can answer in the affirmative. You can't ask questions, or you can just say I don't understand.

THE WITNESS: Okay.

A. I don't understand.

Q. Sponsor had not consulted with its sound consultant, correct?

A. I am told now that it was not actually a sound consultant. It was a consultant or the engineer or something.

Q. That statement was not accurate, correct?

A. I guess at the time it was not accurate.

Q. You testified that you got the information for this January 3 e-mail from someone who worked with the sponsor, correct?

A. That is correct.

Q. And you do not recall specifically who you spoke with regarding the conversation, right?

A. I mentioned it would have been either Katie --

THE COURT: Let me just ask that question.

You are saying who it would have been. That suggests that you don't actually have a recollection of this conversation. You are answering based on what your usual practice is and how you act in this circumstance.

THE WITNESS: Exactly.

THE COURT: All right.

THE WITNESS: Exactly.

MR. DIEDERICH: Thank you.

BY MR. DIEDERICH:

Q. Let's look at JX 10, which is a letter that we looked at before.

You wrote to Ms. Rabinovich in this January 4 letter, "My clients are clearly disappointed that purchaser has had a

change of heart with respect to the purchase of the unit."

That statement was based on the e-mails that we just look at between you and Ms. Rabinovich, correct?

A. I would say that e-mail was mostly based on her December 28 e-mail talking about how her clients were unhappy, didn't like the way they were being treated. I believe that's what it was based on.

Q. You did not have any communications with Ms. Rabinovich in which she stated that CDM1 would not close if sponsor complied with Section 17.3, correct?

A. Well, I have a statement from Ms. Rabinovich stating that they had no intention of closing.

Q. That was not my question.

A. It sounded like your question, but okay.

Q. There were no communications between you and Ms. Rabinovich in which she stated that CDM1 would not close if sponsor complied with Section 17.3?

MR. SOLOMON: Objection.

THE WITNESS: I am not understanding.

THE COURT: I am going to sustain it. Even I am having trouble understanding the question. There is a double negative in there. If you could either rephrase it or try something different.

BY MR. DIEDERICH:

Q. You understood that CDM1's position was that if sponsor

complied with Section 17.3 it would close after it had showed its compliance, correct?
A. No. That is not my understanding at all.
Q. Let's go back to -- Ms. Rabinovich never said to you that if sponsor complied with Section 17.3, CDM1 would not close, correct?
A. Again, we're back to that prior question. She never said that if they did not comply that they would close. I am having trouble with that. She never said that --
THE COURT: So just --
THE WITNESS: Sorry.
THE COURT: I understand the point of your question. I am just going to ask you to move on.
BY MR. DIEDERICH:
Q. Let's look at JX 21, which was a letter we looked at earlier.
A. Letter?
Q. Yes, here it is. Do you recognize this from earlier?
A. I do.
Q. I want to look at the bottom of this JX 21 --
A. Uh-huh.
Q. -- which is a letter that you wrote to Ms. Rabinovich.
A. Uh-huh.
Q. Looking at the sentence, "Given the circumstances, *i.e.*, that purchaser is now in default of the agreement, unless

purchaser is ready to commit to a confirmed closing date" --

THE COURT: You need to slow down just a little bit for the court reporter.

Q. -- "and impose title to the unit, purchaser's request to access the unit to conduct a walk-through will not be accommodated at this time."

MR. DIEDERICH: Could you please scroll up to the date of this letter.

BY MR. DIEDERICH:

Q. So as of February 15, 2019, you recall that CDM1 had requested information concerning the system, correct?

A. You are talking about prior to this letter being issued?

Q. Right.

A. That's my understanding.

Q. And you agree that sponsor did not comply with that request and provide the information, right?

THE COURT: Could you get close to the mic.

A. I'm agreeing that sponsor's position was that they gave what they were required to give under 17.3.

Q. My question is, in response to that request for information, sponsor did not provide any information, right?

A. Not that I am aware of.

Q. In this letter it is your position that sponsor was requiring CDM1 to set a date for closing before CDM1 had received access to the system, correct?

A. Not correct. Because they had received access on a host of occasions. Irrespective, when you want to do your walk-through, your punch list walk-through, that is not permitted under the contract until a closing has in fact been confirmed. If you were advised that they elected not to close, a punch list walk-through would not be permitted. They had access on a host of occasions.
Q. Ms. Sheeber, I'll break this down.
A. Okay.
Q. So CDM1 had not seen the tank and pump system adjacent to PH-58, correct?
A. I can't tell you that whether they saw it on their various walk-throughs that they had that were set forth in here and any other times they went. I don't know, or heard it.
Q. Sponsor did not allow CDM1's consultant Jim Cicalo to review the pump, correct?
A. I don't know.
Q. You have represented companies owned or controlled by the Zeckendorfs, such as Zeckendorf Development and Zeckendorf Marketing for more than 20 years, correct?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. Yes.
Q. Your firm has collected more than $1 million in fees for your work for the Zeckendorf companies, correct?

MR. SOLOMON: Objection.

THE COURT: Overruled.

A. Yes.

Q. They are a big client, right?

A. They are one of many.

MR. DIEDERICH: Please scroll down in this exhibit to December of 2018.

BY MR. DIEDERICH:

Q. December 5, 2018, Mr. Carey met with Mr. Buckworth that date, but they did not meet in the unit, correct?

A. I have no idea.

MR. DIEDERICH: Nothing further.

THE COURT: Redirect?

MR. SOLOMON: No redirect, your Honor.

THE COURT: All right. You may be excused. Thank you.

THE WITNESS: Thank you.

(Witness excused).

THE COURT: You may call your next witness.

Is that your virtual witness.

MR. SOLOMON: It is, your Honor.

THE COURT: Wonderful let's give it a try.

Please call your next witness.

MR. SOLOMON: Plaintiff's next witness is Kathryn Brandvold.

THE COURT: Can you just say that loudly.

MR. SOLOMON: Plaintiffs call Kathryn Brandvold.

THE COURT: Thank you. Brandvold Brandvold.

KATHRYN BRANDVOLD,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

MR. SPERLING: Your Honor, is there a way to increase the volume?

THE COURT: That is what we are trying.

DIRECT EXAMINATION

BY MR. SOLOMON:

Q. Hi, Ms. Brandvold.

A. How are you?

Q. Okay.

MR. SOLOMON: Is she sworn in?

THE DEPUTY CLERK: Yes.

Q. Let's go through this very quickly. What is your role at in connection with sponsor?

A. I am the CFO of Zeckendorf Development. Zeckendorf Development has a develop/management agreement with the sponsor.

Q. As the CFO, what are your duties in connection with 520 Park Avenue?

A. In connection with 520 Park Avenue I am responsible for all financing matters, but over the course of time my role has

morphed more into a project manager role.
Q. Okay. And are you familiar with the purchase or attempted purchase and litigation regarding the sale of Penthouse 58 to the Morenos, to CDM1?
A. I am.
MR. SOLOMON: Let's put up Plaintiff's Exhibit 7 which is already in evidence, if you could, please.
BY MR. SOLOMON:
Q. Can you see it?
A. I can.
Q. You can?
A. Yes.
Q. Great. If we go to the bottom of Plaintiff's Exhibit 7, it is an e-mail from purchaser's counsel dated December 27, 2018, to Ms. Sheeber, who is sponsor's counsel. Do you see that?
You're nodding. You have to say yes, no, or I don't know.
A. Yes. I'm saying I do. Can you hear me?
Q. Yes, we can. So in the e-mail purchaser's counsel lists a bunch of reasons why they're unhappy, but they say in the middle of that paragraph no one has reached out to them to evidence sponsor's compliance with Section 17.3 of the option agreement.
Do you see that?
A. Yes. I see it.

Q. Okay. Prior to this e-mail, did purchaser or their representative make any indication that they did not fully understand the fire suppression system was a passive system and only went on during emergencies or routine maintenance and testing?
A. I did not.
Q. Did Ms. Sheeber reach out to you or anyone else at sponsor after receiving this e-mail from buyer's counsel?
A. She did.
Q. Okay. And then Ms. Rabinovich writes on the top of this e-mail that she wants sponsor to provide to buyer what actions the sponsor took to comply with sponsor's preclosing obligation per 17.3, the option agreement.
Do you see that?
A. I do.
Q. Did 17.3 require sponsor to deliver anything to purchaser to comply?
A. Deliver anything? No.
Q. So after getting this letter, was there a discussion with you, Ms. Sheeber, and anyone else on behalf of sponsor?
A. Yes, we discussed it internally. It would have been discussed between myself, the attorneys, our director of construction at the time, Ron Noll. We then would speak with Ron and I together, with WSP representatives, which would be Ashado Smith and Gary Pomerantz.

Q. Okay. So you had those discussions about the fire suppression system after this December 27 e-mail?
A. Correct.
Q. Plaintiff's Exhibit 8 which is already in evidence, can you see it, Ms. Brandvold?
A. I can see it, yes.
Q. Excellent, great.
Okay. So it is a January 3, 2019, e-mail, 10:00 p.m. from Ms. Sheeber to Ms. Rabinovich in which Ms. Sheeber says, with respect to Section 17.3 of the option agreement, "We confirm that sponsor has consulted with its sound consultant who has confirmed that the tank and pump system is not anticipated to create sounds or noise that would impair purchaser's quiet enjoyment and the use of the unit, except potentially during emergency or routine maintenance."
I want to focus on two things:
One, prior toy to Sheeber making this statement, had she spoken with you and/or Mr. Pomerantz or Mr. Noll?
A. She would have spoken with likely myself and/or Ron Noll before she sent this statement.
Q. Okay. And the second is she mentions a sound consultant. Is that a mistype?
A. Firm, sound consultant -- she may in this instance mean WSP.
Q. Okay.

MR. DIEDERICH: Objection. Calls for speculation, your Honor.

A. They were the people that --

THE COURT: So I am going to sustain that.

Do you actually know who she was referring to, like what was in her head or what anyone told her?

THE WITNESS: I believe that she would be speaking with respect to WSP. But what was in her head I only think that she could answer that. I don't want to --

THE COURT: What is the basis for your thinking that she meant WSP here or she was referring to WSP?

THE WITNESS: That's who Ron and myself would have spoken with.

THE COURT: Okay. Thank you.

BY MR. SOLOMON:

Q. In your conversation with Ron and WSP, what did they tell you about the fire suppression system that was then conveyed to Ms. Sheeber that she wrote this letter?

A. The fire suppression system is a passive system that is always operational, and it consists of two separate pumps, a jockey pump which maintains the pressure, and the fire pump, which is really only for emergency purposes.

Q. Okay. And I would like to put in front of you Plaintiff's Exhibit 14. Do you see it?

A. Yes, I do.

Q. This is a letter from Ashado Smith to Ron Noll. Ashado Smith is at WSP, right?
A. He is no longer, yes, but Ashado was -- he may be at WSP still, but not in the New York office.
Q. Okay. This letter says:
"Ron,
"The tank room consists of a fire water tank and two pumps, a jockey pump and the fire pump. The fire water tank is filled to the top of house water tanks, roof tanks via gravity. The jockey pump maintains a constant predetermined pressure to the sprinkler system and only runs during an emergencies, such as minor leaks or if one sprinkler head opens.
"To further clarify, the jockey pump and the fire pump are equipped with a pressure switch. If the pressure in the sprinkler system drops to a predetermined level, the jockey pump starts first. If the pressure in the system continues to drop because the flow cannot be satisfied, the fire pump starts. This occurs only in an emergency situation."
Do you see that?
THE COURT: What is the date of that?
MR. SOLOMON: That is January 4, 2019. It is at 6 p.m. GMT, which I think is like 1 p.m.
THE COURT: Okay. Thank you.
BY MR. SOLOMON:
Q. Do you see that?

A. Yes.
Q. This letter is written after Ms. Sheeber's letter to purchaser, right?
A. Correct.
Q. Okay. But your discussions with Gary at WSP and Ms. Sheeber, were they before or after her letter to the purchaser?
A. They had been before her letter.
Q. Why is this letter, which is Plaintiff's Exhibit 14, being written at all?
A. It became clear that the purchaser was potentially having second thoughts, and we said please get this information in writing in the event that we need this information.

MR. SOLOMON: I have nothing further for Ms. Brandvold.

THE COURT: Okay.

Cross?

MR. DIEDERICH: If you could leave PX 14 up, or I suppose we could share.

THE DEPUTY CLERK: Try sharing it, but it wasn't coming in clear from the other side.

MR. DIEDERICH: Your Honor, may I?

THE COURT: Now we've lost the witness.

THE DEPUTY CLERK: You have to share it from Teams, not on the court system.

THE WITNESS: I am here.
Do you see me?
MR. SOLOMON: We do.
MR. DIEDERICH: Your Honor, would it be all right if I sat here with the computer, or would you like me to bring the computer up there so I can see the exhibits?
THE COURT: Whatever you like.
MR. DIEDERICH: Thank you.
CROSS-EXAMINATION
BY MR. DIEDERICH:
Q. Ms. Brandvold, can you hear me?
A. Can you hear me?
Q. Yes, I can hear you. Can you hear me all right?
A. Excellent, yes. Thank you.
Q. Thank you. You recall one meeting that you had with Chip Carey as CDM1's representative, right?
A. That's correct.
Q. And aside from this one meeting with Mr. Carey, you do not recall having any other meeting or conversation with a representative of CDM1, right?
A. Personally?
Q. Personally, yes.
A. Personally, I do not.
Q. You met Mr. Carey in person in September of 2017. Is that right?

A. Correct.
Q. You joined Louis Buckworth at a meeting that he had with Chip Carey then, right? Is that correct?
A. Yes. That's correct.
Q. Thank you. Just remember to answer audibly instead of by nodding.
A. I am trying. I'm sorry.
Q. No need to apologize. Your role at the September 2017 meeting was to answer questions regarding the offering plan, correct?
A. Correct.
Q. The offering plan contains information about the tank and pump system among other subjects, right?
A. Correct.
Q. You recall the offering plan including that there will be an easement through the unit, and there will likely be routine maintenance done three times per year, right?
A. I don't recall the specific language of the offering plan, as I said, right now.
Q. Let's look at JX 23. We will go to page 17. This is the offering plan which I believe was admitted earlier.
A. I mean it looks like the offering plan.
Q. Let's look at Section 34. You will see page 17 on the top. There it is. Thank you.

It is anticipated that such easement will be exercised

three times per year. This is the easement used for the routine maintenance of the tank and pump room, right?
A. Yes.
Q. You are aware that the tank and pump system is actually activated for testing at least 13 times per year, right?
A. I don't know exactly how many times it is accessed, but, as you know, here it says "it is anticipated that such easement." It doesn't say "will."
Q. Let's look at JX 13, which is the option agreement. We will turn to Section 17.3. Ms. Brandvold, you recall that sponsor proposed the "except in an emergency or routine maintenance" language, correct?
A. I recall that this language was originally proposed by CDM1 counsel, and that we then made adjustments to that language.
Q. Let me be a little more clear.
A. I can't say. Okay.
Q. I'm looking only at the "except in an emergency or routine maintenance" language.

Do you see that at the end of 17.3?

Yes?
A. Yes, I do.
Q. That particular language was proposed by the sponsor, right?
A. I believe so, yes.
Q. Of course, that language does not include the word

"testing," right?
A. Well, I would -- routine maintenance would include testing.
Q. It doesn't include the word "testing," but you believe maintenance includes testing. Is that right?
A. Yes, I do.
Q. Let's go back to the offering plan. This is JX 23. If we are looking at the numbers on top, I'm looking at page 11. I would like to look at Section 18B. This is in the section on mechanical equipment in the building.

18B states, "The condominium board and sponsor have the right to operate the emergency generator as necessary as well as to activate the emergency generator for testing on a periodic basis, normally once per month. During such testing periods, which may occur at any time, unit owners may experience excessive noise and vibration which may exceed applicable NYC noise requirements. The condominium board and sponsor will attempt to minimize any potential disruption."

That's what the offering plan says about emergency generator use, right?

MR. SOLOMON: Objection. Relevance.

THE COURT: Overruled.

BY MR. DIEDERICH:
Q. Did I read that correctly, Ms. Brandvold?
A. You read what this states, but I am not quite sure why we are talking about the emergency generator.

Q. Right now I am just asking if that's what it states. I will get to the next question. In this section on the emergency generator, sponsor uses the word "testing," not "maintenance" to refer to testing of the emergency generator, right?
A. You are saying that they are saying "testing" instead of "maintenance" for the generator.
Q. This section uses "testing" to say that testing is going to happen. It doesn't use "maintenance" to say that testing is going to happen. Correct?
A. I am confused. You are asking me if this says "testing"?
Q. No --
THE COURT: It says what it says. These questions are all sort of in the nature of argument. They are not really fact questions for a fact witness.
MR. DIEDERICH: I will move on.
We can pull down that exhibit. Thank you.
BY MR. DIEDERICH:
Q. Prior to closing, sponsor had information about the tank and pump system that it could have provided to CDM1 but did not provide, correct?
A. Repeat the question.
Q. Prior to the date of closing, sponsor had information about the tank and pump system that it could have provided but did not provide to CDM1, correct?

A. Sure. That's correct. I mean, we had a lot of information about a lot of things that we could have provided. It seems like a very general statement.
Q. Sponsor --
THE COURT: Ms. Brandvold, it will be quicker and easier if you just answer the question. You don't have to argue with the questioner. I don't necessarily buy anybody's argument because it is embedded in a question. So it is quicker if you just answer the question.
A. I apologize. I am trying.
THE COURT: Okay. I appreciate it. Thank you.
I know it's late in the day there.
THE WITNESS: Thank you.
THE COURT: Counsel?
MR. DIEDERICH: Yes, I will proceed.
Let's move to DX 8.
DX 8 is a copy of an e-mail that Ms. Brandvold sent.
I move that this e-mail chain be admitted.
THE COURT: It is admitted.
(Defendant's Exhibit 8 received in evidence)
MR. DIEDERICH: We will make it a little bigger for you Ms. Brandvold. Let's go to the bottom of the e-mail chain that Ms. Brandvold sent.
THE COURT: If you could identify it for the record.
MR. DIEDERICH: Of course. There is a December 31,

2018, e-mail from Ms. Brandvold to Ron Noll and Dominick DeAngelis. Both of those them are, were your colleagues at Zeckendorf Development, correct?
A. That's correct yes.
Q. You wrote, "Ron and Dom, please see below and confirm that this has been done and signed off regarding PH-48, Moreno."
You meant PH-58, right?
A. Excuse me. I'm sorry. I said I did, yes.
Q. That was just a typo? PH-58 was the unit number, not PH-48?
A. That's correct.
Q. In saying, "Please see below," you were referring to the language of Section 17.3 of the option agreement, right?
A. Correct.
Q. And as of the date of this December 31, 2018, e-mail, closing was scheduled for January 4 of 2019, right?
A. Closing had been rescheduled yes, that's correct.
Q. For January 4, 2019, right?
A. Yes.
Q. Let's scroll up a little bit to the next e-mail, please.
December 31, 2018, 1:34 p.m., Ron Noll.
Mr. Noll wrote, "No sound testing has been done."
That is how he responded to your e-mail, correct?
A. That is correct.
Q. And then you respond --

A. December 31 the office was closed so probably should have been a little bit more detailed.

Q. Ms. Brandvold, please remember just answer the question.

A. Yes, sorry.

Q. Let's look at the next e-mail where you responded.

You wrote, also December 31, "What is the recommended course of action to confirm we are in conformance with the below provision?"

That's what you wrote, right?

A. Correct.

Q. "You also wrote same consultants as 36" question mark, Right?

Correct?

MR. DIEDERICH: I am not able to hear.

THE COURT: I didn't hear that either. I think she spoke, but we didn't hear it.

A. Correct.

BY MR. DIEDERICH:

Q. Thank you. You might have to lean as close to your microphone as I am.

A. I'm sorry.

Q. That's okay. Now it's working. Thank you.

Then Mr. Noll responds to you, also December 31, 2018, "Yes, use Shem Milsom to do sound tests. I would guess take sound readings in bedroom next to tank room while pump is on

and somewhere else in apartment and compare."
That is what he wrote to you, right?
A. Yes. Correct.
Q. And after that Mr. Noll engaged Avi Bortnick of Shem Milsom to do some sound testing, correct?
A. Did you hear me? Correct.
Q. The sound testing that Mr. Bortnick did was not when the tank was on, correct?
MR. SOLOMON: Objection as to form.
THE COURT: Overruled.
Q. Sorry. It looks like you may have tried to answer. Let me be more clear. The testing that Mr. Bortnick did after this e-mail was done on the tank and pump system was not on, correct?
A. Correct.
Q. Thank you. We heard you that time.
A. The tank is always on.
THE COURT: It is not when the pump was pumping when he did his test, correct?
THE WITNESS: The main pump only goes on when there is an emergency.
THE COURT: I understand. But the sound test that he did initially was when the system was not pumping.
Is that right?
THE WITNESS: My understanding is that the tank is

always on. I don't know if the jockey pump -- the jockey pump may have been running at that time because it maintains pressure. I can't say for sure. The main pump was not on because that would only be happening obviously in a fire or such.

THE COURT: Or if it were activated?

THE WITNESS: Right.

THE COURT: Okay.

MR. DIEDERICH: Thank you.

I believe just one more exhibit. Let's look at DX 15.

BY MR. DIEDERICH:

Q. DX 15 is an e-mail chain where the last e-mail is from Marina Rabinovich to Benjamin Segal, copying Samantha Sheeber, and there is an attachment.

I move that this be admitted.

THE COURT: It is admitted.

(Defendant's Exhibit 15 received in evidence)

THE COURT: What is the date?

MR. DIEDERICH: Sorry I was going ask that next.

To stay to this page, the date of this e-mail is January 17, 2019.

MR. DIEDERICH: I want to look at the attachment. Let's look at the second page of this document. Actually, the second page of the letter. I am looking for the section about complete operating instructions.

One more page, I believe. Sorry.

Yes. It's the top paragraph. If you could make that bigger so others can see.

BY MR. DIEDERICH:

Q. "Complete operating instructions and maintenance testing requirements must be provided in writing."

Do you see that?

A. I see that, yes. I see that.

Q. Sponsor did not provide complete operating instructions and maintenance and testing requirements to CDM1, right?

A. We would not offer any of this type of information to anyone. This is all just information that they are requesting. That's not anything we would ever give. So I really feel like this was an overreaching letter asking for information that's not germane. It seems also kind of silly the way that this is written as it relates to his questions. I don't know that he is a sound person or is he -- I am -- I am not answering any longer. Sorry.

MR. DIEDERICH: Move to strike this answer, your Honor, as not responsive.

THE COURT: I will keep it in the record, but please proceed.

BY MR. DIEDERICH:

Q. Ms. Brandvold, I am going to ask my question again. Complete operating instructions and maintenance and testing

requirements were not provided to CDM1, correct?
A. Correct.
Q. With having Section 17.3 of the option agreement in mind, you do not deny that providing the information requested by CDM1's consultant in this document could have helped specifically ensure CDM1 under Section 17.3, right?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. The question again?
Q. Yes. I can ask the question again.
Can you hear me all right?
With Section 17.3 in mind, you do not deny that providing the information requested by CDM1's consultant in this document could have helped ensure CDM1 under Section 17.3, right?
A. I don't believe that we are required to offer this, so I am not sure. There is a lot of information that anybody could ask after the fact. So I feel that this is a question that is not easily responded to.
Q. Ms. Brandvold, I am going ask you the question one more time.
THE COURT: I have her answer and I have your question twice. That's sufficient. Thank you.
MR. DIEDERICH: Would it be helpful, your Honor, if I turned to her deposition transcript?

THE COURT: This is all argumentive. It's all lawyer argument about what the language of this provision means and what it means to ensure the purchaser. I don't think this is very helpful frankly to either side because it is just argument.

MR. DIEDERICH: Just briefly, your Honor, Ms. Brandvold testified at her deposition as a corporate designated repetitive, and she admitted it would be helpful at her deposition.

THE COURT: All right. You may elicit that.

MR. DIEDERICH: Let's look at the deposition transcript of Ms. Brandvold. We will look at 152 and we'll put it on the screen.

BY MR. DIEDERICH:

Q. Ms. Brandvold, you recall giving your deposition in this case, correct?

Sorry. Could you lean closer. We are not able to hear you.

A. I do.

Q. You agreed to testify truthfully and honestly at that deposition, correct?

THE COURT: I am just going interrupt. This is a party admission. Just read it into the record.

MR. DIEDERICH: Thank you, your Honor.

I am looking at page 152, line 10.

"Q. With Section 17.3 in mind, do you deny that providing the information requested by CDM1's consultant could have helped ensure CDM1 under Section 17.3?

"A. Do I deny that it could have helped? No."

MR. DIEDERICH: Last -- I'm sorry. I was inaccurate. One more exhibit. DX 36. Can we go to the first page. Thank you.

THE COURT: Is this in evidence?

MR. DIEDERICH: This is a February 14, 2019, e-mail from Mr. Buckworth to Ms. Brandvold. And I would move that that it be admitted.

THE COURT: It is admitted.

MR. DIEDERICH: Thank you.

(Defendant's Exhibit 36 received in evidence)

BY MR. DIEDERICH:

Q. Ms. Brandvold, do you see this is a February 14, 2019, e-mail from Mr. Buckworth to you?

A. Yes.

Q. Let's go to the next page. These are Mr. Buckworth's notes about visits of CDM1 with respect to PH-58, correct?

A. It seems to be, yes.

Q. I want to read the last entry to you. 12/5/18.

MR. DIEDERICH: Thank you. Make it a little bigger if you can.

BY MR. DIEDERICH:

Q. This visit on December 5, 2018, occurred on the 28th floor sales office, correct?
A. That is what this says.
Q. It did not take place in PH-58, correct?
A. The e-mail is from Louis to me. These are notes. I can't say for certain where this meeting took place or didn't take place. I wasn't there.
MR. DIEDERICH: Thank you. I have nothing further.
THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. SOLOMON:

MR. SOLOMON: Very, very brief.
THE COURT: Yes.

BY MR. SOLOMON:

Q. Ms. Brandvold, can you hear me?
A. I can.
Q. Okay. Great.
When testing of the fire suppression system adjacent to Penthouse 58 is done, does anyone need to access inside the living quarters of Penthouse 58?
A. I don't think so. I don't know.
Q. Okay. Next is the e-mail that was just shown to you, not the most recent one, but the one about the response from FSI Architects. They sent a letter asking for a bunch of information about the system. Do you recall that?

A. Is what that other gentleman just put up before?
Q. Yes. Defendant's counsel just put that up.
A. Yes.
Q. It asks about, that the architect needs testing information, right, about how to test the system and when it's tested?
A. He was asking me, yes.
Q. Are you aware that testing information and the mandates for testing are driven by statute?
A. I am not aware of what the mandates are regarding testing.
MR. SOLOMON: I have nothing further for Ms. Brandvold. Thank you.
THE COURT: All right. Thank you.
Ms. Brandvold, thanks so much for making yourself available. You are excused.
THE WITNESS: Thank you so much. Sorry for the noise.
THE COURT: No. No. Thank you for accommodating us.
THE WITNESS: Thank you.
THE COURT: Have a good evening.
THE WITNESS: Thank you. Bye.
(Witness excused)
THE COURT: Plaintiff may call their next witness.
MR. SOLOMON: Your Honor, our next witness is Avi Bortnick from Shem Milsom.
THE COURT: All right.

MR. SOLOMON: But to save time, you can have them cross if they want to, because we have his report.

THE COURT: He is an expert witness?

MR. SOLOMON: He is the sound consultant.

THE COURT: Let's do that.

MR. SOLOMON: We already have the e-mail where we convey his sound report in evidence. To have him put it in separately --

THE COURT: There's no point. Okay.

Plaintiff has put on this witness. Actually, why don't you call this witness. Mr. Street will swear him.

MR. SOLOMON: Your Honor, plaintiff's call Avi Bortnick.

THE COURT: All right. Mr. Street.

AVI BORTNICK,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

THE COURT: So my understanding is that his report is in evidence and so there are no other questions on direct?

MR. SOLOMON: I will reserve the right to redirect.

THE COURT: Of course.

MR. SOLOMON: Let's just move on.

MS. SOKOLOFF: Your Honor, I think Mr. Bortnick has been in the courtroom this entire day.

THE COURT: Okay.

MS. SOKOLOFF: He is a fact witness. He is not an expert witness.

THE COURT: All right. That is unfortunate, but he's here now on the stand. So thank you for pointing that out. I will take that into account in assessing his testimony.

MS. SOKOLOFF: Thank you, your Honor.

THE COURT: Let me just ask, of all the people who are in the courtroom, is there anyone here who is not a lawyer, not Mr. Carey, not an expert, and not from my chambers?

I know the folks over here are all experts, is that right. And the gentleman in the back you are an expert also, okay.

Then I see are you a lawyer?

SPECTATOR: I am a lawyer.

THE COURT: And the person behind you?

SPECTATOR: Yes.

THE COURT: Also a lawyer.

MR. SPERLING: Your Honor, just so the record is clear, CDM1 does not have any fact witness apart from its corporate representative in the courtroom in accordance with this Court's order.

THE COURT: Thank you.

You may proceed.

MS. SOKOLOFF: Thank you, your Honor.

CROSS-EXAMINATION

BY MS. SOKOLOFF:
Q. Mr. Bortnick, sponsor's counsel stated that your report is in evidence. What report -- is that the letter that you provided to sponsor in January of 2019?
A. I believe so.
Q. You work as an acoustical consultant, right?
A. Right.
Q. You do not have any educational background or training with respect to the mechanical function of fire suppression systems, right?
A. Not specifically. No.
Q. You do not have any experience with the mechanical functioning of fire suppression systems, correct?
A. The mechanical functioning, no.
Q. It is not customary for you as an acoustical consultant to provide advice regarding fire suppression systems, right?
A. To provide what?
Q. Advice regarding fire suppression systems?
A. No.
Q. When you worked with SM&W, you did acoustical consulting work for the building located at 520 Park Avenue in New York City, correct?
A. Correct.
Q. I will refer to the building located at 520 Park Avenue in New York City as the building.

A. Okay.
Q. In addition to work relating to the building, you have done acoustical consulting work for somewhere between one and four other buildings that the Zeckendorf companies developed, correct?
A. I don't recall. It's more than one, yeah.
Q. With respect to the project that you worked on relating to the building, you reviewed the design of the building from an acoustics perspective and identified areas where you thought the design should be modified, right?
A. Right.
MS. SOKOLOFF: I am going to show JX 14, please.
THE COURT: Is that in evidence?
MS. SOKOLOFF: I was about to.
THE COURT: It is admitted.
(Joint Trial Exhibit 14 received in evidence)
MS. SOKOLOFF: Thank you, your Honor.
BY MS. SOKOLOFF:
Q. JX14 is a contract between SM&W and Zeckendorf Development for SM&W's work on this project?
A. For -- yes. There may have been additional contracts that were add services, but this looks like probably the original contract, right.
Q. You were the lead person for SM&W on this project, correct?
A. Yes. I was not the most senior person that could have been

involved, and I worked with other people, but I believe I would have been considered the lead person, yes.
Q. You did not do any work on this project in relation to fire suppression systems, right?
A. No.
Q. No, you did not do any work or --
A. No I did not do any work -- I did not do any work, sorry.
Q. In addition to acoustical design work that we just discussed, you also performed sound testing in the building, right?
A. Yes.
MS. SOKOLOFF: I would like to show DX 31, and move it into evidence, please.
THE COURT: It is admitted.
(Defendant's Exhibit 31 received in evidence)
THE COURT: Can you identify it for the record.
MS. SOKOLOFF: Yes. I am just waiting for it to come up. Thank you.
Q. DX 31 contains an e-mail chain between you and Ron Noll of Zeckendorf Development, dated -- I'm going to -- if you scroll all the way to the first e-mail in the chain the last page, all the way to the bottom, please.
Ah. With the subject "520 Park Sound Testing," right?
A. I see that, yes.
MS. SOKOLOFF: Mr. Gillespie, can you please go to the

first -- scroll down to the next page.

MR. GILLESPIE: The next page?

MS. SOKOLOFF: Yes, please.

If you could just scroll to the first e-mail in the chain. There we go. Thank you. It's dated September 19, 2017.

BY MS. SOKOLOFF:

Q. Mr. Noll, asked you to work up a proposal to perform sound testing above and below mechanical rooms in the building, correct?

A. Yes.

Q. In the same e-mail chain, if we could, Mr. Noll wrote to you most of the building could be done in one trip.

MS. SOKOLOFF: If we could scroll up, please.

BY MS. SOKOLOFF:

Q. So you asked if it would be one trip or multiple trips.

Then --

MS. SOKOLOFF: I apologize. It's the e-mail right above that, Mr. Gillespie. So unfortunately I think it might need -- thank you.

BY MS. SOKOLOFF:

Q. In that same e-mail chain, Mr. Noll wrote to you, "Most of the building could be done in one trip, but the 48th floor will probably not be done until very late in the project."

Right?

A. Yes.
Q. You understood that the floor that Mr. Noll said that would probably not be done until very late in the project is the floor where the fire suppression system at issue in this case is located correct?
A. Sorry. Would you repeat that?
Q. Certainly. You understand that the floor that Mr. Noll was referring to, it would not be done until very late in the project?
A. That's what he says.
Q. That is the floor on which the fire suppression system at issue in this case is located?
A. I don't think I was aware that that was fire suppression equipment.

MS. SOKOLOFF: Turning to DX 32, please.

DX 32, please.

If you could go to the fourth page of this exhibit, please.

DX 32 contains -- may this be admitted into evidence, please.

THE COURT: It is admitted.

(Defendant's Exhibit 32 received in evidence)

MS. SOKOLOFF: Thank you.

BY MS. SOKOLOFF:
Q. DX 32 contains an e-mail that you wrote to Maria Forgione

and Ron Noll on January 4, 2019, with the subject "520 Park open receivables."

Correct?

A. Yes.

Q. You wrote to Ron Noll on January 4, 2019, "What time would you like to schedule it on Monday. Preferably for me late morning or afternoon. Will be standard rate of 1500 per one site visit measurement and writeup on letterhead."

Correct?

A. I can't see that.

MR. DIEDERICH: It should be on page 1. There is an e-mail January 4, 2019, from Mr. Bortnick, starting with okay.

BY MS. SOKOLOFF:

Q. Right there on the screen, Mr. Bortnick.

A. Okay. What is the question then?

Q. Sure.

Is it correct that you wrote to Mr. Noll on January 4, 2019 to schedule the time to come on Monday for one site visit to measure and write up a report on letterhead?

Correct?

A. Correct.

Q. In the next e-mail you agreed to take sound measurements of the building on Monday, January 7, 2019 around 2:00 p.m., correct?

A. Correct.

Q. In the final e-mail you sent Mr. Noll the sound measurements that you took on January 7, 2019, correct?
A. It looks like it, yes.
Q. Those were the sound measurements that you had taken earlier that day in relation to the unit in the building at issue in this case that is known as PH-58, correct?
A. Yes.
Q. You took those measurements from inside the unit PH-58, right?
A. Yes, I believe so.
MR. DIEDERICH: Put JX 11 on the screen, please.
Okay. I believe JX 11 has been admitted into evidence.
THE COURT: It has.
MS. SOKOLOFF: Thank you.
BY MS. SOKOLOFF:
Q. JX 11 contains a report that you sent to Ron Noll on January 7, 2019, regarding the sound measurements that you took within PH-58, right?
A. I am not cced on it. I don't know what this e-mail has to do with me.
MS. SOKOLOFF: Mr. Gillespie, if you could please scroll down to the report.
A. Yes. That's the report I wrote, correct.
Q. Thank you.

MS. SOKOLOFF: Could you scroll down to the numbers.
BY MS. SOKOLOFF:
Q. Your report contains two of the numbers that were reflected in your January 7 e-mail to Ron Noll, correct?
A. Correct.
Q. You understand that there was a fire suppression system located in the mechanical room adjacent to PH-58, right?
MR. SOLOMON: Objection to the form.
THE COURT: Overruled.
A. I can't recall that I was aware of that. I mean, I may have been, but at this point I can't recall.
Q. If you take a look at the highlighted language in your report, it says, "It should also be noted that there was no noise coming from the pump room adjacent to the bedroom."
A. Okay, yes, uh-huh.
Q. And that pump room was the fire suppression system, correct?
A. Yes, I believe so.
Q. There was no noise coming from the fire suppression system when you took sound measurements from inside?
THE COURT: I am having trouble understanding you.
Could you get closer to the mic.
MS. SOKOLOFF: Sure. I apologize, your Honor.
BY MS. SOKOLOFF:
Q. There was no noise coming from the fire suppression system

when you took the sound measurements from inside PH-58, correct?
A. To my knowledge, yes. Now, I am not sure that I would have been aware whether the pumps were on or off, but probably I would have surmised that they were off when I took the measurements.
Q. You did not take any measurements from inside PH-58 when the fire suppression system was activated, did you?
A. I don't recall whether it was activated or not. But judging from this, I think I probably knew at the time that they weren't activated.
Q. You do not recall ever seeing the fire suppression system, right?
A. I don't recall, but that doesn't mean I didn't see it. I did a lot of walk-throughs of the building during construction, so I may well have entered that room at some point.
Q. You had never been inside the completed unit PH-58 before taking measurements on January 7, 2019, correct?
A. I don't recall. I may have walked through prior to it being completed.
Q. You never performed a sound test in relation to PH-58 before January 7, 2019?
A. I don't recall. And, you know, usually these buildings go up, so if I am doing walk-throughs and doing sound tests it usually starts towards the bottom, and then once it's complete

maybe I do a measurement.

Q. You were not aware of any of your colleagues at SM&W performing a sound test in relation to PH-58 before January 7, 2019?

A. No.

Q. The sound testing that you did in relation to PH-58 on January 7, 2019, and the report that you drafted on that date were the only occasions in which you provided any advice or opinions with respect to sound levels in relation to PH-58, correct?

A. Probably.

MS. SOKOLOFF: No further questions.

THE COURT: Any redirect is limited to five minutes.

Do you have any?

MR. SOLOMON: One second, your Honor, if I could confer with counsel.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. SOLOMON:

Q. Very briefly. Hi, Mr. Bortnick. Opposing counsel inquired of you whether your firm was retained to do acoustical work in regards to 520 Park Avenue.

Is it your practice and your firm's practice to do acoustical work and acoustical attenuation work as it relates to fire suppression equipment?

A. No.
Q. Why is that?
A. Multiple reasons. One is that since they typically only go off during a fire or an emergency that you've got other things to worry about other than noise.

Two is that, to the extent they need to be tested or maintained, it is only a periodic occurrence. That wouldn't be sufficient enough time to merit all the noise control measures that you might need to do.

And, third, that in the instance of fire pumps and associated piping, it can't be vibration isolated, and that's the source of most of the noise. It's not airborne through the wall; it's vibrating the structure. For code reasons it can't be vibration isolated. So in the case of pumps, there's really not much you can do anyway.
Q. And --
A. But normally we wouldn't look at it mostly for the reasons I mentioned.
Q. When you were in Penthouse 58 on January 7 to conduct the sound test you conducted, can you describe how loud it was in the room? I mean, forgetting the numbers, was it loud? Was it quiet?
A. It was quiet except that about every 30 seconds a smoke alarm would go off because the apartment wasn't completely finished, it wasn't occupied, and there weren't batteries in

the smoke alarms. I had to take sort of short measurements in between these beeps.

MR. SOLOMON: Nothing further, Mr. Bortnick.

Thank you, Judge.

THE COURT: Okay. You may be excused. Let's break for lunch. It's 1:05.

Let me ask plaintiff's counsel. I would be inclined to come back at 2 unless you have real time constraints and ten minutes makes a big difference.

MR. OVED: Every moment makes a difference. If it is not too much of an imposition, the earlier we start, the better.

THE COURT: No problem.

MR. OVED: If it is not good for the Court, I understand too.

THE COURT: Let's come back in 45 minutes. We'll be back at 10 minutes until 2.

MR. OVED: Thank you, your Honor.

THE COURT: Thank you.

(Luncheon recess)

AFTERNOON SESSION

1:57 p.m.

MR. DIEDERICH: Our clients are here and the fact witnesses I believe are done, so I was wondering if it was okay for them to be in the courtroom or not.

THE COURT: So, I mean, they are the corporate representatives of the buyer, right?

MR. DIEDERICH: Mr. Carey——

THE COURT: Oh, Mr. Carey has been here.

MR. DIEDERICH: Yeah.

THE COURT: Any position from the plaintiffs?

MR. OVED: I couldn't hear. Who was——Mr. Carey I know has been here.

THE COURT: So the Morenos are apparently here and would like to be in the courtroom.

MR. OVED: So to be fair, I don't want to color their testimony.

THE COURT: Okay. I will exclude them until they testify.

MR. DIEDERICH: To be clear, Ms. Moreno won't be testifying.

THE COURT: Well, she's welcome to be in here if she's not testifying, but if she'd prefer to stay out there, that's fine.

MR. DIEDERICH: Thank you. Sorry we got held up.

THE COURT: All right. You may call your next witness.

MR. SOLOMON: Thank you, Judge. Plaintiffs call Don Winston, but he's being presented——

THE COURT: As an expert.

MR. SOLOMON: But pursuant to declaration, so he's available for cross.

THE COURT: So I have Mr. Winston's declaration. I have reviewed it. If Mr. Winston would take the stand. And Mr. Street, if you could swear the witness.

(Witness sworn)

THE DEPUTY CLERK: If you would state your full name and spell it for the record.

THE WITNESS: Donald Winston. D-O-N-A-L-D, W-I-N-S-T-O-N.

THE COURT: All right. So for the expert witnesses, we have the direct testimony by declaration, so we're ready for cross.

DONALD WINSTON,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

CROSS EXAMINATION

BY MR. DIEDERICH:

Q. Good afternoon, Mr. Winston.

A. Good afternoon.

Q. You are a licensed professional engineer, right?
A. I am.
Q. And you were engaged by counsel for the sponsor or the plaintiff in this case, right?
A. I was.
Q. Your assignment in connection with this case was to provide an opinion regarding a fire suppression system that is adjacent to the unit known as PH-58, right?
A. Yes.
Q. For some of your opinions you rely upon the National Fire Protection Association code sections, right?
A. Standards.
Q. Standards?
A. Yes.
Q. And I'll refer to that as NFPA. Is that okay?
A. That's correct.
Q. The NFPA is a nationally recognized model code-making organization that most jurisdictions recognize as it relates to fire protection systems, right? Correct?
A. Yes.
Q. The NFPA standards or code sections are incorporated as reference standards in the New York City Building Code, right?
A. To the——yes, yes, as——to the extent that it——for construction, they're incorporated into the building code; and for operations, they're incorporated into the fire code.

Q. The NFPA code or standards is an important authority in your field, right?
A. Yes.
MR. DIEDERICH: May we please put DX 50 on the screen. Thank you.
Q. Mr. Winston, this is the 2011 edition of NFPA 25, right?
A. Yes.
Q. And you relied upon this NFPA standard or section for some of your opinions in this case, right?
A. I did.
MR. DIEDERICH: You can take that down.
THE COURT: Do you want to offer it?
MR. DIEDERICH: Yes, I would like to move that into evidence. Thank you, your Honor.
THE COURT: All right. It's admitted.
(Defendant's Exhibit 50 received in evidence)
BY MR. DIEDERICH:
Q. You based your opinions in this case on three design drawings that you reviewed, right?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. I did.
Q. You asked to review these three design drawings to understand the overall system design concept of the fire protection system at issue, right?

A. I believe that's what I wrote, yeah.
Q. And these three design drawings were helpful to you in performing your analysis, correct?
A. I'm not sure what you're asking.
Q. The three design drawings that you reviewed, they were helpful to you in performing your analysis, right?
A. In order to analyze a design, I would have to review the drawings.

MR. DIEDERICH: Let's look at DX 37.

I move that this be admitted, your Honor.

THE COURT: Could you identify it for the record.

MR. DIEDERICH: Yes.

Could we please scroll so I can see the bottom right.

THE COURT: These are different from the ones that we looked at before that looked similar?

MR. SOLOMON: We already introduced this document.

THE COURT: All right. Then it's in evidence. But it's in evidence probably with another number.

MR. SOLOMON: Yes.

THE COURT: Do you happen to know what the number is?

MR. SOLOMON: I will get it for you, Judge.

MR. DIEDERICH: Thank you.

Shall I proceed?

THE COURT: Yes.

BY MR. DIEDERICH:

Q. So one of the three design drawings that you requested and reviewed contained a pump schedule, right?
A. Yes.
MR. DIEDERICH: Let's scroll down a little bit so we could see the pump schedule heading.
And scroll down, please. There it is, pump schedule. Thank you.
Q. This document is used by the engineer to convey specific information regarding the equipment or products required to be used in this project, right?
A. Yes.
MR. DIEDERICH: Let's look at DX 49.
THE COURT: It's Plaintiff's 24, and I thought Joint Exhibit 17?
MR. DIEDERICH: Next is DX 49, which has the Bates number WSP 0034 in the bottom right.
Thank you. Let's zoom back out.
BY MR. DIEDERICH:
Q. Another one of the three design drawings that you requested and reviewed was a partial fire protection riser diagram, right?
A. Yes.
Q. This document informed your opinions in this case by allowing you to understand the system topology and the concept of operations, right?

A. Yes.

MR. DIEDERICH: Let's turn to DX 38. Thank you.

This is a document stamped WSP 0011. I move this into admission, your Honor.

THE COURT: It's admitted.

(Defendant's Exhibit 38 received in evidence)

Q. The third of three design drawings——

THE COURT: And what is DX 38?

Q. DX 38, what is this, Mr. Winston?

A. This is a fire protection detail sheet.

MR. DIEDERICH: Let's look at No. 3. If we could highlight that. Thank you.

Q. This is used by the engineer to indicate details of specific elements of the design that the contractor is required to follow in the installation, right?

A. Yes.

Q. And this document informed your opinion as to how the work was required to be installed and whether it met industry standard configurations and practices, right?

A. Yes.

Q. In connection with your opinions in this case——

MR. DIEDERICH: We can take that down. Thank you.

Q. In connection with your opinions in this case, you also reviewed the deposition transcript of the building's resident manager, Victor Confeiterio, right?

A. Yes.
Q. And you considered some of the information in that transcript in forming some of your opinions, right?
A. Yes.
Q. And then you also conducted a site visit of the room containing the tank and pump system in June of 2023, right?
A. I did.
Q. You wanted to confirm the space and whether the system was installed in accordance with the detail that you reviewed, right?
A. Yes.
Q. And you reviewed some photographs that CDM1's experts put in their expert reports, right?
A. If it was in their expert reports, then yes, I reviewed them, but I don't recall specifically.
Q. You recall that some of the photographs of the space that were in their report were unclear as to the proximity of the pumps to the walls?
A. I don't recall that specifically.
Q. This site visit that you conducted in June of 2023, you requested to conduct it, right?
A. Yes.
Q. And you asked to conduct this site visit because it's not your practice to render an opinion without looking at the equipment in the space, right?

A. Yes.

MR. DIEDERICH: Pass the witness.

THE COURT: Any redirect?

Five minutes.

MR. SOLOMON: I don't think I'll have five minutes, Judge.

REDIRECT EXAMINATION

BY MR. SOLOMON:

Q. Mr. Winston, opposing counsel just asked you a litany of things that you reviewed in rendering your report, okay? He went over all those things. Did you need to see all those things to know how an automatic fire pump functions?

A. No.

Q. Are automatic fire pumps standard pieces of equipment in myriad buildings throughout New York City?

A. Yes.

Q. And the engineers on this project were with WSP; are you aware of that?

A. Yes.

Q. If they had designed the system and they had reviewed those materials, would they be able to make representation regarding the functioning of the system to sponsor or its agents?

A. Yes.

Q. And my last point is: That fire code that was brought up, DX 50——

MR. SOLOMON: Can we bring that up real quickly.

Are we able to share that with the witness and the Court? Got it?

See it?

THE COURT: It's on the screen.

MR. SOLOMON: Thank you.

Scroll up to the title.

BY MR. SOLOMON:

Q. Okay. This is the standard for the inspection, testing, and maintenance of water-based fire protection systems. The automatic fire pump falls under this?

A. Yeah, the operation, maintenance of it falls under this as——as referenced in the New York City Fire Code.

Q. Okay. The agreement in this case references maintenance. How does maintenance relate to testing under this fire code?

A. It's——testing is part of maintenance. The fire code refers to periodic testing and other maintenance as defined in NFPA 25 as a requirement. I don't recall the exact fire code section. And then in a reference to the reference standards, it also refers to standards for the maintenance of water-based fire protection systems. That includes NFPA 25 in that list.

Q. So testing is part of maintenance, not vice versa?

A. In my opinion, yes. There are other maintenance elements besides testing, but testing is an important part of the maintenance process, which is regulated by the fire code.

Q. And the reason is that because of that is because you need to make sure the system is working properly so if there's a fire, people are in good hands.
A. That's correct.

MR. SOLOMON: Nothing further of Mr. Winston.

THE COURT: All right. You may be excused. Thank you.

(Witness excused)

THE COURT: Your next witness?

MR. SOLOMON: Next witness is Virginia Dempske Roth.

THE COURT: Okay.

MR. SOLOMON: And again, your Honor, pursuant to your directive, she's being submitted by declaration and ready for cross and then redirect.

THE COURT: All right. You may take the witness stand.

(Witness sworn)

THE DEPUTY CLERK: Please state your name and spell it for the record.

THE WITNESS: Virginia Demske. That's V-I-R-G-I-N-I-A, D-E-M-S-K-E.

THE COURT: And counsel said Virginia Demske Roth.

THE WITNESS: My legal name is Virginia Demske.

THE COURT: Okay. Got it. Thank you.

VIRGINIA DEMSKE,

called as a witness by the Plaintiff,
having been duly sworn, testified as follows:

CROSS EXAMINATION

BY MS. SOKOLOFF:

Q. Good afternoon, Ms. Demske.
A. Good afternoon.
Q. You have a degree in acoustical engineering and music, correct?
A. Yes.
Q. You were retained as an acoustical expert in this case, correct?
A. Yes.
Q. Sponsor retained you to measure the sound caused when the fire suppression system adjacent to PH-58 is activated, correct?
A. That's correct.
Q. You are not a mechanical engineer, correct?
A. No.
Q. You do not have experience designing fire suppression, tank and pump systems, correct?
A. Not as it pertains to mechanical functionality of the fire suppression system, no.
Q. And that would be designing them, correct?
A. Correct.
Q. You are not an expert on the mechanical functioning of fire

protection systems, correct?
A. Correct.
Q. You measured sound and noise measurements in PH-58 on May 2, 2023, correct?
A. Yes.
Q. Your declaration and attached report reflect the LEQ and LMAX measurements for three categories, correct——ambient all pumps off, jockey pumps on, and then automatic fire pump on?
A. That sounds correct, yes.
Q. LEQ is the average measured sound level over a period of time, correct?
A. That is correct.
Q. LMAX is the highest sound level that was measured within the period of time, correct?
A. That is correct.
Q. You stated in your declaration that LEQ and LMAX are typically only marginally different, correct?
A. As it pertains to the background noise level, correct.
Q. A marginal difference is a difference of 3 dBA or lower, right?
A. It would be considered a noticeable difference, yes.
Q. And so a noticeable difference is anything over 3 dBA.
A. Generally, yes.
Q. Anything more than 10 dBA is a significant difference, correct?

A. Correct.
Q. There was an 18-point difference between the LEQ and LMAX measurements that you recorded specifically for the ambient and jockey pump measurement, correct?
A. I do recall that, yes.
Q. And 18-point discrepancy between LEQ and LMAX measurements could have been caused by a discrete impulsive sound that the sound level meter picked up, correct?
A. It could be.
Q. A discrete impulsive sound could be a noise unrelated to the noise you are measuring, correct?
A. It could be, yes.
Q. For example, if you are measuring an ambient room and a cellphone rings, that would be a discrete impulsive noise, correct?
A. That would be correct.
Q. And if the cellphone ringing was your LMAX, that noise would not be representative of the actual ambient noise, right?
A. That's correct.
Q. You agree that the LMAX ambient and jockey pump measurements you took are not representative of the actual sound levels, correct?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. That is correct. However, that is why I presented both LEQ

and LMAX to provide some more contextual evidence of my measurements and recordings.
Q. And because those numbers were not representative——the LEQ of 30 dBA reflects the average ambient sound in PH-58, correct?
A. That's correct.
Q. The LEQ of 30 is more representative of the ambient noise in PH-58 than your LMAX measurement, correct?
A. Not necessarily true.
Q. Well, you've talked about your LMAX is not representative, correct?
A. That is correct.
Q. On May 2, 2023, Mr. Clemente, CDM1's acoustical expert, also measured sound levels within PH-58, correct?
A. Yes, correct.
Q. Mr. Clemente was standing a few feet away from you in PH-58 when you both conducted acoustical testing in the unit, correct?
A. That's correct.
Q. You both recorded measurements of the ambient noise, the operation of the jockey pump, and the operation of the automatic fire pump, correct?
A. That's correct.
Q. The LMAX numbers you recorded differed from those in Mr. Clemente's report, correct?
A. That is correct, but I do have evidence to believe or

information to believe that we have a discrepancy between our background noise measurements and what we presented in our reports.

Q. And that wasn't my question. My question is whether they were simply different.

A. They were, yes.

Q. In your rebuttal expert report you did not offer any opinion about why your sound measurements were different from Cerami's sound measurements, correct?

A. I do not recall.

Q. Cerami's measures may have differed from yours because you used two different sound meters, correct?

A. That could be the case, yes.

Q. You have no opinion regarding whether the noise measurements taken by you or the noise measurements taken by Mr. Clemente are more accurate or reliable, correct?

A. Can you repeat that, please.

Q. Sure. You have no opinion regarding whether the noise measurement taken by you or the noise measurement taken by Mr. Clemente are more accurate or reliable, correct?

A. That's correct.

Q. You used a rational acoustic RTA 420 omnidirectional microphone with a windscreen, correct?

A. Yes, correct.

Q. You stated in your declaration that the laboratory

calibration of the microphone was field verified using an ND 9 calibrator before and after measurement, correct?
A. That's correct.
Q. Laboratory calibration and field testing are two separate things, right?
A. That is correct.
Q. You have not provided any documentation regarding when your microphone was laboratory calibrated, correct?
A. To my knowledge, that's correct.
Q. The first time you used the microphone was in 2022, correct?
A. That's correct, yes.
Q. Your microphone was not laboratory calibrated again before you conducted testing in PH-58, right?
A. I do not recall.
Q. You are not offering an opinion on Mr. Clemente's discussion on the New York City Noise Code, correct?
A. Would you mind repeating that, please.
Q. Sure. You are not offering an opinion on Mr. Clemente's discussion of the New York City Noise Code, correct?
A. How do you mean? Sorry.
Q. Your expert report does not offer any opinion over whether the sections of the New York City Noise Code that Mr. Clemente offers are accurate, are the proper sections to use, correct?
A. In my initial report or the rebuttal report?

Q. Your rebuttal report.
A. I do not recall, but I do not believe so.
Q. You're not offering any opinion in this case concerning New York City Noise Code Section 24-203, correct?
A. I'm sorry. Can you repeat, please.
Q. Sure. You are not offering any opinion in this case concerning New York City Noise Code Section 24-203, correct?
A. I believe I reference Section 24-203 in both my initial reports and the rebuttal report, as I believe that pertains to unreasonable noise.
Q. 24-203 or 24-218 relates to unreasonable noise?
A. Both. I can say for certain 24-218 has the quantifiers for unreasonable noise, but I believe unreasonable noise is defined in Section 24-203.
Q. You think you referenced it——I'll present your copy of your report.
MS. SOKOLOFF: If we could put PX 46 on the screen for the Court.
Your Honor, may I approach?
THE COURT: Mr. Street?
Q. Ms. Demske, if you could show me where in your report you mentioned 24-203.
A. On page 2, in the first paragraph, I mention unreasonable noise. I don't call out the specific section, but I do refer to the unreasonable noise section per New York City Noise Code.

MS. SOKOLOFF: If we could put up PX 47, please.
Q. And taking a look at PX 47, your rebuttal report, can you tell me where you referenced 24-203.
A. I reference Cerami's——Section 24-203 on the first page.
Q. You're not offering any opinion in this case concerning the New York City Noise Code 24-227, correct?
A. Excuse me. I'm reading the report.
THE COURT: In the meantime, did you want to offer PX 46 and 47?
MS. SOKOLOFF: Yes, your Honor. Thank you.
THE COURT: Okay. They're admitted.
(Plaintiff's Exhibits 46 and 47 received in evidence)
A. Counsel, can you repeat the question, please.
Q. Sure. You're not offering an opinion in this case concerning New York City Noise Code 24-227, right?
A. 227 or 203?
Q. 203 we discussed previously, and now I'm asking about 227.
A. No, I do not refer to 227.
Q. You analyzed the noise caused by the tank and pump system under Section 24-218 of the New York City Noise Code, correct?
A. That's correct.
Q. Section 24-218 prohibits unreasonable noise in such a manner that that exceeds prohibited sound level in excess of 7 dBA above ambient when measured anywhere within a receiving property between 10 p.m. and before 7 a.m., correct?

A. Yes.
Q. Section 24-218 also prohibits unreasonable noise in excess of 10 dBA measured anywhere within a receiving property between 7 a.m. and before 10 p.m., correct?
A. That's correct.
Q. To determine whether there is a violation, you need to look at the difference between the ambient LMAX and the LMAX level of the noise you are measuring, correct?
A. That's correct.
Q. You previously testified today that your LMAX levels during the ambient tests were not representative, correct?
A. That is correct.
Q. If we used your ambient LEQ measurements, the noise caused by the tank and pump system exceeded the New York City Noise Code under 24-218, correct?
MR. SOLOMON: Objection.
THE COURT: Overruled.
A. Sorry. Can you repeat the question.
Q. Certainly. If we used your ambient LEQ measurements, the noise code——the noise caused by the tank and pump system exceeded the New York City Noise Code under 24-218, correct?
A. Not necessarily the case.
Q. I believe you have your report in front of you.
MS. SOKOLOFF: If we could put up PX 46, please. Let's go to page 3 of 5, please.

Q. Your ambient LEQ in PH-58 was 30 dBA, correct?
A. That's correct.
Q. And your LEQ with the automatic fire pump on was 47 dBA?
A. That is correct.
Q. And that's 17 dBA difference, right?
A. Yes.
Q. And your LMAX for the automatic fire pump was 51 dBA, correct?
A. That's correct.
Q. Looking at Cerami's——we could put up your declaration, please.
MS. SOKOLOFF: And go to page 5.
Q. Looking at Cerami's LMAX numbers, reflected in paragraph 23 of your declaration, Mr. Clemente's LMAX with the fire code setting is 29 higher than his ambient LMAX, correct?
A. That's correct.
Q. Cerami's measurements reflect that the running of the automatic fire pump violates New York City Noise Code 24-218, correct?
A. Not necessarily. What are you defining as the fire suppression system or the fire pump? Are you referring to the jockey pump or are you referring to the automatic fire pump?
Q. I'm referring to the automatic fire pump that is at issue in this case that is reflected when the main pump is running.
A. The——the automatic fire pump, yes.

MS. SOKOLOFF: No further questions, your Honor.

THE COURT: All right. Redirect?

MR. OVED: May I proceed, your Honor?

THE COURT: You may.

MR. OVED: Thank you.

REDIRECT EXAMINATION

BY MR. OVED:

Q. Good afternoon.

A. Good afternoon.

Q. I want to just clear some conflation that was done. Let's be clear. There are two measurements when it comes to the noise code as applicable here. There's an LMAX and there's an LEQ, correct?

A. That's correct.

Q. To violate a noise code, does the noise code look at the LEQ or does it look at an LMAX figure?

A. New York City Noise Code utilizes LMAX.

Q. So if we're going to measure any type of violation, I have to look at the LMAX under the noise code.

A. That's correct.

Q. Irrespective of the LEQ number, correct?

A. It provides additional context, but the LMAX is used.

Q. Now you have——and I'll get into what opposing counsel had done trying to talk about your LEQs and compare them to the LMAX. We'll talk about that momentarily. But just to be clear

here, when you testified that, I gave my report, I put in LEQ to give context because I didn't find LMAX to be so accurate, would that be a fair statement of Mr. Clemente's LMAX as well?
A. Would you repeat the question, counselor.
Q. Sure. Let me phrase it a different way.
When you get an LMAX, is it fair to say that that is a peak sound at a particular point?
A. Yes, that's correct.
Q. So at any time during any recording, if I sneeze, an elevator button goes off, it's going to catch that sound and that's going to max out LMAX, and the noise code doesn't care. They just look at LMAX, I don't care, if you hit that number, that's what you have to record as an LMAX, correct?
A. That's correct.
Q. And so when you testified and said——and that same holds true whether it's your LMAX or Mr. Clemente's LMAX, correct?
A. That's correct.
Q. So when you testified that you chose to give an LEQ number to give context, was it because your LMAX was somehow inaccurate or because in general, LMAX is always never going to catch the true environment, it just catches a moment in time?
A. The latter. It catches a moment in time.
Q. And is that the same for Mr. Clemente's LMAX as well?
A. I would believe so, yes.
Q. It doesn't matter what machine you use. It's going to

record it, no matter what, and if it's a peak, a sneeze, an elevator, it's an LMAX that's hit, correct?
A. That's correct.
THE COURT: One second. I know it's your first time doing a redirect. I want to make sure you're aware of my individual rule.
Got it. Thank you.
MR. OVED: How much time do I have?
THE COURT: Two minutes.
MR. OVED: Oh.
BY MR. OVED:
Q. And now when we look at your——Mr. Clemente didn't include any LEQs, correct?
A. He did not specify which metrics he was using in his original report.
Q. And can you just tell us, when I look at your report on page 3, your ambient sound that you get for the jockey pump on your LMAX, your LMAX——that's what the noise code covers——your LMAX ambient is 48 decibels; that's the sound with everything off, correct?
A. Correct.
Q. All right. And then we take the LMAX with the jockey pump on. It's 49. How do you interpret that? What does that sound like? Is that pretty much the same way as the sound of the room, it doesn't really add anything to it?

A. I would consider that, in my expert opinion, imperceptible.
Q. Is that a noise code violation?
A. No.
Q. Why?
A. So if you use unreasonable noise, it's 7 dB or seven points, we say, colloquially, over the ambient condition, which this is not.
Q. And let's go to when the main pump comes on, it kicks on after awhile. You measured LMAX of 51 dBA. Do you see that?
A. Yes, correct.
Q. That's also not a noise violation on the ambient, correct?
A. If you're using unreasonable noise, no, it is not.
Q. And does it matter if your system has been lab calibrated or not, and all that matters is, when you do a performance in the field, you have to field calibrate it?
A. It does matter, if your sound level meter or equipment sounds wildly out of calibration. But that's why it's best practice to take a field calibration before and after the course of measurement.
Q. And so your calibration matched up to Mr. Clemente's calibration?
A. That's correct. Meters and calibrations, they're all industry standard, and they usually hit the same level.
Q. So in this case it didn't matter that your meter was calibrated by a lab.

A. It should not matter, no.
Q. And do you know if it matters that it was calibrated, let's say, a year before that? Would that change anything?
A. If it was wildly inaccurate during my field calibration measurements, I would have pause, but I did not see any reason to not——or, you know, continue with the measurements.
Q. Okay. Last question, last——
THE COURT: One last question.
Q. When you look at Mr. Clemente's report, he uses the building code——he uses a lot of the measurements for the New York City Building Code 2014. Is that the right code to use?
A. No, it's not.
Q. What is the right building code to use?
A. 2008 year building code.
MR. OVED: Judge, can I just introduce a publicly filed document in evidence? It's a TCO.
THE COURT: Yes.
MR. OVED: It's going to be Plaintiff's Exhibit 53.
Publish it, please.
THE COURT: It's a certificate of occupancy?
MR. OVED: Yes. This is the TCO with the New York City Department of Buildings. This is after you get the fire department approval in June. You file for a TCO and you get one, and it has an effective date of August 2018, but if you look here, on the CO itself, it says the building is subject to

this building code, 2008.

THE COURT: But it's a different building, right?

MR. OVED: No, it's the same building. That's the address of this building. It's an alternate address.

THE COURT: Okay.

MR. OVED: Nothing further for now, your Honor.

THE COURT: All right. You may be excused. Thank you.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Plaintiff's next witness?

MR. OVED: We're out of witnesses.

THE COURT: All right. Plaintiff rests?

MR. OVED: Yes, we do, Judge.

THE COURT: Okay. Defense case.

MR. SPERLING: Thank you, your Honor.

CDM1 calls Arte Moreno, and his wife Carole Moreno will be coming in the court with him, but she's not a witness.

THE COURT: All right.

(Discussion off the record)

(Witness sworn)

THE DEPUTY CLERK: Please state and spell your full name for the record.

THE WITNESS: Art Moreno. Art, I go by Art. A-R-T, last name Moreno, M-O-R-E-N-O.

ART MORENO,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SPERLING:

Q. Good afternoon.

A. Good afternoon.

Q. Did you become interested in purchasing a unit in a condominium building at 520 Park Avenue sometime in 2016 or 2017?

A. Yes, sir.

Q. Why did you ultimately enter into an agreement to purchase PH-58?

A. My wife and I spent a lot of time looking at the apartment and we liked the design and location of this building.

Q. What stage of construction was the building in at the time you were deciding to purchase a unit in the building?

A. It wasn't framed in yet. We went to the design, design center, looked at the design.

Q. Did you visit the unit before CDM1 signed the option agreement?

A. Yes.

Q. Did any representative of sponsor accompany you when you saw where the unit was going to be constructed?

A. Yes.

Q. Who was that?
A. We had a real estate consultant and then Louis Buckworth, Buckworth.
Q. And do you recall when you began speaking with Mr. Buckworth about the unit?
A. A couple times. We——we visited the showroom, went through the floor plans, different things, and then we continued to look in the city.
Q. Was this in 2017?
A. Correct.
Q. How did you learn that there was an automatic fire suppression system next to PH-58?
A. Oh, we looked at many layouts, floor layouts, and particularly liked this particular unit because it had a balcony, and nice view, southern view, and it had a balcony and——but it was one of the last units, and it had——we were aware that it had a fire suppression unit there.
Q. Did you actually see the tank and fire——and pump room before you signed the option agreement?
A. We saw the room but never saw the pump.
Q. Why weren't you able to see the pump?
A. Well, we were going through the design phase. They never put the pump in.
Q. So the pump had not yet been installed?
A. It had not.

Q. What was your reaction when you learned that the tank and pump system would be next to the unit that you were interested in purchasing?
A. Very concerned about the noise level.
Q. Why were you concerned?
A. My wife's a light sleeper, and young family, and just didn't want to be in a situation we had a guest that——that that pump is going to be making noise.
Q. Apart from your concern about noise from the tank and pump system, did you have any other significant concerns about the unit?
A. Not really.
Q. Did you communicate your concern about the noise to Mr. Buckworth or any other representative of the sponsor?
A. Yes.
Q. And do you recall what Mr. Buckworth said to you in response?
A. He said that they had been——they had been ensured that it would be quiet.
Q. Did CDM1 take any action to require that sponsor would take care of your concern by adding anything to the option agreement?
A. When we were going through the agreement, there was a big concern. I didn't want to sign the agreement just because they had not proven that——well, we had never seen the pump first;

and two is the fact that——that they said that it was going to be quiet and so they allowed me to put the, you know, in bold letters in the agreement that they'll get the pump really quiet.

MR. OVED: Your Honor, I'm sorry. I'm having difficulty hearing. Is there a way I can move somewhere where I won't have the difficulty hearing?

THE COURT: Do you want to sit in the far seat of the front row of the jury box? Juror No. 1.

(Discussion off the record)

BY MR. DIEDERICH:

Q. Let's look at the option agreement, which is Exhibit JX 13, and specifically, let's look at Section 17.3.

Do you recognize this section?

A. I don't have anything on my screen.

MR. DIEDERICH: That's not good.

(Discussion off the record)

THE COURT: Okay. You may proceed.

MR. DIEDERICH: Thank you, Judge.

Q. Is 17.3 the bold provision that you talked about?

A. Correct.

Q. Did you negotiate the language of this or did Mr. Carey?

A. Chip Carey did.

Q. And did you review the option agreement before Mr. Carey signed it on behalf of CDM1?

A. Yes, I reviewed it but also spent a lot of time on this particular paragraph.
Q. And why did you want this provision added?
A. Because, one, we had not seen the tank; and that I wasn't going to sign anything unless they guaranteed that it was going to be quiet.
Q. Would CDM1 have signed the option agreement if Section 17.3 had not been added?
A. Absolutely not.
MR. DIEDERICH: So I'd like to look at Exhibit DX 42. And your Honor, we'd ask that that be admitted into evidence. This is an email from Chip Carey to Mr. Moreno dated January 17, 2019, with the subject 520 Park.
THE COURT: It's admitted.
(Defendant's Exhibit 42 received in evidence)
BY MR. DIEDERICH:
Q. So the first sentence states, "This is the letter from our engineering firm evaluating 520's acoustical testing done on the unit." Do you see that?
A. Correct.
Q. And then the third sentence says, "The testing was inadequate and in some regards improper," and that "much more data and information is needed in order to professionally evaluate whether they can meet the standard in our Amendment No. 17.3." Do you see that?

A. I do.
Q. And then, further down, Mr. Carey wrote, they have to provide us——"they have a lot to provide us if they intend to get us to a closing on Friday, the 25th." Do you see that?
A. I do.
Q. And do you know if sponsor provided CDM1 with any of the information in response to the letter from its engineering firm?
A. They did not.
Q. Would CDM1 have closed and purchased the unit if sponsor had complied with 17.3?
A. Yes, we would have.
MR. DIEDERICH: Thank you.
THE COURT: Cross?
CROSS EXAMINATION
BY MR. OVED:
Q. Good afternoon.
MR. DIEDERICH: May I proceed, your Honor?
THE COURT: Oh, yes. Apologies. Go ahead.
Q. Good afternoon, Mr. Moreno.
A. Good afternoon.
Q. Prior to entering into the option agreement, you said that it was——you were very concerned about the noise that would be generated from that tank pump room?
A. Correct.

Q. And you of course expressed that deep concern to Mr. Carey as your agent, correct?
A. Yes.
Q. Especially prior to entering into the agreement, you would want to make sure you told your agent, listen, no matter what, we're not going to sign this deal unless they really guarantee us that this is not going to make any noise whatsoever; fair point?
A. Fair.
MR. OVED: Good. Can you put up DX 1, please.
Can you scroll down, please.
Q. This is an email chain between Chip and Louis Buckworth prior to you entering into the agreement, into the option agreement.
A. Yes.
MR. OVED: Could you scroll up, please.
Q. And this is an email from Chip dated September 21st, and in it——why don't you take some time to read it.
THE COURT: Do you want to offer it?
MR. OVED: Yes, your Honor. I'd like to introduce this into evidence.
THE COURT: All right. It's admitted.
MR. OVED: Thank you, your Honor.
(Defendant's Exhibit 1 received in evidence)
Q. So Chip is writing to Louis, saying there are "a few areas

that we'd just like some more information or comfort," and then you write a few things——lot line windows, fire suppression. Can you tell me if anywhere in this provision does he ever articulate how this is a deal breaker or this is an extreme concern of yours, above all?

MR. SPERLING: Objection, your Honor. Counsel said "you write," but this is an email by Chip Carey so that's a misrepresentation.

MR. OVED: Actually, he testified that he communicated his deep concern——

THE COURT: Just rephrase the question.

MR. OVED: Sure.

Q. Looking at this email, is there any——and you've already testified that you've communicated your extreme concern regarding the noise. Is that reflected anywhere here, that you're extremely concerned or that this would be a deal breaker unless it's included in the option agreement?

A. Basically said we were concerned. I mean, there are areas that we want more information on, including fire suppression tank room, safety noise. Noise is the big issue here.

Q. I hear you. I hear you. I recognize that. Though he does say we wanted some more information or comfort. He doesn't use the word concern.

A. No, but——

THE COURT: So I'm just going to break in here. It

says what it says, and it also says in the last two lines, "as there are some high-end buildings where sales are a bit soft," etc. But in any event, it says what it says. You don't need to get him to agree to what it does or doesn't say.

BY MR. OVED:

Q. Okay. Ultimately, again, that agreement is signed, and as your counsel pointed out, 17.3, it's not an absolute "no noise guaranteed" provision as you wanted, is it?

A. When I signed that agreement, it was all about the noise, period.

Q. I recognize that. I'll get into that in a second. But 17.3, as you said, was an ultimate deal maker to you. No noise absolutely emanating from that room. 17.3 doesn't say that, does it?

A. You'd have to bring it back up.

Q. Sure. Do you see that?

A. Yes. It says, all reasonable measures but verify and specifically ensure the purchaser——ensure the purchaser. That's my wife and I.

Q. But what does it say after those words?

A. That it does not create any sound or noise.

Q. That? See, if it's as you wanted it, there should be a period right after the word "noise." You recognize that, right?

A. I do not recognize that.

Q. So when it says, Any noise that will impair purchaser's quiet enjoyment and use of the unit——both of them; so the noise that has to impair your quiet enjoyment and use of the unit, it has to do that——so even if there is a noise and it doesn't satisfy the quiet enjoyment and use, it's permitted, and then there's a comma, a big exception, that there's going to be noise in terms of emergency and maintenance. See that?
A. Except in emergency and routine maintenance.
Q. Right. So you accepted the provision as it is now that says, if there's noise with regards to——
A. No.
Q. No?
A. You're playing with words here with me. The pump system does not create any sound or noise, period.
Q. That's how you read that paragraph?
A. I mean, the reason I put this in here was the fact that I was concerned about it.
Q. I recognize that.
A. If there was no pump, there would have been no problem. We have even——we never even got to see the pump, or see the pump run.
Q. I got that. I will get to that momentarily. We'll get there shortly. But as it's written, as it's written, noise can emanate from that room?
A. I don't agree with you. (Continued on next page)

Q. Got it. So you interpret this provision as, no matter what, you cannot have any noise coming out of that room into that apartment?
A. Correct?
Q. Got it. Do you recall, and is it fair to say -- did Louis ever tell you while you were going through the apartment that this was a passive system, and it only makes noise when it is an emergency or during maintenance/testing?
Did he ever tell you any of that stuff?
A. We had numerous conversations.
Q. Did he ever tell you that?
A. He did not say it in so many words.
Q. So he did tell you that?
A. That there would be service, and that service could happen a couple of times a year.
Q. So he told you that the system would be -- make noise when -- he told you, excuse me, that the system was a passive system and except for testing, maintenance and/or if it goes off in an emergency?
A. In not so many words.
Q. But you understood that?
A. What I understood was I was going to get to see the pump and hear the pump run.
Q. Your impression was you cared to see the pump room itself?
A. Yes. The pump room. The room was right next to bedroom.

Q. Got it?
A. And there was a hole in the floor, period. We never saw a pump, never heard the pump run.
Q. You eventually made it to the apartment after the pump was running in August?
A. Never.
Q. You never went to the apartment in August?
A. Never. I'm not telling you I wasn't there in August. What I am saying is I never saw that pump.
Q. Okay. Aside from you going -- the pump is not inside your actual apartment, the pump is in a closet in the hallway adjacent to your apartment, right?
A. If you look at the floor plan, there is a master bedroom and then a guest bedroom. What would normally be the third bedroom was the pump room.
Q. The pump is not inside your apartment; it's outside your apartment?
A. They had it walled off, but there was a door adjacent.
Q. You could go into the hallway into the pump room, but you don't need to go into your apartment to go into the pump room, correct?
A. The hallway is right down from the master bedroom.
Q. Okay. Again --
A. It is on the same floor.
THE COURT: Let me just understand. The pump is

adjacent to the apartment right on the other side of that bedroom wall?

THE WITNESS: Correct.

THE COURT: But it is not in the apartment?

THE WITNESS: Yes. It's on the same floor.

THE COURT: It is the same floor in a separate room adjacent to the apartment?

THE WITNESS: No. We had the whole floor.

THE COURT: Including the pump room?

THE WITNESS: That pump room is on that same floor.

THE COURT: I understand that. But did you have to go through the apartment to get to that pump room.

THE WITNESS: Yes. There was a service entrance.

THE COURT: Okay.

Q. There is a hallway that leads to that pump room, correct?

A. That's correct.

Q. And that hallway also leads to a door into the bedroom, correct?

A. Right.

Q. Now, in August you met Louis at the apartment?

A. I can't recall all the dates, the exact date.

Q. Were you here when he testified?

A. No, I was not allowed.

Q. He testified that he met you in the apartment in August, August 20, 2018?

A. That is a possibility.
Q. All right. When you were at the apartment, is he showing you the apartment and saying, "Wow, take a look at this apartment no noise, do you see how quiet it is"?
A. He did not.
Q. He did not?
A. I was up in that apartment when it was a shell.
Q. So as of August 2018 the unit was still a shell?
A. We were under construction.
Q. Well, but the fire suppression system was already activated at that point?
A. It was not.
Q. How do you know?
A. Because I walked that apartment every time I went, when they allowed me in. I checked on that room.
Q. So you went into the room and you checked on it?
A. There was no pump. Every time I went to the apartment there was no pump in that room.
Q. So as of August 2018 there was no pump in that room too?
A. I can't tell you the exact dates.
Q. Well, we agree you were at the apartment on August 2018?
A. I do not agree because I cannot remember back eight years ago.
MR. OVED: Can you pull up Ms. Sheeber's e-mail.
BY MR. OVED:

Q. While he's doing that, just to be clear, whenever it is you went to visit that apartment, it is your testimony you checked into that room and that pump was never installed?
A. I do not recall ever seeing that pump.
Q. But you checked into the room?
A. I used to check the whole apartment. We were going through a design phase. I was checking that apartment.
Q. It was so important to you, that's why you checked it, because it was really a priority to make sure there was no noise coming?
A. It was very much a priority.
MR. OVED: Do you have that?
MR. SOLOMON: I have it.
I don't know why it's not loading. Mr. Street --
MR. SOLOMON: Mr. Street, what am I doing wrong?
THE COURT: There is nothing on the witness's screen.
MR. OVED: Okay.
THE COURT: Now there is.
BY MR. OVED:
Q. I put before you which is what, Exhibit PX 38 or JX 21. It is in evidence already. This is a letter dated February 15, 2019. So this is after the dispute about the closing is going on.
This is a letter to Marina, which is your lawyer representing your side, by the sponsor's lawyer.

MR. OVED: Can you scroll down, please.
BY MR. OVED:
Q. And if you acclimate yourself please to that middle paragraph "notwithstanding the foregoing," do you see that?
Then number five says, "Site visit with purchaser, August 20, 2018."
So it is your testimony that as of August 20, 2018, when you did a site visit at the apartment, there was no pump in that pump room, correct?
A. I do not have a calendar that tells me exactly when. There were a couple of times I went to the site where they let me walk the first floor to look at the amenities, but they did not let me up to our floor.
Q. But this is telling you, August 20, 2018, all you have to do is answer the question that's posed.
A. Here's my answer: If you're calling the site the apartment, that's one thing. If you are calling the site if I go in the door to look at the pool and the workout room, they let me in that first floor, but they were not letting me up to the apartment.
Q. So it is your testimony that in August 2018 they didn't let you up in the apartment now?
A. There was multiple times they did not let me in the apartment. I do not -- I cannot testify the exact date.
Q. So you don't know if they let you up in the apartment in

August of 2018?
A. I do not know.
Q. You come from Arizona, you live in Arizona. Right?
A. Correct.
Q. This purchase of this apartment was not to be your primary residence, but you were going to have it as an additional residence, not to be primary, correct?
A. Correct.
Q. You traveled all the way from Arizona in the summer of 2018 just so you could see the pool?
A. No. They didn't let me up.
Q. They didn't let you up. You just had a surprise visit and said, "I'm here, hello"?
A. That's incorrect. We called and set up an appointment to visit the apartment.
Q. And when you did that appointment --
THE COURT: You need to speak into the mic.
Q. When you went there on August 20, 2018, Mr. Buckworth says you were at the apartment, that he took you to the apartment.
Do you have any reason to think that he's lying?
A. No. I wouldn't say that. I'm just saying that I do not have a calendar in front of me, and I can't tell you exactly the dates that we went to the apartment.
Q. But the point is, whenever you went to the apartment, you looked in that room and the fire pump was not installed?

A. Whenever I visited that apartment, I never saw the fire pump.
Q. You looked in the room?
A. I used to look in the room every time I went to that apartment.
MR. OVED: Can you please put up DX 36?
MR. SOLOMON: DX or PX 56?
MR. OVED: DX.
BY MR. OVED:
Q. DX 36. This is a piece of a document that was proffered by your counsel in this matter in this hearing.
MR. OVED: Can you scroll down, please.
BY MR. OVED:
Q. This is a list from Mr. Buckworth in terms of what he had, notes in terms of the meetings and stuff like that.
If you look at August 20, 2018, do you see that?
A. Yes.
Q. It says, "Site visit with Art Moreno, Carol Moreno" -- that is your wife right?
A. Correct.
Q. "Dominick and Louis."
Who is Dominick?
A. Dominick was the foreman, like the foreman.
Q. And Louis?
A. And Louis, yes.

Q. Do you see that?
A. I do.
Q. Does that refresh your recollection that you went up to the apartment then?
A. I don't believe -- I can't remember if they went up to the apartment.
Q. Got it.
THE COURT: Plaintiff has about 30 minutes left.
MR. OVED: Got it.
THE COURT: Total. But that already includes the depositions. Questioning time.
Q. Eventually sponsor sends you a letter to do a closing. Do you recall getting that?
A. Yes, I believe it went to Chip.
Q. Got it.
MR. OVED: Can you please put up PX 17.
BY MR. OVED:
Q. Now, again, this is a primary concern of yours is the noise of the apartment, which you testified I would not have closed if there was any noise coming out of that pump room, right?
A. Correct.
Q. Good. So opposing counsel had just sent over a notice to close and set the November 27 timeline as the closing date. Let's close on that date.
And then in response to that --

MR. OVED: Can you scroll down to the bottom please.
Q. Your attorney, Ms. Rabinovich, on November 2, in response to that says, Samantha, our client spoke to Louis Buckworth, who suggested I reach out to you and request for an adjournment. The closing is scheduled for Tuesday, which is right after Thanksgiving and after Thanksgiving it will be very difficult to timely inspect the unit and the parties still have to agree on a kitchen credit.
Do you see that?
A. Yes.
Q. I would greatly appreciate an adjournment, give us 60 days, summarizing.
A. Okay.
Q. Fair to say nowhere in this agreement does your lawyer say whoa, whoa, whoa, whoa, how dare you close. You didn't give me any documents whatsoever, you didn't fulfill any of your obligations under 17.3, you have no right to call a closing because you didn't comply with 17.3?
Do you see that anywhere in that e-mail?
A. In this e-mail, no.
Q. In fact, fair to say that more concern was with the kitchen credit? That's what's called out here.
A. That is not the reason why we didn't close.
Q. But that is the reason she lists here.
A. I understand.

Q. Let's go to the response. After a couple of inartful things, then the next day. Again, your lawyer asks back a few days later, what is the story with the extension?

This is another opportunity for your lawyer to tell the sponsor, "Hey, you can't close here. This 17.3 was so important you have an obligation, you have to give me documents, you have the right, you have to do all of these things. You didn't do any of that."

Why doesn't your lawyer say that?

Do you know?

A. I do not know.

Q. In fact, the only thing your lawyer does say is, "Hey, we need to figure out what to do about this kitchen credit."

That seems to be, as you read that, the most important thing?

A. It wasn't.

Q. It wasn't.

So even though it is not the most important thing, it's the only thing that's mentioned in this request for an extension.

A. I understand that.

Q. And it is fair to say, do you recall being asked and answered in your deposition whether you even had an expectation to receive documents, any documents from the sponsor under 17.3, and your answer was you don't recall?

A. I do not.
Q. Correct?
A. That's correct.
MR. OVED: Time says I have to stop.
THE COURT: All right.
Redirect limited to five minutes.
REDIRECT EXAMINATION
BY MR. SPERLING:
Q. So do you recall that in advance of the January 4 date that was scheduled for closing CDM1's lawyer specifically asked what sponsor had done to comply with Section 17.3?
A. Correct.
MR. SPERLING: Thank you.
THE COURT: You may be excused.
Thank you.
MR. OVED: Thank you.
(Witness excused)
MR. SPERLING: Your Honor, we could proceed to begin with Chip Carey, but we won't get through it before 3:30, when one of CDM1's experts --
THE COURT: Is that expert available now?
MR. SPERLING: No. He will be available at 3:30, but we could put the other expert on now.
THE COURT: Let's do that.
Put on whoever you like and we will just break at

3:30.

Who is defendant calling.

MS. SOKOLOFF: Victor Clemente. Victor Clemente is our expert in this case. His testimony went in by declaration.

THE COURT: You may come to the witness stand. We have your declaration, which has your expert testimony. We will have cross-examination.

How much time does plaintiff have left?

THE DEPUTY CLERK: 26 minutes.

Victor Clemente,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. OVED:

Q. Good afternoon.

A. Good afternoon.

Q. You submitted an affidavit in this matter, correct?

A. Correct.

Q. You also submitted two reports in this matter, which are annexed to your affidavit, correct?

A. Correct.

MR. SOLOMON: Declaration.

Q. Or declaration, right.

Just to be certain, can you please put up the building code. When I look --

MR. OVED: Actually, before that can you please put up his May 18, 2023 report.

BY MR. OVED:

Q. That is the first report you issued that's incorporated into your declaration, correct?

A. Correct.

Q. Other than the exhibits annexed thereto it's about seven pages long. Do you see that?

A. Okay.

Q. Good. Now, if I run you through it, just so we can focus everything because my time is very abbreviated, is it fair to say under I is introduction, which pretty much says the scope of your work, correct?

It's not really substantive as opposed to more, "Hi this is why I was hired and this is way was doing."

Right?

A. Correct.

Q. And then Section II talks about testing of the tank in the pump room, the actual tank room itself, correct?

A. Correct.

Q. If the provision in this agreement only talks about noise in the actual room, while these statistics may be interesting and may provide a wildflower, it doesn't really indicate any particular violation of the noise code inside that bedroom, correct?

A. Only that the measurements that I took allow me to make an estimate of what I think might be happening in the room.
Q. Right. But that estimate is independent of the fact that whatever the measurements in the room are, they are in the room?
A. Correct.
Q. Got it.
So we won't focus on this. When I say in the room, I mean in that bedroom that is adjacent.
A. The bedroom, yeah.
Q. You understand that?
A. Yes.
Q. So Section II we are going to ignore because it is not really germane to Section 17.3.
Then I want to go to Section III. This is when you are testing in the unit.
And then section -- I believe it is you have some tables in Section III starting on page 5, 6 and 7, where you talk about a building code that generates these tables, correct?
These octave band noise -- that is not a noise code. Those are building codes, right?
A. Yes.
Q. And you are applying there the 2014 building code, right?
A. Yes.

Q. But you were here for the testimony, so you can see that the 2008, the TCO is covered under the 2008 building code, correct?
A. Right. But the 2008 does allow for field testing if there is a suspicion that the noise from the adjacent mechanical room is not meeting code.
Q. Right.
A. The challenge, though, is that the specs in the 2008 code are not specs that can be measured in the field.
Q. I hear you.
A. So, therefore, in order to do a field test, we have to do something that can be measured in the field, which thankfully the 2014 code rectified that by putting parameters that can be measured in the field.
Q. But the 2014 code is not applicable to the 2008 building code?
A. No. But it would be reasonable if you need to do a field test --
Q. But, again, the governing building code for this and any violations would be under the 2008 code, correct?
A. Correct.
Q. Now that we have disposed of the sandwiches, let's look at your actual report itself, when you are talking about the measurements in your report.
You now say, and I specifically refer you to on page 4

of your report, you have a list, a chart, noise measurements in the bedroom.

Do you see that?

A. I don't see it right now.

THE COURT: We don't have anything on our screen.

Okay.

A. I see it.

Q. Okay. So you make a point to say, Listen, when all pumps are off it's 31 dBA, correct?

A. Correct.

Q. I assume that is what you assume is the ambient when everything is quiet in the room?

A. Yes.

Q. And then once you pump on, the jockey pump comes on, your measurement is 37 dBA?

A. Correct.

Q. And then between the main pump starting and the other pump running it is about 60, 62, right?

A. Yes.

Q. Great.

In your affidavit --

MR. OVED: Can we pull up his affidavit?

MR. SOLOMON: Declaration you mean.

MR. OVED: Declaration.

Please pull up the corresponding chart. I think it is

a paragraph 46.

MR. SOLOMON: Paragraph 46?

MR. OVED: 46.

THE COURT: That just talks about the relevant noise code.

MR. OVED: That's not it.

THE COURT: 43?

MR. OVED: Yes, 43. Publish that, please.

BY MR. OVED:

Q. This is the first time ever that you actually indicate that your measurement for the ambient in the room is done on an Lmax. Do you see that, if you look at your column, you say CDM1 Lmax. You have identified that.

That wasn't in your original report. You didn't say what you used. Now you say, Listen, CDM1, we have a 37dBA, 62, 60, and for your ambient you list an Lmax of 31 dBA?

Do you see that?

A. Yes.

Q. In fact, in paragraph 44, you say: Listen, sponsor's expert no good. I use a significantly -- I recorded it on my device. You provided underlying data for this. You gave a spreadsheet for this. So that way you can see your recordings on a spreadsheet, right?

A. Correct.

Q. Let's pull that up, so we can see how you got to your

numbers.

First, on page of -- this measurement is published, right?

This is on a tab that is called measurement index.

THE COURT: What is the exhibit number?

MR. OVED: It is Exhibit 2 to his declaration.

THE COURT: Got it. Thank you.

MR. OVED: Go back to that other one.

MR. SOLOMON: It is actually -- I'm sorry the native is Exhibit 3.

MR. OVED: Can you go back to the first one.

BY MR. OVED:

Q. You divide what you did in projects. Meaning, I took a calibration, which is project 1. Project 2, I did another calibration. Project 3, pumps off. That project 3 would be the ambient noise, right?

A. Correct.

Q. Project 4 is when the pump is on.

And project 5, you close out with an ambient.

Let's look to see if your ambient that you have represented under oath as 31 dBA Lmax, what you didn't say in your letter which you originally gave in March is that the true Lmax at highest point, because that's what an Lmax would be, the snap at the highest point of the hit, right?

A. Yes, where you're trying to match it.

Q. Let's look at project 3, which is here is your underlying data. If you look at project 3 this is the date that you were in column B, May 2. Every row dictates an elapsed second. So this is every second of time your machine is categorizing these times. If you look at --

THE COURT: Project 3 is ambient, right?

MR. OVED:

A. Yes.

Q. If you look at project 3 and we look at the Lmax, and it's the Lmax is LAS max, correct?

A. Correct.

Q. Right. So it's row G.

In actuality, what you under oath said and impugned our expert, saying that her Lmax is wrong on the ambient, it is you that are wrong because when I look at your figures you have under line 49 an Lmax of 39.76, close to 40, not 31 as you said.

Do you see that?

A. What was the question?

Q. What you wrote in your declaration as the Lmax for all pumps off is significantly underrecorded based on the work and on the product that you have here?

A. I am agreeing with the other expert that the Lmax that they reported was not representative.

Q. You agree?

A. Of the pump -- of the ambient, because of the impulsive noise. I reported the noise that did not include that impulsive noise.
Q. Let's stop. But you didn't do for the other recordings?
A. Yes, I did.
Q. No. Your other one for the pump startup and for the pump running, you knew how to take the peak of the 60, you didn't filter out an Lmax, elevated max?
A. I did not. Sorry. I did not.
Q. Let's look at that. Let's look at what the highest point on that point is.
MR. OVED: Go ahead. Scroll down.
Stop.
Keep going.
Keep going.
Okay.
BY MR. OVED:
Q. I'm in project 4. I am in row G.
A. Yes.
Q. I see 59s.
A. Yes.
Q. Keep going. I see 59s. Oh, there is a 60. There is a 62. Do you see the 62? You pick that up. You know how to pick the 62, and that you did from a pump startup. Hold on a second.
MR. OVED: Go back, Aaron. I want to show something.

BY MR. OVED:
Q. You don't break down when the jockey pump kicks in versus the prior pump.
It's fair to say if I go to row 285, you can start to see the jockey pump comes off at 39.
And then all of a sudden pretty much at row 289 the active pump is activated.
You start in project 4, project 4 we said is when the pump is running. You picked the highest point, you picked 62.44 for that, and for the pump running you did a 60.
Why didn't you just eliminate that?
You were so careful to eliminate the ambient to make it really so that the discrepancy can be so high, but when it comes to saying, look, how much noise, you didn't do that, did you?
A. So what is the question.
Q. It is not, as you said, that you erased the top Lmax out when it came to show that the pump was?
A. That's what I said. But what is the question.
Q. Your data doesn't support what you just testified to?
A. What is the question?
Q. Isn't that correct?
A. No.
MR. OVED: I have nothing further, your Honor.
THE COURT: Okay. Redirect.

REDIRECT EXAMINATION
BY MS. SOKOLOFF:
Q. Mr. Clemente, you were asked to determine if the functioning of the automatic fire suppression system made a lot of noise, not whether it violated a noise code, correct?
A. Correct.
Q. Can you please tell me the process you used to determine your Lmax measurements?
A. So, like the other expert discussed, during field measurements sometimes there are impulsive noises that are not related to what we are trying to measure, in this case the pump.

Like the gentleman from SM&W said earlier today, he had to work around the beeping smoke alarm when he did his measurements, because you wouldn't include the beeping noise alarm as a representative measurement, because that is not what you are there to measure.

So in the same manner, we used the time history that opposing counsel showed to determine what an impulsive noise, together with audio recordings what we took to determine that, oh, that peak, that was not the pump. That was somebody's beeper went off during the measurement.
Q. So you said you used the time recording and an audio measurement. How do you make sure that what you are removing would be this extraneous noise you are mentioning?

A. Because the recording is contemporaneous with the time history. So you can -- you have the time stamp in the recording. So you know at this particular point, at this particular time the beeper went off, so you go to the record and you see, Oh, yeah, that's the number.

Q. Focusing on the ambient measurement that you took, why did you remove the extraneous Lmax measurements from your --

A. Because.

Q. Let me just finish my question.

A. Sorry.

Q. You know I understand. Why did you remove the extraneous Lmax measurement from your report?

A. Because in my opinion that high number was not due to the ambient; it was due to an extraneous noise. In this case I believe it was somebody's walkie-talkie went off.

Q. Did you reach that conclusion using the process you discussed before with us?

A. Correct.

Q. And then --

THE COURT: Do you mind if I just --

MS. SOKOLOFF: Please.

THE COURT: Just so I understand, so you went over your readings and listened to the audiotape so that you could identify any points in time with some extraneous noise and eliminate that, is that right?

THE WITNESS: Correct. And I also --

THE COURT: Is that recorded on the spreadsheet somewhere with some footnote or something to say walkie-talkie or just something so we know that that one doesn't count and why?

THE WITNESS: I did not write that.

THE COURT: Okay.

BY MS. SOKOLOFF:

Q. But you did produce the actual data along with your report in this case, correct?

A. Correct.

Q. When the automatic fire pump was operating, were there extraneous noises that you heard that had to be removed from your report?

A. When the automatic fire pump --

Q. Yes, when the loud pump was on.

A. I did not hear any extraneous noises.

MS. SOKOLOFF: No further questions.

Thank you.

THE COURT: Okay. Thank you.

You may be excused. Thank you.

(Witness excused)

THE COURT: So are we ready for the other witness?

THE DEPUTY CLERK: He is on the line.

THE COURT: He is on the line. Great.

Defense, call your other expert, please, who is on the line.

All right. I see we have our witness could someone call the witness, please.

MR. DIEDERICH: Yes. CDM1 calls Jim Cicalo, who submitted his direct testimony by declaration so he is available for cross-examination.

JAMES CICALO,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. OVED:

Q. Good afternoon, Mr. Cicalo?
A. Good afternoon.
Q. Is it fair to say that as part of your 2018 project, you were not asked to give any particular meaning to the phrase "any sound or noise that will impair purchaser's quiet enjoyment and use of the unit?
A. Yes. That's fair.
Q. But rather you were just asked generally to assess whether the system would create sound or noise under any circumstances that could disrupt the unit, correct?
A. Yes, I was asked to evaluate the fire pump in the adjacent room.
Q. Irrespective of what conditions they would come under to

make noise, you were just asked to evaluate whether or not it would make noise?
A. Correct. I was asked to evaluate the equipment and asked for documents --
Q. Right.
A. -- so that I could provide that opinion.
Q. Again, you weren't asked to take that data that you were asked to evaluate and filter it through, whether or not that noise would affect purchaser's quiet enjoyment and use of the unit; you were just asked to assess generally whether the system would create sound or noise that could disrupt the unit?
A. Well, I was asked really to evaluate the equipment, and in order to do that I asked for documentation, and I wasn't given any.
Q. Let me direct your attention to paragraph 19 of your declaration.
By the way, while he's he doing that, is it fair to say when you are there that the jockey pump makes no discernable noise when it comes on, correct?
A. No, I don't think that's correct. I heard the jockey pump come on very clearly actually when it came on during our one -- our two site visits, but one time in the apartment.
Q. You went inside the unit and outside the unit, correct?
A. Correct.
Q. And if I look -- you really rely on the noise code

violation dependent on -- pretty much you are not a noise expert, you really much rely on Mr. Clemente's report, correct?
A. From an acoustical testing, yes, but from listening and hearing the conditions firsthand, I am relying on my own experience.
Q. Paragraph 19, page 5.
A. Yes. 19.
Q. Do you see that?
A. Yes, correct.
Q. True statement?
A. Correct, yes.
Q. Okay. So you couldn't tell me, and in fact I believe in your deposition you testified that you couldn't even explain what the legal definition of quiet enjoyment is, right?
A. I said I was not an expert in quiet enjoyment, correct.
Q. Right. In fact, it is fair to say also that you testified also that in your entire 30 years of experience you've never seen, encountered a fire pump in New York City that didn't accompany a jockey pump, correct?
A. I don't recall if I said that exactly, but yes, probably. I mean, most systems have jockey pumps.
Q. I think you testified that if it has a fire pump it has a jockey pump?
A. Most of the time, but the original documents given to us didn't state that.

Q. In your letter --

MR. OVED: Let's go to DX 15.

BY MR. OVED:

Q. Opposing counsel had made a question to point out that you had asked for in January '19, page 2, the top of page 2, we would ask for documents, these documents should include original, the designs, shop drawings, commission reports.

A. Okay.

Q. All those things. Complete operating instructions and maintenance, user manuals, things like that.

Do you see that?

A. Yes.

Q. Don't you think that data is a bit overkill in terms of what you would have really wanted to see if you had a choice? That's not asking for the kitchen sink?

A. It was asking for complete documents that I though would be readily available. Maybe not necessarily all of them were needed, but certainly some of them were definitely needed.

Q. Why didn't you ask for what you needed as opposed to make a whole blunderbuss, make a whole list?

Why didn't you say, listen, I really need this? You get a chance, you are coming in. Why didn't you just say, I need this, as opposed to asking for everything under the kitchen sink?

A. These things should be readily available. They are all

part of the process --
Q. That's not my question?
A. -- of designing a system.
Q. Right. But if you say --
A. The more information I could have, the better I can offer an opinion.
Q. Actually, I want to also direct your attention because my time is limited, that you don't anticipate that system, the system when it's not -- when it is not but not activated doesn't make any noise, correct?
A. Correct.
Q. That we can agree on?
A. For the most part. I mean, there are times when different parts of that system, you know, could make noise or when people entered the floor, there's noise. But when the system is off, the fire pump does not make any noise.
Q. Did you tell that to the purchasers when they hired you? Did you say, "Listen, you know that this system when it's on but not active, it doesn't make noise"?
A. I told them -- I asked for information to be able to provide an opinion, and I wasn't given that information. So I didn't -- no, I wouldn't make that statement.
Q. They hire you and they tell you they have a problem because the sponsor is telling them the system doesn't make noise when it's off. And you don't answer them back, "Listen, before I

take your retainer, before I write a whole big letter, I just want you to know by default these systems really don't make noise when they are not activated?"

You didn't tell them that?

A. I looked at 17.3, which talks about when the system, what's permitted and what isn't and knew there would be other issues. I wanted to see everything and evaluate the installation.

Q. I recognize that your answer --

A. Before I --

Q. I recognize that. But I asked you a question.

Did you think it would be behoove you to tell that to your clients who hired you as an architect? You wrote a report, you wrote some pages, you asked for unnecessary documents. You don't think you would at least tell them, "Listen, at the end of the day" --

A. I don't agree with that.

Q. You don't. Okay.

Do you know sitting here today what 35 decibels is like?

A. I have a rough idea.

Q. Fair to say that it's lower than a suburban ambient if I'm under that stuff? That's very quiet, 35 decibels?

A. It's not very loud. I would agree with that.

MR. OVED: Thank you.

THE COURT: Redirect?

MR. DIEDERICH: I will go back here, your Honor, so I can see it on the screen, if that's all right.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. DIEDERICH:

Q. Mr. Cicalo, can you clarify your last answer, I don't think I understood it, where you were responding to a question about 35 decibels?

THE COURT: Could you speak right into the mic, please.

MR. DIEDERICH: Sorry, your Honor.

BY MR. DIEDERICH:

Q. Mr. Cicalo, could you please clarify your last answer to that last question. I didn't understand what you said in relation to the 35-decibel question.

A. Yes. I think I said that 35 decibels is fairly -- it's noise, but it's fairly quiet. It is low-volume noise.

Q. Is it your practice to provide an opinion about mechanical equipment without seeing that equipment?

A. No.

Q. Why not?

A. I have to see the installation. You have to see how the equipment is -- it was put in and what the circumstances are around it. There's lots of factors that come into play with respect to how a system will or won't perform.

Q. Is 35 decibels the sound measurement when the fire suppression system is running?
A. No.
MR. DIEDERICH: Nothing further.
THE COURT: All right.
Thank you, Mr. Cicalo. You may be excused.
THE WITNESS: Thank you very much.
(Witness excused)
THE COURT: Defense, last witness.
MR. SPERLING: Your Honor, we have as a live witness Chip Carey, and then we have deposition excerpts.
THE COURT: Understood.
MR. SPERLING: Would you like us to play those first?
THE COURT: Why don't we take Mr. Carey first.
MR. SPERLING: Your Honor, can I inquire as to how much time the sponsor has remaining.
THE COURT: Sure. Mr. Street can answer that, not me.
THE DEPUTY CLERK: Defendant has 39 minutes, plaintiff has 8 minutes.
CHARLES CAREY,
called as a witness by the Defendant,
having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. SPERLING:
MR. SPERLING: Your Honor, may I ask for A

clarification, whether the remaining time we have includes the deposition designation time?

THE COURT: It's already been netted out, so the time you have remaining is time for live testimony.

MR. SPERLING: Thank you.

BY MR. SPERLING:

Q. Good afternoon, Mr. Carey.

A. Good afternoon.

Q. So I am going to ask you to be close to the microphone so the judge and counsel can hear you clearly.

What is your role with CDM1?

A. I am the corporate secretary and the authorized representative.

Q. Who are the members?

A. Mr. and Mrs. Moreno.

Q. What is your relationship with Arty Moreno?

A. I am an employee in the Moreno family office.

Q. What is your role at the Moreno companies?

A. No title. I just help him manage the family office.

Q. What role did you play in CDM1's potential purchase of a unit in 520 Park Avenue?

A. I helped Mr. Moreno negotiate the option agreement.

Q. When did you first learn there was an automatic fire suppression system next to PH-58?

A. Very early on in the process. The first meeting we had

with Mr. Buckworth.
Q. What do you recall being told?
A. Just that it was a huge system, and it would be on the same floor and that they would assure us that they would take care of maintaining it to our specifications.
Q. Sponsor's counsel referred to the area in which it was housed as a closet. Was it a closet?
A. It was intended to be a third unit. It was a large, it was a large room.
THE COURT: Third unit or a third bedroom?
THE WITNESS: Sorry. Third bedroom.
Q. Did you review the offering plan for information about the tank and pump system around the time you learned about it?
A. I did.
Q. What do you recall seeing in the offering plan?
A. That it was that separate bedroom unit, it was going to be very large and that sponsor had certain rights to inspect, including an easement three times per year.
Q. Did you discuss the tank and pump system with Moreno before the option agreement was signed?
A. Yes.
Q. What did you understand Mr. Moreno's reaction to be?
A. It was his primary concern.
Q. Did he tell you the reason for his concern?
A. The scale and size of it.

Q. When you were negotiating the option agreement, did anyone from CDM1 have the opportunity to see the tank and pump system?
A. No. It was not installed.
Q. Did there come a time when you raised CDM1's concerns to the sponsor?
A. Yes. Frequently.
Q. And with whom did you raise those concerns?
A. Mr. Buckworth.
Q. Was anything done to address your concerns, specifically, was anything added to the option agreement?
A. Well, yes, specifically we added language to address our concerns.
Q. I would like to show you Section 17.3 of the option agreement.
A. Okay.
Q. Sponsor's counsel testified that you wrote the original draft of this provision, is that correct?
A. Correct.
Q. And sponsor's counsel testified about her understanding of various portions of this provision. I want to ask you about what meant when you wrote it.
So it begins, "Prior to the date of closing of title to the unit."
Why did you begin with that
A. Very specifically because at the time we were negotiating

this nothing existed. This unit was not constructed, nothing existed.

Q. It then says "sponsor will have taken all reasonable measures."

Why did you include that language?

A. Again, specifically because we wanted them to have the responsibility to tell us. We were not experts. We were not mechanical engineers. We knew it would be an enormous machine, and we wanted them to have the specific responsibility to assure us.

Q. Now you wrote "all reasonable measures."

Why didn't you use more specific language?

A. Well, again, because the tank and pump system didn't exist yet, just on paper. We drafted it broadly for that reason.

Q. So you then have three requirements here: To test, to verify, and to specifically ensure purchaser.

Let's break those down.

What did you understand "test" to mean?

A. Well, test, Mr. Buckworth had told us about the system, but test meant we weren't going to just rely on Mr. Buckworth, their sales repetitive. We wanted an objective measure of testing.

Q. Why did you include the word "verify"?

A. Well, by "verify" we meant to check and double check and to provide us with proof that they have tested.

Q. Did verify also mean they had to verify the only exception would be in an emergency or routine maintenance?
A. Can you repeat that?
Q. Yes. Did they also have to verify that the only exception would be in an emergency or routine maintenance?
A. Yes.
Q. Why did you say "specifically ensure purchaser"?
A. Well, just to reiterate, this was the most important provision of the transaction. It was the only thing that we included that sponsor agreed to amend the option agreement with. And we wanted to be specific that they provided that assurance to us, very specific that it was their obligation to assure us.
Q. And you said that it does not create any sound or noise that would impair purchaser's quiet enjoyment or use of the unit. Why did you say that?
A. For a number of reasons. Again, paramount in this was that this was a very large system, a huge system, two tanks, two stories, and we just wanted in writing and not from their sales representative that this unit was going to be enjoyable within reasonable expectations of Mr. and Mrs. Moreno.
Q. Would have CDM1 have entered into the option agreement if Section 17.3 had not been included?
A. No.
Q. What do you recall about the status of PH-58 during the

time period between when you signed the option agreement?
A. It was a major construction site. You to take the temporary hoist up on the time that I visited, and, you know, the -- when I was there it was a big hole in the ground, the tank and pumping system.
Q. There's been some testimony about when the tank and pump system was actually installed. Were you ever told when it was actually installed?
A. No.
Q. As of October 23, 2018, had anyone informed CDM1 what sponsor had done to comply with Section 17.3?
A. They had not.
Q. Had anyone ever informed CDM1 1 when the tank and pump system became functional?
A. No.
Q. During December of 2018, did anyone inform CDM1 what sponsor had done to comply with Section 17.3?
A. Still no.
Q. Was CDM1 concerned?
A. Of course.
Q. Why?
A. To repeat, this was the most important part of the contract for us, and we were concerned that no one had informed us of compliance with any of this provision.
Q. We've seen today that December 27, 2018, letter from Ms.

Rabinovich e-mailed to Samantha Sheeber in which she pointed out that no one's reached out for evidence of sponsor's compliance with Section 17.3.

Did you review this e-mail before it was sent?

A. Are you going to put something on the screen or could you repeat that.

Q. Do you recall the December 27, 2018, letter that Ms. Rabinovich e-mailed to Samantha Sheeber in which she stated that no one has reached out to them to evidence sponsor's compliance with Section 17.3?

A. I do recall that, yes.

Q. Did you see that e-mail before it was sent?

A. Yes.

Q. And did it accurately reflect CDM1's concerns?

A. Yes.

Q. Did it accurately reflect your concerns?

A. Yes.

Q. On December 31, 2018, Ms. Sheeber responded that sponsor intends to enforce all of its contractual rights with respect to the sale of the above-referenced unit.

Did Ms. Rabinovich show you that response?

A. She did.

Q. Do you recall that on January 3, 2019, Ms. Rabinovich wrote back: Saying the buyer's position is no different than the sponsor, and the buyer intends to enforce all of its

contractual rights under the option agreement. To that effect, the buyer would like to know what actions sponsor's took to comply with sponsor's preclosing obligations per 17.3 of the option agreement. Please provide info ASAP."

Do you recall that?

A. Yes.

Q. Did Ms. Rabinovich show you a copy of that e-mail?

A. She did.

Q. How important was this to CDM1?

A. Utmost importance.

Q. Let's look at Joint Exhibit 8, which is in evidence.

So I would like you to look at the statement from Ms. Sheeber saying, With respect to Section 17.7" --

A. 17.3.

Q. Again it's four lines down. "With respect to Section 17.3 of the option agreement, we confirm that sponsor has consulted with its sound consultant, who has confirmed that the tank and pump system is not anticipated to create sounds or noise that would impair purchaser's quiet enjoyment and use of the unit except potentially during an emergency or routine maintenance."

Do you recall seeing that?

A. I do.

Q. What was your reaction?

A. Unfavorable.

Q. Why?

A. Because a year earlier we put in an important provision in the contract, and to receive something like this to say it is not anticipated to create sound or noise, it didn't make us comfortable.

Q. Do you recall that the very next day, on January 4, Ms. Rabinovich spooned to Ms. Sheeber's e-mail saying, "With respect to 17.3, please provide a copy of the report from the sponsor's sound consultant so that buyer can understand, verify the consultant's determination and how it was made"?

Do you recall that?

A. Yes.

Q. Did you see it at the time?

A. Yes.

Q. As of January 4 had sponsor provided CDM1 with a report reflecting its testing?

A. They had not.

Q. Did you subsequently learn that in fact no testing had been done as of that date?

A. Yes.

Q. Did you subsequently learn the consultant hadn't even been hired as of that date?

A. Yes.

Q. Did sponsor ever inform CDM1 that the tank and pump system would actually need to be tested every month?

A. No.

Q. Did sponsor ever inform CDM1 that the tank and pump system would run during renovations?
A. No.
Q. Did sponsor ever directly advise CDM1 how often the tank and pump system would actually run?
A. Not to me.

(Continued on next page)

BY MR. SPERLING:

Q. Let's look at Joint Exhibit 11, which is in evidence.

So on January 10, 2019, Ms. Sheeber sent Ms. Rabinovich a copy of a sound report, and described the document as the report generated by sponsor's sound consultant regarding the testing performed in unit PH-58. Did Ms. Rabinovich share this with you at the time?

A. She did.

Q. And what was the date of the report?

A. I believe it was one——yeah, January 10, 2019.

Q. Did you find the report useful?

A. Not at all.

Q. Why not?

A. Well, first and foremost, the report said they tested the system when it was not running.

Q. Why wasn't that useful to you?

A. Well, sir, I don't know how you can test a mechanical system when it's not running; for the noise, to be clear.

Q. Did you ever receive any other report sponsor prepared regarding sound levels within the unit?

A. No.

Q. What did CDM1 do in response to receiving this report?

A. Well, we thought it best to take on responsibility and hire our own expert.

MR. SPERLING: And let's look at DX 15, which is in

evidence.
Q. That's a January 17, 2019, communication from Ms. Rabinovich to Ms. Sheeber, which has the response to sponsor's sound consultant letter and a request from Mr. Cicalo. Did you review this before it was sent?
A. Yes.
MR. SPERLING: And let's look at DX 42. I believe that is already in evidence.
Q. This is your email to AR Moreno, correct?
A. Correct.
Q. You said, "This is a letter from our engineering firm evaluating 520's acoustical testing done on the unit. He said the testing is inadequate and in some regards improper, and much more data and information is needed in order to professionally evaluate whether they can meet the standard in our amendment 17.3. They have a lot to provide us if they intend to get us to a closing on Friday, the 25th."
So if in fact you'd received information that complied with 17.3, would CDM1 have closed?
A. Yes.
Q. Are you certain about that?
A. 100 percent.
Q. Had you discussed that with Mr. Moreno?
A. Yes, often.
Q. And was that his view as well?

A. Yes.
Q. Did sponsor ever provide any of the information in response to Mr. Cicalo's report?
A. No, nothing.
Q. Did they ever let Mr. Cicalo inspect the property?
A. I don't believe so.
MR. SPERLING: So let's look at DX 18. I believe it's not yet in evidence. So your Honor, I'd ask that this be admitted into evidence.
THE COURT: Could you identify it for the record and I'll admit it.
MR. SPERLING: Yes. This is a——I need to——can we scroll down.
So this is a February 13 email.
THE COURT: February 13, 2019, email from Mr. Carey to?
MR. SPERLING: Patricia Garza.
THE COURT: Okay. It's admitted.
MR. SPERLING: Thank you, your Honor.
(Defendant's Exhibit 18 received in evidence)
BY MR. SPERLING:
Q. So you emailed sponsor's representative Patricia Garza and asked to schedule a walk-through appointment with a party consisting of three persons. Do you see that?
A. I do.

Q. And did you expect the CDM1's consultant would be one of those persons?
A. Yes.
Q. And why did you want this?
A. Well, we were negotiating a closing here and we still, to this date, I believe, February 13——well, no, we never received——we had no information whatsoever, and so we thought it very appropriate to have a walk-through ourselves.
Q. And did sponsor allow you that?
A. They did not.
Q. Did sponsor actually say they wouldn't let you have a walk-through until you agreed in advance that you were going to close?
A. They did tell us that, yes.
MR. SPERLING: Let's look at JX 21.
So this is a February 15, 2019, letter from Samantha Sheeber to——
THE COURT: Can I just ask a question.
You hadn't received the information. You said the information was essential for you to close. So you presumably did not have any intention of closing at that point. Why did you want a walk-through?
THE WITNESS: We never didn't have an intention of closing. We just wanted the information, your Honor.
THE COURT: I know. But I thought you didn't have an

intention to close because you didn't have the information. Or maybe I misinterpreted what you said. So when you said that you would have closed if they had complied with 17.3, I took that to mean that you would not close if they didn't comply with 17.3, and they still hadn't given you any information which you thought was essential to comply with 17.3, and so why did you want a walk-through?

THE WITNESS: Well, at the time we thought that there was still a chance that they would provide this information to us, either then or at some point prior to closing.

MR. SPERLING: I think I can clear that up, your Honor.

THE WITNESS: Does that answer——

THE COURT: Yes, but don't ask leading questions. I just want to know what he thinks.

MR. SPERLING: Understood. I just wanted to clarify was part of the walk-through going to include an inspection of the pump.

THE COURT: Well, that does sound like a leading question, but thank you for helping me.

MR. SPERLING: I'm sorry. I thought he'd already said that.

THE COURT: Never mind my interruption. Go ahead.

MR. SPERLING: I apologize.

BY MR. SPERLING:

Q. Let's start over. Why did you want a walk-through?

THE COURT: I think he already answered it.

MR. SPERLING: Okay.

Q. Let's be clear. If Mr. Cicalo had had an opportunity to inspect the pump and was satisfied that it complied with 17.3, would you have proceeded to close?

A. Could you——Mr. Cicalo——could you repeat the question, yes.

Q. So Jim Cicalo is CDM1's consultant.

A. Yes.

Q. He'd asked for information and he'd asked for opportunity to inspect the pump. If he'd received the information and had an opportunity to inspect the pump and was satisfied that it complied with 17.3, would CDM1 want to close?

A. Yes.

Q. And would CDM1 still have wanted to close as of February 2019, if 17.3 was satisfied?

A. Yes.

Q. So looking at JX 21. Look at the bottom of the first page. "Given the circumstances, i.e., that purchaser is now in default of the agreement, unless purchaser is ready to commit to a confirmed closing date and to close title to the unit, purchaser's request to access unit to conduct a walk-through will not be accommodated at this time."

Did you understand that to mean that unless you agreed in advance, Mr. Cicalo could not inspect the pump?

A. Yes.
Q. And this is about a month after CDM1's counsel had sent Mr. Cicalo's request, correct?
A. About a month, approximately, yes.
Q. During that month did CDM1——did sponsor provide any information to CDM1?
A. No.
Q. And did they ever allow anyone from CDM1 to inspect the pump?
A. No.
Q. And let's be clear. My colleague has just suggested to ask you: What did you mean by walk-through?
A. An inspection of the unit.
Q. And did that include an inspection of the pump system as well?
A. Yes.

MR. SPERLING: So let's look at DX 20.

So this is a February 26, 2019, letter from Marina Rabinovich to sponsor's counsel.

THE COURT: Is this in evidence?

MR. SPERLING: It is not yet. I'd move for its admission into evidence, your Honor.

THE COURT: It's admitted.

MR. SPERLING: Thank you.

(Defendant's Exhibit 20 received in evidence)

BY MR. SPERLING:
Q. So in the fourth paragraph of the second page, CDM1's counsel referred to specific requests for information to be provided by sponsor to enable the purchaser to verify sponsor's compliance with Section 17.3. Do you see that?
A. I do, yes.
Q. And the next sentence, the letter states sponsor failed to provide any of the requested information. Do you see that?
A. I do.
Q. And did you believe that to be accurate at the time?
A. Yes.
Q. And was that a continuing matter of concern?
A. It was.
Q. Now CDM1 did not ultimately close on the unit, correct?
A. Correct.
Q. Why?
A. Because of sponsor's failure to provide——to comply with 17.3.
MR. SPERLING: Nothing further, your Honor.
THE COURT: All right. Cross?
Mr. Street, it's ten minutes; is that right?
THE DEPUTY CLERK: Eight.
THE COURT: Eight minutes.

CROSS EXAMINATION

BY MR. OVED:

Q. Prior to closing on the——prior to entering into this option agreement, it's fair to say nobody did——from your side did any due diligence on the apartment?

A. Prior to——

Q. Signing the option agreement. October 2017. Prior to doing that, did you do any due diligence on the apartment? Did you inspect anything? Did you——

A. No.

Q. And during the time of the contract from October 2017 to the first time you got a notice to close in October, had you done any due diligence on the apartment? Had you hired any experts to verify, to test, to do anything with something that was so critical to you with the sound system, the sound or the noise?

A. We did not.

Q. Ultimately, you testified that it was you that drafted the first provision of 17.3, right?

A. Correct.

Q. And then ultimately Ms. Sheeber amended it slightly, adding some provisions to it, right?

A. Correct.

Q. And in your first crack at writing what was so critical to you, why didn't you write, you're going to provide me

documents, you're going to provide me proof, you're going to provide me a noise recording? If noise was the issue, why didn't you just write that?
A. Nothing existed at the time we wrote that other than pictures.
Q. I hear you.
A. So that we wrote it very broadly.
Q. Right, right. Broadly is one thing. Asking for what you're asking in your subsequent letters after you got a closing date is something else. And my question to you is: Even if it was an empty box, which it was, and you were concerned about noise, seems logical that you would write, and you will provide me, to satisfy my concerns, a noise report that, under a specific sound metric system, that will assure me, with an "a," not with an "e." Why didn't you just write that if that's what you sought ultimately now?
A. We're not mechanical engineers. We asked you to provide us with that.
Q. No, you didn't ask that. The provision doesn't say any of that stuff. Since you wrote it, since you cared about it so much, nobody can go into your head. If it was such a concern for you, you would detail, at least in broad strokes, the noise that you'd want and how to measure that noise.
A. Sponsor would test, verify, and specifically ensure us, not vice versa.

Q. Well, didn't they when they approved the ultimate system? The system was approved?
A. They did none of what we wrote.
Q. Okay. So that's different. They didn't do what you wanted them to do, but that's not the same as them not doing what they thought was right. You wanted a bucket of goods. They did a different bucket of goods. And the two——you would agree with what I'm saying, right? And you don't agree that what they did is enough, correct?
A. No, incorrect.
Q. Incidentally, the option agreement——and your lawyer keeps saying this——the only amendment to the option agreement was what's the 17.3, in bold, right? That's not an accurate statement, is it?
A. I believe it is.
Q. It is? You ultimately, pretty much a month later, entered into an exhibit, a rider, a rider to that option agreement where you discussed a whole kitchen and the work to be done there; is that right?
A. That's right.
Q. So you not only took that simple agreement, that regular agreement, you went back to revisit it and have a whole——how many pages is that rider, three, four pages——specifics about how you want what's to be done to the apartment, a credit to get for that. You didn't take the time there to write more

specifics about what you wanted? You know how to really write all those details in that rider about the kitchen, took three pages, who to assign the contract to, you went really——but you cannot talk about, by the way, this noise is so important, I will never close unless you make me so happy. You didn't write that.
A. We were pleased with how it was already written.
Q. Now you are aware——you were here for the testimony——you are aware that the suppression, the pump system was ultimately installed and tested by the FDNY on June 26, 2018.
A. Yes.
Q. And both Mr. and Mrs. Moreno visited the apartment after that time period, in August, correct?
A. I'm not at all sure of that.
Q. Okay. And you visited the site on——in December.
A. I only visited the sales office in December.
Q. Mr. Buckworth testified that he took you up to the apartment.
A. I visited the sales office, in December.
Q. So in December——just let's frame it. You had already gotten a notice to close in October, saying, hey, let's close in November. And then your lawyer at the time had written back——and it's in evidence, we don't have enough time to go through all the emails——saying, hi, can we adjourn it, can we get the kitchen credit, can we get the kitchen credit, can we

get the kitchen credit. Never mentioned noise, what was so important. But it is important, according to you, right? Most important thing is the noise.

A. Everything in the contract was important.

Q. Right. But ultimately, when she asks to adjourn the closing, she doesn't say, you have no right to close because you didn't comply with 17.3. She doesn't say that. It's what you say now, but when she got that first notice to close, she says, can I——I'd love to close, we're going to close, but I really want to sort out this kitchen credit, so can we adjourn it? Do you recall that testimony? You've seen those exhibits, correct? Do you want to see them?

A. Well, I——I don't understand. What's the question?

Q. So the question is: She never mentioned anything what you——

THE COURT: So the documents say what they say. We've seen them a whole bunch of times. And you have only a few minutes left.

MR. OVED: Got it.

Q. Incidentally, when you say that you spoke to Mr. Buckworth or sponsor throughout the process and really concerned about this noise, there's not a single piece of email, document, paper, text, between October 2017, when you signed that document, to when you, in December, said, hey, you know what, what have you done to comply with 17.3, there's not a single

stitch of document that documents that you're not happy with the assurances with what they've done to that apartment.
A. Every time we met we spoke about a litany of issues.
Q. And despite every time you met you spoke about them, including in December——including in August, you never wrote, hey——when your lawyer goes, we're ready to close, you never said, whoa, I told you this a million times, I'm not closing because there's so much noise. Never said that.
Incidentally, you mentioned about——you mentioned about noise codes. Your lawyer was going through different sound testing and noise and reports and stuff like that. Do you have any idea what those sound recordings equate to? Like a 39——like our expert says the ambient noise in the apartment is I believe 48. Do you know what that sounds like?
A. No.
MR. OVED: So your Honor, I'd like to introduce a document. It's a treatise from Yale University.
MR. SOLOMON: Judge, we have it. It's a link, and then it's a decibel chart from Yale that shows what different decibel levels are equivalent to. For example, a jet engine is 140.
THE COURT: Okay. What do you want to mark it as?
MR. SOLOMON: As Plaintiff's 54.
THE COURT: All right.
MR. SOLOMON: And we have physical copies of it. We

can email it about. But I have a physical copy of it as well.

THE COURT: Okay. Please do that. But I will admit it.

MR. SOLOMON: Thank you, Judge.

MR. OVED: Thank you, your Honor.

(Plaintiff's Exhibit 54 received in evidence)

BY MR. OVED:

Q. And now you are aware that under the option agreement, Section 18.1 discusses what an actual walk-through of the apartment is.

A. Yes.

Q. And you also——in connection with DX 15, which spoke about you requesting a February request, is it fair to say, if you recall, they had asked you back in January, for the January 11th closing, to do a walk-through but you ignored them?

MR. SPERLING: Your Honor, I believe sponsor has exceeded their time.

THE COURT: You're right, but I will let him finish his question.

Q. Do you recall when she asked you, do you want to do a walk-through, you didn't answer back?

A. No, I don't recall.

Q. Do you recall——last line of questions. It will be a minute.

Do you recall in your deposition being asked and answered in terms of what were you suddenly not satisfied that generated that December email? Do you remember that discussion you had during your deposition?
A. I don't.

MR. SPERLING: Your Honor, I don't believe it's a proper form of examination to ask if a witness remembers deposition testimony. It can be used if there's a question and answer——

THE COURT: It's your last question, so just ask your last question and then we'll be done.

BY MR. OVED:
Q. So your answer to me is, you weren't satisfied throughout the process with the answers you got from sponsor.
A. Regarding what?
Q. The noise. That's what you testified to.
A. No. Every time we spoke with Mr. Buckworth, he assured us they were going to take care of it.
Q. And so you were satisfied with the answers you got.
A. Yes.
Q. So I'm going to point out——

THE COURT: Okay. So that was the last question.

MR. OVED: I have——just point out that's inconsistent with his deposition testimony.

THE COURT: Well, it is a party admission, so if you

want to offer that page, that's fine.

MR. OVED: Yes, your Honor.

THE COURT: Or you can read it into the record and then we're done.

MR. OVED: And did you make any——page 160, line 15:

"And did you make any notes or memos regarding these conversations that you had?"

"A. No. We were satisfied with the answers we got."

It actually goes on.

"Yes. Did there come some point when you weren't satisfied?"

"Yes."

"When was that?"

"During the period of time in December of 2018."

"What specifically happened that you learned?"

"It wasn't specifically with Mr. Buckworth. Our counsel at the time may have also had conversations. I don't know, but we weren't——but they weren't complying with Section 17.3."

THE COURT: Okay. Thank you.

MR. OVED: Thank you.

REDIRECT EXAMINATION

BY MR. SPERLING:

Q. Sponsor's counsel asked you, even though you didn't get anything of what CDM1's consultant requested, or an opportunity

to inspect the pump, you got a different bucket of goods. Did you get a different bucket of goods providing information concerning compliance with Section 17.3?

A. We——we never received anything.

Q. And you were asked if you were satisfied with the repeated reassurances you received from Mr. Buckworth that they would make sure that the sound——that tank and pump system did not create sound or noise that would interfere with the use of the unit. When you said you were satisfied, did you mean you didn't need them to comply with 17.3 or did you mean that you were satisfied that they would keep their word and comply?

MR. OVED: Objection, your Honor.

THE COURT: I'm going to allow him to answer.

Q. Do you still have the question?

THE COURT: I know it was a leading question, but you can answer it anyway.

MR. SPERLING: I'll rephrase it, your Honor.

THE COURT: Okay.

Q. When you testified that you were satisfied when Mr. Buckworth reassured you that they would make sure that the pump system did not create noise that would interfere with the use of the unit, what did you mean by saying that you were satisfied?

A. We were comfortable with his assurances about 17.3. Not that they wouldn't comply but that they would take care of it.

Just repeated to us every time we met.
Q. And did you in any way regard that as relieving them of their obligations under 17.3?
A. No, of course not. No.
MR. SPERLING: Thank you.
THE COURT: You may be excused. Thank you.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: So as I understand it, the only evidence that's left are deposition designations; is that correct? And that's going to be done by video?
MR. SPERLING: That's correct, your Honor, and they're designated and ready.
THE COURT: All right. Let's take a brief break.
If one of plaintiff's counsel needs to be excused, one may. Although one of you needs to stay.
MR. OVED: Unfortunately, he's my ride.
THE COURT: Then you will both stay.
MR. SOLOMON: Judge, if I may, in lieu of playing the deposition transcripts, since we're doing post-trial briefing anyway, and we've all designated what portions of the transcript are going in other than the ones we're fighting about, do we need to play them out loud?
THE COURT: Well, I guess it's a question. People are entitled to put on evidence however they want. If they want to

play them, they can play them.

The proposal has been made by the plaintiffs that the deposition designations just be submitted in writing so that we don't take the time now to play them. Is there any objection to doing that?

MR. SPERLING: Your Honor, we think it would be helpful for the Court to see the witnesses' testimony. They're very short.

THE COURT: Okay. I'm amenable to doing that. I think we should take, though, a quick break before doing it. So we'll take, what, we'll aim for a five-minute break, and then we'll come back and play the deposition videos.

MR. SPERLING: Thank you, Judge.

THE DEPUTY CLERK: All rise.

(Recess)

THE COURT: All right. We're back from the break. Shall we play videos? I understand there are designations and counterdesignations. I saw the objections. I'm going to allow all of it. I will take it for what it's worth. So go ahead.

MR. SPERLING: Thank you, your Honor.

So the first is Victor Confeiterio.

(Deposition played)

MR. SPERLING: Your Honor, the next witness is Henry Bethray.

THE COURT: All right. Thank you.

(Deposition played)

MR. SPERLING: CDM1 rests, your Honor.

THE COURT: Okay. You may be excused. But we need to have a discussion at some point about——let me just say this, then we won't have further discussions. I thought your proposed findings of fact and conclusions of law from both parties were extremely helpful. What I would like is amended findings of fact and conclusions of law that include citations to the trial transcript and anything new, and if there are places where there are disputes of fact that are relevant, then you can include a discussion of that in the findings of fact as to how it's resolved and why. Okay?

I'm going to ask for simultaneous submissions. So tell me when you'd like to submit them.

MR. SPERLING: Your Honor, question on that. May we also submit a short brief discussing the issues in the case?

THE COURT: How short?

MR. SPERLING: Ten pages or less.

THE COURT: Okay.

MR. SPERLING: Thank you.

THE COURT: So give me a date. Propose dates.

MR. SPERLING: Four weeks, your Honor?

THE COURT: Plaintiff?

MR. OVED: So holidays are in between.

THE COURT: Didn't we just have all the holidays?

MR. OVED: I know. This is a long——

THE COURT: I know. But we had Rosh Hashanah, we had Yom Kippur, Sukkot. What's next?

MR. OVED: Sukkot is 10 days.

I would say six weeks.

THE COURT: Okay. Five weeks. That's a compromise. All right? Five weeks. Proposed findings of fact, conclusions of law. I'll issue an order. It will probably be on the record or on the docket tomorrow. There will be page limits on both. And then I'll look forward to seeing them. Thank you so much.

MR. SOLOMON: In light of the hour, may I ask that we leave our boxes here and we pick them up tonight or tomorrow?

THE COURT: Yes. I have conferences in the courtroom tomorrow, so if you could put them to the side, that would be great.

MR. SOLOMON: Will do, Judge. Thank you, your Honor.

MR. SPERLING: Your Honor, I had raised before, if it would be helpful to the Court, we'd welcome an opportunity to have a hearing in person to answer any questions the Court has after reviewing the proposed findings.

THE COURT: I recall that. I'll let you know if I do have questions like that. I don't anticipate I will, but if I do, or particularly if there are things that I know are in the record from summary judgment that didn't make it into the

record at trial, I may ask about that. And if there's anything you want to add to the record because it is critical and for some reason it didn't get into trial, you may make an application. I'm not saying I'll grant it, but you may make an application.

MR. SPERLING: Thank you, Judge.

I also want to thank the Court and the court's personnel for holding this trial, notwithstanding the government shutdown, and we appreciate it.

THE COURT: The whole courthouse is determined essential and so we're still in operation through the middle of the month, and then we see what happens. But thank you.

Okay. We're adjourned.

ALL COUNSEL: Thank you.

o0o

INDEX OF EXAMINATION

Examination of: Page

GARY POMERANTZ

Direct By Mr. Solomon . . . . . . . . . . . . . . 8

Cross By Ms. Sokoloff . . . . . . . . . . . . . .28

Redirect By Mr. Solomon . . . . . . . . . . . . .33

LOUIS BUCKWORTH

Direct By Mr. Solomon . . . . . . . . . . . . . .36

Cross By Mr. Sperling . . . . . . . . . . . . . .50

Redirect By Mr. Solomon . . . . . . . . . . . . .56

SAMANTHA SHEEBER

Direct By Mr. Solomon . . . . . . . . . . . . . .58

Cross By Mr. Diederich . . . . . . . . . . . . . .85

KATHRYN BRANDVOLD

Direct By Mr. Solomon . . . . . . . . . . . . . .94

Cross By Mr. Diederich . . . . . . . . . . . . . 101

AVI BORTNICK

Cross By Ms. Sokoloff . . . . . . . . . . . . . 119

Redirect By Mr. Solomon . . . . . . . . . . . . 128

DONALD WINSTON

Cross By Mr. Diederich . . . . . . . . . . . . . 132

Redirect By Mr. Solomon . . . . . . . . . . . . 139

VIRGINIA DEMSKE

Cross By Ms. Sokoloff . . . . . . . . . . . . . 142

Redirect By Mr. Oved . . . . . . . . . . . . . . 152

INDEX OF EXAMINATION

ART MORENO
Direct By Mr. Sperling . . . . . . . . . . . . . 158
Cross By Mr. Oved . . . . . . . . . . . . . . . 163
Redirect By Mr. Sperling . . . . . . . . . . . . 179
Victor Clemente
Cross By Mr. Oved . . . . . . . . . . . . . . . 180
Redirect By Ms. Sokoloff . . . . . . . . . . . . 190
JAMES CICALO
Cross By Mr. Oved . . . . . . . . . . . . . . . 193
Redirect By Mr. Diederich . . . . . . . . . . . 199
CHARLES CAREY
Direct By Mr. Sperling . . . . . . . . . . . . . 200
Cross By Mr. Oved . . . . . . . . . . . . . . . 219
Redirect By Mr. Sperling . . . . . . . . . . . . 227

PLAINTIFF EXHIBITS


| Exhibit No. | Received |
|---|---|
| 46 and 47 | 149 |
| 2 | 59 |
| 6 | 67 |
| 7 | 68 |
| 8 | 75 |
| 10 | 77 |
| 12 | 78 |
| 13 | 80 |
| 14 | 27 |
| 16 | 37 |
| 17 | 64 |
| 35 | 83 |
| 38 | 49 |
| 39 | 82 |
| 40 | 59 |
| 41 | 83 |
| 52 | 35 |
| 54 | 225 |

DEFENDANT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 1 | 164 |
| 15 | 110 |
| 18 | 213 |
| 20 | 217 |
| 31 | 121 |
| 32 | 123 |
| 36 | 114 |
| 38 | 137 |
| 42 | 162 |
| 50 | 134 |
| 74 | .32 |
| 8 | 106 |

JOINT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 14 | 120 |
| 17 | 16 |