UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| 41-45 PROPERTY OWNER, LLC, Plaintiff, -against- CDM1, LLC, Defendant. | : | 22 Civ. 8634 (LGS) **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

LORNA G. SCHOFIELD, District Judge:

Following a bench trial, below are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. This case arises from a dispute over an $8.5 million deposit (the "Deposit") that Defendant CDM1, LLC ("Purchaser") made with Plaintiff 41-45 Property Owner, LLC ("Sponsor") in connection with Purchaser's refusal to close on the purchase of a two-bedroom condominium apartment (the "Unit") in a luxury high-rise building (the "Building') in Manhattan. The bench trial was limited to the issue of whether Sponsor performed under section 17.3 of the parties' contract (the "Agreement"). For the reasons below, judgment is entered for Sponsor.

## I. BACKGROUND

### A. The Claims and Nature of the Dispute

On or around October 6, 2017, Sponsor and Purchaser entered into the Agreement for the purchase and sale of the Unit. The parties agreed to a purchase price of $34 million, and Purchaser paid a so-called Premium Payment of $8.5 million, which was the Deposit. After several extensions to the scheduled closing date, Purchaser ultimately failed to close on the purchase. The Deposit is being held in escrow.

Sponsor asserts one surviving cause of action for breach of contract on account of Purchaser's failure to close. Sponsor seeks to retain the Deposit as damages pursuant to a liquidated damages provision in the Agreement, as well as attorneys' fees, disbursements and 9% pre-judgment interest.

Purchaser asserts a counterclaim for breach of contract for Sponsor's failure to perform under section 17.3 of the Agreement, which Purchaser argues excuses Purchaser's failure to perform, and for Sponsor's notice of default to Purchaser, which Purchaser argues was a repudiation of the Agreement. Purchaser seeks the return of the Deposit and accrued interest.

### B. The Summary Judgment Opinion

The parties cross-moved for summary judgment on their respective breach of contract claims. After construing the facts on each motion in favor of the non-moving party, the cross-motions were denied because genuine issues of material fact existed regarding the dispositive question of whether Sponsor performed under section 17.3 of the Agreement. *41-45 Prop. Owner, LLC v. CDM1, LLC*, No. 22 Civ. 8634, 2024 WL 4008119, at *3 (S.D.N.Y. Aug. 30, 2024) (the "Summary Judgment Opinion"). Section 17.3 states:

> Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.

The Summary Judgment Opinion finds that the evidence then in the record supported competing inferences on whether Sponsor took "all reasonable measures" to test and verify the system, whether Sponsor "specifically ensure[d]" Purchaser and whether the Pump activates only during "emergencies or routine maintenance." *Id.* at *3-4. The Summary Judgment Opinion explains that the question of what "all reasonable measures" requires of the Sponsor raises a

question for the finder of fact. *Id*. at *3. The Summary Judgment Opinion also rejects Sponsor's argument that Purchaser's December 27, 2018, email -- suggesting Sponsor's non-compliance with section 17.3 -- constituted repudiation as a matter of law, finding that the issue of whether Purchaser repudiated was a question best answered by the trier of fact. *Id*. at *5. Finally, the Summary Judgment Opinion notes that even crediting Sponsor's argument that "quiet enjoyment" requires more than the evidence Purchaser had offered, Sponsor still failed to demonstrate that it complied with its obligations under the Agreement as a matter of law, since section 17.3 refers to noise that will impair Purchaser's quiet enjoyment *and use* of the Unit. *Id*.

**C. Trial**

A one-day bench trial was held on October 6, 2025. Sponsor called the following witnesses:

- Gary Pomerantz: Sponsor's engineering consultant during construction
- Louis Buckworth: Sponsor's sales agent
- Samantha Sheeber: Sponsor's real estate attorney
- Kathryn Brandvold: CFO of Zeckendorf Development, which developed and managed the Building for Sponsor
- Avi Bortnick: Sponsor's acoustical consultant during construction
- Donald Winston: Sponsor's engineering expert
- Virginia Demske (formerly Virginia Roth): Sponsor's acoustical expert.

Purchaser called the following witnesses:

- Arturo "Art" Moreno: member of Purchaser and intended resident of the Unit
- Victor Clemente: Purchaser's acoustical expert
- James Cicalo: Purchaser's architecture and engineering expert
- Charles "Chip" Carey: Purchaser's corporate Secretary.

The parties played deposition excerpts of the following witnesses:

- Victor Confeiterio: resident manager of the Building

- Henry Bethray: current director of construction at Zeckendorf Development and former construction manager for the Building.[1]

Each of the four expert witnesses testified on direct examination via a declaration, which appended their respective expert reports. *See* Dkts. 141 (Cicalo), 142 (Clemente), 144 (Winston), 145 (Demske).

Regarding exhibits, the Court ruled that (1) documentary evidence is admissible, and all objections go to weight rather than admissibility, (2) documents must be used at trial in order to be admitted and (3) the procedures for formal admission need not be followed at trial. Regarding depositions, the Court ruled that all objections go to weight rather than admissibility and that any deposition testimony must be read or played at trial in order to be considered.

Purchaser objected to Sponsor's counter-designations of Sponsor's corporate representatives, Mr. Confeiterio and Mr. Bethray, who were not included on Sponsor's witness list, and argued that the counter-designations were outside the scope of Purchaser's designations. Purchaser's objections to the deposition testimony upon which this conclusion is based are overruled. Although Sponsor's counter-designations do not provide context or clarify the issue addressed by Purchaser's designations -- whether Sponsor, through Mr. Bethray, possessed certain information -- Purchaser was not surprised by the testimony. *Cf.* Fed. R. Civ. P. 32(a)(6). The parties exchanged deposition designations on September 29, 2025, over one month before trial. Excluding the designations only because Sponsor failed to include Mr. Bethray on its witness list

[1] Deposition of Victor Confeiterio (Dkt. 155-3) at 7:14-20, 8:13-23 and 9:25-11:1; at 12:10-13:14 and counter-designation at 13:15-22 and at 43:22-44:18 and counter-designation at 44:19-46:14. Deposition of Henry Bethray (Dkts. 155-1, 155-2) at 8:21-9:7, 12:4-16 and counter-designation at 11:10-25; at 54:6-25, 55:22-61:8 and at counter-designation at 70:13-22, 73:1-74:10.

is unwarranted because Sponsor's witness list could have been amended. Sponsor's counter-designations, which were played at trial, in fairness may be considered.

At trial, Sponsor presented 20 exhibits,[2] and Purchaser presented 15 exhibits.[3] The parties filed a joint stipulation of limited undisputed facts. The sole issue for trial was whether Plaintiff performed under section 17.3 of the Agreement.

## II. DISCUSSION

### A. Undisputed Facts

#### 1. Stipulated Facts

The following facts are drawn from the parties' joint stipulation. Sponsor is the sponsor of the Building, a new construction luxury condominium project known as the 520 Park Avenue Condominium and located at the same address in Manhattan. Purchaser is a limited liability company whose members are Arturo Moreno and Carole Moreno (together, the "Morenos"). In 2017, the Morenos visited the sales office for the Building and the Building itself, and became interested in purchasing the Unit, also known as PH-58.

The second bedroom of PH-58 is located adjacent to a double-height mechanical room (the "Tank Room"), which contains an automatic fire pump, a smaller jockey pump and a water tank (collectively, the "Pump"). In 2017, portions of the Building, including PH-58 and the Tank Room, had not yet been constructed, and the Pump had not yet been installed. The Pump was installed and functional by approximately October 2018.

---

[2] PX-2/JX-2, PX-6/JX-6, PX-7/JX-7, PX-8/JX-8, PX-10/JX-10, PX-12/JX-11, PX-13/JX-12, PX-14, PX-16/JX-13, PX-17, PX-24/JX-17, PX-35, PX-38/JX-21, PX-39, PX-40/JX-23, PX-41, PX-52, PX-53, PX-54, DX-1.

[3] DX-8, DX-15, DX-18, DX-20, DX-31/JX-15, DX-32, DX-36, DX-38/JX-18, DX-42, DX-49, DX-50, DX-74, JX-14, PX-46, PX-47.

On or about October 6, 2017, the parties executed the Agreement for Purchaser to purchase the Unit. Section 17.3 in the final version of the Agreement states in bold text:

> **Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.**

The Agreement states that the total purchase price for the Unit is $34 million, of which $8.5 million (the Deposit) was due upon signing and delivery of the Agreement. The remaining $25.5 million was due upon Sponsor's delivery of the deed. Purchaser paid the Deposit as required by the Agreement. The Deposit is being held in escrow pursuant to a rider to the Agreement.

Sponsor designated November 27, 2018, as the original closing date for the sale of PH-58. After repeated adjournments, the ultimate closing date was February 8, 2019. Purchaser did not close title to the Unit on February 8, 2019. On February 11, 2019, Sponsor's counsel served Purchaser's counsel with a notice of default. Sponsor sold PH-58 to another purchaser for $32 million.

**2. Communications Between the Parties**

The following facts are undisputed but not stipulated. On September 21, 2017, before the first closing date was scheduled, Charles Carey on behalf of Purchaser wrote to the director of sales for the Building regarding "a few areas where we'd like some more information or comfort," "mainly including the Fire Suppression Tank Room (safety, noise, the easement, etc.)." In that email, Mr. Carey said: "As you can see, and probably have discerned from your conversations with us, there is nothing we are overly concerned about but rather, just want some additional guidance and comfort about."

On September 29, 2017, Purchaser, through Mr. Carey, submitted the following proposed language to be included in the Agreement:

> [17.3] Sponsor acknowledges that the location of the Fire Suppression Water Tank and Pump in PH-58 is a unique and specific feature of the Unit. Prior to the date of First Closing, Sponsor will have, to the best of its abilities, taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not, and will not, cause any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit.

Sponsor, through its counsel, countered on October 3, 2017, and made the following four changes to Purchaser's proposed section 17.3:

1. Removed reference to the Pump being a "unique and specific feature" of the Unit;
2. Changed the deadline of "First Closing" to "Closing of Title to the Unit";
3. Removed "to the best of its abilities" such that Sponsor was obligated only to have "taken all reasonable measures" and
4. Added the caveat, "except in an emergency or routine maintenance."

Purchaser agreed to Sponsor's changes and, on October 6, 2017, signed the Agreement to purchase the Unit and tendered the Deposit.

Prior to closing, on December 27, 2018, Purchaser, through Marina Rabinovich, emailed Sponsor, stating: "I have a very unhappy client. They are unhappy with the way the sponsor has treated them throughout the process." The email identified several alleged issues, including that "[n]o one has reached out to them to evidence sponsor's compliance with Section 17.3 of the option agreement . . . . In this respect, by now, sponsor should have provided a copy or copies of all reports obtained by sponsor from acoustical engineers it employed for this purpose. Sponsor's failure to do so suggests, disturbingly, that sponsor may not have complied with Section 17.3."

On January 3, 2019, Purchaser, through Ms. Rabinovich, again emailed Sponsor, stating: "The buyer's position is no different from the sponsor's and the buyer intends to enforce all of its contractual rights under the option agreement. To that effect, the buyer would like to know what actions the sponsor took to comply with sponsor's pre-closing obligations per 17.3 of the option

agreement." The same day, Sponsor responded: "With respect to section 17.3 of the option agreement, we confirm that Sponsor has consulted with its sound consultant, who has confirmed that the Tank and Pump system is not anticipated to create sounds or noise that would impair purchaser's quiet enjoyment and use of the unit, except potentially during an emergency or routine maintenance." Purchaser argues that Sponsor's statement was false because Sponsor engaged a sound consultant only after the date of that email. During trial, Ms. Sheeber, attorney for Sponsor, testified she may have meant to write "Sponsor's consultants," referencing WSP, the engineers who designed the Pump. Regardless, Purchaser's counsel, Ms. Rabinovich, requested a copy of Sponsor's sound consultant's report on January 4, 2019. Purchaser concedes that Sponsor provided a sound report dated January 7, 2019, to Purchaser on January 10, 2019, prior to the final scheduled closing date. In the email delivering the report, Sponsor's counsel stated its position that "neither the option nor the offering plan requires this report be provided" to Purchaser and that "[t]he report is being provided solely as a courtesy in response to your request."

The report was generated by Sponsor's sound consultant, Avi Bortnick of Shen Milsom & Wilke ("SMW"), and concerned sound testing performed in the Unit. Mr. Bortnick visited the Building on January 7, 2019, and took sound measurements inside PH-58. He used a sound level meter to measure sound levels in the bedroom adjacent to the pump room and in the living room. Mr. Bortnick reported Noise Criteria ("NC") levels of 28 in the bedroom and 27 in the living room. The report explains that the American Society of Heating, Refrigerating and Air-Conditioning Engineers recommends that sound levels in living spaces not exceed an NC level of 30 due to operation of mechanical equipment and that "a 1- or even 2-point difference in NC levels . . . is generally not considered significant or audible." The report also notes that "some of the variation in sound level may be attributable to outside noise intrusion," that "rooms were bare, without

residential furnishing which tend to absorb sound and lower interior sound level" and that "there was no noise coming from the pump room adjacent to the bedroom, since the pumps in this room are activated only during emergencies."

On January 17, 2019, Purchaser emailed Sponsor a document in response to the sound consultant's report, alleging shortcomings with the report. The document was an assessment by Purchaser's architectural and engineering expert, James Cicalo. Mr. Cicalo reported that Mr. Bortnick's report was "inadequate" because it did not provide a clear description of how the Pump operated, include measurements taken while the Pump was in operation or address noise or vibrations caused by the Pump while in operation. The document includes a request to Sponsor for "Complete Plans and Specifications" for the Pump, as well as "[c]omplete operating instructions and maintenance and testing requirements," further sound testing by Sponsor and by Purchaser's own acoustical consultant and information about the apartment wall adjacent to the Pump.

On February 11, 2019, after repeated adjournments of the scheduled closing date, Sponsor served Purchaser with a notice of default, which stated that Purchaser must close title on March 15, 2019, or the Agreement would be deemed canceled without further notice and Sponsor would have the right to retain the Deposit. On February 26, 2019, Purchaser responded to the notice, stating:

> Sponsor cannot declare Purchaser in default because Sponsor failed to satisfy its pre-closing obligations in violation of the [] Agreement. Sponsor's refusal to perform -- and its election to instead invoke the cancellation remedy in Section 13.2 of the [] Agreement by sending a Default Notice -- constitutes a repudiation of the [] Agreement by Sponsor and entitles Purchaser to a return of the [Deposit] in its entirety.

Purchaser did not close title on March 15, 2019. Following the failure to close, Sponsor incurred costs of approximately $2.4 million to eliminate Purchaser's modifications to the Unit and to restore it to its original completed state. In 2022, Sponsor sold the Unit to another purchaser.

Sponsor represents that the current owner of the Unit and the owners of the other units adjacent to a fire suppression system throughout the Building have not complained about noise to date.

### 3. The Pump and Sounds

The Pump consists of (1) a water tank, (2) a large fire pump, which has 100 horsepower (the "Main Pump") and (3) a small pump, which has two horsepower (the "Jockey Pump"). This same configuration is found in several locations in the Building, as well as in other buildings in New York City. The Jockey Pump activates on an initial drop in system pressure to restore and maintain pressure in the system. If waterflow requirements exceed the capacity of the Jockey Pump, then the Main Pump activates to provide additional capacity. Thus, while the system is always on, it pumps water only under certain circumstances. Mr. Pomerantz, the designer of the Pump, and Mr. Winston, Sponsor's engineering expert, testified about when the Main Pump and Jockey Pump activate:

1. In the event of a fire, the Main Pump activates to pump water to the fire hose risers and the sprinkler heads. The Jockey Pump is not involved.

2. For maintenance and testing, the Main Pump is churned (run without flowing water) once every month for ten minutes and is run with flowing water once every year for ten minutes, resulting in a total annual run time of 130 minutes, which can be scheduled in advance at the convenience of the owner.

3. If a pipe in the fire suppression system leaks, the Jockey Pump turns on. If the leak is catastrophic, the Main Pump activates.

4. If a branch of the fire suppression sprinkler system is shut off to relocate a sprinkler, for example in connection with remodeling in the Building, the Jockey Pump activates briefly once the water is turned back on to restore pressure and refill the system. This final type of activation had occurred only four to five times anywhere in the Building as of March 2023.

When Purchaser became interested in the Building and the Unit, both were still undergoing significant construction, but Purchaser was aware of the Pump before agreeing to purchase the

Unit. Mr. Buckworth, Sponsor's selling agent, advised Purchaser prior to the parties' Agreement that the Pump is:

> a passive system and that in essence, it doesn't come on at all. It's off, essentially. There's no noise unless there is routine maintenance or -- or an emergency of some kind. You know, it's kind of like a fire alarm in that -- in that regard, right? It's off until it's on.

In designing the Pump, WSP reviewed code requirements and performed necessary calculations and measurements. WSP reviewed shop drawings for the installation of the Pump and then verified through site inspections and liaising with New York City agencies that the Pump was functioning as designed and as required by Code. The Pump was tested by the New York City Fire Department, was verified as functioning properly and received approval and certification for occupancy in 2018.

Following the failure to close, both Sponsor and Purchaser engaged acoustical consultants to take sound measurements in the Unit (1) when no pumps are activated, (2) when the Jockey Pump is activated and (3) when the Main Pump is activated. The parties agree that the Pump does not make noise when it is not activated. The tank that holds water does not make noise. The Main Pump and the Jockey Pump make noise only when pumping.

**a. Sponsor's Acoustical Expert: Ms. Roth**

On May 2, 2023, Sponsor's sound expert, Virginia Demske (formerly Virginia Roth), measured the sound levels in Bedroom 2 of the Unit, the bedroom closest to the Pump. She reported both the Lmax (the highest decibel level reached during a particular period) and the Leq (the average decibel level over a particular period).

In Bedroom 2, Ms. Roth measured an Lmax of 48 dBA for ambient noise and 49 dBA when the Jockey Pump was on. She measured Leq levels of 30 dBA and 31 dBA for the same

scenarios. Ms. Roth's sound test showed that, when the sound generated by the Jockey Pump is compared to ambient sound in the Unit, the difference is a 1 dBA increase.

For the Main Pump, Ms. Roth measured an Leq of 47 dBA and an Lmax of 51 dBA, which is quieter than a household refrigerator (55 dBA) and normal conversation (60-70 dBA).

**b. Purchaser's Acoustical Expert: Mr. Clemente**

Purchaser's acoustical expert, Victor Clemente, also measured sound levels in Bedroom 2, as well as in the Tank Room, and reached different conclusions. In Bedroom 2, the levels Mr. Clemente observed for ambient sound when the Jockey Pump was inactive compared to when it was active were 31 dBA and 37 dBA, respectively -- both sound levels between a whisper (25 dBA) and a suburban area at night (40 dBA). Mr. Clemente measured a greater sound level in Bedroom 2 when the Main Pump was activated -- 60 dBA, equivalent to a business office (60-65 dBA) and normal conversation (60-70 dBA).

**B. Threshold Question of Law: The Meaning of Section 17.3**

A threshold question for determining whether Sponsor performed under section 17.3 is the section's meaning. Section 17.3 is unambiguous except for the meaning of the phrase "specifically ensure Purchaser" in the phrase "Sponsor will have taken all reasonable measures to . . . specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise . . . except . . . ."

"The resolution of an ambiguous provision, for which extrinsic evidence may be used, is for the trier of fact." *Rhoda v. Rhoda*, 110 N.Y.S.3d 35, 37 (2d Dep't 2019). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties'

intent, or when specific language is susceptible of two reasonable interpretations."[4] *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014).

Although "ensure" and "assure" have similar meanings, i.e., "to make sure, certain, or safe" and "to make sure or certain," the difference is the object of each verb. *See Ensure*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/ensure [https://perma.cc/DD76-MMJ3] (last visited Sep. 28, 2026); *Assure*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/assure [https://perma.cc/M62Z-NZ9V] (last visited Sep. 28, 2026). In English usage, the term "ensure" is used with a thing, such as to ensure "that the mechanical functioning of said Tank and Pump system . . . ." By contrast, "assure" is used with a person (or entity), such as to assure "Purchaser that the mechanical functioning of said Tank and Pump system . . . ." But in section 17.3, "ensure" is used ungrammatically with a person/entity, "Purchaser," as its object. This usage is ambiguous, as it has at least three reasonable interpretations: (1) "specifically ensure that the mechanical functioning," ignoring the word "Purchaser," (2) "specifically assure Purchaser that the mechanical functioning," replacing the word "ensure" with "assure" and (3) both of the above.

When interpreting a contract, under New York Law, "[c]ourts must give meaning to every word whenever possible." *MAK Tech. Holdings Inc. v. Anyvision Interactive Techs. Ltd.*, 249 N.E.3d 1194, 1198 (N.Y. 2024). "We may transpose, reject, or supply words to make the meaning of the contract more clear only in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part." *Id.* "We must also

[4] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

be mindful to read a contract as a whole to ensure that undue emphasis is not placed upon the particular words and phrases." *Id.* at 1199.

To avoid violating these rules of construction, the phrase "specifically ensure Purchaser" is interpreted to mean both (1) ensuring that the mechanical functioning of the Pump would not create noise that would impair Purchaser's quiet enjoyment and use of the Unit and (2) assuring Purchaser of the same. The words "specifically" and "Purchaser" suggest the second meaning -- namely, that section 17.3 required Sponsor to assure Purchaser. However, the word "ensure" suggests the first interpretation -- namely, that Sponsor needed to ensure that the Pump operated properly.

There is no subjective element to section 17.3. Sponsor's attorney, Ms. Sheeber, testified that section 17.3 deliberately utilized "ensure" with an "e" rather than "assure" with an "a" because she would "never, in drafting anything, add language that is subjective to a purchaser, or to assure anybody," as Sponsor would "never close a deal if [it] had to make every single purchaser subjectively comfortable." Ms. Sheeber testified that to comply with section 17.3, Sponsor "just had to put in a functioning system that would not make noise other than in [limited] instances" and that Sponsor "absolutely [did] not" have to provide the buyer with anything.

Mr. Moreno testified at trial that he interpreted the same language to mean that "[t]he pump system does not create any sound or noise, period." Mr. Carey, Purchaser's agent, explained that his understanding of section 17.3 included a right to receive an "objective measure of testing" and "proof that [Sponsor] ha[d] tested." Mr. Carey further testified that section 17.3 was "the most important provision of the transaction. . . . [W]e just wanted in writing and not from their sales representative that this unit was going to be enjoyable within reasonable expectations of Mr. and Mrs. Moreno."

Despite Mr. Moreno's and Mr. Carey's testimony on behalf of Purchaser, Ms. Sheeber's testimony on behalf of Sponsor is credited in that section 17.3 did not require Purchaser's subjective satisfaction with the functioning of the Pump or the form of assurance. Purchaser's interpretation would convert section 17.3 into a "satisfaction clause," allowing Purchaser to terminate the Agreement if Purchaser was subjectively unsatisfied. The preponderance of the evidence shows that such a reading was not the parties' intent in drafting section 17.3. The parties did not agree to a subjective standard that in effect would give Purchaser veto power over the transaction. They agreed to a reasonableness standard.

**C. Findings of Disputed Facts**

Section 17.3 states:

> Prior to the date of Closing of Title to the Unit, Sponsor will have taken all reasonable measures to test, verify and specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance.

Sponsor complied with its duties to (1) take all reasonable measures to ensure that the Pump does not create any sound that would impair Purchaser's quiet enjoyment and use of the Unit except as specified and (2) provide Purchaser assurance of the same.

**1. "All Reasonable Measures"**

Whether Sponsor's performance was tantamount to "all reasonable measures" is a factual inquiry. *See Zev v. Merman*, 533 N.E.2d 669, 670 (N.Y. 1988) ("The determination of reasonableness must by its very nature be determined on a case-by-case basis" and "depends upon the facts and circumstances of the particular case."); *Wenning v. On-Site Manager, Inc.*, No. 14 Civ. 9693, 2016 WL 3538379, at *18 (S.D.N.Y. June 22, 2016) (New York law) (noting "the general presumption that reasonableness is a jury question"). "In determining whether conduct is

objectively reasonable, industry norms may be appropriately considered." *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 535 (1st Dep't 1998); *accord IGT v. High 5 Games, LLC*, 380 F. Supp. 3d 390, 394-95 (S.D.N.Y. 2019) (explaining that in determining what is "reasonable" in a contract, "[t]he Court may consider industry norms to make this objective determination").

Sponsor took all reasonable measures to test, verify and ensure that the pump operated as intended. Sponsor hired qualified engineers at WSP to do the analysis necessary to ensure that the Pump was designed in accordance with New York law and the Building's offering plan. The New York City Department of Buildings approved WSP's design specifications. WSP then oversaw construction of the Pump to ensure that it was constructed pursuant to WSP's designs. The New York City Fire Department tested the Pump after it was installed to verify that it was functioning as a fire suppression system should. Although Purchaser argues that these tests and approvals concern only safety and are irrelevant to noise, that argument is unconvincing given the evidence that systems like the Pump, which are common in New York City, do not generate unreasonable noise when functioning properly.

Sponsor also took steps aimed specifically at sound attenuation. Specifically, Sponsor constructed the wall separating the Unit from the Pump using thick concrete masonry units; installed an additional wall to separate the concrete encapsulating the Pump from the Unit; filled that wall with sound-attenuating insulation; de-coupled that wall from the masonry wall to create an air gap that mitigates sound transmission and utilized a "high sound-rated," "full-thickness" door for access to the Tank Room.

Purchaser argues that Sponsor's sound attenuation techniques fell short in certain regards. Those arguments are unpersuasive. The Pump's configuration (i.e., a Jockey Pump and a Main Pump) is common across New York City buildings, and Sponsor's design and construction

methods were reasonable for New York City buildings. For example, Purchaser's expert reported that noise caused by vibrations in the rigid connections between equipment in the Tank Room could have been mitigated with the use of vibration isolators, such as spring mounts and hangers. But Sponsor's expert credibly testified that vibration isolation is rarely if ever provided for fire suppression systems due to the requirements of the New York City Building Code.

**2. "Purchaser's Quiet Enjoyment and Use"**

The Pump did "not create any sound or noise that [would] impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance."

While the covenant of quiet enjoyment is more commonly raised in the context of lease agreements, the covenant is sometimes expressly included, as here, in contracts for the sale of residential property. *See Badding v. Inglis*, 977 N.Y.S.2d 829, 831 (4th Dep't 2013). The covenant of quiet enjoyment is "a promise by the lessor that it will not interfere with the rights granted" under a lease. *Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*, 26 F. Supp. 2d 698, 706 (S.D.N.Y. 1998) (citing *Dolman v. U.S. Tr. Co.*, 157 N.Y.S.2d 537 (1956); *Baitzel v. Rhinelander*, 167 N.Y.S. 343 (1st Dep't 1917)); *accord City of New York v. Mabie*, 13 N.Y. 151, 151 (1855) ("[A] covenant for quiet enjoyment, whether express or implied, is broken by an unlawful interference by the lessor, under color of right, with the enjoyment by the lessee of the premises or incorporeal right demised."). The covenant "can be broken only by an eviction, actual or constructive." *In re O'Donnell*, 147 N.E. 541, 542 (N.Y. 1925); *accord Schwartz v. Hotel Carlyle Owners Corp.*, 20 N.Y.S.3d 341, 342-43 (1st Dep't 2015). In the case of a constructive eviction, "[e]ven if the tenant remain[s] in possession of the premises, the landlord may still be found to have breached the covenant of quiet enjoyment if the tenant can show that the landlord's conduct substantially and materially deprived the tenant of the beneficial use and enjoyment of the

premises." *721 Borrower LLC v. Premier Digit. Equip. Servs. Inc.*, 250 N.Y.S.3d 513, 516 (1st Dep't 2026). "Beneficial use" describes a tenant or property owner's ability "to use the area for the purpose intended." *Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 610 (S.D.N.Y. 2018). To establish a constructive eviction, there must be a deprivation -- not mere diminution -- of beneficial use. 74 New York Jurisprudence § 247 (2d ed. 2026); *see Barash v. Pa. Terminal Real Estate Corp.*, 256 N.E.2d 707, 710 (N.Y. 1970) (requiring of constructive eviction that a tenant be "substantially and materially deprive[d] . . . of the beneficial use and enjoyment of the premises"); *accord Port Morris Distillery Inc. v. Sengdara LLC*, 221 N.Y.S.3d 546, 547 (1st Dep't 2024) (applying *Barash* standard).

The sound of the Pump was not enough to deprive an occupant of beneficial use of the Unit. As discussed above, the evidence showed that the Pump did not make any sound when it was not in operation; that the Jockey Pump produced insignificant sound even when activated -- more than a whisper but less than a suburban area at night; and that the Main Pump made a louder sound when activated -- at most, roughly the volume of normal conversation. The evidence also showed that the Main Pump was activated only (1) during a fire, (2) during routine maintenance for ten minutes once a month plus ten minutes per year and (3) on rare occasions when a branch of the fire suppression system was turned off and then turned back on, such as when a sprinkler was relocated, which had occurred only four times anywhere in the Building.

This amount of sound, measured both by volume and incidence, was not enough to "substantially impair[] the value of the property and the use or enjoyment thereof," *Badding,* 977 N.Y.S.2d at 831, even without the contractual carve-out in section 17.3 for emergencies and routine maintenance. Under New York law, noise is not "substantial or unreasonable" if it is "premised upon noises that are incidental to normal occupancy." *Brown v. Blennerhasset Corp.*,

979 N.Y.S.2d 27, 28-29 (1st Dep't 2014). "Mere temporary inconveniences and annoyances . . . do not ordinarily constitute a breach of the covenant of quiet enjoyment." *Goldner v. Doknovitch*, 388 N.Y.S.2d 504, 507 (1st Dep't 1976); *accord* 74 New York Jurisprudence § 247 (2d ed. 2026) ("[T]he covenant is not broken simply because of annoyances or temporary inconveniences to the tenant."); *see also Spinale v. 10 W. 66th St. Corp.*, 648 N.Y.S.2d 105, 106 (1st Dep't 1996) (affirming a dismissal of a claim "predicated on a breach of the proprietary lease prohibition of unreasonable noise" because the "appellant made no competent showing of continuous noise of a type or volume that a reasonable person, under the circumstances, would not tolerate" and "[t]here was no evidentiary proof of unusual noises other than those normally emanating from an apartment, such as persons walking"). The temporary noise created by the Pump when activated would not prevent Purchaser from using the Unit for its intended purpose as a residence.

Purchaser argues that the Pump is activated more often than the exceptions permitted in section 17.3 for emergencies or routine maintenance. The record evidence of these occasions outside the exceptions -- when the water supply in a branch of the fire-suppression system is turned off and then on again -- shows that they are exceedingly rare and would not interfere with a reasonable person's quiet enjoyment and use of the Unit. To the extent Purchaser distinguishes between "maintenance" and "testing," that is a distinction without difference. Routine testing of the Pump to ensure it functions properly and will respond appropriately in an emergency (testing that Sponsor asserts is required under New York law) is a part of maintenance. *Cf. Walton v. Comfort Sys. USA (Syracuse), Inc.*, 155 F.4th 144, 151 (2d Cir. 2025) (concluding, in the context of New York's prevailing wage statute, that testing constitutes maintenance of fire alarm systems). In any event, such testing would not interfere with Purchaser's quiet enjoyment and use

considering the limited noise the Pump generates and the duration of testing, which is ten minutes per month, plus another ten minutes per year.

Purchaser argues that noise levels from the Pump violate section 17.3 because they violate New York City Noise Code § 24-227, which limits the volume of circulation devices in property dwelling units to 42 decibels, and New York City Building Code § 1207.2.2, which imposes restrictions on airborne sound caused by machine and equipment rooms. That argument is unpersuasive. Even crediting the sound measurements of Purchaser's expert, which differ from those recorded by Sponsor's expert, the infrequent noise caused by the Pump when in operation during emergencies or routine maintenance is not unreasonable, nor does it rise to the level of noise "detrimental to life, health and enjoyment of . . . property" with which the City's noise control regulations are concerned. *See* New York City Noise Code § 24-202. These events -- emergencies and maintenance -- in any event are expressly excluded from section 17.3 of the Agreement.

**3. "Ensured Purchaser"**

Sponsor fulfilled its obligation to take "all reasonable measures to . . . specifically ensure Purchaser that the mechanical functioning of said Tank and Pump system does not create any sound or noise that will impair Purchaser's quiet enjoyment" except as specified. Sponsor complied with those requirements by, for example, hiring WSP to conduct measurements and testing, obtaining approvals from New York City agencies as to the Pump's functioning and communicating with Purchaser and providing it with the SMW report, which included sound level measurements from the bedroom and living room. That Purchaser successfully renegotiated the language of section 17.3 to replace "to the best of its abilities" with "all reasonable measures" reinforces this conclusion.

As discussed above, there is no subjective element to section 17.3. Section 17.3 did not require Purchaser's subjective satisfaction with the functioning of the Pump or the form of assurance. Here, the primary object of the all-reasonable-measures obligation was to limit the sound produced by the Pump to a specified level and communicate that fact to the Buyer. Those goals were satisfied. That additional steps could have been taken to achieve those goals crosses the line between "all reasonable measures" and Purchaser's subjective satisfaction and does not relieve the buyer of its obligations. For example, if a real estate sales contract imposed on the buyer an obligation to use all reasonable efforts to obtain a mortgage and assure the seller of the same, and if the buyer then obtained a mortgage, it would make no sense to allow the seller to walk away from the sale on the basis that the buyer could have taken additional steps to obtain the mortgage and could have provided the seller with more information about its efforts. Based on a preponderance of the evidence, including the lack of material dispute about the amount and frequency of noise generated by the Pump, Sponsor acted reasonably and as required under section 17.3.

**D. Conclusions of Law**

Judgment is granted to Sponsor on its breach of contract claim. Under New York law, a breach of contract requires that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022). Sponsor argues that Purchaser breached the Agreement by failing to close on the purchase of the Unit after Sponsor adequately performed under section 17.3 of the Agreement. Purchaser argues that its performance is excused because Sponsor materially breached the Agreement by failing to perform under section 17.3. The parties agree that the Agreement is a valid contract governed by New York law. The

sole issue, which is dispositive for this case, is whether Sponsor performed under section 17.3. Judgment is granted for Sponsor because it performed its obligations under section 17.3.

**1. Performance by Sponsor**

Based on the foregoing findings of fact, Sponsor performed its contractual duty to "take[] all reasonable measures to test, verify and specifically ensure Purchaser" prior to the closing date that the Pump would not "create any sound or noise that [would] impair Purchaser's quiet enjoyment and use of the Unit, except in an emergency or routine maintenance."

**2. Breach by Purchaser**

Purchaser breached the Agreement by failing to close. Under the Agreement, Purchaser's "failure to close title to the Unit on the scheduled Closing Date" constituted a default, and because the default was not cured within 30 days of notice, Sponsor had "the right to retain, as and for liquidated damages . . . the entire [Deposit] and any interest earned on the [Deposit]." The parties do not dispute that the last scheduled Closing Date was February 8, 2019, and that Purchaser failed to close on that date or later. Although the Agreement contains exceptions that would excuse Purchaser's obligation to close, those exceptions do not apply here. Purchaser's only argument is the now-rejected argument that Sponsor breached section 17.3. Purchaser breached the Agreement.

**3. Damages**

Purchaser's breach resulted in damages to Sponsor. Sponsor incurred $2.4 million in costs to restore the Unit to its original completed state. Further, Sponsor sold the Unit to another purchaser for $32 million instead of the $34 million price agreed upon with Purchaser. That sale occurred in 2022, three years after Purchaser failed to close. *See NML Cap. v. Republic of Argentina*, 952 N.E.2d 482, 494 (N.Y. 2011) (explaining that the loss of the time value of money is

a separate injury from the loss of the principal itself); *IHG Harlem I LLC v. 406 Manhattan LLC*, 203 N.Y.S.3d 543, 548 (1st Dep't 2024) (explaining the "economic hardship associated with delayed judgment, due to the time-value of money"). Sponsor has proved all elements of a breach of contract claim. The remaining issue is the measure of damages to which Sponsor is entitled.

**a. Liquidated Damages**

Sponsor is entitled to liquidated damages equal to the amount of the Deposit of $8.5 million plus interest. Section 13.2 of the Agreement states that if a default is not cured, "Sponsor shall have the right to retain, as and for liquidated damages . . . the entire [Deposit] and any interest earned on the [Deposit]." "[W]here the court has sustained a liquidated damages clause the measure of damages for a breach will be the sum in the clause, no more, no less." *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005); *accord Wells Fargo Tr. Co., N.A. v. Synergy Grp. Corp.*, 465 F. Supp. 3d 355, 364 (S.D.N.Y. 2020), *aff'd*, 848 F. App'x 467 (2d Cir. 2021). Purchaser does not argue that the liquidated damages provision is unenforceable. *See PTI IMP, LLC v. Software Sculptures Consulting, Inc.*, 258 N.Y.S.3d 708, 711-12 (2d Dep't 2026) ("Whether [a] . . . fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances. . . . The burden is on the party seeking to avoid liquidated damages to show that the stated liquidated damages are, in fact, a penalty."). Sponsor is entitled to damages of $8.5 million.

**b. Interest**

Sponsor is entitled to interest equal to the amount actually earned on the Deposit in escrow and not the 9% statutory rate of interest under CPLR § 5004. "Where the parties to a contract have fashioned an exclusive remedy of a liquidated sum that includes bank interest, or another form of compensation for the time-value of money, an award of statutory interest would result in a windfall

to the nonbreaching party." *IHG Harlem I LLC*, 203 N.Y.S.3d at 548. Sponsor is entitled to pre- and post-judgment interest actually earned on the Deposit until the date of payment to Sponsor.

**c. Attorneys' Fees and Disbursements**

In accordance with the parties' contract, Sponsor's request for attorneys' fees and disbursements is granted. Section 30 of the Agreement states: "Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder." A contractual provision for attorneys' fees is enforceable. *See Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 548 N.E.2d 903, 904-05 (N.Y. 1989) (concluding that contractual provisions for attorneys' fees are enforceable when the language of the contract is "unmistakably clear"); *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993) ("[P]arties may agree by contract to permit recovery of attorneys' fees, and a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law."); *accord PWV Consultants LLC v. Chebil Realty LLC*, No. 20 Civ. 9030, 2023 WL 5529919, at *5 (S.D.N.Y. Aug. 28, 2023). Section 30 of the Agreement is unmistakably clear. Purchaser must pay Sponsor's reasonable attorneys' fees. *See CARCO GRP., Inc. v. Maconachy*, 718 F.3d 72, 86 (2d Cir. 2013) ("[T]he touchstone for an award of attorneys' fees pursuant to a contract is reasonableness.").

Sponsor shall file an application for reimbursement of its reasonable attorneys' fees and disbursements as set forth below. "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *PWV Consultants LLC*, 2023 WL 5529919, at *5. A "presumptively reasonable fee" is "the product of a reasonable hourly

rate and the reasonable number of hours required by the case." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *accord PWV Consultants LLC*, 2023 WL 5529919, at *5.

## III. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that judgment is entered for Plaintiff. Plaintiff is awarded damages in the amount of the Deposit ($8,500,000), plus interest actually earned on the Deposit until the date of payment to Sponsor, plus reasonable attorneys' fees and disbursements.

To avoid additional costs for potential motion practice, the parties shall exchange documentation and confer in good faith to resolve the amount of fees and disbursements due. The parties shall file a joint letter by **October 12, 2026**, regarding the status of those discussions. If the parties are unable to agree on the amount of fees and disbursements due, the joint letter shall propose a briefing schedule for Plaintiff's fee application.

As there is no just reason for delay,[5] the Clerk of Court is respectfully requested to enter final judgment in favor of Plaintiff and close the case.

Dated: September 28, 2026
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

[5] *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs and Participating Emps.*, 571 U.S. 177, 179 (2014) ("[A] decision on the merits is a 'final decision' under § 1291 even if the award of amount of attorney's fees for the litigation remains to be determined.").